1   KAMALA D. HARRIS
    Attorney General of California
2   DAMON G. MCCLAIN
    Supervising Deputy Attorney General
3   JENNIFER J. NYGAARD
    Deputy Attorney General
4   State Bar No. 229494
     1515 Clay Street, 20th Floor
5    P.O. Box 70550
     Oakland, CA  94612-0550
6    Telephone:  (510) 622-4460
     Fax:  (510) 622-2270
7    E-mail:  Jennifer.Nygaard@doj.ca.gov
    *Attorneys for Defendants Burris, Gates,*
8   *Gongora, Healy, Pimentel, and Prelip*

9

10                 IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14   **JESSE PEREZ,**                    C 13-5359 VC (PR)

15                        Plaintiff,     **DEFENDANTS' NOTICE OF MOTION
                                         AND MOTION FOR SUMMARY**
16          v.                           **JUDGMENT; MEMORANDUM OF
                                         POINTS AND AUTHORITIES**
17   **J. PRELIP, et al,**
                                         Date:          May 21, 2015
18                        Defendants.    Time:          10:00 a.m.
                                         Courtroom:     4
19                                       Judge:         The Honorable Vince Chhabria
                                         Trial Date:    July 27, 2015
20                                       Action Filed:  November 19, 2013

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ............................................................................. 1

STATEMENT OF ISSUES ................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 8

I.    The Prison Litigation Reform Act Requires Prisoners to Exhaust Administrative Remedies Before Filing Suit. ....................................... 8

    A.   A summary-judgment motion is the appropriate device for determining whether administrative remedies have been exhausted. ......... 9

    B.   Perez failed to exhaust administrative remedies for some of his claims. ........................................................................................ 10

        1.   Perez did not exhaust his claims about the RVR and against Prelip. ......................................................................... 10

        2.   Perez did not exhaust his claim regarding comments.................. 12

        3.   Perez did not exhaust his claim that improper validation procedures were used.............................................................. 12

        4.   Perez did not exhaust the claims based on hunger strikes and articles. ........................................................................... 13

II.   Defendants Did Not Retaliate Against Perez. ....................................... 14

    A.   All the actions are not "adverse" and Perez has not linked each defendant. ...................................................................................... 14

        1.   Burris and Prelip did not participate in the cell search. ................ 15

        2.   Proper validation procedures were used. ..................................... 15

        3.   Only Gates was involved with issuing the Rules Violation Report. ................................................................................ 15

        4.   Healy and Prelip did not confiscate Perez's property................... 16

        5.   The alleged comments are not "adverse actions.".......................... 16

    B.   Causation ("because of") and legitimate penological goal...................... 17

        1.   There were legitimate penological reasons for the search and validation. .................................................................... 18

        2.   Gates had a legitimate penological reason for issuing the RVR. ................................................................................ 19

        3.   The 2013 hunger strike occurred after the alleged retaliatory conduct. .......................................................................... 20

    C.   Participation in a hunger strike is not protected conduct. ...................... 20

    D.   Perez did not allege a chilling of his exercise of First Amendment rights........................................................................................... 21

III.  There Was No Conspiracy. ................................................................. 22

i

**TABLE OF CONTENTS**
(continued)

Page

IV.   Defendants are Entitled to Qualified Immunity. ................................................. 22

    A.   There has been no constitutional violation. ............................................. 24

    B.   A hunger strike was not clearly established "protected conduct." ........... 24

    C.   Burris and Prelip followed superiors' orders, which did not clearly violate Perez's constitutional rights. ....................................................... 24

    D.   Gates, Gongora, Healy, and Pimentel's participation in the search was not clearly unconstitutional. ................................................................ 24

    E.   The taking of Perez's property was reasonable under the circumstances. ........................................................................................... 25

    F.   It was not clearly established that making comments was unconstitutional. ....................................................................................... 25

    G.   Defendant Gates is entitled to qualified immunity for the RVR. ............. 25

CONCLUSION ........................................................................................................................ 25

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Albino v. Baca*
   747 F.3d 1162 (9th Cir. 2014) (en banc)..................................................... 9

*Alnutt v. Cleary*
   913 F.Supp. 160 (W.D.N.Y. 1996)..................................................17, 25

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)................................................................................ 8

*Barnett v. Centoni*
   31 F.3d 813 (9th Cir. 1994)..................................................................... 20

*Booth v. Churner*
   532 U.S. 731 (2001)................................................................................ 9

*Brodheim v. Cry*
   584 F.3d 1262 (9th Cir. 2009).............................................................17, 21

*Bruce v. Ylst*
   351 F.3d 1283 (9th Cir. 2003).............................................................14, 19

*Cal. Att'ys for Criminal Justice v. Butts*
   195 F.3d 1039 (9th Cir. 1999)................................................................. 24

*Cano v. Taylor*
   739 F.3d 1214 (9th Cir. 2014)................................................................. 9

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)................................................................................ 8

*Community House, Inc. v. Bieter*
   623 F.3d 945 (9th Cir. 2010.).................................................................. 23

*Dietrich v. John Ascuaga's Nugget*
   548 F.3d 892 (9th Cir. 2008)................................................................... 18

*Estate of Ford v. Ramirez Palmer*
   301 F.3d 1043 (9th Cir. 2002)................................................................. 23

*Franklin v. Fox*
   312 F.3d 423 (9th Cir. 2001)................................................................... 22

*Griffin v. Arpaio*
   557 F.3d 1117 (9th Cir. 2009)................................................................. 9

iii

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

4

*Harlow v. Fitzgerald*
   457 U.S. 800 (1982) ............................................................................................ 22

5

*Hart v. Parks*
   450 F.3d 1059 (9th Cir. 2006) ........................................................................... 22

6

7

*Hartman v. Moore*
   547 U.S. 250 (2006) ............................................................................................ 18

8

*Hines v. Gomez*
   108 F.3d 265 (9th Cir. 1997) ............................................................................. 14

9

10

*Huskey v. City of San Jose*
   204 F.3d 893 (9th Cir. 2000) .........................................................................14, 17

11

12

*Jones v. Bock*
   549 U.S. 199 (2007) .............................................................................................. 9

13

*Leer v. Murphy*
   844 F.2d 628 (9th Cir. 1988) ............................................................................. 15

14

15

*Mt. Healthy City Bd. of Educ. v. Doyle*
   429 U.S. 274 (1977) ............................................................................................ 20

16

*Pearson v. Callahan*
   555 U.S. 223 (2009) ............................................................................................ 23

17

18

*Pinard v. Clatskanie School Dist.*
   467 F.3d 755 (9th Cir. 2006) ............................................................................. 15

19

*Pratt v. Rowland*
   65 F.3d 802 (9th Cir. 1995) ...........................................................................14, 20

20

21

*Rhodes v. Robinson*
   408 F.3d 559 (9th Cir. 2005) .........................................................................14, 21

22

23

*Richardson v. McKnight*
   521 U.S. 399 (1997) ............................................................................................ 23

24

25

*Rosenbaum v. Washoe County*
   654 F.3d 1001 (9th Cir. 2011) ........................................................................... 23

26

*Sapp v. Kimbrell*
   623 F.3d 813 (9th Cir. 2010) .......................................................................11, 12, 13

27

28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Saucier v. Katz*
    533 U.S. 194 (2001).............................................................................. 23

*Sorrels v. Mckee*
    290 F.3d 965 (9th Cir. 2002)............................................................... 23

*Texas v. Johnson*
    491 U.S. 397 (1989)............................................................................ 20

*Vaden v. Summerhill*
    449 F.3d 1047 (9th Cir. 2006).............................................................. 9

*Wood v. Yordy*
    753 F.3d 899 (9th Cir. 2014)............................................................... 14

*Woodford v. Ngo*
    548 U.S. 81 (2006)............................................................................... 9

**STATUTES**

42 United States Code
    § 1997e(a)............................................................................................ 8

**CONSTITUTIONAL PROVISIONS**

United States Constitituion, First Amendment ............................................... *passim*

**COURT RULES**

Federal Rule of Civil Procedure 56 ........................................................... 8

v

Defs.' Notice Mot., Mot. Summ. J. & Memo P. & A. (C 13-5359 VC (PR))

1

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

2

<u>Page</u>

3

**REGULATIONS**

4

California Code of Regulations, Title 15

5
§ 3084.1(a) .................................................................................................................. 6

§ 3084.1(b) ................................................................................................................. 11

6
§ 3084.1(f) ............................................................................................................. 7, 13

§ 3084.2(a) ............................................................................................................. 6, 13

7
§ 3084.2(a)(1) ............................................................................................................. 6

§ 3084.2(a)(3) ............................................................................................................. 6

8
§ 3084.6(b)(8) ............................................................................................................. 6

§ 3084.7 ...................................................................................................................... 7

9
§ 3084.7(d)(3) ............................................................................................................. 7

§ 3084.8(b) ................................................................................................................ 12

10
§ 3084.8(b)(1)-(3) .................................................................................................. 6, 12

§ 3378 ......................................................................................................................... 6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO PLAINTIFF JESSE PEREZ BY AND THROUGH HIS COUNSEL:

PLEASE TAKE NOTICE that Defendants Burris, Gates, Gongora, Healy, Pimentel, and Prelip (Defendants) move for summary judgment under Federal Rule of Civil Procedure 56 on the grounds that: (1) Perez failed to exhaust administrative remedies for some of his claims; (2) there is no evidence to support a retaliation claim; (3) there is no evidence of a conspiracy; and (4) Defendants are entitled to qualified immunity. This motion is based on the following memorandum of points and authorities, the declarations and supporting exhibits of Anderson, Burris, Barneburg, Foston, Gates, Gongora, Healy, Hubbard, Nygaard, Pimentel, Prelip, and Townsend, Defendants' request for judicial notice, and the Court's file in this action.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE CASE

Perez filed his original complaint while he was proceeding pro se. (ECF No. 1.) The Court screened the complaint, and ordered Defendants to answer. (ECF No. 8.) The Court then appointed Perez counsel. (ECF No. 14.) Perez's counsel subsequently filed the First Amended Complaint, and Defendants answered. (ECF No. 33; ECF No. 36.) Perez alleges that because he (a) exercised his rights to petition the courts, (b) participated in hunger strikes, and (c) wrote articles critical of the CDCR, Defendants retaliated and conspired to retaliate against him by taking the following five adverse actions: (1) conducting unscheduled and inappropriate validation procedures from October 2012 to January 2013; (2) filing a false Rules Violation Report ("RVR"); (3) searching through and disrupting the contents of his cell; (4) confiscating his personal property; and (5) making derogatory comments about his choice to file a lawsuit.

At the most recent case management conference, the Court referred the case for a settlement conference, set a dispositive-motion hearing, and set the case for a July 27 trial. (ECF No. 62.) The parties attended a settlement conference, but the case did not settle. (ECF No. 70.)

### STATEMENT OF ISSUES

1)    The Prison Litigation Reform Act requires prisoners to exhaust their administrative remedies before filing suit. Perez did not exhaust administrative remedies for some of his claims. Should this Court enter summary judgment on the claims that Perez failed to exhaust?

1

2)    To state a retaliation claim, a plaintiff must allege that:  (1) a state actor took some adverse action against an inmate; (2) because of; (3) that inmate's protected conduct; (4) such action chilled the inmate's exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal.  Should this Court enter summary judgment because Perez failed to establish all five elements for a successful retaliation claim?

3)    A conspiracy claim requires proof of an agreement or meeting of the minds to violate constitutional rights, as well as an actual deprivation of constitutional rights resulting from the alleged conspiracy.  Should this Court enter summary judgment because there is no evidence of an agreement to violate Perez's constitutional rights, nor an actual deprivation of his rights?

4)    An official is entitled to qualified immunity unless:  (1) the plaintiff alleged facts that show a constitutional violation and (2) it was clearly established, at the time, that the conduct was unconstitutional.  Should this Court find that Defendants are entitled to qualified immunity because there was no constitutional violation, and it was not clearly established that Defendants' conduct was unconstitutional.

## STATEMENT OF FACTS

**The Parties.**

Plaintiff Perez is an inmate housed at Pelican Bay State Prison ("Pelican Bay"), and has been validated as an associate of the Mexican Mafia prison gang.  (ECF No. 33 at 2, 15; Decl. Nygaard, Ex. A at 23:9-11.)

Defendants Burris, Gates, Gongora, Healy, and Pimentel were correctional officers at Pelican Bay, working as Assistant Institutional Gang Investigators ("IGI") during the relevant time.  (ECF No. 33 at 3-4.)  Defendant Prelip is a Senior Special Agent with the Office of Correctional Safety ("OCS"), Special Services Unit.  (*Id.* at 3.)

**Perez's Previous Lawsuit.**

Perez filed a lawsuit against multiple CDCR employees in 2005 alleging that he had been misclassified as a prison gang associate and that validation procedures conducted in 2003 violated his right to due process ("Perez I").  (ECF No. 33 at 6.)  Burris, Gates, Gongora, Healy, Pimentel, and Prelip were not defendants in Perez I.  (Defs.' Req. Jud. Notice, Exs. A, B.)  The district court

2

1    ruled that the Perez I defendants were not entitled to qualified immunity, and the defendants

2    appealed.  (ECF No 33 at 7; Defs.' Req. Jud. Notice, Ex. A at 16.)  While the appeal was pending,

3    the Ninth Circuit appointed Perez counsel (the same attorneys who represent him here).  (ECF

4    No. 33 at 7.)  In early 2012, counsel for the Perez I defendants and Perez began to engage in

5    settlement negotiations.  (*Id.*)  Through these negotiations, Perez sought a new gang validation

6    and money.  (*Id.*)  A final settlement agreement was executed in June 2013.  (*Id.*)

7    **October 2012 Events.**

8         While the parties were negotiating a settlement in Perez I, Prelip received an email from his

9    supervisor on October 3, 2012, instructing him to "follow-up with CCI [the California

10   Correctional Institution] tomorrow in regard to this settlement agreement."  (Decl. Prelip ¶ 2, Ex.

11   A.)  Attached to the email was a "Request for Settlement Authority" memorandum from an

12   attorney with CDCR's Office of Legal Affairs concerning the Perez I lawsuit.  (*Id.* ¶ 2.)  Prelip's

13   understanding of this email was that his supervisor wanted him to contact the IGI at CCI and

14   inform the IGI that CCI needed to conduct a new gang-validation proceeding for Perez pursuant

15   to a "settlement agreement."  (*Id.*)  Thus, on October 4, 2012, Prelip sent an email to, and spoke

16   with Josh Tyree, the IGI at CCI, and requested that his staff conduct a new gang-validation

17   proceeding for Perez.  (*Id.*)  Prelip then sent an email to his supervisor informing him of his

18   conversation with Mr. Tyree.  (*Id.*)  Prelip's supervisor responded to the email and informed him

19   that the deadline to complete Perez's validation was October 14.  (*Id.* ¶ 2, Ex. A.)  Mr. Tyree

20   subsequently informed Prelip that Perez was now housed at Pelican Bay, not CCI.  (*Id.*)  Prelip

21   then called Lt. Barneburg, the IGI at Pelican Bay, and they discussed the need to conduct a new

22   gang-validation proceeding for Perez as soon as possible as part of a settlement of a pending

23   lawsuit.  (*Id.*; Decl. Barneburg ¶ 4.)  Prelip had no communication with Burris, Gates, Gongora,

24   Healy, or Pimentel about this validation.  (Decl. Prelip ¶ 3.)

25        After speaking to Prelip, Lt. Barneburg sent an email on October 10, 2012, to four of his

26   subordinates, including Burris and Pimentel, instructing them to review Perez for a new

27   validation, and informing them that the validation needed to be completed as soon as possible.

28   (Decl. Barneburg ¶¶ 4-5.)  He attached a copy of the "Request for Settlement Authority"

3

1    memorandum, which he had received from Mr. Tyree, to the email.  (*Id.* ¶¶ 3, 5.)  When Burris

2    received this email from his supervisor, he understood that CDCR had been ordered by the Court

3    to redo Perez's validation.  (Decl. Burris ¶ 2.)

4         Searching an inmate's cell for evidence of gang activity, and confiscating property,

5    including paperwork, to review more thoroughly for indications of gang activity, is a regular part

6    of the gang-validation process.  (Decl. Barneburg ¶ 6.)  Accordingly, Perez's cell was searched by

7    Gates, Gongora, Healy, and Pimentel on October 10, 2012.  (Decl. Gates ¶ 2; Decl. Gongora ¶ 3;

8    Decl. Healy ¶ 2; Decl. Pimentel ¶ 2.)  None of them knew who Perez was before they searched

9    his cell.  (Decl. Gates ¶ 2; Decl. Gongora ¶ 3; Decl. Healy ¶ 2; Decl. Pimentel ¶ 2.)  They had no

10   recollection of reading any of Perez's mail, were not aware of any articles he authored, and did

11   not know he had participated in hunger strikes.  (Decl. Gates ¶¶ 2-3; Decl. Gongora ¶¶ 3-4; Decl.

12   Healy ¶¶ 2-3; Decl. Pimentel ¶¶ 2-3.)  Perez also acknowledges that he did not know Gates,

13   Gongora, and Healy before the search, and that his only interaction with Pimentel was during one

14   previous cell search.  (Decl. Nygaard, Ex. A at 143:9-144:11.)  Paperwork and other property

15   were removed from Perez's cell during the search for further review and use during his gang-

16   validation proceedings.  (Decl. Gates ¶ 6.)  The property was delivered to Burris, and Gates,

17   Gongora, and Healy did not review it further.  (Decl. Burris ¶4; Decl. Gates ¶ 6; Decl. Gongora ¶

18   5; Decl. Healy ¶ 7.)  Perez's property was returned to him the next day, except for contraband or

19   items retained for further review and investigation as part of the gang-validation proceedings.

20   (Decl. Burris ¶ 4; Decl. Pimentel ¶ 4.)  Perez alleges that Defendants "trashed" his cell.  (ECF No.

21   33 at 11.)  Defendants deny this allegation, and assert that they have been trained to respect an

22   inmate's property.  (Decl. Gates ¶ 5; Decl. Gongora ¶ 5; Decl. Healy ¶ 5; Decl. Pimentel ¶ 4.)

23        Perez alleges that during the search of his cell, inmate Mendoza, who was in the adjacent

24   cell, overheard one of the Defendants say "these knuckleheads should file suits more often—

25   makes our job a whole lot more rewarding."  (ECF No. 33 at 63.)  Defendants deny making any

26   such statement, and inmate Mendoza cannot identify which specific Defendant allegedly made

27   the statement.  (Decl. Gates ¶ 5; Decl. Gongora ¶ 6; Decl. Healy ¶ 5; Decl. Pimentel ¶ 5; Decl.

28   Nygaard, Ex. B at 42:19-43:5.)  Perez also claims that Healy asked his cellmate Guerrero whether

4

Defs.' Notice Mot., Mot. Summ. J. & Memo P. & A. (C 13-5359 VC (PR))

1  he was "into filing lawsuits too," and that when Guerrero responded "no," Healy said "Good for

2  you.  Keep it that way."  Defendants deny that Healy made these statements.  (Decl. Gates ¶ 5;

3  Decl. Gongora ¶ 6; Decl. Healy ¶ 5; Decl. Pimentel ¶ 5.)  And when questioned at his deposition

4  about which officer made the alleged comments, inmate Guerrero was not able to identify him

5  except to say that he was "tall."  (Decl. Nygaard, Ex. C. at 40:6-16.)  Perez also claims that Gates

6  said "you might've been able to collect from us, but get comfortable because we're going to make

7  sure you stay here where you belong."  (ECF No. 33 at 11.)  Defendants deny that Gates made

8  such a statement.  (Decl. Gates ¶ 5; Decl. Gongora ¶ 6; Decl. Healy ¶ 5; Decl. Pimentel ¶ 5.)

9  **Rules Violation Report.**

10       As Defendants approached Perez's cell on October 10, 2012, Gongora heard Perez instruct

11  his cellmate Guerrero, in Spanish, to "hurry up."  (Decl. Gongora ¶ 5.)  Guerrero was at the toilet

12  tearing up pieces of paper and putting the paper into the toilet.  (Decl. Gates ¶ 4; Decl. Gongora ¶

13  5; Decl. Healy ¶ 4.)  Perez appeared to be trying to block Defendants' view of Guerrero because

14  every time Gates would move to get a more straight-on view of Guerrero, Perez would move into

15  his view between the toilet and the front of the cell.  (Decl. Gates ¶ 4; Decl. Healy ¶ 4.)  Gates

16  ordered to Perez to stop doing that and to cuff up, but he did not comply with the orders for a few

17  minutes.  (Decl. Gates ¶ 4.)

18       On or about October 22, 2012, Gates issued Perez a RVR charging him with "Willfully

19  Obstructing a Peace Officer."  (ECF No. 33 at 12; Decl. Gates ¶ 7.)  Before issuing the RVR,

20  Gates forwarded a draft of the RVR to his supervisor for review.  (Decl. Gates ¶ 7.)  Gates did not

21  discuss the RVR with any of the other Defendants before he issued it.  (Decl. Burris ¶ 6; Decl.

22  Gates ¶ 7; Decl. Gongora ¶ 7; Decl. Healy ¶ 6; Decl. Pimentel ¶ 6.)  At the disciplinary hearing,

23  Perez was found "Not Guilty" and the RVR was dismissed.  (Decl. Anderson ¶ 3.)  The Senior

24  Hearing Officer's ("SHO") findings were based on the evidence that, although Perez may have

25  wanted or attempted to mask the actions of his cellmate, he was not successful in doing so

26  because the officers were able to see his cellmate destroying "kites" and placing them into the

27  toilet.  (*Id.*)  Even though the SHO found Perez "not guilty," he did not see any indication of

28  misconduct by Gates in issuing the RVR.  (*Id.* ¶ 4.)  If he had felt that Gates had done anything

5

1    wrong, he would have reported it to a superior, which he did not do.  (*Id*.)  The evidence disclosed

2    at the disciplinary hearing was simply not sufficient to support the charge, which, in the SHO's

3    experience, is not uncommon.  (*Id*.)

4    **October 2012-January 2013 Validation Proceedings.**

5    Burris conducted a new gang validation for Perez in accordance with the policies in the

6    California Code of Regulations title 15, section 3378, which were in effect at the time.  (Decl.

7    Burris ¶ 5.)  The validation procedures under the Security Threat Group ("STG") Pilot Program

8    were not implemented until March 1, 2013.  (*Id*.; Decl. Barneburg ¶ 7; Decl. Hubbard ¶¶ 3-4.)

9    Burris recommended that Perez be validated as an associate of the Mexican Mafia prison gang in

10   December 2012, and submitted the validation package to OCS for verification as required under

11   the regulations.  (Decl. Burris ¶ 6.)  OCS returned the validation package because Burris had

12   neglected to indicate which of the source items were a direct link to a current or former validated

13   member or associate of a prison gang.  (*Id*.)  He redid the validation package, noting the direct

14   links, and returned it to OCS in January 2013.  (*Id*.)

15   **The California Inmate-Appeal Process.**

16   The State of California allows its prisoners to administratively appeal any policy, decision,

17   action, condition, or omission by the department or its staff that an inmate can demonstrate as

18   having a material adverse effect upon his health, safety, or welfare.  Cal. Code Regs. tit. 15, §

19   3084.1(a) (2012).  An inmate shall use a CDCR Form 602 to "describe the specific issue under

20   appeal and the relief requested."  *Id*., § 3084.2(a).  The inmate shall list all staff members

21   involved and shall describe their involvement in the issue.  *Id*., § 3084.2(a)(3).

22   An inmate is limited to one issue or related set of issues per each appeal.  *Id*., §

23   3084.2(a)(1).  An appeal that involves multiple issues that do not derive from a single event, or

24   are not directly related, may be rejected.  *Id*., § 3084.6(b)(8).

25   An inmate must submit the grievance within thirty calendar days of the occurrence of the

26   event or decision being appealed, or upon first having knowledge of the action or decision being

27   appealed, or upon receiving an unsatisfactory departmental response to an appeal filed.  *Id*., §

28

1    3084.8(b)(1)-(3).  An inmate may only submit one appeal every fourteen calendar days, unless the

2    appeal is accepted as an emergency appeal.  *Id.*, § 3084.1(f).

3         With certain exceptions, all administrative appeals shall be submitted through three levels

4    of review—the first level, second level, and third level.  *Id.*, § 3084.7.  A decision at the third

5    level of review exhausts all available administrative remedies.  *Id.*, § 3084.7(d)(3).

6    **Perez's Inmate Appeals.**

7         Between October 10, 2012, and November 19, 2013, the date that Perez's original

8    complaint was filed, Perez submitted the following eight inmate appeals:

9         (1)    PBSP-12-3402, in which Perez complained that:  Gates, Gongora, Healy, and

10   Pimentel trashed his cell and confiscated his property on October 10, 2012 in retaliation for his

11   litigation activities; Burris trashed and stole his property; and Defendants conspired to retaliate.

12   (Decl. Foston ¶ 7(a), Ex. B.)  This appeal was denied at the Third Level.  (*Id.*)

13        (2)    PBSP-12-3503, in which Perez complained that Burris, Gates, Gongora, Healy, and

14   Pimentel violated his rights by conducting an active/inactive review two years early.  (Decl.

15   Townsend ¶ 7(b).)  This appeal was received and screened out because it had been submitted less

16   than fourteen days after inmate appeal PBSP-12-3402.  (*Id.*)

17        (3)    PBSP-12-3796, in which Perez complained that his copy of "The Rock" newsletter

18   had not been delivered.  (*Id.* ¶ 7(c).)  This appeal was screened out for missing documents.  (*Id.*)

19        (4)    PBSP-13-0647, which was cancelled as a duplicate of PBSP-12-3402.  (*Id.* ¶ 7(d), Ex.

20   B.)

21        (5)    PBSP-13-0680, in which Perez appealed the cancellation of PBSP-13-0647.  (Decl.

22   Foston ¶ 7(b), Ex. C.)  This appeal was denied at the Third Level.  (*Id.*)

23        (6)    PBSP-13-1556, in which Perez requested to receive tennis shoes and amino acids

24   with his annual package.  (Decl. Townsend ¶ 7(f), Ex. C.)

25        (7)    PBSP-13-1998, in which Perez complained that validation proceedings conducted

26   between November 2012-May 2013 violated his right to due process, were conducted in

27   accordance with the wrong policies, and violated the settlement agreement reached in *Perez v.*

28   *Woodford*.  (*Id.* ¶ 7(g), Ex. D.)  This appeal was partially granted at the second level on August

7

1   13, 2013—his request to have documents expunged from his file was denied, and his request to

2   receive a validation in accordance with the STG program was granted.  (*Id.*)  Perez appealed this

3   decision to the Third Level, but it was screened out as untimely.  (Decl. Foston ¶ 7(c).)

4        (8)   PBSP-13-2582, in which Perez sought reimbursement for damaged or missing

5   property after he had been placed in administrative segregation.  (Decl. Townsend ¶ 7(h), Ex. E.)

6                                  **LEGAL STANDARD**

7        Summary judgment shall be granted when there is no genuine dispute as to any material

8   fact, and if the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56.

9   The party moving for summary judgment bears the initial burden of identifying those portions of

10  the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of

11  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will

12  have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable

13  trier of fact could find other than for the moving party.  *Id.*  But on an issue for which the

14  opposing party will have the burden of proof at trial, the moving party need only point out "that

15  there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  A party

16  opposing a motion for summary judgment must affirmatively show that a dispute about a material

17  fact is genuine, such that a reasonable jury could return a verdict for the non-moving party.

18  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the

19  outcome of the suit under governing law, and a dispute about such a material fact is genuine "if

20  the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

21                                   **ARGUMENT**

22  **I.   THE PRISON LITIGATION REFORM ACT REQUIRES PRISONERS TO EXHAUST**
    **ADMINISTRATIVE REMEDIES BEFORE FILING SUIT.**
23

24       The Prison Litigation Reform Act of 1995 ("PLRA") requires prisoners to exhaust their

25  administrative remedies before filing suit:  "No action shall be brought with respect to prison

26  conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any

27  jail, prison, or other correctional facility until such administrative remedies as are available are

28  exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that the PLRA requires

                                          8

1   exhaustion regardless of the type of relief that a prisoner seeks. *Booth v. Churner*, 532 U.S. 731,

2   739 (2001).  No claim may be pursued in court unless the inmate has given the prison authorities

3   an opportunity to consider providing some relief regarding the facts underlying the grievance.

4   *See Id.* at 736.  An inmate cannot satisfy the exhaustion requirement by filing an untimely or

5   otherwise procedurally defective administrative grievance or appeal. *Woodford v. Ngo*, 548 U.S.

6   81, 83 (2006).  Proper exhaustion demands compliance with an agency's deadlines and other

7   critical procedural rules. *Id.* at 90-91.

8       A complaint is "brought" by an inmate when he submits it to the court, at which time a

9   prisoner must have entirely exhausted his administrative remedies. *Vaden v. Summerhill*, 449

10  F.3d 1047, 1050 (9th Cir. 2006).  However, "claims which are *added* to a suit via an amendment

11  and which are administratively exhausted prior to that amendment, comply with the PLRA's

12  exhaustion requirement." *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014) (emphasis added).

13      The level of detail in an administrative grievance necessary to properly exhaust a claim is

14  determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218

15  (2007).  "[W]hen a prison's grievance procedures are silent or incomplete as to factual specificity,

16  a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought."

17  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

18      **A.  A Summary-Judgment Motion is the Appropriate Device for Determining**
        **Whether Administrative Remedies Have Been Exhausted.**
19

20      Unless an inmate's failure to exhaust is evident from the face of the complaint, the

21  appropriate procedural device for determining before trial whether administrative remedies have

22  been properly exhausted under the PLRA is a motion for summary judgment. *Albino v. Baca*,

23  747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).  If disputed material facts prevent summary

24  judgment, the district judge may resolve those disputes through a preliminary proceeding. *Id.* at

25  1168.  Exhaustion should be decided, if feasible, before reaching the merits of an inmate's claim.

26  *Id.* at 1170.  If summary judgment is denied, the case may proceed to the merits. *Id.* at 1171.

27  ///

28  ///

**B.    Perez Failed to Exhaust Administrative Remedies for Some of His Claims.**

Perez failed to exhaust his administrative remedies for his claims regarding:  (1) the RVR; (2) Prelip's actions; (3) the comments made by Defendants during the cell search; and (4) the use of improper validation procedures.  He also failed to exhaust his administrative remedies for his claims that Defendants' adverse actions were taken because he (a) participated in hunger strikes and (b) wrote articles critical of CDCR.

**1.    Perez did not exhaust his claims about the RVR and against Prelip.**

On October 28, 2012, Perez submitted inmate appeal PBSP-12-3402.  (Decl. Foston ¶ 7(a), Ex. B.)  He complained that Gates, Gongora, Healy, and Pimentel removed him from his cell on the basis that that they were conducting an inactive review into gang status, and  proceeded to "completely trash" his cell and confiscate his property.  (*Id*.)  He claimed that the actions were retaliatory because he had successfully litigated a lawsuit against CDCR, including obtaining a five digit monetary payment in the suit, and because he was not scheduled or eligible for an inactive review until 2014.  (*Id*.)  He also stated that the officials' actions indicated a conspiracy.  (*Id*.)  He further complained that Burris was part of the conspiracy by trashing and stealing his property.  (*Id*.)  Perez requested an immediate cessation of the violation of his rights, the return of his property, the identity of the officer who instructed the Pelican Bay officials to conduct an unscheduled review, and damages.  He made no mention that Gates had issued him a RVR.  (*Id*.)

On November 28, 2012, the appeal was partially granted at the Second Level—Perez's request for the identification of the official who had instructed Pelican Bay officials to begin the gang-review investigation was granted and Prelip was identified.  (*Id*.)  Perez was interviewed by Sgt. Dornback as part of the review process, and said that he had evidence supporting his claim of retaliation and conspiracy because he had received a RVR that was dismissed, and that the RVR had been misclassified as serious rather than administrative.  (*Id*.)  This interview was referenced in the Second Level decision, and it was noted that Sgt. Dornback found no evidence that the RVR was misclassified or that due process had not been met.  (*Id*.)

Perez further appealed to the Third Level.  (*Id*.)  Perez mentioned that "IGI had filed a false [RVR]," which he claimed was evidence supporting the retaliation and conspiracy charges.  (*Id*.)

10

He also stated that Sgt. Dornback and Prelip's "overt acts of misrepresenting the record is probative of their willful intent to assist, promote or further the retaliation and the conspiracy to retaliate." (*Id.*) The Third Level denied Perez's appeal and noted that "appellant has added new issues and requests to his appeal. The additional requested action is not addressed herein as it is not appropriate to expand the appeal beyond the initial problem and the initially requested action (CDC Form 602, Inmate/Parolee Form, Sections A and B.) This must be addressed separately to provide the institution with the opportunity to respond to, and possibly resolve, the newly added issue." (*Id.*) Under the regulations, "[a]dministrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included in the originally submitted [appeal] and addressed through all required levels of administrative review up to and including the third level." Cal. Code Regs. tit. 15, § 3084.1(b). A prisoner does not exhaust administrative remedies when he includes new issues from one level of review to another. *See Sapp v. Kimbrell*, 623 F.3d 813, 825 (9th Cir. 2010) (concluding that it was proper for prison officials to "decline[] to consider a complaint about [prisoner's] eye condition that he raised for the first time in a second-level appeal about medical care for a skin condition"). Thus, inmate appeal PBSP-12-3402 did not exhaust Perez's administrative remedies for his claims about the RVR or Prelip's actions.

In response to this Third Level decision, Perez submitted PBSP-13-0647, stating that "[p]resumably the 'newly added issues' [are] the allegation–made to the TLR–that Sgt. A Dornback (2nd level appeal interviewer) and Senior Special Agent J. Prelip's overt acts of misrepresenting the record is probative of their willful intent to assist, promote or further the retaliation and conspiracy to retaliate against appellant for exercise of his 1st Amendment right" to petition the courts. (Decl. Townsend ¶ 7(d), Ex. B.) This appeal was cancelled as a duplicate of the action requested in PBSP-12-3402. (*Id.*) Perez appealed the cancellation by filing inmate appeal PBSP-13-0680, which was denied at the Third Level. (Decl. Foston ¶ 7(b), Ex. C.)

Arguably, the cancellation of inmate appeal PBSP-12-0647 as a duplicate, and the denial of his appeal challenging the cancellation, were improper because Perez had raised new issues concerning persons (Dornback and Prelip) not previously identified in appeal PBSP-12-3402.

11

1    Improper screening of an administrative appeal can make administrative remedies effectively

2    unavailable. *Sapp*, 623 F.3d at 823.  But the inmate must establish that he submitted a grievance

3    that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the

4    claim.  *Id*. at 824.  Even if inmate appeal PBSP-12-0647 had been accepted, it would not have

5    exhausted Perez's claim that Gates's issuance of the RVR was retaliatory.  Perez only indirectly

6    mentions Gates and the RVR, and instead, the appeal is focused on his "newly added issues"

7    regarding Sgt. Dornback and Prelip's actions.  (Decl. Townsend ¶ 7(d), Ex. B.)

8         Furthermore, the RVR was dismissed on November 18, 2012.  (Decl. Anderson ¶ 3.)  And

9    Perez was informed of Prelip's identity on November 28, 2012.  (Decl. Foston ¶ 7(a), Ex. B at

10    DEF 193-95.)  An inmate has thirty calendar days from the occurrence of an event to submit his

11    appeal.  Cal. Code Regs. tit. 15, § 3084.8(b).  Thus, Perez had until December 18, 2012 to appeal

12    the issuance of the RVR, and until December 28, 2012 to appeal Prelip's actions, but he did not

13    submit inmate appeal PBSP-13-0647 until March 10, 2013—nearly three months late.  (*Id*., §

14    3084.8(b)(1)-(3); Decl. Townsend ¶ 7(d), Ex. B.)  If this inmate appeal had not been dismissed as

15    a duplicate, it would have been dismissed as untimely and would not have exhausted Perez's

16    administrative remedies.

17              **2.    Perez did not exhaust his claim regarding comments.**

18         Perez submitted inmate appeal PBSP-12-3402 concerning the cell search and taking of his

19    property, but he did not mention the comments Defendants allegedly made during the search.

20    (Decl. Foston ¶ 7(a), Ex. B.)  And he submitted no other inmate appeals about the comments.

21    (*See* Decl. Townsend.)  Thus, he did not exhaust his administrative remedies for that claim.

22              **3.    Perez did not exhaust his claim that improper validation procedures
                        were used.**
23

24         In inmate appeal PBSP-12-3402, Perez grieved that the cell search and confiscation of his

25    property by Burris, Gates, Gongora, Healy, and Pimentel was retaliatory, in part, because he was

26    not scheduled or eligible for an inactive review until 2014.  (Decl. Foston ¶ 7(a), Ex. B.)

27    However, he made no mention in this appeal that the validation was being conducted under

28    "inappropriate" policies (i.e. title 15, rather than STG).  (*See id*.)

12

Less than two weeks later, Perez submitted inmate appeal PBSP-12-3503, in which he grieved that Burris, Gates, Gongora, Healy, and Pimentel conducted an active/inactive gang review two years early.  (Decl. Townsend ¶ 7(b).)  This appeal was screened out because the regulations only permit an inmate to submit one non-emergency appeal every fourteen days.  *See* Cal. Code Regs., tit. 15 § 3084.1(f).  (*Id.*)

Then on August 8, 2013, Perez submitted inmate appeal PBSP-13-1998, in which he complained that the validation submitted by Burris violated his right to due process, title 15, the Penal Code, and the settlement agreement reached in *Perez v. Woodford* because it had not been conducted in accordance with the STG policies.  (Decl. Townsend ¶ 7(g), Ex. D.)  The only Defendant that Perez named in this appeal was Burris.  (*Id.*)  He also did not complain that the validation had been done in retaliation, or as part of a conspiracy in retaliation, for the exercise of his First Amendment rights.  (*Id.*)  Thus, this inmate appeal did not put the prison on notice of Perez's claim that Defendants used "improper" validation procedures in retaliation for the exercise of First Amendment rights.

### 4.    Perez did not exhaust the claims based on hunger strikes and articles.

Defendants acknowledge that inmate appeal PBSP-12-3402 exhausted Perez's administrative remedies for his claims that Gates, Gongora, Healy, and Pimentel searched his cell, and that they, along with Burris, confiscated his property in retaliation, and conspiracy to retaliate, for his right to petition the courts.  But Perez made no mention in this appeal that Defendants' retaliatory actions were taken because he had participated in hunger strikes or written articles critical of CDCR.  (Decl. Foston ¶ 7(a), Ex. B.)  The regulations required Perez to "describe the specific issue under appeal."  Cal. Code Regs. tit. 15, § 3084.2(a).  Accordingly, this appeal did not alert the prison to the nature of all of the wrongs for which he sought redress—specifically, that he had been retaliated against for participating in hunger strikes and writing articles.  *Sapp*, 623 F.3d at 823-24.  Thus, this appeal did not exhaust those claims.  And Perez did not submit any other appeals within thirty days of the alleged adverse actions claiming that they had been taken in retaliation for his exercise of those specific First Amendment activities, as required under the regulations.  (*See* Decl. Townsend ¶ 7.)

13

## II.   DEFENDANTS DID NOT RETALIATE AGAINST PEREZ.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).  The alleged retaliatory action need not, in itself, constitute a constitutional violation. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (to prevail on a retaliation claim, plaintiff need not "establish an independent constitutional interest" was violated).  However, not every allegedly adverse action will support a retaliation claim. *See e.g. Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation claim cannot rest on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this'") (citation omitted).

The prisoner must show that the type of activity in which he was engaged was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest. *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997) (inferring retaliatory motive from circumstantial evidence).  Retaliatory motive may be shown by the timing of the allegedly retaliatory act and other circumstantial evidence, as well as direct evidence. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).  However, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (affirming grant of summary judgment where there was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

### A.   All the actions are not "adverse" and Perez has not linked each Defendant.

Perez alleges that Defendants retaliated against him by taking the following adverse actions:  (1) conducting unscheduled and inappropriate validation procedures; (2) filing a false RVR; (3) searching through and disrupting the contents of his cell; (4) confiscating his personal property; and (5) making derogatory comments about his choice to file a lawsuit.  (ECF No. 33 at 17.)  But not all of this conduct amounts to an "adverse action."  Adverse action is action that

14

1   "would chill a person of ordinary firmness" from engaging in that activity.  *Pinard v. Clatskanie*

2   *School Dist.*, 467 F.3d 755, 770 (9th Cir. 2006).

3       Also, not every Defendant was involved in each of the alleged "adverse actions."  To

4   succeed on his claims, Perez must show how each Defendant actually and proximately caused the

5   deprivation of his constitutional rights.  *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).

6               **1.    Burris and Prelip did not participate in the cell search.**

7       Perez alleges that on October 10, 2012, Gates, Gongora, Healy, and Pimentel searched his

8   cell and disrupted the contents.  (ECF No. 33 at 10.)  He does not allege that Burris or Prelip

9   participated in this search, and neither of them did.  (*See* ECF No. 33; Decl. Burris ¶ 3; Decl.

10  Prelip ¶ 3.)  Therefore, summary judgment should be entered in favor of Burris and Prelip on

11  Perez's claim that the cell search was retaliatory.

12              **2.    Proper validation procedures were used.**

13      Perez alleges that he was subjected to unscheduled validation procedures in December 2012

14  and January 2013, and that the validation was improperly conducted using the old policies, rather

15  than the new STG program.  (ECF No. 33 at 13-14.)  He claims that Prelip initiated the validation,

16  and that Burris conducted it.  (*Id.*)  He does not allege that Gates, Gongora, Healy, and Pimentel

17  were involved with the validation, and they were not.  (*See* ECF No. 33; Decl. Gates ¶ 6; Decl.

18  Gongora ¶ 8; Decl. Healy ¶ 7; Decl. Pimentel ¶ 7.)  Thus, summary judgment should be entered in

19  favor of Gates, Gongora, Healy, and Pimentel on Perez's claim that the unscheduled validation

20  procedures were retaliatory.

21      Moreover, the STG policies for gang validations were not implemented until March 2013

22  (Decl. Barneburg ¶ 7; Decl. Burris ¶ 5; Decl. Hubbard ¶ 4.)  Perez's expert witness conceded this

23  fact at his deposition.  (Decl. Nygaard, Ex. D at 103:25-105:13, 175:19-176:1.)  Thus, summary

24  judgment should be entered on Perez's claim that the validation was conducted using improper

25  policies.

26              **3.    Only Gates was involved with issuing the Rules Violation Report.**

27      Perez alleges that he was issued a RVR authored by Gates.  (ECF No. 33 at 12.)  He does

28  not allege that any of the other Defendants played a role in the issuance of the RVR, and none of

15

them did.  (*See* ECF No. 33; Decl. Burris ¶ 6; Decl. Gongora ¶ 7; Decl. Healy ¶ 6; Decl. Pimentel ¶ 6; Decl. Prelip ¶ 3.)  Therefore, summary judgment should be entered in favor of Burris, Gongora, Healy, Pimentel, and Prelip on Perez's claim that the issuance of the RVR was retaliatory.

### 4.   Healy and Prelip did not confiscate Perez's property.

Perez alleges that after searching his cell, he returned to find a cell-search receipt signed by Gates, Gongora, and Pimentel indicating that all of his paperwork had been taken by IGI for review.  (ECF No. 33 at 11.)  He claims that Pimentel returned most of the property the next day along with a cell-search receipt signed by Burris and Pimentel indicating that his address book, photographs, and pages of addresses were being confiscated.  (*Id*. at 12.)  He further claims that several other pages of his documents were missing, including court filings and copies of articles he had written.  (*Id*.)

Prelip was not involved in the taking of Perez's property, and Perez does not allege that he was.  (*See id*.; Decl. Prelip ¶ 3.)  Also, there is no evidence that Healy played any role in the taking of his property because his signature is not on the cell-search receipts.  (Decl. Burris, Ex. B; Decl. Gates, Ex. A.)  Thus, summary judgment should be entered for Healy and Prelip on Perez's claim that the taking of his property was retaliatory.

### 5.   The alleged comments are not "adverse actions."

Perez alleges that during the cell search, Healy asked his cellmate Guerrero whether he was "into filing lawsuits too," and that when Guerrero replied "no," Healy allegedly said, "Good for you.  Keep it that way."  (ECF NO. 33 at 11.)  At his deposition, however, Guerrero was not able to identify Healy as the declarant.  (Decl. Nygaard, Ex. C at 40:6-14.)  Perez also claims that Gates said to him "…you might've been able to collect from us, but get comfortable because we're going to make sure you stay here where you belong..."  (*Id*.)  Finally, he claims that inmate Mendoza in the adjacent cell heard an officer say "these knuckleheads should file suits more often—makes this job a whole lot more rewarding."  (*Id*. at 12.)

Defendants deny making any of these statements.  (Decl. Gates ¶ 5; Decl. Gongora ¶ 6; Decl. Healy ¶ 5; Decl. Pimentel ¶ 5.)  But this dispute of fact is not material, because even

assuming that the comments were made, they do not amount to "adverse actions."  Two of the comments were allegedly made outside of Perez's presence—one was directed to inmate Guerrero and the other was said in an empty cell.  These comments were not threats directed to prevent Perez from exercising his constitutional rights in the future.  Healy's alleged statement to Guerrero concerned his opinion about Guerrero's litigation activities, and if anything, could have been interpreted as trying to chill Guerrero's pursuit of litigation, not Perez's.  And the "knuckleheads" comment was not made directly to any inmate.  Verbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action.  *See Alnutt v. Cleary*, 913 F.Supp. 160, 165–66 (W.D.N.Y. 1996) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.").  Section 1983 is not intended to represent a code of professional conduct for federal, state and local prison officials.  *Id*. at 166.

Furthermore, Perez has not sufficiently linked any Defendant to the "knuckleheads" comment.  When questioned at his deposition, inmate Mendoza could not identify the officer who made the statement.  (Decl. Nygaard, Ex. B at 42:24-43:5.)  Because Burris and Prelip did not search Perez's cell, they could not have made the statement.  And a reasonable jury could not hold Gates, Gongora, Healy, and Pimentel all responsible for the statement.

### B.    Causation ("because of") and Legitimate Penological Goal.

The second element of a prisoner retaliation claim focuses on causation and motive.  *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).  A plaintiff must show that his protected conduct was a "'substantial' or 'motivating' factor behind the defendant's conduct."  *Id.* (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).  The conduct identified by Perez as retaliatory must have been motivated *by* his engagement in a protected activity, and the conduct must *not* have reasonably advanced a legitimate penological goal.  *Brodheim*, 584 F.3d at 1271-72.  Retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two.  *See Huskey*, 204 at 899 (summary judgment proper against plaintiff who could only speculate that adverse

17

1    employment decision was due to his negative comments about his supervisor six or seven months

2    earlier); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (finding no

3    retaliation where plaintiff presented no evidence that defendants gave her a traffic citation after

4    defendants read a newspaper article about her First Amendment activities, rather than because she

5    drove past a police barricade with a "road closed" sign on it).  A retaliation claim cannot rest on

6    the logical fallacy of post hoc, ergo propter hoc, i.e., "after this, therefore because of this." *See id.*

7    If retaliation was not the but-for cause of the action complained of, the claim fails for lack of

8    causal connection between unconstitutional motive and resulting harm, despite proof of some

9    retaliatory animus in the official's mind.  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).

10              **1. There were legitimate penological reasons for the search and validation.**

11       Prelip's only role in the alleged retaliatory actions was contacting the IGI at Pelican Bay to

12   initiate a new gang-validation proceeding.  (Decl. Prelip  ¶¶ 2-3.)  He did so based on instructions

13   from his supervisor that a new validation was required as part of a settlement agreement.  (*Id.* ¶¶

14   2-3, Ex. A.)  Although Defendants acknowledge that an executed settlement agreement was not in

15   place, Prelip's misunderstanding of this does not equate to retaliatory motive.  Prelip did not

16   know anything about Perez, except that his supervisor had told him there was a "settlement

17   agreement."  (*Id.*)  Prelip had never met Perez, nor heard anything about him.  (*Id.* ¶ 3.)  And

18   Perez did not know him.  (Decl. Nygaard, Ex. A at 145:2-4.)  Prelip did not know whether Perez

19   had participated in hunger strikes and he was not aware of any writings Perez had authored.

20   (Decl. Prelip ¶ 3.)  Perez's protected conduct was not the motivating factor behind Prelip's

21   actions; rather Prelip believed, based on his supervisor's instructions, that he was fulfilling the

22   terms of a settlement agreement, a legitimate penological goal.

23       Burris conducted Perez's gang-validation proceeding, including keeping some of his

24   property, based on his supervisor's instructions that a validation needed to be completed as soon

25   as possible.  (Decl. Burris ¶ 2, Ex. A.)  His understanding was that the validation had been court

26   ordered as part of a settlement.  (*Id.* ¶ 2.)  Burris did not know Perez, did not know whether he

27   had participated in hunger strikes, and was not aware of any writings he had authored.  (*Id.*  ¶ 8.)

28   And the only knowledge that he had about Perez's litigation activities was that the validation was

                                                    18

1   to be conducted as part of a court-ordered settlement in the Perez I case.  (*Id.*)  Burris also kept

2   some of Perez's property because it was contraband or needed to be reviewed further as part of

3   the validation process.  (Decl. Burris ¶ 4.)  "[P]risons have a legitimate penological interest in

4   stopping prison gang activity."  *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).  Thus, the

5   motivating factor behind Burris's actions was to comply with the terms of the settlement

6   agreement and investigate prison-gang activity, all legitimate penological goals.

7       Gongora was asked by co-workers to help with the search, and was told that it was for a

8   gang validation Perez had been awarded in a court case.  (Decl. Gongora ¶ 3.)  He did not know

9   any details about the case and he had no independent knowledge of it or any other lawsuit Perez

10  had filed.  (*Id.*)  He did not know Perez before he conducted the search, did not know whether

11  Perez had participated in hunger strikes, and was not aware of any of Perez's writings.  (*Id.*)

12  Gates, Healy, and Pimentel were also asked by a co-worker to search Perez's cell as part of a

13  gang validation.  (Decl. Gates ¶ 2; Decl. Healy ¶ 2; Decl. Pimentel ¶ 2.)  They did not know

14  Perez, and did not know that he had a pending lawsuit.  (*Id.*)  They also did not know whether

15  Perez had participated in hunger strikes, and were not aware of any writings he had authored.

16  (*Id.*)  Perez did not know Gates, Gongora, or Healy, and only knew Pimentel from a previous cell

17  search.  (Decl. Nygaard, Ex. A at 143:9-144:11.)  Gates, Gongora, Healy, and Pimentel's

18  motivation was simply to assist their co-workers in conducting the search for a gang validation, a

19  regular part of the validation process and duty of an Assistant IGI, and a legitimate penological

20  goal.  (Decl. Barneburg ¶ 6; Decl. Burris ¶ 1; Decl. Gates ¶ 1, Decl. Gongora ¶ 2.)

21          **2.      Gates had a legitimate penological reason for issuing the RVR.**

22      When Defendants arrived at Perez's cell, his cellmate Guerrero was tearing up pieces of

23  paper and putting them in the toilet.  (Decl. Gates ¶ 4; Decl. Gongora ¶ 5; Decl. Healy ¶ 4.)  Gates

24  and Healy observed Perez trying to block their view of Guerrero as he moved around between the

25  toilet and cell front.  (Decl. Gates ¶ 4; Decl. Healy ¶ 4.)  Gates ordered Perez to stop and cuff up,

26  but he did not comply for a few minutes.  (*Id.*)  Gates later issued Perez a RVR for his misconduct

27  during the cell search, which was dismissed at a disciplinary hearing.  (Decl. Anderson ¶ 3; Decl.

28  Gates ¶ 7.)  Even though Perez was found not guilty at the disciplinary hearing, the SHO did not

19

1   see any indication of misconduct by Gates in issuing the RVR.  (Decl. Anderson ¶ 4.)  The

2   evidence disclosed at the disciplinary hearing was simply not sufficient to support the charge,

3   which is not uncommon.  (*Id.*)

4       Even assuming Perez's claim that he told Gates about the pending lawsuit during the cell

5   search, and thus before the RVR was issued, is true, that was not the substantial and motivating

6   factor behind the issuance of the RVR.  Rather, it was Perez's perceived misconduct that

7   motivated Gates to issue the RVR.  And preserving institutional order and discipline are

8   legitimate penological goals.  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994).

9       **3.    The 2013 hunger strike occurred after the alleged retaliatory conduct.**

10      Perez's participation in a hunger strike in July 2013 was not a substantial and motivating

11  factor for Defendants' alleged adverse actions, because the hunger strike occurred months later.

12  Timing may undermine a claim of retaliation, for instance, when the alleged retaliatory conduct

13  takes place before the exercise of First Amendment rights.  *See Pratt*, 65 F.3d at 808.

14      **C.    Participation in a Hunger Strike Is Not Protected Conduct.**

15      The type of activity that Perez was engaged in must have been protected by the First

16  Amendment.  *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Perez

17  claims that the "protected conduct" he was engaged in was his pursuit of a lawsuit challenging his

18  gang validation, participating in hunger strikes, and writing articles critical of CDCR.  (ECF No.

19  33 at 6-7.)  Defendants acknowledge that the pursuit of litigation and writing of articles are

20  "protected conduct."  But there is no Supreme Court or Ninth Circuit case law that addresses

21  whether an inmate's participation in a hunger strike is "protected conduct," and the district court

22  and out of circuit cases that have addressed this issue are inconsistent and unpublished.

23      In *Texas v. Johnson*, 491 U.S. 397 (1989), the Supreme Court stated that "[t]he First

24  Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that

25  its protection does not end at the spoken or written word."  *Id.* at 404.  The view that a limitless

26  variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends

27  thereby to express an idea has been rejected by the Supreme Court, but conduct may be

28  sufficiently imbued with elements of communication to fall within the scope of the First

20

1   Amendment. *Id*. The Supreme Court described several examples of "expressive" conduct that

2   were protected under the First Amendment; however, none touched on whether participation in a

3   hunger strike qualified as speech under the First Amendment. *See id*.

4   **D.   Perez Did Not Allege a Chilling of His Exercise of First Amendment Rights.**

5   Perez claims that Defendants' actions "were aimed at chilling" the exercise of his First

6   Amendment rights, but he does not allege that he was actually chilled in any way. (ECF No. 33

7   at 16.) "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he

8   suffered some other harm" as a retaliatory adverse action. *Brodheim*, 584 F.3d at 1269, citing

9   *Rhodes*, 408 F.3d at 568 n.11. An allegation of "harm that is more than minimal" from the

10  alleged retaliation can satisfy the fourth element without an allegation of a chilling effect. *See*

11  *Rhodes* 408 F.3d at 567, 568 n.11. Perez fails to satisfy this fourth element because the harm that

12  he suffered was, at most, minimal.

13  Perez alleges that Defendants' actions caused him to experience severe depression and

14  anxiety. (ECF No. 33 at 16.) But he did not seek or receive mental-health treatment until about

15  nine months after the cell search and issuance of the RVR. (Decl. Nygaard, Ex. A at 91:4-17, Ex.

16  E at Nos. 6, 8.) And the reason that he requested to speak to a therapist then was that he was

17  feeling depressed because CDCR was not complying with the settlement agreement in Perez I,

18  not because of Defendants' alleged "adverse actions." (*Id*. at 91:18-25.) When a therapist came

19  to see him, he declined to speak to her because it was not in a private setting; he never requested a

20  more confidential setting. (*Id*. at 92:20-94:9.) Perez also alleges that Defendants' actions caused

21  him to experience insomnia. (ECF No. 33 at 18.) But he did not seek or receive any treatment

22  for insomnia. (Decl. Nygaard, Ex. E at Nos. 5, 7.) This undisputed evidence reflects that Perez's

23  emotional and physical injuries were at most minimal—no reasonable jury could find otherwise.

24  Perez also claims that Defendants' actions caused confusion and delay in his receiving a

25  new validation under the terms of the Perez I settlement, and that they prevented his timely

26  release from the SHU. (ECF No. 33 at 16.) Defendants acknowledge that there was initially

27  some confusion over whether the premature validation satisfied the terms of the settlement

28  agreement. However, this confusion did not cause a delay in his receipt of a new validation or his

21

1   release from the SHU.  Perez received a new STG validation within the time required under the

2   terms of the Perez I settlement agreement and he was then released from the SHU—Perez

3   admitted this fact at his deposition.  (Decl. Nygaard, Ex. A at 130:22-131:10.)

4       Perez also claims that when he returned to his cell he found that "[b]lankets, mattresses,

5   sheets, and clothing were unfurled and strewn across the cell's floor and marked with dirty prints.

6   Shampoo, soap, toothpaste and deodorant were scattered and spilled within the lockers."  (ECF

7   No. 33 at 11.)  Defendants deny leaving his cell in this condition.  But this is not a material

8   dispute, because even if his cell had been "trashed" this one time, it amounts to a minimal injury.

9   **III.   THERE WAS NO CONSPIRACY.**

10       A conspiracy claim requires proof of an agreement or meeting of the minds to violate

11   constitutional rights, *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2001) (quotation omitted), as

12   well as an actual deprivation of constitutional rights resulting from the alleged conspiracy, *Hart v.*

13   *Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (quotation omitted).  To be liable, each participant in

14   the conspiracy need not know the exact details of the plan, but each participant must at least share

15   the common objective of the conspiracy.  *Franklin*, 312 F.3d at 441 (quotation omitted).

16       Here, there is no evidence that Defendants had "an agreement or meeting of the minds" to

17   violate Perez's constitutional rights.  Prelip did not communicate with any of the other

18   Defendants.  (Decl. Prelip ¶ 3.)  The remaining Defendants only communicated about searching

19   Perez's cell as part of a gang-validation proceeding.  (Decl. Gates ¶ 2; Decl. Gongora ¶ 3; Decl.

20   Healy ¶ 2; Decl. Pimentel ¶ 2.)  And none of the Defendants spoke to Gates about the RVR.

21   (Decl. Burris ¶ 6; Decl. Gates ¶ 7; Decl. Gongora ¶ 7; Decl. Healy ¶ 6; Decl. Pimentel ¶ 6.)

22   **IV.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

23       Government officials are "shielded from liability for civil damages insofar as their conduct

24   does not violate clearly established statutory or constitutional rights of which a reasonable person

25   would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of the rule is

26   to permit officials to undertake their responsibilities without fear that they will be held liable in

27   damages for actions that appear reasonable at the time, but are later held to violate statutory or

28   constitutional rights.  *Id.* at 819.  "The concern of the immunity inquiry is to acknowledge that

1    reasonable mistakes can be made" and that it is "often difficult for an officer to determine how

2    the relevant legal doctrine will apply to the factual situation that he faces." *Estate of Ford v.*

3    *Ramirez Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).

4         In *Saucier*, the Supreme Court set forth a two-part inquiry to determine whether the

5    immunity exits. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The first prong is whether "[t]aken in

6    the light most favorable to the party asserting the injury, . . . the facts alleged show that the

7    officer's conduct violated a constitutional right." *Id*.  If a violation can be made out, the second

8    prong, is to ask whether the "right was clearly established." *Id*.  If the right was clearly

9    established at the time of the alleged incident, the court must then determine whether, "under that

10   law, could a reasonable state official have believed his conduct was lawful." *Id*. at 202.  "The

11   linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v.*

12   *Washoe County*, 654 F.3d 1001, 1006 (9th Cir. 2011).

13        Qualified immunity allows ample room for mistaken judgments—regardless of whether the

14   government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed

15   questions of law and fact"—and applies even when wrongful conduct occurs. *Richardson v.*

16   *McKnight*, 521 U.S. 399, 403 (1997); P*earson v. Callahan*, 555 U.S. 223, 231 (2009).  The court

17   has the discretion, based on the circumstances of the particular case at hand, to decide whether the

18   two-part inquiry is worthwhile or if a determination can be made by analyzing a single prong of

19   the immunity inquiry.  *Pearson*, 555 U.S. at 236.

20        This Court, in determining whether a right was clearly established, must look to "Supreme

21   Court and Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v.*

22   *Bieter*, 623 F.3d 945, 967 (9th Cir. 2010.)  In the absence of binding precedent, the court may

23   look to all available decisional law, including the law of other circuits and district courts.  *Id*.  It

24   will, however, "be a rare instance in which, absent any published opinions on point or

25   overwhelming obviousness of illegality, [that the court] can conclude that the law was clearly

26   established on the basis of unpublished decisions only." *Sorrels v. Mckee*, 290 F.3d 965, 971-72

27   (9th Cir. 2002).

28

23

1

### A.  There Has Been No Constitutional Violation.

2

Defendants are entitled to qualified immunity because there has been no Constitutional

3

violation.  (*See supra* Arg. II-III.)

4

### B.  A Hunger Strike Was Not Clearly Established "Protected Conduct."

5

There is no Supreme Court or Ninth Circuit case law that addresses whether an inmate's

6

participation in a hunger strike is "protected conduct," and the district court and out-of-circuit

7

cases that have addressed this issue are inconsistent and unpublished.  (*See supra* Arg. II(C).)

8

Thus, Defendants are entitled to qualified immunity on Perez's claim that they retaliated against

9

him for his participation in hunger strikes because it was not clearly established that participating

10

in a hunger strike was "protected conduct" in the context of a retaliation claim.

11

### C.  Burris and Prelip Followed Superiors' Orders, Which Did not Clearly Violate Perez's Constitutional Rights.

12

13

The Ninth Circuit denies qualified immunity to state actors who rely on directives that

14

contradict clearly established constitutional safeguards.  *See Cal. Att'ys for Criminal Justice v.*

15

*Butts,* 195 F.3d 1039, 1049-50 (9th Cir. 1999).  But the directives Burris and Prelip received from

16

their supervisors to initiate validation proceedings based on their misunderstanding that there was

17

a settlement agreement did not contradict a clearly established constitutional safeguard.  Perez

18

had no constitutional right to be free from a gang validation that he was requesting.  Although

19

Defendants acknowledge that the proceeding was premature because the settlement agreement

20

was not finalized, conducting a validation before one was due did not violate CDCR policy.

21

(Decl. Nygaard, Ex. D at 155:7-24.)

22

### D.  Gates, Gongora, Healy, and Pimentel's Participation in the Search was not Clearly Unconstitutional.

23

24

It also was reasonable for Gates, Gongora, Healy, and Pimentel to believe that the cell

25

search they conducted was part of an authorized gang validation and thus not unconstitutional.

26

They understood that the search served a legitimate penological interest, and their not asking

27

further questions as to the reason behind the search did not violate any policy.  (Decl. Nygaard,

28

Ex. D at 150:8-19.)

1
**E.    The taking of Perez's Property Was Reasonable under the Circumstances.**

2
Defendants are also entitled to qualified immunity on Perez's claim that the confiscation of

3
his property was retaliatory.  Defendants would not have understood that taking contraband and

4
reviewing property for evidence of gang activity violated Perez's constitutional rights.  (Decl.

5
Burris ¶ 4, Ex. B.)

6
**F.    It was not clearly established that making comments was unconstitutional.**

7
Defendants are also entitled to qualified immunity on Perez's claim concerning the alleged

8
comments.  Defendants deny making the statements, but even if they were said, the law was not

9
clearly established that making these non-threatening comments violated the Constitution.  *See*

10
*Alnutt*, 913 F.Supp. at 165–66.

11
**G.    Defendant Gates is entitled to qualified immunity for the RVR.**

12
Gates is entitled to qualified immunity for his role in issuing the RVR.  A reasonable officer

13
would not have understood that issuing a RVR, which was approved by a supervisor before

14
issuance, for the behavior that Gates observed (Perez's attempt to block officers' view of illicit

15
activity) was unconstitutional.

16
**CONCLUSION**

17
The Court should find that Perez failed to exhaust his administrative remedies for his claims

18
regarding:  the RVR, Prelip, the comments, the use of improper validation procedures, and his

19
participation in hunger strikes and writing of articles critical of CDCR.  The Court should also

20
find that there is no evidence that Defendants retaliated against Perez or conspired to retaliate

21
against him.  Finally, the Court should find that Defendants are entitled to qualified immunity.

22
Dated:  April 16, 2015                                    Respectfully submitted,

23
                                                          KAMALA D. HARRIS
                                                          Attorney General of California
24
                                                          DAMON G. MCCLAIN
                                                          Supervising Deputy Attorney General
25

                                                          */S/ JENNIFER NYGAARD*
26
                                                          JENNIFER J. NYGAARD
                                                          Deputy Attorney General
27
                                                          *Attorneys for Defendants*

28

25

Defs.' Notice Mot., Mot. Summ. J. & Memo P. & A. (C 13-5359 VC (PR))