Randall R. Lee (SBN: 152672)
randall.lee@wilmerhale.com
Matthew D. Benedetto (SBN: 252379)
matthew.benedetto@wilmerhale.com
Katie Moran (SBN: 272041)
katie.moran@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE PEREZ, | Case No. 3:13-CV-05359-vc |
| Plaintiff, | **DECLARATION OF JESSE PEREZ ISO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| J. PRELIP, SENIOR SPECIAL AGENT, AND OFFICERS A. GATES, S. BURRIS, D. GONGORA, E. HEALTHY and G. PIMENTEL | Hon. Vince Chhabria |
| Defendant. | Hearing Date: May 21, 2015 |

I, Jesse Perez, declare as follows:

**Background**

1. My name is Jesse Perez, and I am a 34 year-old prisoner housed at Pelican Bay State Prison ("PBSP"). I have been in the custody of the California Department of Corrections and Rehabilitation ("CDCR") since I was 17 years old. Before my incarceration, I lived in Colton, California, in San Bernardino County.

2. During my early childhood, I lived with my mother and father and three siblings (Xochitl, Davo, and Esperanza). When I was 11 years old, my mother and father began having marital problems, and my father began physically abusing my mother and me. Eventually, he abandoned our family entirely.

3. I did not cope with this abandonment well. I ran away from home, dropped out of school, and in a misguided attempt to restore a sense of family, I got involved with a neighborhood street gang called North Side Coltons.

4. In 1996, when I was 15 years old, I was arrested and charged with second-degree murder. Afraid of the prospect of spending the rest of my life in prison, I accepted a plea agreement. Although at the time I understood the length of the agreed-upon prison term to be otherwise, I recently learned that I am currently serving a sentence of 19 years to life.

5. In awe of the unwavering and unconditional love of my family as they stood by my side through my arrest and incarceration, I soon appreciated the magnitude of my error in attempting to create a sense of family through gang life.

6. Once incarcerated, it became very important to me that I remain an active participant in my family's life, and I took measures to stay as close to my family as possible. Knowing that I had made some poor decisions in my past, I wanted to become a positive presence in my family. I was particularly focused on providing guidance to my little brother Davo in the hopes that he would not make the same choices I had made.

7. In 1998, I was transferred to the California Correctional Institution at Tehachapi. While at Tehachapi, my family visited me frequently, and I spoke to Davo on the phone almost every night. I heard about family events, such as birthdays, relationships, graduations, and other life milestones as they happened. I was able to provide real-time advice to problems encountered by my siblings, and I benefited from their counsel as I settled into prison life. Despite my incarceration, I was an active participant in my family's life.

**2003 Validation & SHU Confinement**

8. In 2003, that all changed. In March 2003, I was removed from my cell and placed in administrative segregation pending the results of a gang validation investigation. When I asked the Institutional Gang Investigator (IGI) why I had been selected for a gang validation investigation, he explained that I had been "acting up" and that he had been told to make "headaches" like me "go away."

9. Without providing me any opportunity to refute the evidence, the IGI compiled six "source items" into a validation packet and sent it to the Law Enforcement Investigations Unit ("LEIU"), which determined that the evidence was sufficient to validate me as an associate of the Mexican Mafia prison gang.

10. In September 2003, the Institutional Classification Committee found that, as a validated associate, I met the criteria for an indeterminate term in the Security Housing Unit ("SHU") at PBSP.

11. I was devastated. In prison, prisoners refer to transfer to the SHU as being "put on the shelf"— out of sight and out of mind of everything and everyone. I knew this meant that I might never be in the same room with my family again; never share a hug; never hear my brother's voice on the phone.

12. In December 2003, I was transferred to Pelican Bay and placed in an 8 by 10 foot concrete cell, where I remained for 23 hours a day, every day, for 10 years.

13. The isolation I experienced was unbearable. I had no cellmate[1], no phone privileges, no contact visits, and no opportunities to interact with anyone except for the occasional correctional officer and the few prisoners who could hear me through the air vents or see me as I walked to the shower. I felt that I had been buried alive.

14. It took everything I had to hold onto my sanity. I worked hard to keep hold of reality by developing a disciplined routine. I began waking up very early to exercise and became a vegetarian.

15. Other prisoners were not as successful at maintaining control of their mental faculties. I could hear screaming as prisoners succumbed to feelings of panic and desolation. When I first arrived, I thought there were two inmates in the cell below me because I frequently heard animated and violent arguments. I discovered that, despite the distinct voices, these were the sounds of one man who had lost touch with reality as he argued and beat himself. Another inmate in my pod became so terrified of leaving his cell that he barricaded himself in his cell,

---

[1] I received a cellmate in May 2012.

convinced that guards would kill him if he left. Correctional officers had to forcibly extract him, using an incendiary device to open his blockaded door. Another inmate in my pod began taking bird baths with Kool-Aid. Watching once vibrant and engaging individuals become sub-human versions of their original selves was nothing short of terrifying.

16. The separation from my family was devastating. I received letters, but the mail system was too slow to allow me to meaningfully participate in their lives. The cost of traveling up to the Oregon border from southern California was prohibitive to my family and would require 15 hours in a car. When my family was able to make the trip, which occurred less than once a year, I had to speak to them through a telephone and from behind a glass window. During this time, my brother Davo became a U.S. Marine, was deployed to Afghanistan and received two Purple Hearts. It was very difficult to learn about his injuries and heroism on the battle field via letter when I had no means of communicating in real-time with my family about what was going on.

17. After the initial shock of my transfer to the SHU wore off, the fear turned to depression and disbelief. I had thought places like this were reserved for prisoners who had hurt someone in prison. I was overwhelmed by the injustice that I had lost everything important to me because I had somehow proved to be a "headache" to the wrong correctional officer.

18. I knew very little about the law or the rules governing validation proceedings, but I knew that putting someone in solitary confinement indefinitely without giving him an opportunity to refute the evidence was wrong. Heeding the advice I had seen on some pamphlets disseminated by prisoners' rights organizations, I filed a prison grievance, but to no avail.

19. Motivated by the prospect of seeing my family again, I set out to learn as much as I could about the law. I submitted a request to go to the law library. Roughly once a month, I would be shackled to a line of other prisoners and escorted to what Pelican Bay refers to as the "prison law library." The "library" is a row of metal cages large enough to fit one person standing up. The cage is roughly 7 feet tall and 2 and ½ feet wide and contains a narrow slot in

which a book may be passed in and out of the cage. An officer pushes a cart of books along the row of cages passing out books.

20. With only a 7th grade education, the process of educating myself was slow at first. I had to acquire a new vocabulary; learn how information is stored and organized in treatises and cases; and familiarize myself with the adversarial system, the litigation process, and hierarchical structure of the courts. In addition, I had to develop analytical thinking and writing skills, not to mention learn the law specific to validations and SHU confinement. The process of selecting which books might help me with these endeavors was trial and error. I read every book about the law I could get my hands on.

**Previous Lawsuit**

21. In April 2005, I finally felt prepared to file a lawsuit against the IGI who had set out to "put headaches like [me] away" and several other correctional officers involved in my validation. For the following eight years, I litigated this case—alone and from inside the confines of the SHU. Learning whatever I could during my limited time at the law library, I amended my complaint, and drafted motions and responses to the defendants' motions.

22. In November 2008, defendants filed a motion for summary judgment arguing that they were entitled to qualified immunity. Encouraged by my understanding of the controlling legal doctrine, I prepared and filed an opposition. On September 30, 2010, the district court judge denied defendants' motion for summary judgment, holding that, if my allegations were true, then what happened to me was a violation of my clearly established rights.

23. That day was one of the best days I can remember. Overwhelmed with joy, I banged on the cell wall in celebration, and the prisoners in my pod cheered and congratulated me for my years of hard work. I knew that it was not a complete victory and that there were hurdles ahead, but, to me, this order meant that someone with authority recognized that what happened to me was wrong. It suggested that my faith in the legal system may not be misplaced, and that my hard work might pay off.

24. A few days later, the defendants appealed the order denying them qualified immunity. Although I had become well-versed in the law of my case, I knew that a Ninth Circuit brief would be a challenge. I asked the Ninth Circuit to provide me pro bono counsel. And on November 2, 2011, the Ninth Circuit appointed WilmerHale to represent me during the appeal.

25. On February 2, 2012, my lawyers and I filed an answering brief. Shortly thereafter, the Deputy Attorney General (DAG) reached out to my lawyers and asked if I would consider a settlement. More than anything else in the world, I wanted to get out of the SHU. I knew that doing so would require a new validation proceeding, one that would require a bona fide review of my history and a good-faith analysis as to whether the SHU was the appropriate housing placement for me. As discussed further below, I knew the CDCR was engaged in the process of revamping its validation and segregation procedures. Therefore, I said I would settle only if I could receive a validation procedure under the improved policies that were forthcoming.

26. Over the course of the following eight months, the DAG and my attorneys exchanged several settlement proposals. In early October, just two weeks before the scheduled date for oral argument before the Ninth Circuit, the CDCR agreed in principle to settle the case for a new initial validation procedure that I would receive under the new policies and a monetary payment in exchange for my dismissal of the lawsuit.

27. I was ecstatic to hear that the CDCR had agreed to provide me with a new validation under the new policies because I knew I did not meet the revised, and more stringent, threshold for SHU placement. I felt that my years of hard work finally paid off, and I would soon be able to reengage with my family in a meaningful way.

**2011 Hunger Strikes and the STG Pilot Program**

28. In 2011, I participated in two hunger strikes aimed at drawing national attention to the harsh conditions of Pelican Bay's SHU and the cruel practice of placing non-dangerous prisoners in solitary confinement.

29. After the second hunger strike, the CDCR announced that it would reevaluate the procedure by which it validated prison gang associates and members, as well as the policies regarding administrative placement of these prisoners in the SHU.

30. The CDCR, to its credit, recognized the seriousness of the problem and committed to overhaul the SHU housing policies. It developed the Security Threat Group (STG) Pilot Program and throughout 2012 circulated drafts of the program throughout the prison to assure prisoners that it was taking measures to bring about a more humane housing program.

31. Several drafts of the STG Pilot Program were disseminated between September 2011 and October 2012, with the final version published on October 11, 2012. The pending changes to CDCR policy were well-known and talked about by IGIs, line officers, and prisoners at Pelican Bay. Chief among the changes was the requirement that a prisoner would be assigned to the SHU only if he had a serious rules violation report showing a nexus to gang activity.

**Publications/Other Activism**

32. In addition to participating in the hunger strikes, I become an active participant in the prison rights movement. I began reading various publications that addressed the practice of solitary confinement and, in 2011, I began submitting articles to various magazines. My articles appeared in publications such as the San Francisco Bay View and The Rock Newsletter, to which many prisoners subscribe. My writings criticized the use of solitary confinement and advocated the creation of a Prisoner Political Action Committee to give prisoners a political voice. I also received letters in response to my writing from people who were not incarcerated, and from readers as far away as France.

33. In September and October 2012, after sending out several articles with no response, I began to suspect that my outgoing mail was being intercepted by CDCR. One such article criticized changes to the validation procedure that were proposed in a draft memo describing the STG Pilot program. I tested this theory by asking my pod mate Derrick Simms to send the article for publication. This article was eventually published, under Derrick Simms' name, in the November 2012 issue of the Rock Newsletter.

34. Where I could, I tried to help other prisoners fight their SHU confinement by helping them draft inmate appeals, complaints, and various other court documents. Through my years of studying the law, I became somewhat of a "jail house lawyer."

**October 10, 2012 Cell Search**

35. On October 10, 2012, days after learning that the CDCR had preliminarily agreed to provide me with a validation procedure under new, more rigorous procedures, Officers Gates, Gongora, Healy, and Pimentel showed up to search my cell.

36. I was startled to my feet by the sound of yelling and rattling of keys echoing throughout my housing pod. I heard one of the guards yell "come to the front of the cell and strip down." I immediately complied with the order and came to the front of the cell and began to strip down. My roommate, Rudy Guerrero, remained a bit further back and also began to strip down. I recognized Pimentel from a previous cell search he conducted in 2009, and was also familiar with Burris because in 2011 he issued me a disciplinary report alleging that I stored peanut butter in a mattress. I subsequently was found not guilty of this offense.

37. Standing naked at the front of the cell, I asked the officers what was going on, and Officer Gates replied, "We're doing a cell search." After a visual inspection of my naked body, Gates instructed me to get dressed in boxer shorts and shower-shoes.

38. Gates then opened the food-port slot on the cell's door, through which I placed my hands, allowing Gates to place me in handcuffs. Rudy did the same. The four correctional officers escorted Rudy and me into the rotunda at the center of our housing pod.

39. Officers Healy and Gongora locked Rudy in the rotunda's holding cell, while Officers Gates and Pimentel began photographing my face and body. I asked Gates and Pimentel whether this was being done as part of a validation procedure. I told them that I was not eligible for an Active/Inactive review until December 2014. Sarcastically, Gates responded, "I don't know man, your name just happened to come up."

40. While Gates and Pimentel photographed my body, I had my back to the holding cell where Healy and Gongora had placed Rudy. I heard Healy and Gongora say something to

Rudy, but I could not make out what was said. After securing Rudy in the holding cell, Healy and Gongora walked back toward my cell.

41. When they were done taking pictures, Gates and Pimentel placed me in the holding cell with Rudy, and walked back toward my cell to assist Healy and Gongora with the cell search.

42. While in the holding cell, I asked Rudy what the officer said to him while I was being photographed. Rudy said that Healy had asked him which locker was his, and he told him that his locker was the one to the left. Rudy told me that Healy asked if he was "into filing lawsuits too" and Rudy responded "no." Rudy told me that Healy said "Good for you. Keep it that way."

43. After about 25 minutes, I saw Healy and Gongora wheel two carts full of our property into the rotunda and out of the housing pod. Several minutes later Gates and Pimentel returned and ordered us to "cuff-up."

44. I told Officer Gates that I would need my paperwork back as soon as possible because I had a lawsuit pending. Gates then said to me, "Oh yea, about that – you might've been able to collect from us, but get comfortable because we're going to make sure you stay here where you belong." Gates and Pimentel then escorted us back to our cell and left.

45. When we got back to our cell, I knew immediately that this was no ordinary cell search. The cell was in complete disarray. Our mattresses were overturned; our clothing, sheets, and blankets were unfurled and marked with dirty boot prints; and our shampoo, toothpaste, and other liquid toiletries, which had been contained in transparent plastic bags, were emptied out and spilled in the lockers. All of our property was gone, including my books, folders containing drafts of my Ninth Circuit brief, and several articles I had written criticizing the CDCR's use of solitary confinement. On the desk, I found a cell search receipt signed by Officers Pimentel, Gates and Gongora indicating that my property had been confiscated for review by the IGI.

46. In my years of incarceration, I have witnessed many cell searches. In my experience, it is common practice for the officers to return the cell to the state it was before the search.

47. As Rudy and I began cleaning up our cell, Salvador Mendoza, the prisoner housed to the left of our cell, began speaking to us through the ventilation opening in the cell wall. Because the ventilation system connects the cells, sound travels easily from cell to cell.

48. Salvador said that after we had been escorted out of the cell, the officers returned. He said he heard the sound of papers being crumpled and torn as the officers searched the cell. He said one of the officers said something to the effect of "these knuckleheads should file lawsuits more often – makes this job a whole lot more rewarding." He said he heard the other officers laugh.

49. The next day, Officer Pimentel returned most of our property with a cell search receipt which stated that our address books, twelve of my personal photographs and three pages of addresses were being confiscated. Although it wasn't listed on the cell search receipt, the officers had also confiscated drafts of my Ninth Circuit brief and four of the articles I had written.

50. Hearing what the officers had said to Rudy and what the officers had said while searching the cell confirmed my fears that this action was taken to punish me for filing lawsuits. At once, I knew that the officers had initiated validation procedures under the older policies in an effort to keep me housed in the SHU for as long as possible.

51. I know it sounds counter-intuitive that efforts to keep someone in the SHU can be evidenced by affording me a new validation procedure. But whether I was validated under the new or old procedures was the difference between staying in the SHU or finally getting out, and Defendants knew this. What I was asking for during the settlement negotiations was a substantive review of my file and a fresh look as to whether Pelican Bay's SHU was the appropriate housing for me. Under the old regime, such a substantive housing determination was precluded by the CDCR's policy of automatically assigning validated prison gang associates to the SHU. The new policies, which I had studied at great length as various drafts were circulated,

Perez Declaration ISO Opposition to Motion for Summary Judgment
Case No. 3:13-CV-05359-vc

were not so draconian when it came to housing assignments. For SHU placement, they required that a validated gang associate engage in serious misconduct that showed a nexus to prison gang activity. Without a rules violation report (RVR) demonstrating this misconduct, even a validated prison gang associate was to be placed in the general population.

52. Given the scant evidence used to initially validate me, I suspected that, despite the new policies, the CDCR may still believe I was somehow associated with a prison gang after a new validation procedure. But I knew that I did not engage in misconduct, let alone serious misconduct that demonstrated a nexus to prison gang activity. I knew that if the CDCR used the new procedures, I would be released to the general population. I also feared that, if I was revalidated under the old policies, I would be re-assigned to the SHU, and because I would appear on paper as having been recently validated, I would be put at the end of the line when it came to any substantive review of my file conducted by the Departmental Review Board after the implementation of the STG Program.

53. The very next day, a finalized version of the Security Threat Group Pilot Program was circulated. For a year, the CDCR had circulated several drafts of this program, all of which included the new requirement that assignment to the SHU be predicated on a serious RVR. This allowed me to maintain some hope that, even though Officer Gates had told me he would make sure I stayed "where I belonged," the Institution Classification Committee, the committee charged with determining appropriate housing, would place me in the general population since I had no instances of misconduct with a nexus to gang activity.

**October 28, 2012 RVR**

54. That hope was shattered 10 days later when I was issued an RVR authored by Officer Gates. According to the report, before the cell search on October 10, I had instructed my roommate, Rudy Guerrero, to tear up pieces of paper and put them down the toilet. The report alleged that I had repeatedly moved from the cell front to where Rudy had been supposedly throwing papers in the toilet in an effort to obscure the officers' view. The RVR said the torn-up

Perez Declaration ISO Opposition to Motion for Summary Judgment
Case No. 3:13-CV-05359-vc

pieces of paper were "kites," or gang-related notes that contained information related to the Mexican Mafia.

55. I do not doubt that the officers found pieces of paper in the toilet. It is common practice for prisoners to tear up personal letters from home and dispose of them in the toilet. We do this not only to protect our own privacy, but also to protect the privacy of our loved ones. General population prisoners in protected custody are charged with processing out the trash from the SHU, separating out the recyclables. We do not want our family members' addresses or other personal information to fall into the wrong hands. Therefore, we tend to tear up these correspondences and dispose of them in the toilet.

56. However, Rudy Guerrero was not tearing up any papers when the officers came to the front of our cell, nor was I instructing him to do so. When the officers instructed us to strip down, I was standing at the front of the cell, and Rudy Guerrero was behind me nowhere near the toilet. In any event, there is not space between the toilet and the front of the cell that would allow for anyone to obstruct any officer's view.

57. Nonetheless, Officer Gates charged me with "willfully resisting or obstructing a peace officer," a serious offense that not only would result in a forfeiture of good-time credit, but would also preclude me from leaving the SHU in the event my file was ever re-evaluated under the new policies. In short, if I was found guilty, it would serve the exact purpose for which it was drafted—to keep me in the SHU, where according to Officer Gates "I belonged."

58. On November 18, I attended an administrative hearing for the RVR. I pleaded not guilty and explained that the events described in the RVR had not occurred. I argued that the physical layout of the cell would have prevented me from obscuring any officer's view. The hearing officer, Lieutenant J.C. Anderson, dismissed the RVR, finding not only that there was insufficient evidence to support the serious violation of "willfully resisting or obstructing a peace officer," but also that there was insufficient evidence to support the lesser included offense of "refusal to obey orders." According to the new policies, a serious RVR would be relevant to housing even apart from a validation procedure because those who had been validated pursuant

to the old procedures would be afforded a hearing before the Departmental Review Board ("DRB"). The DRB was to release any gang associate who did not have a serious RVR with a nexus to gang activity within the preceding four years. Because I was found not guilty, the RVR was removed from my file, as was any record of its adjudication, but I still worried that the officers would continue to try to make good on their efforts to keep me where "I belonged." I worried that I would not be able to prove my innocence next time and that I would remain in the SHU forever. The retaliation I experienced filled me with anxiety. I became depressed and suffered from insomnia.

**Grievances**

59. In an effort to alert the CDCR that Defendants were improperly targeting me due to my filing of lawsuits and political activism, on October 28, 2012, I filed an prisoner grievance describing the incident. I hoped that the inmate appeal process might cause those reviewing the appeal to realize that there was no finalized settlement in place requiring a validation. I had hoped that, once the CDCR realized that there was no settlement in place, the validation procedure would be put on hold.

60. I used all the available space on the 602 form and described how Gates, Healy, Gongora, Pimentel, Burris, and "the individual who ordered my validation" (who I later learned was Prelip), engaged in "retaliation and conspiracy to violate my federally protected rights in violation of the 1st Amendment & 42 U.S.C. 1983." I further stated that Defendants had initiated an unscheduled validation proceeding, trashed my cell, and confiscated my property. I requested (1) "an immediate cessation" of retaliatory conduct; (2) return of my personal property; (3) the identity of the official(s) who ordered his validation; and (4) money damages.

61. On November 26, Sergeant Dornback came to my cell and introduced himself as the officer assigned to investigate my grievance. He interviewed me and asked if I had anything to add. I told him that, as further evidence of the retaliation, Gates had issued a meritless and retaliatory RVR, and that the underlying allegations did not warrant a serious RVR.

62. On November 28, my appeal was reviewed by Warden G.D. Lewis. Warden Lewis considered all the allegations in his written opinion, including the RVR, but ultimately denied my requested relief. His reason for denying my relief was that the new validation was provided pursuant to a settlement agreement, despite the fact that no settlement was in existence.

63. On February 22, 2013, my appeal was reviewed at the third level and denied. The examiner denied the requested relief because I had "added new issues and requests" to the appeal.

64. Having no idea to which "new issues" the examiner referred, on March 10, 2013, I submitted a new grievance challenging this decision, and on March 12, this appeal was dismissed as duplicative of the October 28 appeal.

65. On March 14, I submitted another appeal requesting (1) clarification as to which issues were considered new in the previous appeal's denial, (2) tolling of time period regarding the alleged "new" issues, and (3) the reinstatement of the grievance dated March 10.

66. On April 22, 2013, Warden Lewis issued an opinion denying the March 14 appeal. The third-level reviewer upheld this opinion, finding that the March 10 appeal had been properly screened as duplicative of the October 28 appeal.

**Validation Procedures**

67. On November 30, 2012, Officer Burris came to my cell providing me with a list of source items that were going to be used in my validation proceedings and told me I had 24 hours to prepare a response. Of the 12 source items to be considered, only one had been procured as a result of the search on October 10: a confidential memorandum drafted by Defendant Burris which claimed that I had been in possession of addresses and photographs of other validated associates. Of the remaining 11 source items, all were more than two years old and seven were older than 4 years. One was a decade old.

68. On December 3, Officer Burris came to my cell to interview me as part of the validation process. I provided my written rebuttal to the source items and asked Defendant Burris why the new STG forms were not being utilized. In my written rebuttal, I pointed out that one of the source items, a photograph taken from my cell in 2009, was being identified as a

tattoo or symbol rather than as a photograph. The reason this is relevant is that under the new STG policy, photographs can be used as a source item only if they are under four years old. I was concerned that the correctional officers were purposefully misclassifying this item in an effort to permanently keep it in my file, since I could not see how one could reasonably mistake a photograph for a tattoo or symbol.

69. On December 15, 2012, Officer Burris returned to my cell and issued another CDCR 128B disclosure form, this time including additional information relating to a 2007 source item. He again said I had 24 hours to prepare a response. He returned to my cell on December 20, 2012 to ask if I had anything to add to my written rebuttal.

70. On January 15, 2013, Officer Burris again returned to my cell and provided me with a CDCR 128B disclosure form. Again, the disclosure form listed the same 12 items as before. He told me I had 24 hours to prepare my response. Because the source items were identical, I again provided my written response when he returned the next day.

71. On June 26, 2013, Officer T. Adams served me with a CDC128B-2 form indicating that my validation packet had been submitted once again to OCS in late April, and was received by OCS on April 30, 2013. Despite the fact that I had done everything I could to alert CDCR that this validation was not part of any settlement, the document indicated that "Per request for settlement authority memorandum," I was afforded a new validation investigation. The form indicated that "the results of this investigation are as follows" and listed *the same* 12 source items that were provided to me first in November, then in December, and then again in January. In all of these disclosures, the most recent source item remained the November 20, 2012 confidential memorandum drafted by Defendant Burris after the October 10, 2012 search. The packet that was submitted to OCS was identical to the one submitted in January, complete with a copy of a written response that I submitted in December.

72. On June 30, 2013, my settlement with the CDCR was executed. By this time, the STG Pilot program had been put into effect fully, and so the settlement called for a validation under "current procedures."

73. On July 10, 2013, I submitted an inmate appeal form again notifying the CDCR that the validation I had undergone in late 2012 and early 2013 was not compliant with the settlement because it had not been conducted under new procedures and occurred 8 months before the settlement's execution.

74. On July 15, I submitted an inmate request for an interview, noting that I had raised the issue with my attorneys and that my attorneys had informed me that the DAG, who had negotiated the settlement on behalf of the CDCR, was in agreement that a validation conducted before the execution of the settlement and under old procedures did not satisfy the terms of the settlement.

75. On July 21, I submitted another inmate request for an interview, stating that it is not accurate that the previous validation was done in compliance with a settlement agreement. I again attempted to explain that a validation provided before the execution of the settlement agreement could not have been done in compliance with that settlement agreement. I asked the CDCR to reconsider its position.

76. On July 23, Litigation Coordinator Shara Soderlund responded that the time limits laid out in the settlement agreement pertained only to the monetary compensation, and that the validation completed before the settlement complied with the settlement agreement.

77. On August 8, 2013, Sergeant Countess responded to the July 15 request for an interview, explaining that, because I had filed an appeal concerning this issue, I needed to wait for the appeal to be processed fully before my concern would be addressed.

78. To say I was given the runaround would be an understatement. After years of litigating my case and after months of negotiations, it seemed as though my faith in the process had been misplaced and that the officers were successful in making good on their promise to keep me in the SHU.

79. It was only when my attorneys intervened with the DAG that the CDCR changed its position to adopt the only reasonable interpretation, indeed the interpretation the DAG himself agreed was intended, of the settlement agreement.

**2013 Hunger Strike**

80. While this back and forth continued about whether a settlement ultimately executed in June 2013 could be satisfied by a validation investigation in October 2012, a statewide hunger strike began.

81. On July 8, 2013, I joined 29,000 other prisoners in refusing my meals. Similar to the 2011 hunger strikes, the idea was to bring national attention to the conditions of solitary confinement, including the use of indeterminate SHU terms for prisoners without violent histories in prison.

82. As a politically active prisoner, I participated in the hunger strike to bring public awareness to the issue of solitary confinement. However, in light of the fact that the CDCR seemed to be putting up every barrier imaginable to keep me from receiving the substantive review I deserved, the hunger strike resonated with me on a very personal level.

83. Over the course of nearly a decade of litigating my case, I had heard from several prisoners that I was wasting my time and was drawing more negative attention from correctional officers to myself and to those around me. I held fast to my belief in the process—that through proper channels I could achieve a substantive review of my file and be provided a more appropriate housing assignment.

84. My faith in that process was shaken when Defendants trashed my cell while saying discouraging and disparaging remarks to my cellmate and me and within earshot of my entire housing pod.

85. When, despite being told that the validation was premature and that my case was pending, Defendants attempted to validate me in December 2012, and again in January 2013, and again in April 2013, I began to realize that Defendants might be successful after all in making good on their promise to keep me where "I belonged." That became exceptionally clear when the CDCR repeatedly took the position that the validations that occurred in late 2012 and early 2013 satisfied the terms of my settlement.

86. On August 23, 2013, after 47 days of not eating, roughly 100 striking prisoners, myself included, were transferred to the medical ward at Folsom prison for close monitoring.

87. There, legislators and CDCR representatives met with the hunger strikers. It was agreed that, if we stopped engaging in the hunger strike, legislative hearings would be held on the topic of solitary confinement, and additional reforms would be considered.

88. On September 5, 2013, after 58 days, the hunger strike ended. I had started the hunger strike weighing 155 pounds, in good health, and ended weighing 116 pounds, experiencing symptoms of liver failure. I was transferred back to the SHU at PBSP.

**December 2013 Validation and Release from SHU**

89. One month later, on October 5, 2013, Officer Healy came to my cell and issued me a 128B form, listing the same source items listed in the November, December, January, and April 128B forms. This time, the officer told me I had 72 hours to prepare a response, indicating that the validation would proceed under the new STG pilot program.

90. On October 8, 2013, Officer Healy returned and interviewed me regarding the validation package. I submitted a written response addressing all of the documents used in the packet.

91. On December 18, 2013, after the Office of Correctional Safety and the Unit Classification Committee determined that the evidence in my validation packet was sufficient to validate me as a gang associate, I met with the Institutional Classification Committee (ICC). The ICC reviewed my disciplinary history and, finding no serious RVRs, determined that general population housing was appropriate.

92. While in the general population, despite my fear of ongoing retaliation, I was intent on continuing to advocate on behalf of misclassified prisoners in the SHU. With new opportunities to interact with prisoners in the general population, I have been able to help others with litigating their cases. I hear stories from prisoners who confirmed what I already knew — that my experiences with prison guards abusing their authority and retaliating against prisoners

were neither isolated nor uncommon throughout the system. I continue to write articles about prison policy.

94. In October 2014, I drafted a proposal seeking permission to form a prisoner activity group aimed at improving relations among racial groups at PBSP. In February 2015, the warden approved my proposed group. The group regularly convenes to discuss race relations and how we can go about improving the quality of life at PBSP. Just recently we conducted an integrated sports competition in the general population yard with much success.

94. Unfortunately, just as my political writings and activism continue to develop, so too has the retaliation. Most of the retaliation occurs in subtle ways. For example, a correctional officer might allow everyone in my cell block, except me, to use the telephone. Some of the retaliation is more overt. For example, I had a job working in the education department as a clerk, helping other prisoners receive their GED. The teacher in the group provided me high praise and positive written reviews. Recently, I was told that I no longer have the job. When I asked why, the teacher told me that she had been told to not work with me because I was a troublemaker.

95. I fear that the retaliation against me will never stop and that my reputation as a "troublemaker" because of my political activities will follow me wherever I go within CDCR.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 30, 2015

Respectfully submitted,

/s/ Jesse Perez
Jesse Perez