Pages 1 - 65

                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
             BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

JESSE PEREZ,                        )
                                    )
            Plaintiff,              )
                                    )
  VS.                               ) NO. C 13-5359 VC
                                    )
J. PRELIP, et al.,                  )
                                    )  San Francisco, California
            Defendants.            )  Monday
                                    )  October 26, 2015
_____)  1:37 p.m.

                     TRANSCRIPT OF PROCEEDINGS

 APPEARANCES:

 For Plaintiff:          WILMER CUTLER PICKERING
                           HALE AND DORR LLP
                         350 South Grand Avenue
                         Suite 2100
                         Los Angeles, California  90071
                    BY:  MATTHEW D. BENEDETTO, ESQ.
                         KATHLEEN BRIDGET MORAN, ESQ.
                         RANDALL LEE, ESQ.


 For Defendants:         KAMALA D. HARRIS
                         Attorney General of California
                         1515 Clay Street, 20th Floor
                         Oakland, California  94612-0550
                    BY:  JENNIFER J. NYGAARD, ESQ.
                         and
                         KAMALA D. HARRIS
                         Attorney General of California
                         Civil Division - Correctional
                           Law Section
                         455 Golden Gate Avenue, Suite 11000
                         San Francisco, California  94102
                    BY:  ELLIOTT T. SEALS, ESQ.

 Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                         Official Reporter, U.S. District Court

```
 1   MONDAY, OCTOBER 26, 2015                              1:37 P.M.

 2                      P R O C E E D I N G S

 3        THE CLERK:  Calling Case No. 13-CV 5359, Perez versus

 4   Prelip, et al.

 5      Counsel, please step forward and state your appearances

 6   for the record.

 7        MR. BENEDETTO:  Matthew Benedetto from the law firm

 8   of WilmerHale on behalf of the Plaintiff Jesse Perez.

 9        THE COURT:  Good afternoon.

10        MR. LEE:  Good afternoon, Your Honor.  Randall Lee

11   for Mr. Perez.

12        THE COURT:  Good afternoon.

13        MS. MORAN:  Katie Moran for Mr. Perez.

14        THE COURT:  Good afternoon.

15        MS. NYGAARD:  Jennifer Nygaard from the Attorney

16   General's office for Defendants.

17        MR. SEALS:  Elliott Seals for the Defendants.

18        THE COURT:  Good afternoon.  Okay.  Why don't we talk

19   first, I guess, about the motions in limine.

20      I will say -- we can sort of hold off discussion on this,

21   but in the thinking about the motions in limine, it struck me

22   that it might be a good idea, the defense has suggested that

23   we bifurcate it to do punitive damages after liability and

24   compensatory damages.

25      It struck me in thinking about the motions in limine that
```

1    it might actually be better to do liability, and then damages.

2    And that might make it sort of easier to prevent the defense

3    from being prejudiced by the admission of too much evidence

4    that arguably relates to the emotional-distress claim, but

5    ought not be considered by the jury as part of the liability

6    question because of the exhaustion issue.

7        So, again, we can sort of talk about that when we get into

8    -- more into the motions in limine.  But why don't we -- get

9    your thoughts on that but why don't we kind of go through

10   them, one by one.

11       And I'll start with the Defendants' motions.

12       And the first one is moot basically, right?

13       There's reference to wanting to preserve the ability to

14   put in evidence of indemnification in case the -- if the

15   Defendant opens the door to the issue.

16       I mean, with all motions in limine, but all these rulings

17   are subject to revisiting at trial if somebody opens the door

18   to something.

19       In the case of indemnity, I'm not sure.  If the Defendant

20   opens the door, I think that's -- still the proper thing to do

21   is just instruct the jury not to consider it, and it's not to

22   -- not to put in evidence of an indemnification agreement.

23       But in any event, I think for now, at this stage, the

24   first motion can be denied as moot.  Right?

25           MS. NYGAARD:  The only thing that we wanted was

1    during discussions with Plaintiff's counsel, they had

2    indicated that if Defendants brought up information about the

3    individual Defendants' financial situation, that they wanted

4    the possibility to bring up indemnification.

5              THE COURT:  Right.  And I think that's –– I think

6    that's actually not the right way to deal with that problem.

7    I think the right way to deal with that problem is to instruct

8    the jury to disregard financial condition.

9              MS. NYGAARD:  No, Your Honor; I believe that we are

10   entitled to ask Defendants questions about their personal

11   financials because under the Government Code, the public

12   entity is not authorized to pay punitive damages.

13      So ––

14             THE COURT:  I'm not talking about punitive damages

15   now.

16             MS. NYGAARD:  Okay.

17             THE COURT:  I'm talking about with respect to

18   liability and compensatory damages.

19             MS. NYGAARD:  Oh, yes, that, we agree is moot now.

20             MR. BENEDETTO:  We agree.

21             THE COURT:  Okay.  All right.  So, Defendants' second

22   motion in limine, this, this brings up –– this brings up an

23   issue that is implicated I think in a couple of the motions in

24   limine.  And it's just generally Perez's history of

25   rabble-rousing and, you know, whether that –– whether and what

1     aspects of that can be admitted.

2         And I guess my general -- I start from the presumption

3     that because the Plaintiff did not exhaust his administrative

4     remedies with respect to his claim that he was retaliated

5     against for the hunger strikes and retaliated against for his

6     prior writings, critical of CDCR, that that -- the default is

7     that evidence of that prior activity should not be admitted.

8         You have your argument about damages.  And that argument

9     resonates with me.  But that's part of why I think, to avoid

10    sort of the unfairness that might attend for the Defendants if

11    a lot of that stuff comes in, that we do a damages phase

12    separately from liability.  And, so, that's the default.

13        My sort of default position is that it shouldn't come in,

14    unless there's's another good reason for it to come in.  And I

15    think that in a limited way, there is a good reason for some

16    of it to come in, is my tentative view.  I'm happy to hear

17    both of your views on it.

18        Number one, I think both sides agree that the materials

19    that were confiscated are part of the case.  I also think

20    that, you know, there's an issue of credibility with respect

21    to Burris and Pimentel -- is that how you pronounce --

22             **MR. BENEDETTO:**  Pimentel.

23             **THE COURT:**  Pimentel, there is an issue of

24    credibility with respect to Burris and -- I've already

25    forgotten.

1          **MS. NYGAARD:**  Pimentel.

2          **THE COURT:**  Pimentel, you know, about whether they

3    knew Perez and knew who he was, and Pimentel got this email.

4    And, it was about Perez and his cellmate.

5          And it makes reference to the fact that they participated

6    in the hunger strikes.  And then Burris issued the RVR against

7    Perez for some activity that he engaged in relating to the

8    hunger strikes.

9          And I think that that -- that has to come in, I think,

10   because it goes to their credibility when they say they didn't

11   know who Perez was.

12         So although, generally speaking, you know, my feeling is

13   that Perez's history of rabble-rousing should primarily be

14   reserved for the second phase of trial if we should get there,

15   the fact that he was involved in hunger strikes I think comes

16   in because of the prior RVR by Burris and because of the email

17   which needs to come in, and therefore, by definition, mention

18   of the hunger strikes needs to come in.

19         So what's everybody's reaction to that?

20         **MR. BENEDETTO:**  Your Honor, we would certainly agree

21   that the hunger strike evidence is relevant to Defendant

22   Burris.

23         As a larger point though, I think our position is that

24   what happened on October 10th, 2012, did have a longer

25   history.  And that there is a risk that if that evidence is

1   circumscribed too severely, the jury will not have a full

2   sense of why those events unfolded in the way that they did.

3          **THE COURT:**   And that's the risk that Perez took on

4   when he didn't exhaust those claims.   And it would be unfair,

5   I think -- basically what you are saying is:   We want the jury

6   to know that the Defendants were motivated by the hunger

7   strike and his other history of rabble-rousing activity,

8   because that's what motivated the Defendant -- that's part of

9   what motivated the Defendants.

10      But Perez didn't exhaust that claim.   And so I think it

11   would be unfair for the jury to know that that -- and to hear

12   argument -- you know, to allow to you make the point that the

13   alleged retaliation was part and parcel of his history of

14   First Amendment activity.

15          **MR. BENEDETTO:**   I think the way I would parse that is

16   that the Defendants' awareness and possible motive with

17   respect to the hunger strike and the other writings bleeds

18   into the motive that may be at stake with respect to the cell

19   search, because the -- the lawsuit, the 2005 lawsuit concerned

20   gang validation which was itself at issue in the hunger

21   strikes.

22      So these are not two separate things, but they converge on

23   October 10th.   And so we think that they are relevant to that

24   limited extent, acknowledging that the exhaustion issue is

25   there.

1          **THE COURT:**  Yeah.  And I think that what you're

2     saying is, you know, correct to a large extent.  I mean, it's

3     relevant in that large, larger sense.

4          But, Perez does not have a claim for retaliation.  He

5     doesn't have a claim in this lawsuit that the Defendants

6     retaliated against him for his participation in the hunger

7     strikes and for his prior critical writings.

8          And so, you use the word "parsing," this is how you parse

9     it.  I agree, it's parsing.  And it's parsing it too finely.

10    And I think it would give you an unfair advantage to bring all

11    that stuff in at the liability phase.

12         And so I think -- you know, again, I'll hear from you on a

13    couple of caveats that I've included.  But I think it needs to

14    be limited to, you know, it needs -- you can't get up in your

15    opening statement and talk about Perez being this

16    First-Amendment hero and all this stuff, you know, all this

17    stuff that he did.  You can't get up in your opening statement

18    and talk about Perez's long history of rabble-rousing.  I'm

19    sure you wouldn't use that exact word.

20         But if we phase the trial in the way that I'm suggesting,

21    then during the liability phase you would be limited to, you

22    know, mention of these issues as they're necessary, you know,

23    to establish that Burris, you know, took action against Perez,

24    and that Pimentel took -- that Pimentel got that email which

25    could undermine his credibility with respect to his testimony

1  that he didn't know who Perez was.

2        **MR. BENEDETTO:**   (Nods head)

3        **THE COURT:**   And there would be -- by the way, with

4  respect to that email, there would be a limiting instruction

5  about the purpose for which it can be considered.

6     So anyway, reaction to that?

7        **MS. NYGAARD:**   Um, I think, you know, Defendants are

8  pretty much in agreement with that idea.

9     The Pimentel email, we are concerned that it could be

10  looked at as a bad act by a non-party defendant -- or

11  non-party CDCR employee.

12     And again, also, you know, the email doesn't include

13  Mr. Perez's first name; it doesn't include his CDCR number; it

14  was a different cell, you know, at the point in time.

15     So, you know, we're still saying that it's not relevant

16  for the purposes to establish that Pimentel knew who Perez

17  was.

18        **THE COURT:**   Okay.  And I disagree with that.  So that

19  will be allowed in, but with, you know, an appropriate

20  limiting instruction.

21     And I have not been through the proposed jury instructions

22  yet, so I don't know whether you proposed an instruction about

23  this email.  But if you believe -- I mean, you know, sometimes

24  trial lawyers say:  Well, I don't want a pinpoint instruction

25  about that because I don't want to draw too much attention to

1    it, and we'll just...

2        You know.  So it's, of course, up to you.  But if you want

3    to propose a pinpoint instruction about that email, please do

4    so by Friday of this week.  And, make an effort to reach

5    agreement with the other side on the language.

6        And if you can't reach agreement with the other side, then

7    I want you to file something on behalf of both sides which

8    includes competing proposed language, and brief argument with

9    about why each side thinks their proposed language is better.

10       So, that's by Friday.  And we may discuss a couple of

11   other pinpoint instructions as we go through stuff today.  And

12   your due date for that will be Friday.

13           **MR. BENEDETTO:**  One more point, if I may, about the

14   articles, and not the hunger strikes.

15       We believe the evidence of the articles may be relevant

16   for a couple of additional reasons.  One --

17           **THE COURT:**  Because they looked at his mail?

18           **MR. BENEDETTO:**  Because they looked at his mail.  And

19   the jury is entitled to assess their credibility as to -- as

20   to those statements.

21       And second, we believe it makes it more likely that

22   Mr. Perez would have had the articles in his cell that he

23   claims were confiscated on October 10th if, in fact, he was a

24   prolific author.

25       And those -- again, not the basis for a separate claim,

1  but relevant to claims that are actually viable right now.

2          **THE COURT:**  So on the first point, on the issue of

3  they looked at his mail, I agree that has some degree of

4  relevance.  But I think it -- I think it's outweighed by the

5  possible prejudice that the Defendants would suffer from

6  turning this into a trial about Perez and his history of

7  advocacy.

8      So, again, if we bifurcate in the way that I'm suggesting,

9  I don't think that that's a reason to include testimony and

10  evidence of his history of writing.

11      You know, your other point I haven't thought about.  Do

12  they -- do they -- do they deny that they confiscated writings

13  of his critical of CDCR?  I can't remember.  The witnesses?

14          **MS. NYGAARD:**  Defendants are saying that they

15  confiscated all paperwork that was inside his cell on that

16  date.  Specifically, the specific articles and legal brief

17  that he's talking about are not identified as specific things

18  that were taken.

19      You know, Defendants could suggest that maybe Perez could

20  testify that he had written articles without going into, you

21  know, detail of the mail review, and how many articles he

22  wrote, and you know, all that kind of stuff that we feel is

23  prejudicial and not relevant at all in this case.

24      You know, there is a dispute whether he had these specific

25  articles and legal brief taken.

1          **MR. BENEDETTO:**  I think without what I call the long

2    history, we continue to believe that there is a risk that the

3    jury may believe that this was sort of an isolated incident.

4    And that what happened on October 10th was, in fact, an

5    isolated occurrence.  And that's not true.  And without --

6          **THE COURT:**  Well, I mean, you're not going to get the

7    long history.

8          **MR. BENEDETTO:**  Right.

9          **THE COURT:**  But the defense has sort of given you a

10   little bit of --

11         **MR. BENEDETTO:**  Yeah.

12         **THE COURT:**  Given you a little bit of a bone.

13         **MR. BENEDETTO:**  Yeah.

14         **THE COURT:**  In the sense that, you know, there can be

15   mention of the fact that he had written articles critical of

16   CDCR.  I mean, we don't need to put in the articles; we don't

17   need to have a discussion -- you know, a long discussion about

18   with what they -- or even really a short discussion about how

19   -- you know, all the ways in which he criticized CDCR.

20     But it sounds like they're saying they're sort of willing

21   to live with the idea that there can be -- he can mention that

22   he had written articles critical of CDCR, as long as a big

23   production isn't made of it.  And that's something that I

24   would be on top of during trial.

25     Is that right?

1        **MS. NYGAARD:**  Uh-huh.  That's what we were

2   suggesting.

3        **THE COURT:**  Yeah.

4        **MR. BENEDETTO:**  Yeah.  I mean, I think we could be

5   amenable to that.

6        **THE COURT:**  Yeah.  So that will be the ruling with

7   respect to his history of rabble-rousing.

8        Defendants' -- the Motion in Limine No. 3 about the

9   security threat group policy for gang validations.  I have a

10   bunch of questions about this one.

11        I mean, overall, it struck me that the jury should know --

12   should have -- get sort of a brief history of this issue of,

13   you know, they had this policy, and then they changed to this

14   policy, and here's some of the reasons why they -- behind the

15   change -- changes that were made.

16        And so, I guess that sort of counsels in favor of the

17   ruling that, you know, the policy is relevant, and the policy

18   can be referenced or admitted.  But to me, the question is how

19   much, and how does it come in?

20        I find myself wondering whether this is the appropriate

21   subject of expert testimony at all.  It's not immediately

22   clear to me why an expert is needed to provide sort of a brief

23   narrative to the jury with sort of how -- how and why things

24   changed.  But I don't know how -- you know, I hadn't thought

25   about how else it would come in.

1    So, anyway, that's sort of my general thing about -- I

2    haven't really done a very good job of wrapping my brain

3    around this one yet.

4    But what is your reaction to everything I just said?

5    **MR. SEALS:**  Well, Defendants' concern, Your Honor, is

6    that going into the description, it seems to me that what they

7    would like to offer is that the hunger strike was the cause of

8    this new STG policy going into effect.  And Mr. Perez was a

9    participant in the hunger effect.  Ergo, Mr. Perez was the

10   cause of the new policy going into effect.

11   Which, we believe the hunger strike isn't relevant to

12   their claim, as we discussed some earlier.  And that going

13   into that would be prejudicial in that it would paint our

14   clients as if they had some doing as to what CDCR's policy is.

15   And that CDCR's policy change admitted that there was

16   something wrong with the way the SHU was run, when our

17   Defendants had no role in the policies of CDCR and how they

18   run the SHU.

19   **THE COURT:**  Okay.  But, I mean, you could establish

20   that your clients had no role in the way the SHU was run.  I

21   mean, that would be a pretty easy thing to establish through

22   evidence.

23   And I think my concern -- putting aside the issue of

24   expert, whether it should be expert testimony or lay testimony

25   about this, this -- you know, this case arose because Perez

```
 1    was supposed to be subject of a new validation procedure
 2    pursuant to the new policy.  But they made a mistake, and they
 3    validated him pursuant to the old policy.
 4       Right?  And -- am I right about that?
 5            MR. SEALS:  Mostly.  Yeah; I guess my only concern
 6    with the way you phrased it was that on October 10th, so as --
 7    as discussed during the motion for summary judgment, the
 8    higher-ups made the mistake that --
 9            THE COURT:  Right, right.  Yeah.
10            MR. SEALS:  -- a new validation should proceed.  So
11    as of October 10th, they proceeded under the correct -- they
12    proceeded under the regs that were in place.
13            THE COURT:  That were in place, yeah.  No, I
14    understood that that was --
15            MR. SEALS:  Okay.
16            THE COURT:  That understanding was built into my
17    words.  Even if I didn't say so out loud.
18            MR. SEALS:  Okay.
19            THE COURT:  So yeah, I get that.  But nonetheless, he
20    was supposed to get a new validation, he was supposed to be
21    subject to a new validation procedure pursuant to a new policy
22    that they were working on.  And that was pursuant to his
23    settlement agreement.  Right?
24       And they made a mistake, and thought that the settlement
25    agreement required a new validation procedure right away, and
```

```
1    they -- they proceeded under the regs that existed at the
2    time.
3        Right?
4        MS. NYGAARD:  Your Honor, the -- the settlement was
5    being negotiated in 2012.  The new regs weren't in effect
6    while they had started the settlement negotiations.
7        The language of the settlement agreement says that
8    Mr. Perez shall receive a new validation under existing
9    regulations or policies.  "Existing."
10       So in 2012, in October, when the higher-ups made the
11   mistake that there was a valid settlement agreement, the
12   existing regulations at that point in time was the Title XV.
13           THE COURT:  Right.
14           MS. NYGAARD:  Not the STG.
15           THE COURT:  Right.  But then by the time they finally
16   actually reached the settlement agreement or signed the
17   settlement agreement, the new policies were in place?
18           MS. NYGAARD:  Correct, like, nine months later.
19           THE COURT:  Right.  And so I guess that's my whole
20   point, is that -- I mean, for this to make any sense to the
21   jury, doesn't the jury need to receive an explanation of all
22   of this?
23       I mean, this goes both to this motion and also the motion
24   that you have about not wanting to -- the jury to learn that
25   this was a mistake.  Which, by the way, I don't know why you
```

1    filed that motion, because I think it's very much in your

2    interest for the jury to learn that this was a mistake.

3         But, be that as it may, I mean, how can the jury sort of

4    assess this case without understanding -- I mean, this is --

5    this is primary backdrop the case.  This is like, sort of, how

6    it all went down.

7         So why shouldn't the jury be able to get an explanation

8    of -- you know, not a long, you know, ponderous explanation,

9    but an explanation of, you know, the old policy, the new

10   policy, why it changed, and where Perez's settlement agreement

11   fit into all that.

12              MR. SEALS:  Well --

13              THE COURT:  I just don't understand how the jury is

14   going to be able to understand what you all are talking about

15   unless it hears that back story.

16              MR. SEALS:  I think our position is that it's a

17   discrete issue that on October 10th, Defendants were told to

18   prepare a new validation packet.  So they went, and part of

19   preparing that validation packet was to do a search of Perez's

20   cell.

21        So, it doesn't -- I don't think it needs to go into all of

22   the STG policy changes.  Basically the start was that they

23   were told to validate Mr. Perez on October 10th.

24              THE COURT:  Okay.  But then, they are going to say to

25   the jury, Mr. Perez is going say to the jury that:  They were

1  retaliating against me for filing a lawsuit, and they said

2  that this is what happens when you file a lawsuit, and you

3  should file more law- -- you people should file more lawsuits

4  because it makes our job more fun.

5      And then the jury's going to be like:  What lawsuit?  What

6  are you talking about?

7      Okay, and then what are we going to let the jury know

8  about the lawsuit?

9          **MR. SEALS:**  That there was -- their supervisors had

10  informed him that there was a settlement or a court order.

11          **THE COURT:**  Uh-huh.

12          **MR. SEALS:**  That led to a new validation being

13  necessary.

14          **THE COURT:**  Okay.  But, of course, that ended up

15  being incorrect.  Right?

16          **MR. SEALS:**  Right.  But at that -- the fact that it

17  was incorrect -- Defendants didn't know that it was incorrect.

18  Defendants went on the advice of their supervisors.

19          **THE COURT:**  Well -- right.  But, but why was there a

20  court order to do a new validation?

21          **MR. SEALS:**  There wasn't.

22          **THE COURT:**  There wasn't.  Oh, there wasn't.  Well,

23  then, why are we telling the jury that there was?

24          **MR. SEALS:**  Well, we're telling them that the

25  Defendants' supervisors told them --

1          **THE COURT:**  Why did the Defendants' supervisors tell

2     them that there was a court order?

3          **MR. SEALS:**  Because they made a mistake.

4          **THE COURT:**  Okay.  But the jury should just be left

5     under the misimpression that there actually was a court order

6     requiring them to do this?

7          **MR. SEALS:**  I guess -- we have -- we've tried to

8     figure out how to best address this issue.

9          **THE COURT:**  Yeah.  And I think the best way to

10    address the issue is to tell the jury the story about what

11    went down.

12          **MR. SEALS:**  And I guess our concern with that is, as

13    you mentioned earlier, the discussion of Mr. Perez's

14    rabble-rousing.  And I guess that being tied in with all of

15    the inmates' rabble-rousing, that got the policy to change.

16    And how much testimony is going to be permitted regarding the

17    conditions of the SHU and how terrible the conditions of the

18    SHU were before.

19       And all of this stuff, you know:  The SHU was so horrible,

20    it was so terrible that the CDCR had to change the policy.

21          **THE COURT:**  But as you said, like, your clients

22    weren't responsible for any of that.  Right?

23          **MR. SEALS:**  Right.

24          **THE COURT:**  And we can -- you know, we can -- you can

25    establish that, I mean, at trial, that, you know, your clients

1   didn't have any policy-making authority with respect to how

2   things are run in the SHU.

3        But to give context to this dispute, I just don't see how

4   -- I don't see, you know, at what place it makes sense to --

5   you know, wherever you cut it off, you know, it doesn't make a

6   lot of sense.

7        Like, we just started going down that road, right?  You

8   know, are we going to leave the jury with the misimpression

9   that it was a valid court -- there was a valid court order

10  that required a validation to take place on October 10th?

11  That doesn't really make sense.

12       Are we going to leave the jury with the misimpression or

13  the impression that these Defendants were -- is the jury not

14  going to know what the lawsuit was about?

15            **MR. SEALS:**  Prior lawsuit?

16            **THE COURT:**  Yeah.

17            **MR. SEALS:**  I think -- no, they'll know, because

18  that's why he needed a new validation.

19            **THE COURT:**  That's why you needed a new validation.

20            **MR. SEALS:**  Right.

21            **THE COURT:**  Because of the new lawsuit.

22            **MR. SEALS:**  Because the lawsuit was regarding val- --

23  his -- his placement in the SHU.

24            **THE COURT:**  Okay.

25            **MR. BENEDETTO:**  Your Honor, if I may, to sort of

1   bring the two together, when the Defendants characterize the

2   settlement negotiations, sort of the main point that they're

3   omitting is that the central feature of the settlement was

4   that Mr. Perez would be validated under the new guidelines

5   that were being implemented, which he knew were being

6   implemented, because of his involvement in the hunger strikes.

7   And that he had received draft copies of the SEG memo.  And he

8   knew that he lacked the disciplinary infraction, and that he

9   would be let out from the SHU.

10      That is crucial to this story.  And it is why, certainly,

11   I think, we believe the mistake is relevant.  But it also ties

12   into the -- to the memo, because without that sort of crucial

13   fact of the memo changing the criteria for SHU housing, the

14   story doesn't make any sense.

15          **THE COURT:**  Okay.  Well, why can't you -- going to

16   the issue of whether this is an appropriate subject of expert

17   testimony, why can't you elicit that information through

18   examination of Mr. Perez and cross-examination of the

19   Defendants, or maybe some other witness from CDCR who was sort

20   of involved in presiding over the transition?

21          **MS. MORAN:**  Yeah, I think Mr. Perez can speak to the

22   memo.  And I also think that Mr. Subia can speak to it as a

23   percipient witness as well.  He was involved in the working

24   group that created the policy.  He spoke to the hunger

25   strikers during the creation of the policy.

1    And I think that he is able to provide guidance to the

2    jury or allow the jury to understand what the terms of the

3    memo meant, what the changes -- why the changes were brought

4    about.

5         **THE COURT:**  But he wasn't around when the memo was

6    finalized, right?  I mean, he was involved in discussions

7    about how to change CDCR's policy, but he wasn't around when

8    that memo was issued.  Right?

9         So why -- he doesn't have any sort of -- I mean, what he

10   can say as a percipient witness about that actual memo seems

11   kind of limited.

12        **MS. MORAN:**  Well, I think, as a percipient witness,

13   he can speak to the fact that central to the whole point of

14   the memo was that a behavior component was to be added.  And

15   that was something that was discussed at CDCR while he was the

16   director, and while he was involved in these discussions.

17        And then separately, I think, as an expert, he would have

18   expertise as to what type of training would be provided to

19   Defendants to show that Defendants knew that this change was

20   coming.  And I think that that speaks to the motive of Gates

21   in bringing the RVR.  And --

22        **THE COURT:**  When did he leave CDCR?

23        **MS. MORAN:**  Yeah, it's March.

24        **THE COURT:**  Of?

25        **MS. MORAN:**  Of 2012.

1          **THE COURT:**  Of 2012?  And this happened in October of

2     2012?

3          **MS. MORAN:**  Right.

4          **THE COURT:**  Well, I don't -- I think anything that he

5     would have to say about the training they received on the new

6     policy would be speculation, then.

7          **MS. MORAN:**  Well, I think it would be in the -- as a

8     capacity as an expert.  As to someone who knows how the CDCR

9     operates when rolling out a new policy, any new policy.  And

10    what type of training is provided the line officers and the

11    IGIs.

12         **THE COURT:**  So, okay.  So, so, maybe this would be a

13    good time to sort of take a step back and tell me what it is

14    that you want -- Subia?  Is that his name?

15         **MS. MORAN:**  Uh-huh.

16         **THE COURT:**  What is it that you want him to provide

17    expert testimony on?  Can you kind of give me a summary of it?

18         **MS. MORAN:**  Sure.  I think we would want him to

19    provide expert testimony with respect to a number of topics.

20       With respect to the STG pilot program, I think we would

21    want him to testify that it came about as a result of the

22    hunger strikes, and that one of the concerns of the hunger

23    strikers was that people were being placed indefinitely in the

24    SHU without there being any sort of corresponding behavioral

25    component.

1    And that in order to address that concern, that the CDCR

2    took about to kind of change the policy so that it would be

3    centered around a behavioral component, or SHU placement would

4    be centered around behavioral components.

5    We would also like him to testify as to CDCR policy with

6    respect to cell searches.  And, you know, in the ordinary

7    course of searching an inmate's cell, what is the general

8    practice and procedure with respect to how belongings are

9    kept.

10         **THE COURT:**  All right.  Anything else?

11         **MS. MORAN:**  And then I think we would like him to

12    testify that when CDCR rolls out a policy, particularly one of

13    this magnitude, there is extensive training.  And that prison

14    officials and IGIs would have been extensively trained on the

15    parameters of this program.

16         **THE COURT:**  But when was the policy rolled out?

17         **MS. MORAN:**  In October, 2012, it was, like,

18    published.

19         **THE COURT:**  In October, 2012, it was published?

20         **MS. MORAN:**  Yeah, the memo.

21         **THE COURT:**  But I thought that the -- I thought that

22    we all agreed that the Defendants did the validation pursuant

23    to existing regs.

24         **MR. SEALS:**  If I may, Your Honor, that's one of our

25    main concerns with Subia as an expert is that he got that

1   wrong in his expert report, and admitted that during thing

2   testimony, that he didn't understand the difference between

3   phase one and phase two.  And when the regs were actually

4   going into place.

5        So the change in the validation procedures did not go into

6   place until 2013, late 2013.

7             **THE COURT:**  Late 2013?

8             **MS. NYGAARD:**  March.

9             **MR. SEALS:**  March, sorry.

10            **MS. MORAN:**  A fact that he testified at, at the

11   deposition.  He amended the statement in his expert report.

12   Like, I don't think that the jury would be confused as to that

13   fact at all.

14            **MR. SEALS:**  But it goes to his expertise and

15   whether -- if he only prepared that in preparation for this

16   trial, that's not expertise that he doesn't have.

17            **MR. BENEDETTO:**  At most, it would go -- at most, it

18   might go to the weight that the jury would give to the -- to

19   his credibility.  But it doesn't vitiate him as an expert.

20            **THE COURT:**  But what did he say at his deposition

21   about when you would normally expect people to get trained on

22   a policy that doesn't go in effect until March, 2013?

23            **MR. BENEDETTO:**  I don't believe he was specifically

24   asked that question.

25        To be fair, in October of 2012, it was clear in the memo

```
 1    that the behavior component was being implemented over the

 2    next few months.  The fact is that is as of validation packets

 3    received before March --

 4         THE COURT:  But, so what?  I mean, on the issue of

 5    whether we would expect them to have been trained by October,

 6    2012, so, so what, if the memo said, you know, there's going

 7    to be a behavioral component of this that's going to be

 8    implemented in a few months?

 9         MS. MORAN:  Well, I think it goes to the motive in

10    delivering that RVR.  If Gates had been fully trained and knew

11    that he couldn't keep Jesse in the SHU without an RVR, and he

12    had gone through extensive training to let him know that

13    that's the case, I think that that's very probative of his

14    retaliation.

15         THE COURT:  But how do we know that -- was it Burris?

16    Sorry.

17         MS. MORAN:  Gates.

18         THE COURT:  How do we know that Gates would be

19    expected to have been trained by that point?

20         MS. MORAN:  Well, I think that's where Subia's expert

21    testimony comes in.  That even though the program was rolled

22    out or fully implemented by March, 2013, by October 12, there

23    was an official publication of the memo that was widely

24    distributed.

25       And as Subia I think will testify, in that instance where
```

```
 1    there's a memo that is rolling out a policy, training would

 2    have occurred, you know, months before.

 3          THE COURT:  So, but you don't need his expert

 4    testimony to establish that the memo was circulated by

 5    October, 2012.  Right?

 6          MS. MORAN:  No.

 7          THE COURT:  And distributed widely by October 2012?

 8    You don't need Subia for that, do you?

 9          MS. MORAN:  No.

10          THE COURT:  You just want him for -- and does the

11    memo -- forgive me, I have not read the memo, so that might be

12    -- you know, this is one I'm going to need to spend a little

13    more time on before ruling, I think.

14       But, does the memo talk about why the changes are being

15    made?

16          MS. MORAN:  Tying it to the hunger strike?  It does

17    not.  What the memo does is they tie it to studies coming out

18    of UCLA as to revamping security threat groups.

19          THE COURT:  But it sort of explains what the old

20    policy is and what the new policy is going to be?

21          MS. MORAN:  Yeah --

22          THE COURT:  Why --

23          MS. MORAN:  It explains the new policy in a fair

24    amount of detail.

25          THE COURT:  And why the changes are being made?
```

1          **MS. NYGAARD:**  It has, like, two pages that explain

2    the purpose of the new program.

3          **THE COURT:**  Uh-huh.  So, again, what I'm trying to do

4    here is sort of, you know, sift through this and try to figure

5    out what expert testimony is really needed for.

6       And so one of the things that you say expert testimony is

7    needed for is to say that:  We would expect that by time a

8    memo like this is circulated, the prison guards would have

9    already been trained on this.

10      Is that basically --

11         **MS. MORAN:**  (Nods head)

12         **THE COURT:**  And what's the basis for his testimony

13   about that?

14         **MS. MORAN:**  With respect to the training?

15         **THE COURT:**  Yeah.

16         **MS. MORAN:**  I think just his experience as the Deputy

17   Director of the Division of Adult Operations.  And overseeing,

18   you know, large programs being rolled out in the past.

19         **THE COURT:**  But I mean, is there some -- I mean,

20   every program is different, and different people might be

21   trained in different ways and at different times, depending on

22   what the program rollout is.  Right?

23         **MS. MORAN:**  Right.  But Mr. Subia has experience with

24   institutional gang investigators, which is who Defendants are.

25   And the type of training that IGIs receive.  And I think he

1   would assist the jury with his opinion in terms of:  This is

2   the type of program that would have been the subject of

3   extensive training by institutional gang investigators.

4         **MR. SEALS:**  However, his experience as an IGI was in

5   the nineties, I believe.  And not at Pelican Bay.

6         **MS. MORAN:**  No, not as an IGI; I'm saying with an

7   IGI.  Because he, as -- as the director, you know, he oversaw

8   the rollout of several programs.

9         **THE COURT:**  Okay, so --

10        **MR. BENEDETTO:**  He was also a warden.  And I think

11  that to the extent that wardens would be sort of

12  institutionally responsible for the implementation of training

13  in their facilities, he could speak in that regard as well.

14        **THE COURT:**  You may be right, that it goes to weight

15  and not admissibility.  But I'm not convinced that this is the

16  appropriate subject of expert testimony.

17     I'm not convinced that, you know, to make the points that

18  you want to make and that I think you should have the right to

19  make, you need an expert witness.

20     I mean, I haven't given careful thought to how you would

21  get it all in through lay witnesses, but -- you know, again,

22  part of it can certainly be through Perez.  And, you know,

23  part of it I assume could be through -- you know, examination

24  or cross-examination of other -- other lay witnesses.

25        **MS. NYGAARD:**  And Your Honor, Defendants anticipate

1   calling Susan Hubbard as a witness.  And she was instrumental

2   in drafting this policy, the STG program, and getting

3   implemented, and she's still working as a part of it.

4        So we --

5        **THE COURT:**  Were you planning to call her as an

6   expert witness or percipient?

7        **MS. NYGAARD:**  No, she is not being designated as an

8   expert, just a percipient witness.  So we would object to

9   Mr. Subia being an expert on this issue because, you know,

10  it's pure speculation.  He wasn't there after March 30th.  He

11  wasn't at CDCR to talk about the specific details of who got

12  trained and when, et cetera.

13       So, we believe that it would be more appropriate for them

14  to question Ms. Hubbard about that.

15       **MR. BENEDETTO:**  We will be happy to cross-examine

16  Ms. Hubbard on this.  But, Ms. Hubbard's ability to talk about

17  operationally, right, the training that would be attendant to

18  this, and also to enable the jury to evaluate the credibility

19  of the Defendants when we anticipate them saying they don't

20  remember any training about this particular program, if that's

21  a credible statement.

22       And while we think Ms. Hubbard's testimony may be helpful

23  for the jury, --

24       **THE COURT:**  But it -- sorry.

25       **MR. BENEDETTO:**  -- that the testimony of someone like

1  Subia who had operational experience would come in handy.

2        **THE COURT:**  Uh-huh.

3        **MS. NYGAARD:**  Ms. Hubbard also has operational

4  experience within CDCR.  I believe that she assumed the

5  position -- I don't know exactly; I don't have her resume in

6  front of me.  But sometime after Subia left, Susan Hubbard

7  took his position.  So she has operational experience within

8  CDCR also.

9        **THE COURT:**  Would the memo, the memo, itself, would

10  it be admissible?  I know you've moved to exclude it as

11  prejudicial or whatever, and I'm inclined to disagree with you

12  about that.

13      But would it be otherwise admissible, like over a hearsay

14  objection or something like that?

15        **MS. NYGAARD:**  We don't have a problem with having a

16  specific portion of the policy admitted into evidence

17  regarding the -- you know, the RVRs and the disciplinary or

18  the gang nexus requirement.  We just feel that 125 pages of

19  this policy is just -- would be confusing to the jury and a

20  waste of their time, et cetera.

21      We don't have an objection to the relevant portion being

22  admitted.  We just think the entire thing is just too much,

23  would confuse the jury, waste of time, mislead them,

24  et cetera.

25        **THE COURT:**  My tentative inclination here is to say

1    that we should admit the relevant portions of the memo.  We

2    should -- you know, both parties should be allowed to elicit

3    testimony about how the old policy worked, how the new policy

4    worked, why the changes were implemented.

5         But I'm -- I just really question whether, you know, it's

6    an appropriate subject of expert testimony.  I'm not sure it's

7    so, you know, inaccessible as to -- you know, for jurors, as

8    to be -- as to require expert testimony.

9         But I'm going to give that one some more thought.

10             **MR. SEALS:**  Can I make one last comment?

11             **THE COURT:**  Sure.

12             **MR. SEALS:**  Just that they repeatedly referred to

13   Subia's experience implementing policies as the high-up in

14   CDCR.  But this is one of the largest policy changes that

15   CDCR's implemented in a long time.  So it would be very

16   different from other policies that were implemented during

17   Subia's time.

18             **THE COURT:**  Uh-huh.

19             **MS. MORAN:**  One more point as to the size of the

20   policy, and kind of what portions are relevant or not.

21             **THE COURT:**  The size of the memo, you mean?

22             **MS. MORAN:**  Yeah.  I think that the fact that this

23   policy was a vast change in validation procedure and that

24   Perez's 2005 lawsuit, the subject of it was his validation

25   procedure, that the jury's entitled to know kind of that

```
 1   that's what the policy entailed, because I think it's very
 2   probative that right on the eve of this policy, in conjunction
 3   with his lawsuit, he was subject to retaliation.
 4           THE COURT:  I mean, I sort of generally agree with
 5   you.  And I think you can probably do that through the memo,
 6   or the relevant portions of the memo, and examination and
 7   cross-examination of lay witnesses.
 8           MS. MORAN:  (Nods head)
 9           THE COURT:  But I will think about that more.
10       My very strong inclination is to grant Motion in Limine
11   No. 4.  And, to grant the Plaintiff's motion in limine about
12   prior rules violations by Mr. Perez.
13           MR. BENEDETTO:  Plaintiff -- right.
14           THE COURT:  You guys moved to exclude --
15           MR. BENEDETTO:  Right, yes.
16           THE COURT:  -- evidence of prior rules violations by
17   Mr. Perez.  They moved to exclude evidence of grievances by
18   other prisoners against the Defendants.
19       My strong inclination is to grant both of those motions,
20   because they would be mini trials on peripheral issues, and it
21   wouldn't be -- your point is well taken with respect to
22   Mr. Perez that this is not an excessive-force case.  And so
23   whether he misbehaved in some, you know, context is not really
24   relevant to his First Amendment retaliation claim, or
25   marginally relevant.
```

```
 1          MR. BENEDETTO:  The only comment that Plaintiff would
 2   make is that with respect to the staff complaints filed
 3   against the Defendants, Plaintiff would not seek to introduce
 4   that evidence to show that they actually committed the acts
 5   that are alleged.  But rather, and only, that they received
 6   those grievances, the nature of the grievance.  And that the
 7   jury could infer from that fact that they may have an
 8   inclination to dislike prisoners who file --
 9          THE COURT:  I understand --
10          MR. BENEDETTO:  -- less than meritorious grievances.
11          THE COURT:  I understand the argument, yeah.  But I'm
12   not going to allow those in.
13       The only exception, of course, is the -- I think, although
14   you moved to exclude all of them, all of the RVRs issued
15   against Mr. Perez, I think you actually want one of them in,
16   right?  And I've said that one of them is relevant.  Because
17   it's relevant to Burris and whether he knew Perez.
18          MS. NYGAARD:  And Your Honor, I don't even think that
19   was a rules violation report.  It was a chrono.
20          MR. BENEDETTO:  Right.
21          THE COURT:  And I don't think the document -- there's
22   no reason that the document needs to be admitted into
23   evidence.  But, it's fair game to talk about that.
24          MR. BENEDETTO:  Right.  Yeah, we certainly weren't
25   intending to exclude testimony about that particular document,
```

1    but we separated that as a chrono from an actual CDC 115.

2              **THE COURT:**  Okay, got it.  Okay.

3              **MS. MORAN:**  And then, one question of clarification

4    with respect to Motion in Limine No. 4.

5        In granting, would Defendants -- or would Plaintiff still

6    be allowed to refer to the SEG policy and memo with respect to

7    its validation procedures?  That it was a change in validation

8    procedures?  Since the motion, itself, is --

9              **THE COURT:**  Wait, are you talking -- going back --

10             **MS. MORAN:**  I'm sorry, 3, yeah.

11             **THE COURT:**  Sorry, start over.  I was distracted,

12   because I was thinking about 4.

13             **MS. MORAN:**  Sorry about that.

14       So with respect to Motion in Limine No. 3, the Defendants

15   moved to exclude everything regarding the policy except for

16   the disciplinary behavior needed for SHU placement.

17       So, my question is:  Would Plaintiff be precluded from

18   providing testimony or evidence that the STG policy was,

19   itself, a change in validation procedure?

20             **THE COURT:**  I'm not sure I understand the difference

21   between those two things.

22             **MS. MORAN:**  So, I think of the validation procedure

23   as being separate from SHU placement.

24             **THE COURT:**  Okay.

25             **MS. MORAN:**  That under the old policies, one could be

1    validated as a prison gang associate, and automatically placed

2    in SHU housing.

3            **THE COURT:**  Uh-huh.

4        **MS. MORAN:**  And the change was that there's

5    procedures with respect to validation.  And without a

6    behavioral component, one could still be validated, but not

7    placed in SHU housing.

8            **THE COURT:**  I mean, what you just said seems to me

9    like an appropriate thing to be able to establish in front of

10   the jury.

11       **MS. MORAN:**  Okay.  Thank you.

12       **THE COURT:**  All right.  Going to No. 5, we already

13   talked about the email from Ellery, and why that is

14   admissible.  This is Defendants' Motion in Limine No. 5.  Why

15   that can be used.

16      Except, you know, again, it may be appropriate to have a

17   limiting instruction.  Any limiting instruction that you want

18   to propose, either jointly or competing limiting instructions,

19   as I said, are due by Friday.

20      And then we've kind of already talked about this, but the

21   other issue that's kind of still live in the Defendants' fifth

22   motion in limine is this question of whether the jury should

23   be able to hear the story of -- you know, of how the bosses

24   thought there was a settlement that required a new gang

25   validation.

1       And I think that the jury should be able to hear the story

2   about what happened.  Because I think it would be just too

3   difficult to truncate it.

4           **MR. SEALS:**  Can we prepare or can we draft a limiting

5   instruction that would sort of --

6           **THE COURT:**  Absolutely.

7           **MR. SEALS:**  Hopefully keep that a little bit tighter,

8   then.

9           **THE COURT:**  Absolutely.  Yeah.

10          **MR. SEALS:**  Okay.

11          **THE COURT:**  I think with respect to the -- I'm going,

12  moving on to Perez's Motion in Limine No. 1, and No. 2, which

13  are the convictions and street-gang involvement of Mr. Perez

14  and of his two witnesses, Mr. Guerrero and Mr. Mendoza.

15      And my reaction to that is the rule calls for the jury to

16  learn that he was -- he and they were convicted of felonies,

17  and the jury can learn that they were convicted of felonies.

18  And it seems rather obvious that they were convicted of

19  felonies, in any event.

20      And so the jury can learn of that, and the government can

21  cross-examine Mr. Perez and those other witnesses about the

22  fact that they were convicted of felonies.  But I don't see

23  any reason to go beyond that to get into the details of it.

24      So, unless -- again, as with all these rulings, it's

25  subject to change at trial if somebody opens the door.  But,

1    you know, it will be limited to the fact that they are in

2    there for having committed felonies or a felony, whichever the

3    case may be, with respect to each witness.

4         With respect to the prior gang involvement, I think that

5    that -- I think that because so much -- because this case is

6    so much about gang validation and, you know, this guy Perez

7    had a lawsuit about whether he was properly validated, and --

8    I think to get into -- I understand that prior gang activity

9    before they came to prison is relevant.  And it's relevant to

10   -- it goes to their bias, I get that.

11        But I think under 403, given the particular very unique

12   facts of this case, to have to get into whether the witnesses

13   were -- had gang involvement before they came to prison or

14   whether they were members of a prison gang is too -- it would

15   be too prejudicial, and would -- I mean, because whether they

16   were members of a gang or not either before they were in

17   prison or now is not relevant to whether the Defendants

18   violated Mr. Perez's First-Amendment rights by retaliating

19   against him.

20        And like I say, it is relevant to bias, but because so

21   much of this is wrapped up in the idea of gang validation and

22   whether Mr. Perez was a gang member, on an atmospheric level,

23   anyway, I think it's too prejudicial.  And so I'm going to

24   exclude it.

25        **MS. NYGAARD:**  Okay.

1          **MR. SEALS:**  Your Honor?

2          **THE COURT:**  Yeah.

3          **MR. SEALS:**  Depending on how much they get into

4   Mr. Perez's prior lawsuit regarding his validation and -- I

5   know that they claim that he won that lawsuit which led to the

6   new -- the new validation procedure, you know.  Our position

7   is that a settlement is not necessarily a victory, and that

8   these policies were coming.

9      And so if they get into all this stuff showing that CDCR

10  messed up and validated him but he wasn't a gang member, you

11  know, going on and on about how he's not actually a gang

12  member, I think that this -- this would sort of be a

13  counterbalance to that testimony.

14         **THE COURT:**  I think that's a good example of how, you

15  know, the door could be opened.  And I think, you know, it is

16  appropriate to establish that he filed a lawsuit.  And it's

17  appropriate to establish -- to kind of -- for the jury to know

18  what the lawsuit was about.  And it's appropriate for the jury

19  to know that the lawsuit was settled.

20     And implicit in all that is that he contended he shouldn't

21  have been validated, right?  And I think it's fine for the

22  jury to learn that he contended he shouldn't have been

23  validated.

24     But, if, if Mr. Perez or his lawyers place undue focus on,

25  you know, the actual merits of the underlying lawsuit, and try

```
 1   to convey to the jury in anything more than a passing way as
 2   part of an effort to describe the lawsuit, the prior lawsuit
 3   to put this case into context, then I would consider that
 4   opening the door to whether -- to evidence that Mr. Perez did,
 5   in fact, have prior gang involvement.
 6      Does that make sense?
 7           MR. BENEDETTO:  We agree with that.
 8           MS. NYGAARD:  Yes.
 9           THE COURT:  Okay.  And same with Guerrero and
10   Mendoza, same principle.
11      I think that's it on motions in limine, right?
12           MS. NYGAARD:  Right.
13           MR. BENEDETTO:  Right.
14           THE COURT:  Okay.  So I'll issue a short written
15   ruling on those, after I think a little bit more about the
16   expert, you know, the expert testimony issue, so that you all
17   will have a written ruling which hopefully summarizes this in
18   a somewhat comprehensible way and provides -- gets everybody
19   on the same page.
20      Now that we have been here for a while, does anybody have
21   any thoughts about my bifurcation proposal?
22           MS. NYGAARD:  Defendants like that idea.  We'd be in
23   agreement with it.
24      (Off-the-Record discussion between counsel)
25           MR. BENEDETTO:  Your Honor?
```

1        **THE COURT:**  Yeah.

2        **MR. BENEDETTO:**  This is a tough issue.  I'm going to

3   front that.

4        Our -- our position is that the issue of motive, the

5   statements that Plaintiff alleges were made to him by the

6   Defendants "We're going keep you here, this is what happens

7   when people file lawsuits" is so tied to the harm that we're

8   seeking that to separate the two questions would sort of

9   prejudice us in a way as to liability that we think would not

10  be appropriate.

11       In our view of the world, the harm is -- is very

12  intertwined with the motive.  And to sort of establish a kind

13  of artificial separation between the two we think would

14  severely and unduly prejudice us.

15       **THE COURT:**  But -- I mean, I do understand what

16  you're saying.  But the jury is going to be instructed that --

17  I mean, and I haven't gone through your jury instructions yet,

18  and we will do jury instructions during trial.

19       And just while we're on the topic, the way it will work is

20  I will go through your proposed -- joint proposed jury

21  instructions, including what you all submit on Friday, and I

22  will either tell you that you didn't do a good enough job and

23  require you to resubmit joint proposed jury instructions -- I

24  doubt that will happen in this case.  You people seem like you

25  have it together.

```
 1        So what will likely happen is that I will create a set of
 2   proposed, you know, final Judge's proposed jury instructions,
 3   and submit those to you all some time in the middle of trial.
 4   And then we will have a conference at which we can discuss any
 5   objections that anybody has to the proposed final jury
 6   instructions.
 7        But I assume that the instructions will essentially say
 8   that:  If, in fact, they did what Perez said they did, you
 9   must find that they violated Perez's First Amendment rights.
10        Right?
11             MR. BENEDETTO:  Right.
12             THE COURT:  And don't you agree with that?
13             MS. NYGAARD:  Yes.
14             THE COURT:  And so if that's the case, then it seems
15   like the jury is being instructed pretty clearly that
16   regardless of what it might want to speculate about the effect
17   of this on Mr. Perez subjectively, it was a First Amendment
18   violation.  They're effectively required to find a First
19   Amendment violation.
20        So, thinking about it in that way, how is it that
21   Mr. Perez would be prejudiced?
22             MR. BENEDETTO:  Well, I think that one of the key
23   elements is chilling effect.  Chilling effect is an -- about
24   an effect on a reasonable prisoner.  And that's the element we
25   have to prove.
```

1      **THE COURT:**  But part of what you argued so well in

2  the summary-judgment stage was that it's -- it's really an

3  objective test, right?  It's about whether it would chill a

4  person of ordinary firmness.

5      **MR. BENEDETTO:**  Correct.

6      **THE COURT:**  And I think actually, if the test were

7  whether it had a chilling effect on Mr. Perez, you would

8  probably be in much worse shape in this case than you are now,

9  right?

10      **MR. BENEDETTO:**  Right.  No, we would -- I mean, have

11  asserted in our instructions, in fact, that it's an objective

12  standard.

13      **THE COURT:**  Right.  And, and, to the extent that they

14  want to try to argue that there's no First Amendment violation

15  because he wasn't chilled because he's continued to be a

16  rabble-rouser, I'm not even sure that would be permissible

17  argument.  I would think they would be precluded from arguing

18  something along those lines.

19    Right?

20      **MR. BENEDETTO:**  Right.  Right.  I mean, I think, even

21  though -- even an objective prisoner in the SHU, however,

22  right -- some of this still has to enter into what that

23  analysis would be.  Even if -- even if we do not assert that,

24  Mr. Perez would need to establish actual, actual harm.

25      **THE COURT:**  Uh-huh.  Okay.  I'll think about it a

```
 1    little bit further.  But my inclination would still be to

 2    bifurcate the way I have proposed.

 3              MR. SEALS:  Your Honor?

 4              THE COURT:  Yeah.

 5              MR. SEALS:  Just to clarify, he mentioned the

 6    threats, the threats by Defendants, and that that's necessary

 7    for the motive.  And I don't think that's in dispute.

 8       I think what you were stating earlier was that the hunger

 9    strike and a lot of the sort of extraneous topics are what

10    would be bifurcated, because those go -- those may go to

11    damages, but they don't really go to motive.

12              THE COURT:  In other words, the big dog and pony

13    show -- and I don't mean that in a derogatory way at all --

14    the dog and pony show about Mr. Perez being a First Amendment

15    crusader comes in the second phase, not the first.  And what

16    comes in in the first phase is -- is just enough to give the

17    jury the context.

18              MR. SEALS:  The elements.

19              MS. NYGAARD:  The five elements under *Rhodes*.

20              MR. BENEDETTO:  But Mr. Perez's testimony about his

21    -- the conditions of his experience in the SHU, which we say

22    is relevant to damage, would also be relevant to threat.  And,

23    and so, is that in the Court --

24              THE COURT:  You mean, you mean that --

25              MR. BENEDETTO:  In other words, if one of the -- if
```

```
 1   one of the principle benefits of the bargain of his settlement
 2   was that he would have been released pursuant to the new
 3   guidelines --
 4           THE COURT:  Uh-huh.
 5           MR. BENEDETTO:  -- and he finds himself with a
 6   Defendant threatening to keep him in the SHU where he belongs.
 7           THE COURT:  Uh-huh, and you want him to be able to
 8   testify how terrible -- how big a difference it is to be in
 9   the SHU versus in the general population?
10           MR. BENEDETTO:  Absolutely.
11           THE COURT:  I mean, that's a different que- -- I
12   mean, I think this is the point you were just making, right,
13   is that's -- I don't see why Mr. Perez shouldn't be allowed to
14   testify about that during the first phase, because it's not
15   about his, sort of, prior history of rabble-rousing.
16           MR. BENEDETTO:  Uh-huh.
17           THE COURT:  And it's not about the emotional distress
18   he suffered.  It's about -- you know, it's to help explain to
19   the jury why an ordinary prisoner would be chilled by the
20   difference between being in the SHU and being in the general
21   population.  I think that should be fair game during the first
22   phase.
23           MR. BENEDETTO:  That's certainly our position.
24           THE COURT:  Yeah.
25           MR. SEALS:  You lost me a little bit.
```

1          **MS. NYGAARD:**  Yeah.  When you said that should be

2     fair game (Indicating quotation marks), could you clarify?

3          **THE COURT:**  Yeah.  "They threatened to keep me in the

4     SHU."

5          **MS. NYGAARD:**  The threatening statements should be

6     fair game during the non-damages portion of the trial.

7          **THE COURT:**  Yeah.  And the significance of that

8     threat.

9          **MS. NYGAARD:**  Correct.

10          **THE COURT:**  Yeah.

11          **MR. SEALS:**  But our concern is, I guess, how much

12     testimony would be allowed regarding the conditions of the

13     SHU?

14          **THE COURT:**  Enough to give the jury a sense of the

15     significance of the threat.

16          **MR. SEALS:**  I guess I'm -- I'm trying to figure out

17     how that -- how the conditions of the SHU fit into the issue

18     of whether or not Defendants retaliated against Plaintiff.

19     Because the threat, while the threat I believe is relevant --

20          **THE COURT:**  Well, there has to be First Amendment

21     injury, right?  And the threat has to chill a person of

22     ordinary firmness.  Right?

23          **MR. SEALS:**  The threat -- the threat is not one of

24     the alleged adverse actions.  So that's not --

25          **MR. BENEDETTO:**  Yes, it is.

1          **THE COURT:**  Well, wait a minute.  Part of the case is

2    that they issued a -- an allegedly false RVR against him --

3          **MR. SEALS:**  Correct.

4          **THE COURT:**  -- to keep him in the SHU.

5          **MS. NYGAARD:**  Right.  That part is --

6          **MR. SEALS:**  Correct.  The confiscation of his

7    materials, the alleged trashing of his cell --

8          **THE COURT:**  Yeah.

9          **MR. SEALS:**  -- and the issuance of the RVR.

10         **MR. BENEDETTO:**  And Your Honor, there are also

11   statements that Mr. Perez will testify were made to him in the

12   course of the cell search from Defendant Gates, who later

13   issued the RVR.  That -- that would amount to a threat to

14   person of ordinary firmness.

15         **THE COURT:**  Yeah.  I mean, I have primarily viewed

16   those statements as evidence of retaliation as opposed to, you

17   know, retaliatory action, in and of themselves.

18         **MR. BENEDETTO:**  Right.  We do believe that there is

19   circuit law to support our position that a threat can stand

20   alone as an adverse action.  But we also believe it's evidence

21   of motive.

22         **THE COURT:**  Yeah.  But, I mean, why is that -- isn't

23   that really like, to a certain degree, neither here nor there?

24   Because so much of your case is built on the idea that this

25   false rules violation report was issued to keep him in the

1  SHU.

2          **MR. BENEDETTO:**  (Nods head)

3          **THE COURT:**  And so, why wouldn't it be relevant to --

4  why wouldn't Mr. Perez be allowed to explain what a big deal

5  it is to be kept in the SHU?

6          **MR. SEALS:**  All right.

7          **MS. NYGAARD:**  I understand what you're saying,

8  Your Honor.

9          **THE COURT:**  Okay.  All right.  So, let's see.

10  Anything else on the motions in limine?

11          **MR. BENEDETTO:**  No, Your Honor.

12          **MS. NYGAARD:**  (Shakes head)

13          **THE COURT:**  Okay.  And we have discussed bifurcation.

14  I'm pretty -- I'll think about it a little more, but I'm very

15  strongly leaning towards bifurcating it in the way that we

16  have discussed.

17      On the Defendants' Motion in Limine No. 4, which is to

18  exclude evidence of grievances filed against the Defendants by

19  other prisoners, you had a motion to seal in there.  And it

20  really didn't sort of meet the standard for -- that would

21  justify sealing materials.  I mean, I think you have to show

22  that, you know, there's a pretty compelling need to seal the

23  materials.

24      So, do you want to like take a shot at making that showing

25  now, so I can hopefully grant your motion to seal?

```
 1        I mean, why is that stuff, why should that be -- why
 2   should that stuff be concealed from the public eye?
 3            MS. NYGAARD:  Could you give us one moment?
 4            THE COURT:  Sure.
 5        (Off-the-Record discussion between counsel)
 6            MR. SEALS:  Your Honor, I think to the extent that it
 7   was simply grievances filed by other inmates, I don't know
 8   that that necessarily needs to be sealed.  But I think our
 9   concern was that there was stuff from his personnel file.
10        And we may need to go back and look at it again, and maybe
11   we could either withdraw or --
12            THE COURT:  Do you want to just do a supplemental
13   filing?
14            MR. SEALS:  Yeah.
15            THE COURT:  Like withdrawing -- you know, do that by
16   Friday also.  Anything that you no longer think should be
17   under seal, you can withdraw your motion to seal it.
18        And you know, anything that you do think should be under
19   seal, you know, you've got to show -- I mean, just to say that
20   it's confidential is not enough.  You have to explain -- I
21   mean, it's not hard to explain why information from -- private
22   information from somebody's personnel file should be under
23   seal.  But you need to do it, and you need to be more
24   discerning about what should be filed under seal.
25            MR. SEALS:  Okay.
```

1          **THE COURT:**  The last item I have -- oh, are we still

2     doing jury selection the same day?  Is that the current plan?

3          **MR. BENEDETTO:**  That is the current plan.  The 16th.

4          **THE COURT:**  Okay.  I do like doing it beforehand

5     because it's nice for the jury to get picked, and then have

6     like a couple of days to sort of get their affairs in order.

7          **MS. NYGAARD:**  Well, Defendants would object at this

8     point in time because we have five officers who would need to

9     travel down from Crescent City to come early for a jury

10    selection.  And I don't know what their availability is like.

11    It was hard enough for us to come up with the week of November

12    16th.  If they were local I think it would be different, but I

13    have no idea what their schedules are.

14         **THE COURT:**  Okay.

15         **MS. NYGAARD:**  Everybody is planning to be here on the

16    16th.

17         **THE COURT:**  Okay, that's fine.  We'll do that, then.

18    And do we have an estimate -- now that we've sort of pared

19    down the trial a little bit, do we have an estimate about how

20    long it will last?  How many court days you need?

21       (Off-the-Record discussion between counsel)

22         **MS. NYGAARD:**  So, we're thinking because we're doing

23    jury selection on Monday, that we would probably need to go

24    into that Friday to do closings.  So four days, because you're

25    dark on Thursday.

1        **THE COURT:**  Dark -- you're including in that that

2    we're dark on Thursdays.  Okay.  That's great.

3        And then, I think you should plan to do -- typically jury

4    selection in a civil case, we're done by lunchtime.  We have a

5    jury by lunchtime.  So you should plan to do your openings

6    that day.  Probably right after -- I'm guessing it'll be right

7    after lunch.

8        (Off-the-Record discussion between counsel)

9        **MR. BENEDETTO:**  Maybe a witness or two?

10       **THE COURT:**  And then you should have -- yeah, you

11    should have your first witness available.  If it's a short

12    witness, you should have two witnesses available.

13       And for opening statements, half an hour each side.

14       The way we'll do jury selection is we will bring about 25

15    people in here.  We will line them all up in order.  You will

16    get a list which shows Juror No. 1, No. 2, No. 3, all the way

17    down to 25 or 30, or however many it ends up being.

18       So that you will know if you ding No. 5, or if I excuse

19    No. 5, then No. 6 will ultimately become No. 5.  And it'll --

20    so you'll know that, you know, Prospective Juror No. 22 is

21    very unlikely to end up on the jury so you're not going to

22    have to waste, you know, really much time with that person.

23       And, we'll hand -- we'll give the 25 jurors, roughly 25

24    prospective jurors, the questionnaire.

25       First we'll do hardships, I'll do hardships with them.

 1   Then we'll give them the questionnaire that's on my website.

 2   And I'll go through with them verbally, each of them, the

 3   questionnaire.  And I'll -- I usually can ask some followup

 4   questions of them during that process.

 5       Then I'll probably ask everybody two or three

 6   raise-your-hand questions.  And they will be some of the

 7   questions that you have submitted.  I'll pick out two or three

 8   of the ones that I think are most important and ask them, you

 9   know, raise-your-hand questions that will be specific to the

10   case, and get into a dialogue about that.

11       And then we will caucus and discuss for-cause challenges

12   or for-cause discussions.  And I will tell you who I'm

13   inclined to excuse for cause.  And if there is no objection,

14   we will just go ahead and excuse those people so you don't

15   have to waste your time during your own voir dire with those

16   people.  But if one of you objects, we will leave them there

17   so you can try to rehabilitate them or whatever.

18       And, then you can each do -- since you're doing this as

19   appointed counsel, I'll give you each half an hour for

20   voir dire, which is longer than I usually give.  But you can

21   each have half an hour for voir dire.  And then we'll pick our

22   jury.  And like I said, we should be done right around

23   lunchtime.

24       Courtroom configuration.  So, we -- I'm hopeful that we

25   can get the video conferencing capability set up in this

1    courtroom.  I was initially told that we might not have it set

2    up for this courtroom, which wouldn't be a big deal, we'd just

3    do it in some other courtroom on the hallway.

4         But one thing I was thinking about is because Mr. Perez is

5    a prisoner at Pelican Bay, obviously I don't want to restrict

6    his movement in the courtroom in any way, but I also don't

7    want to be -- want the jurors and the prospective jurors to be

8    freaked out.

9         And so, what I was thinking would be ideal is if the

10   Plaintiffs sit where the Defendants usually sit, and the

11   Defendants --

12        **MS. NYGAARD:**  Here (Indicating)?

13        **THE COURT:**  Yeah and the Defendants sit where

14   Plaintiffs usually sit.  So that way, just in case there are

15   skittish prospective jurors who are concerned about being, you

16   know, in close proximity to somebody who is an inmate at

17   Pelican Bay, that should alleviate their concerns.  And so

18   that's -- if we do a different courtroom, then I think it will

19   -- it will be fine, probably.

20        I'm going to give this some more thought, but I think it

21   will be fine for the Defendants to sit at counsel table

22   closest to the jury box, and the Plaintiffs to sit at counsel

23   table further from the jury box.

24        But ideally we'll be here, and you all will be there.  And

25   I may give some thought to where the witness stand goes, too,

1  although I'm not sure if we need to worry about that yet or

2  not.

3        **MR. SEALS:**  Have you given any thought to where -- I

4  believe he'll have some guards with him.  So I don't know

5  where you would want them to be.  Just in terms of -- we need

6  to check with CDCR about where they would want the guards to

7  be.

8        **THE COURT:**  Uh-huh.

9        **MR. SEALS:**  I don't know if they would want to be

10  behind or if they could sit in the back (Indicating), or if

11  you have any --

12        **THE COURT:**  Well, I mean, the number-one concern is I

13  don't want Mr. Perez to be prejudiced by any of it.  But also,

14  we do have -- I'm concerned about jurors, you know, being

15  worried.  And I'm -- and there is a safety issue that we have

16  to worry about.

17        And so, you know, I'm going to be flexible, and I trust

18  that you are going to be flexible on that as well.  And if the

19  -- you know, if the CDCR folks want to come check it out and

20  talk to us about it, you know, they're more than welcome to do

21  so.  You know, and I invite you all to come as well, if you

22  would like.

23        **MS. NYGAARD:**  They'll probably just figure it out the

24  morning of.  I mean, I've seen it in other courtrooms where,

25  you know, it was a little different configuration.  People

1  were sitting, you know, in the front row right by the table.

2          **THE COURT:**  Uh-huh.

3          **MS. NYGAARD:**  Or -- you know.  But I would defer to

4  -- and I would hope that the Court would too, and Plaintiff's

5  counsel, to the discretion of the officers, because, I mean,

6  they're the ones who are experienced and know what level of

7  security or closeness that he is going to need.

8          **THE COURT:**  Yeah, and I certainly will defer to them,

9  to a point.  But as long as it's not going unfairly prejudice

10  Mr. Perez.

11      (Note handed up to the Court)

12          **THE COURT:**  Oh.  And, he's not going to be shackled.

13  I don't know if that was clear.

14          **MS. NYGAARD:**  On the -- on the legs?  We would ask

15  for him to be shackled.

16          **THE COURT:**  Thoughts?

17          **MS. NYGAARD:**  We would object to not having that

18  happen.  He is a Level 4 maximum-security inmate, Your Honor.

19  We would not be comfortable having him just sitting here with

20  nothing on.

21          **MR. BENEDETTO:**  We had reached an agreement with the

22  Defendants that as long as the jury never had a view of

23  Mr. Perez being visibly shackled, which means --

24          **THE COURT:**  Okay.

25          **MR. BENEDETTO:**  -- either behind a curtain or --

1          **MS. NYGAARD:**  This wall (Indicating).

2          **THE COURT:**  Well, this is the perfect courtroom for

3     that.  Right.

4          **MR. BENEDETTO:**  Right.  As long as they are not

5     informed that this is typically where the Defendant sits.

6          **THE COURT:**  Right.

7          **MR. BENEDETTO:**  And also when he testifies, that he

8     be put in the witness stand before the jury enters the room,

9     so they don't see him with his legs shackled.

10          **THE COURT:**  Okay.

11          **MR. BENEDETTO:**  Those are our primary concerns.

12          **MS. NYGAARD:**  Right.

13          **MR. BENEDETTO:**  Relatedly, I guess I have a question

14     for Ms. Nygaard, if she knows how the CDCR officers will be

15     attired.

16          **MS. NYGAARD:**  In their uniforms.

17          **THE COURT:**  Do they have to be in their uniforms?

18          **MS. NYGAARD:**  Yes.

19          **THE COURT:**  I mean, you know, I'm less worried about

20     this in this case than I would be in a criminal case where

21     somebody's being, you know, accused of a crime.  I mean, it's

22     not a secret a that he -- you know, that Mr. Perez is a

23     prisoner at Pelican Bay.  And it's not a secret that there are

24     security issues associated with that.

25          So, but why do they need to be in uniform?  Just because

1  they need to have their weapons --

2       **MS. NYGAARD:**  Yeah, I mean, they are peace officers,

3  and they need to have their safety equipment on them and, you

4  know --

5       **THE COURT:**  Okay, well, I was just asking because we

6  often have -- you know, the U.S. Marshal is often in here

7  without marshals' uniforms on.

8       **MS. NYGAARD:**  I have never seen a CDCR officer come

9  to court without their uniform on.  They are going to be

10  transporting from a prison, driving here.  They -- you know,

11  they need to have everything on.

12       **THE COURT:**  Okay.

13       **MR. BENEDETTO:**  I mean, we're concerned about the

14  prejudice to our client, regardless of the stipulation that he

15  is a prisoner of Pelican Bay.  We are not hiding from that.

16    But to the extent that that can be mitigated in some way,

17  perhaps where they sit, their proximity to Mr. Perez, possibly

18  their attire, we would be -- we would be concerned about --

19       **THE COURT:**  Well, maybe you all could -- with respect

20  to -- I think it would be worth it, you know, so that we don't

21  have any, like, issues the morning of jury selection, which is

22  the last thing that you all need -- I mean, for me, it's not

23  that big of a deal.  I can come out here and sort of make a

24  decision.  But you all don't need that.

25    Maybe you'd rather try and work it out amongst yourselves,

```
 1   see if you can reach agreement about all this stuff.  But in

 2   particular, the uniform issue, that's something that needs to

 3   be resolved in advance.  And if you're not satisfied on that,

 4   you should file something.

 5      I mean, the more I think about it, and the more we talk

 6   about it, my inclination is:  He is a prisoner at Pelican Bay,

 7   and pretty much everybody knows what that means.  And so we're

 8   not, like, playing a big trick on the jury here by putting

 9   people in plainclothes rather than in their uniforms.

10      But -- and by the way, I mean, I don't know if you

11   included a proposed instruction about not, you know -- about

12   not -- you know, that you shouldn't take into account -- I

13   mean, this will come up, no doubt, during voir dire and stuff,

14   that:  You're not going to hold it against the guy that he's a

15   prisoner, and you know, prisoners have First-Amendment rights

16   too.  But I don't know if there is an instruction along those

17   lines.

18          MR. BENEDETTO:  We did not have -- include such an

19   instruction.

20          MR. SEALS:  I think the difficulty with that

21   instruction is the -- the rule regarding felonies being

22   evidence of credibility.  So...

23          THE COURT:  Oh, uh-huh.  Yeah.  Well, but, I'm sure

24   they're going to say with some regularity that prisoners have

25   First-Amendment rights too, and you are not going to disagree
```

```
 1   with that.
 2           MR. BENEDETTO:  That is an instruction.
 3           THE COURT:  What?
 4           MR. BENEDETTO:  That is an instruction.
 5           MR. SEALS:  Exactly.
 6           THE COURT:  That you're not going disagree with that?
 7           MR. BENEDETTO:  No, that prisoners have
 8   First-Amendment rights.
 9           THE COURT:  Yeah.  I mean, you know.  So I think it
10   will all be fine.  But if you all have any problems, just -- I
11   mainly just ask you to sort of try to get ahead of problems as
12   much as possible.  And if you need my assistance, to, you
13   know, file something seeking my assistance.
14       Anything else for today?
15           MR. BENEDETTO:  I informed Ms. Nygaard that there was
16   a -- a small error in the Bates label of one of our exhibits.
17   I informed her of what the new label is.
18       And we will be refiling a corrected version of Exhibit A
19   to the joint proposed pretrial order.
20           THE COURT:  Oh, if only everybody was so careful and
21   exacting in their pretrial preparation.
22       Okay.  Very good.  So --
23           MR. BENEDETTO:  And, and finally, on Mr. Guerrero and
24   Mr. Mendoza, if in fact we go forward with a video conference,
25   we're going to test that out?
```

 1          **THE COURT:**  Yeah, yeah.  Certainly.  You can

 2    certainly come test that out.

 3      Arrange with Kristen.

 4          **THE CLERK:**  I'll talk with you guys after court.

 5          **MS. NYGAARD:**  Okay.

 6          **MR. BENEDETTO:**  One --

 7      (Off-the-Record discussion between counsel)

 8          **THE COURT:**  All right.  Anything else?

 9          **MR. SEALS:**  We were just discussing the possibility

10    of the exhibits and our objections to the exhibits.

11      Will you address those issues during the course of trial?

12    Or -- before the first day?

13          **THE COURT:**  That's a good question.  One thing that

14    -- I mean, the problem with exhibits and objections to

15    exhibits and addressing them before trial is that typically

16    what happens is that, you know, each side includes 500

17    exhibits on their exhibit list, and objections, and only five

18    to ten of those exhibits ever end up getting offered if the

19    first place.

20      So, you know, for me to go through and rule on exhibits

21    and objections to exhibits now is generally not a good idea.

22      One question is:  Have these rulings on the motions in

23    limine resolved a lot of the issues relating to the exhibits?

24      (Off-the-Record discussion between counsel)

25          **MS. NYGAARD:**  Some of them, yes.

1        **THE COURT:**   Okay.   Another question is:   Are there,

2   like, you know, say, four or five bellwether documents where

3   if -- you know, documents that you consider really important,

4   and documents where a similar evidentiary issue is going to

5   come up with respect to more than one document.

6        You know, what I did in preparation for the last civil

7   trial is invited the parties to kind of pick among -- you

8   know, get together and pick four bellwether documents, and do

9   a joint submission to me, you know, describing the evidentiary

10  issues raised by those documents.

11       And I could issue a ruling in advance on those, sort of in

12  the same format that you might have done like jury

13  instructions, you know.

14       Or, you know, where you're submitting one brief to me

15  which has each side's arguments on each of the bellwether

16  documents.   You could, like, each pick two or something like

17  that.

18       If you would like to do that, I would be happy to sort of

19  help you out that way.

20       **MS. NYGAARD:**   One big category that I can think of

21  right now are articles that Mr. Perez wrote after the cell

22  search, that we believe if a jury read the contents of those

23  articles, that it would be overly prejudicial.

24       It's just Mr. Perez's advocacy (Indicating quotation

25  marks) about the perceived misjustices in the prison system,

et cetera, and he uses a lot of inflammatory terms and

languages.  Sometimes he has legal conclusions in there.  And,

you know, we just -- we believe that the jury reading what he

wrote would be overly prejudicial.

Now, the fact that he wrote them, that's different.  But

we just believe that actually handing the document to the jury

and letting them read pages and pages of his -- you know, his

statements about how horrible Pelican Bay is and everything,

we just feel --

**THE COURT:**  Why are those relevant at all?  I would

think that you would -- you might be sifting through that and

trying to figure out if there's any admission that he makes in

those writings that you would want to admit.

But assuming it wouldn't be like a party admission,

assuming it wouldn't be admissible for that purpose --

**MS. NYGAARD:**  No, there's nothing about Defendants in

them.

**THE COURT:**  So, I mean, it's hearsay.  Right?

What exception would that fall under?  Why would you want

to --

**MR. BENEDETTO:**  I think there's a state-of-mind

exception.  And, we also would have to sort of think about

these articles in light of the Court's ruling today on the

other First Amendment activities.

**THE COURT:**  Uh-huh.

1          **MR. BENEDETTO:**  And how we would seek to use them.

2          **THE COURT:**  Uh-huh.

3          **MR. BENEDETTO:**  We believe that they -- the

4    post-October articles are evidence of the fact that there

5    would be similar articles in his cell on the day of the cell

6    search.

7       But, you know, we would have to really think about whether

8    we -- how we would use them in light of the bifurcation and in

9    light of the --

10         **THE COURT:**  Yeah.  My pure gut reaction -- take it

11   for no more than that, but you know, I mean, if it were stuff

12   -- I mean, if there was an allegation -- if there was an

13   implication or an allegation that he's just now making this

14   stuff up, and then it's prior -- prior consistent statement.

15   But that's not what it's going to be about.

16      So anyway, I'm sort of left wondering what -- you know.

17   You mentioned state of mind.  Maybe it's more relevant in the

18   second phase.  I don't know.  I mean, but anyway, that'll be

19   something to think about.

20      If you want those to be part of your bellwether documents,

21   you can pick one example.  You don't have to, you know, seek a

22   ruling on all of them.

23         **MS. NYGAARD:**  Right.

24         **THE COURT:**  Pick an example and an exemplar.  And,

25   you know, pick that as one of your documents and submit it,

1   seek a ruling.

2          **MS. NYGAARD:**   Okay.  And I think Defendants had

3   another question about how Your Honor prefers to have

4   witnesses called.

5      If Defendants are called in Plaintiff's case-in-chief, do

6   you prefer them to just only be on the stand once?  Or do we

7   get to call them in our case-in-chief later?

8          **THE COURT:**   I think that you should -- they should be

9   -- I mean for their sake, they should be on the stand once.  I

10  mean, I don't see why -- I mean, if they called one of the

11  Defendants, you can get up and do your direct of them.

12         **MS. NYGAARD:**   Okay.

13         **THE COURT:**   Yeah.  Anything else?

14         **MR. SEALS:**   (Shakes head)

15         **MR. BENEDETTO:**   No, Your Honor.

16         **THE COURT:**   Okay.  Great.  Thanks very much.

17     So I will see you -- oh.  I think I've said this before.

18  I don't care at all whether you want to settle, whether you

19  want to go to a Magistrate Judge, doesn't matter to me.  My

20  job is to preside over trials.  I'm happy to do this one.

21  Kind of looking forward to it, actually.

22     But, do you want to?  If both sides wish to go back to --

23  Judge Vadas?

24         **MR. LEE:**   (Shakes head)

25         **THE COURT:**   No?  Okay.  Good.  See you on the 16th,

1   then.

2            **MR. BENEDETTO:**  Thank you, Your Honor.

3            **MS. NYGAARD:**  Thank you, Your Honor.

4            **MR. LEE:**  Thank you, Your Honor.

5            **THE CLERK:**  Court is adjourned.

6        (Conclusion of Proceedings)

**CERTIFICATE OF REPORTER**

   I, BELLE BALL, Official Reporter for the United

States Court, Northern District of California, hereby certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

/s/  Belle Ball_____

   Monday, November 9, 2015

  Belle Ball, CSR 8785, CRR, RDR