Volume 1

Pages 1 -  178

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

JESSE PEREZ,                          )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 ) No. C 13-5359 VC
                                      )
A. GATES, et al,                      )
                                      )  San Francisco, California
            Defendants.               )  Monday
                                      )  November 16, 2015
_____)  8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          WILMER CUTLER PICKERING HALE DORR, LLP
                           350 South Grand Avenue
                           Suite 2100
                           Los Angeles, California 90071
                    BY:    **RANDALL ROSS LEE, ESQ.**
                           **MATTHEW DONALD BENEDETTO, ESQ.**
                           **KATHLEEN BRIDGET MORAN, ESQ.**


**For Defendant:**          STATE OF CALIFORNIA
                           Office of the Attorney General
                           455 Golden Gate Avenue
                           Suite 11000
                           San Francisco, California 94102
                    BY:    **JENNIFER J. NYGAARD, ESQ.**
                           **ELLIOTT THOMAS SEALS, ESQ.**



*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR*
               *Belle Ball, CSR 8785, CRR, RMR*
               Official Reporters - US District Court

```
 1                    P R O C E E D I N G S

 2   November 16, 2015                            8:23 a.m.

 3            THE CLERK:  Calling Case No. 13-5359, Perez v Gates,

 4   et al.

 5       Counsel, please state your appearances for the record.

 6            MR. LEE:  Good morning, your Honor.  Randall Lee,

 7   Matthew Benedetto and Katie Moran for Mr. Perez.  Mr. Perez is

 8   present.

 9            THE COURT:  Good morning.

10            MS. NYGAARD:  Good morning.  Jennifer Nygaard from

11   the Attorney General's office.

12            MR. SEALS:  Good morning.  Elliott Seals from the

13   Attorney General's Office.

14            MS. NYGAARD:  For defendants.

15            MS. TUCAY:  Good morning.  Jocelyn Tucay from the

16   Attorney General's Office.

17            THE COURT:  Good morning.

18            MR. BURRIS:  Sean Burris, California Department of

19   Corrections.

20            THE COURT:  Okay.  You all don't need to make your

21   appearances.

22            MR. SEALS:  Jocelyn is our paralegal.  These are the

23   defendants.

24            THE COURT:  I understand.  Good morning, everybody.

25       So just a couple of quick questions.  One question that
```

PROCEEDINGS

```
 1  came to my mind that we hadn't talked about was because we're
 2  phasing the trial in the way that we are, you know, there is
 3  always a little bit of an issue about how to discuss that with
 4  the jury without -- you know, you kind of want to avoid saying
 5  outright:  If you vote this way, you're going to be free to go;
 6  and if you vote the other way, you're going to have to spend
 7  some more time.
 8      So I was going to kind of just avoid addressing that issue
 9  and in terms of discussing how long the trial will last, just
10  say about a week.  I think that probably would cover us.
11      My guess is that we may well be done -- based on the
12  witnesses you've identified, we may well be done with the
13  liability phase by Wednesday or possibly Friday; don't you
14  think?
15          MR. LEE:  Your Honor, I -- I think that's right.  I
16  think our only concern about the timing is that if we're facing
17  Friday afternoon and, you know, it's -- that there is a danger
18  it spills over into Thanksgiving week, you know, we're a little
19  worried about the dynamic that the Court just referred to;
20  that, you know, the jurors will feel incentivized to reach a
21  particular decision by Friday afternoon.  And I don't know
22  that --
23          THE COURT:  Well, I mean, I think that when we
24  discuss scheduling with them today, I want to make very clear
25  that there is -- you know, that there is significant
```

PROCEEDINGS

 1  possibility it will go over to next week.

 2      I'm going to suggest to them that they are going to be

 3  done by the end of this week.  I want everyone to have that

 4  expectation.

 5          MR. LEE:  Thank you.

 6          THE COURT:  If we go to the damages phase, I also

 7  assume that it will not take that much time.

 8          MR. LEE:  That's our anticipation.

 9          MS. NYGAARD:  Correct.

10          THE COURT:  I can't imagine it being more than one

11  trial day's worth of evidence presentation.

12          MR. LEE:  Less than that.

13          THE COURT:  Okay.  So I just want to make sure

14  everybody was on the same page about that.

15      I got your suggested edits of the case description.  That

16  all looked fine.  The only thing is, you know, nobody knows

17  what a gang validation is.  Maybe you all have been living with

18  this case too long and you think everybody knows what a gang

19  validation is, but, you know, when I first saw that term, I

20  started scratching my head and got confused.

21      So I'm just using, like, something closer to regular

22  English to describe that, but otherwise your edits look fine.

23  Of course, you'll be able to explain to them what a gang

24  validation is during trial.

25      The expert is Subia?  Is that the name of the expert?

PROCEEDINGS

1          MR. LEE:  Yes.

2          THE COURT:  I'm a little unclear.  It may be just I

3   don't remember very well our prior discussions of Subia, but

4   I'm -- are you calling him as a percipient witness?  As an

5   expert witness?

6       If you're calling him as an expert witness, you know, what

7   is there left to call him about after my ruling on the motion

8   in limine?  I just wanted to get sort of clear what his

9   situation was.

10          MR. BENEDETTO:  Yes, your Honor.  We will be calling

11  him as an expert with respect to cell search procedures.

12          THE COURT:  Okay.

13          MR. BENEDETTO:  And that would be it.

14          THE COURT:  Okay.  And that's something that -- that

15  everybody agrees he's an expert on and can testify about?

16          MR. BENEDETTO:  Yes, your Honor.

17          MS. NYGAARD:  Yes.

18          THE COURT:  All right.  Are there any other

19  evidentiary issues that you anticipate coming up with whoever

20  your first or second witnesses are that we can begin to address

21  in advance?

22          MR. BENEDETTO:  Our first witness will be Mr. Perez.

23  And we have the understanding that the defendants have objected

24  to a number of the exhibits that we plan to use with him.

25          THE COURT:  All right.

PROCEEDINGS

1          **MS. NYGAARD:**  That's correct.

2          **THE COURT:**  Do I have an exhibit binder?  Yeah, I do.

3      What I'm going do is not hear argument about it now,

4  because I assume the prospective jurors are going to be ready

5  to come down pretty soon.

6      Kristen, if you find out what the ETA is, you can let me

7  know.

8      At a minimum, if you could just identify what the issues

9  are so we can start to look at it.

10      And this is something that you guys need to be really

11  conscientious about doing throughout the course of trial; that

12  is to say, doing your best to identify what potential

13  evidentiary issues could come up and front them in advance so

14  that we don't waste the jury's time bickering about them at

15  sidebar.

16      And you need to keep in mind that I am fairly

17  inexperienced in terms of presiding over trials, and so it will

18  be more important with me, than most judges, to front issues

19  with me in advance to avoid the -- to reduce the chances of

20  error.  So with that in mind.

21          **MR. LEE:**  Before we proceed on the exhibits, could I

22  just ask the Court if the court would ask the correctional

23  officers to remove Mr. Perez's arm restraints?  They wanted to

24  hear it from you first.

25          **THE COURT:**  Oh, yes.  Certainly.  Yes.

PROCEEDINGS

1          **MR. LEE:**  And since we're on the topic of the

2   conditions for Mr. Perez, one other thing we wanted to ask.

3          Ordinarily, I understand that prisoners are only entitled

4   to a shower and shave three times a week, but we think in light

5   of the importance that Mr. Perez look presentable, that he have

6   the opportunity to shower and shave every day.

7          **THE COURT:**  Yes.  Do you need a written order on

8   that?

9          **THE SHERIFF:**  Yes.

10         **THE COURT:**  Okay.  I will prepare a written order.

11  So it should just say that during the course of trial,

12  Mr. Perez must be permitted to shower and shave every day.

13         **MR. LEE:**  Yes, please.

14         **MS. NYGAARD:**  Your Honor, just for the record,

15  defendants would be objecting to that order.  I don't know how

16  San Quentin's shower schedules are set up or anything.  So for

17  on a daily basis, it might be too difficult.  I just want to

18  note that for the record.

19         **THE COURT:**  Objection noted.

20         And then Mr. Perez is going to be the first witness, so

21  that we -- we will take a -- if Mr. Perez is called today, we

22  will take a short break after opening statements to get him up

23  there outside the presence of the jury.  All right?

24         **MR. BENEDETTO:**  Right.

25         **MS. NYGAARD:**  Great.

PROCEEDINGS

1      **THE COURT:**  All right.  Okay.  What are your -- what

2  are the issues?

3      **MS. NYGAARD:**  On Exhibit 2, defendants object to the

4  introduction of this exhibit, specifically the second page.

5  Perez 86, contains underlining, presumably made by Mr. Perez

6  himself, and we feel it's unduly prejudicial, leading the jury

7  to think that the things that are underlined are more important

8  or have some significance.

9      **THE COURT:**  Okay, that's overruled.

10      Next?

11      **MS. NYGAARD:**  No. 10.

12      **THE COURT:**  Okay.

13      **MS. NYGAARD:**  This is an article written by

14  Mr. Perez.  Your Honor, defendants object to the admission of

15  this article because it contains --

16      **THE COURT:**  Okay, hold on.  First of all, it's -- in

17  my version of the binder I actually don't have that article in

18  here.

19      **MS. NYGAARD:**  It's entitled "Opposition to Elements

20  of Proposed STG," No. 10.

21      **THE COURT:**  Yeah.  That didn't find its way into my

22  binder.  I have a tab, Tab 10, but there is nothing in there.

23      (Whereupon, document was tendered to the Court.)

24      **THE COURT:**  Kristen, what's the status of the jurors?

25      **THE CLERK:**  I've asked for them.  They should be on

PROCEEDINGS

```
 1  their way down.

 2            THE COURT:  Sorry?

 3            THE CLERK:  I've asked for them.  They should be on

 4  their way down.

 5            THE COURT:  Okay.  So, Exhibit 10.  And the objection

 6  is?

 7            MS. NYGAARD:  First of all, Rule 403.  It would be

 8  overly prejudicial to have this submitted to the jury.  It

 9  contains Mr. Perez's objections to policies the CDCR was

10  talking about implementing.  He's very critical of the CDCR.

11            THE COURT:  Is this a document that is alleged to

12  have been improperly confiscated?

13            MS. NYGAARD:  No.

14            MR. BENEDETTO:  It is.  It was an article that was in

15  his cell that was not confiscated that is --

16            THE COURT:  I'll think about that.  We'll talk about

17  it at a break.

18            MS. NYGAARD:  I have one more objection to that.  It

19  also contains an impermissible legal conclusion.  He talks

20  about how the procedures violate the Fifth Amendment and I just

21  don't feel it's appropriate to be submitted to a jury.

22            THE COURT:  Okay.

23            MR. BENEDETTO:  We wouldn't be offering it for its

24  contents.

25            THE COURT:  We'll have a chance to talk about it
```

1  later.   I just want to know what the objections are right now.

2              **MR. BENEDETTO:**  12.

3              **MS. NYGAARD:**  No. 12 is the settlement agreement.

4  Defendants object on relevance.  We are not -- defendants do

5  not disagree that there was no valid settlement agreement in

6  place.  We feel that it's just not necessary for the jury to

7  actually see the written settlement agreement.

8              **THE COURT:**  I just want to make sure that prospective

9  jurors haven't walked into the room.  The two people who walked

10  in, are you -- you're not --

11             **MS. NYGAARD:**  They are from the Attorney General's

12  Office.

13             **THE COURT:**  Okay.  Thank you.

14             **MS. NYGAARD:**  Defendants also object that it would be

15  overly prejudicial because it contains, you know, the -- the

16  amount of the settlement, and it could be misleading to a jury

17  to kind of give them an idea of what they should award in this

18  case.

19             **THE COURT:**  Okay.  Any other objections?

20             **MS. NYGAARD:**  Not to that document.

21             **THE COURT:**  I mean, any more objections to exhibits?

22             **MS. NYGAARD:**  Oh.  Yes.  What's the next one?

23             **MR. BENEDETTO:**  15.

24             **MS. NYGAARD:**  15.  No. 15.  It's a photograph of a

25  empty SHU cell.

1      **THE COURT:**  Okay.

2      **MS. NYGAARD:**  Defendants object to this in that it's

3  not representative of the cell -- Mr. Perez's cell, which is at

4  issue in this case looked like.  The toilet or the sink that

5  you see on the right-hand side is actually on the left.  Mr.

6  Perez's cell is kind of a mirror image of this one.

7      We also believe that it's overly prejudicial because it's

8  just a barren empty cell that, you know, would be overly

9  prejudicial to the jury to think that this is the conditions

10  that inmates live in.  It's not representative.

11      **THE COURT:**  Because the conditions they live in are a

12  mirror image of this picture as --

13      **MS. NYGAARD:**  Mr. Perez's cell was a mirror image,

14  but we also object.  There is no furnishings in here.  I mean,

15  inmates personalize their cell.  They have clothing.  They

16  have, you know, two mattresses if there's two inmates.  They

17  have bedding on it.  This is just a barren, empty cell.  It's

18  not representative.

19      **THE COURT:**  All right.  Any other exhibits?

20      **MR. BENEDETTO:**  17.

21      **MS. NYGAARD:**  17, again, is a photograph of a cell.

22  It's not the cell at issue in this case.

23      We also believe it would be overly prejudicial because it

24  shows some inmates in there that are not Mr. Perez or any of

25  his witnesses in this case.

1          THE COURT:  Okay.

2          MR. BENEDETTO:  19.

3          MS. NYGAARD:  19.  Object on the basis of relevance.

4    This is a hallway inside the Security Housing Unit; that

5    Mr. Perez would rarely ever be taken down this hallway.  It has

6    no bearing on whether defendants retaliated.  No relevance on

7    whether defendants retaliated.

8          And, again, we believe it's also danger of unfair

9    prejudice by misleading the jury to think that, you know,

10   Mr. Perez is brought down this hallway on a daily basis.

11         THE COURT:  Okay.

12         MS. NYGAARD:  Exhibit 20 is a photograph of a SHU

13   exercise yard.  Again, defendants object on the basis of

14   relevance.  This has nothing to do with whether defendants

15   retaliated or conspired to retaliate against Mr. Perez.

16         And the same goes -- the same goes for No. 21.

17         THE COURT:  Okay.

18         MS. NYGAARD:  Again, it's an exercise yard at the

19   SHU.  We're not disputing that, but we don't believe there is

20   any relevance to the introduction of this exhibit.  It has

21   nothing to do with whether defendants retaliated or conspired

22   to retaliate against him, and it could also be overly

23   prejudicial for the liability phase.

24         MR. BENEDETTO:  25.

25         MS. NYGAARD:  No. 25.  This is purported to be a

PROCEEDINGS

```
 1  diagram of the SHU rotunda.  It appears to be drawn by

 2  Mr. Perez himself.  The defendants object that -- lack of

 3  authentication.

 4          THE COURT:  That is also missing from my binder.

 5      (Whereupon document was tendered to the Court.)

 6          THE COURT:  Thanks.  Okay.

 7          MS. NYGAARD:  First of all, authentication, lack of

 8  -- like I said, it just appears to be a hand drawn --

 9          THE COURT:  Mr. Perez drew it.  He can authenticate

10  it.

11          MS. NYGAARD:  Also, relevance.  It doesn't have any

12  bearing on whether defendants retaliate or conspired to

13  retaliate against Mr. Perez.

14          THE COURT:  Okay.

15          MS. NYGAARD:  And, also, that the -- under Rule 403,

16  that it could be confusing and misleading to the jury because

17  defendants believe that this is not a completely accurate

18  depiction of the rotunda and the SHU layout.

19          THE COURT:  Okay.

20          MR. BENEDETTO:  26.

21          MS. NYGAARD:  No. 26.  Defendants object to this for

22  relevance.  We don't -- we don't believe that this photograph

23  of a holding cell has anything to do with the relevance of this

24  case.

25      Also, for lack of authentication.  It's -- we don't
```

1  believe that this is actually a photograph from the Security

2  Housing Unit or even Pelican Bay State Prison at all, so it

3  also has no relevance in this case.

4           **THE COURT:**  Okay.

5           **MS. NYGAARD:**  And under Rule 403 that the probative

6  value is substantially outweighed by unfair prejudice by having

7  the jurors see this holding cell when it has no relevance to

8  the case.

9           **THE COURT:**  Okay.

10          **MS. NYGAARD:**  And No. 66 -- excuse me.  No. 65 --

11      (Discussion held off the record between counsel.)

12          **THE COURT:**  Kristen, is the jury here now, do you

13 know?

14          **THE CLERK:**  They are.

15          **THE COURT:**  Are they waiting outside the door?

16          **THE CLERK:**  I will go check.

17          **MS. NYGAARD:**  We only have one more.

18          **THE COURT:**  Okay.

19          **MS. NYGAARD:**  No. 77, your Honor.

20          **THE COURT:**  77?

21          **MS. NYGAARD:**  Yes.

22          **THE COURT:**  Okay.

23          **MS. NYGAARD:**  Defendants, again, object that this

24 exhibit is not relevant and would be unfairly prejudicial under

25 Rule 403.  It also contains inadmissible character evidence

1  under Rule 404, and that it's also hearsay.

2          MR. BENEDETTO:  I would note on 77, your Honor, you

3  had invited the defendants to draft a limiting instruction.

4          THE COURT:  This is the one about -- from, like, a

5  year ago?

6          MR. BENEDETTO:  Correct.

7          MS. NYGAARD:  The Ellery email, correct, to Pimentel.

8          THE COURT:  I was curious why --

9          MR. BENEDETTO:  The defendants did not draft a

10 limiting instruction.

11         THE COURT:  Okay.  So, I mean, most of that -- most

12 of this stuff, my reaction is that it's sort of setting the

13 stage and to the extent -- there may be an authentication issue

14 with respect to Exhibit 26, but for the most part these seem

15 like setting-the-stage exhibits.  I can't imagine there is

16 going to be much of a problem with them, but we can discuss

17 them further at a break.

18      So, meanwhile, I will go back behind the curtain until the

19 jury gets settled and we'll see you shortly.

20         MR. BENEDETTO:  Thank you, your Honor.

21         MS. NYGAARD:  Thank you.

22      (Brief pause.)

23      (Prospective Jurors enter the courtroom.)

24         THE CLERK:  Calling Case No. 13-CV-5359, Perez v

25 Gates, et al.

1          **MR. LEE:**  Good morning, your Honor.  Randall Lee from

2    Wilmer Hale for plaintiff, Mr. Perez, who is present in court.

3          **MR. BENEDETTO:**  Good morning, your Honor.  Matthew

4    Benedetto from Wilmer Hale on behalf of Mr. Perez.

5          **MS. MORAN:**  Good afternoon, your Honor.  Katie Moran

6    on behalf of Mr. Perez.

7          **MS. NYGAARD:**  Good morning, your Honor.  Jennifer

8    Nygaard from the California Attorney General's Office

9    representing Defendants Burris, Gates, Gongora, Healy and

10   Pimentel, all present here in court.

11         **THE COURT:**  Good morning.

12         **MR. SEALS:**  Good morning, your Honor.  Elliott Seals

13   from the Attorney General's Office, also representing the

14   defendants.

15         **THE COURT:**  Good morning.

16      Good morning.  Good morning, everybody.  Thank you very

17   much for coming.  My name is Vince Chhabria.  I'm a United

18   States district judge for the Northern District of California.

19   On behalf of the United States District Court, I want to

20   welcome you here.

21      Why don't we start first by having my Courtroom Deputy,

22   Kristen Melen, who is sitting right here, swear everybody in as

23   prospective jurors.

24         **THE CLERK:**  All rise.

25      (Prospective Jurors sworn.)

### JURY VOIR DIRE

1        **THE COURT:**  Okay.  I realize that you are all

2 summoned here.  You're not here necessarily of your own free

3 will, but we are nonetheless very thankful that you are here

4 today.

5        Other than maybe voting, there is no better way for an

6 average citizen to participate in our democracy and to make a

7 contribution to our community.  I think a lot of people would

8 actually say that jury service is more important and more

9 meaningful than voting.

10        After all, the founders of our democracy created the

11 judiciary and this jury system almost 230 years ago, and it's

12 still here, and it's one of the things that has helped protect

13 our freedom and one of the things that has allowed our

14 democracy to survive for so long.

15        And I think every jury that I have been involved with has

16 come away feeling -- you know, even if a juror might have been

17 skittish about being selected at the outset, every juror has

18 come away feeling like it really was a positive experience and

19 they really were able to make a meaningful contribution to the

20 community.

21        Now, if you end up serving on the jury in this case, I

22 think it will be probably a better experience than jury service

23 in the vast majority of cases, and that's for a couple of

24 reasons.

 1        One, we expect this trial to last around a week.  What

 2   that means is that we can't give you a precise estimate for how

 3   long the trial is going to go, but, you know, you will be out

 4   of here before Thanksgiving.  I mean, the case will be over

 5   before Thanksgiving and quite possibly, you know, significantly

 6   before that.

 7        But the other thing this case is that it's not a boring

 8   case or a case that will be difficult for you to wrap your mind

 9   around.  It's not a patent case, for example.  It's not an

10   unpleasant subject matter, like a child are pornography case,

11   or something like that.  This is a First Amendment case.  So in

12   terms of the amount of time that it will take and in terms of

13   the subject matter, it's about as good a way for you to

14   complete your jury service as I can imagine.

15        Let me talk about scheduling.  The way we work here is

16   that we begin at 8:30 in the morning.  And we go until some

17   between 2:00 and 2:30 in the afternoon.  We take a short break

18   or two in the morning and we do a -- like, a 45-minute lunch

19   break at around 11:45 or 12:00 o'clock.  We never -- we might

20   keep you a little bit longer than 2:00 o'clock, if we need to

21   finish something up.  If there is -- you know, if the witness

22   is in the middle of testimony, but we will never keep you here

23   longer than 2:30.  You have my assurance of that.

24        The purpose of having that schedule is so that you can

25   sort of take care of whatever business you need to take care of

1  during business hours.  We don't keep you here all day.  And

2  then in the afternoons, we are working.  I'm working and the

3  lawyers are working on evidentiary issues and other issues

4  outside the presence of the jury in order to make things more

5  efficient during the time that you are here.

6      So the schedule is really designed to make things -- I was

7  going to say as convenient as possible for you, but I guess

8  what I will say is to reduce as much as possible the

9  inconvenience for you and to be as efficient as possible and to

10  get as much work done as possible outside your presence so that

11  we're not wasting your time.

12      And by the way, we're not in trial on Thursdays.  So we go

13  Monday, Tuesday, Wednesday and Friday.

14      There is only one exception to the rule that you won't be

15  here past 2:30 and that is if during deliberations -- after the

16  jury is selected, if during deliberations you decide you want

17  to stay past 2:30 to continue deliberations, you -- that will

18  be up to you.  If you decide that it would be more efficient to

19  do it that way.  But other than that, we won't -- we won't keep

20  you here past 2:30 and you can bank on that in terms of making

21  your other plans.

22      With respect to how things are going to go today.  Today

23  we will, obviously, go through the process of jury selection.

24  I expect that we will have a jury selected by lunch time and

25  then we will take a lunch break.  Small chance we need to take

 1   a lunch break before the jury is picked, but very unlikely.

 2   And then you will come back here and hear opening statements

 3   today and we may even hear from the first witness in the case

 4   today.  That will probably -- that will probably be it.  And

 5   then after that, we'll resume again tomorrow morning at 8:30.

 6        Once the jury is selected, I and Kristen will give you a

 7   little more detail about sort of the ins and outs of being here

 8   every day and what is expected of you, but that's sort of the

 9   basic schedule that you need to be aware of.

10        Now, keeping all of that in mind, keeping in mind the fact

11   that this is a relatively short trial and whatnot, and keeping

12   in mind the fact that if anybody has any difficulty with

13   serving on this particular jury at this particular time, you

14   will not be released from your jury service.  You will be sent

15   back up to the jury office and perhaps be put on a different

16   jury that lasts -- for a case that lasts five weeks instead of

17   five days.

18        Keeping all that in mind, if there is something going on

19   in your life right now that would make it extremely difficult

20   or impossible to serve on this jury at this time, now is the

21   time to share that with me.

22        And I'm not talking about an inconvenience.  I'm not

23   talking about the need to rearrange things at work.  I'm

24   talking about prepaid travel plans, for which documentation

25   will be requested, or things along those lines.

```
 1        And let me ask if anybody has anything going on in their
 2   life right now that would make it extremely difficult or
 3   impossible to serve on this jury, could you raise your hand and
 4   we'll get a microphone to you and talk to you about it.
 5        THE COURT:  Okay.  And before you speak, let me just
 6   ask you, whenever anybody speaks and whenever any of the
 7   prospective jurors speak, if you could start off by giving us
 8   your first and last name so we know who you are, that would be
 9   much appreciated.
10        PROSPECTIVE JUROR TAYLOR:  My name is Yuriy Taylor.
11        THE COURT:  Okay.
12        PROSPECTIVE JUROR TAYLOR:  My wife has surgery
13   scheduled for the beginning of next week.  After that, the plan
14   is for her to be on disability for a few weeks.  Which very
15   much preoccupies my mind in terms of preparation and some other
16   appointments, which I feel could make it difficult for me to
17   stay focused on what I need to be focusing on this week.
18        THE COURT:  Okay.  And --
19        PROSPECTIVE JUROR TAYLOR:  That is my concern.
20        THE COURT:  I'm sorry to interrupt.
21        PROSPECTIVE JUROR TAYLOR:  That is my concern.
22        THE COURT:  Okay.  What day is her surgery scheduled
23   for?
24        PROSPECTIVE JUROR TAYLOR:  Monday or Tuesday of next
25   week.
```

1          THE COURT:  Monday or Tuesday?

2          PROSPECTIVE JUROR TAYLOR:  Next week.

3          THE COURT:  All right.  Thank you.

4      (Show of hands)

5          PROSPECTIVE JUROR ALIYEV:  My name is Eldaniz Aliyev.

6  I have 11-years-old twin boys.  Today, stay home because nobody

7  can take them to school.  My wife has a child care, she's from

8  7:00 to 6:00, stay with other kids.  But my kids stay home

9  today.  I don't know.

10      And then tomorrow we have a parent-teacher conference,

11  2:30 tomorrow, that is on at this point.

12          THE COURT:  Okay, and you said that your wife, what

13  does your wife do?

14          PROSPECTIVE JUROR ALIYEV:  She has a daycare, child

15  care.  And then she can't stop child care to take my kids to

16  school because, you know, from 7:00 to 6:00 she's provider,

17  daycare provider.

18          THE COURT:  And you live here in San Francisco?

19          PROSPECTIVE JUROR ALIYEV:  Yes, sir.

20          THE COURT:  And what time do your sons' school start?

21          PROSPECTIVE JUROR ALIYEV:  Start at 9:00 until 3:30.

22  But this week, 2:30, parent-teacher conference week, this week.

23  That's all.

24          THE COURT:  So your parent-teacher conference is

25  today?

JURY VOIR DIRE

```
 1              PROSPECTIVE JUROR ALIYEV:  Tomorrow, 2:00.  But today
 2   can't take them to school.  Eleven years old, can't take --
 3   school alone.
 4              THE COURT:  Thank you.
 5              PROSPECTIVE JUROR LIAO:  My name is Patti Liao.  I
 6   have a flight booked on Saturday, so if it's shorter than that,
 7   that's fine.
 8              THE COURT:  This coming Saturday?
 9              PROSPECTIVE JUROR LIAO:  This coming Saturday.
10              THE COURT:  Where are you headed to?
11              PROSPECTIVE JUROR LIAO:  I'm going to the D.C. area,
12   Virginia, for Thanksgiving week.
13              THE COURT:  Okay.
14              PROSPECTIVE JUROR KUJANPAA:  Yes, Your Honor.  My
15   name is David Kujanpaa.  I also have a flight booked for
16   Saturday morning to Florida.  I have very elderly parents
17   there.
18        My mother was diagnosed with cancer earlier this year.
19   She underwent radiation therapy for lesions in her brain.  She
20   is taking targeted therapy for a lung tumor, and seems to be
21   doing okay, except that she has horrible memory issues, and
22   therefore is very reliant on my father as primary care giver.
23        And I have just learned in the last week or two that he
24   has fallen victim to more than one fraudulent scam, to the tune
25   of tens of thousands of dollars.  And so I need to get down
```

 1  there to assess the situation, see if they are still

 2  financially solvent, or if we need to make arrangements to sell

 3  their house.

 4          THE COURT:  Okay.  Sorry to hear that.  Thank you.

 5          PROSPECTIVE JUROR KUJANPAA:  Thank you.

 6          PROSPECTIVE JUROR SISSON:  Ed Sisson.  And I too have

 7  a flight, to Chicago -- Sunday, though -- for the week.

 8          THE COURT:  Okay.  You have a flight to Chicago on

 9  Sunday for the week.

10          PROSPECTIVE JUROR SISSON:  Yes.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR TEMESGEN:  My name is Muluwork.

13  I'm working at --

14          THE COURT:  I'm sorry, it's Muluwork Temesgen?

15          PROSPECTIVE JUROR TEMESGEN:  Yeah.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR TEMESGEN:  You're welcome.  I'm

18  working as a temp employee.  The company pay me is not enough

19  to factor in to the jury every day.  That is my financial

20  problem.

21          THE COURT:  What company do you work for?

22          PROSPECTIVE JUROR TEMESGEN:  I work for, like, San

23  Pablo Casino, cocktail server.

24          THE COURT:  And what is your work schedule?

25          PROSPECTIVE JUROR TEMESGEN:  Four, but I have to be

```
 1  there like 3:30.  4:00 to 1:00.  1:00 p.m.  1:00 a.m., sorry.
 2          THE COURT:  And what is your occupation?
 3          PROSPECTIVE JUROR TEMESGEN:  Cocktail server.
 4          THE COURT:  And, the San Pablo casino does not pay
 5  its employers for jury --
 6          PROSPECTIVE JUROR TEMESGEN:  No, they pay, but it --
 7  not for me, it depend on my income, my tip.  They pay me like
 8  9.20 but the tax it takes, maybe the maximum I get is 400, 300.
 9  That's enough for two weeks but that's about two weeks, but
10  that is not enough for my rent, for everything.
11          THE COURT:  Okay, than you.
12          PROSPECTIVE JUROR TEMESGEN:  You are welcome.
13          PROSPECTIVE JUROR GONZALES:  Hi.  My name is Aileen
14  Gonzales.  I'm currently pregnant right now, but throughout my
15  pregnancy I have been having complications.  I was supposed to
16  see a doctor today, but I had to cancel it because of jury
17  duty.
18          THE COURT:  Okay, thank you.
19          PROSPECTIVE JUROR DURHAM:  Good morning.  My name is
20  Robert Durham.  I have non-refundable plane tickets to Mexico,
21  leaving on Saturday for a week.
22          THE COURT:  Okay.  All right.  Thank you.
23      Can I see the attorneys at sidebar for a moment?
24          LAW CLERK:  One more.
25          THE COURT:  Oh, I'm sorry.
```

1          **PROSPECTIVE JUROR ZHANG:**  Yeah, I can -- yeah.  My

2    name is Tao Tao Zhang.  You know, today is my last day as jury

3    duty but tomorrow and next week I have a lot appointment, you

4    know.

5          **THE COURT:**  Okay.  What are your appointments?

6          **PROSPECTIVE JUROR ZHANG:**  Tomorrow, tomorrow.

7    Tomorrow morning, from, I think maybe from 9:00 -- 9:00 a.m. to

8    6:00 p.m.  Yeah, I have a lot of patients.  Sorry.

9          **THE COURT:**  You have a lot of patients, okay.  I'm

10   sorry; what do you do?  What is your job?

11         **PROSPECTIVE JUROR ZHANG:**  I'm dentist.  But today is

12   my last day, is jury duty.  I have -- I have two weeks, I

13   blocked two weeks, but this --

14         **THE COURT:**  So this is the first time you have been

15   called in for jury duty, today?

16         **PROSPECTIVE JUROR ZHANG:**  Yes, yes.

17         **THE COURT:**  Okay.  And you are a dentist?

18         **PROSPECTIVE JUROR ZHANG:**  Yeah yes, yeah.

19         **THE COURT:**  So you have appointments with patients.

20         **PROSPECTIVE JUROR ZHANG:**  Yes, very full, yes,

21   already.

22         **THE COURT:**  Okay.  Okay.  Thank you.

23      (Whereupon, the following proceedings were held at

24         sidebar.)

25         **THE COURT:**  So, you know, we are going to have a

1  problem.  They didn't send us enough jurors.  We have 22

2  people.  And, nine of them are going on hardship.

3      I mean, my inclination was to let everyone go except for

4  the dentist.  But everybody else, it sounded like a legitimate

5  hardship.

6      So, that would leave us with how many people?  Twelve?

7          **MS. NYGAARD:**  Ten?

8          **MR. BENEDETTO:**  Thirteen --

9          **MS. NYGAARD:**  Twenty-two?

10          **MR. LEE:**  This is why we're lawyers.

11          **MR. BENEDETTO:**  Fourteen.

12          **THE COURT:**  So, I mean, we have no flexibility,

13  right, because the plan is to select eight.  And we don't have

14  to select eight, we can select fewer than eight.  But I'm a

15  little reluctant to select fewer than eight in case it falls

16  off during trial.

17      So I think what I'm going to do is have Kristen call for

18  more jurors.  I don't know why they only sent us 22 jurors.

19  But, I think we will proceed with jury selection, and you know,

20  I'll -- we will proceed with -- I'll excuse those eight people.

21  And, we will proceed with the questionnaires.

22      And then hopefully, we will have -- get a collection of,

23  like, five prospective jurors at some point during the morning,

24  figure out a way to start incorporating them into the selection

25  process.

```
 1        Thoughts or objections?
 2            MR. LEE:  No objection from us, Your Honor.
 3            MS. NYGAARD:  No objection.
 4            THE COURT:  Okay, thank you.
 5        (Conclusion of sidebar discussion; the following
 6         proceedings were held in the presence and hearing of
 7         the Jury:)
 8            THE COURT:  Okay, so I'm going to excuse the
 9   following people.  And as I said, you have to go back to jury
10   office and let them know that you have not been released from
11   jury duty; you have only been released from this trial.
12        Mr. Aliyev, Ms. -- is it Liao?
13            PROSPECTIVE JUROR LIAO:  Yes.
14            THE COURT:  Ms. Liao.  Mr. Kujanpaa.  Mr. Taylor.
15   Mister -- is it Sisson?  S-I-S-S-O-N?
16        Ms. Temesgen.  Mr. Durham, and Ms. Gonzales.  You can head
17   back to the jury office.
18        (Off-the-Record discussion between the Court and
19         Clerk)
20            THE COURT:  Okay, so Kristen is passing out to the
21   rest of you a questionnaire.  And in a moment, I'm going to ask
22   you to take a look at that questionnaire, and verbally answer
23   the questions on the questionnaire.  Fairly simple, 20
24   questions.
25        And the point of asking you to answer those questions to
```

 1   us out loud is for you to give us a sense of -- of what you're

 2   like, and your background and stuff like that.  So, so that the

 3   lawyers can begin to assess you as prospective jurors.

 4        Now, before I do that, before I have you -- before you

 5   start reading that questionnaire and thinking with about your

 6   answers to that, I would like to introduce everybody here to

 7   make sure -- I think it is unlikely, but just to make sure you

 8   don't know anyone involved in the case.

 9        So, let me start with the court staff.  I mentioned a

10   little bit ago, you have already interacted with her a little

11   bit, this is Kristen Melen, my courtroom deputy.  I have

12   several courtroom clerks.  Here right now, Rebecca Lee.

13   Elizabeth Yates has been passing around the microphone.  She's

14   an intern here in the building.

15        We will have two court reporters working this trial.  One

16   is named Debra Pas and the other is Belle Ball.

17        The plaintiff in this case is named Jesse Perez.  The

18   attorneys for Mr. Perez are Randall Lee -- or the team for

19   Mr. Perez which includes attorneys and support staff, are

20   Randall Lee, Matthew Benedetto, Tim O'Dwyer and Katie Moran of

21   the WilmerHale law firm.

22        The defendants in this case are Sean Burris, Anthony

23   Gates, Daniel Gongora, Eric Healy, and Guillermo Pimentel.

24        The attorneys for the defendants or the defense team for

25   the Defendant are Jennifer Nygaard, Jocelyn Tucay and Elliott

1    Seals from the California Attorney General's office.

2         Now, if you know or think you might know anybody who I

3    identified, can you please raise your hand?

4         (No response)

5              **THE COURT:**  Okay.  Thank you.

6         Now let me read you a list of potential witnesses who will

7    be called in this case.  It's not certain that every one of

8    those witnesses will take the stand but just in case you think

9    you might know anybody:  Judd Anderson, David Barneburg, Suzan

10   Hubbard, Rudy Guerrero, Salvador Mendoza, and Richard Subia.

11   That is in addition to the plaintiff and the defendants who

12   might be called as witnesses in this case.

13        Does anybody think they might know any of those witnesses?

14        (No response)

15             **THE COURT:**  Okay.  So let me describe the process

16   that we are going to follow the rest of the day.  I described

17   it a little bit already.

18        But, the job of the jury is to decide what happened.  To

19   decide the facts of the case.  You take the law as I give it to

20   you, and you follow the law.  And you apply it to the facts of

21   the case as you find them, to decide whether the defendants are

22   liable to the plaintiff.

23        Given the performance of your job as factfinders, we have

24   this process for picking the jury that's designed to make sure

25   that the jury is fair for both sides.

1        The first step of that process will be to have you answer

2   the questions that are in the questionnaire that has been

3   handed out to you and as I said we will have you answer those

4   questions verbally.

5        During that process, I may ask a few followup questions of

6   you, to get any clarifications or to further discuss anything

7   that you feel might need discussing or that I feel might need

8   discussing.

9        And after that, the lawyers will get a chance to ask you

10  some followup questions for a short period of time.  And after

11  that, we'll be pretty much ready to pick the jury.

12       And by the way, if there's anything that you need to

13  discuss, that you need to raise that's a private matter, that

14  you don't feel comfortable discussing in this semi-full

15  courtroom, just let me know.  We will bookmark the issue and we

16  will bring you back to the jury room to discuss it with you.

17  The court reporter still needs to be there and the lawyers need

18  to be there, but if it's a private matter that you -- where you

19  would rather sort of limit the audience, like I said, just let

20  me know and we'll bookmark the issue.

21       So, why don't we go ahead and start with the

22  questionnaire.

23       And, Ms. Williams, you are Juror No. 1.  So you have got

24  the unfortunate task of starting off.  Feel free to take your

25  time.  If you don't understand any of the questions feel free

 1   to ask clarification questions.

 2        And then the rest of you, what I would ask is that you pay

 3   attention during this process, pay attention to the answers and

 4   pay attention to my followup questions, so it will help clarify

 5   for you sort of what we're looking for in asking you these

 6   questions.

 7        One moment.

 8        (Off-the-Record discussion between the Court and

 9         Clerk)

10        **THE COURT:**  Give me just one second.

11        All right.  Thanks.  Go ahead.

12        **PROSPECTIVE JUROR WILLIAMS:**  My name is Dana

13   Williams.  I'm 47.  I live in Brentwood.  I was born in

14   Minnesota.

15        I'm a hospice nurse, registered nurse.  And I work for

16   Kaiser.  And prior to that I did hospice with Hospice of the

17   East Bay in Pleasant Hill.

18        My spouse is a professor of microbiology at Cal State.

19        I have four children.  My oldest is 27.  She is a

20   hairstylist.  26 is a contracts administrator at Sycomp.  And

21   23 is a -- oh, my gosh, I just blanked.  She starts her job

22   this week at Sycomp.  Executive administrator, I think is her

23   title.  And then my son delivers pizza.  He's 20.

24        I have a college degree in nursing.  I don't have any

25   difficulty with English.  I have never served in the military.

 1   I have never served on a jury.  And, I don't think there's

 2   anything that would prevent me from being fair.

 3          **THE COURT:**  Okay, thank you very much.

 4          **PROSPECTIVE JUROR RIEWE:**  My name is Linda Riewe.

 5   I'm 55 years old.  I live in Oakland.  I have been there more

 6   than five years.  I was born in Milwaukee, Wisconsin.

 7          I'm a librarian.  And I have been working as a librarian

 8   for ten years, and before that sort of in a library, so library

 9   assistant for a few years.  Three years, maybe, before that.

10          My employer is the Mathematical Sciences Research

11   Institute.  I have been at that job for more than five years.

12          No other adults live in my household.  I have no children.

13   The highest grade I completed was a master's of library and

14   information science.

15          Before that, I had an undergraduate degree, double major

16   in mathematics and computer science, with a minor in education.

17          I have no difficulty understanding or reading English.  I

18   have never served in the military.  I have never served on a

19   jury.

20          And, there's nothing that would prevent me from being a

21   fair and impartial juror.

22          **THE COURT:**  Thank you.

23          **PROSPECTIVE JUROR ZHANG:**  My name is Tao Tao Zhang.

24   And, 34.  Uh-huh.  I'm living Foster City.  And I think, I'm

25   living here over five year.  I was born in Beijing, China.

```
 1      Working, I'm dentist, you know.  And employees,
 2   (Inaudible) dental care.  Yeah.  I -- okay.  I'm working over
 3   ten years.  My husband has -- my husband -- husband is the
 4   engineer.  I have no children.  Uh-huh.  Yeah.
 5      I graduated the Beijing, with Beijing University.  You
 6   know, I'm speak English is not very well, yeah.
 7           THE COURT:  Ms. Zhang, could I ask you a question?
 8           PROSPECTIVE JUROR ZHANG:  A little bit difficult to
 9   understand, you know, yeah.
10           THE COURT:  I was going to ask you.  Have you had
11   difficulty understanding --
12           PROSPECTIVE JUROR ZHANG:  Yes, a little bit
13   difficult.  Yeah.  But I can read something, yeah.  But, I
14   speak is not -- not very -- uh-huh.  Yeah.
15           THE COURT:  Okay, thank you.
16           PROSPECTIVE JUROR ZHANG:  Yeah.  Yeah.  Yes.  Yeah, I
17   think -- yeah, I understand --
18           THE COURT:  And Ms. Zhang, have you ever served on a
19   jury before?
20           PROSPECTIVE JUROR ZHANG:  Sorry?  Yeah.
21           THE COURT:  Have you ever served on a jury before or
22   been on a grand jury?
23           PROSPECTIVE JUROR ZHANG:  No, first time.
24           THE COURT:  Thank you.
25           PROSPECTIVE JUROR BRANSON:  My name is Lynn Branson.
```

 1   I'm 56.  I live in Walnut Creek for more than five years.  I

 2   was born in El Paso, Texas.  I'm currently working in the

 3   Lafayette School District in an early intervention program,

 4   which is for three- to five-year-old special-needs children.

 5   This is my third year there.

 6        Prior to that, I was working as a Certified Public

 7   Accountant.

 8        My husband lives in my home.  He works for Chevron.

 9        We have two children.  One is 27.  She is a speech

10   therapist.  Our son is 19, he goes to Oregon State.

11        I have a bachelor's degree in accounting.  No difficulty

12   in understanding English.

13        I have never been in the military.  Never served on a

14   jury.  And I don't think there's anything that would prevent me

15   from being fair.

16        **THE COURT:**  Thank you very much.

17        If we could head back down to Mr. Larson here.

18        **PROSPECTIVE JUROR LARSON:**  My name -- my name is Arlo

19   Larson.  I'm 73 years old.  I live in Oakland, California.  And

20   I lived there, oh, about 30-plus years.

21        And I was born in Bemidji, Minnesota.

22        My job is database administrator, and I've worked at that

23   job for a little more than 30 years.  My employer is Kaiser

24   Permanente.

25        And my wife is living in the house with me.  And, she

JURY VOIR DIRE

1    works as a substitute teacher for the Oakland Public Schools.

2         I have three children.  My son, oh, let's see.  I think

3    he's -- he's 32 years old, and he's an immigration lawyer.

4    Then I have a daughter who has been -- she is 26 years old, and

5    she has worked in miscellaneous jobs.  Video, and has been a

6    barrista and miscellaneous things.  And then I have another son

7    who is autistic, so he does nothing.

8         My educational background, I have a doctorate in

9    philosophy.  I also have a bachelor of science in computer

10   science.

11        I don't have any difficulty in understanding English.  And

12   I never served in the military.

13        Also, I never served in a jury before.  And I don't know

14   of anything that would prevent me from being a fair and

15   impartial juror.

16        **THE COURT:**  Mr. Larson, following up on what you said

17   about your son, you said your son is an immigration attorney?

18        **PROSPECTIVE JUROR LARSON:**  Yes.

19        **THE COURT:**  Obviously we haven't talked really about

20   what this case involves yet.  There's no immigration issue.

21        But, but, is there anything about your interactions with

22   your son that you think would affect your ability to follow the

23   law as given to you by a judge and decide the facts fairly?

24        **PROSPECTIVE JUROR LARSON:**  No, I don't think so.

25        **THE COURT:**  Okay, great.  Thank you.

 1      Is it Mr. Patrick?

 2          **PROSPECTIVE JUROR PATRICK:**  It is.  My name is John

 3   Patrick.  I'm 39 years old.  I live in San Francisco.  I have

 4   lived here since 2006, although between 2012 and 2013 I lived

 5   in Miami Beach.  I was born in Trent, Wyoming.

 6      I'm an attorney.  I have been an attorney since 2001.  I'm

 7   a partner at the firm of Gordon & Rees.  I've been there since

 8   the beginning of this year.

 9      Before that I was a partner with the firm of Wilson Elser.

10   For two years before that, I was a partner with a firm called

11   Watt Tieder, which is T-I-E-D-E-R, also in San Francisco, for

12   seven years.

13      The only other adult in my household is my wife Amy.

14          **THE COURT:**  Mr. Patrick, can I interrupt just for a

15   sec to ask a couple of followup questions?

16          **PROSPECTIVE JUROR PATRICK:**  I'm not shocked,

17   Your Honor.

18          **THE COURT:**  So, you're at Gordon & Rees now.  Are you

19   a litigator or a corporate attorney?

20          **PROSPECTIVE JUROR PATRICK:**  I'm a litigator.  I'm a

21   construction lawyer.

22          **THE COURT:**  Is that what you did at the other couple

23   of firms as well?

24          **PROSPECTIVE JUROR PATRICK:**  That's what I have done

25   more or less exclusively since, let's say, 2004.

```
 1          THE COURT:  Okay.  Where did you go to law school?
 2          PROSPECTIVE JUROR PATRICK:  University of Minnesota.
 3          THE COURT:  Okay.  Thank you.
 4          PROSPECTIVE JUROR PATRICK:  Okay.  The only other
 5   adult in my household is in my wife Amy.  She works for Charles
 6   Schwab as a manager in their treasury department, running their
 7   bank's stress testings.
 8       We do not have any children.
 9       I have a J.D.  I do not have any particular difficulty
10   understanding or reading English.
11       I have not served in the military, although my brother and
12   his wife both did.
13       I have never served on a jury before, although I have been
14   interviewed before.  There's nothing about the case as
15   Your Honor has described that suggest to me I could not be a
16   fair and impartial juror.
17          THE COURT:  Okay.  We will -- you know, we'll get
18   into a little more what the case is about, and we will -- we
19   will -- everybody will have a chance to talk a little bit more
20   about that.  But for now, at least, I just wanted to get a
21   general sense of everybody.  So, thank you.
22          PROSPECTIVE JUROR MILLER:  My name is Dean Miller.
23   I'm 53.  I live in Alamo.  I have lived there over five years.
24   Born in Bremerton, Washington.
25       I have been self-employed for 30-plus years.  The
```

1  Restoration Cleanup Company is the company I own and operate.

2         THE COURT:  What is restoration cleanup?  What do you

3  all do?

4         PROSPECTIVE JUROR MILLER:  Insurance, mold, water,

5  fire, damage restoration.

6     I do have children.  I have four.  I have a 35-year-old

7  daughter, a 21-year-old son, 18-year-old daughter, and

8  12-year-old daughter.  My older daughter is the only one that's

9  -- well, no, my daughter's employed, she is a doula, midwife

10 type.  My son is just -- he's now into some accounting.

11     Education, just completed high school.

12     I don't have any trouble understanding English.  Never

13 served in the military.  I have been on a jury.

14        THE COURT:  Now, because you are the first person

15 that's been on a jury, the questionnaire says it, but I'll just

16 say it again, just to emphasize.  We don't want to hear how the

17 jury came out.  Right?

18     We only want to hear what type of case it was, and where

19 it was, and whether the jury reached a verdict.  But you

20 shouldn't share with us what that verdict was.

21        PROSPECTIVE JUROR MILLER:  Okay, thank you.  It was a

22 county case.  It was approximately ten years ago.  I believe

23 it's criminal, and we did reach a verdict.

24     And there isn't anything to prevent me from being fair or

25 imposition.

 1              **THE COURT:**  Okay.  Thank you, Mr. Miller.

 2         Mister -- is it McGoveran?

 3              **PROSPECTIVE JUROR MCGOVERAN:**  Yes.  Richard

 4    McGoveran.  I'm 47.  I live in Antioch.  I have lived there for

 5    more than five years.  I was born in Walnut Creek.

 6         I've worked in my field for 26 years.  I work for Shell

 7    Oil.  I'm an oil refinery operator.  I have held my current

 8    position for more than five years.

 9         I don't have any other adults living with me.  I have no

10    children.

11         High-school diploma.  I understand and read English.

12    Never served in the military.

13         I have served on a jury.  It was a civil case, in about

14    1990.  I'm not sure if they reached a verdict or not.  I was an

15    alternate.  So I did not go to deliberation.

16              **THE COURT:**  That's sort of a good time for me to note

17    that we won't have any alternates on this jury.  The goal is to

18    select eight jurors, all of whom would deliberate, and

19    participate in reaching a verdict.

20              **PROSPECTIVE JUROR MCGOVERAN:**  Okay.  And no, there's

21    nothing that would prevent me from being fair.

22              **THE COURT:**  Thank you.

23              **PROSPECTIVE JUROR JONES:**  My name is Ginette Jones.

24    I'm 66.  I live in Emerald Hills.  We have been living there

25    for 30-plus years.

1      I was born in Egypt.  I'm a business administrator and

2  surgical coordinator.  And I work for Dr. Jane Weston in

3  Atherton, plastic surgery center.  I have had my job for

4  ten-plus years.

5      My husband lives with me, and he is retired.  We have two

6  children.  Thirty-nine, he's a Realtor.  And -- sorry, 40, he's

7  a Realtor.  Thirty-nine, he's an electrician.

8      I have an AA degree, associate of arts in business.  I

9  don't have a difficulty understanding or reading English.

10      I never served in the military, never served on a jury.

11  And I don't believe I have anything that would prevent me from

12  being a fair and impartial juror.

13          **THE COURT:**  Thank you.

14          **PROSPECTIVE JUROR ZAIDI:**  My name is Asma Zaidi.  And

15  I'm 45 years old.  I live in Fremont, California.  And I have

16  been living in this place more than five years.

17      And I was born in Pakistan.  And my current job is I'm the

18  owner of two gas stations.

19      And, my husband lives with me.  He's an engineer.  I have

20  two girls.  The older one is 20 years old; she's a full-time

21  student in the university.  And the younger one is 13 years

22  old, she is a hard-of-hearing kid.  And I'm the only one to

23  take care of her at home, because there's nobody at home to

24  send back to school and everything.  And there's nobody at home

25  when I'm not there because my husband is at work, and my

1  daughter is a full-time student.

2      And I don't have any difficulty of understanding English.

3  And I didn't -- never served in the military before, never

4  served in a jury before.  And there's nothing that would

5  prevent me from being a fair and impartial juror.

6          THE COURT:  And your daughter, she's in middle

7  school, I guess?

8          PROSPECTIVE JUROR ZAIDI:  She is in middle school,

9  yeah.  She is in a special school.  She's a hard-of-hearing

10 kid.

11         THE COURT:  And where is the school?  In Fremont?

12         PROSPECTIVE JUROR ZAIDI:  No, in Hayward.  I live in

13 Fremont.  There is no program in Fremont, so she goes to

14 Hayward school.  But when she comes back from school, there is

15 nobody at home, so that's --

16         THE COURT:  When does her school day end?

17         PROSPECTIVE JUROR ZAIDI:  Her school, at 3:00.

18         THE COURT:  Okay, thank you.

19         PROSPECTIVE JUROR ZAIDI:  Yeah.

20         PROSPECTIVE JUROR HUANG:  Hi.  My name is Lina Huang.

21 I'm 45 years old.  I'm living in El Cerrito for more than five

22 years.  I was born in Taipei, Taiwan.

23     And my -- my job, I'm an administrative director for

24 preschool.  I started my new job on August 10th year.  I work

25 for Deport Montessori School (Phonetic).  Before that I was an

JURY VOIR DIRE

```
 1   operations manager for a charter school in Oakland.

 2        And there's no other adults that live in my household.  I

 3   don't have any children.

 4        I have a bachelor's degree in Chinese and preveterinary

 5   medicine.  I don't have difficulty understanding or reading

 6   English.

 7        Never served in military.  I served on jury twice.  And,

 8   one was in federal court, one was in county court.  The county

 9   court case took about a week.  And the federal court case took

10   a month.  Both were criminal trials.  And both reached

11   verdicts.

12        There isn't anything preventing me from being fair and

13   impartial.

14           THE COURT:  In fact, you seem very well qualified,

15   having spent five weeks of your life already on a jury.

16           PROSPECTIVE JUROR GALBRETH:  My name is Ed Galbreth.

17   I'm 68.  I live in Point Richmond.  I lived there about five

18   years.  I lived in Oakland before that.  I was born in

19   Kingston, New York.  I'm retired.  Before that, I was a

20   property manager in Ithaca, New York.

21        There is one other adult in my household, and she works

22   for the -- she is a secretary for the West Contra County School

23   District.

24        I have two sons.  One is 43, he is a lawyer.  The other is

25   28, and he works in a facility for disabled adults.
```

JURY VOIR DIRE

```
 1        I have a BA in sociology.  I have no problem understanding
 2   or reading English.
 3        I haven't served in the military.  I have never been on a
 4   jury.  And, there's nothing that would prevent me from being a
 5   fair and impartial juror.
 6             THE COURT:  Thank you.
 7             PROSPECTIVE JUROR SOTO:  I'm Kim Soto.  I'm 48.  I
 8   was born and raised in Livermore.  I work at Safeway for the
 9   last 15 years, and I just got promoted up to a checker plus
10   night crew.  Working on nights, so I'm stocking shelves.
11        My other half, he works -- just started at a Ford
12   dealership as car porter.
13        I have a 24-year-old working at this place called Top Con,
14   it's a computer place.  My daughter's just turning 19 this
15   Sunday.  She's working at this fast food place where -- as a
16   cook.
17        I have a diploma for a car dealer, for working on cars,
18   and mechanic.  I can read and understand English.  And I have
19   no military background.  I haven't served on any juries.
20        There's nothing else going that I can -- I can do this.
21   So --
22             THE COURT:  Thank you.
23             PROSPECTIVE JUROR NORTH:  My name is Jim North.  I'm
24   57 years old.  I live in Dublin, California.  I've lived there
25   for 30 years.  Was born in Salt Lake City.
```

1          Right now I'm a software engineer at Verizon.  For four

2     years before that I was one year at eBay/PayPal.  Before that,

3     I was nine and a half years at Charles Schwab, same job,

4     software engineer.

5          There's one adult in my home.  It's my wife, Toni.  She is

6     an HR manager for Albertson's, Safeway, whatever they're

7     calling themselves these days.

8          We have one son, 24, gainfully employed at Cisco as a

9     cloud engineer.

10         My highest grade of education, I have an undergraduate

11    degree from Cal State Hayward.  I do not have any difficulty

12    understanding or reading English.  Have never served in the

13    military.

14         I have served on a jury twice before.  Once, one criminal,

15    one civil.  We came to a verdict in both cases.

16         I don't believe there's anything that would prevent me

17    from being an impartial juror.

18         **THE COURT:**  Thank you very much.

19         So now I want to tell everybody a little bit about this

20    case.  And, I want you to think about -- and I'll give anybody

21    a chance to raise their hand who wants to.  I want you to think

22    about whether there's anything about the description of the

23    case that raises concerns for you about whether you could be

24    fair and impartial.  Okay?

25         This is a civil-rights action brought by the plaintiff,

 1   Jesse Perez, who is a prisoner at Pelican Bay State Prison.

 2   Mr. Perez is suing the defendants who are correctional officers

 3   at Pelican Bay.

 4       In 2003 while at a different prison, Mr. Perez was

 5   determined by the Department of Corrections to be an associate

 6   of the Mexican Mafia prison gang.  And as a result he was

 7   transferred to Pelican Bay's security housing unit.

 8       In 2005, Mr. Perez filed a lawsuit against the officers

 9   from the other prison, alleging that the determination that he

10   was a gang associate and the assignment to the security housing

11   unit violated his constitutional rights.

12       On October 10, 2012, four of the defendants in this case

13   searched Mr. Perez's cell, based on instructions from their

14   supervisor to conduct a new review of Mr. Perez's gang status.

15       Perez alleges that these four defendants trashed his cell

16   during the cell search and confiscated some of his property.

17   He alleges that a fifth defendant improperly kept some of his

18   property.

19       And he alleges that one of the defendants wrote up a false

20   report against him, called a "Serious Rules Violation Report"

21   with the goal of keeping him in the security housing unit.

22       Perez alleges that the Defendants did these defendants to

23   him out of retaliation for his prior lawsuit, which if true,

24   would be a violation of his Frist-Amendment rights.

25       The defendants deny that they improperly trashed

```
 1   Mr. Perez's cell or that they improperly kept some of his
 2   property or that they wrote up a false report about him.  They
 3   contend their conduct complied with prison regulations and that
 4   they did not retaliate against Mr. Perez based on his prior
 5   lawsuit.
 6        So that's -- obviously, if you serve on this jury, you
 7   learn a lot more about the case, but that is a basic
 8   description of it.
 9        And so, my question to you, sort of a raise-your-hand
10   question is:  Is there anything about the fact that this case
11   involves a prisoner or prison guards that raises concerns for
12   you about whether you could decide the facts fairly and be a
13   fair and impartial juror?
14        (Show of hands)
15           PROSPECTIVE JUROR PATRICK:  So, nothing that -- I'm
16   not sure that this works but --
17           THE COURT:  Just for the record, I know you have all
18   introduced yourselves, already but just for recordkeeping
19   purposes, if you could start off still by giving your full
20   name.
21           PROSPECTIVE JUROR PATRICK:  My apologies, Your Honor.
22   John Patrick.
23        There isn't anything about your description that raised a
24   concern for me.  But just in the interest of fairness and full
25   disclosure, there is something that you said that brings
```

1   another job of mine into question.

2       When I was in law school, I was for two years a clerk at

3   the U.S. Attorney's office for the District of Minnesota.  And

4   in connection with that job, I assisted the USAO on a number of

5   1982 actions, whose allegations at times were similar to the

6   ones that you described.

7       That was then in those cases, this is now in this case,

8   but because this is a little bit different than just your

9   standard case I thought that other experience of mine was

10  probably relevant and I should mention it.

11          **THE COURT:**  Okay.  And it sounds like from your

12  description of it, that you believe that you have the

13  capability of separating any prior work that you have done from

14  this case, and you sort of understand that if you are selected

15  as a juror in this case, your job is to review the evidence,

16  consider only the evidence that appears inside the four walls

17  of this courtroom, and make your decision based on that.

18      Is that right?

19          **PROSPECTIVE JUROR PATRICK:**  Certainly, your Honor.  I

20  don't know that I even remember that much about the facts of

21  those 1982 cases, but it's probably relevant to mention that I

22  assisted the government in defending some of them.

23          **THE COURT:**  Much appreciated.  Okay, thank you.

24  Anybody else?

25      (A hand is raised)

 1          **THE COURT:**  Was it Ms. Soto?

 2          **PROSPECTIVE JUROR SOTO:**  Yes.  I'm Kim Soto.

 3     What you are just saying, I just talking to my monthly,

 4  she's Hispanic, she was born and raised in Mexico -- well,

 5  sorry, born in Mexico and emigrated up here.

 6          But similar to what you are talking about, I think that

 7  she made a comment something similar to about it.  Just jarred

 8  my memory that something, something similar, the name doesn't

 9  ring a bell, but something kind of came across that it's

10  because of family issues, that's kind of my concern.

11          I mean, I can try and keep everything that's here, but

12  because of family, just -- I'm trying to separate two because

13  that's what you just said, a kind of -- kind of concerning.  I

14  have heard about it before.

15          **THE COURT:**  So let me ask you a clarification

16  question about that.

17          Are you suspecting that you may have heard something about

18  this particular case?  Or are you suspecting that you may have

19  heard something about prisoners generally, or Pelican Bay

20  generally?

21          **PROSPECTIVE JUROR SOTO:**  Well, I haven't doubt --

22  heard anything about Pelican Bay, but my mother-in-law's

23  brother been in and out of jail, so I have got an understanding

24  about that.  So it's like it's kind of -- there are certain

25  rules that they have and they don't have.

1      And for this case, I haven't really heard anything on this

2   case, but it's just prior to this case, what I have heard about

3   through family.

4          THE COURT:   Okay.  But again, so, are you -- are you

5   -- I want to get a sense.  Are you concerned that you may have

6   heard something about this particular case?

7          PROSPECTIVE JUROR SOTO:   Yeah.  A little bit.  Not

8   that much but just a little bit.  But not that much.

9          THE COURT:   Okay.  And, you said that you don't

10  necessarily recognize any of the names, but you are saying that

11  the issue kind of seems familiar to you, based on prior

12  conversations with family members?

13         PROSPECTIVE JUROR SOTO:   Yes.

14         THE COURT:   Okay.  All right.  Thank you.

15      Anyone else?

16      (No response)

17         THE COURT:   Okay.  Great.  So, here's what we are

18  going to do now.  We'll take a -- we will take a short break.

19  I think we will take a 20-minute break.  So, we will ask

20  everyone to be back here at ten after 10:00, to resume, to

21  resume the jury selection process.

22      And I'll ask the lawyers to take a five-minute break and

23  then come back and we will chat.  Okay?  Thank you.

24      (Recess taken from 9:47 a.m. to 10:05 a.m.)

25      (Discussion held outside the presence of the Jury

```
 1        Venire:)

 2          THE COURT:  Kristen is dealing with somebody, so why

 3   don't we start without her.  Hopefully she will come in.

 4        So, I think we have to excuse Ms. Zhang.  Juror No. 5, the

 5   dentist.  Because of language difficulty.

 6        Does anybody disagree?

 7          MR. LEE:  No, Your Honor.

 8          MR. SEALS:  That's okay with the defendants.

 9          THE COURT:  Okay.  So, you know, there's also this

10   issue about Ms. Soto.  And, my tentative inclination was to

11   leave her on for now, and let you guys ask her more questions.

12   I mean, for me it was hard to get a handle on what she was

13   saying.

14        I sort of doubt that she has any knowledge about this

15   actual case, and she may just have had discussions, you know,

16   like about incarceration or something with her relatives.  Hard

17   to know.

18        I think it's probably a close question -- I mean, I might

19   already be inclined to excuse her for cause, but my inclination

20   would -- is that it's a close case, and sort of to leave her on

21   for now and let you all explore it with her a little more.

22        So, with that, that would leave us with 13 prospective

23   jurors.  And, possibly 12.  Depending on how the rest of the

24   discussion goes with Ms. Soto.

25        So I'm told by Kristen that we have, I think, three extra
```

 1  prospective jurors who came out of another -- I guess they

 2  weren't needed for another jury selection that was going on

 3  this morning.  I mean, we could just sort of proceed with the

 4  group that we have, and that might leave us with a jury of

 5  seven or six people.

 6       I would be very reluctant to go with a jury of six people.

 7  So I guess, even as I talk about it, my inclination in an

 8  abundance of caution is to bring those other three jurors down,

 9  even though it's inefficient, and go through an abbreviated

10  version of the drill that we just went through with those three

11  jurors.  And then open it up to you all for voir dire of

12  everyone.

13       And those three jurors that we bring in would be

14  juror numbers -- so everybody still has the same number that

15  they had already.  They would be seated as Prospective Juror

16  Nos. 23, 24 and 25.

17       And so, if you ultimately, you know, use your challenges,

18  that would bump -- if you use all your challenges and it is not

19  of those three, that would bump a couple of those onto the

20  jury.

21       But I think that's probably the way to go, given where

22  we're at.  Does that sound right?

23            MR. LEE:  I think that sounds right, Your Honor.

24            MR. SEALS:  Yes, Your Honor.  Can I make one comment

25  regarding Ms. Soto?

```
1              THE COURT:  Sure.

2              MR. SEALS:  My only concern would be -- it wasn't

3    really clear what the issue was with her.  And, if it is

4    related to the Mexican Mafia.

5              THE COURT:  Uh-huh.

6              MR. SEALS:  My only concern, you know, is

7    contamination either way.  You know, she mentioned that her

8    mother was Hispanic, and that she has a brother -- I think it

9    was the brother of her mother had been in and out of prison.

10   So I don't know if it would be a Mexican Mafia, related that

11   way, or correctional officer related.  But I'm a little

12   concerned about contamination.

13             THE COURT:  Yeah.  I mean, the other thing we could

14   do is we could bring the other -- you said there are three more

15   prospective jurors?

16             THE CLERK:  Uh-huh.

17             THE COURT:  And Kristen, were they -- how did they

18   become available?  Were they never sent down to the courtroom

19   that --

20             THE CLERK:  Right.

21             THE COURT:  -- the jury office was planning to bring

22   them to?

23             THE CLERK:  They were supposed to come to us to make

24   it an even 25.  And for whatever reason, those three didn't

25   make it onto the list.  So, never made it to Judge Orrick.  And
```

 1  they were supposed to come here.  So they have been untouched.

 2          **THE COURT:**  Okay.

 3          **MR. LEE:**  Your Honor, with respect to Ms. Soto, could

 4  perhaps the Court do further inquiry?  And then it doesn't lead

 5  into either bar's opportunity.

 6          **THE COURT:**  What I was going to suggest is what if we

 7  bring the three new prospective jurors down, go through the

 8  drill with them.  And assuming there's no hardship or no cause

 9  problem that's apparent with those three, I could just let Ms.

10  -- I could just cut Ms. Soto loose for cause, based on what she

11  said so far.

12      Or would you rather spend time with her and further

13  explore it?

14          **MR. LEE:**  Our preference would be to further explore

15  it a bit.  I think it is highly unlikely that she has read

16  anything about this specific case.  The only press that we are

17  aware of in this case has been in a publication specific to,

18  sort of, prisoners.

19          **THE COURT:**  Right.

20          **MR. LEE:**  So it may just be that she's, you know,

21  heard something generally about the issues.

22          **THE COURT:**  Or about the Mexican Mafia.

23          **MR. LEE:**  Yeah, yeah.  Clearly, it could cut either

24  way, but I think it's -- yeah.

25          **THE COURT:**  Uh-huh.  Do you want to talk to her in --

1   do you want to talk to her in here more?

2           **MR. LEE:**  Sure, I mean --

3           **THE COURT:**  Why don't you start exploring it with

4   her, and if things -- if it seems like there's like a potential

5   contamination problem, I'll cut it off, and we'll resume her

6   voir dire in here.  Okay?

7           **MR. SEALS:**  (Nods head)

8           **MS. NYGAARD:**  (Nods head)

9           **THE COURT:**  But other than that, I'll let you guys

10  ask her questions out there.

11      So why don't we get those three other jurors down here.

12  We'll seat them as Nos. 23, 24 and 25.

13          **THE CLERK:**  Uh-huh.

14          **THE COURT:**  And I'll go through an abbreviated drill

15  with them.

16          **THE CLERK:**  Okay.  I'll need to just swear them in

17  again.

18          **THE COURT:**  Okay.  And we'll do that first thing.

19          **THE CLERK:**  Okay.

20          **THE COURT:**  Okay.

21          **THE CLERK:**  And are they getting 20 or 30 minutes

22  apiece for voir dire?

23          **THE COURT:**  Thirty minutes apiece.

24          **THE CLERK:**  Okay, thank you.

25          **THE COURT:**  So, see you in a few minutes.

```
1              MR. LEE:  Okay.

2              THE COURT:  All right, thank you.

3              MR. LEE:  All right.

4         (Conclusion of discussion; the following proceedings

5          were held in the presence and hearing of the Jury

6          Venire:)

7              THE CLERK:  Remain seated, come to order.  Court is

8   back in session.

9              THE COURT:  Okay.  We're back and we have three new

10  prospective jurors in the courtroom.  And this is a little

11  bit -- it's a little bit odd.  There was a glitch in the jury

12  office.  I'm not sure exactly what happened, but we were

13  supposed to have been sent 25 prospective jurors and only got

14  sent 22 prospective jurors and you three somehow got left up

15  there.  I'm not exactly sure what happened, but I really

16  apologize for your having to sit around up there for a little

17  bit.  We're going to try to spend a few minutes catching you up

18  right now, if you don't mind.

19        First, my Courtroom Deputy Kristen Melen has to swear the

20  three of you in as prospective jurors.  The rest of the group

21  has already been sworn in.  So if the three of you could please

22  rise and raise your right hand?

23        (Prospective jurors sworn.)

24             THE COURT:  So for the three of you, I'm going to try

25  to sort of describe the situation in a somewhat abbreviated way
```

```
 1   to get you caught up to where we are in the jury selection

 2   process.

 3        First of all, I'm going to talk about the trial that you

 4   have been called down to potentially serve on and the schedule

 5   for that trial.  It is expected that this trial will last about

 6   a week.  We cannot predict exactly how long the trial will

 7   last, but we can predict with confidence that it will be over

 8   before Thanksgiving and perhaps quite a bit before

 9   Thanksgiving.

10        Schedule-wise, if you're selected for this jury, we begin

11   every day at 8:30 in the morning and we have you out of here

12   between 2:00 and 2:30 in the afternoon.  We never -- we might

13   go a little bit past 2:00, but we'll never go past 2:30.  So if

14   you get picked for this jury, you can be assured that you will

15   be out of here by 2:30 and you can sort of take care of

16   whatever business you have.

17        By the way, I should say, you saw my name on the door, but

18   my name is Vince Chhabria and I'm a district judge for the

19   United States District Court of California.

20        The other thing about the schedule is that we don't go on

21   Thursdays.  We're what we call dark on Thursday.  This trial

22   will proceed today, tomorrow, Wednesday.  You don't come in

23   Thursday.  We'll proceed again on Friday and, if necessary,

24   resume again Monday the following week.

25        The purpose of this schedule is for us to spend time in
```

1  the afternoon, the judge and the lawyers, working on

2  evidentiary issues and jury instructions and other matters that

3  are done outside your presence so that we're not wasting your

4  time during the course of trial.  So we try to be as efficient

5  as possible and it gives you time, like I said, to sort of

6  organize your affairs in the afternoon if you get selected for

7  this case.

8      Having heard about the schedule, I want to ask the three

9  of you -- I've already gone through this with everybody else,

10 but I want to ask the three of you:  Is there anything going on

11 in your lives that would make it extremely difficult or

12 impossible to serve on this jury that we're contemplating here

13 today?

14     Let me just say at the outset, if there is anything that

15 would prevent you -- going on in your lives right now that

16 would prevent you from serving on this jury, I would have to

17 send you back up to the jury office and -- without releasing

18 you from your jury duty, to see if they could find another

19 trial for you at a different time.

20     As I mentioned, this is a relatively short trial.  So

21 there would -- there is some benefit to serving on this jury as

22 opposed to a different one.

23     So in light of all that, is there anything going on in

24 your lives right now that would make it extremely difficult or

25 impossible to serve on this jury?

 1         **PROSPECTIVE JUROR McMILLAN:**  I'm out of work right

 2   now and sitting in here is not getting me a job.

 3         **THE COURT:**  Okay.  Hold on a second.  Let me get you

 4   the microphone and ask you to begin by stating your name.

 5         **PROSPECTIVE JUROR McMILLAN:**   My name is Dan McMillan.

 6         **THE COURT:**  Dan McMillan?

 7         **PROSPECTIVE JUROR McMILLAN:**  Yeah.

 8         **THE COURT:**  Okay.

 9         **PROSPECTIVE JUROR McMILLAN:**  Forty.  Live in

10   Petaluma --

11         **THE COURT:**  You don't need to go through that

12   questionnaire right now.

13      If you could just tell me what it is that's going on in

14   your life that would make it difficult or impossible to serve.

15         **PROSPECTIVE JUROR McMILLAN:**  Well, I'm out of work

16   right now, so I can't get a job if I'm sitting in here.

17         **THE COURT:**  Okay.  And I assume you're actively

18   looking for work?

19         **PROSPECTIVE JUROR McMILLAN:**  Yeah.

20         **THE COURT:**  Okay.  And you live in Petaluma, you

21   said?

22         **PROSPECTIVE JUROR McMILLAN:**  Yes.

23         **THE COURT:**  Okay, thank you.

24      Anybody else?

25      (No response.)

1          **THE COURT:**  Okay.  Thanks.

2      So now what I'm -- what I'd like to do is just begin.

3  We've done this with the rest of the folks already.  Kristen

4  has given you a questionnaire and I would like for you to just

5  go through that questionnaire and verbally answer the

6  questions.  And the purpose of that is for the lawyers and me

7  to get a little bit of a sense of you so that we can know more

8  about everybody as we proceed down the road of picking a jury

9  for this case.

10     So if we could start maybe with Mr. Fernandez.

11         **PROSPECTIVE JUROR FERNANDEZ:**  Hi.  My name is Arturo

12  Fernandez.  I'm 25 years old.  I live in Knightsen, California.

13  I was born in Martinez.  I work at O'Reilly Auto Parts.  I'm a

14  parts specialist there.  And I've only worked there for two

15  years so far.  And I'm currently living with my parents.  And I

16  have no -- no children.  And I have a high school diploma and

17  some college.  I have not served in the military and it's my

18  first time serving as a juror.  And --

19         **THE COURT:**  And that last question I'll just tell you

20  a little bit more about it.

21     The role of the juror is to decide what happened in the

22  case, right?  Witnesses come and testify.  Documents are

23  admitted into evidence.  And the role of the juror is to decide

24  what happened in the case, to find the facts.  And I give you

25  the law and you're obligated to apply the law as it exists to

1  the facts as you find them.

2      So the question is -- and I will tell you a little bit

3  more about this particular case in a second, but the question

4  is:  In general, do you believe that there is any reason that

5  you could not be a fair and impartial juror in a case?

6          **PROSPECTIVE JUROR FERNANDEZ:**  No, I don't think so.

7          **THE COURT:**  Okay.  Thank you.

8      All right.  Mr. McMillan, we've heard a little bit from

9  you, but if you wouldn't mind going through the questionnaire.

10         **PROSPECTIVE JUROR McMILLAN:**  All right.  My name is

11  Dan McMillan.  I'm 40.  I live in Petaluma.  Born in Petaluma.

12  I'm an out-of-work plumber.  I live alone.  I went through an

13  apprenticeship program.  Fine with English.  Never been in the

14  military.  Never been on a jury.  And I'd have to know what the

15  case was to say if I could be impartial or not, so...

16         **THE COURT:**  Okay.  And we'll get to that in just a

17  second.  Maybe you could pass the mic to Ms. Smith?

18         **PROSPECTIVE JUROR SMITH:**  My name is Nancy Smith.

19  I'm 71.  I live in San Francisco for more than five years.  I

20  was born in Missouri.  I'm a retired attorney.  I was an

21  associate and then a partner with a large downtown law firm.  I

22  live alone.  I have no children.  I have a law degree.  I

23  understand English.  Never served in the military.  I've served

24  on two criminal juries in state court, one about 20 years ago.

25  We did reach verdict.  One several years ago --

 1          **THE COURT:**  And let me just interrupt.  Just in case,

 2  we don't want to hear what the verdict was.

 3          **PROSPECTIVE JUROR SMITH:**  I understand.

 4          **THE COURT:**  We want to know whether you reached a

 5  verdict.

 6          **PROSPECTIVE JUROR SMITH:**  That's what the

 7  instructions say.

 8      And a couple years ago I was in another state criminal

 9  court jury and we did reach a verdict.  I assume I would be

10  fair and impartial, but I would have to know what the case is

11  about.

12          **THE COURT:**  So let me go ahead and read you a

13  description of the case.  I apologize that you have to hear it

14  one more time.

15      This is a civil rights action brought by the plaintiff,

16  Jesse Perez, a prisoner at Pelican Bay State Prison.  Mr. Perez

17  is suing the defendants, who are correctional officers at

18  Pelican Bay.

19      In 2003, while at a different prison, Mr. Perez was

20  determined by the Department of Corrections to be an associate

21  of the Mexican Mafia prison gang and as a result, he was

22  transferred to Pelican Bay's Security Housing Unit.

23      In 2005 Mr. Perez filed a lawsuit against the officers

24  from that other prison alleging that the determination that he

25  was a gang associate and the assignment to the Security Housing

1    Unit at Pelican Bay violated his constitutional rights.

2         On October 10th, 2012 four of the defendants searched Mr.

3    Perez's cell based on instructions from their supervisor to

4    conduct a new review of Mr. Perez's gang status.  Mr. Perez

5    alleges that these four defendants trashed his cell during the

6    cell search and confiscated his property.  He alleges that a

7    fifth defendant improperly kept some of his property.  And he

8    alleges that one of the defendants wrote up a false report

9    against him called a Serious Rules Violation Report with the

10   goal of keeping him in the Security Housing Unit.

11        Mr. Perez alleges that the defendants did these things to

12   him out of retaliation for his prior lawsuit, which, if true,

13   would be a violation of his First Amendment rights.

14        The defendants deny that they improperly trashed Mr.

15   Perez's cell, or that they improperly kept some of his

16   property, or that they wrote up a false report on him.  They

17   contend that their conduct complied with prison regulations and

18   that they did not retaliate against Mr. Perez based on his

19   prior lawsuit.

20        So the question really is -- this is a First Amendment

21   case and it's a case involving a prisoner and prison guards.

22   And so the question is:  Is there anything about that, is there

23   anything about the description that I read to you or the fact

24   that this case involves a prisoner or prison guards that you

25   think would prevent you from being a fair and impartial juror

1   in this case?  Raise your hand if you -- if you think there may

2   be a problem.

3        All right.  Mr. McMillan?

4            **PROSPECTIVE JUROR McMILLAN:**  Yeah.  I just got laid

5   off from San Quentin and so, you know, dealing with the COs and

6   stuff, I don't know if that's something -- I was working

7   hand-in-hand with the inmates and then having COs supervise,

8   and I don't know if it's really appropriate for me to be

9   sitting in on something like this.

10           **THE COURT:**  You were working as a plumber at San

11  Quentin?

12           **PROSPECTIVE JUROR McMILLAN:**  Yeah.

13           **THE COURT:**  Okay.  So there is no question that you

14  know a lot more about how things work in San Quentin than the

15  rest of us and probably about how things work in prisons

16  generally.  The question is whether you would be unfairly

17  biased in favor of one side or another.

18       Do you think that you would be unfairly biased in favor of

19  one side or another or do you think you could sort of limit

20  your inquiry to examining the evidence that comes in in this

21  case and making a decision based -- about what happened based

22  on the evidence that you hear in this case?

23           **PROSPECTIVE JUROR McMILLAN:**  Having been in there and

24  seen it and, like -- there was definitely guards that were

25  focused on certain inmates, and it was kind of -- it was

1   definitely a bias thing, where they could go:  Oh, well, he --

2   you know...

3        THE COURT:  And, obviously, any issue that you may

4   have had with -- or anything you may have observed with respect

5   to any guard or any prisoner -- and those people are not

6   involved in this case presumably.  I will say -- rattle off

7   everybody's names to make sure you don't know anybody, but

8   would you be able to separate, do you think, you know, any

9   knowledge that you gained or any experience that you had about

10  other people and assess the evidence with respect to these

11  people based on what you hear in the courtroom?

12       PROSPECTIVE JUROR McMILLAN:  I -- I don't think so.

13  I don't, just from what I saw in there.

14       THE COURT:  Okay.

15       PROSPECTIVE JUROR McMILLAN:  I would be a little -- a

16  little leery.

17       THE COURT:  Okay.  Okay.  Thanks very much.

18     Why don't I chat briefly at sidebar with the attorneys?

19     (Proceedings held at sidebar.)

20       THE COURT:  I would be -- I'm sort of inclined to

21  excuse Mr. McMillan both for hardship and for cause, but I

22  am -- if anybody objects, I will allow him to stay and be part

23  of voir dire as long as it makes any -- as long as nobody tries

24  to poison the pool with questions of him.

25       MS. NYGAARD:  Your Honor, we believe he already has

JURY VOIR DIRE

1  poisoned the pool by his statement that he has seen guards zero

2  in on particular inmates.  That's exactly what this case is

3  about, retaliation against a particular inmate.  We feel that

4  the damage has already been done.

5       **MR. LEE:**  We have no objection if the Court wants to

6  excuse him.

7       **THE COURT:**  I'm going to excuse him, both for cause

8  and for hardship.  And I'll let Ms. Zhang go right now and then

9  I'm -- then I'll rattle the names off one more time for the two

10 new people.  And then you all can to your thing.  And after you

11 to your thing, we'll probably take a break for lunch and do

12 opening statements.  And there will be a slightly early break

13 for lunch.  After you do your thing, we'll go in and do

14 peremptories and then take a break for lunch.

15      **MR. LEE:**  Okay.

16      (Proceedings held in open court.)

17      **THE COURT:**  Okay.  Mr. McMillan, you are excused.

18 Thank you.  Thank you very much for coming in and I'm sorry,

19 again, that we kept you upstairs for a little bit.

20      Ms. Zhang?  Is it Zhang?

21      **PROSPECTIVE JUROR ZHANG:**  Yes.

22      **THE COURT:**  You're also excused.  Both of you can go

23 back up to the jury office and let them know that you've

24 completed your jury duty.  All right?  Thank you.

25      (Prospective jurors exit the courtroom.)

JURY VOIR DIRE

```
 1          THE COURT:  Now, I am just going to quickly for the
 2   two prospective jurors who are new, Mr. Fernandez and
 3   Ms. Smith, I'm just going to rattle off the names of the people
 4   involved, just in an abundance of caution, to make sure there
 5   is nobody involved here who you know or think you may know.
 6          Again, my name is Vince Chhabria.  My Courtroom Deputy,
 7   the person who swore you in, is named Kristen Melen.  My law
 8   clerk is Rebecca Lee.  And Elizabeth Yates here has been
 9   passing the microphone.  She's an intern here in the building.
10   The two court reporters who will be working this trial are
11   Debra Pas and Belle Ball.
12          The plaintiff's name is Jesse Perez, and the team
13   representing Mr. Perez are Randall Lee, Matthew Benedetto, Tim
14   O'Dwyer and Katie Moran of the Wilmer Hale firm.
15          The defendants in this case are Sean Burris, Anthony
16   Gates, Daniel Gongora, Eric Healy, and Guillermo Pimentel.
17          The attorneys or the team representing the defendants -- I
18   apologize.  Is it Pimentel or Pimentel?
19          MR. PIMENTEL:  It's Pimentel.
20          THE COURT:  Pimentel, sorry.
21          The attorneys or the team representing the defendants are
22   Jennifer Nygaard, Jocelyn Tucay and Elliott Seals from the
23   California Attorney General's Office.
24          So if you know any of those people I identified or you
25   think you may know any of the people I identified, can you
```

1   raise your hand?

2        (No response.)

3        Okay.  And, Ms. Smith, any connection to the Wilmer Hale

4   firm?

5            **PROSPECTIVE JUROR SMITH:**  No.

6            **THE COURT:**  Okay, thank you.

7        Let me read you a list of potential witnesses.

8        Judd Anderson.

9        David Barneburg.

10       Susan Hubbard.

11       Rudy Guerrero.

12       Salvador Mendoza.

13       Richard Subia.

14       If you think you might know any of those witnesses, can

15   you raise your hand?

16       (No response.)

17       Okay, very good.

18       So now is the time for attorneys to spend a little bit of

19  time talking to you further, having any follow-up questions

20  they may have of any of you or all of you.  And, again, the

21  point of this is to give them a chance to explore your

22  background, probe for any biases, in an effort to form a jury

23  that will be fair and impartial in this case.

24       And so we'll go ahead and begin with the plaintiffs.

25           **MR. LEE:**  Thank you, your Honor.

1       Good morning.  I know the judge has introduced us already,

2   but just to do it again, my name is Randall Lee.  I'm joined by

3   my colleagues, Matthew Benedetto, Katie Moran, and Tim O'Dwyer.

4   Mr. Benedetto and Ms. Moran are attorneys at the law firm where

5   I work and Mr. O'Dwyer is helping us with technology.  And it's

6   our privilege to represent our client, Jesse Perez.

7       I know all of you understand the importance of having a

8   fair and impartial jury.  I know the judge has told you that,

9   you know, that's our objective.  And, really, the purpose here

10  is that all of us have different life experiences and different

11  perspectives and sometimes those experiences and perspectives

12  can make it difficult to be a fair and impartial juror and

13  sometimes those experiences and perspectives may mean that a

14  particular person just wouldn't be a good juror on a particular

15  type of case or involving particular parties.  And I know

16  certainly in my case, I mean, I can think of cases where I

17  probably wouldn't -- I'd have a hard time being fair and

18  impartial as well.  And so that's why we have this chance to

19  ask some follow-up questions.

20      The nature of this process is such that some of the

21  questions may seem kind of personal.  They are not meant to

22  invade your privacy.  And so I apologize in advance if it seems

23  like that, but that's how we sort of get at some of these

24  issues.

25      Some of the questions I'll be asking you as a group and

```
 1   some I may have specific follow-up questions for some of you

 2   individually.

 3       And as the Court told you earlier, if any of the questions

 4   I ask make you uncomfortable and you would prefer to answer

 5   them privately and not in front of everybody, just please speak

 6   up.  I know that answering kind of personal questions in a big,

 7   grand setting like this can be a little intimidating.  So

 8   that's really just, you know, the background.

 9       I have -- just so you know, I have 30 minutes to ask

10   questions.  And then Ms. Nygaard or Mr. Seals will have 30

11   minutes.  And then after that, I expect the process will be

12   done and we'll have a jury and we can proceed.  So that's what

13   the next hour will look like.

14       So my next question is a group question.  That is, I'd

15   like to know if any of you or anyone close to you, family

16   member, close friend and the like, has been a victim of a

17   crime?

18       (No response.)

19          MR. LEE:  Okay.  Has any of you or anybody close to

20   you ever been a witness to a crime?

21       (No response.)

22          MR. LEE:  Okay.  Another group question:  Has --

23          PROSPECTIVE JUROR LARSON:  Do you mean something that

24   came to a trial or do you mean just a crime, let's say, on the

25   street?
```

```
 1              THE COURT:  I apologize for interrupting.  If I could
 2    just remind everybody --
 3              PROSPECTIVE JUROR LARSON:  Oh, Arlo Larson.  Sorry
 4    there.
 5              THE COURT:  Thanks.
 6              MR. LEE:  I'm really referring to just anything, even
 7    if you happen to witness something on the street.
 8              PROSPECTIVE JUROR LARSON:  Oh, okay.  I was held up
 9    twice at gunpoint in Chicago.
10              MR. LEE:  Would you tell me a little bit about the
11    experience?  How long ago was it?
12              PROSPECTIVE JUROR LARSON:  It was probably about 35
13    years ago.  The person who did it the first time confessed
14    later.  I don't know what happened to the second time.
15              MR. LEE:  And on either occasion were you injured?
16              PROSPECTIVE JUROR LARSON:  No, I was not.
17              MR. LEE:  Were -- was it successful and did they take
18    a lot from you?
19              PROSPECTIVE JUROR LARSON:  They didn't take very
20    much.  They took what they could, what we had available at the
21    time in the house.
22              MR. LEE:  In either case did you end up having to
23    testify or go to court for any reason?
24              PROSPECTIVE JUROR LARSON:  No.
25              MR. LEE:  So in the first one, I think you said the
```

```
1   individual --
2              PROSPECTIVE JUROR LARSON:   The police told me later
3   that the individual confessed.
4              MR. LEE:   And do you know what happened to the
5   individual?
6              PROSPECTIVE JUROR LARSON:   I don't know what
7   happened.
8              MR. LEE:   And in the second case you don't know
9   either?
10             PROSPECTIVE JUROR LARSON:   No, I don't know.  I don't
11  think anything happened.  I think they got away with it.
12             MR. LEE:   How did those experiences -- do you still
13  think about those experiences?
14             PROSPECTIVE JUROR LARSON:   Well, the second time
15  there was a big discussion among the -- there were three of
16  them, and I was -- I and fellow students at the University of
17  Chicago were lying on the floor and then they were discussing
18  whether they were going to shoot me or not and they decided not
19  to.
20             MR. LEE:   That sounds like a scary experience.
21             PROSPECTIVE JUROR LARSON:   Yes.  It was a traumatic
22  experience.
23             MR. LEE:   Is that something -- that sense of drama,
24  has it stayed with you?
25             PROSPECTIVE JUROR LARSON:   Oh, I don't know that it
```

 1   has so much.  Once in a while I think about it.

 2          MR. LEE:  Is there anything about having gone through

 3   that experience that makes you think that, you know, maybe you

 4   wouldn't be a good juror for this case?

 5          PROSPECTIVE JUROR LARSON:  No.  I think I could be

 6   impartial regardless of that.

 7          MR. LEE:  And, obviously, you will hear that my

 8   client has been convicted of a crime.  Anything about the

 9   experience that sort of carries over that you might think --

10   will make it hard for you to give him a fair trial?

11          PROSPECTIVE JUROR LARSON:  I don't think there would

12   be anything like that, no.

13          MR. LEE:  Well, now that the question is clear.  Yes,

14   sir.

15          PROSPECTIVE JUROR McGOVERAN:  Richard McGoveran.  I

16   have been a witness to a crime.  I witnessed a drunk driver hit

17   two people in a crosswalk about 20 years ago.

18          MR. LEE:  And do you know what happened with the

19   case?

20          PROSPECTIVE JUROR McGOVERAN:  I did a deposition and

21   the -- the next thing -- well, I got called to court a few

22   times and then it was postponed.  Then the next thing I heard

23   was -- I read a newspaper article where she plea bargained and

24   ended up getting, I think, three years.

25          MR. LEE:  What happened to the two victims?

```
 1            PROSPECTIVE JUROR McGOVERAN:  The gentleman broke his
 2    leg.  The young lady was paralyzed from the waist down.
 3            MR. LEE:  How did -- the plea bargain, how did that
 4    make you feel?
 5            PROSPECTIVE JUROR McGOVERAN:  Considering, according
 6    to the newspaper article that it was her fifth drunk driving
 7    and she basically ruined a young lady's life forever, I thought
 8    she got off real light, so...
 9            MR. LEE:  Is there anything about that experience
10    that you think will carry over to your ability here to sit on a
11    jury?
12            PROSPECTIVE JUROR McGOVERAN:  Not with that
13    experience, no.
14            MR. LEE:  Were you sort of in danger or threatened at
15    all or were you really just sort of an eye witness?
16            PROSPECTIVE JUROR McGOVERAN:  I was in a vehicle
17    coming the other way.
18            MR. LEE:  Thank you.
19        Anyone else?
20            PROSPECTIVE JUROR FERNANDEZ:  Arturo Fernandez.  And
21    my uncle was -- he got a DUI and was in prison for about a
22    year, I believe.
23            MR. LEE:  And how long ago was that?
24            PROSPECTIVE JUROR FERNANDEZ:  About five years ago.
25        (Court reporter interruption.)
```

```
 1            THE COURT:  Mr. Lee, could you get your voice up a
 2   little bit so the court reporter can hear you?
 3            MR. LEE:  That was about how long?  I'm sorry.
 4            PROSPECTIVE JUROR FERNANDEZ:  That was about five
 5   years ago.
 6            MR. LEE:  About five years ago.  And he's out of
 7   prison now?
 8            PROSPECTIVE JUROR FERNANDEZ:  Yes, he is.
 9            MR. LEE:  Do you recall where he served?
10            PROSPECTIVE JUROR FERNANDEZ:  No.  I don't remember.
11   I'm not sure.
12            MR. LEE:  Was there anything about that experience
13   that would make it difficult for you to sit on this jury?
14            PROSPECTIVE JUROR FERNANDEZ:  No, I don't think so.
15            MR. LEE:  Thank you.
16       We have one more.
17            PROSPECTIVE JUROR RIEWE:  I have some relatives and
18   friends who were victims of crimes.  My great grandfather --
19   I'm kind of removed from all these and they were long ago
20   mostly, so I don't really think it would affect ability to be
21   fair.
22       My great grandfather was murdered.  My dad's uncle was
23   beaten up a few times, assaulted.  And a friend of mine was
24   also assaulted.  And my wallet was stolen a couple of times,
25   but there was no assault or anything.
```

1          **MR. LEE:**  And for the crimes that -- the ones you

2    described, not the also once involving property damage, but the

3    ones that involved either murder or assault, how long ago did

4    those takes place?

5          **PROSPECTIVE JUROR RIEWE:**  I think my great

6    grandfather was murdered around 1931.  I think my dad's uncle,

7    probably took place in the 60's.  And my friend, I don't know.

8    He -- I think it may have been five years ago.  I'm not sure.

9          **MR. LEE:**  And how about the occasion where your

10   wallet was stolen?  How long ago was that?

11         **PROSPECTIVE JUROR RIEWE:**  Once was, like, in '82 or

12   '-3 and once was, like, '96.

13         **MR. LEE:**  I know that -- I mean, some of the

14   incidents you've described were quite a long time ago, but they

15   also sound like they were obviously extremely serious and, I'm

16   sure, traumatic for your family.

17         Was there anything about those, those experiences, either

18   that you've heard about directly or sort of witnessed, that

19   would make it difficult for you to be a juror in this case?

20         **PROSPECTIVE JUROR RIEWE:**  No, I don't think so.

21         **MR. LEE:**  Okay.  Thank you.

22         **PROSPECTIVE JUROR SOTO:**  I have a question.  I'm Kim

23   so toe.  I've just got a question.

24         In front of my -- in the parking lot that I work at there

25   was a gang shooting.  I don't know what all took place.  Is

 1   that still considered what you're asking about?

 2        Because, I mean, I showed up after the -- after all the

 3   police and the investigations was there.  So, I mean, it was

 4   just recently, last couple of months.  So I don't know who was

 5   involved.  I don't -- I don't know.

 6        Is that including what you were asking?

 7            **MR. LEE:**  Well, sure.  So you did not witness the

 8   actual shooting?

 9            **PROSPECTIVE JUROR SOTO:**  Right.

10            **MR. LEE:**  You came after?

11            **PROSPECTIVE JUROR SOTO:**  I came after and all --

12   everything was settled down.  They threw -- what I saw was the

13   blood on the ground, that was in the parking lot, and the tape

14   that got thrown away.  That was the aftermath.

15            **MR. LEE:**  Do you know who the victims were?

16            **PROSPECTIVE JUROR SOTO:**  That, I'm not too sure.  I

17   didn't even ask.  I know they -- that they had a warrant out

18   for their arrests.  Last time I was talking to the Livermore

19   police, they had a warrant for other people.  They were from

20   two different towns.  They met in the middle.  That's all I

21   know.

22            **MR. LEE:**  And this happened in --

23            **PROSPECTIVE JUROR SOTO:**  A parking lot of my work.

24   So the CVS, Orchard, like a few -- Starbucks and the company

25   Safeway, where I work at, is in the same parking lot.  They all

1  came and met in the middle.  I don't know exactly what -- all I

2  knew is it was just gang involved.  That's all I pretty much

3  know.  There's two fatals.  Two of them were fatal.

4          MR. LEE:  Anything about the experience that you

5  heard about from people, either just seeing it or hearing about

6  it from other people at work, that would affect your ability to

7  be a juror on this case?

8          PROSPECTIVE JUROR SOTO:  Yes and no, because it's

9  more of -- yes, because it's more of a stressful part because

10 it's more of an impact on -- for people for dying.  I can -- I

11 have people that are -- not through gang related or anything

12 die, but there is -- but no, not really, because it's more of

13 an understanding of what's there, which means in and out of

14 communicating with the people.

15         MR. LEE:  And just to be clear, so this case is a

16 civil case.  And so our client, Mr. Perez, is suing the

17 defendants here, the correctional officers, for money damages.

18 And so it doesn't involve, you know -- and it's a First

19 Amendment case, as the judge said, so it doesn't involve any

20 underlying crime.

21      Do you think that in light of that, it's something -- you

22 know, that you can set aside the experience of the shooting and

23 be a fair and impartial juror?

24         PROSPECTIVE JUROR SOTO:  I mean, I can try.  Because

25 it's -- it just makes it kind of -- with death, that's there.

 1  So it's closely.  I mean, I can try.  So it's -- that's all I

 2  can do, is just try.

 3      Because, I mean, and, also, the thing like earlier -- I

 4  was talking about earlier my mother-in-law's brother has been

 5  in and out of jail because of drinking, combination drinking

 6  and driving for the DUIs and lost his job.  Lost his business

 7  of drinking.  So that's why he was -- that's why he was in San

 8  Quentin, in and out of San Quentin and a few other jails.

 9          **MR. LEE:**  This is your mother's brother?

10          **PROSPECTIVE JUROR SOTO:**  Yes.

11          **MR. LEE:**  Who was in San Quentin for a DUI?

12          **PROSPECTIVE JUROR SOTO:**  Yes.

13          **MR. LEE:**  How long was he in?

14          **PROSPECTIVE JUROR SOTO:**  The first time was about

15  three years.  The -- there is quite a few times.  The shortest

16  time was three years.  The longest time was maybe -- maybe

17  about six, seven years, something like that, because of how

18  severe it was.

19      Because, I mean, there's -- I guess there's certain points

20  that you -- for drinking and driving and stuff.  So he had to

21  settle all -- some stuff, that I'm not quite too sure what's

22  there.

23          **MR. LEE:**  Okay, thank you.

24      Ms. Smith.

25          **PROSPECTIVE JUROR SMITH:**  In the interests of being

 1  complete, I have had several car break-ins where my car was

 2  parked overnight.  I assume that's a traditional San Francisco

 3  experience.  And I did have a wallet stolen 30 years ago when

 4  my purse was left unguarded.

 5          MR. LEE:  Yes.  I think it's safe to say car

 6  break-ins are a way of life here in San Francisco.  I know I

 7  have sustained a few of them.

 8      Anything about those --

 9          PROSPECTIVE JUROR SMITH:  No.

10          MR. LEE:  -- experiences that's would impact your

11  ability here?

12          PROSPECTIVE JUROR SMITH:  No.

13          MR. LEE:  Anyone else have any experience as either a

14  victim or witness?  Victim of or witness to a crime?

15      (No response.)

16          MR. LEE:  Okay.  Another question I'd like to ask the

17  group is whether any of you or anyone close to you has ever

18  worked in or been affiliated with law enforcement?

19          PROSPECTIVE JUROR WILLIAMS:  Any sort of family

20  member?

21          MR. LEE:  Yes.  Yes.  You or a family member, close

22  friend?

23          PROSPECTIVE JUROR WILLIAMS:  My uncle was a police

24  sergeant in Orange County.

25          THE COURT:  And that's Ms. Williams, right?

1          **PROSPECTIVE JUROR WILLIAMS:**  Yes.  Sorry.  Yes.

2          **MR. LEE:**  And is he still a police sergeant?

3          **PROSPECTIVE JUROR WILLIAMS:**  He's retired.

4          **MR. LEE:**  How long was he a police sergeant?

5          **PROSPECT JUROR WILLIAMS:**  A long time.  I don't know.

6   Probably 20, 25 years.

7          **MR. LEE:**  Do you recall what kind of assignments he

8   had or what his duties were?

9          **PROSPECTIVE JUROR WILLIAMS:**  No.

10          **MR. LEE:**  Is this an uncle you were close to?

11          **PROSPECTIVE JUROR WILLIAMS:**  Yes.

12          **MR. LEE:**  So did he talk to you much about his job?

13          **PROSPECTIVE JUROR WILIAMS:**  No.

14          **MR. LEE:**  Did he ever tell you stories about sort of

15   a particular case or a particular --

16          **PROSPECTIVE JUROR WILLIAMS:**  No.

17          **MR. LEE:**  -- defendant or anything like that?

18          **PROSPECTIVE JUROR WILLIAMS:**  No.

19          **MR. LEE:**  And anything you would take away from the

20   experience or whatever you heard from your uncle that would

21   affect your ability here to be --

22          **PROSPECTIVE JUROR WILLIAMS:**  No.

23          **MR. LEE:**  -- a juror?

24          **PROSPECTIVE JUROR WILLIAMS:**  No.

25          **MR. LEE:**  Okay.  Any other -- anyone else here who

JURY VOIR DIRE

1   has a family member, close friend or yourselves been affiliated

2   with law enforcement?

3        Ms. Soto.

4        **PROSPECTIVE JUROR SOTO:**  I'm Kim Soto.

5        I used to work with somebody that became a San Jose police

6   officer.  And then my brother-in-law's brother is actually a

7   police officer, but I'm not too sure which town.  And I'm not

8   really that close to either one of them.

9        So I'm...  So, I mean, I do talk to the one in San Jose.

10  The one that works in San Jose, I do talk to him every once in

11  a while, but we don't really get into detail of what's going on

12  with his work.

13       **MR. LEE:**  Okay.  Thank you.

14       So there has been a lot of news in the last, you know,

15  months, years about sort of the scrutiny that's been placed on

16  law enforcement and on police officers around the country and,

17  you know, there have been various stories about the conduct of

18  police officers.

19       And I have another question for the group, and that is:

20  Do any of you think that the kind of attention that's placed on

21  police officers can sort of unfairly make it difficult for them

22  to do their job?  That police officers are subject to too much

23  second guessing after the fact?

24       Yes, sir.

25       **THE COURT:**  Sorry.  Could you --

 1              **PROSPECTIVE JUROR McGOVERAN:**  Richard McGoveran.

 2              **THE COURT:**  Thank you.

 3              **PROSPECTIVE JUROR McGOVERAN:**  In general, I think

 4    it's starting to get out of control.  I mean, police officers,

 5    correctional officers and stuff, sometimes they got to make

 6    split-second decisions that could cost or save somebody's life.

 7         So, you know, with all the scrutiny that is going on, you

 8    know, I'd hate to see one hesitate if it was my life on the

 9    line.

10              **MR. LEE:**  Thank you for your candid response.

11         Is there anybody else who shares Mr. McGoveran's view?

12         (No response.)

13         You look like you want to say something?

14              **PROSPECTIVE JUROR LARSON:**  This is Arlo Larson again.

15         I can see both sides of this.  I think there is a big

16    challenge with the -- I believe the police have been trained in

17    a certain kind of style, an aggressive style to handle

18    problems.

19         I think now that we have these videos and we can see

20    that -- that many police have been misusing their -- what they

21    were able to get away with in the past, I think.

22         So I think it's a positive thing.  I would -- I would hope

23    we would have kind of video, pictures of what's happening in

24    probably most confrontational situations.  This is a very

25    positive thing.

1          **MR. LEE:**  Thank you.

2      And you understand that, of course -- I mean, the

3   incidents you are describing, I assume, have nothing to do with

4   this particular case?

5          **PROSPECTIVE JUROR LARSON:**  Right.  Nothing at all.

6          **MR. LEE:**  And so do you think you would be able to

7   separate in your own mind sort of what you've seen and what

8   your impressions may have been in other cases and still be able

9   to sort of fairly judge the evidence in this case?

10         **PROSPECTIVE JUROR LARSON:**  Yes.  Yes.

11         **MR. LEE:**  Anyone else kind of have views on the

12  larger issue or the views expressed by Mr. McGoveran on the

13  scrutiny that law enforcement officers are sometimes placed

14  under?

15         **PROSPECTIVE JUROR JONES:**  Ginette Jones.

16     I just would like to say that, yes, there is this

17  controversy and these issues that are being brought up to the

18  service -- to the surface.  But I also recognize there's two

19  sides to every story and being in this room will provide me, at

20  least, with a chance to evaluate the facts and see them for

21  what they are.

22         **MR. LEE:**  And thank you for that.

23     And do you have some of the stories, though, about -- I

24  mean, some of the views that Mr. McGoveran expressed, which is

25  police officers have to make split-second decisions.  The

1  stakes are sometimes extremely high.  Does that really resonate

2  with you?

3            **PROSPECTIVE JUROR JONES**:  It does.  It does.  But I

4  think you need to -- you know, I think there is always that

5  ultimate question of seeing both sides of the story and taking

6  that in consideration, taking all the facts in.

7            And, you know, for us in the population hearing the news,

8  watching the media and the story, we're not always entitled to

9  everything, all the evidence that there is to consider.  So I

10 think it's an difficult place to be in most of the time as a --

11 as a viewer.

12           **MR. LEE**:  We certainly hope this trial gives you the

13 opportunity to -- for both sides to fully and fairly present

14 the evidence.  It's not just a TV show.  So, thank you.

15           Another issue I'd like to ask the group about, and that

16 is, you know, this case involves constitutional rights.  And

17 specifically it involves constitutional rights for prisoners.

18 And one of the things that you will learn in this trial is that

19 certain constitutional rights apply to people in prison.

20           And so I -- my question is:  Does anybody have sort of --

21 does that cause anybody concern or does anybody think that --

22 question why prisoners have constitutional rights?

23           (No response.)

24           **MR. LEE**:  Does anybody think that prisoners sometimes

25 just have too many rights; that, you know, whether they are

 1  constitutional or not, that prisoners have too many rights?

 2      (No response.)

 3          MR. LEE:  Does anybody think that -- or question why

 4  prisoners have the opportunity to bring lawsuits?  I mean this

 5  specific case involves -- the underlying facts involve a

 6  lawsuit that was originally brought by Mr. Perez.  And, of

 7  course, this is now another lawsuit brought by Mr. Perez.

 8      Do any of you think that prisoners -- that these are

 9  nuisances, prisoners file too many lawsuits?

10      (No response.)

11          MR. LEE:  Okay.  Now, one of the things that will

12  happen in a trial is you will hear from different witnesses and

13  people will testify.  What happens in court, what people

14  testify to is evidence.  And you'll also see some -- some

15  documents and some other sort of pieces of evidence, documents,

16  photos and that sort of thing.  Those are also pieces of

17  evidence.

18      And my question is really -- my next question really goes

19  to testimony, and that is:  If you hear -- you may -- you're

20  likely to hear testimony from both our client, Mr. Perez, and

21  the defendants.  And if you hear a conflict in testimony or if

22  you hear different versions of what happened from the

23  testimony -- setting aside whatever the documents may show, but

24  just from testimony -- do any of you think, you know, you would

25  just be more likely to believe the defendants because they are

1  correctional officers over my client because he's at Pelican

2  Bay?

3      (No response.)

4      **MR. LEE:**  Can any of you imagine a circumstance where

5  you have a -- you would just have a hard time sort of accepting

6  as true what you hear from my client, just because of the fact

7  that he has been convicted of a crime?

8      (No response.)

9      **MR. LEE:**  And so I take it from the fact that no one

10  has responded, that all of you can assure me that you will

11  evaluate all the testimony you hear fairly and balance it,

12  taking into account a number of different factors and your own

13  experience without sort of putting too much weight on one side

14  or the other just because of who they are?  Is that fair to

15  say?

16      (No response.)

17      **THE CLERK:**  You have three minutes.

18      **MR. LEE:**  Oh, okay.  A few questions specifically.

19  Ms. Smith, can you tell me what kind of law you practiced?

20      **PROSPECTIVE JUROR SMITH:**  I practiced business law

21  for a large business firm in the city.

22      **MR. LEE:**  And by "business" you mean transactional?

23      **PROSPECTIVE JUROR SMITH:**  Yes.

24      **MR. LEE:**  Did you ever do any litigation?

25      **PROSPECTIVE JUROR SMITH:**  As a very young associate,

1    I did some litigation.

2            MR. LEE:  What kind of litigation did you do?

3            PROSPECTIVE JUROR SMITH:  I don't remember them all,

4    it was so long ago.  One was a pension case.

5            MR. LEE:  Thank you.

6        Mr. Patrick?

7            PROSPECTIVE JUROR PATRICK:  Yes.

8            MR. LEE:  You talked a little about the experience

9    you had, I think, when you were in law school working at the

10   U.S. Attorneys office in Minnesota.

11       Do I understand it correctly that those were cases where

12   the Government, Department of Justice, was defending cases

13   brought by federal prisoners?

14           PROSPECTIVE JUROR PATRICK:  The 1982 actions that I

15   mention, yes.

16           MR. LEE:  And it was all on the defense side?

17           PROSPECTIVE JUROR PATRICK:  That's correct.

18           MR. LEE:  So what was your role on those?

19           PROSPECTIVE JUROR PATRICK:  For the actions I

20   participated in, they were initiated pro se by prisoners.  So

21   we would receive the brief, which was usually handwritten.  The

22   brief would be given to me for the three or four months where I

23   was the first to act and my job would be to draft the response

24   brief, which would be submitted as sort of competing briefs to

25   the judge for some sort of initial determination.  I don't know

1  if it was a procedural determination, whether it was a

2  determination on the merits, whether this was to see whether or

3  not the action would go further.

4      I know I got in the prisoner's brief.  My job was to draft

5  the Government's brief in response.  Work with the AUSA who was

6  assigned.  He or she, depending on who it was, would give me

7  notes and comments back.  I would get it in the spot where they

8  were good with it.  They would sign and we would submit.

9      And I think in that role I probably was involved in a half

10  dozen, give or take, of which -- I mean, literally what I can

11  remember is one was a complaint about bad food.  One was a

12  complaint that the prisoner fell down some stairs and was not,

13  in his mind, medically treated soon enough.  And beyond maybe

14  those two things, I don't know that I could tell you anything

15  specific about anything.

16      **MR. LEE:**  And, Mr. Patrick, was there -- since you

17  were on the defense side, and so your job was to defend against

18  those lawsuits brought by prisoners, was anything about that

19  experience that you think will make it a hard time for you to

20  judge the case brought by my client fairly?

21      **PROSPECTIVE JUROR PATRICK:**  You know, every case is

22  its own case.

23      It's certainly fair to say that for the cases I was

24  involved in, I came to the personal conclusion that I thought

25  that they did not have merit.  I don't know what the Court did

1   with them.  You know, once I'm done with the brief, it was out

2   of my ambit.

3       But to your question, you know, those were those cases

4   brought by those prisoners at that time.  Yours is your

5   client's case brought here.  There is nothing about those other

6   cases that, as far as I know, have anything in common with it

7   and it wouldn't matter if they did.  This is your case.  Those

8   were those cases.

9           **THE COURT:**  Mr. Lee, your time is up, but if you want

10  to ask more question to somebody, you can go ahead and do that.

11          **MR. LEE:**  Sure.  I wanted to ask Mr. Miller a

12  question about your restoration business.

13      Can you tell us a little about how long you have had that

14  business, how it got started?  You know, sort of how you --

15          **PROSPECTIVE JUROR MILLER:**  Dean Miller.

16      Started -- I got married young.  Had a child young.  Had

17  to get going.  Being on welfare wasn't going to cut it.

18  Couldn't live with my parents.  So I started a franchise in

19  restoration.  And then subsequently sold that.  Started my

20  independent.  So that's how I did that and I have been doing

21  that since 1979.

22      Do you want to know about the work we do?

23          **MR. LEE:**  Do you have employees?  How big a business

24  is it?

25          **PROSPECTIVE JUROR MILLER:**  Yes, I do.  I've had up to

```
 1   40 employees.  Probably about 35 now.
 2            MR. LEE:  And are you generally hired by homeowners
 3   or insurance companies or all of the above?
 4            PROSPECTIVE JUROR MILLER:  Yeah, that's a confusing
 5   situation.  Usually it's technically the homeowner, but we're
 6   on programs where the insurance companies give recommendations.
 7   So we'll get referred, but I guess technically and legally we
 8   work for the homeowner.
 9            MR. LEE:  And does that create sort of a potential
10   conflict or do you ever find yourself caught in the middle
11   between, you know, a homeowner's view of the damage he or she
12   sustained and what the insurance company would like to believe
13   that's what happened?
14            PROSPECTIVE JUROR MILLER:  Yeah.  There's always
15   differences of opinion.  Differences of settlements.  Things
16   like that.  And, luckily, I have employees now and I'm -- I'm
17   not intimately involved in that any more because it's -- it's a
18   tough place to be.
19            MR. LEE:  And when that happens, what is your role?
20   I mean, what...
21            PROSPECTIVE JUROR MILLER:  I try to take a stand and
22   say, look, this is what we did.  We tried to make it right.
23   And if the homeowner continues to not be happy, I need to
24   get -- you know, I just try to do what I can do to fix it
25   usually.  I try to say no.  Show my pictures.  But ultimately
```

 1  it's customer service and I just -- I give the benefit.  I

 2  mean, I do -- in business, I mean, I'm looking for a reputation

 3  to get ongoing business.

 4          **THE COURT:**  Okay.  Thank you, Mr. Lee.

 5          **MR. LEE:**  Okay.  Okay.  Thank you, ladies and

 6  gentlemen.  We look forward to presenting our case to you later

 7  today.

 8          **MS. NYGAARD:**  Good morning, ladies and gentlemen.

 9      Mr. Lee has asked quite a few questions and I'm going to

10  just continue expanding on some of the questions he might have

11  asked or ask some different ones.

12      First of all, by a show of hands, does anybody here ready

13  the San Francisco *Bayview* publication or have heard of it?

14      Has anyone --

15          **THE COURT:**  Wait.  Hold on.  You have a hand.

16          **MS. NYGAARD:**  We do have a hand.

17          **PROSPECTIVE JUROR SMITH:**  Nancy Smith.  I've heard of

18  it, but I don't read it.

19          **MS. NYGAARD:**  In what context have you heard of it?

20  Just in your daily life or professionally?

21          **PROSPECTIVE JUROR SMITH**:  Not professionally.

22          **MS. NYGAARD:**  Has anybody heard of a publication

23  called *The Rock* or read that?

24      (No response.)

25          **MS. NYGAARD:**  And how about *California Prison Focus*?

1    Is anybody familiar with that publication?

2        (No response.)

3            **PROSPECTIVE JUROR SOTO:**  This is Kim Soto.

4        I've heard about it.  I heard it through the -- my

5    husband's uncle.  I just heard about it through him.

6            **MS. NYGAARD:**  Okay.  Is this the --

7            **PROSPECTIVE JUROR SOTO:**  The one I was talking about

8    earlier.  He's the one in and out of prison.

9            **MS. NYGAARD:**  Are you close with him?

10           **PROSPECTIVE JUROR SOTO:**  Not really.  On that side of

11   the family, I'm not really that close.  The only one I'm close

12   to is my in-laws, but that's -- the only time I really see them

13   is around the holidays.  I might touch bases through the year

14   just to find out what's going on, letting them know what's

15   going on with my kids.

16           **MS. NYGAARD:**  How did you come to hear about the

17   *California Prison Focus*?

18           **PROSPECTIVE JUROR SOTO:**  Around on Christmas Eve he

19   was actually home and he got -- brought it up and one of those

20   times that we kind of -- before -- brought it up just talking

21   with a group of family members that's there.

22           **MS. NYGAARD:**  Okay.  And had you read the publication

23   yourself?

24           **PROSPECTIVE JUROR SOTO:**  No, I haven't.

25           **MS. NYGAARD:**  I apologize if I'm pronouncing your

1   name wrong.  Ms. Riewe?  Riewe?

2           **PROSPECTIVE JUROR RIEWE:**  Riewe.

3           **MS. NYGAARD:**  Do you do any volunteer work?

4           **PROSPECTIVE JUROR RIEWE:**  Yes.

5           **MS. NYGAARD:**  And what is that?

6           **PROSPECTIVE JUROR RIEWE:**  I volunteer on Monday

7   nights at the Berkeley Free Clinic, just as a -- in the -- a

8   member of the Information Resource Collective, which basically

9   gives out information.  When people call and it's something

10  that the limited services of the Berkeley Free Clinic cannot

11  handle, we let them know of other places they could possibly

12  go.

13          **MS. NYGAARD:**  Okay.  Anybody else, by a show of

14  hands, do any volunteer work?

15      Let's start with Ms. Smith in the back.

16          **PROSPECTIVE JUROR SMITH:**  Nancy Smith.

17      I work with environmental organizations.

18          **MS. NYGAARD:**  Environmental organizations?

19          **PROSPECTIVE JUROR SMITH:**  Yes.

20          **MS. NYGAARD:**  Doing what type of work?

21          **PROSPECTIVE JUROR SMITH:**  Just advocacy of our

22  issues.

23          **MS. NYGAARD:**  Thank you.

24          **PROSPECTIVE JUROR JONES:**  I'm Ginette Jones.  I just

25  volunteer at my church about once every weight eight weeks.

 1  I'm part of the cleaning committee.

 2          **MS. NYGAARD:**  Thank you.

 3          **PROSPECTIVE JUROR McGOVERAN:**  Richard McGoveran.

 4      Do some volunteering work through the sponsors through my

 5  work.  There are different projects for the communities.  Most

 6  of the ones I do are for underprivileged kids, stuff like that.

 7  Like, an example once a year the Salvation Army and my company

 8  get together, sponsor money, and we take the kids without their

 9  parents into Walmart when the store is closed to shop for their

10  school clothes.

11          **MS. NYGAARD:**  That sounds like a great cause.

12      Mr. Patrick?

13          **PROSPECTIVE JUROR PATRICK:**  Sure.  John Patrick.

14      I'm a board member for the local chapter of the National

15  Association of Minority Contractors.

16          **MS. NYGAARD:**  And are you in any leadership position

17  in that board?

18          **PROSPECTIVE JUROR PATRICK:**  I'm a board -- there

19  isn't a distinction.  There is a president and then there are

20  seven board members.  And I -- I guess that I am the de facto

21  legal counsel, although our letter says that I'm certainly not

22  offering any formal legal opinions when I sit on the board.

23          **MS. NYGAARD:**  Okay.  All right.  Thank you.

24      Has anyone here ever been arrested or convicted of a

25  crime?  By a show of hands?

```
 1        Yes.  Mr. Miller?

 2             PROSPECTIVE JUROR MILLER:  Dean Miller.

 3             MS. NYGAARD:  And if you feel comfortable discussing

 4   it out in open court, what were the circumstances?

 5             PROSPECTIVE JUROR MILLER:  It could have been back to

 6   your question earlier long ago.  This was when I was a

 7   teenager.  I guess I got a wet reckless.  A wet reckless.

 8   Driving under the influence.  So that's what they called it.

 9   That's what I was convicted of, so...

10             MS. NYGAARD:  And did you serve any time in jail for

11   that.

12             PROSPECTIVE JUROR MILLER:  Just overnight.

13             MS. NYGAARD:  And is there anything in particular

14   about that experience, spending a night in jail, that you feel

15   would affect your ability to be a juror on this case?

16             PROSPECTIVE JUROR MILLER:  No.

17             MS. NYGAARD:  Has anybody else been arrested or

18   convicted of a crime?

19        (No response.)

20             MS. NYGAARD:  How about any family members?  Have any

21   of your family members served time in prison or jail?

22             PROSPECTIVE JUROR McGOVERAN:  I have had two

23   different cousins serve time.  One five years.  The other one,

24   I believe, did ten years.

25             MS. NYGAARD:  Okay.  Let's starts with the first one
```

```
 1  who did five years.  Do you know where they served their time?

 2           PROSPECTIVE JUROR McGOVERAN:  Vacaville.

 3           MS. NYGAARD:  And what were they convicted of?

 4           PROSPECTIVE JUROR McGOVERAN:  Attempted murder.

 5           MS. NYGAARD:  Were you close with that cousin?

 6           PROSPECTIVE JUROR McGOVERAN:  When we were younger,

 7  yeah, but I ended up moving to southern California.  I moved

 8  back up in this area after he went in.  I did visit him in

 9  jail.  And I've talked to him since he has been out.

10           MS. NYGAARD:  Okay.  And is there anything memorable

11  from your visit to the jail that might affect your ability to

12  serve in this case?

13           PROSPECTIVE JUROR McGOVERAN:  No.

14           MS. NYGAARD:  Did you discuss much with your cousin

15  about his time in prison?

16           PROSPECTIVE JUROR McGOVERAN:  Just a general what it

17  was like, yes.

18           MS. NYGAARD:  Okay.  And you said you also had

19  another cousin who did time in prison?

20           PROSPECTIVE JUROR McGOVERAN:  Yes.

21           MS. NYGAARD:  Okay.  Was that one, you said, ten

22  years?

23           PROSPECTIVE JUROR McGOVERAN:  I believe he did ten.

24           MS. NYGAARD:  And what was he convicted of?

25           PROSPECTIVE JUROR McGOVERAN:  That's -- the family
```

 1  won't exactly say, but it was -- I know he's a registered sex

 2  offender.  Let me just put it that way.

 3          MS. NYGAARD:  Okay.  And are you very close with this

 4  cousin?

 5          PROSPECTIVE JUROR McGOVERAN:  As far as I'm

 6  concerned, he does not exist.

 7          MS. NYGAARD:  So I take it you haven't spoken to him

 8  about his experience in prison?

 9          PROSPECTIVE JUROR McGOVERAN:  No, I have not.

10          MS. NYGAARD:  Okay.  Now, I believe before we --

11  Mr. Fernandez had mentioned his uncle had served time in

12  prison.  I'd like to just ask a few follow-up questions.

13      So, Mr. Fernandez, you said your uncle was arrested for a

14  DUI, is that correct.

15          PROSPECTIVE JUROR FERNANDEZ:  Yes.

16          MS. NYGAARD:  Okay.  And do you know how much time he

17  served in prison for that?

18          PROSPECTIVE JUROR FERNANDEZ:  I want to say it was

19  about a year.

20          MS. NYGAARD:  And do you know where he was

21  incarcerated?

22          PROSPECTIVE JUROR FERNANDEZ:  I can't remember.

23          MS. NYGAARD:  And did you speak to your uncle about

24  that experience in prison?

25          PROSPECTIVE JUROR FERNANDEZ:  We talked about it a

```
 1   little bit, but it was just general, how it was like and that's
 2   pretty much it.
 3           MS. NYGAARD:  Okay?  And are you close with this
 4   uncle.
 5           PROSPECTIVE JUROR FERNANDEZ:  Not any more.
 6           MS. NYGAARD:  Do you feel that -- that it was fair;
 7   that it was right for him to have to go to prison for that
 8   crime?
 9           PROSPECTIVE JUROR FERNANDEZ:  Yeah, I believe so.  I
10   want to say it was his third DUI offense, second or third.
11           MS. NYGAARD:  And Ms. Soto?
12           PROSPECTIVE JUROR SOTO:  Yes.  Hi, this is Kim Soto.
13           MS. NYGAARD:  You mentioned before -- is it your
14   mother-in-law's brother or is it your mother's brother?
15           PROSPECTIVE JUROR SOTO:  No, it's my mother-in-law.
16   My parents are passed away.  It's my mother-in-law.  Her
17   brother has been in and out of -- mainly San Quentin, but more
18   than once.  I don't know how -- a few times.  One, like I said,
19   five years.  The other one is a little bit longer.
20       There's other jails there, but I don't remember which ones
21   that he went to.  I just try not to bring the subject up
22   because it's a touchy subject for them because it's a drinking
23   and driving.  Most of it's drinking and driving, but it's
24   pretty much drinking type of thing.
25           MS. NYGAARD:  Okay.  Now I'm going to ask you the
```

1  same thing I asked Mr. Fernandez.  Do you feel that it was

2  wrong for him to go to prison for the drinking and driving or

3  do you think it was the right thing?

4       **PROSPECTIVE JUROR SOTO:**  Well, the thing is is how  I

5  -- I'm going to answer it this way.  How I teach my kids, if

6  you're going to do the time, you gotta do the crime type of

7  thing [sic], but the thing is if you're going to be in jail,

8  yes, they do have -- they should have rights, too.

9       So, I mean, it's -- if he's going to drink -- I mean,

10  yeah, on rare occasion I do drink, but I stopped to drink that

11  way.  If he's going to drink, then he -- he should know his

12  limitations before he starts going behind the wheel or do

13  anything, anything to anybody else or to himself.

14       **MS. NYGAARD:**  Okay.  Thank you.

15       Is there anybody else who had relatives who spent time in

16  prison?

17       (No response.)

18       **MS. NYGAARD:**  Okay.  Now, Mr. Lee covered this also,

19  but I would just like to ask if anybody here has any strong

20  feelings about the recent news events involving law enforcement

21  officers that you did not already discuss with Mr. Lee?

22       (No response.)

23       **MS. NYGAARD:**  Has anyone here heard of the Mexican

24  Mafia?

25       **PROSPECTIVE JUROR SOTO:**  Kim Soto.

 1       My mother-in-law's sister lives in Mexico and there is a

 2   couple times they brought it up when she was actually up

 3   visiting.  So I've kind of heard a little, at least a little

 4   bit about it and that's it.

 5       **MS. NYGAARD:**  Okay.  That's fine.

 6       **PROSPECTIVE JUROR McGOVERAN:**  Everyone has kind of

 7   heard about it through the news.

 8       Richard McGoveran.  I think we all kind of heard about

 9   that particular phrase before through the media or, you know,

10   along those type of lines.

11       I mean, it's just -- kind of like hearing about any of the

12   other high profile affiliates -- not affiliates, but

13   organizations like that.

14       **MS. NYGAARD:**  Okay.  Has anyone here ever worked

15   inside of a jail or prison or volunteered inside a jail or

16   prison?

17       (No response.)

18       **MS. NYGAARD:**  Do you have any family members or close

19   friends who work inside a jail or prison or who have?

20       (No response.)

21       **MS. NYGAARD:**  Have any of you had any experiences

22   with law enforcement that you view to have been either

23   particularly favorable or negative?

24       **PROSPECTIVE JUROR PATRICK:**  I don't know that this is

25   additive to what I said before.

1      It's certainly the case that for the two years that I was

2  a law clerk at the U.S. Attorney's Office, I was working with

3  law enforcement officials on a daily basis.  Now, it wasn't

4  anyone from Bureau of Prisons.  And so I would be talking about

5  ATF agents, FBI special agents, IRS enforcement agents.  I was

6  involved in a child pornography case and so that was the U.S.

7  mail service.

8      So I definitely spent a lot of time working with them.  I

9  don't know, you know, to what extent that's relevant to a case

10  that involves people who work inside the prisons, but I was

11  certainly working on a daily basis with people in law

12  enforcement at that point in that job.

13          **MS. NYGAARD:**  Okay.  Anybody else?

14      (No response.)

15          **MS. NYGAARD:**  Now, in this case you're going to

16  hear -- you'll probably hear testimony about different prison

17  rules or procedures.

18      If you personally disagree with a particular rule, do you

19  feel that you could set aside that disagreement and still

20  decide this case fairly?

21      (No response.)

22          **MS. NYGAARD:**  I guess by a show of hands, is there

23  anybody who wouldn't be able to set aside their feelings if

24  they disagreed with a rule?

25      (No response.)

1          MS. NYGAARD:  Is anybody here familiar with Pelican

2   Bay State Prison from seeing anything on television about it or

3   hearing things in the news?

4          PROSPECTIVE JUROR NORTH:  (Raises hand.)

5          MS. NYGAARD:  Okay.  Without going into too much

6   detail, how do you know -- how are you familiar with Pelican

7   Bay?

8          PROSPECTIVE JUROR NORTH:  Jim North.

9      Just television, news programs.  I don't know if it was

10  NBC or CBS had a background story about Pelican Bay Prison,

11  what it was for, the type prisoners they house and such.

12         MS. NYGAARD:  Okay.  Does that --

13     (Court reporter interruption.)

14         THE COURT:  Ms. Nygaard, sorry to interrupt, but if

15  you could either speak up or sort of point partly towards the

16  court reporter as you're speaking, that would be great.

17         MS. NYGAARD:  Was that just a general news story or

18  was it, like, a documentary about the inside of Pelican Bay

19  State Prison?

20         PROSPECTIVE JUROR NORTH:  As I remember, it was a

21  documentary about the inside of the prison.

22         MS. NYGAARD:  Okay.  And do you watch a loot of those

23  types of programs?

24         PROSPECTIVE JUROR NORTH:  No.

25         MS. NYGAARD:  I think somebody else had there hand

1   up.

2       Ms. Smith?

3           **PROSPECTIVE JUROR SMITH:**  Nancy Smith.

4       I've skimmed some newspaper articles on Pelican Bay.

5           **MS. NYGAARD:**  So just from reading the news, have you

6   seen any of the television programs --

7           **PROSPECTIVE JUROR SMITH:**  No.

8           **MS. NYGAARD:**  -- documentaries?

9       Okay.

10          **PROSPECTIVE JUROR MILLER:**  Dean Miller.

11      Pelican Bay that I've heard is just a hearing of it's

12  possibly a high security facility, and that's the extent of

13  what I've heard.

14          **MS. NYGAARD:**  So just a little bit of knowledge about

15  the prison, but you haven't gotten any details or anything like

16  that about it, correct?

17          **PROSPECTIVE JUROR MILLER:**  No.

18          **MS. NYGAARD:**  Okay.

19      Are you now or have you ever been associated with any

20  group or organization that is connected with the operation of

21  jails or prisons, the treatment of prisoners or prison reform

22  within California or anywhere else?

23      (No response.)

24          **MS. NYGAARD:**  Anybody?  Nobody?  Okay.

25      (Brief pause.)

JURY VOIR DIRE

```
 1              MS. NYGAARD:  So, Mr. Patrick --

 2              THE COURT:  Star of our show, I guess.

 3              PROSPECTIVE JUROR PATRICK:  John Patrick, thank you.

 4              MS. NYGAARD:  From where do you get most of your

 5   news?

 6              PROSPECTIVE JUROR PATRICK:  A subscription to the

 7   Chronicle and a subscription to the Economist.

 8              MS. NYGAARD:  Okay.  And Ms. Zaidi, we haven't really

 9   heard much from you.  I will ask you the same question:  From

10   what source do you get most of your news?

11              PROSPECTIVE JUROR ZAIDI:  What source?

12              MS. NYGAARD:  Yes.

13              PROSPECTIVE JUROR ZAIDI:  Mostly the TV.

14              MS. NYGAARD:  Pardon me?

15              PROSPECTIVE JUROR ZAIDI:  You mean news, right?

16              MS. NYGAARD:  Yes.

17              PROSPECTIVE JUROR ZAIDI:  TV.  Television.

18              MS. NYGAARD:  Any particular stations?

19              PROSPECTIVE JUROR ZAIDI:  Channel 2 news, KTVU.

20              MS. NYGAARD:  Local Channel 2.

21              PROSPECTIVE JUROR ZAIDI:  Local channel.

22              MS. NYGAARD:  Do you watch any national news, cable

23   news channels or anything.

24              PROSPECTIVE JUROR ZAIDI:  No, no.

25              MS. NYGAARD:  Okay.  I think I'll ask Ms. Huang the
```

1  same question.  We haven't heard from her either.

2          **PROSPECTIVE JUROR HUANG:**  I read sfgate.com and

3  cnn.com, mostly.

4          **MS. NYGAARD:**  And Mr. North, same question for you.

5  Where would you say you get most of your news?

6          **PROSPECTIVE JUROR NORTH:**  Most of my news?  I would

7  say I get it off the internet, reading the various newspaper

8  publications.  I read the *Chronicle* online, *Washington Post*

9  online, *New York Times* online and the Chicago *Centurion*.

10         **MS. NYGAARD:**  Okay.  I think I'm almost out of time,

11 right?

12         **THE CLERK:**  Nine minutes.

13         **MS. NYGAARD:**  Oh, nine minutes.

14         **THE COURT:**  You don't have to use it all.

15         **MS. NYGAARD:**  I don't know if I do.  Let me confer

16 with my co-counsel for a moment.

17    (Discussion held off the record between defense

18     counsel.)

19         **MS. NYGAARD:**  I don't think we'll take any -- up any

20 more time.  Thank you very much.

21         **THE COURT:**  Okay.  So we are very close to selecting

22 a jury.  What we're going to do now is we're going to take a

23 15-minute break for the jurors, and you're free to --

24 prospective jurors, I should say.  You're free to go use the

25 restroom or walk around or whatever.  Come back here at 11:45.

```
 1        The lawyers can take five minutes and then Kristen will
 2   bring you back into the jury room in five minutes and when we
 3   come out, we'll be able to tell you who is on the jury and
 4   we'll give you some more instructions for how to proceed from
 5   there.
 6        So stay in your -- remember where you're sitting and
 7   return to the same seat when you come back.
 8        Thank you.
 9        (Whereupon there was a recess in the proceedings
10         from 11:28 a.m. until 11:37 a.m.)
11        (The following proceedings were held in the jury room,
12         outside the presence and hearing of the venire.)
13           THE COURT:  Okay.  I am still inclined to excuse
14   Ms. Soto for cause.  I don't think anybody gave us any -- was
15   able to get any assurance out of her that she didn't know
16   anything about the case.  I think she probably doesn't, but I
17   don't know for sure, so I think --
18           MR. LEE:  We would agree.
19           MS. NYGAARD:  We would agree.
20           MR. SEALS:  Yes.
21           MS. NYGAARD:  No objection.
22           THE COURT:  So anything else before you all start
23   exercising your challenges?
24           MS. NYGAARD:  Yes.  Defendants would like to formally
25   object to just even continuing with this jury, impaneling this
```

1    jury, based upon Mr. McMillan, No. 24's description of how he

2    was familiar -- how he knew people at San Quentin, officers

3    that targeted in and zeroed in on particular inmates.  We feel

4    that that poisoned this entire jury pool.

5          **THE COURT:**  Okay.  I'm not going to -- so are you

6    moving for a mistrial?  What technically is it?

7          **MS. NYGAARD:**  We would be, yes.  Yeah, we object to

8    this -- you know, any of these jurors being impaneled.  So if

9    it is making a mistrial motion, then yes.

10         **THE COURT:**  Maybe it's not technically a mistrial if

11   the jury hasn't been impaneled yet, but either way the

12   objection is overruled.  I will instruct the jury after --

13   after the jury is selected, that nothing that was said during

14   voir dire can be considered.

15         **MS. NYGAARD:**  Okay.  Just in general.  Not zeroing in

16   on --

17         **THE COURT:**  Correct.

18         **MS. NYGAARD:**  Right.  Okay.

19         **THE COURT:**  All right.  Do you want to make your

20   first challenge?

21         **MR. LEE:**  Yes, we would ask the Court to thank and

22   excuse Juror No. 12, Mr. McGoveran.

23         **THE COURT:**  All right.

24         **MS. NYGAARD:**  Yes.  Defendants would ask to strike

25   Juror No. 4, Ms. Riewe.

JURY VOIR DIRE

```
1              THE COURT:  Okay.
2              MR. LEE:  We would ask the Court to thank and excuse
3    Juror No. 14, Ms. Zaida.
4              THE COURT:  Okay.
5              MS. NYGAARD:  Defendants would ask to thank and
6    excuse Juror No. 8, Mr. Larson.
7              MR. LEE:  We would ask the Court to thank and excuse
8    Juror No. 9, Mr. Patrick.
9              THE COURT:  Last one?
10             MS. NYGAARD:  Just one moment.
11             THE COURT:  Sure.
12        (Brief pause.)
13             MS. NYGAARD:  Defendants would ask to thank and
14   excuse Juror No. 10, Mr. Miller.
15             THE COURT:  Hmm-hmm.  Okay.  So let me --
16             MS. NYGAARD:  We only get three strikes, right?
17             THE COURT:  Uh-huh.  And you're out.
18             MS. NYGAARD:  If we may, just hold on one second,
19   your Honor.  I was doing the math wrong.
20             THE COURT:  Okay.
21             MS. NYGAARD:  And so we just had said No. 10.
22             THE COURT:  Mr. Miller.
23        (Discussion held off the record between defense
24         counsel.)
25             MS. NYGAARD:  No. 25 instead of No. 10, Ms. Smith.
```

```
 1            THE COURT:  Okay.  So you want Mr. Miller on?

 2            MS. NYGAARD:  Correct.

 3            THE COURT:  And you want to use your last challenge

 4   on Ms. Smith?

 5            MS. NYGAARD:  Right.

 6            THE COURT:  Okay.

 7            MS. NYGAARD:  Because you're impaneling eight,

 8   correct?

 9            THE COURT:  Correct.

10       Okay.  So let me -- so I'm just going to announce who the

11   jurors are.  Let me make sure I have that right.

12       (Brief pause.)

13            THE COURT:  Okay.  So it will be Dana Williams --

14   make sure I've got this right.

15       Dana Williams.

16       Lynn Branson.

17       Dean Miller.

18       Ginette Jones.

19       Lina Huang.

20       Edward Galbreth.

21       Jim North.

22       And Arturo Fernandez.

23       Is that right?

24            MR. LEE:  That's what we have.

25            MR. BENEDETTO:  Yes.
```

JURY VOIR DIRE

```
 1          THE COURT:  Okay.  So we can go back in.  I'll
 2   announce that that is the jury.  I'll give them a few
 3   preliminary instructions, then send them to lunch.  Bring them
 4   back and you can do your opening statements and we may start
 5   with -- I think we probably will start with Mr. Perez.
 6        So during the lunch break, after I send them off for
 7   lunch, we'll chat about the various objections before you all
 8   go to lunch, okay?
 9          MR. SEALS:  Okay.  Thank you, your Honor.
10          MR. BENEDETTO:  Okay.  Sounds good.
11        (Proceedings held in open court.)
12          THE CLERK:  Remain seated.  Come to order.  Court is
13   back in session.
14          THE COURT:  Okay.  As promised, we have a jury before
15   the lunch hour.  And I'm going to call out the names of the
16   people who are serving on the jury.  People who will stay, and
17   be with us for a little while.
18        Dana Williams, Lynn Branson, Dean Miller, Ginette Jones,
19   Lina Huang, Edward Galbreth, Jim North, and Arturo Fernandez.
20   You will be on the jury.
21        If you can all stay where you are for the moment, I would
22   like to thank everybody else for coming.  Really, appreciate
23   your time.  I'm glad we were able to let you go before the
24   lunch break.
25        You can just head back up to the jury office on the 19th
```

```
 1   Floor and tell them your jury service has been completed and
 2   that I have released you, and very much appreciate it.   Thank
 3   you.
 4       (Jury Venire excused)
 5           THE COURT:   Okay.   Now we're are going to do a little
 6   bit of rearranging.   You don't have to stay there for the while
 7   trial.   So what I would like to do is sort of keep everybody in
 8   the same order they're seated, but move them down.
 9       So what that means is you're in Seat No. 1, so you stay
10   there.
11       Ms. Branson, why don't you move down and sit next to
12   Ms. Williams in Seat No. 2.
13       And then, Mr. Miller, why don't you sit in the seat
14   immediately behind you, which is Seat No. 3.
15       And then Ms. Jones, why don't you sit next to Mr. Miller
16   in what is Seat No. 4.
17       And then, Ms. Huang, you're next, right?   Why don't you
18   come sit down here, in what we will now call Seat No. 5.   What
19   we find is that -- yeah, down here at the end.
20       What we find is that for the eight jurors it's best for
21   you all to be sitting as close as possible.   If at some point
22   you are having trouble seeing and you want to rearrange your
23   seating you can, but we find that this is usually the best way
24   to go.
25       So Mr. Galbreth, if you will have a seat next to
```

JURY VOIR DIRE

```
 1  Ms. Huang, and then Mr. North next to Mr. Galbreth.  And
 2  Mr. Fernandez, after Mr. North.
 3       There we go.  Okay.  So, the first thing that I'll do now
 4  that we have you as jurors is have Kristen swear you in yet
 5  again.  The oath you took this morning was to be a prospective
 6  juror.
 7       And we have a special and perhaps equally
 8  difficult-to-understand oath for you to take as actual jurors.
 9       So Kristen, do you want to swear them in?
10            THE CLERK:  Please stand and raise your right hands.
11       (Jury Panel sworn in)
12            THE CLERK:  Thank you.
13            THE COURT:  Okay.  So, I'm going to give you a little
14  bit of instruction right now.  Then we are going to do our
15  lunch break as promised.  And bring you back, do a little more
16  instruction.
17       We will start with opening statements today.  And, you
18  will probably begin to hear from the first witness today.  And
19  as I said, we will get you out of here, some time between 2:00
20  and 2:30, and for sure, no later than 2:30.
21       Let me also go over the schedule with you again, just in
22  case you're paying more attention now than you were this
23  morning when you weren't sure if you were even going to be on
24  this jury.
25       We start at 8:30 sharp every morning.  I have the lawyers
```

```
 1   come in before 8:30 and I come in before 8:30 so if there's any

 2   business that we need to deal with, we are not wasting your

 3   time, and we get you in as close to 8:30 as we can.  Breakfast

 4   is available in the jury room.

 5        At the end of today, Kristen will bring you back to the

 6   jury room, give you your badges, and sort of show you around

 7   back there, show you the drill, get your contact information,

 8   all of that stuff.  Light breakfast is available every morning,

 9   so you can come in early and get a bite if you want.

10        As I said, we'll take one or two morning breaks, depending

11   on how things are going, and a break for lunch usually for 45

12   minutes, and then have you out of here between 2:00 and 2:30

13   every day.

14        We don't have trial on Thursdays.  Thursday's the day for

15   me to deal with all the other cases we have here on the docket

16   and for the lawyers to do any trial prep work that they need to

17   do.

18        We anticipate it will be around a week.  We can't

19   guarantee you exactly how long it will last, but as I said, we

20   anticipate it will be around a week.  There's a very real

21   possibility that you will have to come in next week, but I can

22   assure you this case is not going to go past Thanksgiving.  Nor

23   will you have to be here on Thanksgiving.

24        So that's the schedule.  Let me take a couple of minutes

25   to talk to you about your duties as jurors.  And give you some
```

1  general instructions about being a juror.

2  **PRELIMINARY INSTRUCTIONS**

3       **THE COURT:**  At the end of trial, I'll give you more

4  detailed written instructions about the law, and how to apply

5  the law.  And when we come back from lunch I'll give you a bit

6  more instruction on the evidence and how to view the evidence.

7  But for now, let me just sort of make some general comments.

8      When you deliberate, it will be your duty to weigh and to

9  evaluate all the evidence received in the case, and in that

10  process to, decide the facts.  And as I said earlier, you find

11  the facts, but to the facts as you find them, you will apply

12  the law as I give it to you, whether you agree with the law or

13  not.

14      You must decide the case solely on the evidence, and the

15  law before you.  And you must not be influenced by any personal

16  likes, or dislikes, opinions, prejudices, or sympathy.

17      Please do not take anything I may say or do during the

18  course of trial as indicating what I think the evidence is,

19  what I think of the evidence, or what I think your verdict

20  should be.  that is entirely up to you.

21      Similarly, don't take anything that anybody has said up to

22  this point as evidence of anything.  Right?  I mean, what was

23  said in voir dire during the jury selection process by me, by

24  the lawyers, by the other prospective jurors, none of that is

25  relevant to your consideration.  None of that is evidence.  You

1    are to do your best to put that out of the your mind and decide

2    the case based on the evidence you are going to begin hearing

3    this afternoon.

4         Keep an open mind throughout the trial.  And don't decide

5    what the verdict should be until after you and your fellow

6    jurors have completed your deliberations at the end of the

7    case.  And the point of that is that all the evidence doesn't

8    come in at once, and you want to consider all of it before you

9    reach a decision.

10        And because you must decide the case based only on the

11   evidence that you receive here in the courtroom, and on my

12   instructions as to the law that applies to the case, you must

13   not be exposed to any other information about the case or to

14   the issues it involves during the course of your jury duty.

15        So that is until the end of the case, or unless I tell you

16   otherwise, do not communicate with anyone in any way, and do

17   not let anyone else communicate with you in any way about the

18   merits of the case or anything to do with it.  This includes

19   discussing the case in person, in writing, by phone or

20   electronic means, by email, text messaging, over the internet,

21   on a blog, on a website or anything else.

22        This applies to communicating with your fellow jurors,

23   until I give you the case for deliberation.  And it applies to

24   communicating with anybody else, including your family members,

25   your employer, the media, the press, people involved in the

 1   trial.

 2        Now, of course, that restriction, you've got to -- you

 3   know, there has to be some limit to that restriction, otherwise

 4   people are going to be calling the authorities wondering where

 5   you are, right?  So it's okay to tell your family members or

 6   your employer that you are on jury duty.  Okay?  And it's okay

 7   to tell them what you anticipate the schedule to be, and when

 8   you expect to be available and when you don't expect to be

 9   available.

10        Other than that, though, the problem is that people are

11   really tempted to ask you questions about the case.  People get

12   excited to hear when you are on jury duty and when you are on a

13   jury.  So if people start asking you followup questions:

14   What's the case about, who's the plaintiff, who are the

15   defendants, what's your impression, anything like that, just

16   tell them the that you are under strict orders from me not to

17   respond to any questions, and that you are only permitted to

18   talk about the fact that you are on jury duty and scheduling

19   matters relating to that.  You are not allowed to talk about

20   anything else with respect to the case, and the Judge has

21   specifically ordered you not to say anything further.

22        Now, after I release you from jury duty, you are then free

23   to discuss, to talk about the case.  But until then it is

24   critical that you don't.

25        Another specific word about social media, Twitter,

1  Facebook, whatnot.  Obviously, that's a big issue these days.

2  And you know, it might be tempting to just say something on

3  Facebook along the lines of "Just got picked for a jury."

4  Right?  Which is slightly more interesting than "Just did my

5  laundry" or some of the other things that people put on

6  Facebook all the time.

7       But you really shouldn't even do that.  Because, you know,

8  you can control what you say, but you can't control what people

9  say back to you.  Right?  And, you know, who knows what

10  somebody is going say on Facebook into -- in response to your

11  statement "Just got picked for a jury."  That would be

12  inappropriate for you to hear.  So, just entirely stay off

13  social media when it comes to your jury service.  Okay?

14       If you are asked anything about the case, or about your

15  jury service, if you are approached by anyone, and you're

16  concerned that it's problematic or somebody's a little too

17  curious, report it to me and Kristen immediately so that we can

18  look into it.  Okay?

19       As I said, the law requires these restrictions to enhad is

20  that your the parties have a fair trial based on the same

21  evidence that each party has had an opportunity to address.

22  And so the other thing that that means is no outside research,

23  right?  Don't search the internet, don't do any outside

24  research, don't look at dictionaries.

25       You are supposed to sort of -- I don't expect there to be

1 anything out there on this case, necessarily, but you should

2 not be searching for it.  You should be limiting your

3 consideration to the evidence that you hear in this courtroom.

4 And it's important that every juror consider the same evidence.

5 Absent that, you know, the parties are denied a fair trial.

6 And, if you violate these restrictions, a mistrial could result

7 that would require the entire trial process to start over.

8      One other thing, you know, on this issue of communicating

9 with other people, you know, we, the lawyers and the other

10 members of the teams are under strict instructions not to have

11 any communication or interaction with you whatsoever.

12      So from time to time, you know, you might be in the

13 hallway getting in the elevator and -- and/or let's say you're

14 in the elevator, and the door opens, and one of the lawyers is

15 there, and they start to walk in, and they see you.  And they

16 turn around and they walk out and they wait for the next

17 elevator.  That's not because they are being rude, right?  And

18 if they avoid making eye contact with you, that's not because

19 they're being rude; that's because they are under strict

20 instructions from me not to interact with the jurors in any

21 way.  Even if -- a wink or a smile or whatever.  So please

22 don't take any of that the wrong way.

23      So for now as I said, what we will do is give you a lunch

24 break.  We will have you come back here at 12:45.  We will have

25 a little bit more of the trial, you will hear opening

 1  statements and hear from the first witness.  And then, at the

 2  end of our day, Kristen will take you back there, you will get

 3  your badges, you will -- she will show you around, get your

 4  contact information, et cetera.

 5       But for now we'll do a 45-minute lunch break.  I'll stay

 6  here with the attorneys and do some work with them while you

 7  are having your lunch break.  There is a cafeteria downstairs

 8  on the second floor.  And then there are a few things, you

 9  know, close by, sandwiches and stuff like that within a

10  one-block radius of the courthouse, should you want to venture

11  out.

12       So with that, I'll see you back here at 12:45.  Thank you.

13       (Jury excused)

14       (The following proceedings were held in open court,

15        outside the presence and hearing of the jury.)

16       **THE COURT:**  Okay, do you want to talk about the

17  evidentiary objections to the exhibits that come in with

18  Mr. Perez?

19       The defense has had a chance to articulate the objections.

20  Do you persist in all of those objections or --

21       **MS. NYGAARD:**  Yes, Your Honor.  We do.

22       **THE COURT:**  Okay.  So, why don't we just do it in

23  numerical order.

24       **MR. BENEDETTO:**  Sure, Your Honor.

25       **THE COURT:**  As I said, the objection to Exhibit 2 is

```
 1  overruled.

 2       Exhibit 10, all right.  Remind me what Exhibit 10 is

 3  again.

 4          MR. BENEDETTO:  It is the outline of an article that

 5  was not seized on October 10, so it was an article that

 6  remained in Mr. Perez's cell.  And we would offer it as

 7  evidence of -- that shows he was likely to have similar

 8  articles that day in his cell.

 9       We're not offering it for the -- its contents.

10          THE COURT:  Right.  Well, so, I would think, I mean,

11  if they -- I mean, I would think that that would come in to

12  rebut something, some suggestion that they make.  But, I'm not

13  sure -- what suggestion are you anticipating that they are

14  going to make that would render this relevant?

15          MR. BENEDETTO:  That there were no articles in his

16  cell that day, and therefore, they weren't confiscated.

17          THE COURT:  Well, so, to the extent that it would be

18  needed to rebut a suggestion on their part that there were no

19  articles or evidence of articles in the cell, that sounds like

20  it would be relevant.  But are you intending to elicit

21  testimony along those lines?

22          MS. NYGAARD:  That there were no articles in his

23  cell?  No, Your Honor.  The defendants will testify that all

24  paperwork was confiscated.

25          THE COURT:  Uh-huh.
```

PROCEEDINGS

```
 1          MR. BENEDETTO:  I think this is different, because I

 2   mean, this is again a -- representative of the kind of specific

 3   article that we are alleging was confiscated.

 4          THE COURT:  Right.  That objection is sustained.  It

 5   can be revisited if they suggest something that's directly

 6   contrary to the presence of this article in his cell.

 7       Exhibit 12, settlement agreement.

 8          MR. BENEDETTO:  Yes.  Your Honor, first of all, we

 9   think that the settlement agreement is the best evidence of the

10   language of the settlement which the defendants have put at

11   issue.

12          THE COURT:  Can you show me the language that is

13   important to you in this agreement?

14          MR. BENEDETTO:  Sure.  It would be on Section 2(3) on

15   Page 2.  Under "Terms and Conditions."

16          THE COURT:  Okay.

17          MR. BENEDETTO:  "In consideration for plaintiffs's

18   release..."

19          THE COURT:  Let me just read it to myself real quick.

20          MR. BENEDETTO:  Okay.

21       Okay, this agreement had not been reached by October 12,

22   right?

23          MR. BENEDETTO:  Correct.

24          THE COURT:  So, is there going to be any dispute that

25   as of October 12th, they agreed in principle to what's
```

PROCEEDINGS

1  contained in Paragraph 3?

2          **MS. NYGAARD:**  I don't think that anybody can testify,

3  because -- to whether they had agreed in principle except, I

4  guess, Mr. Perez.

5          **THE COURT:**  Well, Mr. Perez can.

6          **MS. NYGAARD:**  Mr. Perez.  But none of the defendants

7  or any of the defendants' witnesses had any involvement in

8  negotiating this settlement agreement in any way.

9          **THE COURT:**  Right.

10         **MS. NYGAARD:**  What defendants will offer is evidence

11  that Pelican Bay was informed there was a settlement agreement,

12  but they will also testify that they know today, sitting here

13  today, that there actually was not an executed settlement

14  agreement in place.

15         **THE COURT:**  Well, what they know today doesn't really

16  seem relevant.  But I guess here's my question about the

17  settlement agreement.

18     It doesn't seem to me that there's any dispute that they

19  reached an agreement in principle, if not a signed agreement,

20  to do a new gang validation proceeding.

21         **MR. BENEDETTO:**  Right.

22         **THE COURT:**  And he can testify that they reached an

23  agreement, a settlement agreement to do a new gang validation

24  proceeding, and he can testify, I presume, that they reached

25  that agreement in principle by October, and they put it to

PROCEEDINGS

1   writing later on.  Right?

2          MR. BENEDETTO:  Correct.

3          THE COURT:  So why does this actual document have to

4   be in?  I mean, if they -- if they dispute that, then I would

5   think that the document would become relevant to support his

6   assertion, perhaps.  But, why does the document actually need

7   to be in?

8          MR. BENEDETTO:  We think that one of the -- you know,

9   one of the strategies by the defendants will be to discredit

10  Mr. Perez, discredit his credibility and his testimony with

11  respect to the prior lawsuit.

12      And it's -- and, and this -- we should be entitled to show

13  the jury something that is -- corroborates that testimony and

14  is a legal document.  A real document that they could, you

15  know, look at and read.

16         THE COURT:  Well, I'm sure they're going to try to

17  discredit him generally, but why does this need to come in if

18  they don't try -- if they don't dispute the point that he had

19  an agreement with the state that required them to do a new gang

20  validation procedure?

21         MR. BENEDETTO:  If, if that point is not in dispute,

22  and there is no question about the timing of the validation and

23  which regulations apply, because that's why the language, "New

24  gang validation procedures under current departmental

25  regulations," we understand what that language means, but the

PROCEEDINGS

 1   jury may not.

 2          **THE COURT:**  Right.

 3          **MR. BENEDETTO:**  As long as that has not been

 4   disputed, then, and beyond sort of rehabilitating Mr. Perez's

 5   credibility, that's what we would seek to use this document

 6   for.

 7          **THE COURT:**  So my sense, though, is that they are not

 8   disputing that.  They're just going to make a pitch to the jury

 9   about what -- about what the -- these defendants knew about the

10   situation.

11          **MR. BENEDETTO:**  Right.

12          **THE COURT:**  They're not going dispute that he had

13   that deal with the state.  Right?

14          **MS. NYGAARD:**  Correct.  Defendants will just testify,

15   you know, to what degree, if any, you know, that they knew he

16   had a settlement agreement, and what they knew any of those

17   terms to be.

18          **THE COURT:**  Right.  Okay.  So, I mean, same ruling, I

19   think, sustained, subject to -- you know, I mean, you can put

20   it in, if they say anything that you can refute with the

21   settlement agreement.  Or if they, you know, attack his

22   credibility on that point that we have been discussing.  Okay?

23      Next?

24          **MR. BENEDETTO:**  Is Exhibit 15.  One of the

25   photographs of the interior of the cell.

```
1              THE COURT:  Uh-huh.

2              MR. BENEDETTO:  One thing I would say here is that --

3              THE COURT:  Who took the picture?

4              MR. BENEDETTO:  This is a picture that we obtained

5    from a public source.  We had --

6              THE COURT:  Is there a dispute as to the authenticity

7    of this?  I know you say that it's irrelevant and prejudicial

8    but --

9              MS. NYGAARD:  It appears to be a cell in the SHU, but

10   I don't have any -- I mean, I guess people could testify that

11   that's what a SHU cell looks like.  But I have no idea where

12   they got from this from, or who took the photograph when, and

13   et cetera.

14             MR. BENEDETTO:  And our client can certainly testify

15   that this is a fair and accurate depiction of not only a SHU

16   cell, but a SHU cell at Pelican Bay.

17             THE COURT:  Okay.

18             MR. BENEDETTO:  One of the reasons that we are

19   seeking to use this photo is that we don't have a good interior

20   photo of Mr. Perez's cell that was occupied that day.  We had

21   invited the CDC to take a picture of Mr. Perez's cell from the

22   inside to show the interior.  We don't have a good photo.  And

23   so in the absence of that, we are seeking to use this.

24       I would note the defendants were willing to stipulate to

25   the use of this photo (Indicating), if the image could be
```

1   reversed, you know, if the sink could be shown on the other

2   side.  But that's not possible.

3          **MS. NYGAARD:**  And Your Honor, if -- defendants would

4   stipulate that plaintiffs have produced a photo that was an

5   occupied cell with belongings in that.  We had stipulated to

6   that.

7          **THE COURT:**  Why is that?

8          **MS. NYGAARD:**  This just makes it look like an inmate

9   is thrown in a concrete slab with nothing.  I mean, there's a

10  mattress folded over, if that.  It's not representative of how

11  an inmate lives in a cell.  They put up pictures, and going to

12  clothing and bedding and personal items.

13         **THE COURT:**  If you really cared about that, couldn't

14  you get to that in cross-examination?  Or there's your own

15  defendants, for that matter, if you think that actually

16  matters.

17      From a forest-from-the-trees standpoint, if you think that

18  actually matters, can't you establish that?

19         **MS. NYGAARD:**  Correct.  But I would also like to

20  point out that when they said that we -- they invited us to

21  give them a picture, they never sought a picture during

22  discovery.  They never, to my knowledge, asked Pelican Bay if

23  they could go in and see Mr. Perez's cell and take a photograph

24  of the cell.  So --

25         **THE COURT:**  I still don't understand -- I need to

PROCEEDINGS

```
 1  look at your objections.  Did you object to its authenticity?

 2          MS. NYGAARD:  Yes.

 3          THE COURT:  And you continue to object to its

 4  authenticity.

 5          MS. NYGAARD:  Yes.

 6          THE COURT:  Okay.  So how are you going to lay the

 7  foundation for the picture?

 8          MR. BENEDETTO:  I would show it to Mr. Perez and have

 9  him testify about --

10          THE COURT:  Did Mr. Perez take the picture?

11          MR. BENEDETTO:  He did not.

12          THE COURT:  Okay.  Who took the picture?

13          MR. BENEDETTO:  We -- we don't know who took the

14  picture because it was obtained from the internet.

15          THE COURT:  Who obtained it from the internet?

16          MR. BENEDETTO:  Members of my team.  But Mr. Perez

17  certainly can testify as to his experience inside a SHU cell,

18  that this is an accurate depiction of what such a cell looks

19  like.

20      We are not -- would not be claiming that this was in fact

21  the cell he occupied, but that it is a depiction of --

22          THE COURT:  I'm going to allow you to use it as a

23  demonstrative.  But it's not going to be admitted into

24  evidence.

25      Exhibit 17?
```

PROCEEDINGS

1              **MR. BENEDETTO:**  Yes.  So, one of the issues that is

2     in dispute, particularly with respect to the RVR, is what the

3     officers could see happening inside the cell on that day.  And,

4     this is a photo that shows -- that is relevant because it shows

5     how perforated the door is, and sort of what a view into such a

6     cell would be.

7         This is not Mr. Perez's cell.  And we're not claiming that

8     it is.  But again, we don't have a picture of his actual cell

9     that shows the perforations quite as clearly as this does.

10             **MS. NYGAARD:**  Your Honor, again we would object for

11    lack of authentication.  Also relevance.  And, Rule 40 --

12             **THE COURT:**  I mean, what's -- relevance, he just

13    articulated the relevance of it.

14             **MS. NYGAARD:**  Well, relevance to show this particular

15    cell.  It's not plaintiff's cell.  It's not the cell that's in

16    dispute or anything.

17             **THE COURT:**  Is it a cell from -- similar to the

18    plaintiff's?

19             **MS. NYGAARD:**  Yes.

20             **THE COURT:**  Is it from Pelican Bay?

21             **MS. NYGAARD:**  It appears to be.

22             **MR. BENEDETTO:**  (Nods head)

23             **THE COURT:**  Okay.

24             **MS. NYGAARD:**  But I don't know.

25             **THE COURT:**  Where did the picture come from?

1        **MR. BENEDETTO:**  Members of my team, again, obtained

2    it from the internet.

3        **THE COURT:**  I mean, the problem -- I mean if you

4    wanted to get -- if you wanted to put into evidence -- I don't

5    think the picture of the empty cell is that big of a deal.

6        But if it's in dispute how you can see into the cell, you

7    know, you could have gotten through discovery an actual picture

8    of the actual door to Mr. Perez's cell or some cell that was

9    similar to it.  And, you know, you could have -- you could have

10   obtained that from them or you could have, you know, figured

11   out a process for taking a picture, yourselves.

12       But to just say, like, you know, "A member of our team

13   pulled this picture from the internet, and we assert that it is

14   like Mr. Perez's cell," I mean, you have an

15   authenticity/foundation problem, I think, that they're not --

16   you know, I mean, I think perhaps it's a little bit

17   unreasonable of them not to just see the forest from the trees

18   and withdraw their objection to this, but they're objecting to

19   it on authenticity and foundation grounds.

20       **MR. BENEDETTO:**  Right.

21       **THE COURT:**  So, what am I to do?

22       **MR. BENEDETTO:**  So, the threshold showing that I

23   understand is that it needs to be a fair and accurate depiction

24   of the exterior -- of the door.

25       Jesse, our client, can lay the foundation, can testify

PROCEEDINGS

1  because he went in and out of the door, what a door looked

2  like.  The defendants can testify about whether this is a fair

3  and accurate depiction of an exterior door and how perforated

4  it is.

5      And we believe we can lay the foundation and the

6  defendants can cross-examine Mr. Perez on his recollection of

7  what that door looked like.  And they can also adduce their own

8  testimony about whether this is an accurate depiction of the

9  door.

10         THE COURT:  Let me -- I'll think about that and let

11  you know before opening statements.

12      Same issue with 19 -- is it 19?

13         MR. BENEDETTO:  19.

14         THE COURT:  Same issue?

15         MS. NYGAARD:  Yeah.  This one particularly, no

16  relevance, Your Honor.  This doesn't have annoying do with the

17  cell that the officers came and searched or that resulted in

18  the issuance of an RVR because of what was going on inside the

19  cell.

20      This is a hallway within -- inside the prison.  It appears

21  to be, I should say, because again, lack of authentication.

22  But it appears to be a hallway within the SHU at Pelican Bay

23  that inmates would not go down on a daily basis -- I mean,

24  this, it has no relevance to what happened in Mr. Perez's cell

25  that day.

PROCEEDINGS

1              THE COURT:  But they're just trying to sort of set

2     the stage and sort of show the jury what things look like.  I

3     mean, what's the big deal?

4              MS. NYGAARD:  We believe this would go more towards

5     the damages phase if we get to that, not liability.  It has no

6     relevance to what happened inside Mr. Perez's cell that day.

7              MR. BENEDETTO:  This photo along with a couple of the

8     photos that are coming up are relevant to our ability to show

9     the magnitude of the threat that our client faced, the -- one

10    of the elements is chilling effect.

11         And we believe that we are entitled to show and have the

12    jurors appreciate visually what it would mean to be in the SHU.

13    And our client will testify that he saw this corridor as he

14    went to the law library.  He can lay the foundation for the

15    photo in that way.

16         And --

17              THE COURT:  And same thing --

18              MR. BENEDETTO:  Same thing for 20 and --

19              THE COURT:  Somebody from your team took that picture

20    or pulled that from the internet?

21              MR. BENEDETTO:  Correct.

22              THE COURT:  And same with 20?

23              MR. BENEDETTO:  And 21, yes.

24              THE COURT:  And 21.  Okay.  25.

25              MR. BENEDETTO:  Is the diagram of the rotunda.

PROCEEDINGS

1           THE COURT:  Uh-huh.

2           MR. BENEDETTO:  So we had asked for a diagram of the

3    rotunda to be provided.  We don't have one.  so Mr. Perez drew

4    this, based on his experience being there.  He can certainly

5    lay the foundation for it's -- it's a fair and accurate

6    depiction of the space that he occupied.

7       Part of the story is where Mr. Perez and Mr. Guerrero were

8    moved from the cell to a separate cell.  And, the diagram would

9    be relevant to allowing the jury to sort of appreciate where

10   various events happened on the day of October 10th.

11          MS. NYGAARD:  Again Your Honor, plaintiffs did not

12   make a discovery request for rotunda diagram or pictures.  They

13   only asked for it when we were finalizing pretrial documents.

14          THE COURT:  But he could draw a diagram for the jury

15   while he is on the stand if they wanted to, right?

16          MS. NYGAARD:  Right.

17          THE COURT:  To help explain.  Are you really saying

18   that you want to make him draw the diagram again when he is on

19   the stand, as opposed to using this one?

20          MS. NYGAARD:  No, I'm just saying a diagram is not

21   relevant to --

22          THE COURT:  You're saying he can't draw a diagram

23   when he's on the stand?

24          MS. NYGAARD:  No, he --

25          THE COURT:  To try and explain sort of the layout of

1    where he was?

2              **MS. NYGAARD:**  No, I'm not saying that.

3              **THE COURT:**  Okay.  So the only difference is that

4    maybe -- and I didn't see a hearsay objection in there, but

5    maybe this is hearsay because it is an out-of-court writing.

6    Right?

7              **MS. NYGAARD:**  Correct.

8              **THE COURT:**  And you were going to tell me that what

9    you want is you want him to draw it again while he is on the

10   stand, instead of using this one.

11             **MS. NYGAARD:**  No, I think this could be admitted with

12   -- and then obviously defendants could, you know, interject in

13   their examinations of what's wrong with this, what's -- you

14   know, if anything.

15             **THE COURT:**  Okay.  So are you still objecting to the

16   use of this diagram?

17             **MS. NYGAARD:**  Yes.

18             **THE COURT:**  Why?

19             **MS. NYGAARD:**  Still, on the basis of relevance.  I do

20   not believe that it is relevant at all to --

21             **THE COURT:**  Okay, so you don't have a hearsay

22   objection in your objections that you filed, so it's overruled.

23   You waived -- waive that objection.

24        Okay.  What's next?

25             **MR. BENEDETTO:**  26, Your Honor.  The picture of the

1  cage that was used as the law library.

2              THE COURT:  Okay.

3              MR. BENEDETTO:  A part of Mr. Perez's testimony, part

4  of the narrative will be how he learned enough of the law to

5  file his 2005 lawsuit.  He did so in a cage that looked very

6  much like this.  He can testify that this is the sort of cage

7  that constituted the prison law library at Pelican Bay.

8      We are not asserting that this is the actual cage, but it

9  is certainly a fair and accurate depiction of what the law

10 library was.

11             THE COURT:  Okay.  I'm sustaining that objection

12 because I don't -- I think it's tangential to what you are

13 trying to prove here.

14             MR. BENEDETTO:  And the final exhibit will be 77.

15             THE COURT:  Okay.  Yeah, so we already dealt with

16 this in the motion in limine.

17     What is the problem, other than your objections that you

18 made in the motion in limine?

19             MS. NYGAARD:  We would also add that it's hearsay.

20             THE COURT:  Right, but it's not being offered to

21 prove the truth of what's asserted in there, so it's not

22 actually hearsay.

23     Anything else?

24             MS. NYGAARD:  Nothing else.

25             THE COURT:  Okay.  And you didn't submit a proposed

PROCEEDINGS

1  pinpoint instruction on this?

2          **MS. NYGAARD:**  No, we didn't.

3          **THE COURT:**  Okay.  So that's overruled.

4      Okay.  Thanks.  So we will see you back here at 12:45.

5          **MR. BENEDETTO:**  Thank you, Your Honor.

6          **THE CLERK:**  Court is in recess.

7      (Luncheon recess taken from 12:24 p.m. to 12:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PRELIMINARY INSTRUCTIONS

1                       **P R O C E E D I N G S**

2   **NOVEMBER 16, 2015**                              **12:51 P.M.**

3          (The following proceedings were held in the presence

4           of the jury)

5          **THE CLERK:**  Remain seated, come to order.  Court is

6   back in session.

7          **THE COURT:**  Okay.  Welcome back.  We're going to

8   proceed with opening statements in just a moment.  Let me first

9   give you a few additional instructions on how to consider the

10  evidence.

11         And as I said, you will get a bunch more detailed

12  instructions on the law, and also on how to consider the

13  evidence in writing, after the -- at the close of the case and

14  when you go into your deliberations.  But for now, let me just

15  share a couple of basic points.

16                   **PRELIMINARY INSTRUCTIONS**

17         **THE COURT:**  This is a civil case, and the burden of

18  proof in a civil case for most issues, including the issues

19  that you are going to start hearing about now, is preponderance

20  of the evidence.  Which is different from reasonable doubt, and

21  I'm quite sure the lawyers will talk to you more about that in

22  their opening statements.

23         But when a party has the burden of proof on any claim by a

24  preponderance of the evidence, it means you must be persuaded

25  by the evidence that the claim is more probably true than not.

1    You should base your decision on all of the evidence,

2  regardless of which party presented it.

3    There are multiple defendants in this case.  You should

4  decide the case as to each defendant separately.

5    Unless otherwise stated, the instructions will apply to

6  all parties, but you should apply -- decide the case as to each

7  defendant separately.

8    What is evidence.  The evidence you will consider in

9  deciding what the facts are consist of the sworn testimony of

10  any witness, the exhibits which are received into evidence, and

11  any facts to which the lawyers have agreed.

12    In reaching your verdict, you may only consider the

13  testimony and exhibits received into evidence.  Certain things

14  are not evidence, and you may not consider them in deciding

15  what the facts are.  We have discussed this a little bit

16  before, but let me just list them.

17    Arguments and statements by lawyers are not evidence.  The

18  lawyers are not witnesses.  What they say in their opening

19  statements, what they say in their closing arguments and at

20  other times is intended to help you interpret the evidence.

21  But, it is not evidence.  If the facts as you remember them

22  differ from the way the lawyers have stated them, your memory

23  controls.

24    Questions and objections by lawyers are not evidence.

25  Attorneys have a duty to their clients to object when they

1  believe a question is improper under the rules of evidence.

2  You should not be influenced by the objection or by the Court's

3  ruling on the objection.

4      Testimony that has been excluded or stricken or that you

5  have been instructed to disregard is not evidence, and must not

6  be considered.

7      In addition, sometimes testimony and exhibits are received

8  only for a limited purpose.  When I give you an instruction, a

9  limiting instruction, you must follow it.

10     Anything you may have seen or heard or will see or will

11  hear when court is not in session is not in evidence.  You are

12  to decide the case solely based on the evidence received at

13  trial.

14     As I said, sometimes evidence will be admitted for a

15  limited purpose.  And, when I instruct you that an item of

16  evidence has been admitted for a limited purpose, you must

17  consider it only for that limited purpose, and no other.

18     Let's talk for a minute about direct and circumstantial

19  evidence.  Evidence can be direct or circumstantial.  Direct

20  evidence is direct proof of a fact such as testimony by a

21  witness about what that witness personally saw, or heard, or

22  did.  Circumstantial evidence is proof of one or more facts

23  from which you could find another fact.  And I'll explain a

24  little bit more about that in a second.

25     But, you can -- can and should consider both kinds of

1  evidence.  The law makes no distinction between the weight to

2  be given to either direct or circumstantial evidence.

3      It's for you to decide how much weight to give to any

4  evidence.  And so, you know, a good example of this is if you

5  wake up in the morning and you walk out of your house and you

6  see that the ground is wet, that's pretty good evidence that it

7  rained the night before.  It's circumstantial evidence.  It's

8  not direct evidence.  Because you didn't see it raining.  You

9  didn't hear it raining.  But you walk out the next morning and

10  you see that the ground is wet.  And there is, of course, a

11  possibility that that could have happened some other way, but

12  it's pretty good circumstantial evidence that it rained last

13  night.

14      Direct evidence is if you wake up in the middle of the

15  night and you hear the rain, and/or you look out the window and

16  you see it raining.  That is direct evidence.  If you came and

17  testified in court about that you would be providing direct

18  evidence that it rained last night.

19      And as I said, the law doesn't make distinctions between

20  the weight you give to direct evidence versus circumstantial

21  evidence.  That's for you to decide.

22      There are rules of evidence that control what can be

23  received into evidence.  When a lawyer asks a question or

24  offers an exhibit into evidence, and a lawyer on the other side

25  thinks it's not permitted by the rules of evidence, the lawyer

1    may object.  If I overrule the objection, the question may be

2    answered or the exhibit received.  If I sustain the objection,

3    the question cannot be answered and the exhibit cannot be

4    received.  Whenever I sustain an objection to a question, you

5    must ignore the question and must not guess what the answer

6    might have been.

7         Sometimes I may order as I said earlier that evidence be

8    stricken from the record and that you disregard or ignore the

9    evidence.  That means that when you are deciding the case, you

10   must not consider the evidence that I told you to disregard.

11        In deciding the facts of this case you may have to decide

12   which testimony to believe and which testimony not to believe.

13   You may believe everything a witness says, or part of it, or

14   none of it.  Proof of a fact does not necessarily depend on the

15   number of witnesses who testify about it.

16        In considering the testimony of any witness, you may take

17   into account the opportunity and ability of the witness to see

18   or hear or know the things that the witness testifies to; the

19   witness's memory; the witness's manner while testifying; the

20   witness's interest in the outcome of the case, and any bias or

21   prejudice; whether other evidence contradicted the witness's

22   testimony; the reasonableness of the witness's testimony in

23   light of all the evidence; and any other factors that bear on

24   believability.

25        The weight of the evidence as to a fact does not

1  necessarily depend on the number of witnesses who testify about

2  it.

3       During deliberations, you will have to make your decision

4  based on what you recall of the evidence.  You won't have a

5  transcript of the trial.  I urge to you pay close attention to

6  the testimony as it is given.  If at any time you can't hear or

7  see the testimony, or the evidence, or a chart or a questions

8  or arguments, let me know so that I can correct the problem.

9       Notes.  Kristen has provided you with pens and note pads.

10  If you wish, you may take notes to help you remember the

11  evidence.  If you do take notes, please keep them to yourself

12  until you and your fellow jurors go to the jury room and decide

13  the case.

14       Do not let note-taking distract you.  When you leave, your

15  notes should be left in the jury room.  No one will read your

16  notes.  They will be destroyed at the conclusion of the case.

17       Whether or not you take notes, you should rely on your own

18  memory of the evidence.  Notes are only to assist your memory.

19  You should not be overly influenced by your notes or those of

20  your fellow jurors.

21       And let me just say that, you know, occasionally some of

22  us tend to want to write everything down.  Everything the

23  professor says in the lecture, we want to write it down.  We

24  don't want to miss anything.  We want to make sure we didn't to

25  get anything.  But if you concentrate too much on taking too

 1  many notes you are more likely to miss stuff.

 2      So I would urge you if you're the type of person who

 3  really wants to take notes, be judicious in the notes that you

 4  take, and don't just be writing stuff furiously in an effort to

 5  get everything down because that will cause to you miss things.

 6  Including witness demeanor and things like that.

 7      So with that, as I said, you will get more detailed and

 8  written instructions at the close of the case before you begin

 9  your deliberations.  But for now, we will begin with opening

10  statements.  Each side has 30 minutes to make an opening

11  statement.  We will be strict about these the time limits.

12      So, we'll begin with the plaintiff, if the plaintiff

13  wishes to proceed.

14          MR. LEE:  Thank you, Your Honor.  We have one

15  demonstrative, if the Court will allow.

16      (Photograph displayed)

17                  **OPENING STATEMENT**

18  **BY MR. LEE:**

19      May it please the Court, counsel, ladies and gentlemen of

20  the jury.

21      Imagine a maximum-security prison deep in the words up in

22  northern California near the Oregon border, about 400 miles

23  north of here, far from the public eye.  And imagine within

24  this prison, there's an even higher security area called the

25  security housing unit, or the SHU.

```
 1        And imagine that inside the SHU are rows and rows of tiny

 2   concrete cells, cells surrounded on three sides by concrete,

 3   and with a steel door with teeny little holes in it facing out

 4   onto a hallway.

 5        And imagine that inside each of these cells sits a

 6   prisoner who spends 22 and a half hours a day in that cell.  He

 7   eats all his meals alone in his cell because his meals are

 8   handed to him through a little slot in the metal door.  His

 9   only break is to go a small yard about the size of a dog run,

10   surrounded by 20-foot-high walls, where the only piece of

11   equipment is a pull-up bar.

12        And imagine that the rest of the time, the prisoner sits

13   in his cell, hour after hour, day after day, month after month,

14   year after year.  And then imagine what it would be like to do

15   that for ten years.

16        Ladies and gentlemen, that was the life that my client,

17   Mr. Perez, lived.  For ten years, he spent 22 and a half hours

18   a day inside a tiny concrete cell.  And for nine of those

19   years, he sat alone, until he was finally given a cellmate

20   after almost a decade of solitary confinement.

21        Now, how did Mr. Perez end up in the SHU?  He ended up

22   there because back in 2003, when he was a prisoner at another

23   prison, he was determined by prison officials there to have

24   been what's called an associate of a prison gang.  Not a

25   member, but an associate of a prison gang.  And based on that
```

 1  determination alone, he was sent to the SHU at Pelican Bay,

 2  where he sat for the next ten years.

 3       Now, one of the things you will learn about at this trial

 4  is that the U.S. Constitution guarantees certain rights all of

 5  us, including prisoners at Pelican Bay.  And one of those

 6  rights that the U.S. Constitution guarantees to all of us is

 7  the right to file lawsuits against prison officials.  It's part

 8  of the First Amendment to the Constitution which protects

 9  freedom of speech.  And it applies even to an inmate in a

10  maximum-security prison.  And that's what this case is about.

11       Now, even though Mr. Perez was locked away in the most

12  isolating circumstances imaginable, he didn't give up hope.  He

13  wanted to educate himself.  And he wanted to be able to stand

14  up for and protect his own rights in the proper manner.  And so

15  he studied and he read and he learned the law and he learned

16  the Constitution.

17       And in 2005, he filed a lawsuit against prison officials,

18  alleging that the procedures whereby he was determined to have

19  been an associate of a prison gang and sent to SHU indefinitely

20  were a violation of his constitutional rights.

21       The Department of Corrections fought that lawsuit for

22  seven years.  But finally, in 2012, Mr. Perez won what he

23  viewed as a tremendous victory.  He learned that the state

24  wanted to settle the lawsuit.  And that settlement gave him the

25  opportunity to finally get out of the SHU after nearly a

1   decade.

2        And that's where the defendants come into play.  Because

3   when the defendants, Mr. Gongora, Mr. Healy, and Mr. Pimentel

4   and Mr. Gates and Mr. Burris (Indicating) learned about the

5   settlement, they decided to teach my client a lesson.  They

6   wanted to show him what happens when you challenge the system.

7   And they crossed a line.

8        And the evidence in this case will show that they abused

9   their authority, they tried to intimidate him, and they

10  retaliated against him.  And thereby, violated his

11  constitutional rights yet again.  And that's what this case is

12  all about.  And that's why we're here today.

13       Let me tell you a little more about Mr. Perez.  Mr. Perez

14  was raised in a town about 60 miles east of Los Angeles, a town

15  called Colton.

16       When he was 11 or 12, his abusive father abandoned the

17  family, leaving his --

18       **MS. NYGAARD:**  Objection, Your Honor.  Relevance and

19  argumentative.

20       **THE COURT:**  Overruled.

21       I'll just remind the jury that argument by lawyers in

22  opening statements is not evidence.  sometimes lawyers have a

23  tendency to promise certain evidence in their opening

24  statements.

25       But what you have to focus on is not what the lawyers

1  promise to you, but the evidence that is delivered to you on

2  the witness stand.  So just keep in mind for both sides, that

3  arguments by lawyers, opening statements by lawyers, are not

4  actual evidence.  It's a preview of what the lawyers believe

5  the evidence will show.

6       **MR. LEE:**  And Mr. Perez will tell you about his

7  background.  When he was 11 or 12 his abusive father left the

8  family, leaving his mother to raise him and his three siblings.

9  He has a brother who served honorably in the United States

10  Army.  And two sisters.  And to this day, he remains close to

11  his siblings and his mother.

12       But after his father left, Mr. Perez made some bad

13  decisions.  And he fell in with the wrong crowd.  And when he

14  was 15 years old, he was charged with a felony.  He was

15  eventually convicted.  And he was sent to the California Youth

16  Authority.

17       When he turned 18, he was sent to state prison, to

18  Tehachapi, California.  And it was there at Tehachapi that

19  several years later he was determined by prison officials

20  through a process known as a gang validation procedure, he was

21  determined or validated as an associate of a prison gang.  And

22  I'll explain a bit later, you know, what the validation process

23  means.

24       And with that decision, his life changed dramatically,

25  because that validation sent him to the SHU at Pelican Bay.  He

 1  wasn't told whether or when he would ever get out.

 2      Now, at the SHU, Mr. Perez will tell you that some inmates

 3  literally go crazy.  But Mr. Perez didn't.  Mr. Perez realized

 4  that in order to be able to protect his own rights, in order to

 5  be able to stand up for what is right, he needed to learn the

 6  system.  He needed to learn how to, in the proper manner,

 7  protect his rights.

 8      And so with nothing more than a seventh-grade education

 9  because he had dropped out of school after seventh grade, he

10  learned to read and write.  He learned the law; he learned the

11  legal system.  He learned the Constitution.

12      And with incredible perseverance and determination, and

13  hard work and reading, he learned and determined after several

14  years that he had what he believed was a good basis for a

15  lawsuit against prison officials for that validation.

16      And so in 2005, he filed lawsuit, as I mentioned before,

17  against prison officials, alleging that the procedures that

18  were followed for determining that he was a prison gang

19  associate and for sending him to the SHU for an indefinite

20  period of time were unconstitutional.

21      The Department of Corrections tried to fight the case.

22  The case dragged on for years.  Department of Corrections tried

23  to get the case thrown out of court.  But Mr. Perez prevailed,

24  using briefs that he written by hand.  And eventually, after

25  many years, in 2012, in the summer of 2012, he learned that the

 1  state wanted to settle the case.

 2       And the key term of the settlement -- the settlement

 3  provided for payment of a modest amount of money, which

 4  Mr. Perez will tell you he gave to his mother.

 5       And the key term was that he would have the opportunity to

 6  go through a new gang validation procedure under new rules that

 7  were coming into effect that he knew about.  And that

 8  validation, that new procedure under these new rules would give

 9  him the opportunity to finally get out of the SHU after nine

10  and a half years.

11       Now, let me pause there and just explain a little more

12  about this procedure and about why it would have given him the

13  opportunity to get out of the SHU.

14       Historically, the process of validation, an inmate could

15  be validated as either a prison gang associate, which was the

16  case with Mr. Perez, or a prison gang member, based on certain

17  pieces of evidence that prison officials will look for.  It

18  could be a name in an address book.  It could be a letter.

19  Prison guards read mail to look for correspondences with

20  potentially other prison gang members.  It could be a drawing;

21  it could be a tattoo.

22       And based on that evidence, alone, prison gang officials

23  could make the determination that somebody was an associate or

24  a member of a prison gang.  And based on that determination,

25  alone, some -- a validated member or associate would be sent to

1  the SHU, indefinitely.  Don't know when or whether you will

2  ever get out.

3       Several years ago there was a growing amount of criticism

4  of the practice of long-term solitary confinement.  And there

5  was a widely-publicized hunger strike at Pelican Bay in 2011,

6  criticizing practices in the SHU.

7            **MS. NYGAARD:**  Objection --

8            **THE COURT:**  Overruled.

9            **MR. LEE:**  And one of the conditions at Pelican Bay

10  that was the subject of the hunger strike was the validation

11  practice.  The practice of automatically sending a validated

12  prison gang associate or member to the SHU.

13       And so, over time, the California Department of

14  Corrections developed -- began to develop a new policy, a new

15  validation policy.  And this new policy provided that simply

16  being a validated gang member or associate was not enough to

17  get you sent to the SHU.  In order to be sent to the SHU, you

18  also had to have engaged in some violation, in a serious

19  violation of prison rules.

20       So in other words, that the test wasn't just affiliation

21  or association or membership.  There also had to have been some

22  actual misconduct, in order for a prisoner to go to the SHU.

23       That new policy was critical to Mr. Perez.  Because

24  Mister -- Mr. Perez knew at the time of these events, Mr. Perez

25  knew that he did not have on his record a serious violation of

1  prison rules.  And therefore, he knew that if he went through a

2  new gang validation procedure, he would have the opportunity to

3  finally get out of the SHU.  And that's why the settlement was

4  such a tremendous victory for him.  That's why it was so

5  important to him, because he knew that that would give him the

6  pathway out of the SHU.

7      And the matter should have ended there, with a settlement,

8  and a path out of the SHU for Mr. Perez.  But that's when the

9  defendants decided to take matters into their own hands, and

10 send Mr. Perez the message.  The defendants were members of a

11 unit at Pelican Bay called the Institutional Gang Investigation

12 Unit.  You will hear that term a lot.  IGI.  And the defendants

13 held the title Assistant Institutional Gang Investigator, AIGI.

14 And during the relevant time, you will hear that there were

15 seven AIGIs, and five of whom were the defendants.

16     The AIGIs and that unit is responsible for investigating

17 and finding evidence that could lead to somebody being

18 validated, and therefore, either being sent to or having -- in

19 the case of the Pelican Bay SHU, having to remain within the

20 SHU.  And so the -- the defendants, members of that unit, would

21 review people's mail, search cells, monitor the activities of

22 prisoners.  And if they found sufficient evidence, they would

23 compile a package and that -- their actions and that

24 determination could lead to somebody being sent to or having to

25 remain in the SHU.

1      And it was on October 10, 2012, that these defendants

2  learned of the settlement, and decided to send Mr. Perez a

3  message.  On October 10th, 2012, Mr. Gates, Mr. Healy,

4  Mr. Pimentel, and Mr. Gongora showed up at Mr. Perez's cell to

5  do a cell search.  And it wasn't just any cell search.  It was

6  a search to look for evidence for purposes of a validation

7  procedure.  It was to look for evidence of an association with

8  a prison gang.

9      But Mr. Perez wasn't expecting a cell search that day.  He

10 wasn't due for -- you will hear there is a regular review.  He

11 wasn't due, wasn't due for his regular review.  And he learned

12 that the settlement that he had learned about wasn't yet in

13 effect because this was October of 2012, and the settlement

14 wasn't actually signed until June of 2013, eight months later.

15 And he knew that the new policy for gang validations wasn't in

16 effect yet either.

17     You will hear evidence that during the search, the

18 defendants made comments that demonstrated their intent to

19 retaliate against Mr. Perez.  You will hear that defendant

20 Gates said to Mr. Perez, "You might have been able to collect

21 from us, but you better get comfortable because we are going

22 make sure you stay where you belong."

23     You will hear that one of the defendants in the process of

24 searching the cell said, "These knuckleheads should file

25 lawsuits more often.  Makes this job that much more rewarding."

1      You will hear that defendants trashed Mr. Perez's cell and

2   violated prison regulations in the process, prison regulations

3   that govern how cell searches are to be conducted.  And you

4   will hear that they destroyed his paperwork; you will hear that

5   he confiscated his legal papers.  You will hear that they

6   confiscated articles he had written that were critical of the

7   Department of Corrections.  Materials that were never returned

8   to him, again, contrary to prison regulations.

9      Now, you won't see any photos of the cell search.

10  Mr. Perez and inmates generally aren't allowed to have cameras

11  in prison.  You will hear that the defendants did have a

12  camera, but they won't show you any pictures either.

13      What you will hear, however, is the testimony of two

14  eyewitnesses, two other inmates, who will testify about what

15  they saw and heard that day.  First you will hear from an

16  individual named Rudy Guerrero.  Rudy Guerrero was Mr. Perez's

17  cellmate at the time.  Remember, in his tenth year, he finally

18  got a cellmate.

19      And Mr. Guerrero will tell you about comments he heard.

20  Mr. Guerrero will tell you that one of the defendants said to

21  him "Are you into filing lawsuits too"?  And when he said no,

22  the defendant said "Good.  Keep it that way."

23      And he will tell you too how the cell that he shared with

24  Mr. Perez was trashed, and how Mr. Perez's papers were taken.

25      And you will also hear from Mr. Mendoza.  Salvador Mendoza

1  occupied the cell right next to Mr. Perez and Mr. Guerrero.

2  And, he could hear what was going on through vents in the

3  ceiling.  And he will tell you he heard comments that the

4  defendants were making, and he will tell you he heard the

5  tearing of papers --

6      (Reporter interruption)

7          **MR. LEE:**  Tearing of papers, the ripping of papers,

8  and the trashing of the cell.

9      But there's more.  Several days after the cell search,

10  defendant Gates issued a report, what's called a Serious Rules

11  Violation Report, to Mr. Perez, claiming that he had improperly

12  interfered with the search.

13      And remember how I told you one of the new -- the key

14  features of this new policy was that in order to be sent to or

15  remain in the SHU, you had to have not only affiliation or

16  association with a prison gang, but you also had to have some

17  affirmative misconduct, a violation, a serious violation of

18  prison rules.  And remember how I told you that Mr. Perez knew

19  at the time he did not have had in his record any serious

20  violation of prison rules.  The evidence will show that that's

21  why the defendant -- defendant Gates issued this report.  To

22  make sure that Mr. Perez stayed right where he belonged, to use

23  their words, in the SHU, 22 and a half hours a day.

24      Now, I expect you will hear that defendants were just

25  doing their jobs.  They were following orders.  And I expect

 1  you will hear that the defendants will say they didn't even

 2  know who Mr. Perez was.  But we will show you evidence that

 3  will prove that Mr. Perez was already under close scrutiny by

 4  the AIGIs, by the very unit that the defendants worked in.

 5      And we will show you that he had come to their attention

 6  in the past.  We will even show you an email that was sent a

 7  year beforehand to several AIGIs, including defendant Pimentel,

 8  asking the AIGIs to do a retaliatory cell search on Mr. Perez,

 9  on Mr. Perez, himself.

10      And we will show you and we will explain to you prison

11  regulations and rules that govern how cell searches are to be

12  conducted, how property is to be handled.  And, and the like.

13      And as for the RVR, the Serious Rules Violation Report,

14  Mr. Perez challenged that, as he was entitled to do.  And he

15  was found not guilty of that charge, by an independent prison

16  hearing officer.  Proof that it was issued for a retaliatory

17  purpose.

18          **MR. SEALS:**  Objection, argumentative.

19          **THE COURT:**  Overruled.

20          **MR. LEE:**  Ladies and gentlemen, the defendants

21  weren't just doing their jobs.  The evidence will show that

22  they deliberately retaliated against Mr. Perez because he had

23  dared to exercise his constitutional rights.  The very same

24  rights that protect all of us.

25      Now, at the conclusion of this case, after you have seen

1  and heard all of the evidence, my colleague, Mr. Benedetto,

2  will speak to you.  And he will ask you to decide this case

3  fairly and impartially, based on the law and the facts as you

4  have heard them.  And he will ask you to uphold the principle

5  that the First Amendment protects everyone, even prisoners at

6  Pelican Bay.

7      We will ask you to return a verdict in favor of Mr. Perez,

8  and against each of the defendants (Indicating).

9      Thank you.

10                    **OPENING STATEMENT**

11  **BY MR. SEALS:**

12      Good afternoon, ladies and gentlemen of the jury.

13      We promise that by the end of this case, the evidence will

14  show you three important things:  The defendants were following

15  standard procedure when they searched Mr. Perez's cell.  The

16  defendants were following standard procedure when they

17  confiscated gang-related materials from Mr. Perez's cell.  And

18  the defendants were following standard procedure when they

19  issued Mr. Perez an RVR, otherwise known as a Rules Violation

20  Report, for interfering with their ability to secure evidence

21  during the cell search.

22      My name is Elliott Seals.  I was introduced to you earlier

23  today.  You also met my co-counsel, Jennifer Nygaard and our

24  paralegal, Jocelyn Tucay.  I would also like to take a moment

25  to introduce you to each of the defendants.  Officer Sean

1    Burris will testify that he was involved in the review of

2    Mr. Perez's paperwork.

3        Officer Jim Pimentel will testify that he was also

4    involved in the review of Mr. Perez's paperwork, and that he

5    was involved in the search of Mr. Perez's cell.

6        Sergeant Eric Healy, who was an officer at the time of the

7    incident, he will testify that he was involved in the search of

8    Mr. Perez's cell.

9        Counselor Dan Gongora, who WAS also an officer at the time

10   of the incident, will testify that he was involved in the

11   search of Mr. Perez's cell.

12       And Officer Anthony Gates --

13           **SERGEANT GATES:**  Sergeant.

14       **MR. SEALS:**  Sorry.  Sergeant Anthony Gates, who was

15   an officer at the time of the incident, and will testify that

16   he was involved in the search of Mr. Perez's cell, and that he

17   issued Mr. Perez an RVR because of Mr. Perez's conduct during

18   the cell search.

19       You have heard that Mr. Perez claims that these officers

20   conspired to retaliate against him, and did retaliate against

21   him, because of a lawsuit that Mr. Perez had previously filed.

22       The lawsuit Mr. Perez previously filed was not against

23   officers at Pelican Bay State Prison.  It was against officers

24   at another prison.  Mr. Perez claims that these officers

25   retaliated against him by trashing his cell, issuing a false

 1   Rules Violation Report, and by confiscating articles and a

 2   legal document from his cell.

 3        But I ask that you pay careful attention to the evidence.

 4   The evidence will show that these officers were following

 5   standard procedure when they searched Mr. Perez's cell.  They

 6   were following standard procedure when they confiscated

 7   documents from Mr. Perez, that were related to gang activity.

 8   And they were following standard procedure when they issued

 9   Mr. Perez a Rules Violation Report.

10        I would like to take a moment to give you some background

11   on Pelican Bay State Prison.  As you heard, Pelican Bay State

12   Prison is a maximum-security prison.  And the evidence will

13   show that the SHU at Pelican Bay, sometimes referred to as the

14   SHU, is a special unit within Pelican Bay State Prison.

15   Inmates that have been determined to be members or associates

16   of prison gangs such as the Mexican Mafia are housed there.

17   And inmates who have been -- who have shown themselves to be

18   violent while in prison are also housed there.

19        The defendants were gang investigators.  As gang

20   investigators, their duties included reviewing inmates' gang

21   status.  One thing about inmates that were housed in the

22   Security Housing Unit at that time is that every six years the

23   defendant was housed there because of their gang status, they

24   would receive a review of that gang status.

25        Officers Pimentel and Burris were assigned to review the

 1  status of inmates who had been assigned to the Security Housing

 2  Unit because of their gang status.

 3      You will hear that there were regulations in place to

 4  combat gang activity within the prisons, and that standard

 5  procedures were required in order to determine -- sorry.  That

 6  standard procedures were required when evaluating the gang

 7  status of inmates and when reviewing documents to determine if

 8  they amounted to evidence of gang activity.

 9      Next I will tell you what the evidence will show happened

10  on October 10, 2012.  You are going to hear testimony that

11  Officers Burris and Pimentel, as reviewers of inmates' gang

12  status, received an email from their supervisor.  This email

13  simply informed them that Mr. Perez needed to receive a new

14  gang validation, otherwise known as a review of his gang

15  status, because of a settlement or a court order in a previous

16  lawsuit that Mr. Perez had filed.  These officers were

17  instructed to prepare a new validation for Mr. Perez as soon as

18  possible.

19      You are going to hear testimony from Officers Pimentel and

20  Burris that they did not know Mr. Perez at the time that they

21  received this email from their supervisor.  There may be some

22  testimony regarding paperwork that Officer Burris or Officer

23  Pimentel had prepared in the past regarding Mr. Perez.  But

24  they will testify that that paperwork did not require them to

25  meet Mr. Perez, and they did not have any interaction with

1  Mr. Perez when preparing that paperwork.

2       You will also hear testimony about an email that

3  Mr. Pimentel received at some point.  He received this email

4  over a year before the incidents at issue in this case.

5       Now I want you to pay close attention this.  He received

6  an email from another officer at Pelican Bay.  An officer that

7  is not a defendant in this case.  This email did ask him to do

8  a cell search on an inmate because -- because that other

9  officer did not like the inmate.

10      But when Mister -- Mr. Pimentel will tell you that when he

11  came into the prison that day, and saw this email in his

12  in-box, he immediately forwarded it to his supervisor.  He told

13  his supervisor that he had received this inappropriate email.

14  And he did not ignore this email, nor did he go through what

15  was requested of him in that email.  Instead, he followed

16  standard procedures and did what he was trained do and reported

17  it to his supervisor.

18      You are going to hear that after Officers Pimentel and

19  Burris were ordered to prepare a new validation of Mr. Perez,

20  as soon as possible, Officers Pimentel, Healy, Gongora and

21  Gates proceeded to search Mr. Perez's cell.  It was standard

22  procedure for a cell search to be conducted while preparing a

23  gang validation.

24      The purpose of that procedure, you will hear, was so that

25  any gang-related evidence could be found in the cell.  You will

1   hear that it was standard procedure for four officers to go to

2   a cell when there were two inmates within the cell.

3        Mr. Perez had a cellmate, Mr. Guerrero.  So, four officers

4   went down to his cell.  The Security Housing Unit is a special

5   section of the prison, as I mentioned.  That means that there

6   is high security there.  And inmates cannot be released from

7   their cell unless they are placed into handcuffs.

8        So when these officers arrived at Mr. Perez's cell, they

9   first instructed Mr. Perez and his cellmate to submit to

10  handcuffs.  In addition to that, standard procedure was for one

11  of these officers to turn off the water so that the toilet

12  cannot be used to dispose of any evidence or other items in the

13  cell as they were going into the cell to search for evidence.

14       You will hear that when these officers arrived at the

15  cell, Mr. Perez and Mr. Guerrero did not fully comply with

16  orders.  The evidence will show that Mr. Guerrero began tearing

17  up notes and sticking them into the toilet, trying to destroy

18  them so that they could not be read by the gang investigators

19  after they had searched the cell.

20       You will hear that while Mr. Perez's cellmate Mr. Guerrero

21  was putting notes into the toilet, Mr. Perez was moving around

22  the cell in a manner so that he could block the view of the

23  defendant officers so that they could not see what Mr. Guerrero

24  was doing.

25       He was also moving around and blocking the hole in the

 1   door, which is known as a food port.  That hole can be used to

 2   gain compliance with orders, if necessary.

 3       Based on the conduct of Mr. Perez and his cellmate

 4   Mr. Guerrero, you are going to hear that Mr. Gates wrote a

 5   Rules Violation Report.  He wrote this report up for Mr. Perez

 6   and for his cellmate Mr. Guerrero.  Mr. Guerrero was written up

 7   for destroying evidence for putting it into the toilet.  And

 8   Mr. Perez was written up for interfering with their ability to

 9   conduct a job -- to conduct their job and to secure evidence

10   during cell searches.

11       You are going to hear that inmates are provided due

12   process while in prison.  That means that the Rules Violation

13   Report requires a hearing before an inmate is found guilty or

14   not guilty.

15       You are going to hear testimony that Mr. Perez's cellmate

16   was found guilty of the Rules Violation Report issued against

17   him, but Mr. Perez was found not guilty of his Rules Violation

18   Report.

19       However, the evidence will show that Mr. Gates did not do

20   anything wrong by issuing this Rules Violation Report.  You are

21   going to hear from the hearing officer who found Mr. Perez not

22   guilty, and he will testify that it is standard procedure for

23   officers to issue a Rules Violation Report to both inmates in a

24   cell when one of them has engaged in conduct that violated

25   prison regulations.  This is standard procedure so that an

 1  investigation can be conducted into both of the inmates'

 2  activities.

 3       You heard -- I'm sorry.  Mr. Perez may state that he was

 4  issued a Rules Violation Report several days later.  But

 5  Mr. Gates will testify and the evidence will show that he

 6  actually wrote that Rules Violation Report the day of or the

 7  next day, shortly thereafter the incident occurred.

 8       The reason Mr. Perez did not receive the Rules Violation

 9  Report until later is because it goes through several steps.

10  There are checks by Mr. Gates's supervisor, and there are other

11  procedures before Mr. Perez receives the Rules Violation

12  Report.

13       After Mr. Perez and Mr. Guerrero finally complied with

14  orders, the defendants will testify that he searched the cell

15  following standard procedure.  Mr. Guerrero and Mr. Perez were

16  placed in handcuffs and removed from the cell.

17       Officers Pimentel, Gates, Gongora and Healy were there, at

18  Mr. Perez's cell.  They then searched Mr. Perez's cell for any

19  gang items, gang-related material or other contraband that

20  might be in the cell.

21       You are going to hear that they did a thorough search.

22  That means that they searched the light fixtures and the walls

23  for any hidden items.  They searched through all of Mr. Perez's

24  clothes.  They had to search through his bedding and check the

25  mattress for anything hidden in there.

 1    You will hear that standard procedure is for them to place

 2 the clothes and the bedding and the mattress, to leave them on

 3 the bed in the cell.  However, you will also hear -- and you

 4 will also hear that they did not trash Mr. Perez's cell, and

 5 they followed standard procedure during the cell search.

 6    You are going to hear that one of these officers removed

 7 notes from the toilet.  These are the notes that Mr. Guerrero

 8 had torn up and placed into the toilet.  You are also going to

 9 hear that they followed standard procedure when they took

10 paperwork and other property from Mr. Perez's cell so that it

11 could be reviewed later by Officers Burris and Pimentel.

12    The reason why the evidence -- the evidence will show that

13 the reason they took this paperwork from Mr. Perez's cell is so

14 that it could be reviewed at another location, and Mr. Perez

15 would not have to be left out of his cell for an extended

16 period of time.

17    You are also going to hear that the defendants' memory of

18 this incident is not perfect.  They have all conducted hundreds

19 of cell searches as gang investigators.  They have all

20 conducted -- going to hear that they have all conducted dozens

21 of cell searches where they witnessed inmates trying to destroy

22 evidence or paperwork in the toilets of the cell.

23    Some of these officers will remember the incident better;

24 some will remember the incident worse.  The incident occurred

25 over three years ago, so they will tell you that everything is

 1   not perfectly clear in their memory.

 2        You will also hear testimony from Mr. Perez, his cellmate

 3   Mr. Guerrero, and an inmate in the cell next-door to them,

 4   Mr. Mendoza.  The evidence will show that these inmates had all

 5   been validated as members of the Mexican Mafia.  The evidence

 6   will show that these inmates were all friends, and that

 7   Mr. Perez had helped Mr. Guerrero and Mr. Mendoza out with

 8   legal work in the past.

 9        These inmates will -- may testify that officers made some

10   comments disparaging his lawsuit and other comments regarding

11   lawsuits when they searched the cell.  But you are also going

12   to hear testimony from the officers.  And they are going to

13   testify that they didn't make these comments, and that they

14   wouldn't make comments such as those because they hold

15   themselves to a high standard.

16        Now I'm going tell you a little bit about what happened

17   after the cell search was completed.  Mr. Perez was returned to

18   his cell.  Officers Burris and Pimentel then reviewed the

19   paperwork that had been taken from Mr. Perez's cell.  And they

20   confiscated pictures and an address book from that paperwork,

21   along with some other contraband such as magazines that were

22   over the limit for how many Mr. Perez could have in his cell.

23        You are going to hear that they then returned all of the

24   other paperwork to Mr. Perez.  You are going to see evidence

25   that they provided Mr. Perez a receipt at the time that they

OPENING STATEMENT / SEALS

```
 1  returned this paperwork to Mr. Perez.  The receipt listed all
 2  of the items that they confiscated from Mr. Perez.  And the
 3  receipt also noted that all other paperwork had been returned
 4  to Mr. Perez.
 5      Mr. Perez was then given the opportunity to sign that
 6  receipt, acknowledging that had he received his property back.
 7      You will hear that a couple weeks later, Mr. Perez filed
 8  what is called an inmate appeal.  This is a procedure that
 9  inmates have to complain about actions of officers or file
10  other complaints with the prison.  You are going to hear that
11  Mr. Perez requested some of his property back in this appeal.
12  You are going to hear that he specifically requested pictures
13  and an address book which officers -- which Officer Burris
14  acknowledges were confiscated from Mr. Perez.
15      But you are also going to hear that Mr. Perez did not
16  specifically request the return of any articles, or a legal
17  document which he now claims were confiscated at the time.
18      In summary, the evidence is going to show a few important
19  things:  That Officers Burris and Pimentel were ordered to
20  provide Mr. Perez a new gang validation.  They were informed
21  that this was because of Mr. Perez's previous lawsuit.  And
22  that it was standard procedure for them to review Mr. Perez's
23  paperwork, and to conduct a cell search in order to find any
24  future -- any additional evidence regarding Mr. Perez's gang
25  activities.
```

1      You are going hear that during the cell search, Officer

2   Gates and other officers saw Mr. Guerrero putting notes into

3   the toilet.  And that it is standard procedure to issue

4   Mr. Guerrero a Rules Violation Report for that conduct.

5      You are also going to hear that officers witnessed

6   Mr. Perez interfering with their view of Mr. Guerrero, and --

7   sorry.  And encouraging Mr. Guerrero to continue destroying the

8   property.

9      You are going to hear that issuing Mr. Perez and

10   Mr. Guerrero a Rules Violation Report for this conduct is

11   standard procedure.

12      The evidence will show that these officers did not

13   confiscate articles or legal documents from Mr. Perez.  The

14   evidence will show that these officers did not trash

15   Mr. Perez's cell.  And the evidence will show that these

16   officers did not issue Mr. Perez a Rules Violation Report

17   because of any desire to keep him in the Security Housing Unit

18   or because of Mr. Perez's previous lawsuit.

19      Please listen carefully to all of the evidence.  Mr. Perez

20   has the burden of proof by a preponderance of the evidence.

21   You will see that Mr. Perez cannot prove his case.  And at the

22   end of -- at the end of listening to all of the evidence, my

23   colleague Jennifer Nygaard will be asking to you return a

24   verdict for the Defendants.

25      Thank you.

1          **THE COURT:**  Thank you.  So we will now take a -- you

2   know what, it's a quarter to 2:00.  And instead of -- because

3   Kristen has to spend some time orienting you in the back to the

4   jury room and to the procedures and everything, I think if we

5   start with our first witness today, we are barely going to be

6   able to get any testimony in.

7          So I think it would be better in the interest of my

8   promise to you that you will always be out of here by 2:00, and

9   no later than 2:30, we will stop for the day.

10          And Kristen will take you back, show you the jury room,

11   give you your badges, exchange contact information with you,

12   answer any questions you may have about the logistics of all of

13   this.

14          Meanwhile, though, let me remind you -- I know it wasn't

15   that long ago that I gave you the instructions, but let me just

16   remind you of some of the most important aspects of them.

17          Don't have any conversations with anybody about what you

18   have seen or heard so far, other than that you are in jury

19   duty, and you have an estimate of how long it is going to last

20   and when you are going to be available and when you are not

21   going to.  This is very important.

22          And don't -- and if anybody tries to communicate with you,

23   let us know right away.  And with that, I'll let Kristen take

24   you back to the jury room and start showing you around.

25          (Jury exits the courtroom at 1:42 p.m.)

PROCEEDINGS

```
 1        THE COURT:  All right.  I just thought it would be
 2   better -- rather than having Mr. Perez testify for five minutes
 3   or 10 minutes, I thought it would be better to just call it a
 4   day.
 5        Tomorrow is the plan to call the two witnesses from
 6   Pelican Bay first, get that out of the way, to make sure we
 7   sort of plow through any potential technical glitches and
 8   whatnot?
 9        MR. LEE:  Your Honor, our plan is to -- after
10   Mr. Perez, to call one of the defendants first.  And then
11   Mr. Mendoza and Mr. Guerrero.
12        THE COURT:  My concern about that, I don't know how
13   long you anticipate Mr. Perez and one of the defendants will
14   testify.  But we've got -- we've got this lined up for the
15   prisoners to testify from Pelican Bay on Tuesday, right?  I
16   mean, that's how it's -- that's how it's been set up.
17        MR. LEE:  Right.
18        THE COURT:  How confident are you that those other
19   two defendants will be able to complete their defendant in
20   enough time for the two folks at Pelican Bay to give their full
21   testimony?
22        MR. LEE:  Well, I guess a lot depends on how long the
23   cross examination from Ms. Nygaard.  We'll defer to the Court.
24        I understand the Court -- it's a priority that the two
25   prisoners testify tomorrow.  So if the Court wants to be
```

PROCEEDINGS

1  absolutely positive that we get through them tomorrow, then --

2       **THE COURT:**  I think we should do that.  I think at a

3  minimum, you know -- I don't know if you really want Mr. Perez

4  to go first, but at a minimum, the folks up at the prison

5  should probably be the second and the third witnesses.

6       Do you folks feel confident that we'll be able to get done

7  by Tuesday?  I imagine so, but...

8       **MR. LEE:**  Certainly should, from our perspective.

9       **MS. NYGAARD:**  Yes.  We had told the prison that the

10  witnesses would be called around -- like shortly after lunch,

11  because that's what we had discussed last Friday when we were

12  here.

13       **MS. MORAN:**  We didn't confirm.  I said we would

14  discuss it internally.

15       **MS. NYGAARD:**  They can come at any point in time, but

16  the prison needs some advance notice to get the guys down into

17  the video conference room for their testimony.  So I think --

18  you know, if we can figure out now so I can let the prison know

19  tonight what time approximately the witnesses will be called.

20       **THE COURT:**  Okay, let me ask the question another

21  way, then.  If they -- if they get called after lunch, are we

22  confident that we can get them done by, you know, around --

23  let's say we call them at 12:45.  Are they going to be done by

24  2:00 o'clock?

25       **MR. LEE:**  I think so, yes.

PROCEEDINGS

1        **MS. NYGAARD:**  I think so.

2        **MR. LEE:**  Yeah, we anticipate short testimony.

3        **THE COURT:**  Why don't we just plan, regardless of

4   where we are at the lunch break, if one of the witnesses is in

5   the middle of his testimony we'll interrupt that testimony and

6   call the two witnesses from Pelican Bay immediately after

7   lunch.

8        **MS. NYGAARD:**  And they are at actually two different

9   prisons, which adds a little twist.  So, I think you wanted to

10  call Guerrero first.

11       **MR. BENEDETTO:**  Yes.

12       **MS. NYGAARD:**  Guerrero is at Pelican Bay.  I will

13  then let them know that maybe around 12:30-ish.

14       **MR. LEE:**  I suppose theoretically it could even be

15  before lunch, right?  If we're definitely going to call

16  Mr. Guerrero second, you know, Mr. Perez, I think we estimate

17  his direct to be maybe two and a half hours.  I don't know how

18  long you plan to cross him for, but...

19       **THE COURT:**  Well, I think -- I think you should

20  tell -- I think you should create a cushion here, right?  So

21  tell -- sorry, the witness from Pelican Bay is the first one

22  that you want to call?

23       **MR. BENEDETTO:**  Yes.

24       **THE COURT:**  Tell them to have him ready by noon.

25       **MS. NYGAARD:**  Yeah.

```
 1              THE COURT:  And tell them to have the second witness
 2    ready by 12:15 or something like that, or 12:30.  Just to make
 3    sure that if -- you know, if they have to -- you know, if they
 4    have to sit around for a little while, that's okay.  What would
 5    be a problem is the jury sitting around or us going past 2:30.
 6         So just tell Pelican Bay to have the witness ready by
 7    noon, and tell -- where's the other prisoner?
 8              MS. NYGAARD:  Kern Valley State Prison.
 9              THE COURT:  Tell them to have him ready by 12:30.
10              MS. NYGAARD:  Okay.
11              THE COURT:  Regarding these photographs, you know, we
12    spent some time poking around in the law on this issue, and we
13    couldn't really find anything directly on point.  I mean, if
14    Mr. Perez had taken the photos or if you had a witness who
15    was --
16              MR. BENEDETTO:  Your Honor?
17              THE COURT:  Sorry.  Go ahead.  You look like you want
18    to say something.
19              MR. BENEDETTO:  Your Honor, sorry if I cut you off.
20              THE COURT:  No, that's okay.
21              MR. BENEDETTO:  We have -- not Ninth Circuit, we have
22    out of circuit authority out of the Fifth Circuit and some
23    treatise secondary source to suggest in the absence of a
24    photographer being present a person who can lay the foundation
25    as to the photograph showing a fair and accurate depiction of
```

 1  what the photograph shows is enough to authenticate under 901.

 2          **THE COURT:**  We saw that Fifth Circuit case, too.  But

 3  was that -- okay.  So it wasn't the person taking the picture.

 4  But wasn't it a picture of the actual thing being testified

 5  about?

 6      I mean, in other words, here you've got a picture of

 7  something that looks like the thing the witness is testifying

 8  about.  And I'm not 100 percent sure if that should matter, but

 9  I think that's a different -- as I recall correctly, that's a

10  difference from the Fifth Circuit case.  And I -- you know, I

11  mean, I'll sort of buy that.

12      If it's a picture of the Golden Gate Bridge, right, and

13  somebody is testifying about --

14          **MR. BENEDETTO:**  Isn't that self-authenticating?

15          **THE COURT:**  Yeah, for now.  But, you know, this is a

16  picture of something that resembles the thing the witness is

17  testifying about.  And so that seems -- it does seem like one

18  level removed.

19      (Discussion held off the record between plaintiff's

20       counsel.)

21          **MR. BENEDETTO:**  Your Honor, the report.  The photos,

22  to my knowledge, have been pulled from the *Ashker* expert

23  report.  So it -- it wasn't sort of indiscriminately pulled.

24          **THE COURT:**  Who's *Ashker*?

25          **MR. BENEDETTO:**  The case that was settled recently

PROCEEDINGS

1  involving Pelican Bay and long-term solitary confinement.

2  These photos weren't indiscriminately pulled.

3       Again, our client can lay the foundation, we believe,

4  particularly as to the exercise yards.  And we believe that --

5  yeah.

6       **THE COURT:**  Does it matter when -- how much do you

7  care about whether they are demonstratives versus actual

8  exhibits?

9       **MR. BENEDETTO:**  I mean, we -- we believe it's -- I

10 mean, certainly we believe, at least, it should be a

11 demonstrative.  But we certainly feel that in evaluating the

12 chilling effect element, the magnitude of the threat, that it

13 would be important for the jury to have those exhibits with

14 them.

15      **THE COURT:**  Okay.  I'm going to think about it a

16 little bit further.  I am sort of tentatively inclined to allow

17 those photographs to be used.  And I'll think a little more

18 about whether it should be demonstrative or actually -- actual

19 exhibit.

20      But I'm you know, sort of -- you're going to have to sort

21 of plan for both scenarios, but I'm tentatively inclined to

22 think that it -- it's slightly weird, but that would it be

23 appropriate to use the photos to assist Mr. Perez in providing

24 his testimony.

25      Is there anything else we need to discuss right now?

```
 1          MS. NYGAARD:  Yes, your Honor.  I was -- defendants

 2    are wondering if the jury instructions are going to be coming

 3    out before Perez's testimony tomorrow?  Specifically the jury

 4    instruction on retaliation and the chilling effect.

 5          THE COURT:  Remind me your -- remind me the issue

 6    that it goes straight to Mr. Perez's testimony, that it would

 7    affect how Mr. Perez actually testifies.

 8          MS. NYGAARD:  Well, it would go -- could go to our

 9    cross examination of whether -- of whether he continued to

10    exercise his First Amendment rights after the cell search, if

11    it's going -- if we can take into account the -- if the jury

12    can take into account for the chilling effect not just a

13    prisoner of ordinary firmness, but also what Mr. Perez had

14    continued to do.

15          THE COURT:  I'll provide you some guidance on that.

16    I mean, my -- my -- I had been thinking about it up to this

17    point as a legal issue, and what the jury needs to decide.  And

18    we had some argument about this at motion in limine.  But what

19    I concluded -- I don't think there is really much dispute about

20    it -- is that the test is how the conduct would affect a person

21    of ordinary firmness.

22        But what you are saying is that what -- the fact that it

23    didn't chill Mr. Perez is probative of the impact that it would

24    have on a person of ordinary firmness.

25          MS. NYGAARD:  Correct.
```

```
 1          THE COURT:  They can argue that Mr. Perez is a person
 2   of extraordinary firmness, and you can argue:  No, it's
 3   probative of how a person of ordinary firmness would react.
 4   You're just saying it's probative on that point.
 5          MS. NYGAARD:  Yes.  That is defendants' position.
 6          THE COURT:  All right.  I'll get you some guidance on
 7   that before the end of the day.
 8          MS. NYGAARD:  Okay.  Thank you.
 9       And then a matter that we did not discuss earlier today.
10   Defendants would be making a motion to exclude non-party
11   witnesses during testimony.  Specifically, Richard Subia is the
12   only witness they have that I would be asking to have not
13   present in the courtroom during other testimony.
14          THE COURT:  Okay.  Is Mr. Subia -- has Mr. Subia been
15   in the courtroom?
16          MS. NYGAARD:  I don't think so.  I'm just -- in
17   advance of tomorrow.
18          THE COURT:  Okay.  You don't oppose that motion.
19          MR. LEE:  No.
20          THE COURT:  Motion granted.
21       Anything else?
22          MR. LEE:  Nothing from us, your Honor.
23          MS. NYGAARD:  No.
24          THE COURT:  Okay.  We'll see you tomorrow.  I'll be
25   in at about 8:00 o'clock to discuss -- to be available to
```

PROCEEDINGS

1   discuss anything that you need, but like I said, we'll issue

2   some guidance on the firmness issue today.  All right?

3       Thank you.

4           **MR. LEE:**  Okay.  Thank you, your Honor.

5           **MR. BENEDETTO:**  Thank you.

6           **MS. NYGAARD:**  Thank you.

7           **THE CLERK:**  Court is in recess.

8       (Whereupon at 1:55 p.m. further proceedings were

9        adjourned until Tuesday, November 17, 2015 at

10       8:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **I N D E X**

|                                     | **PAGE** | **VOL.** |
|-------------------------------------|----------|----------|
| Voir Dire                           | 17       | 1        |
| Instructions by the Court           | 137      | 1        |
| Opening Statement by Mr. Lee        | 143      | 1        |
| Opening Statement by Mr. Seals      | 156      | 1        |

—   —   —

*Debra L. Pas, CSR, CRR and Belle Ball, CSR, CRR*
*Official Reporters - U.S. District Court - San Francisco, California*
*(415) 431-1477*

**CERTIFICATE OF REPORTER**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Monday, November 16, 2015