```
                                          Volume 2

                                          Pages 179 - 377

                 UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE VINCE CHHABRIA

JESSE PEREZ,                        )
                                    )
           Plaintiff,               )
                                    )
   VS.                              ) No. C 13-5359 VC
                                    )
A. GATES, et al,                    )
                                    )  San Francisco, California
           Defendants.              )  Tuesday
                                    )  November 17, 2015
_____ )  8:00 a.m.
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

```
For Plaintiff:            WILMER CUTLER PICKERING HALE DORR, LLP
                          350 South Grand Avenue
                          Suite 2100
                          Los Angeles, California 90071
                    BY:   RANDALL ROSS LEE, ESQ.
                          MATTHEW DONALD BENEDETTO, ESQ.
                          KATHLEEN BRIDGET MORAN, ESQ.


For Defendant:            STATE OF CALIFORNIA
                          Office of the Attorney General
                          455 Golden Gate Avenue
                          Suite 11000
                          San Francisco, California 94102
                    BY:   JENNIFER J. NYGAARD, ESQ.
                          ELLIOTT THOMAS SEALS, ESQ.
```

*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
              *Belle Ball, CSR 8785, CRR, RMR*
              *Official Reporters - US District Court*

PROCEEDINGS

```
1                      P R O C E E D I N G S

2   NOVEMBER 17, 2015                                8:23 A.M.

3        (The following proceedings were held outside of the

4         presence of the jury)

5            THE CLERK:  Calling Case No. 13-CV-5359, Perez v.

6   Gates, et al.  Please state your appearances for the record.

7            MR. LEE:  Good morning, Your Honor.  Matthew Lee,

8   Matthew Benedetto, and Katie Moran.

9            MS. NYGAARD:  Jennifer Nygaard for the Attorney

10  General's office for defendants, along with Elliott Seals, also

11  from the Attorney General's office.

12            THE COURT:  Good morning.

13            MS. NYGAARD:  Good morning.

14            THE COURT:  So a couple of things that I have, and

15  then you all may have stuff for me as well.

16        With respect to the photographs and whatnot, I did some

17  research on it last night.  It doesn't seem like there's

18  anything sort of directly on point.  I found somewhat useful a

19  Seventh Circuit opinion from 2013, I'm forgetting -- Diane Wood

20  was the author.  I'm forgetting the name of the case right now,

21  but I found it very educational in terms of talking about sort

22  of the difference between demonstratives and substantive

23  evidence.

24        And sort of based on that discussion, and the other

25  research that I did, my inclination would be to allow the
```

 1   photographs to be used but only as demonstratives.  That is to

 2   say, only to help Mr. Perez describe what he's trying to

 3   describe.  But not as substantive evidence.  So that's my

 4   ruling on that.

 5        Another thing, Mr. Lee, I was -- I overruled the objection

 6   because I don't -- I didn't think it was necessary to shut you

 7   down during opening statement, sort of your own, you know,

 8   little problem that you were creating for yourself.  But I was

 9   surprised to hear you talking about Mr. Perez's childhood and

10   abusive -- that he had an abusive childhood, and he fell in

11   with the wrong crowd.  I'm not allowing you to examine

12   Mr. Perez about that.

13        And if I did allow it, by the way, I mean, it seems to

14   me -- and this is for both sides -- you don't seem to have paid

15   terribly close attention to my rulings on the motions in

16   limine.  Because if you did bring that stuff in about his

17   childhood and falling in with the wrong crowd, you would be

18   opening the door for evidence about the crime he committed and

19   any other wrongful conduct he engaged in before going to

20   prison.  And I can't believe you, you know, would want that.

21        Sorry, go ahead.

22             **MR. LEE:**  No, I'm --

23             **THE COURT:**  So, I'm not -- I mean, I'm not allowing

24   you to go -- and most importantly, it's not relevant.  I mean,

25   you know, his childhood is not relevant to this case.  So, you

1   know, you can -- you can elicit sort of basic biographical

2   information from him to sort of set the stage, where were you

3   born, where did you grow up, where did you go to school, things

4   like that.

5       But getting into the substance of his childhood or whether

6   he fell in with the wrong crowd or the right crowd, I don't see

7   how that's -- I don't see how that's appropriate to get into in

8   this case.

9           MR. LEE:  That's fine, Your Honor.  Obviously we're

10  mindful of the Court's view on that.  It really was meant as

11  biographical context.  I think we were very careful about

12  honoring the Court's ruling.  I was very safe to say he was,

13  you know, charged, convicted of a felony, ended at that.

14      When I spoke about the gang validation, I was very careful

15  not to address the substance of the validation, the merits of

16  the actual determination.  I intended --

17          THE COURT:  Yeah, but you need to -- the sort of

18  basic rule of trial lawyering is you have to be careful not to

19  open the door to a change in a favorable motion in limine that

20  you got.

21      And I'm not -- you know, I was sort of considering whether

22  to rule right now that the state can go into the crime that

23  Mr. Perez committed that got him incarcerated and anything else

24  about his background they wanted to go into in response to what

25  you did in your opening statement.  But because I instructed

1  the jury pretty strongly about the relative lack of importance

2  of your opening statement, when you started talking about his

3  childhood, I'm not going to do that.

4       But I mean, I just want to remind everybody that, you

5  know, you run the risk of, you know, getting the motion in

6  limine rulings that were favorable to you changed if you open

7  the door.

8       And the state, I mean, you know, you -- you either

9  violated or came very close to violating my motion in limine

10  about -- my motion in limine ruling about the gang status of

11  Mr. Perez and his cellmate and the two witnesses who -- who are

12  testifying on his behalf.  I'm not sure if you violated it, but

13  you came very close.

14            **MR. SEALS:**  Can I respond?

15            **THE COURT:**  Go ahead.

16            **MR. SEALS:**  I believe I only referred to his status

17  as a Mexican Mafia, as a validated member of -- associate.

18            **THE COURT:**  Yeah, but then you went into their

19  motivation for helping each other.  And --

20            **MR. SEALS:**  Well, I believe --

21            **THE COURT:**  -- to the extent that you link their gang

22  status to their motion -- their motivation for helping each

23  other you have effectively -- you are effectively saying they

24  are gang members and they are helping each other.

25            **MS. NYGAARD:**  But Your Honor, the motions in limine

1  that plaintiffs filed was specifically directed towards his

2  street gang status.

3       Now, there's a difference between a street gang and a

4  prison gang.  His street gang was Colton, Northside Colton or

5  something like that.  His prison gang is Mexican Mafia

6  associate.  And nobody's disputing that he has been validated

7  as an associate of the Mexican Mafia.

8       We were respectful of not mentioning his street gang.

9            **MR. BENEDETTO:**  Two points on this, Your Honor.

10 First Mr. Seals, reading from no cards, said "The inmates had

11 all been validated as members of the Mexican Mafia."  That's a

12 factually untrue statement.

13           **MS. NYGAARD:**  It is.

14           **MR. BENEDETTO:**  Second, the Motion in Limine No. 2

15 with respect to Mr. Guerrero and Mr. Mendoza was more expansive

16 than the motion in limine with respect to Mr. Perez.  It

17 referred to all gang activity.

18      And this was specifically addressed at the pretrial

19 conference and the hearing on the motions, in which we believe

20 the Court made it quite clear that under Rule 403, reference to

21 whether or not Mr. Perez or Mr. Guerrero or Mr. Mendoza were in

22 a prison gang would be unduly prejudicial.  And we believe that

23 Mr. Seals' statement was a clear violation of the order.

24           **THE COURT:**  Yeah, I think it probably was, actually.

25 I just went back and read my ruling on the motion in limine.

 1   And it said that they may not refer to the -- to their gang

 2   affiliations.

 3           MR. BENEDETTO:  (Nods head)

 4           THE COURT:  And so anyway, I mean, what -- opening

 5   statements aren't that important.  I made clear to the jury

 6   that they are not that important, and you know, the jury's been

 7   instructed to consider only the evidence, and only use

 8   arguments by the lawyers to assist them in understanding the

 9   evidence.

10       But I just am concerned, frankly that, both sides haven't

11   really given careful thought to, you know, the motion in limine

12   rulings.

13       It's also, you know, the other one that sort of raised my

14   eyebrows was the, you know, continued objection to the email

15   about the cell search or the requested cell search from a year

16   ago.  I mean, we already went through that.  We already dealt

17   with that issue.

18       So, I would just encourage both sides to, you know, hew a

19   little more closely to the in limine rulings and remember that

20   if you have got a favorable ruling you are still in danger of

21   opening the door to having that ruling changed.

22           MS. NYGAARD:  And Your Honor, on that point, in

23   Mr. Lee's opening statement he specifically said that Mr. Perez

24   knew -- at the time of these events, Mr. Perez knew that he did

25   not have on his record a serious violation of prison rules.

PROCEEDINGS

```
 1       That's a flat-out incorrect statement.  He did have

 2   serious violations of prison rules.  He didn't have one with

 3   the gang nexus, which is what kind of is at issue in this case.

 4   So we believe that they have opened the door now to make

 5   Mr. Perez look like he had never had violated a prison rule.

 6   And we believe that it's fair for us to bring that up now.

 7           THE CLERK:  Counsel, can you step to the podiums,

 8   please, and speak into the microphones?  Those ones don't work

 9   very well.

10           MS. NYGAARD:  Okay.

11           THE COURT:  Yeah, I don't remember exactly what -- I

12   remember --

13           MS. NYGAARD:  I have --

14           THE COURT:  I remember raising my eyebrows at that

15   statement by Mr. Lee as well.  But I don't remember exactly

16   what he said on that point.

17           MS. NYGAARD:  Do you have the transcript?  I can show

18   it to you (Indicating).

19           MR. LEE:  Your Honor --

20           MS. NYGAARD:  Page --

21           MR. LEE:  Ms. Nygaard is correct.  That was a

22   misstatement by me.  I meant to say serious rules violation

23   with a -- she's correct.  There is a -- with a gang nexus.

24           THE COURT:  Uh-huh.

25           MR. LEE:  I didn't mean to suggest -- I mean, we were
```

1  well aware that he has other rules violations.

2  **THE COURT:** Uh-huh.

3  **MR. LEE:** And so the specific issue is rules

4  violation with a gang nexus.

5  **THE COURT:** Okay.

6  **MR. LEE:** So, I -- Ms. Nygaard is correct.

7  **THE COURT:** So I think you can cure that in your

8  direct examination of Mr. Perez, probably?

9  **MR. LEE:** Yes, yes.

10  **THE COURT:** Right?

11  **MR. LEE:** Yes, yes.  We can make very clear he had no

12  serious rules violation with a gang nexus.

13  **THE COURT:** Well, I mean, I -- I'm not going to let

14  the government get into the details of it, but I do think it

15  would be appropriate, given your misstatement, that the

16  government say -- the government ask Mr. Perez a question along

17  the lines of "Well, you don't have any serious rules violations

18  with a gang nexus but did you have other -- you did have other

19  rules violations, didn't you?"

20      And not get into what they were, but at least ask that one

21  question to -- to clear up the misimpression that Mr. Lee gave

22  in his opening statement.

23  **MS. NYGAARD:** Your Honor, defendants would

24  specifically request to be able to at least mention a number,

25  so like, for example, "You didn't have anything with a gang

1   nexus but you did have at least..."

2          THE COURT:  "Other rules violations" is enough.

3          MS. NYGAARD:  Okay.

4          THE COURT:  Anything else?

5          MR. BENEDETTO:  No.  No, Your Honor.

6          MS. NYGAARD:  Oh, I do have one other issue.  I just

7   wanted to bring to your attention, Your Honor, that one of the

8   defendants, Sergeant Gates, has a medical condition and is on

9   some medication that can sometimes cause him to have dizzy

10  spells.

11         So if at some point during the trial he feels like he is

12  going to pass out or faint, we would be asking -- if we could

13  just ask for a short recess so we can take care of that.

14         THE COURT:  Any time.  Any time.  Just let me know.

15  And if it's necessary to, you know, give the jury some sort of

16  instruction about that I'll do that as well.  Just let me know.

17         MS. NYGAARD:  Thank you.

18         MR. BENEDETTO:  I guess one final thing, Your Honor,

19  is whether the Court had a preference with respect to certain

20  exhibits that the parties have stipulated to, to preadmit them

21  before testimony starts.  Or do you want to handle that in the

22  course of direct testimony?

23         THE COURT:  You can pre-admit them, you can move to

24  admit them during direct testimony, you can post-admit them.

25         I mean, with post-admitting, I find that people generally

1   have a hard time keeping track of exhibits they need to

2   post-admit.

3             MR. BENEDETTO:  Right.

4             THE COURT:  So, that's your preference.  However you

5   want to handle it.

6        (Off-the-Record discussion between counsel)

7             MR. BENEDETTO:  Yeah, we have a list that we could

8   pre-admit now.

9             THE CLERK:  Okay.

10            THE COURT:  That's fine.  So I take it we've now --

11   we are now clear on which -- there are no additional disputes

12   about admissibility of exhibits in connection with Mr. Perez's

13   testimony?  We've resolved all that?

14            MR. BENEDETTO:  Yeah, we believe --

15            THE COURT:  Okay.

16            MR. BENEDETTO:  -- there are no issues.

17            THE COURT:  Okay.

18            MR. BENEDETTO:  So, the exhibits to be preadmitted

19   would be 1, 3, 4, 8, 11, 22, 49, 50, and 68.

20            THE COURT:  Ms. Nygaard?

21            MS. NYGAARD:  Yes.  Defendants stipulate to those

22   being admitted.

23            THE COURT:  Okay.  Those will be admitted.

24        (Trial Exhibits 1, 3, 4, 8, 11, 22, 49, 50, and 68

25         received in evidence)

```
 1            THE COURT:  Great.  Anything further?

 2            MS. NYGAARD:  Thank you.

 3            THE COURT:  Okay, great.  Probably be back in a

 4   couple of minutes.  I don't know, there was some big BART

 5   delays this morning.

 6            MS. NYGAARD:  That is one other issue.  Our paralegal

 7   Jocelyn was caught in that, so she's due to -- oh, she's here

 8   now.  Okay, thank you.

 9            THE COURT:  Okay.  So, be back in a couple of

10   minutes, probably.

11         (Recess taken from 8:31 a.m. to 8:44 a.m.)

12         (The following proceedings were held in open court,

13          outside the presence and hearing of the jury.)

14            THE COURT:  All right, so everyone's going to remain

15   seated for this when the jury comes in, so that Mr. Perez is

16   not put in an uncomfortable position.  We all agree that this

17   one time we won't rise for the jury.

18         Okay, go ahead and bring them in.

19         (The following proceedings were held in the presence

20          of the Jury)

21            THE CLERK:  Remain seated, come to order.

22            THE COURT:  Okay.  You can proceed with your first

23   witness.

24            MR. BENEDETTO:  Plaintiff calls Jesse Perez.

25            THE COURT:  Mr. Perez, you will be sworn in now.
```

1       **THE CLERK:**  Please raise your right hand.

2                               **<u>JESSE PEREZ</u>**,

3   called as a witness for the Plaintiff herein, having been first

4   duly sworn, was examined and testified as follows:

5       **THE CLERK:**  Thank you.  For the record please state

6   your first and last name, and spell both.

7       **THE WITNESS:**  Jesse Perez.  J-E-S-S-E, P-E-R-E-Z.

8       **THE CLERK:**  Thank you.

9                       **<u>DIRECT EXAMINATION</u>**

10  BY MR. BENEDETTO:

11  Q    Good morning, Mr. Perez.

12  A    Good morning.

13  Q    Please introduce yourself to the Court.

14  A    Good morning.  My name is Jesse Perez.

15  Q    How old are you, Mr. Perez?

16  A    I'm 35 years old.

17  Q    Are you currently incarcerated?

18  A    Yes.

19  Q    This is because you were convicted of a felony?

20  A    Yes.

21  Q    How old were you when you were arrested for that felony?

22  A    Fifteen years old.

23  Q    How old were you when you were incarcerated?

24  A    Fifteen.

25  Q    Where are you currently incarcerated?

1   **A**     At Pelican Bay State Prison, in the general population.

2   **Q**     What does it meant to be in the general population?

3   **A**     As opposed to --

4   **Q**     As opposed to the Security Housing Unit?

5   **A**     There is a vast difference.  In the general population you

6   are able to enjoy way more privileges.  One of the primary

7   benefits is that you are able to interact with people in a

8   congregate setting.

9   **Q**     How long have you been in the general population at

10  Pelican Bay?

11  **A**     Since December of 2003, just shy of two years.

12  **Q**     Since December of 2003?

13  **A**     Excuse me.  2013.

14  **Q**     Where were you housed before December of 2013?

15  **A**     At Pelican Bay Security Housing Unit.

16  **Q**     Do people call that the SHU?

17  **A**     Yes.

18  **Q**     Is the SHU referred to by any other name?

19  **A**     Yes.  The SHU is oftentimes called "solitary confinement."

20  **Q**     How long were you housed in the SHU?

21  **A**     Counting the time I spent in the other SHU I was at, ten

22  years, nine months, and six days.

23  **Q**     Were you housed alone in the SHU that whole time?

24  **A**     When I was in Pelican Bay SHU, I was housed alone for the

25  first eight years.  And in December -- in mid 2012, I was

PEREZ - DIRECT EXAMINATION / BENEDETTO

1   permitted to have a cellmate.

2   **Q**    And what was your cellmate's name?

3   **A**    Rudy Guerrero.

4   **Q**    Did you know Mr. Guerrero before he became your cellmate?

5   **A**    Yeah.  I met Rudy prior to my incarceration.  He and I

6   grew up in the same neighborhood.  I guess he asked to become

7   my cellmate, and the request was approved.

8   **Q**    And where did you grow up?

9   **A**    I grew up in Colton, California.  It is a small city in

10  the County of San Bernardino, southern California.

11  **Q**    Is that southern California?

12  **A**    Yes.

13  **Q**    Do you have siblings?

14  **A**    Yes.

15  **Q**    How many?

16  **A**    Three.

17  **Q**    And how old are they?

18  **A**    I have a younger brother; he's, I believe, 33 years old.

19  And a younger sister; she might be 32.  And an older sister.

20  She's 36, I believe.

21  **Q**    When were you sent to the Pelican Bay SHU?

22  **A**    This would be December of 2003.

23  **Q**    And where were you before that?

24  **A**    In the Security Housing Unit at Tehachapi, California, the

25  California Correctional Institution.

 1  Q    Were you ever in the general population at Tehachapi?

 2  A    Yes.

 3  Q    How long were you in the general population there?

 4  A    Approximately 13 months.

 5  Q    And, where is Tehachapi relatively in the state of

 6  California?  Is it northern California?  Central?

 7  A    It's relatively close to central California.

 8  Q    What happened that caused you to be assigned to the

 9  Pelican Bay SHU in December of 2003?

10  A    So, on March 13, 2003, an institutional gang investigator

11  determined that I was a gang affiliate.

12  Q    And at the time, in 2003, was that determination enough to

13  send you to the SHU?

14  A    At the time, it was.  All this has recently changed as of

15  2013.  But at that time, if you were determined to be an

16  associate of a prison gang, you would be automatically assigned

17  to solitary confinement.

18  Q    And was that the case even if you had not committed any

19  crimes in prison?

20  A    Yeah.  All it took was a gang validation.

21  Q    How long was your sentence to the SHU?

22  A    Indeterminate.

23  Q    And what does that word mean?

24  A    There's no release date.  They could keep me in there as

25  long as they want.  Had I done something wrong, committed a

1  crime, hurt somebody, they would have gave me a determinate

2  sentence.  Something like --

3  **Q**    And is a determinate sentence different from an

4  indeterminate sentence?

5  **A**    Yeah, a determinate sentence is basically nine months, 15

6  months.  You complete that, you get out to general population.

7       But a gang validation is considered an administrative

8  measure.  So because of that, you would stay in the Security

9  Housing Unit until the IGI would determine that you are no

10 longer an associate, or you die.

11 **Q**    Now, you have used the phrase "gang validation."  Can you

12 help the jury understand, what is a gang validation?

13 **A**    Sure.  A gang validation, so the California Department of

14 Corrections or the CDCR has developed and implemented a

15 procedure through which it purports to determine whether

16 somebody is a validated -- or excuse me, a prison gang

17 associate or a member.  They call this the validation process.

18 **Q**    And, how does the CDCR decide -- strike that.

19      What is your understanding of how the CDCR decides whether

20 a prisoner is affiliated with a prison gang?

21 **A**    You mean the process through which?

22 **Q**    Correct.

23 **A**    Okay.  So, the validation process is largely driven by an

24 institutional gang investigator.  The bulk of the process is

25 conducted through the investigation.

1    The investigation takes various forms.  It can be a cell

2  search; it could be a review of the central file of the

3  prisoner being targeted for a validation.  It could be reading

4  through the prisoner's mail or other prisoners' mail to

5  determine if the targeted prisoner is being mentioned.

6    That's pretty much the bulk of the procedure.

7  **Q**   And, once that part of the procedure is complete, is there

8  a second step?  Or what happens next?

9  **A**   Sure.  So, once the IGI has determined that there is

10  sufficient source items to validate somebody as a gang

11  associate, those source items are put together in what is

12  called a gang validation packet.

13    That packet is then forwarded to Sacramento for what is

14  called, I believe, a quality review check.

15  **Q**   And are there different levels of validation?

16  **A**   Yes.

17  **Q**   Do you know what I mean by that?

18  **A**   Yes.  There's two levels.  You can be validated as an

19  associate or you can be validated as an actual member.

20  **Q**   And in 2003, were you validated as a gang associate or as

21  a gang member?

22  **A**   As an associate.

23  **Q**   And once you are validated as a gang associate -- let me

24  rephrase this.

25    In 2003, once an inmate was validated as a gang associate,

PEREZ - DIRECT EXAMINATION / BENEDETTO

1  where was that associate then housed?

2  **A**    At the time, once you are validated, you are automatically

3  assigned to solitary confinement.

4  **Q**    And once you have been -- once an inmate has been assigned

5  to the SHU, are you aware of any way to get out of the SHU?

6  **A**    There's two ways.  One of them is called the debriefing

7  process.  And the other one is called the active/inactive

8  process.

9  **Q**    We will go one by one.  So you said debriefing?

10  **A**    Yes.

11  **Q**    And what is debriefing?

12  **A**    So, the California Department of Corrections has also

13  developed and implemented a separate process.  This process

14  requires an individual to undergo validation -- excuse me --

15  the debriefing process, to actually put his safety and the

16  safety of his family at risk by identifying information of

17  other individuals so that the department can determine that he

18  has dis-associated himself from the gang he's been validated as

19  an associate member of.

20  **Q**    And there was a second way?

21  **A**    Yes.

22  **Q**    What is that?

23  **A**    The second way is the active/inactive review process.  It

24  pretty much mirrors the same initial validation process.  The

25  only exception or the only difference, really, is that rather

1   than requiring three source items to validate somebody, it only

2   requires one.  One source item.

3   **Q**   And that, you said, was the active/inactive process?

4   **A**   Yes.

5   **Q**   When you were in the SHU, how big was your cell?

6   **A**   My cell was 8x10, about 80 square feet.  About the size of

7   a small parking space.

8   **Q**   Is there natural light?

9   **A**   No.

10  **Q**   How many different SHU cells have you been assigned to?

11  **A**   Approximately five or six.

12  **Q**   And, do you remember what they were or what their numbers

13  were?

14  **A**   Sure.  I was assigned to -- well, maybe some background on

15  how the configuration of the Security Housing Unit, is to

16  provide better understanding for the jury, for the public.

17      In Pelican Bay, there's two facilities.  These facilities

18  are broken down or assigned an alphabetical letter.  Facility C

19  and Facility D.  Those are two different facilities.  But they

20  are the exact same replica.

21      I was assigned to C-1, 201.  I was assigned -- then I was

22  moved to D Facility.  There, I was assigned to Delta 5, 117, I

23  believe.  And 108.

24  **Q**   200 and 100, does that refer to upstairs and downstairs?

25  **A**   All of the numbers that start with 1 refers to the bottom

1  stairs cells.  2 refers to the upper stairs -- upper tier,

2  excuse me.

3       MR. BENEDETTO:  I would like to show Mr. Perez a

4  photograph that has been marked as a demonstrative as Exhibit

5  15.

6       THE COURT:  You may do so.

7     (Photograph displayed)

8  BY MR. BENEDETTO:

9  Q    Did that pop up on your screen, like magic?

10 A    Yes.

11 Q    Is this an accurate reflection of what your SHU cell

12 looked like?

13 A    This is an exact replica of what my SHU cell looked like.

14 Q    Where did you eat?

15 A    Alone, in the cell.

16 Q    How do you get your food?

17 A    Through a tray slot on the front of the cell door.

18 Q    So, you don't leave your cell to go to a cafeteria.

19 A    No.

20 Q    Did you have any recreational opportunities?

21 A    Prisoners in solitary confinement are not allowed to have

22 recreational opportunities, other than a dog run.

23 Q    And what do you mean by "a dog run"?

24 A    It's basically a separate cell, approximately the size of

25 two cells put together, with 20-foot-tall walls and metal mesh

 1  roof at the top.  Covered by half of -- thin plastic to kind of

 2  protect you from the rain or the weather.

 3  Q   And is this what the Pelican Bay SHU calls its exercise

 4  yard?

 5  A   Yes.

 6        MR. BENEDETTO:  I would now like to show Mr. Perez a

 7  photograph that has been marked as a demonstrative as Exhibit

 8  20.

 9        THE COURT:  You may.

10     (Photograph displayed)

11        THE COURT:  And you my publish it to the jury.

12  BY MR. BENEDETTO:

13  Q   Do you see this?

14  A   Yes.

15  Q   Mr. Perez, what does this photograph show?

16  A   This is inside of a dog run which acts as an exercise

17  yard.

18  Q   That we were just talking about.

19  A   Yes.

20  Q   And when you were in the SHU at Pelican Bay, how often

21  would it be that you would see the exercise yard?

22  A   I would be given access to the exercise yard approximately

23  -- every day for an hour and a half.

24        MR. BENEDETTO:  I would like to show Mr. Perez a

25  photograph that has been marked as a demonstrative as Exhibit

1    21.

2              **THE COURT:**  You may.

3         (Photograph displayed)

4    **BY MR. BENEDETTO:**

5    **Q**    Mr. Perez, do you know what this is a photograph of?

6    **A**    This is another photograph of a dog run in the Security

7    Housing Unit at Pelican Bay.

8    **Q**    So the two spaces that we have just talked about, your

9    cell and these exercise yards, are these the only two spaces

10   inside Pelican Bay where you were allowed to be for most of a

11   decade?

12   **A**    Yes.

13   **Q**    How did you spend the other 22 and a half hours in a day?

14   **A**    In my cell.  Most of the time, I spent it either studying,

15   reading; I read a lot.  Exercising.  Trying to develop my art

16   skills.

17   **Q**    And while we are on this, in terms of the cells you have

18   been in at Pelican Bay, you listed in the C Pod and a couple in

19   the D Pod.  Are there any other cells that you remember from

20   the D Pod?

21   **A**    Yeah.  113.  215.

22   **Q**    Okay.  When you were in the SHU, did you have any

23   educational opportunities?

24   **A**    Prisoners in solitary confinement don't have any

25   educational opportunities.  You are allowed to have books in

PEREZ - DIRECT EXAMINATION / BENEDETTO

```
 1  your cell.  I believe some of the teachers in the general

 2  population send some materials to the prisoners in the Security

 3  Housing Unit.  Other than that, it's just you and a book.

 4  Q    What about visiting people?

 5  A    There are no contact visits in solitary confinement.

 6  Q    What is a contact visit?

 7  A    A contact visit is where you are allowed to be in the same

 8  room with your family members, you are allowed to hug, hold

 9  hands, and play cards.

10  Q    Did you have any contact visits while you were in the SHU?

11  A    No.

12  Q    Were you able to have contact visits with your family?

13  A    In solitary confinement?

14  Q    In solitary confinement.

15  A    No.

16  Q    Could you use the phone?

17  A    There is no phone access in solitary confinement.

18  Q    Are there any exceptions to that rule?

19  A    No.  Just to give you an example, I -- I tried to request

20  an exception.  I received a letter informing me that my brother

21  had been involved in a roadside bomb while he was deployed in

22  Iraq.  And I was very concerned about his health and his

23  safety, so I requested to have a telephone call with him.  But

24  it was denied.

25  Q    Okay, so you can't -- you can't have a contact visit with
```

 1  them and you can't pick up the phone.  So, how did you

 2  communicate with your family?

 3  **A**    The entire time I was in solitary confinement, the only

 4  way to communicate was through handwritten letters.

 5  **Q**    I believe you testified that you were in the general

 6  population at Tehachapi, a separate facility?

 7  **A**    Yes.

 8  **Q**    And when you were there, were you able to see your family

 9  more often?

10  **A**    Sure.  Tehachapi is approximately three, four hours away

11  from my family.  So they're able to make the trip, more often.

12  Approximately every other week.

13  **Q**    And how often would you speak to your family when you were

14  at Tehachapi?

15  **A**    Every day.  When I was in general population, I could use

16  the phone.  I would call my family, stay in touch with them.

17  **Q**    And, why would you speak to them every day?

18  **A**    In my youth I made some pretty bad choices, so I was

19  determined to be a positive presence in my life -- in my family

20  life.  So I would reach out, particularly to my younger

21  brother.  I was trying to counsel him so that he would avoid

22  some of the pitfalls that I couldn't while growing up.  So that

23  was a primary interest of mine.

24  **Q**    And since you have been moved to the general population at

25  Pelican Bay, have you been able to speak with your family more

1  often?

2  **A**    Sure.  I could use the phone pretty much on a daily basis,

3  if there's no lockdowns or any type of disruption in the

4  program.

5  **Q**    Did your participation in your life -- in the family or

6  your family's life, did your participation in your family's

7  life change when you were assigned to the SHU?

8  **A**    Essentially I couldn't participate in my family life

9  anymore.  I was sort of relegated to just being an observant.

10  I would hear about what takes place in my family weeks after

11  the event took place.  So yeah, I was relegated to pretty much

12  just an observant.

13  **Q**    How do you see the prisoners around you in the SHU handle

14  being in the SHU?

15          **MS. NYGAARD:**  Objection, relevance.

16          **THE COURT:**  I'll sustain it, on vagueness grounds.

17  **BY MR. BENEDETTO:**

18  **Q**    While you were in the SHU, did you ever witness -- see or

19  hear -- other inmates in the SHU ever have any sort of mental

20  breakdown?

21  **A**    Sure.  During my time in solitary confinement I observed

22  several prisoners that were not as effective at adapting at

23  those environment.

24      Just to use some examples, when I was moved to C1, 201,

25  the first night I was there I would hear voices coming from the

1  lower cell.  One of them was a dominant voice and the other was

2  sort of a submissive voice.  And, I assumed that there was

3  actually two people in the cell.

4      A couple of days later when I went to the shower, I looked

5  in there.  There was only one person.  So it was apparent that

6  the individual in that cell was actually acting out two

7  different roles.  And in doing so, he would be aggressive

8  towards the other imaginary person.  And you could hear him

9  beat himself.

10  **Q**   We are going to shift topics.

11  **A**   Okay.

12  **Q**   Aside from the lawsuit that brings us to this courtroom

13  today, had you filed any other lawsuits against prison

14  officials?

15  **A**   Yes.

16  **Q**   One lawsuit?

17  **A**   Yes.

18  **Q**   And, what was the subject matter of that lawsuit?

19  **A**   That lawsuit challenged the validation procedure that I

20  underwent in 2013.  It challenged the Constitution --

21  **Q**   Did you say the validation procedure you underwent in

22  December of 2013?

23  **A**   Excuse me.  2003.  It challenged the constitutionality of

24  that procedure.  Specifically, I alleged that the procedure was

25  conducted without providing me notice of the evidence used

 1  against me and an opportunity to refute the evidence.

 2  **Q**    And who did you sue?

 3  **A**    A couple of Institutional Gang Investigators and other

 4  correctional officers involved in that validation procedure.

 5  **Q**    When did you file the lawsuit?

 6  **A**    This would have been in April of 2005.

 7  **Q**    Now, I believe -- you have testified that you were in --

 8  first placed in the SHU in 2003.  Is that right?

 9  **A**    Yes.

10  **Q**    So, why did you wait the two years?

11  **A**    I actually had to take the time to educate myself on the

12  law, the adversarial process, the litigation process.  It's not

13  -- you just don't wake up one day, and say "I know how to file

14  a lawsuit."  So I had to actually take the time to educate

15  myself on how -- how to proceed in that regard.

16  **Q**    And how did you do that?  How do you learn?

17  **A**    It wasn't easy.  It was slow going at first.  Actually, it

18  was an uphill battle, really.  I would go to the law library

19  and read everything I could.

20  **Q**    And did Pelican Bay have a law library in the SHU?

21  **A**    Yes.

22  **Q**    And how did you get to the law library?

23  **A**    Officers will come to the cell, open up the tray slot and

24  shackle you up and escort you to the law library.

25        **MR. BENEDETTO:**  Your Honor, I would like to show

1   Mr. Perez a photograph that has been marked as a demonstrative

2   as Exhibit 19.

3           **THE COURT:**  Hold on.

4           **MR. BENEDETTO:**  Sure.

5           **THE COURT:**  Okay, that's fine.

6           **MR. BENEDETTO:**  Thank you.

7       (Photograph displayed)

8   **BY MR. BENEDETTO:**

9   **Q**    Is that image on your screen?

10  **A**    Yes.

11  **Q**    Is this the hallway that you would walk down to go to the

12  SHU law library?

13  **A**    Yes.

14  **Q**    Does this hallway have a name?

15  **A**    Yeah, it's informally referred to as "The long corridor."

16  **Q**    And are those doors on the corridor?

17  **A**    Yes.  As you look down the corridor, you can see actually

18  several doors.  Those doors are for housing units.

19  **Q**    How often were you allowed to go to the law library?

20  **A**    Given the large volume of people that request access to

21  the law library, you would probably get access to the law

22  library, on average, twice a month.

23  **Q**    And did the law library have, you know, stacks of books?

24  **A**    No.

25  **Q**    Can you tell the jury what the Pelican Bay SHU's law

 1   library looked like?

 2   **A**   You have cages, metal cages.  They are --

 3   **Q**   Did you say "cage"?

 4   **A**   Yeah, metal cages.  If you could picture a coffin standing

 5   right-side-up.  Slightly bigger, approximately seven feet tall,

 6   two and a half inches -- I mean excuse me, feet, wide.

 7        Those are used when there is no room in the visiting cells

 8   that are -- I guess they have been reconfigured for purposes

 9   of the law library, but yeah, those are the two areas where you

10   would actually attend the law library.

11   **Q**   And somebody would hand you a book through the cage?

12   **A**   Through a tray slot, yes.

13   **Q**   One book at a time?

14   **A**   Yes.

15   **Q**   What is the last year of formal education that you have?

16   **A**   The last year of formal education that I attended was

17   seventh grade.

18   **Q**   In 2005, had you taken any courses in prison?

19   **A**   No.

20   **Q**   Had you had any legal training?

21   **A**   No.

22   **Q**   Had you ever worked in a law office?

23   **A**   No.

24   **Q**   Any lawyers in your family?

25   **A**   No.

1  Q    Did you know any lawyers when you were growing up in

2  Colton?

3  A    No.

4  Q    Did you know how to read a law book?

5  A    No.  That was actually one of the most difficult parts,

6  how to figure out exactly how information is organized in law

7  books, in cases.

8       So just to give you kind of a description, it is kind of

9  sort of putting together a 100-piece jigsaw puzzle in the dark.

10 Do you know what I mean?

11 Q    I do.

12 A    Yeah, so that was pretty much my experience.  Yeah, it was

13 difficult.

14 Q    Did you have anyone to teach you?

15 A    No.

16 Q    How did you learn to write legal documents?

17 A    That was another challenge as well.  What I would do is I

18 would actually look for some of the briefs that I could come

19 by, some of the people that actually are fighting their

20 criminal convictions, and I would read them, kind of get the

21 idea of the formatting.  And I would try to emulate it as much

22 as I can.

23 Q    How did you learn about the United States Constitution?

24 A    I read it.

25 Q    Who represented the defendants in your 2005 lawsuit?

```
 1              MS. NYGAARD:  Objection, relevance, Your Honor.

 2              THE COURT:  Sustained.

 3   BY MR. BENEDETTO:

 4   Q    So you filed your lawsuit, right, in 2005?

 5   A    Yes.

 6   Q    And then what happened?

 7   A    It was a prolonged litigation.  We went back and forth,

 8   filed motions, responses, oppositions.  I believe it was in

 9   2008 when the defendants in that case filed a motion for

10   summary judgment.  I prepared an opposition, filed it.  And,

11   soon thereafter --

12   Q    Let me stop you right there.  When you said you prepared

13   the opposition, did you have lawyers at that time?

14   A    No.

15   Q    You were in the SHU then, right?

16   A    Yes.

17   Q    Did you have, you know, a typewriter, a word processor?

18   A    No.  All my briefs were handwritten briefs.

19   Q    Okay.  So you filed an opposition, and then what happened?

20   A    So the matter was submitted for consideration before the

21   Court.  And, soon thereafter, the Judge ruled in my favor.  So

22   I won.

23   Q    And what do you mean, you won?  In terms of the case could

24   go to trial?

25   A    Yeah.  The District Court determined that there was
```

1  sufficient evidence to go to trial, because they determined

2  that there was a genuine issue of material fact, of whether or

3  not I was provided with notice of the source items that were

4  going to be used against me, or whether I was provided an

5  opportunity to refute the evidence.

6  **Q**    And then what happened?

7  **A**    After the District Court ruled on the matter, the

8  defendants filed a notice of appeal, seeking for a higher court

9  to review the matter.

10 **Q**    An appeal.

11 **A**    An appeal.

12 **Q**    And then what happened?

13 **A**    The defendants filed their opening brief.  Up to that

14 point, my whole focus in the litigation research had been

15 focused in the District Court.  So I was not too familiar with

16 the Ninth Circuit procedures.  So I requested, prepared and

17 filed a motion for appointment of counsel.

18 **Q**    And was that motion granted?

19 **A**    Yes.  The Ninth Circuit granted the motion and appointed

20 the law firm Wilmer Hale to represent me in that matter.

21 **Q**    And then what happened?

22 **A**    The attorneys appointed to represent me in the matter

23 prepared a reply brief to the opening brief.  And after -- I

24 believe it was maybe a month after that open -- reply brief was

25 filed, the state actually reached out to my attorneys and

 1  requested to know if I was interested in a settlement.

 2  **Q**    And do you know roughly when that was?  The month and

 3  year?

 4  **A**    Right.  So, the Attorney General reached out to my

 5  attorneys approximately -- maybe February, 2012.

 6  **Q**    And what happened next?

 7  **A**    I was informed of the interest of the defendants to settle

 8  the case.  But one of the things that didn't really appeal to

 9  me was that they wanted to conduct a validation procedure.  And

10  that's it.

11  **Q**    And had you made a particular request in your settlement

12  negotiations?

13  **A**    Yes.

14  **Q**    And what was your request?

15  **A**    At that particular time, I was aware that there was some

16  changes coming down the pipeline on the validation process, due

17  to the hunger strikes that were taking place.  I learned that

18  the Department of Corrections were in the process of revamping

19  the validation process.

20      And one of the key features in the amendment to the

21  validation process was that it wouldn't be sufficient to just

22  have a validation anymore.  The record would require to have

23  disciplinary behavior in order to relegate somebody to solitary

24  confinement.  That appealed to me, because I was very

25  interested in being released from solitary confinement.

1   Q    So did you make that part of your settlement demands?

2   A    That was my primary demand.

3   Q    And did you ever hear from the defendants whether they

4   were amenable to that request?

5   A    The process of discussing a potential to a settlement was

6   dragged out for approximately six to seven months.  At the

7   beginning it appeared that they -- they wouldn't agree to that.

8   But eventually, they did.

9   Q    And when did you learn that they were going to agree to

10   that request?

11   A    This must have been in October, I want to say the 3rd or

12   4th.

13   Q    Of which year?

14   A    2012.

15   Q    2012.

16   A    Yeah.

17   Q    And why did you ask for -- as part of your settlement

18   demands, why did you ask for a new validation under new

19   procedures that you understood were soon to be implemented?

20   A    Sure.  Like I mentioned earlier, I was aware that the

21   Department of Corrections was actually revamping the validation

22   procedures.  And one of the key figures or one of the key

23   features in that is that there would need to be disciplinary

24   behavior in a prisoner's record in order to maintain or place

25   him in solitary confinement.  And I knew that --

1  Q    And did you understand the disciplinary violation to be a

2  particular kind of disciplinary violation?

3  A    Yes.

4  Q    And what kind was that?

5  A    It wasn't just any type of disciplinary behavior.  It had

6  to be a disciplinary behavior with -- or nexus to a gang.

7  Q    And at the time, in October of 2012, did you believe that

8  you had in your C file a serious rules violation with a gang

9  nexus?

10 A    I knew that there was no val- -- disciplinary behavior

11 with a gang nexus.

12 Q    When was the settlement ultimately executed?

13 A    So the settlement was ultimately executed in June of 2013.

14 Q    And did you eventually receive a new validation pursuant

15 to the settlement?

16 A    Eventually, I did.

17 Q    And when was that?

18 A    That must have been in October of 2013.

19 Q    And then what happened?

20 A    After the validation procedure was concluded, it was

21 determined that my record did not contain any type of

22 disciplinary behavior with a ST or gang nexus.  So due to that,

23 I was actually released to the general population, and I was

24 out of solitary confinement.

25 Q    And when was that, that you were released to the general

1    population?

2    **A**    This was in December of 2013.

3    **Q**    And now that you are in the general population, have you

4    continued your education?

5    **A**    Yes.

6    **Q**    And what have you done?

7    **A**    Within three months after I was released to the general

8    population, I attended -- I signed up and I attended the basic

9    education program that they have there.  Soon thereafter, I

10   took and I received my GED.

11   **Q**    Your GED?

12   **A**    Yes.

13   **Q**    And are you working on any other degrees?

14   **A**    Yeah.  Currently I'm enrolled in the College of the

15   Redwoods and I'm working on my AA, associate of arts degree.

16   **Q**    And do you plan to pursue a bachelor's degree after that?

17   **A**    That's my plan.

18   **Q**    Did you obtain any money as part of the settlement that

19   you achieved with the defendants in your prior case?

20   **A**    Yeah.  There was a monetary --

21   **Q**    And what did you do with the money?

22   **A**    The money, I split it.  The bulk of it I sent it to my

23   mother, so I could help her pay for her mortgage.  And the

24   other part I sent to a non-profit organization called College

25   Tracks.  It's a non-profit that helps underprivileged youths

 1  attend college.

 2  **Q**    All right.  We are going to shift gears a little bit

 3  again.

 4  **A**    Sure.

 5  **Q**    And talk about what happened on October 10, 2012.

 6  **A**    Sure.

 7  **Q**    Okay?  Where were you housed on October 10, 2012?

 8  **A**    I was housed in Delta Facility, D9, 113.

 9            **MR. BENEDETTO:**  Your Honor, I would like to show

10  Mr. Perez a photograph that has been preadmitted as Exhibit 8.

11            **THE COURT:**  Any objection?

12            **MS. NYGAARD:**  There's no objection.

13            **THE COURT:**  Go ahead.

14     (Photograph displayed)

15  **BY MR. BENEDETTO:**

16  **Q**    Do you see that, Jesse?

17  **A**    Yes.

18  **Q**    Do you know what this photograph depicts?

19  **A**    This is a photograph of the entrance to a cell in solitary

20  confinement up at Pelican Bay.

21  **Q**    And was this your cell on October 10, 2012?

22  **A**    Yeah.  It appears to be.

23  **Q**    Now, there's property that you see in the photograph.

24  Right?

25  **A**    Right.

1  Q    Is that yours?

2  A    No.

3         MR. BENEDETTO:  I would like to show Mr. Perez the

4  next exhibit, which has been preadmitted as Exhibit 11.

5         THE COURT:  Okay.

6     (Photograph displayed)

7  BY MR. BENEDETTO:

8  Q    And what is this a photograph of?

9  A    This is the tier in one of the housing pods in solitary

10 confinement at Pelican Bay.

11 Q    And you see 113, 114, 115 in the numbers across the top?

12 A    Yes.

13 Q    And 113, was that your cell?

14 A    Yes.

15 Q    Okay.  So as it pertains to this case, what is the first

16 thing you remember happening on October 10, 2012?

17 A    Right.  So as it pertains to this case, I remember being

18 in my cell, sitting down.  I believe I was researching or going

19 over a document.

20      And then, the front door to the pod opened up.  And I

21 heard keys jingling.  And correctional officers running in,

22 yelling to come to the front of the cell and strip down naked.

23 Q    And were you alone in your cell that day?

24 A    No.

25 Q    Who were you with?

1  **A**    Rudy Guerrero was my cellmate at that time.

2  **Q**    And where, where were you in the cell when the guards

3  approached?

4  **A**    I was towards the back.  By the bunk area.

5  **Q**    And where was Mr. Guerrero?

6  **A**    He was in the same area, but just in front of me.

7  **Q**    And what was your -- you said you were reading or going

8  over a document, is that right?

9  **A**    Yeah.

10  **Q**    And what was Mr. Guerrero doing as the guards approached?

11  **A**    I believe he was watching TV.

12  **Q**    After you heard the shouting, the yelling, what happened?

13  **A**    So, the first person that I seen at the front of the cell

14  was Correctional Officer Gates.  And he instructed me to come

15  to the front of the cell and strip naked.

16  **Q**    And can you describe the door of your cell?

17  **A**    Sure.  The front of the cell, the entire front of the cell

18  is nothing but perhaps three-fourths of an inch thick steel.

19  And it is entirely perforated, which means it has numerous

20  holes through which you could see.

21           **MR. BENEDETTO:**  Your Honor, I would like to show

22  Mr. Perez a photograph that has been marked as a demonstrative

23  as Exhibit 17.

24           **THE COURT:**  You may.

25      (Photograph displayed)

1   **BY MR. BENEDETTO:**

2   **Q**    Now, Mr. Perez, can you tell us what this photograph is

3   of?

4   **A**    Sure.  This is the front of a cell in solitary confinement

5   at Pelican Bay.

6   **Q**    And when you were in the SHU at Pelican Bay, how often

7   would it be that you would see a door to a SHU cell from the

8   outside of the cell?

9   **A**    Can you rephrase the question?

10  **Q**    Sure.  When you were in the SHU, how often would it be

11  that you would have a view of a door like this?

12  **A**    They're all like that.

13  **Q**    And do you see a -- a space, a location on this photograph

14  that looks like a lock and a box?

15  **A**    Yeah.  That would be the tray slot.

16  **Q**    Is that also known as the food port?

17  **A**    That's the food port.  That's how you get fed in solitary

18  confinement.

19  **Q**    Okay.  Back to October 10th.  How many officers appeared

20  at your door?

21  **A**    A total of four.

22  **Q**    And what were their names?

23  **A**    Officer Gates, Officer Pimentel, Officer Gongora, and

24  Officer Healy.

25  **Q**    Do you see those officers in the courtroom today?

1  **A**    Yes.

2  **Q**    And can you point to where they're sitting?

3  **A**    The person in the back table (Indicating) with the blue

4  shirt, that would be Mr. Gates.  Next to him would be Pimentel;

5  next to him would be Healy; next to him would be Gongora.

6  **Q**    What happened next?

7  **A**    After I was instructed to come to the front of the cell

8  and strip down, I went to the front, stripped down, and waited

9  for further instruction.

10  **Q**    And what was your cellmate doing at this time?

11  **A**    He was directly behind me at the time.  I'm looking

12  straight at the front of the cell.  So I wasn't really aware

13  precisely what he was doing.

14         **MR. BENEDETTO:**  I would like to show the witness a

15  document that has been preadmitted as Exhibit 22.

16         **THE COURT:**  You may.

17     (Document displayed)

18  **BY MR. BENEDETTO:**

19  **Q**    Okay.  Mr. Perez, can you help us understand what this

20  exhibit is that we're looking at?

21  **A**    Sure.  That is a diagram of a cell in the Solitary

22  Confinement Unit at Pelican Bay.

23  **Q**    And would you say that this is an accurate depiction of

24  the layout of the cell?

25  **A**    This is a precise depiction of the layout.

1  Q    Can you tell the jury what we're looking at here?

2  A    Sure.  Is this a touch screen --

3        THE CLERK:  It is.

4        THE COURT:  Oh, it is?

5        THE WITNESS:  Okay, so this particular area

6  (Indicating), this would be the front of the -- the entrance to

7  the cell.

8  BY MR. BENEDETTO:

9  Q    Okay.  In lime green there?

10 A    The lime green, that is the entrance to the cell.

11 Immediately after you walk in, you would see the toilet

12 (Indicating).  And sink.  It's a combination.

13      You walk further back (Indicating), and turn to your left,

14 that would be a cement block that acts as a desk.

15      You walk further back (Indicating) and you would find the

16 bunk.

17 Q    Okay.  I mean, just so the jury is clear here, we're still

18 talking about a cell that's 8x10, right?

19 A    Yes, yes.

20      MR. BENEDETTO:  Let the Record reflect that Mr. Perez

21 drew -- made various markings on this exhibit, to display

22 various locations in the cell, please.

23 BY MR. BENEDETTO:

24 Q    Okay.  So, after you came to the front of the cell, and

25 began to remove your clothing, what happened?

1   A    One of the officers began to yell instructions to Rudy.

2   Telling him to wait.

3   Q    And what happened next?

4   A    I believe that Rudy was -- or interpreted the initial

5   instruction order as including himself, so I believe that he

6   began to take his clothes off.  But afterwards, stopped.

7   Q    And did you receive any orders at this point?

8   A    Yeah.  I was ordered to cuff up.

9   Q    And what did you understand the phrase "cuff up" to mean?

10  A    It's a common phrase used in prison.  When an officer

11  tells you to cuff up, it means to submit to being handcuffed.

12  Q    And how are -- I mean, if you are in the cell and the door

13  is closed, how are you handcuffed?

14  A    You would have to stick your hands through the food port.

15  The food slot.

16  Q    Behind your back.

17  A    Behind your back.

18  Q    What did you do after you were told to cuff up?

19  A    I waited for the food port to open up.

20  Q    And did you cuff up?

21  A    Yes.

22  Q    And did Mr. Guerrero do the same?

23  A    He would have to.  You are not allowed outside of your

24  cell without handcuffs.

25  Q    And at some point did you leave your cell?

PEREZ - DIRECT EXAMINATION / BENEDETTO

1   **A**   Yes.

2          **MR. BENEDETTO:**   I would like now to show Mr. Perez an

3   exhibit as a demonstrative that has been marked as Exhibit 25.

4          **THE COURT:**   That's fine.

5          (Document displayed)

6   **BY MR. BENEDETTO:**

7   **Q**   Now, Mr. Perez, what is this image that we're looking at?

8   **A**   So, this is a diagram of a housing unit in solitary

9   confinement at Pelican Bay.

10  **Q**   And is this an accurate depiction of what the rotunda

11  looks like?

12  **A**   Yeah.

13  **Q**   Did you draw this?

14  **A**   Yes, I did.

15  **Q**   Now, so you helped us with the cell diagram.  Can you

16  explain this diagram in the way that you explained the prior

17  one?

18  **A**   Sure.  So if you look at the bottom of the screen where

19  I'm drawing this green line (Indicating), this would actually

20  be the long corridor.

21  **Q**   So, did we see the long corridor in a photograph?

22  **A**   We have previously seen a picture of the long corridor.

23  As you walk down the corridor you would encounter a door every

24  so often, and that door leads to a replica of one of these.

25       As you walk in, you would see a counselor's office here

1  (Indicating).  And this (Indicating) would be a wet cell.  For

2  whenever there is no space.

3      As you continue to walk in, you can go either to your

4  right (Indicating), or to your left (Indicating).

5  **Q**    Okay.  Now can you -- first -- let's stop here.  Can you

6  circle the -- where you were housed on October 10, 2012?

7  **A**    Sure.  That would be Delta Pod, Cell 113.  Here

8  (Indicating).

9  **Q**    All right.  And you have testified just a few moments ago

10 that you eventually left that cell on that day.  Is that right?

11 **A**    Yes.

12 **Q**    And can you draw on this exhibit where you went after

13 that?

14 **A**    Sure.  So after me and Rudy were cuffed up, Correctional

15 Officer Gates instructed the control officer to electronically

16 open the door to my cell.

17     Once the door was opened, we were escorted from Cell 113

18 out of Delta Pod, into the rotunda, and as I continued to be

19 escorted, I went past this cell here (Indicating), just a

20 holding cell, and into the sallyport here (Indicating).

21 **Q**    A sallyport?

22 **A**    Yes.

23 **Q**    Is that a separate holding facility?

24 **A**    No, it's just the entrance to the housing unit.

25 **Q**    Okay.  All right.  Let's pause there for a second.

1       What was your understanding of why you had been removed

2   from your cell on October 10, 2012?

3   **A**   I had no idea.  In fact, when I was instructed to strip

4   down, I had asked "What's this about?"  And I was informed that

5   the correctional officers were going to conduct a cell search.

6   That was the extent of my knowledge at the time.

7   **Q**   Were you expecting a cell search on October 10, 2012?

8   **A**   Well, cell searches are conducted randomly, but not by

9   Institutional Gang Investigators.

10  **Q**   Did any of the officers tell you whether they were

11  conducting a gang validation procedure?

12  **A**   No.  In fact, I asked the question explicitly.  I asked,

13  "Is this some sort of validation procedure?"

14  **Q**   And what were you told?

15  **A**   Correctional Officer Gates responded, "I don't know, man.

16  Your name just happened to come up."

17      (Reporter interruption)

18          **THE WITNESS:**  "I don't know, man.  Your name just

19  happened to come up."

20  **BY MR. BENEDETTO:**

21  **Q**   Okay.  So keeping that statement in mind, can you circle

22  on this exhibit where you were standing when you were told that

23  your name had just come up?

24  **A**   Sure.  So after I was escorted out of the cell that I was

25  assigned to, I was placed here (Indicating).  And I was told to

1   face this way (Indicating).

2   **Q**    And when you were facing that way, did you know where

3   Mr. Guerrero was?

4   **A**    Yeah, he was directly behind me.  He was actually put into

5   this holding cell here (Indicating).

6   **Q**    But physically, those are two different spaces.  Is that

7   right?

8   **A**    Yes.

9   **Q**    So there's a wall there?

10  **A**    This -- there's a wall here (Indicating).

11  **Q**    Okay.  Could you see Mr. Guerrero?

12  **A**    No.  My back was actually turned to him, so I could not

13  see him.

14  **Q**    Did you hear any of the defendants speak to Mr. Guerrero?

15  **A**    Yes, I could hear a discussion taking place.

16  **Q**    Could you make out any words?

17  **A**    No, I could not make out what was being said.

18  **Q**    And after you left the sallyport area, what happened?

19  **A**    As I was standing here, Correctional Officer Pimentel

20  began to take pictures of me.

21       After Rudy was placed here (Indicating), I heard the other

22  two correctional officers return, walking in the direction back

23  to this cell that I was assigned to.

24  **Q**    And that's 113?

25  **A**    And that's 113, exactly.

1  Q    Did Mr. Guerrero say anything to you when you joined him

2  in the holding cell?

3  A    Well, after Officer Pimentel got done taking pictures of

4  my body and my face I was placed back into the holding cell

5  with Rudy, and my handcuffs were removed.  And the officers

6  walked back into the direction of my cell, 113.

7      And immediately after walking into -- or after they left,

8  I asked Rudy what had the officers told him.

9  Q    And what did he say?

10 A    He said that correctional officer asked him:  Which one

11 was your locker.  And that he responded:  My locker is the one

12 looking in on the left.

13 Q    And what did Mr. Guerrero say to you then?

14 A    He said that --

15         MS. NYGAARD:  Objection, hearsay.

16         THE COURT:  Sustained.

17         MR. BENEDETTO:  I mean, Your Honor, we're not

18 offering it for the truth of the assertion, but the effect on

19 Mr. Perez.  It's also a prior consistent statement.  That would

20 be not hearsay.

21         THE COURT:  That hasn't been established yet.

22 Sustained.

23 BY MR. BENEDETTO:

24 Q    Okay.  So, now you are in the cell with Mr. Guerrero.

25 A    Yes.

1   Q    Right?  And what are you -- what is going through your

2   mind at that point?

3   A    Given the fact that I was submitted to a photo session, I

4   sort of recognized it as a gang validation procedure.  So I had

5   no idea really what was going on.

6        There was some statements that were mentioned to me.  And

7   that indicated that something was wrong.  And I began to feel a

8   bit fearful about my possibilities of being released from

9   solitary confinement.

10  Q    And how long were you in the holding cell?

11  A    Approximately 25 minutes.

12  Q    And then what happened?

13  A    During that time, I observed two correctional officers

14  roll out two carts with property that I recognized as being

15  mine and Rudy's.

16  Q    And then what happened?

17  A    After that, Correctional Officer Gates and Correctional

18  Officer Pimentel came to the cell, opened up the food port

19  similar to the one to the front of our cell, and ordered us to

20  cuff up.

21  Q    And did you say anything to the officers at this point?

22  A    Yeah.  At that particular point I addressed Officer Gates

23  and I told him, "Hey, if you're taking my stuff, I'm going to

24  need my legal work back because my lawsuit is still pending."

25  This would be the prior lawsuit that I had filed in 2005.

1  Q    And what, if anything, did Mr. Gates say to you in

2  response to that statement?

3  A    He mentioned, "Oh, yeah, about that, you might have been

4  able to collect from us.  But get comfortable, because we're

5  going to do everything we can to make sure you stay in here,

6  where you belong.  And as for your property, don't worry.

7  We'll get it to you by tomorrow or so."

8  Q    And what did you understand Mr. Gates to be saying to you?

9  A    Exactly what he meant, what he said, that he was going to

10  ensure that I stay in solitary confinement.

11  Q    And then what happened?

12  A    We submitted to being handcuffed and we were escorted back

13  to the cell.

14  Q    When you got back to your cell, did it look the same as it

15  did when you left it?

16  A    No.

17  Q    Describe for the jury what your cell looked like when you

18  returned?

19  A    It was in complete disarray.  It was completely trashed.

20  Some of the linen that was left behind was scattered on the

21  floor, on the bunks.  Some of the clothing that was left behind

22  was on the ground with dirty bootprints on them.

23       And our hygiene that was left behind, which we kept in a

24  locker, lockers underneath the bunk, was spilt on the surface

25  of the locker.  This would be shampoo, toothpaste, that sort of

1    stuff.

2    **Q**    So you mentioned that -- you had sheets?

3    **A**    Yes.

4    **Q**    And where were they, that you found them?

5    **A**    The sheets were -- some of them were on the floor.  Some

6    of them were on the top bunk.  Some were on the lower bunk.

7    **Q**    And were they clean?

8    **A**    Initially, they were.  When we returned, they were not.

9    **Q**    And what about Mr. Guerrero's mattress?

10   **A**    Mr. Guerrero's mattress, I believe, was on the floor next

11   to the concrete slab that acts as a table.

12   **Q**    And what about his sheets?

13   **A**    Same.

14   **Q**    Also with bootprints on them?

15   **A**    Yes.

16   **Q**    Was anything else on the floor?

17   **A**    Other than clothing and linen, that was it.

18   **Q**    Were there bootprints on your clothing?

19   **A**    Yes.

20   **Q**    You mentioned your toiletries, shampoo and toothpaste and

21   the like.  How did you keep your toiletries before the search

22   happened?

23   **A**    So in solitary confinement we're not allowed to have any

24   plastic containers.  So what is done, the content of our

25   hygiene items are actually extracted from these containers and

 1  placed in Ziploc bags which we later place in paper cups.

 2  **Q**    And the Ziploc bags, those are clear, right?  You can see

 3  through them?

 4  **A**    Yes.

 5  **Q**    You said there were footprints, bootprints on various

 6  items, is that right?

 7  **A**    Yes.

 8  **Q**    Were those your footprints?

 9  **A**    They were bootprints.  We're not allowed to have boots in

10  solitary consignment:

11  **Q**    The morning of October 10, 2012, when you woke up that

12  day, what did your cell look like?

13  **A**    Usually, because it's a very small space in which we are

14  placed in, we tend to have an organized way of keeping our

15  stuff.  So I wouldn't describe it military style, but it was

16  organized.  You know, papers, linen was folded.  Our mattress,

17  which is just a -- kind of like a mat folded up.  And our

18  hygiene, again, was organized and placed in paper cups and

19  plastic bags.

20  **Q**    What about your clothes?

21  **A**    Those were kept -- the locker is pretty spacious.  So in

22  one side we could keep the hygiene item and the other side we

23  would keep our clothing.

24  **Q**    You say "spacious."  It's not a walk-in closet, right?

25  **A**    No.  It's not a walk-in closet, right.  But at the same

1  time, we're not allowed to have a whole lot of personal

2  clothing.

3  Q    Do you have of papers that you kept in your cell?

4  A    Yes.

5  Q    And how would you organize them?

6  A    I would organize them by category, depending on what the

7  document would be.  Like, my legal stuff I would label each

8  envelope "Legal Material," or personal papers of interest, I

9  would put "Personal Papers of Interest," "Miscellaneous,"

10 et cetera.

11 Q    Do you own a camera?

12 A    No, I don't.

13 Q    Are prisoners allowed to have cameras?

14 A    No.

15 Q    Did the correctional officers have cameras that day?

16 A    Yes.

17         MS. NYGAARD:  Objection, lack of knowledge.

18         THE COURT:  Overruled.

19         MR. BENEDETTO:  Okay.

20 A    Yes, they did.

21 BY MR. BENEDETTO

22 Q    Did you see them take pictures of the cell?

23 A    No.

24 Q    What did you do next?

25 A    Excuse me?

1   Q    What did you do next?

2   A    After?

3   Q    After you've gotten back to the cell and --

4   A    Oh.  So after finding that cell in complete disarray,

5   completely trashed, first thing I did I started picking up my

6   stuff.  Folding up my sheets.  Folding up my blankets.  Folding

7   up my personal clothing, minimal personal clothing that we're

8   allowed to have there, and cleaning the locker.

9   Q    After the officers left, did you speak to anybody else?

10  A    Yeah.

11  Q    And who was that?

12  A    The prisoner assigned to the cell next to mine, Salvador

13  Mendoza, he was in Cell 114, and he mentioned to me that --

14       MS. NYGAARD:  Objection, hearsay.

15       THE COURT:  Sustained.

16  BY MR. BENEDETTO

17  Q    Let me pause you right there.

18       MR. BENEDETTO:  I would like to show Mr. Perez an

19  exhibit that we looked at previously, Exhibit 11, which has

20  been pre-admitted.

21       (Photograph displayed.)

22  BY MR. BENEDETTO

23  Q    So you're in 113, right?

24  A    Yes.

25  Q    And where was Mr. Perez -- sorry, where was Mr. Mendoza?

1  A    Mr. Mendoza was assigned to the Cell 114.  So that would

2  be the cell immediately next to mine.

3  Q    And you had a conversation with Mr. Mendoza?

4  A    Yes.

5  Q    And after you had that conversation, how did you feel?

6  A    The fear and the sort of shock that I felt after learning

7  or realizing what was going on.  I felt pretty devastated

8  about, again, the possibility that I would be getting out of

9  solitary confinement would no longer happen.

10 Q    Did you look to see if any of your property was missing?

11 A    It was pretty obvious.  All my paperwork had been removed.

12 The only thing left was my hygiene items and my clothing items.

13 Q    And I believe you said this earlier, but did you keep all

14 of your legal papers in one place?

15 A    Yes.

16 Q    And where did you keep them?

17 A    On the bunk.  It's pretty big, so -- the mat is not that

18 big, so I would keep it in the bunk.

19 Q    And what type of legal papers did you keep there?

20 A    My entire case from my previous suit.

21 Q    And that was still pending at the time, right?

22 A    It was still pending at the time.

23 Q    Was anything else missing?

24 A    Some -- like I said, all my paperwork was taken.  Included

25 in that paperwork were articles that had been written in the

 1  past.

 2  **Q**    Okay.  Had you experienced a cell search before

 3  October 10th, 2012?

 4  **A**    Numerous cell searches.

 5  **Q**    And was this cell search different from those past

 6  searches?

 7  **A**    Vastly different.

 8  **Q**    How so?

 9  **A**    The destructive manner in which the cell was left after

10  the officers left.  I had never personally experienced that

11  myself.

12  **Q**    Did you find anything left in your cell by the officers?

13  **A**    Yeah.  The officers left what is called a Cell Search

14  Receipt.  I found it on the concrete slab that acts as a table.

15          **MR. BENEDETTO:**  I'd like to show Mr. Perez a document

16  that has been pre-admitted as Exhibit 49.

17          **THE COURT:**  You may.

18      (Document displayed)

19  **BY MR. BENEDETTO**

20  **Q**    Do you see that?

21  **A**    Yes.

22  **Q**    Is this the Cell Search Receipt that you found in your

23  cell that day?

24  **A**    Yes.

25  **Q**    And are you familiar with these sorts of forms?

1   **A**    Yeah.  This form is left behind every time an officer

2   searches your cell, yes.

3   **Q**    And what is your understanding of the purpose of this

4   form?

5   **A**    There is multiple purposes to leave this behind.  It's

6   basically to create a record of what happened.  If there was

7   any items that was confiscated, it would be noted in here,

8   itemized.  And, also, to determine whether or not the appliance

9   that the prisoner owns is still operable or not.

10  **Q**    If you look at the top of the form it says, "Inmate

11  assigned bed and appliance."  Do you see that?

12       (Document enlarged.)

13  **A**    Yes.

14  **Q**    Which has now been enlarged for the -- those of us who

15  can't see that screen.

16       What is meant by "Inmate (L Perez)" and "Inmate

17  (U Guerrero)"?

18  **A**    The letter "L" in parentheses references the lower bunk

19  and the letter "U" in the parenthesis references the upper

20  bunk.

21  **Q**    So is it right that you occupied the lower bunk --

22  **A**    The lower bunk, yes.

23  **Q**    -- in 113 and Mr. Guerrero was the upper bunk?

24  **A**    Yes.

25  **Q**    Looking back to Exhibit 49, do you see the section called

1   "Items Confiscated"?

2   **A**   Yes.

3   **Q**   And does this exhibit --

4            **MR. BENEDETTO:**   If we could go back to the exhibit,

5   please?

6        (Document displayed.)

7   **BY MR. BENEDETTO**

8   **Q**   There are two columns there, is that right?

9   **A**   Yes.

10  **Q**   Is it your understanding that one column is for the lower

11  bunk inmate and the other column is for the upper bunk inmate?

12  **A**   If you look at the parentheses, the letter "L," that would

13  be the column for the lower bunk and the opposite would be the

14  column for the upper bunk.

15  **Q**   Okay.  So if we could look specifically at the left-hand

16  column under "Items Confiscated Description," was this your --

17  does this column refer to your items?

18       (Document enlarged.)

19  **A**   Yeah.

20            **MR. BENEDETTO:**   And if we could go back to the

21  exhibit?

22       (Document displayed.)

23  **BY MR. BENEDETTO**

24  **Q**   On the right-hand side column, is that for Mr. Guerrero?

25  **A**   Yes.

1  Q    Is there anything written there?

2  A    Nothing.

3  Q    Were your legal papers listed on this exhibit?

4  A    No.

5  Q    What about the briefs that you wrote in connection with

6  your appeal?

7  A    No.

8  Q    Any of your articles?

9  A    No.

10 Q    What about any books?

11 A    No.

12 Q    Now, there is a box down on the right that says -- is

13 captioned "Disciplinary Documentation."

14     (Document enlarged.)

15 Q    Do you see that?

16 A    Yes.

17 Q    And is there anything marked there?

18 A    Completely blank.

19         MR. BENEDETTO:  Back to the exhibit, please.

20     (Document displayed.)

21 BY MR. BENEDETTO

22 Q    And underneath that box is a box captioned "Searched By."

23 Do you see that?

24 A    Yes.

25 Q    And what are the names that you can read there?

 1  **A**    G. Pimentel, A. Gates, and Gongora.

 2  **Q**    Did you see Mr. Healy participate in the search?

 3  **A**    In the actual search?

 4  **Q**    Did he show up that day?

 5  **A**    Yes.

 6  **Q**    Okay.  After you found this receipt, this exhibit, what

 7  happened next?

 8  **A**    That day?  Nothing.

 9  **Q**    Did anything happen the next day?

10  **A**    Yes.

11  **Q**    And what happened that day?

12  **A**    The following day Officer Pimentel returned all the

13  paperwork that was confiscated that day.

14  **Q**    And did he provide you any paperwork when he did that?

15  **A**    Yeah.  He provided me a separate Cell Search Receipt, very

16  similar to the one like you just showed on the screen.

17          **MR. BENEDETTO:**  Your Honor, I would like to show Mr.

18  Perez a document that has been pre-admitted as Exhibit 50.

19          **THE COURT:**  You may.

20          (Document displayed)

21  **BY MR. BENEDETTO**

22  **Q**    This form, at least the form itself, seems similar to the

23  one we just looked at, right?

24  **A**    Yes.

25  **Q**    How is it different?

1  A    There is a new signature on there, Burris.

2  Q    Which signature is that -- okay.

3           MR. BENEDETTO:  Can we highlight that, please?

4      (Document highlighted.)

5           MR. BENEDETTO:  Okay.  Back to the exhibit.

6      (Document displayed.)

7  BY MR. BENEDETTO

8  Q    What else is different?

9  A    There are some items on there listed as "disposed."  If

10 you see the --

11 Q    Okay.  So directing your attention to the first five lines

12 under "Description:  Items confiscated"?

13 A    Yes.

14          MR. BENEDETTO:  If we can enlarge that?

15     (Document enlarged.)

16 BY MR. BENEDETTO

17 Q    Is this what we're talking about?

18 A    Yes.

19          MR. BENEDETTO:  Back to the exhibit, please.

20     (Document displayed.)

21 BY MR. BENEDETTO

22 Q    Do you see an arrow there that points to the right-hand

23 column?

24 A    Yes.

25 Q    And does that read, "Disposed per inmate" -- I guess

1   that's I/M -- "at inmate's request"?

2   **A**   Yes.

3   **Q**   Is that your signature?

4   **A**   Yes.

5        **MR. BENEDETTO:**   If we can focus just in on the

6   left-hand column, please?   Just the first five lines?

7        (Document enlarged.)

8   **BY MR. BENEDETTO**

9   **Q**   Are your legal papers and articles listed anywhere on

10  these lines?

11  **A**   No, they are not.

12       **MR. BENEDETTO:**   Thank you.   Back to the exhibit.

13       (Document displayed.)

14  **BY MR. BENEDETTO**

15  **Q**   Were your legal papers returned to you?

16  **A**   Most of them were.

17  **Q**   And were -- were all of them returned to you?

18  **A**   No.

19  **Q**   And can you estimate roughly how many pages did not make

20  it back to you?

21  **A**   It was the reply brief that was filed in the Ninth

22  Circuit.   So that was probably approximately 20 pages.   And I

23  believe that was it.

24  **Q**   And were your articles returned?

25  **A**   No.

1  Q    Did you keep your articles with your legal papers?

2  A    Yes.  Those I did.

3  Q    And do you know how many articles were not returned?

4  A    It was approximately four articles.  Two of them were in

5  complete form and two of them were still in draft form.

6  Q    And had you sent any of them for publication?

7  A    Two of them.

8  Q    So if you sent them for publication, how was it that you

9  had copies of them in your cell?

10 A    Every time I sent out articles, I would make a handwritten

11 copy of them.

12 Q    And retain them?

13 A    And retain them.

14 Q    Do you remember the titles of any of the articles that you

15 had in your cell that day that were not returned to you?

16 A    Yeah.  One of the titles was "Opposition to Elements of

17 STG Identification and Management Policy."

18 Q    Do you remember any other titles?

19 A    The second one was "Through Brambles and Over Jagged Stone

20 Litter Ground."

21 Q    So these articles that, again, were not returned to you,

22 what were they about?

23 A    The subject matter of these articles were the practice of

24 long-term solitary confinement.  Given the fact that I had been

25 in solitary confinement for quite a long time, I really

1  objected to the practice.  And given the fact that prisoners

2  were at that time really objecting and protesting to the

3  practice, I was inspired to write these articles.

4  Q    Do you have copies of the articles that were confiscated?

5  A    No.

6  Q    There were two other articles you mentioned.

7  A    Not articles in complete form.  They were just drafts that

8  I was working on.

9  Q    And at a high level, what was the -- what were they about?

10 A    The same thing, critical -- the practice of long-term

11 solitary confinement.

12 Q    Have you ever heard of the STG Pilot Program?

13 A    Yes.

14 Q    And what does the acronym STG stand for?

15 A    So STG stands for Security Threat Group.

16 Q    And what is the STG policy?

17 A    The STG policy, as it was rolled out --

18        **MS. NYGAARD:**  Objection, foundation.

19        **THE COURT:**  Overruled.

20 A    The STG policy, as it was rolled out in October of 2012,

21 it pretty much represented the final version of the

22 department's efforts to revamp the validation process.

23 **BY MR. BENEDETTO**

24 Q    And when did you first learn that the CDCR was going to

25 revamp its gang management policies?

1  **A**    This would have been after the first hunger strike took

2  place in 2011.

3  **Q**    How did you learn about the CDCR's housing policy?

4  **A**    Given the fact that I was assigned to solitary confinement

5  based on my validation, it was very important for me to

6  familiarize myself with their policies.  That is what motivated

7  me to research their regulations, their policies, et cetera,

8  et cetera.

9  **Q**    And how did you become familiar with the new policy?

10  **A**    After I learned that the Department of Corrections was

11  actually going to revamp or amend their regulation as it

12  relates to housing validated associates or affiliates, the

13  department began to prepare drafts and disseminate them.

14  **Q**    And you saw those drafts?

15  **A**    Yes.

16  **Q**    How many drafts of -- relating to the program did you see

17  before it was finalized?

18  **A**    I believe it was a total of six drafts.

19  **Q**    And how did you get the drafts?

20  **A**    After the second hunger strike in 2011, the Department of

21  Corrections began to actually distribute the drafts.  One of

22  the concern that the department had was that --

23          **MS. NYGAARD:**  Objection, lack of knowledge.

24          **THE COURT:**  Sustained.

25

**BY MR. BENEDETTO**

**Q**    So you said you began to receive the drafts.  Did they provide them to you in your cell?

**A**    No.  What would happen, the correctional officer that is assigned to the housing unit on the floor, he would slide them underneath the door to the housing pod and pretty much every prisoner in the housing pod would have access to it and would share it with each other.

**Q**    When did you first see a draft?

**A**    I believe this is soon after the second hunger strike in 2011.  So that would probably make it around October or November.

**Q**    Did you ever see a final version of the policy?

**A**    Yes.

**Q**    And when did you see that final version?

**A**    This would be October 11th, 2012.

**Q**    What was your understanding of a -- what was your understanding of how the old policy differed from the new policy with respect to your confinement in the SHU?

**A**    One of the biggest distinctions was the fact that the department, indeed, amend its housing placement for people who have been previously validated.

        And the only way that a prisoner could be placed in solitary confinement is if his record contained disciplinary behavior within the STG nexus.

1  Q    And that was the new policy?

2  A    That's the new policy.

3  Q    What is an RVR?

4  A    That's an acronym for a Rules Violation Report or a

5  disciplinary report.

6  Q    And what does it mean that an RVR is a serious RVR?

7  A    So the department characterizes its rules violations by

8  divisions and level of seriousness.  You have, you know, sort

9  of lesser offenses that are administrative and you have more

10 serious offenses that are serious.  And then within those,

11 those are characterized in certain divisions.

12         MR. BENEDETTO:  I would like to show Mr. Perez a

13 document that's been pre-admitted as Exhibit 4.

14         THE COURT:  You may.

15         MR. BENEDETTO:  Could you go to the second page,

16 please?

17     (Document displayed.)

18 BY MR. BENEDETTO

19 Q    Mr. Perez, can you tell me what we're looking at here?

20 A    This appears to be a cover page to the final version of

21 the department's housing policy for evaluating affiliates.

22 Q    And is this the STG policy that we have just been talking

23 about?

24 A    Yes.

25 Q    What is the date on this page that we're looking at here?

1         MR. BENEDETTO:  Can you blow that up?

2      (Document enlarged.)

3  A    If you look at the very bottom, you would see that the

4  date is actually October 12, 2012.

5  BY MR. BENEDETTO

6  Q    And when was your cell search?

7  A    October 10, 2012.

8  Q    Was this the date that you received this memo?

9  A    I actually received it the previous day, on the 11th.

10 Q    The same day that you received the Cell Search Receipt?

11 A    Yes.

12        MR. BENEDETTO:  Now, if would could move ahead to

13 page -- internal Page 10?  DEF002263 in the lower right-hand

14 corner of the document.

15     (Document displayed)

16 BY MR. BENEDETTO

17 Q    Mr. Perez, I want to direct your attention to the two

18 paragraphs that are listed below the section heading

19 "Section 600 STG Disciplinary Matrix for Related Behavior or

20 Activity."

21     Do you see that?

22 A    Yes.

23 Q    And can you read for us the first sentence of the first

24 paragraph?

25 A    Sure.

1          "The STG policy incorporates a behavior-based

2     disciplinary component as a foundation to

3     pre-existing intelligence based system."

4  Q    Okay.  And please read the second sentence?

5  A    (As read)

6          "The STG validation system also incorporates a

7     layered approach of procedural safeguards to affirm

8     appropriate due process in the validation and housing

9     placement of STG affiliates."

10 Q    Thank you.  Back to the screen.

11     (Document displayed.)

12 Q    I would like to direct your attention to the paragraph

13 below the section titled "Section 600.1 - STG Disciplinary

14 Matrix."

15     (Document enlarged.)

16     Can you read the first sentence of this paragraph?

17 A    Sure.

18          "The following behaviors and activities qualify

19     as STG behavior when a nexus has been established

20     between the behavior and the identified STG.  The

21     nexus shall be clearly articulated in the specific

22     act, as well as clearly described within the

23     narrative of the associated RVR and findings of the

24     Senior Hearing Officer/Hearing Officer (SHO/HO)."

25 Q    Okay.  Thank you.

1        **MR. BENEDETTO:**  Back to the document.

2        (Document displayed.)

3    **BY MR. BENEDETTO**

4    **Q**    At the bottom of this page do you see the beginning of

5    what looks like a chart?

6    **A**    Yes.

7    **Q**    Entitled "STG Disciplinary Matrix"?

8    **A**    Yes.

9    **Q**    Okay.

10        **MR. BENEDETTO:**  Go back to the exhibit, Tim.  And can

11   you scroll through the next two pages?

12        (Document displayed and scrolled.)

13   **BY MR. BENEDETTO**

14   **Q**    So this is a chart that continues over a couple of pages.

15   Do you see that?

16   **A**    Yes.  This is pretty much a list of -- laundry list of

17   offenses that constitute disciplinary behavior with an STG

18   nexus.

19   **Q**    And we're talking about the new policy, right?

20   **A**    This is the new policy.

21   **Q**    Directing your attention to the page of the Exhibit 4 that

22   is marked with the Bates label DEF002265.

23        Do you see the Section entitled "600.2 - Validated

24   Affiliates Housed in the General Population"?

25   **A**    Yes.

1  Q     And there is a Subsection A there, "Validated STG-1

2  Associate."  Do you see that?

3  A     Yes.

4  Q     Can you read that first sentence?

5  A     Sure.

6         "Initial placement into the Step Down Program

7         shall be based upon a validated STG-1 associate being

8         found guilty of STG related behavior, as identified

9         in the STG Disciplinary Matrix and subsequent to

10        initial validation as follows."

11 Q     And read the two bullet points?

12        "Two administrative Rule Violation Reports within

13        any 12-month; period;

14        "Or, one serious Rule Violation Report."

15        And what was your understanding of what this paragraph

16 meant?

17 A     My understanding of this paragraph is that the decision to

18 place somebody into the Step Down Program, which is basically

19 solitary confinement, would be determined on whether or not the

20 prisoner being considered has either two administrative rules

21 violations within the 12-month period or one serious rule

22 violation report.

23 Q     And a gang validation?

24 A     And a gang validation.

25 Q     On October 10th, 2012, which would be the day before you

1  received this, did you know that this was soon to be the new

2  policy?

3  **A**    Yeah.  Yes.

4  **Q**    And while you were negotiating the settlement of your

5  previous lawsuit that we talked about, did you know that this

6  was going to the new policy?

7  **A**    I knew that this was going to be the new policy back in

8  2011.

9  **Q**    And back in 2011 was a period of time before you learned

10  that the defendants in your prior suit were willing to settle

11  that case, is that right?

12  **A**    Yes.

13  **Q**    Why did you care?

14  **A**    That was the whole reason I invested so much time in

15  educating myself on how to litigate a case, so that I can

16  challenge the decision to place me in solitary confinement so

17  that I could get back out to the General Population and

18  reengage in a meaningful way with my family.

19  **Q**    Would you have settled your prior lawsuit at all had the

20  CDCR not agreed to provide you with a new validation under the

21  new procedures?

22  **A**    No, and there is a particular reason for that.

23       I've seen cases where either through a habeas corpus or a

24  similar 1983 lawsuit where the plaintiff had agreed to a new

25  validation procedure under the old policy and --

 1          **MS. NYGAARD:**  Objection, your Honor.  This is a

 2    narrative.  The question called for a "yes" or "no."

 3          **THE COURT:**  Sustained.

 4    **BY MR. BENEDETTO**

 5    **Q**    Back to October 10th.

 6          During the search on that day, did any of the officers

 7    tell you that you were going to be issued an RVR?

 8    **A**    No.

 9    **Q**    Did any of the officers tell you that you were in

10    violation of prison rules?

11    **A**    No.

12    **Q**    Were you issued an RVR?

13    **A**    Ultimately I was.

14    **Q**    And who issued it?

15    **A**    Officer Gates issued a Rules Violation Report.

16    **Q**    When did you first learn that you had been issued an RVR

17    by Mr. Gates?

18    **A**    I believe this was 11 days after the search took place,

19    October 21st, 2012.

20    **Q**    How did you learn what the allegations in the RVR were?

21    **A**    After I was issued the RVR by Officer Trone on that day,

22    which was October 21st, 2012, I took the time to read the

23    actual allegations on the RVR.

24    **Q**    Were you surprised?

25    **A**    Yes.

1          **THE COURT:**  Mr. Benedetto, I know you're kind of in

2  the middle of a subject matter here, but I'm wondering if now

3  is a good time to take a break.  You know, unless in, say, five

4  minutes or something you think we're going to be at a better

5  time to take a break.

6          **MR. BENEDETTO:**  No.  It's as good a time as any.

7          **THE COURT:**  Why don't we take a break for 14 minutes,

8  and we'll come back in here at 10:30.  We'll bring the jury

9  back in at 10:30, so make sure you're here a couple minutes

10  before then.  We'll see new a few minutes.

11       (Jury exits courtroom at 10:15 a.m.)

12       (Discussion held off the record between the defendant

13        and the Court.)

14          **MS. NYGAARD:**  Excuse me, your Honor.  Ex parte

15  communication.  We want to know what he was talking about.

16          **THE COURT:**  I was just going to state it for the

17  record.

18       The witness, again, expressed concern to me about people

19  rising when the jury comes in and leaves, because of his --

20  because of his shackles.  So I'm -- and he's right to express

21  that concern.

22       So I'm going to instruct everybody while Mr. Perez is

23  testifying, while Mr. Perez remains on the witness stand,

24  Kristen will tell people to remain seated when the jury is

25  coming in and when the jury leaves and people should not rise

1  so that we avoid the jury having the misimpression that Mr.

2  Perez is being disrespectful to the jury.

3      I know everyone is in the habit of rising when the jury

4  gets up, but let's everybody try to remember that during Mr.

5  Perez's testimony only, everybody can remain seated when the

6  jury comes in and out.

7      Thank you.

8      (Whereupon there was a recess in the proceedings

9       from 10:17 a.m. until 10:30 a.m.)

10         **THE COURT:**  All right.  Bring them in.  Everybody

11  remember to remain seated.

12      (Jury enters courtroom at 10:31 a.m.)

13         **THE COURT:**  You can resume.

14         **MR. BENEDETTO:**  Thank you, your Honor.

15  **BY MR. BENEDETTO**

16  **Q**    Mr. Perez, welcome.

17  **A**    Thank you.

18  **Q**    Before the break we were talking about the RVR that was

19  issued to you on October 21st, 2012?

20  **A**    Yes.

21  **Q**    What were the allegations contained in that RVR?

22  **A**    The offense I was charged with was obstructing a peace

23  officer from the performance of their duties.  The specific

24  allegations were that on October 10, 2012 during the cell

25  search, I obstructed or attempted to obstruct the officer's

1    view into the cell.

2    **Q**    Were there any other allegations?

3    **A**    Yeah.  Specifically they were alleged that the purpose for

4    obstructing the view into the cell was to conceal Rudy's

5    attempt of destroying gang paraphernalia.

6    **Q**    And does that gang paraphernalia have a nickname?

7    **A**    It's -- within the prison system it's called, specifically

8    the one referenced in the RVR, gang kites.

9    **Q**    Kite?

10   **A**    Kite.

11   **Q**    Like you fly a kite?

12   **A**    Kite.  Not a kite actually.

13   **Q**    And what is a gang kite?

14   **A**    Sure.  A gang kite is what the department describes as a

15   small piece of paper with small writing in it.

16        I think the reference comes from the likeliness that it

17   has because it's -- to an actual kite because you attach to it

18   a string and you pass it from cell to cell.

19   **Q**    And in the RVR -- I think you told us this, but what was

20   the formal charge that was in the RVR?

21   **A**    Sure.  So the formal charge was obstruction of a peace

22   officer from the performance of their duties.

23   **Q**    If you recall the Disciplinary Matrix that we looked at in

24   Exhibit 4, would this willful obstruction of a peace officer

25   charge, would that be considered a serious violation?

1  **A**    According to the Disciplinary Matrix outlined in the new

2  policy, yes, it would be.

3           **MR. BENEDETTO:**  Can we look again at Exhibit 4, Tim?

4       (Document displayed)

5  **BY MR. BENEDETTO**

6  **Q**    So I want to direct your attention -- and this has been

7  pre-admitted, we've looked at it earlier -- the page Bates

8  labeled DEF002264.

9           **MR. BENEDETTO:**  And, Tim, if you could enlarge...

10      (Document enlarged.)

11 **BY MR. BENEDETTO**

12 **Q**    Do you see the enlarged language there, Mr. Perez?

13          "Wilfully resisting, delaying, or obstructing any

14      peace officer in the performance of duties that

15      severely impacts or disrupts facility operations."

16 **A**    Yes.

17 **Q**    Was that the formal charge that was leveled against you in

18 the RVR?

19 **A**    Yes.

20          **MR. BENEDETTO:**  Back to the exhibit, Tim.

21      (Document displayed)

22 **BY MR. BENEDETTO**

23 **Q**    In the column next to -- where that charge is listed,

24 which is the middle column here, do you see a word?

25 **A**    Yes.  That column --

1   Q     And what does that column refer to?

2   A     That column refers to a sort of designation those offenses

3   are given.  This particular offense is given a "serious"

4   designation.

5   Q     On October 10, 2012 did you willfully resist any orders

6   issued by any of the defendants?

7   A     No, I did not.

8   Q     Did you obstruct Mr. Gates from doing his duties that day?

9   A     No, I did not.

10  Q     Did Mr. Guerrero put gang kites down the toilet on

11  October 10, 2012?

12  A     No, he did not.

13        MR. BENEDETTO:  Tim, let's bring back Exhibit 49.

14        (Document displayed)

15  BY MR. BENEDETTO

16  Q     So, Mr. Perez, you testified that Exhibit 49 was the Cell

17  Search Receipt that was left in your cell on October 10th, is

18  that right?

19  A     That's correct.

20  Q     And if we look at the box that is captioned "Disciplinary

21  Documentation," do you see that?

22  A     Yes.

23  Q     Do you know whether a CDC -- or what does a CDC 115 refer

24  to?

25  A     The 115 is the numerical number or the numerical code

 1  given to an RVR.

 2  **Q**    And is that box checked?

 3  **A**    No, it's not.

 4  **Q**    Is anything written in this box?

 5  **A**    Completely blank.

 6  **Q**    Let's look at Exhibit 50 again.

 7       (Document displayed)

 8  **Q**    And we looked at there earlier, Mr. Perez, is that right?

 9  **A**    Yes.

10  **Q**    And this is the Cell Search Receipt that you obtained on

11  October 11th, is that right?

12  **A**    Yes.

13  **Q**    And if we can look again at the box captioned

14  "Disciplinary Documentation"?

15       (Document enlarged.)

16  **Q**    Is the box for CDC 115 checked?

17  **A**    No, it is not.

18  **Q**    Is anything checked here?

19  **A**    The box is completely blank.

20  **Q**    Are there references to gang kites on either of these

21  forms?

22  **A**    No, there is not.

23  **Q**    Did you defend against these allegations?

24  **A**    Yes.

25  **Q**    Did you have a hearing on the RVR?

1   **A**    Yes, I did.

2   **Q**    Did you attend the hearing?

3   **A**    Yes, I did.

4   **Q**    Did Mr. Gates attend the hearing?

5   **A**    No, he did not.

6   **Q**    Was there a hearing officer assigned for the adjudication?

7   **A**    Yes.

8   **Q**    And do you know who that individual was?

9   **A**    That would be Lieutenant J.C. Anderson.

10  **Q**    Were you found guilty of the charged offense?

11  **A**    I was found not guilty.

12  **Q**    Did you receive any paperwork about the RVR after the

13  hearing?

14  **A**    Yes.

15          **MR. BENEDETTO:**  Your Honor, I'd like to show

16  Mr. Perez an exhibit for now marked as identification as

17  Exhibit 2.

18          **THE COURT:**  Any objection?

19          **MS. NYGAARD:**  We have an objection to the admission

20  of it, but not to showing Mr. Perez.

21          **THE COURT:**  Okay.  You can show it to Mr. Perez.

22          **MR. BENEDETTO:**  Is it -- will it pop up on his

23  screen?

24          **THE COURT:**  You can't publish it to the jury.

25          **MR. BENEDETTO:**  I know that, but if it goes up -- can

 1  he see it only or will it go to the jury as well?

 2          THE CLERK:  It's only going to him.

 3          MR. BENEDETTO:  That's all I want.

 4      (Document displayed to the witness.)

 5  BY MR. BENEDETTO

 6  Q    Do you see an image in front of you, Mr. Perez?

 7  A    Yes.

 8  Q    And is this entitled a Rules Violation Report at the top?

 9  A    Yes.

10  Q    Do you see at the bottom any names and signatures?

11  A    Yeah.  The lower signature block you would see three

12  different signatures.

13  Q    And what is the first signature that you see?

14  A    That would be Correctional Lieutenant J.C. Anderson.

15  Q    Is there a signature there?

16  A    Yes.

17  Q    Can you read the date?

18  A    I believe that's October 18 -- actually, November 18.

19  Q    11/18?

20  A    Yeah.  11/18/2012.

21  Q    Do you recall the date of when your hearing on the RVR was

22  held?

23  A    I believe that was October 28.  I'm not sure.

24  Q    At the bottom on the left-hand side there is a -- do you

25  see a phrase, "Copy of CDC 115 given to inmate after hearing"?

1    A    Yes.

2    Q    Is that box checked?

3    A    Yes.

4    Q    Did you receive this exhibit after the hearing on your

5    RVR?

6    A    Yes.

7    Q    And so you've seen this document before?

8    A    Yes.

9         MR. BENEDETTO:  Your Honor, at this point I'd like to

10   move Exhibit 2 into evidence.

11        THE COURT:  Any objection?

12        MS. NYGAARD:  No objection.

13        THE COURT:  Admitted.

14   (Trial Exhibit 2 received in evidence.)

15        MR. BENEDETTO:  Thank you, your Honor.

16   BY MR. BENEDETTO

17   Q    I'd like to show Mr. Perez an exhibit that's been

18   pre-admitted as; Exhibit 3.

19        THE COURT:  You may.

20   (Document displayed)

21   BY MR. BENEDETTO

22   Q    Do you see an image on your screen?

23   A    Yes.

24   Q    And do you recognize this document?

25   A    Yes, I do.

1  **Q**    And what is Exhibit 3?

2  **A**    This is the final copy put together by Lieutenant Anderson

3  after the hearing.

4  **Q**    So I'd like to direct your attention to the second page of

5  this document, which is Bates labeled Perez 000002.  Do you see

6  a name written in the box with "Captioned Signature of Writer"?

7  **A**    Yes.

8  **Q**    And what name is there?

9  **A**    That would be Correctional Lieutenant J.C. Anderson.

10 **Q**    And do you see a date under "Date Notice Signed"?

11 **A**    Yeah.  That would be 11/18/2012.

12 **Q**    What is your understanding of how Mr. Anderson decided the

13 RVR that was issued to you by Mr. Gates?

14 **A**    My understanding of his decision to find me not guilty, I

15 believe, was based on the fact that it is physically impossible

16 for somebody to obstruct the view into the cell the way it was

17 described by Correctional Officer.  But there was also a second

18 reason that he ruled the way he ruled.

19          **MS. NYGAARD:**  Objection, lack of knowledge.

20          **THE COURT:**  Sustained.

21          **MR. BENEDETTO:**  Okay.  I'll back up.

22 **BY MR. BENEDETTO**

23 **Q**    So to be clear, did Officer Anderson find you guilty of

24 any offense?

25 **A**    He found me guilty of no offense.

1  Q    And do you know whether there is a -- within the formal

2  charge of willful obstruction, do you know whether there is a

3  lesser included offense?

4  A    Yes.

5  Q    And what is that lesser included offense?

6  A    The lesser included offense would be refusal to obey

7  direct order.

8  Q    And were you found guilty of a refusal to obey orders on

9  October 10th --

10 A    No, I was not.

11 Q    -- 2012?

12      Do you know whether a refusal to obey orders is a Serious

13 Rules Violation?

14 A    I believe it's an Administrative Rules Violation.

15 Q    Which is different from a Serious Rules Violation?

16 A    Is different from a Serious Rules Violation.

17 Q    Did you disobey any orders on October 10, 2012?

18 A    None.

19 Q    Did you do anything during the October 10th search that

20 was disruptive or threatening?

21 A    No, I did not.  I was completely compliant with the orders

22 provided by correctional officers.

23 Q    Was there any additional staff intervention in response to

24 any of your conduct on October 10th, 2012?

25 A    No, there was not.

1  Q    Did the officers find anything in the toilet?

2  A    No.

3          MS. NYGAARD:  Objection, lack of knowledge.

4          THE COURT:  Sustained.

5  BY MR. BENEDETTO

6  Q    Would you be surprised to hear that there was paper found

7  in the toilet?

8  A    No, I would not be surprised.

9  Q    And why not?

10  A    It's pretty common in solitary confinement for prisoners

11  to rip up their personal letters from their family members to

12  avoid having them found in the trash, which is processed by

13  other prisoners at a lower level facility.

14  Q    What is your understanding of whether you would have been

15  released from the SHU had you been found guilty of the serious

16  RVR that we have just been discussing?

17  A    Can you rephrase the question again?

18  Q    Sure.

19      If you had been -- if Mr. Anderson found you guilty of the

20  willful obstruction charge --

21  A    Right.

22  Q    -- what is your understanding of whether that would have

23  had an effect on your ability to get out of the SHU?

24  A    Based on the STG Disciplinary Matrix and the new

25  regulation, that would cause it to -- one of the offenses or --

1  it would meet the criteria for placement or retainment in

2  solitary confinement.

3  **Q**    So that means not getting out?

4  **A**    It means not getting out.

5  **Q**    Do you have an understanding of how long you would have

6  remained in the SHU had the serious RVR been found to have

7  merit?

8         **MS. NYGAARD:**  Objection, speculation and lack of

9  knowledge.

10        **THE COURT:**  Overruled.

11 **A**    Based on my understanding of the regulations as outlined

12 in the various drafts that were put out by the department,

13 there would be two ways that it would affect me in terms of

14 time duration.

15        One of them would be through the DRB process, which if I

16 would have received a DRB process, which I was anticipating to

17 receive one, I would have been held in solitary confinement an

18 additional four years.

19 **BY MR. BENEDETTO**

20 **Q**    Is that DRB?

21 **A**    Yes.  That's the acronym --

22 **Q**    What is DRB?

23 **A**    Departmental Review Board, which is pretty much the

24 highest classification committee that exists in the Department

25 of Corrections.

1   Q    And do you know what a -- what the DRB does?

2   A    It takes a look at unique cases in the department.  But

3   specifically in referencing validation procedures, they look at

4   every single prisoner who had previously been validated to

5   determine whether or not they should remain or kept in solitary

6   confinement or released to the General Population.

7   Q    And you said four years?

8   A    That would be four years minimum.

9   Q    We talked a little bit about your cellmate, Mr. Guerrero.

10  A    Yes.

11  Q    Have you ever asked Mr. Guerrero to lie for you?

12  A    No.

13  Q    Have you ever asked Mr. Mendoza to lie for you?

14  A    No.

15  Q    Did Mr. Guerrero or Mr. Mendoza draft declarations that

16  were submitted with your complaint?

17  A    No.

18  Q    Were there declaration being -- did you submit

19  declarations at all in connection with your complaint?

20  A    Yes.

21  Q    And on whose behalf were those declarations submitted?

22  A    My behalf.

23  Q    Okay.  And did you actually write the words in those

24  declarations?

25  A    I believe -- if you're referencing the ones that were

 1  signed by Mr. Mendoza and Mr. Guerrero --

 2  **Q**    Correct.

 3  **A**    -- yes, I'm the one who actually handwritten -- hand wrote

 4  the declarations.

 5  **Q**    And were those declarations signed by Mr. Guerrero and

 6  Mr. Mendoza?

 7  **A**    Yes.

 8  **Q**    And why did you write them and not have them write them?

 9  **A**    Based on my acquired knowledge of proper format in

10  drafting declarations, I had the better ability to put them

11  together.

12  **Q**    When was the last time you saw Mr. Guerrero?

13  **A**    That would have been during the last hunger strike in

14  2013.

15  **Q**    Have you been in contact with him at all since July 2013?

16  **A**    No.

17  **Q**    How long have you known Mr. Mendoza?

18  **A**    I met Mr. Mendoza, I believe, in the year 2000.

19  **Q**    And when -- where did you meet him?

20  **A**    In the California correctional institution at Tehachapi,

21  California.

22  **Q**    When was the last time you had any contact with Mr.

23  Mendoza?

24  **A**    Same.  During the last hunger strike in 2013.

25  **Q**    Have you ever done any favors for Mr. Guerrero?

 1  **A**    Can you define "favors"?

 2  **Q**    I mean, have you ever --

 3  **A**    Help him out, stuff like that?

 4  **Q**    Do you know what a "favor" is?

 5  **A**    Well, I mean, yeah.  I've helped him out putting together

 6  some of his legal documents.  Sure.  Yeah.

 7  **Q**    Anything more than that?

 8  **A**    No.

 9  **Q**    What about for Mr. Mendoza?  Have you done any favors for

10  him?

11  **A**    Same.  Helped him out with his legal challenges.

12  **Q**    Do you think Mr. Mendoza owes you anything?

13  **A**    No.

14  **Q**    Have you offered either Mr. Guerrero or Mr. Mendoza

15  anything in exchange for their testifying in this case?

16  **A**    No.

17  **Q**    Mr. Perez, did any of the defendants physically assault

18  you?

19  **A**    No, they did not.

20  **Q**    Was the property they damaged in your cell worth a lot of

21  money?

22  **A**    No, it was not.

23  **Q**    Was the property that the defendants took worth a lot of

24  money?

25  **A**    No, it was not.

1  Q     So are we here today because one day your cell wasn't as

2  neat as it was the day before?

3  A     Not at all.  As an evolving society, our system of law

4  is --

5            MS. NYGAARD:  Objection.  This is a narrative.

6            THE COURT:  Overruled.

7  A     Our system of law requires prisoners like me and many

8  others to surrender our freedom, but our laws do not require

9  us, and we refuse to, surrender our human dignity or the

10  minimal constitutional rights that we retain even after

11  crossing the prison gates.

12       So for me, we're here because prison officials decided to

13  punish me for exercising my constitutional right to file a

14  lawsuit against their colleague.  They threatened Rudy and me.

15  They unnecessarily confiscated important legal documents that I

16  had.  They trashed my cell.  And then they wrote a false

17  disciplinary report in order to keep me in solitary

18  confinement.

19       This is not just about a messy cell or some sort of

20  inconvenience in having to defend against a trumped up RVR.

21  This cell was my whole world for the multiple years that I was

22  in there.  It's the only space where I was able to experience

23  the little bit of life that exists in solitary.

24       They didn't just take my stuff.  They took the only

25  possessions that I had.  It's all I had.  So to me it was a

 1   huge deal.

 2       I think the officers' actions also represent the sort of

 3   backlash that prisoners often have to hazard when speaking out

 4   or exercising their constitutional rights.  So to me, we're

 5   also here so that we can both inform and empower the public to

 6   deal with this continued corrupt course of conduct.  Because in

 7   our reality, the CDCR seems incapable or unwilling to do so.

 8   So that's why we're here.

 9           **MR. BENEDETTO:**  Thank you, Mr. Perez.  I have nothing

10   further.

11           **THE COURT:**  Ms. Nygaard.

12           **MS. NYGAARD:**  Yes.  Defendants would ask a brief

13   sidebar before we cross.

14           **THE COURT:**  Sure.

15       (Proceedings held at side bar.)

16           **MS. NYGAARD:**  We feel that plaintiff opened the door

17   for us to bring in information about his crime, when he

18   mentioned that he had made bad choices and pitfalls early in

19   his testimony.

20           **THE COURT:**  Overruled.

21       Is that it?

22           **MS. NYGAARD:**  That is it.

23           **MR. BENEDETTO:**  Thank you.

24       (Proceedings held in open court.)

25

<b><u>CROSS EXAMINATION</u></b>

**BY MS. NYGAARD**

**Q**    Good morning, Mr. Perez.

**A**    Good morning, Ms. Nygaard.

**Q**    It's true, isn't it, that you were convicted of a felony?

**A**    Yes.

**Q**    And you were sentenced to more than one year for that?

**A**    Yes.

**Q**    Before the cell search on October 10th, 2012, you did not know Officer Gates, did you?

**A**    No.

**Q**    And before the search, you did not know Officer Gongora, did you?

**A**    Let me backtrack.  Define "know."

**Q**    Did you know who they were?

**A**    Yes.

**Q**    Had you had interactions with them before?

**A**    Not personally.

**Q**    So how did you know officer Gongora?

**A**    During my time in solitary confinement, most of the people that were housed in close proximity to me were all validated by the Department of Corrections or either had been issued RVRs, and they would ask me to help them challenge their validations or their RVRs.  Some of these documents were prepared by Officer Gongora or Officer Gates.

 1       So in terms of knowing who they were, like I said, I never

 2  personally interacted with them, but I knew of them.

 3  **Q**    Okay.  Did you know Officer Healy?

 4  **A**    Same.

 5  **Q**    And before the search, did you know Officer Pimentel?

 6  **A**    Yes.

 7  **Q**    The same way or from any other contacts?

 8  **A**    No.  This is different.

 9  **Q**    Was it from a previous cell search that he had conducted?

10  **A**    Yes.

11  **Q**    Okay.  And did you know Officer Burris before

12  October 10th, 2012?

13  **A**    Yes.

14  **Q**    And was that because he had previously served you a

15  validation package in 2009?

16  **A**    I believe that and, also, he authored a disciplinary

17  report against me.

18  **Q**    Okay.  So for clarification, did you know Officer Gates

19  before the cell search?

20  **A**    Again, not personally, but in documents that I've reviewed

21  in the course of helping other prisoners out.

22  **Q**    Mr. Perez, you had your deposition taken on January 12,

23  2015, correct?

24  **A**    Yes.

25  **Q**    And at that time you were sworn in to tell the truth,

1  correct?

2  **A**     Correct.

3  **Q**     And did you tell the truth during your deposition?

4  **A**     I did.

5         **MS. NYGAARD:**  Your Honor, I'd like to show Mr. Perez

6  his deposition transcripts for impeachment purposes.

7         **THE COURT:**  If there's something that you believe is

8  inconsistent, you can read it?

9         **MS. NYGAARD:**  Okay.

10        **THE COURT:**  Absent objection from the other side.

11     And normally you should be providing me a copy of the

12  deposition transcript as well, if you want to be doing that.

13        **MS. NYGAARD:**  All right.  So --

14        **THE COURT:**  Is there -- do you want to --

15        **MS. NYGAARD:**  I would just like to read the questions

16  that I asked in his deposition.

17        **THE COURT:**  Do you want to describe the page and line

18  numbers so opposing counsel can review and determine if he has

19  an objection?

20        **MS. NYGAARD:**  Absolutely.  Page 143, Lines 9 through

21  17.

22        **MR. BENEDETTO:**  No objection.

23        **THE COURT:**  Okay.

24  BY MS. NYGAARD

25  **Q**    Okay.  So, Mr. Perez, at your deposition you were asked

```
 1   the question:

 2            "QUESTION:  Before October 10, 2012 did you know

 3        Officer Gates?"

 4        Do you remember being asked that question?

 5   A    Yes.

 6   Q    And you responded:

 7            "ANSWER:  No."

 8   A    Yes.

 9   Q    And your testimony now today is that you did know who he

10   was?

11   A    My testimony today is qualified on my understanding of

12   what you mean by "know" today.

13   Q    Okay.  Had you had any personal interactions with Officer

14   Gates before October 10th, 2012?

15   A    No.

16   Q    And going back to your deposition, again, you were asked:

17            "QUESTION:  Before October 10, 2012 did you know

18        Officer Gongora?"

19        And you responded:

20            "ANSWER:  No."

21        Is that correct?

22   A    Yes.

23   Q    So, again, today you testified that you did know Officer

24   Gongora before October 10th, 2012, correct?

25   A    That I did know him?
```

1  Q    Yes.

2  A    Yes.  With my -- again, my response was qualified with my

3  understanding of what you mean today when you say "know."

4  Q    Okay.  And had you had any personal interactions with

5  Officer Gongora before October 10th, 2012?

6  A    No.

7  Q    And, again, you had -- at your deposition you were asked

8  the question:

9          "QUESTION:  Before October 10th, 2012 did you know

10     Officer Healy?"

11     And you responded:

12          "ANSWER:  No."

13     Does that sound correct?

14  A    Yes.

15  Q    And you just said earlier that you did know Officer Healy

16  before October 10th, 2012?

17          MR. BENEDETTO:  Objection, misstates the testimony.

18          THE COURT:  I'm going to sustain any objection

19  because you haven't given me a copy of the deposition

20  testimony, so I don't have a way of determining whether there

21  is even an argument that the prior deposition testimony was

22  inconsistent.

23          MS. NYGAARD:  Your Honor, I'd ask to have admitted --

24          THE COURT:  We don't admit it.  Just give it to me.

25          MS. NYGAARD:  Ask to have shown to the judge the

 1  deposition transcript.

 2          THE CLERK:  Open it up for me next time.

 3          MS. NYGAARD:  I thought you needed it sealed.  My

 4  apologies.

 5      (Whereupon, document was tendered to the Court.)

 6          THE COURT:  Okay.  Now what page and line are you

 7  looking at?

 8          MS. NYGAARD:  Page 143, Lines 9 through 17.

 9          THE COURT:  Okay.  And what's your question?

10          MS. NYGAARD:  My question to Mr. Perez is that at his

11  deposition he stated he did not know Officer Gates, and today

12  he is stating that he did.

13      So I wanted clarification about what -- why he didn't say

14  he did at his deposition.

15          THE COURT:  I think he has answered that question.

16          MS. NYGAARD:  All right.

17          THE COURT:  Why don't you move on.

18          MS. NYGAARD:  All right.  I'll move on.  Thank you,

19  your Honor.

20  BY MS. NYGAARD

21  Q    So now you had a previous lawsuit that you had filed.

22  None of the defendants, Burris, Gates, Gongora, Healy or

23  Pimentel, in this case were defendants in that lawsuit, were

24  they?

25  A    No.

1  Q    And none of the defendants in that previous lawsuit worked

2  at Pelican Bay Prison, did they?

3  A    No.

4  Q    How tall are you, Mr. Perez?

5          MR. BENEDETTO:  Objection, relevance.

6          THE COURT:  Overruled.

7  A    Approximately 5'7, 5'6.

8  BY MS. NYGAARD

9  Q    And how much do you weigh?

10         MR. BENEDETTO:  Objection, relevance.

11         THE COURT:  Overruled.

12 A    I would say anywhere from 145 to 150.

13 BY MS. NYGAARD

14 Q    I'm sorry.  Could you say that again?

15 A    Anywhere from 145 to 150.

16 Q    Okay.  Thank you.

17      Now, you submitted an inmate appeal after this

18 October 10th cell search, correct?

19 A    Yes.  Multiple.

20 Q    And you did submit an Inmate Appeal on October 28th, 2012,

21 correct?

22 A    I believe so.

23 Q    And in that Inmate Appeal the only things that you

24 specifically requested be returned to you were pictures and

25 addresses, correct?

1  **A**    Yes.

2  **Q**    Now, during your deposition, you testified that when you

3  returned to your cell, you noticed that it was completely

4  trashed, correct?

5  **A**    Yes.

6          **THE COURT:**  Ms. Nygaard, can we have a sidebar to

7  talk about the rules for how to use deposition transcripts?

8          **MS. NYGAARD:**  Yes.

9      (Proceedings held at sidebar.)

10         **THE COURT:**  Okay.  Before you start talking to him

11 about his deposition transcript, if he testifies on the stand

12 in a way that you believe is inconsistent with his deposition

13 testimony, if that happens, what you're supposed to do is say:

14 Your Honor, I would like to read pages blank through blank,

15 lines blank through blank.  And then opposing counsel has an

16 opportunity to object.  And then I look at the testimony to

17 determine whether it's arguably inconsistent with how he's

18 testified on the stand.  And then you can read the questions

19 and answers to the deposition -- the questions and answers in

20 the deposition transcript.

21     But you can't use his deposition testimony as a launching

22 point for your cross examination.  That's the only limited

23 purpose for which the deposition testimony is relevant.

24         **MS. NYGAARD:**  Okay.

25         **THE COURT:**  Okay.  Thanks.

```
 1        (Proceedings held in open court.)
 2   BY MS. NYGAARD
 3   Q    Mr. Perez, when you were first brought back to your cell
 4   on October 10th, 2012 after it had been searched, you didn't
 5   say anything to anybody about the condition of your cell, did
 6   you?
 7   A    Can you repeat the question?
 8   Q    Sure.
 9        When you were returned to your cell on October 10th, 2012
10   after the officers had searched it, doesn't say anything to
11   anybody about the condition of your cell, did you?
12            MR. BENEDETTO:  Objection, hearsay.
13            THE COURT:  Overruled.
14   A    Okay.  If I'm understanding your question correctly, did I
15   mention anything to anybody about the cell search?  The
16   condition of --
17   BY MS. NYGAARD
18   Q    Correct.
19   A    Yeah, I did.  To my cellmate.
20   Q    Did you mention anything to -- the condition of the cell
21   to any staff member at Pelican Bay?
22   A    No, I did not.
23   Q    Now, you mentioned repeatedly this morning that the
24   Security Housing Unit at Pelican Bay is solitary, but you had a
25   cellmate for part of that time, correct?
```

```
 1   A     The very minimal part of that time, yes.

 2   Q     And you could talk to other inmates that were housed in

 3   the same housing unit, correct?

 4   A     Yes.

 5   Q     And other inmates would walk past your cell to go to the

 6   shower?

 7   A     Yes.

 8   Q     So the term "solitary" isn't actually correct, is it?

 9             MR. BENEDETTO:  Objection, argumentative.

10             THE COURT:  Overruled.

11   BY MS. NYGAARD

12   Q     It's a "yes" or "no."

13   A     I would say yes, it is correct.

14   Q     While you were housed in the Security Housing Unit, you

15   could have non-contact visitation, correct?

16   A     In the Security Housing Unit, right?

17   Q     Pardon me?

18   A     In the Security Housing Unit?

19   Q     Yes.

20   A     Yes.

21   Q     And inmates in the Security Housing Unit back in 2012

22   could take college courses through the mail, correct?

23   A     That's my understanding.

24   Q     And you could take a GED course through the mail, correct,

25   when you were housed in the SHU?
```

 1  **A**    Yes.

 2  **Q**    And currently you said you're housed in the General

 3  Population.  You eat in your cell in the General Population,

 4  correct?

 5  **A**    At this particular facility, yes.

 6  **Q**    And your cell in the General Population is approximately

 7  the same size as your cell was in the SHU?

 8  **A**    I would agree with that.

 9  **Q**    Now, you testified that some legal papers had been taken

10  during the search.  You had lawyers representing you on that

11  legal case at the time, correct?

12  **A**    Yes.

13  **Q**    And, in fact, they were the ones who had prepared that

14  brief that you claim was taken, correct?

15  **A**    In coordination with me, yes.

16  **Q**    Okay.  And we saw that Cell Search Receipt earlier that

17  indicated you had two televisions in your cell, amongst you and

18  Guerrero, correct?

19  **A**    That's correct.

20  **Q**    And were your televisions broken during the cell search?

21  **A**    No, they were not.

22  **Q**    Neither yours or Guerrero's?  I should specify.  Was your

23  television broken?

24  **A**    No.

25  **Q**    And was Guerrero's television broken?

 1  **A**    No.

 2  **Q**    And due to where you were located when the officers were

 3  searching your cell, you couldn't actually see them do the

 4  search, could you?

 5  **A**    When I was kept in the holding cell?  No, I could not.

 6  **Q**    Okay.  So you can't actually say that all four, Gongora,

 7  Gates, Healy and Pimentel, were involved with the actual search

 8  of your cell, correct?

 9  **A**    Based on the descriptions that I received from Mr.

10  Mendoza, yeah.

11  **Q**    I'd like to show you what has been previously been

12  admitted as Exhibit 50.

13       (Document displayed)

14           **MS. NYGAARD:**  And I'm going to ask that the area

15  under "Condition of Cell" be enlarged?  That whole section?

16       Actually -- okay.  I would actually request Exhibit 49

17  first.

18       (Document displayed)

19           **MS. NYGAARD:**  And please enlarge the box under

20  "Condition of Cell".

21       (Document enlarged.)

22  **BY MS. NYGAARD**

23  **Q**    Okay.  Under the "Condition of Cell" on this Cell Search

24  Receipt, it says:

25           "All P/W removed for active/inactive review by

1       IGI."

2       Do you have any idea what "P/W" means?

3   A   Yes.

4   Q   And what is that?

5   A   Paperwork.

6       (Document displayed.)

7   Q   And then on Exhibit 50 it shows that:

8           "All paperwork" --

9           MS. NYGAARD:  Can you blow that part up, please?

10      (Document enlarged.)

11  BY MS. NYGAARD

12  Q   It shows that:

13          "All paperwork returned on 10/11/12.  Items taken

14      listed below."

15      Correct?

16  A   Correct.

17  Q   Okay.  How many source items were used to validate you as

18  an associate of the Mexican Mafia in your most recent

19  validation?

20          MR. BENEDETTO:  Objection, relevance.

21          THE COURT:  Sustained.

22  BY MS. NYGAARD

23  Q   Okay.  I'd now like to show you Exhibit 3, which has

24  previously been admitted.

25      (Document displayed)

```
 1              MS. NYGAARD:  If we could go to the second page,

 2  which is Perez 2?

 3       Okay.  And if you could please pull out the bottom

 4  paragraph, B?

 5       (Document enlarged.)

 6  BY MS. NYGAARD

 7  Q    Mr. Perez, can you read that sentence to me, please?

 8  A    Sure.

 9              "B:  Photograph evidence of what was collected

10       from the toilet clearly depicting torn up paper

11       'kites.'"

12  Q    Okay.  And this is on the Rules Violation Report form that

13  was completed by Lieutenant Anderson, correct?

14  A    That's correct.

15  Q    So were you shown photographic evidence of these -- what

16  had been collected from your toilet clearly depicting torn up

17  kites at your disciplinary hearing?

18  A    I was shown photographic evidence of paper depicting

19  kites.  I'm not sure if they were from my cell.

20  Q    Okay.  But you were shown photographs of papers that --

21  strike that.

22       Then I'd also like to move to the next page of this RVR, a

23  page that's marked Perez 3.

24       (Document displayed)

25  Q    And in Section D --
```

```
 1            MS. NYGAARD:  Just pull up the entire Section D,
 2   please?
 3       (Document enlarged.)
 4   BY MS. NYGAARD
 5   Q    And could you read the second paragraph -- excuse me, the
 6   second sentence starting with, "Based on this..."?
 7   A    Sure.
 8            "Based on this SHO's interpretation of Officer
 9        Gates' report, it does appear plausible that Perez
10        would be able to move between his cellmate and cell
11        front.  Although it is" --
12   Q    Okay, that's fine.  So I just wanted to point that part
13   out in the report?
14   A    Okay.
15   Q    Now, when the officers came to search your cell, you were
16   not due for an active or inactive review of your gang status,
17   were you?
18   A    Given the date of my initial validation -- or, actually,
19   my subsequent active/inactive review which was in 2009, I
20   wasn't up for another one until 2014, I believe.
21   Q    Okay.  And the -- and you testified that you were still
22   negotiating terms of the settlement agreement.  So there was no
23   valid settlement agreement in place at that time either,
24   correct?
25   A    That's correct.
```

1  Q    So in search came as a surprise to you, correct?

2  A    Yes.

3  Q    And items confiscated during the cell search were used to

4  validate you as an associate of the Mexican Mafia, correct?

5         MR. BENEDETTO:  Objection, relevance.

6         THE COURT:  Sustained.

7  BY MS. NYGAARD

8  Q    And you are still validated by the Department of

9  Corrections as an associate of the Mexican Mafia, correct?

10        MR. BENEDETTO:  Objection, relevance.

11        THE COURT:  Sustained.

12     And I'll just remind the jury at this point that -- of the

13  instructions that I gave you at the outset, which is that

14  questions by lawyers are not themselves evidence.  And if an

15  objection is sustained, it means that you should disregard the

16  question asked by the lawyer because that, itself, is not

17  evidence and the ruling is that the witness should not be

18  required to respond to it or should not be permitted to respond

19  to it.

20     So you should disregard Ms. Nygaard's questions when the

21  objections have been sustained.

22     Thank you.

23  BY MS. NYGAARD

24  Q    Now, we heard that you didn't have any Rule Violation

25  Reports with a gang nexus in October 2012, correct?

1  A    Correct.

2  Q    But you did have other Serious Rules Violations, correct?

3  A    With no STG nexus, yes.

4  Q    Okay.  And, Mr. Perez, what do you mean by your cell

5  having been completely trashed?

6  A    Precisely that.  The cell was completely trashed.  The

7  condition of the cell when I arrived was -- I mean, I think

8  that's the best way to describe it, "trashed."  All my items of

9  clothing, all my linen, and my hygiene items were littered on

10  the ground or in the locker.

11  Q    Okay.  Now, when you had your -- earlier today you

12  testified that there were dirty bootprints on your clothing and

13  sheets, correct?

14  A    That's correct.

15       (Discussion held off the record between defense

16        counsel.)

17  Q    But when you had your deposition taken and were asked what

18  you meant by "completely trashed," you didn't mention dirty

19  bootprints, did you?

20  A    I don't recall.

21  Q    And you didn't mention that Guerrero's mattress was on the

22  floor, did you?

23  A    I don't recall the exact description that I provided about

24  the condition of the cell during my deposition, but I believe I

25  did describe that it was trashed.  I just don't know the exact

1  detail I provided during the deposition.

2  **Q**    And, Mr. Perez, isn't it true that you are currently

3  endorsed or approved to be transferred to a prison in the

4  Central Valley?

5  **A**    That's correct.

6  **Q**    And that would be closer to your family, correct?

7  **A**    After almost 13 years, yeah.

8         **MS. NYGAARD:**  If I could just have one moment?

9         (Discussion held off the record between defense

10        counsel.)

11         **MS. NYGAARD:**  Defendants have no further questions

12 for Mr. Perez.

13         **THE COURT:**  Okay, thank you.

14     Any redirect?

15         **MR. BENEDETTO:**  Just a few.

16         **THE COURT:**  Sure.

17                 <u>**REDIRECT EXAMINATION**</u>

18 **BY MR. BENEDETTO**

19 **Q**    Good morning, Mr. Perez.

20 **A**    Good morning.

21 **Q**    I just have a few follow-up items.

22 **A**    Sure.

23 **Q**    You testified that you're currently in the General

24 Population at Pelican Bay, is that right?

25 **A**    That's correct.

1  Q    Can you exercise when you're in the General Population?

2  A    Yeah, you could.

3  Q    When you exercise, do you go to the same yard that you

4  went in -- that you went to when you were in the SHU?

5  A    Not at all.

6  Q    Is the yard different?

7  A    It's extremely different.

8  Q    How so?

9  A    The space that you're allowed to -- that you're provided

10  access to is about 100 times bigger than the dog runs that are

11  in the Security Housing Unit.

12      In addition to that, you have a wide variety of exercise

13  equipment, such as pull-up bars, dip bars.  You have an entire

14  space where you can play football.  You can play baseball.  You

15  can play basketball.  You could run around an entire track --

16  Q    Now, is this space in corridors or outdoors?

17  A    It's outdoors.

18  Q    So you see the sky?

19  A    You could see the sky.  You could see the trees.  Nothing

20  compared to the dog run in solitary confinement.

21  Q    Now, you testified that when you were in the SHU, you were

22  permitted non-contact visits, is that right?

23  A    Yes.

24  Q    And can you explain to the jury what a non-contact visit

25  would be like?

1  **A**    Sure.  A non-contact visit in solitary confinement is a

2  small cubicle about the size of this podium.  And it has a

3  small table with a headphone set that you use to communicate

4  with your visitor, who is behind a barrier, a glass barrier.

5       It's the only way you can have -- excuse me.  It's the

6  only way you could have a visit in solitary confinement.

7  **Q**    So you can't touch them through that glass, right?

8  **A**    No, not at all.

9  **Q**    Ms. Nygaard showed you an exhibit that we had gone over in

10  the morning, Exhibit 49, which was the Cell Search Receipt that

11  you received on October 10th --

12  **A**    Yes.

13  **Q**    -- 2012.

14       Do you remember that document?

15  **A**    Yes.

16       (Document displayed)

17  **Q**    And the document says:

18          "All paperwork removed for active/inactive

19       review."

20       Do you remember that phrase?

21  **A**    Yes.

22  **Q**    Were you eligible for an active/inactive review on

23  October 10th, 2012?

24  **A**    Not at all.

25           **MR. BENEDETTO:**  Tim, can you bring up Exhibit 50,

 1  please?  Sorry, Exhibit 3.

 2       (Document displayed)

 3  **BY MR. BENEDETTO**

 4  **Q**    Now, both Ms. Nygaard and I showed you this document,

 5  which has been pre-admitted as Exhibit 3.

 6       Do you remember this document?

 7  **A**    Yes.

 8  **Q**    And what is this document again?

 9  **A**    Again, this is the final copy of Lieutenant J.C.

10  Anderson's findings of the disciplinary hearing for the RVR

11  that was issued by Correctional Officer Gates .

12  **Q**    And can you --

13            **MR. BENEDETTO:**  Tim, can you scroll to the next page,

14  Page 2?

15       (Document displayed)

16  **BY MR. BENEDETTO**

17  **Q**    And, Mr. Perez, I'll direct your attention to the

18  paragraph in the middle of the page under "Finding."

19            **MR. BENEDETTO:**  Tim, can you blow that up for me?

20       (Document enlarged.)

21  **BY MR. BENEDETTO**

22  **Q**    Under "Finding," can you read the first sentence?

23  **A**    Sure.

24            "Not guilty of CCR -- which is an acronym for

25       California Code of Regulation -- Section 3005(b)

```
 1        conduct of a lesser and included CCR 3315(a)(3)(J)

 2        Division F offense, refusal to obey orders."

 3  Q    Can you please read the next sentence?

 4  A    Sure.

 5        "Not guilty of the charged Division D(7) offense,

 6        willfully resisting, delaying, or obstructing any

 7        peace officer in the performance of duty."

 8  Q    Then I would like you to read the last sentence in that

 9  paragraph?

10  A    Okay.

11        "This finding is based upon the following

12        preponderance of evidence."

13  Q    And you see there is a colon there, right?

14  A    There is a colon there, yes.

15         MR. BENEDETTO:   Tim, can you go back to the exhibit?

16  And can you blow up beginning with this finding through B?

17        (Document enlarged.)

18  BY MR. BENEDETTO

19  Q    Sub (b) section:

20        "Photographic evidence of what was collected from

21        the toilet clearly depicting torn up paper kites."

22        Mr. Perez, does that follow the phrase:

23        "This finding is based upon the following

24        preponderance of evidence"?

25  A    Can you repeat that again, please?
```

```
 1  Q    Yes.  Does Section B follow -- do you see Section B there?

 2  A    Yes.

 3  Q    That's after the sentence:

 4          "This finding is based upon the following

 5       preponderance of the evidence."

 6       Is that right?

 7  A    Yes.

 8  Q    Mister -- what was Mr. Anderson's finding as to your

 9  guilt?

10  A    Not guilty.

11          MR. BENEDETTO:  Tim, can you go to the next page,

12  please?  Page 3?

13       (Document displayed)

14          MR. BENEDETTO:  Can you blow up Section D?

15       (Document enlarged.)

16  BY MR. BENEDETTO

17  Q    Now, Ms. Nygaard had you read the second sentence, is that

18  right?

19  A    Yes.  I believe that's correct, yes.

20  Q    Can you please read the sentence beginning with

21  "Although"?

22  A    Sure.

23          "Although it is likely that Perez would want to

24       mask Guerrero's actions, he clearly did not."

25  Q    No further questions.
```

BENEDETTO - REDIRECT EXAMINATION - PEREZ

```
 1              THE COURT:  Any recross?

 2              MS. NYGAARD:  No, your Honor.

 3              THE COURT:  Okay.  Thank you.  We -- thank you.

 4         We'll take a five-minute break and have you all stretch

 5    your legs a little bit.  Head back into the jury room and then

 6    we'll resume a little bit more testimony before the lunch hour.

 7         (Jury exits courtroom at 11:30 a.m.)

 8              THE COURT:  Only.  So I'll be back in a couple

 9    minutes.  Will the next witness be?

10              MR. LEE:  Should we --

11              THE COURT:  You should start with one of the

12    defendants or whoever it is that you want to call next.

13              MR. LEE:  Okay.

14              THE COURT:  We'll go until noon.

15              MR. LEE:  Okay.

16              THE COURT:  We'll interrupt that defendant's

17    testimony so that immediately after lunch, at about 12:45, we

18    will -- you can start the video testimony of the two witnesses

19    from the prison.

20              MR. LEE:  Okay.

21              THE COURT:  And then you can resume the defendant's

22    testimony.

23              MR. SEALS:  May I ask one question, your Honor?

24              THE COURT:  Sure.

25              MR. SEALS:  We previously discussed when they call
```

 1  the defendants to do a hostile direct, having our side conduct

 2  the cross and the direct so --

 3          **THE COURT:**  Of course.  Yes.

 4      I'll be back in a couple minutes.

 5      (Whereupon there was a recess in the proceedings

 6       from 11:31 a.m. until 11:37 a.m.)

 7          **THE COURT:**  Okay.  Mr. Lee, do you want to call your

 8  next witness?

 9          **MR. LEE:**  Yes, your Honor.  The plaintiff calls

10  defendant Guillermo Pimentel.

11                          <u>**GUILLERMO PIMENTEL**</u>,

12  called as a witness for the Plaintiff herein, having been first

13  duly sworn, was examined and testified as follows:

14          **THE WITNESS:**  I do.

15          **THE CLERK:**  Thank you.  Please be seated.

16      For the record, please state your first and last name and

17  spell both.

18          **THE WITNESS:**  Guillermo Pimentel.  G-U-I-L-L-E-R-M-O.

19  Pimentel, P-I-M-E-N-T-E-L.

20          **THE CLERK:**  Thank you.

21                          <u>**DIRECT EXAMINATION**</u>

22  BY MR. LEE

23  Q    Good morning, Officer Pimentel.

24  A    Good morning.

25  Q    Officer Pimentel, you are a correctional officer at

```
 1   Pelican Bay State Prison.  Correct?

 2   A    That's correct.

 3   Q    And you have been a correctional officer at Pelican Bay

 4   for approximately 12 years, is that right?

 5   A    Thirteen, as of this month.

 6   Q    As of this month, 13 years.  And you would agree that

 7   Pelican Bay is a maximum-security prison in California,

 8   correct?

 9   A    Correct.

10   Q    And it's the -- Pelican Bay is the highest level of

11   security among correctional facilities in California?

12   A    Correct.

13   Q    And would you agree that within Pelican Bay, there's a

14   separate unit called the Security Housing Unit, or SHU?

15   Correct?

16   A    Correct.

17   Q    And the SHU is the highest level of security within

18   Pelican Bay.  Correct?

19   A    No.  That would be the Ad. Seg.

20   Q    Ad. Seg. is different from the SHU?

21   A    In Ad. Seg. they're escorted to the yards, where in SHU

22   they can walk.

23   Q    And other than the Ad. Seg., the Security Housing Unit is

24   the highest level of security within Pelican Bay.  Correct?

25   A    Correct.
```

1  Q     And the Security Housing Unit has a separate entrance with

2  separate locked doors, in order -- that one must use to access

3  it within Pelican Bay.  Correct?

4  A     Correct.

5  Q     One can't just go there freely from the general

6  population, correct?

7  A     Correct.

8  Q     And you don't still work in the SHU?

9  A     No, I don't.

10  Q     The cells within the SHU, fair to say that they are

11  approximately eight feet by ten feet?

12  A     Approximate, yes.

13  Q     Surrounded on three sides by concrete walls?

14  A     Yes.

15  Q     And on the front by a metal door with small holes in it?

16  A     Correct.

17  Q     And the cell has a concrete bunk, correct?

18  A     Yes.

19  Q     So the beds are essentially built in separate concrete

20  slabs?

21  A     Right.

22  Q     And there's a separate area that Mr. Perez described as a

23  table that is built into the actual cell, correct?

24  A     It's like a desk area, correct.

25  Q     And it's not actually movable, correct?

1  **A**    No.

2  **Q**    And there's a metal sink, right?

3  **A**    Yes.

4  **Q**    And a metal toilet?

5  **A**    Correct.

6  **Q**    And those are actually attached to the cell?

7  **A**    Right.

8  **Q**    And there is no furniture within the cell that an inmate

9  can actually move, correct?

10 **A**    No.

11 **Q**    And the storage area within the cell is a cubbyhole below

12 the lowest concrete slab bunk.  Correct?

13 **A**    Correct.

14 **Q**    There's no separate storage area?

15 **A**    No.

16 **Q**    And so what Mr. Perez described as a locker is actually a

17 cubby built into the wall?

18 **A**    Right, but there are times that they will make them out

19 of, like, contraband cardboard; they'll make more storage and

20 they'll put it on the bunk.

21 **Q**    Right, but that wasn't actually my question.

22 **A**    Right.

23 **Q**    You understood my question, right?

24 **A**    Yeah.  Permanent, yeah.

25 **Q**    There's no windows in the cell, correct?

PIMENTEL - DIRECT EXAMINATION / LEE

1    **A**    No.

2    **Q**    No natural light in the cell?

3    **A**    No.

4    **Q**    And many of the prisoners in the SHU are in there, in

5    their cells alone, correct?

6    **A**    Yes.

7    **Q**    And some prisoners have cellmates, correct?

8    **A**    Correct.

9    **Q**    When -- whether an inmate has a cellmate or is alone, is

10   in there alone, it's the same size cell, correct?

11   **A**    Correct.

12   **Q**    And officers or anybody on the outside of the cell can see

13   through the holes in the steel door into the cell?

14   **A**    Yes.

15   **Q**    And there's a slot in the door?

16   **A**    The food tray, yes.

17   **Q**    And that is used to hand an inmate his meals, correct?

18   **A**    Correct.

19   **Q**    And it's also used when an inmate is asked to cuff up,

20   correct?

21   **A**    Yes.

22   **Q**    And so the inmate is asked to put his arms or his hands

23   through that same slot in order for handcuffs to be applied,

24   correct?

25   **A**    Right.

1  Q    Inmates eat all their meals in the cell?

2  A    Yes, they do.

3  Q    And inmates spend approximately 22 and a half hours day in

4  their cell?

5  A    Approximate.  Yeah.

6  Q    They are allowed to leave their cells for showers,

7  correct?

8  A    Correct.

9  Q    And that's once every three days?

10  A    No, it's usually every other day.

11  Q    Every other day?

12  A    They do lower tier one day, upper tier the next.  But the

13  rule is 72 hours.

14  Q    Okay.  So the requirement is that they be provided a

15  shower --

16  A    At a minimum --

17  Q    -- every three days?

18  A    Yeah.

19  Q    And SHU prisoners are allowed out of the their cells for

20  exercise every day?

21  A    Yes, they are.

22  Q    And that's to go to the exercise yard, a picture of which

23  has been shown to the jury, correct?

24  A    Yes.

25  Q    And you would agree that that is a fair and accurate

1  depiction of what one of the exercise yards at the SHU looks

2  like, correct?

3  **A**    Yes.

4  **Q**    It's about ten feet by 20 feet, would you say?

5  **A**    Approximate, yeah.

6  **Q**    Very, very high concrete walls?

7  **A**    Yes.

8  **Q**    And in 2012, there was no exercise equipment?

9  **A**    None allowed, no.  But they manufacture their own to work

10  out.

11  **Q**    But you understood my -- my question was asking what

12  exercise equipment is permitted in the yard.

13  **A**    Correct.

14  **Q**    And there was none, correct, in 2012?

15  **A**    Right.

16  **Q**    And Pelican Bay also has another area outside of the SHU

17  which we have been referring to as the "general population."

18  Is that fair to say?

19  **A**    Yes.

20  **Q**    And the conditions in the SHU are more restrictive than

21  those in the general population.  Correct?

22  **A**    Correct.

23  **Q**    In the general population, there's a very large yard?

24  **A**    Yes.

25  **Q**    Mr. Perez described it, I think, as maybe a couple of

1   football fields?

2   **A**   Correct.

3   **Q**   And prisoners are allowed to go there every day?

4   **A**   Unless they're on lockdown for security concerns.

5   **Q**   But as a general matter, they're allowed to go there every

6   day?

7   **A**   Right.

8   **Q**   And in the SHU, prisoners are not allowed to have what are

9   called contact visits.  Right?

10  **A**   Correct.

11  **Q**   And a contact visit is where you can actually physically

12  make contact with the person you are visiting?

13  **A**   Right.

14  **Q**   And in the general population, as a general matter,

15  prisoners are allowed to have contact visits?

16  **A**   Yes.

17  **Q**   In the SHU, at least during 2012, prisoners were not

18  allowed to make phone calls, correct?

19  **A**   Unless it was an emergency, correct.

20  **Q**   Okay.  So absent an emergency, no phone calls at all,

21  ever?

22  **A**   No.

23  **Q**   And in the general population, prisoners are allowed to

24  make phone calls?

25  **A**   Yeah, I believe so.  I haven't been in and out main

```
 1   population for a while.  But yeah, the way it used to be, it

 2   was daily.

 3        (Reporter interruption)

 4            THE WITNESS:  Yes.

 5   BY MR. LEE:

 6   Q    And in the SHU, you heard testimony this morning, the law

 7   library -- the SHU has its own law library?

 8   A    Correct.

 9   Q    That's not a library with stacks of books that one can

10   walk through, correct?

11   A    Well, the inmates can't walk through there, but there are

12   rows with books.  On shelves.

13   Q    And the general population has a separate law library,

14   correct?

15   A    Correct.

16   Q    And in the SHU, when a prisoner wants to use the law

17   library, the prisoner is required to be isolated, correct?

18   A    In a holding cell, correct, yeah.

19   Q    Either a holding -- a holding cell is one option, right?

20   A    Right.

21   Q    And another option is one of the vertical steel cages,

22   correct?

23   A    Well, they're all holding cells.  There's no cages there.

24   Like portable holding cells, and then there's permanent ones.

25        (Reporter interruption)
```

1              **THE WITNESS:**  Yeah, sorry.

2         Yeah, there's holding cells that were manufactured when

3    the institution was made.  And then there's holding cells that

4    are manufactured out of metal.  But there's no cages.

5    **BY MR. LEE:**

6    **Q**    Okay.  So there's built-in holding cells.

7    **A**    Right.

8    **Q**    That are essentially permanent to the facility.

9    **A**    Right.

10   **Q**    And then there are portable holding cells?

11   **A**    Correct.

12   **Q**    Made out of metal?

13   **A**    Right.

14   **Q**    And if an inmate is using either the metal portable

15   holding cell or the permanent holding cell, books are

16   individually handed to that inmate in order for him to be able

17   to use them.  Correct?

18   **A**    I'm not sure.  I haven't spent much time in there.

19   **Q**    Inmates in the SHU don't actually go to any job, correct,

20   in the prison?

21   **A**    No.

22   **Q**    And other than going to the shower and going to the small

23   exercise yard, inmates are required to remain in the cell.

24   Correct?

25   **A**    Well, not exactly, because going back to the jobs, they're

 1   assigned a porter.  And the porters come out to the sections

 2   and clean up.  So, yeah, there is release time for certain

 3   inmates.

 4          **THE COURT:**  Officer Pimentel, can I ask you to pull

 5   the mic a little closer to you?

 6          **THE WITNESS:**  Yeah.

 7          **THE COURT:**  Or --

 8          **THE WITNESS:**  I don't speak loud enough, huh?

 9          **THE COURT:**  That's okay.

10          **THE WITNESS:**  Okay.

11      (Request complied with by the Witness)

12   **BY MR. LEE:**

13   **Q**    Now, in October, 2012, you held the title Assistant

14   Institutional Gang Investigator.  Correct?

15   **A**    That's correct.

16   **Q**    And the short for that is "AIGI," right?

17   **A**    Correct.

18   **Q**    And you are no longer an AIGI?

19   **A**    No, I'm not.

20   **Q**    You spent about four years as an AIGI?

21   **A**    Yes, I did.

22   **Q**    And then you decided you wanted to do something different?

23   **A**    Yeah.  Try something new.

24   **Q**    And as an AIGI, one of your jobs wars to monitor and

25   investigate activity by prisoners who could potentially be

1  somehow affiliated with a prison gang.  Is that fair to say?

2  **A**    That's correct.

3  **Q**    And as an AIGI, you received special training in order to

4  help you learn how to do that.  Correct?

5  **A**    Correct.

6  **Q**    You received training as an investigator, right?

7  **A**    Yes.

8  **Q**    And you received training in investigative methods and

9  techniques, correct?

10 **A**    Correct.

11 **Q**    And one of our objectives as an AIGI is to get to know who

12 the actual prisoners are, correct?

13 **A**    Not necessarily, because there -- there's no way to get to

14 know them all because in the Security Housing Unit there's

15 like, just guesstimating, about 1,200 inmates, so there's no

16 way to get to know them all.

17 **Q**    But ideally, you would like to get to know them so you can

18 monitor their activities, right?

19 **A**    You wish, yeah.

20 **Q**    That's your objective, right?

21 **A**    Yes.

22 **Q**    And one of the ways you do that is you read inmates' mail,

23 correct?

24 **A**    Correct.

25 **Q**    And you read incoming mail, right?

1   **A**    Yes.

2   **Q**    And you read outgoing mail, correct?

3   **A**    Yes.

4   **Q**    And another way you do that is you monitor the prisoners'

5   activities generally.  Correct?

6   **A**    Could you clarify that?  Activities?

7   **Q**    You try to keep track of who the prisoners are talking to,

8   right?

9   **A**    How?

10  **Q**    Well, is that -- is it fair to say that that's one of the

11  things you do as an AIGI, is to determine which prisoners are

12  associating with which other prisoners?

13  **A**    Via the mail, but -- you don't -- maybe visits?  I don't

14  know what else, though.

15  **Q**    And another way as an AIGI you try to do your job and try

16  to monitor potential prison gang activity is through cell

17  searches.  Right?

18  **A**    Correct.

19  **Q**    And you receive training on how to do cell searches,

20  right?

21  **A**    Right.

22  **Q**    Now, in October of 2012, there were approximately seven

23  AIGIs, is that correct?

24  **A**    That's correct.

25  **Q**    And that group was responsible for among other things, the

```
1    Security Housing Unit at Pelican Bay, right?

2    A    The validation stuff or -- yeah, in general, yes.

3    Q    And in fact, the AIGIs had an office within the SHU,

4    correct?

5    A    Yes.

6    Q    And your co-defendants, Officer Gates, Officer Burris,

7    Officer Healy, and Officer Gongora, were all AIGIs at the time,

8    right?

9    A    Yes.

10   Q    So the five of you constituted five of the seven AIGIs at

11   the time.  Correct?

12   A    Yes.

13   Q    And you interacted regularly with the other AIGIs.  Right?

14   A    Yes.

15   Q    During time you were an AIGI, you actually shared an

16   office with Officer Gates, correct?

17   A    For a -- for a time, yes.

18   Q    And you and Officer Gates worked very closely together,

19   correct?

20   A    In the same office, it was a small office, yes.

21   Q    And you have known Mr. Gates for a few years.  Right?

22   A    Prior to working in the unit?

23   Q    Just generally, through your time at Pelican Bay.

24   A    I knew his name, I knew who he was.

25   Q    And then once you started working with him, you got to
```

1  know him much better.  Right?

2  **A**    Yes.

3  **Q**    And you would consider Officer Gates a friend, correct?

4  **A**    We don't hang out like friends but yeah -- we're friends.

5  **Q**    And for a period of time, you shared an office with

6  Officer Healy, correct?

7  **A**    Yes.

8  **Q**    And you worked closely with him too, right?

9  **A**    In the same office, yes.

10 **Q**    And you worked with him on a daily basis, correct?

11 **A**    Yes.

12 **Q**    You knew Officer Healy before he came to work as an AIGI,

13 correct?

14 **A**    Yes.

15 **Q**    And as to Officer Gongora, he's somebody you have known a

16 long time, right?

17 **A**    Yeah, I have known him throughout my career.

18 **Q**    So over ten years you have known Officer Gongora?

19 **A**    Yes, I -- I would say more than ten years.

20 **Q**    More than ten years?

21 **A**    Yeah.

22 **Q**    And you would consider him a friend, right?

23 **A**    Yes.

24 **Q**    And you have known Officer Burris for most of your time at

25 Pelican Bay?

1    A    Yes.

2    Q    And so you have known Officer Burris for over ten years as

3    well?

4    A    Yeah.

5    Q    And as an AIGI, since one of your responsibilities is to

6    monitor potential affiliation with a prison gang, one of the

7    things you do is try to share information among and with your

8    fellow AIGIs, correct?

9    A    Yes.

10   Q    And you all work closely together.  So I asked you about

11   specific working relationships, but it's fair to say that all

12   five of you worked closely together, correct?

13   A    Yes.

14   Q    And you all shared information about the various

15   investigations that you were engaged in, correct?

16   A    Here and there, because it's a busy day, so there's only

17   so much time to talk, actually.

18   Q    But ideally, one of your objectives is to share

19   information, right?

20   A    Correct.

21   Q    Because that's what a good investigator does, right?  If

22   you have relevant information, you would want to share with it

23   your fellow investigators, wouldn't you?

24   A    It's a need-to-know basis, actually.  I know the

25   lieutenant would need to know, and the sergeant, probably.

 1      There's just not enough time in the day to sit around and

 2  talk about all these certain things when we have got an active

 3  investigation, reading lots of mail and stuff.

 4      So yeah, as much as possible.

 5  Q    Okay.  You are familiar with California Department of

 6  Corrections policies that govern how cell searches are to be

 7  conducted, are you?

 8  A    Correct.

 9  Q    And you know what Title 15 of the Code of California

10  Regulations is?

11  A    I couldn't quote it for you.

12  Q    Are you aware that Title 15 of the California Code of

13  Regulations contains the rules and regulations that govern how

14  adult prisons in the state of California are operated?

15  A    Yes.

16  Q    And you are aware that Title 15 has a provision that

17  concerns cell searches in particular, correct?

18  A    Correct.

19  Q    And in your experience, are all prison guards, all

20  correctional officers, trained on those procedures?

21  A    At the academy.

22  Q    And you were trained on how cell searches are to be

23  conducted, correct?

24  A    Correct.

25  Q    And you were trained to comply with Title 15 of the Code

1    of California Regulations.  Correct?

2    **A**    Correct.

3    **Q**    And that was a specific topic covered in the academy,

4    correct?

5    **A**    Correct.

6    **Q**    And you received refresher training on that, correct?

7    **A**    Yes.

8    **Q**    Now, one of the things you are aware of is that one of the

9    regulations you are required to follow -- well, hold on, strike

10   that.  Let me back up.

11       You are actually required to follow the procedures set

12   forth in Title 15, correct?

13   **A**    That's correct.

14   **Q**    Because those have the force of law, correct?

15   **A**    Right.

16   **Q**    And one of those requirements that you are required to

17   follow is that (As read):

18           "Every reasonable precaution should be taken to

19       avoid damage to personal property and to leave the

20       inmates' quarters and property in good order upon

21       completion of the inspection."

22       Isn't that right?

23   **A**    Yes.

24   **Q**    And your training included that, correct?

25   **A**    Yes.  Yes.

1  Q    And another regulation that you are required to follow is

2  that inspections of a cell may not be used as a punitive

3  measure, nor to harass an inmate.  Correct?

4  A    That's correct.

5  Q    And you were specifically trained on that, right?

6  A    Correct.

7  Q    And you know that deliberately damaging a prisoner's

8  property would not be permissible.  Correct?

9  A    That's correct.

10  Q    And you know that conducting a cell search in order to

11  retaliate against a prisoner for any reason would not be

12  permissible, correct?

13  A    That's correct.

14  Q    And it would be a violation of prison regulations, right?

15  A    Yes, and code of ethics, also.

16  Q    And code of ethics.  And it would subject an officer to

17  discipline, correct?

18  A    That's correct.

19  Q    And in your experience, are officers ever disciplined for

20  having violated regulations respecting cell searches?

21  A    I have never seen one.  May have, but I don't -- I haven't

22  heard of it.

23  Q    Another provision of Title 15 that you are required to

24  follow is that prisoners must be issued a written notice if

25  property is confiscated during a cell search.  Correct?

1   **A**    That's correct.

2   **Q**    And every item taken is to be listed on the receipt.

3   Correct?

4   **A**    Right.

5   **Q**    And all of the officers who participate in a search are

6   supposed to sign the receipt?

7   **A**    Correct.

8   **Q**    And that notice should also list the disposition of any

9   such property, correct?

10  **A**    Correct.

11  **Q**    And the receipt must also list any breach of security

12  noted during the inspection, correct?

13  **A**    Is that what it says in there?  I don't remember that.  I

14  haven't read it in a long time.

15  **Q**    Now --

16          **THE COURT:**  Mr. Lee, I'm wondering if this might be a

17  good time.  It's noon.  You seem like you are --

18          **MR. LEE:**  It is.

19          **THE COURT:**  -- about to change topics.

20          **MR. LEE:**  Yes.

21          **THE COURT:**  So why don't we take our lunch break now.

22          **MR. LEE:**  Okay.

23          **THE COURT:**  Let me explain to the jury what is going

24  to happen this afternoon.

25          We have a couple of witnesses who are testifying by video

1    from the places that they're incarcerated.  So we are going to

2    interrupt Officer Pimentel's testimony to make sure we get all

3    the technology set up properly during the lunch hour, and

4    hopefully it will all be working properly when we get back from

5    the lunch hour.

6         Those two witnesses will testify, and then we will resume

7    Officer Pimentel's testimony, either later today or tomorrow

8    morning.

9         So with that, let's take our lunch break, and everyone, we

10   plan to resume at 12:45.

11        (Jury excused)

12        (Lunch recess taken from 12:00 p.m. to 12:48 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1                    P R O C E E D I N G S

 2   NOVEMBER 17, 2015                              12:48 p.m.

 3        (The following proceedings were held outside of the

 4         presence of the Jury)

 5             THE CLERK:  Remain seated, come to order.  Court is

 6   back in session.

 7             MR. BENEDETTO:  Your Honor, a concern that the guards

 8   are in the shot.  I mean, we don't know whether that's

 9   reasonable on the other end, but --

10             THE COURT:  I don't think that matters.  It's a

11   prison.

12             MR. BENEDETTO:  Okay.  And secondly, you know, his

13   shackles are quite visible.  And we were wondering if that --

14   he's sitting next to a table.  If, you know, the table would

15   obstruct the shackles, whether the camera angle could be

16   adjusted.

17             THE COURT:  I mean, has an effort been made to do

18   that?

19             MR. BENEDETTO:  We don't know.

20             THE COURT:  You just saw the image just now.

21             MR. BENEDETTO:  Yes.

22             MS. MORAN:  We requested of the Defendants that they

23   make the request, and they declined to do so.

24             MS. NYGAARD:  Well, Your Honor, I just instructed her

25   that I don't have control over what they do at Pelican Bay.
```

1    They are not my clients.

2         I could -- you know, we can get them on now and ask them,

3    but I do know -- he's a Security Housing Unit inmate -- that I

4    believe these officers here could attest that he needs to be

5    shackled.

6              THE COURT:  Yeah, no, it's fine.  But why can't about

7    there be, like, a table put in front of him to obstruct the

8    shackles?

9              MR. BENEDETTO:  That's all we ask.

10             MR. SEALS:  Your Honor, we would have to call the

11   officers in the room and ask them what can be done.

12        (Off-the-Record discussion)

13             MS. NYGAARD:  I was just instructed that there is no

14   other -- they can't move that table (Inaudible).

15        (Reporter interruption)

16             THE COURT:  We can talk to them right now.

17             MS. NYGAARD:  And there is nothing else to move in

18   front of it.

19             THE COURT:  I'm going to talk to the guards right

20   now.

21        Hello.  Hi.  This is Judge Chhabria.  I wanted to ask the

22   guards a question, please.

23        Is there a way to put something in front of the witness,

24   like, to move that table in front of the witness, so that the

25   camera does not capture the fact that he has shackles on?

PROCEEDINGS

```
1              PRISON GUARD:  I can turn the chair to face the

2    table.

3              THE COURT:  Yeah.

4              PRISON GUARD:  If the that would help.

5              THE COURT:  So you can put the camera on the other

6    side of the table so that the table is between the camera and

7    him?  I assume at that point we wouldn't be able to see the

8    shackles.

9              PRISON GUARD:  I don't know how far I can move the

10   camera around.  It's pretty --

11             THE COURT:  Why don't you give it a try?

12             PRISON GUARD:  Okay.

13       (Request complied with)

14             MS. NYGAARD:  (Inaudible)

15       (Reporter interruption)

16             THE COURT:  Is it possible to move that table over a

17   little bit?  Kind of towards the camera now?

18             PRISON GUARD:  It's pretty big table.  I don't --

19             THE COURT:  Or to move him a little bit to his right?

20   Maybe, could he move a little bit further to the right?

21       (Request complied with by the Witness)

22             THE COURT:  How about that?

23             MR. BENEDETTO:  That's much improved.

24             THE COURT:  Okay.  Now, does -- does the officer need

25   to be sitting right behind him there?  Or can the officer move
```

PROCEEDINGS

```
 1   out of the camera shot?

 2            PRISON GUARD:  He can move.

 3        (Request complied with)

 4            THE COURT:  Great.  It's not perfect, but it's

 5   better.

 6            MS. NYGAARD:  It's better.

 7            MR. BENEDETTO:  Thank you.

 8            THE COURT:  Okay, thank you.  We are going to call

 9   the jury in now, so we will begin the testimony in just a

10   moment.

11            PRISON GUARD:  Okay.

12        (The following proceedings were held in the presence

13         of the Jury)

14            THE CLERK:  Please be seated.

15            THE COURT:  You can move it more toward, point it

16   more towards the jury.

17        (Request complied with by Mr. Curl)

18            THE COURT:  How's that?  A little back towards me

19   just a tiny bit.

20        (Request complied with by Mr. Curl)

21            THE COURT:  That's fine, right there.

22        Can the jury see that okay?

23        (Jury indicates in the affirmative)

24            THE COURT:  Okay.

25            THE CLERK:  Just adjust the --
```

```
 1              THE COURT:  Stefan, just let us know when you are
 2   ready.
 3              MR. CURL:  That's good.
 4              THE COURT:  All right, go ahead and call your next
 5   witness.
 6              MS. MORAN:  The plaintiff calls Rudy Guerrero.
 7              THE COURT:  Mr. Guerrero, we will have Ms. Melen, the
 8   courtroom deputy, swear you in now.
 9                          RUDY GUERRERO,
10   called as a witness for the Plaintiff herein, having been first
11   duly sworn, was examined and testified as follows:
12              THE CLERK:  Thank you.  For the record, please state
13   your first and last name, and spell both.
14              THE WITNESS:  Rudy Guerrero.  R-U-D-Y,
15   G-U-E-R-R-E-R-O.
16              THE CLERK:  Thank you.
17                        DIRECT EXAMINATION
18   BY MS. MORAN:
19   Q    Good afternoon, Mr. Guerrero.  My name is Katie Moran.
20   I'm a lawyer representing Jesse Perez today.
21        Can you hear and see me all right?
22   A    Yes.
23   Q    Great.
24              MS. MORAN:  We would like the record to reflect that
25   Mr. Guerrero is testifying today by way of video conference.
```

1              **THE COURT:**  So reflected.

2   **BY MS. MORAN:**

3   **Q**    Mr. Guerrero, we are in a courtroom in San Francisco.

4   Will you please introduce yourself to the Court?

5   **A**    I'm Rudy Guerrero.

6   **Q**    Great.  And how old are you, Mr. Guerrero?

7   **A**    Forty.

8   **Q**    And are you currently incarcerated?

9   **A**    Yes.

10  **Q**    And are you currently incarcerated because you were

11  convicted of a felony?  Is that correct?

12  **A**    Yes.

13  **Q**    And where are you currently incarcerated?  Which prison?

14  **A**    In Pelican Bay.

15  **Q**    Great.  And are you housed in the Pelican Bay SHU?

16  **A**    Yes.

17  **Q**    Are you testifying today from Pelican Bay?

18  **A**    Yes.

19  **Q**    Do you know Jesse Perez?

20  **A**    Yes.

21  **Q**    How do you know Mr. Perez?

22  **A**    We were cellies, I think, 2012, right here.

23  **Q**    What does it mean to be cellies?

24  **A**    The same cell.

25  **Q**    And how long have you known Mr. Perez?

1   **A**     About eight years, nine years.

2   **Q**     How did you and Mr. Perez meet?

3   **A**     We met on -- on general population mainline, in another

4   prison.

5   **Q**     And you said you were cellies with Mr. Perez in -- what

6   year was that?

7   **A**     I believe it was 2012.

8   **Q**     Okay.  And that was in the Pelican Bay SHU?

9   **A**     Yes.  In October.

10  **Q**     How long were you and Mr. Perez cellmates?

11  **A**     For about a year, just a year.

12  **Q**     And do you recall when you and Mr. Perez stopped being

13  cellmates?

14  **A**     Yeah.  I would say it was about early 2013.

15  **Q**     Were you and Mr. Perez cellmates in October of 2012?

16  **A**     Yes.

17  **Q**     And was that in Delta 9, Cell 113?

18  **A**     Yes.

19  **Q**     And do you recall the events of October 10, 2012?

20  **A**     Yes.

21  **Q**     And did the officers show up at your cell that day?

22  **A**     Yes.

23  **Q**     What were you doing when the officers arrived at your

24  cell?

25  **A**     Watching TV, reading a book.

1  Q      And were you near the front of the cell or the back of the

2  cell when the officers arrived?

3  A      Probably the back, down.

4  Q      And after the officers arrived at your cell, what happened

5  next?

6  A      They told us to cuff up; there was a cell search.

7  Q      And what did you do?

8  A      We complied.  Put some clothes on and went to the front of

9  the cell to cuff up.

10 Q      And did you go to front of the cell first to cuff up, or

11 did Mr. Perez?

12 A      Mr. Perez went first.

13 Q      So when Mr. Perez was at the front of the cell to cuff up,

14 where were you?

15 A      I was in the back of the cell, putting on my clothes.

16 Q      So what happened next?

17 A      Then they cuffed me up and they escorted us out of the

18 cell.

19 Q      Did the officers say anything at that point?

20 A      Yeah, they said they were conducting a cell search.

21 Q      And were you expecting the officers to show up -- sorry.

22 Were you expecting the officers to show up and search your cell

23 that day?

24 A      No, we were not.

25 Q      At the time, were you eligible for an active/inactive

 1  review?

 2  **A**    No.  I was not.

 3  **Q**    So after the officers told you to cuff up and you cuffed

 4  up, what happened next?

 5  **A**    They escorted us out of the pod to the rotunda.

 6  **Q**    And did any of the officers say anything to you while you

 7  were being escorted into the rotunda?

 8  **A**    No.  No, not until they were placing me in the holding

 9  cell in the rotunda.

10  **Q**    What --

11  **A**    To -- excuse me?

12  **Q**    I'm sorry, I interrupted you.  Go ahead.

13  **A**    Yeah, they had placed me in the holding cell of the

14  rotunda, and they took Mr. Perez to the side to photograph him.

15  **Q**    And did the officers say anything to you at that time when

16  they took you to the holding cell?

17  **A**    Yeah, he was -- he placed me in the cell.  He had asked

18  which locker was mine, and I had told him, the one on the left.

19  And he stated that -- that if I was filing lawsuits as well.

20  And I told him, no, I wasn't.  He said "Good, keep it that

21  way."

22  **Q**    And do you recall the name of the officer who made that

23  comment to you?

24  **A**    I think it was Healy.  IGI.

25  **Q**    And how many officers were present at the time that

1    Officer Healy made that comment?

2    **A**    I believe it was four.

3    **Q**    What happened after you heard that statement?

4    **A**    Nothing.  Just, I was placed in the cell, and waited for a

5    few moments until they brought Mr. Perez back.

6    **Q**    Anything happen after they bring Mr. Perez back?

7    **A**    Yeah.  Mr. Perez (Inaudible) --

8    **Q**    I'm sorry, you need repeat it for the court reporter.

9    **A**    They were -- yeah, they asked -- Mr. Perez asked them if

10   they would be confiscating his property, or our property.

11              **MS. NYGAARD:**  Objection, hearsay.

12              **THE COURT:**  Sustained.

13   **BY MS. MORAN:**

14   **Q**    So after you are in the holding cell with Mr. Perez, did

15   the officers take you back to your cell?

16   **A**    Yes.  Eventually, yes.

17   **Q**    And what was the -- what was your cell -- what was the

18   condition of your cell when you returned?

19   **A**    It was -- it was pretty -- pretty messed up.  Paper all

20   over the floor, torn up.  All my personals, all over the floor.

21   Personal property tore up --

22   **Q**    And was that -- sorry, I interrupted you.

23   **A**    Yeah, just paper all over the floor.  It was a mess.

24   **Q**    Was your cell in that condition before the officers

25   arrived?

 1  **A**    No, it was not.

 2  **Q**    And had you experienced cell searches prior to October 10,

 3  2012?

 4  **A**    Yes.

 5  **Q**    And in those instances, was your cell in that same

 6  condition as you saw it on October 10, 2012?

 7  **A**    No.  Not in that same condition, no.

 8  **Q**    Did you hear the officers say anything else on October 10,

 9  2012?

10  **A**    Just --

11          **MS. NYGAARD:**  Objection, hearsay.

12          **THE WITNESS:**  Just that it was --

13          **MS. MORAN:**  (Inaudible)

14          **THE COURT:**  Hold on a second.  Overruled.

15  **BY MS. MORAN:**

16  **Q**    Did you hear the officers say anything else on

17  October 10th?

18  **A**    Just the response they gave to Mr. Perez when he had

19  inquired about his property.

20  **Q**    And what was that response?

21  **A**    That response was -- well, Mr. Perez had mentioned that he

22  had a case pending, so that he would need his property back

23  soon.

24          And one of the IGI officers stated that, "Oh, yeah, about

25  that," um, something the effect that "We know you collected it

1   for months, but, but we're going to make sure you stay here for

2   a while.  So get comfortable."

3   **Q**    And during the course of the search, did you observe

4   Mr. Perez being cooperative?

5   **A**    Yes.  Yeah, we both were.

6   **Q**    And at any time on October 10, 2012, did you see Mr. Perez

7   disobey any orders?

8   **A**    No, of course not.

9   **Q**    Did you see or engage in any misconduct during the search

10  that you believed would warrant the issuance of an RVR?

11  **A**    No, I did not.

12  **Q**    And did you receive an RVR in conjunction with the search?

13  **A**    Yes, I did.

14  **Q**    And do you recall who issued that RVR?

15  **A**    I believe it might have been Pimentel.  I think he wrote

16  the RVR up.

17  **Q**    Do you know what a kite is?

18  **A**    Yes, it -- I believe it's slang for -- basically a note,

19  or a paper with words on it, a small one.

20  **Q**    And during the search, did anyone tell you to destroy

21  kites by tearing them up and putting them in the toilet?

22  **A**    No.

23  **Q**    And on October 10, 2012, did you destroy kites by tearing

24  them up and putting them in the toilet?

25  **A**    No, I did not.

1  Q    When the officers were at the front of your cell, were you

2  at any point crouched down with your hands in the toilet?

3  A    No.

4  Q    Do you recall the result of -- or was there a hearing on

5  this RVR?

6  A    Yes, there was.

7  Q    And do you recall, what was the result of that hearing?

8  A    The -- the initial RVR was -- it was less than --

9  lessened, to a lesser degree by the senior hearing officer.

10      So in other words, the way IGI wrote it up, the SHO felt

11 that -- that there's was no merit to convicting of that, that

12 charge that they had wrote me up with.  So it was dropped to a

13 lesser, lesser offense.

14 Q    And have you ever thrown trash in a toilet?

15 A    All the time.

16 Q    And why have you thrown trash in the toilet, rather than a

17 trashcan?

18 A    Oh, we don't have a trashcan.

19 Q    Okay.  So why would you throw trash in a toilet at all?

20 A    I usually throw away personal letters; I tear them up and

21 dispose of them in the toilet.

22 Q    And was any of this trash gang-related?

23 A    Of course not.

24 Q    At some point after October 10, 2012, did you prepare a

25 written statement that reflected what you witnessed that day?

1  **A**    Yes.

2  **Q**    Do you recall around what time -- when you made that

3  statement?

4  **A**    I would say it was about a few days after October 10th,

5  after the initial search.

6  **Q**    And was that statement truthful?

7  **A**    Yes.

8  **Q**    And did Mr. Perez offer you anything in exchange for

9  signing that statement?

10 **A**    No.

11 **Q**    Did he offer you any money?

12 **A**    No.

13 **Q**    Any protection?

14 **A**    No.

15 **Q**    Did he force you to sign that statement?

16 **A**    No.

17 **Q**    Did he offer you anything in exchange for your testimony

18 today?

19 **A**    No.

20 **Q**    Has Mr. Perez ever helped you with any legal matter?

21 **A**    No.

22 **Q**    When was the last time you were in contact with Mr. Perez?

23 **A**    It was when we were cellies, in October, a little bit

24 after that, a year after that.

25 **Q**    Have you -- so about a year after October, 2012?

1  **A**    Yeah, maybe, yes, probably that.

2  **Q**    And have you spoken to Mr. Perez on the phone since then?

3  **A**    No, I have not.

4  **Q**    Have you written any letters to Mr. Perez since then?

5  **A**    No.

6  **Q**    Have you received any letters from Mr. Perez since then?

7  **A**    No.

8         **MS. MORAN:**  Thank you, Mr. Guerrero.

9     I have no further questions.

10        **THE COURT:**  Cross?

11        **MR. SEALS:**  Yes, Your Honor.

12                    **CROSS EXAMINATION**

13  **BY MR. SEALS:**

14  **Q**    Good afternoon, Mr. Guerrero.

15  **A**    Good afternoon.

16  **Q**    You said that you have known Mr. Perez for approximately

17  eight years.  But, that's -- you have actually known him for

18  closer to 20 years, correct?

19  **A**    Well, I have known of him, but not personal, on a personal

20  level.

21  **Q**    Isn't it true that you grew up with Mr. Perez?

22  **A**    No.  I -- I'm a little older than him.

23        **MR. SEALS:**  Your Honor, I would like to present you

24  with a portion of Mr. Guerrero's deposition transcript.

25        **THE COURT:**  Okay.

```
 1        (Document handed up to the Court)
 2             THE COURT:  In the future you can just have it up for
 3   me already before the testimony starts.
 4             MR. SEALS:  Sorry.  We can also put it up on the
 5   screen, if you would like that.
 6             THE COURT:  Just read it.  What would you like to
 7   read?
 8             MR. SEALS:  I would like to direct your attention to
 9   Page 14, Line 25 --
10             THE COURT:  Through?
11             MR. SEALS:  Through Page 15, Line 5.
12             THE COURT:  Any objection?
13             MS. MORAN:  No.
14             THE COURT:  Okay.
15   BY MR. SEALS:
16   Q    Mr. Guerrero, did you have your deposition taken for this
17   matter?
18   A    Yes.
19   Q    And did you swear to tell the truth when you had your
20   deposition taken?
21   A    Yes.
22        (Reporter interruption)
23   BY MR. SEALS:
24   Q    Now I would like to read a portion of your deposition
25   transcript.
```

1  A      Okay.

2  Q      (As read)

3          "QUESTION:  Do you know Jesse Perez?

4          "ANSWER:  Yes.

5          "QUESTION:  And how do you know him?

6          "ANSWER:  We are from the same geographical area,

7      city of Colton.  Grew up together.

8          "QUESTION:  So approximately how long have you

9      known Mr. Perez?

10         "ANSWER:  I would say about 20 years."

11     You stated that Mr. Perez was your cellmate on October 10,

12  2012.  Correct?

13  A      Yes.

14  Q      And it's true that Mr. Perez has helped you out with some

15  legal work during your time at Pelican Bay, correct?

16  A      No.

17         MR. SEALS:  Your Honor, I would like to direct your

18  attention to Mr. Guerrero's, deposition, Page 18, Line 16

19  through Line -- through Page 19, Line 3.

20         THE COURT:  Any objection?

21         MS. MORAN:  Sorry, what was that first page?

22         MR. SEALS:  Page 18.

23         MS. MORAN:  No objection.

24         THE COURT:  Proceed.

25

1   **BY MR. SEALS:**

2   **Q**   Mr. Guerrero, I would like to read you another portion of

3   your deposition transcript.  Question, Page 18, Line 19.

4   (As read):

5           **"QUESTION:**  So can you briefly tell me what kind

6           of assistance he provided to you in that habeas?

7           **"ANSWER:**  Just in regards to challenging my

8           validation for 2013 when I got revalidated.

9           **"QUESTION:**  Okay.  So did he assist you with the

10          actual petition that you filed with the court?

11          **"ANSWER:**  A little bit, he guided me."

12          On October 10, 2012, you stated that you received a Rules

13  Violation Report, correct?

14  **A**   Yes.

15  **Q**   And this Rules Violation Report accused you of disobeying

16  orders and putting gang notes into the toilet, correct?

17  **A**   Yes.

18  **Q**   And you were found guilty of a lesser charge, refusal to

19  obey orders, correct?

20  **A**   Yes.

21  **Q**   But you've admitted that you disposed of notes or letters

22  using the toilet in your cell, correct?

23  **A**   Yes.

24  **Q**   And at the hearing for your Rules Violation Report, you

25  were shown photographic evidence of the paper that was taken

1  out of your toilet, correct?

2  **A**    Yes.

3  **Q**    And these were letters that were in your toilet, correct?

4  **A**    Yes.  They could have been.

5  **Q**    I'm sorry; that was a yes-or-no question.

6  **A**    Yes.

7  **Q**    And isn't it true that after you were found guilty of this

8  Rules Violation Report, you did not file an inmate appeal

9  challenging the guilty finding?

10  **A**    Yes.

11  **Q**    Am I correct that you stated that you have not spoken with

12  Mr. Perez since you two were cellmates?

13  **A**    Yes.

14  **Q**    Have you ever spoken with Mr. Perez's attorneys?

15  **A**    Just deposition.

16  **Q**    Did you speak with them prior to the deposition?

17  **A**    Attorney phone call, yes.

18  **Q**    Okay.  And earlier you were discussing comments made by

19  some of the officers during the cell search on October 10th.

20  **A**    Yes.

21  **Q**    You mentioned a statement made by an officer, just to

22  summarize it, was something to the effect of you mentioned

23  something about not filing lawsuits, and they mentioned, "Good,

24  keep it that way," according to you?

25  **A**    Yes.

1  Q    Do you remember which officer made that statement?

2  A    It was Healy.

3          MR. SEALS:  Okay.  Your Honor, I would like to direct

4  your attention to Mr. Guerrero's deposition, Page 40, Line 6

5  through Line 14.

6          THE COURT:  Okay.  Any objection?

7          MR. SEALS:  No.

8          MS. MORAN:  No objection.

9          THE COURT:  Okay.

10 BY MR. SEALS:

11 Q    Mr. Guerrero --

12         THE COURT:  Sorry, go ahead.

13 BY MR. SEALS:

14 Q    Mr. Guerrero, I would like to read a portion of your

15 deposition transcript.

16 A    Okay.

17 Q    (As read)

18         "QUESTION:  And do you recall anything that they

19     said to you at that time?

20         "ANSWER:  Just they inquired into the position of

21     my cell, my cell locker, and whether I was filing

22     lawsuits too against IGI.  And I told them I was not.

23     And they said 'Good.  Keep it that way.'

24         "QUESTION:  And do you remember the identity of

25     the officer who said that?

1          **"ANSWER:**  I cannot recall.  It's been some time."

2      And this deposition was closer in time to when the cell

3  was searched, correct?

4  **A**    Yes.

5  **Q**    Is it true that you have been convicted of a felony,

6  Mr. Guerrero?

7  **A**    Yes.

8          **MR. SEALS:**  No further questions, Your Honor.

9          **THE COURT:**  Thank you.

10      Any redirect, Ms. Moran?

11          **MS. MORAN:**  Yes.

12      (Off-the-Record discussion between counsel)

13                  **REDIRECT EXAMINATION**

14  **BY MS. MORAN:**

15  **Q**    Mr. Guerrero, how long have you been in the SHU?

16          **MS. NYGAARD:**  Objection, relevance.

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  Going on nine years.

19  **BY MS. MORAN:**

20  **Q**    And how long of those nine years were you alone in the

21  SHU?

22          **MS. NYGAARD:**  Objection, relevance.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  About four years.

25

 1  **BY MS. MORAN:**

 2  **Q**    And was there a point in which SHU inmates were not

 3  allowed to have calendars in their cell?

 4           **MS. NYGAARD:**  Objection --

 5           **THE WITNESS:**  Yes.

 6           **MS. NYGAARD:**  -- relevance.

 7           **THE COURT:**  Overruled.

 8  **BY MS. MORAN:**

 9  **Q**    So was there a point where SHU inmates were not allowed to

10  have any calendars in their cell?

11  **A**    Yeah.  For the majority of the time up until maybe like

12  three years ago, they started allowing them, yes.

13  **Q**    And there's no natural sunlight in the SHU, is that right?

14  **A**    No.

15  **Q**    Would you say it's difficult to tell the passage of time

16  in the SHU?

17  **A**    Yes.

18  **Q**    Mr. Guerrero, do you have a law degree?

19  **A**    No.

20  **Q**    And so, did you understand when you were asked whether

21  someone helped you with your habeas, that what they were asking

22  was that they were helping you with legal work?

23  **A**    Yeah, I took it as it -- they actually wrote up a petition

24  for me, or something to that effect.  That's what I felt they

25  meant.

1  Q    And Mr. Seals mentioned the photographs that were shown to

2  you at your hearing.

3  A    Yes.

4  Q    Do you know whether these were taken from your cell?

5  A    No, not -- not --

6  Q    And do you recall a deposition you took in January?

7  A    Yes.

8  Q    And do you recall being shown the copy of the declaration

9  we talked about in January?

10 A    I believe so.

11 Q    And do you recall that that was after Ms. Nygaard had

12 asked you the question about the name of the officer who made

13 that comment?

14 A    Yes.  It was after.

15 Q    And when did you write that written statement, that

16 declaration?

17 A    About five days after the incident, about a week.

18        MS. MORAN:  All right.  Thank you.

19      No further questions.

20        THE COURT:  Any recross?

21        MR. SEALS:  One second, Your Honor.

22        THE COURT:  Sure.

23      (Off-the-Record discussion between counsel)

24

25

<b><u>RECROSS EXAMINATION</u></b>

**BY MR. SEALS:**

**Q**    Mr. Guerrero, you stated that you wrote a declaration for Mr. Perez approximately five days after the October 10th cell search?  Is that correct?

**A**    Approximately.  I couldn't say for sure, but a few days after that, yes.

**Q**    Okay.  Did you, yourself, write that declaration?

**A**    Yes.

**Q**    Mr. Perez testified earlier that he wrote the declaration, and you simply signed it.

**A**    Well, I wrote the rough draft.  He rewrote it.  My writing is not too neat.

      **MR. SEALS:**  No further questions, Your Honor.

      **THE COURT:**  Anything further?

      **MS. MORAN:**  Thank you.

      **THE COURT:**  Okay.  Thank you, Mr. Guerrero.

    (Witness excused)

      **THE COURT:**  Why don't we turn the TV off, and then we'll take a five-minute break so that we can get the next person on.  So after the TV goes off, I'll have the jury exit for five minutes.

    Okay, five-minute break, so you don't have to sit here and watch the setup.

    (Jury excused)

PROCEEDINGS

```
 1        (The following proceedings were held outside of the

 2         presence of the Jury)

 3            THE COURT:  Anything?

 4            MR. LEE:  No, Your Honor.

 5            THE COURT:  Okay.  Just give me a holler when you are

 6   ready.

 7            THE CLERK:  Okay.

 8        (Recess taken from 1:25 p.m. to 1:28 p.m.)

 9        (The following proceedings were held outside of the

10         presence of the Jury)

11            THE CLERK:  Remain seated; come to order.  Court is

12   back in session.

13            THE COURT:  That was fast.  Thank you, Stefan.

14        (The following proceedings were held in the presence

15         of the Jury)

16            THE COURT:  Point it more towards the jury, if you

17   can.  Yeah.

18        (Request complied with by Mr. Curl)

19            THE COURT:  Can the jurors see that okay?

20        (Jury indicates in the affirmative)

21            THE COURT:  Yeah?  Okay.

22        Mr. Mendoza -- thank you.  No, I unmuted it.

23        Mr. Mendoza, can you hear me?

24            THE WITNESS:  Yes.

25            THE COURT:  Hi, I'm Vince Chhabria.  I'm the Judge in
```

 1  this case.  And we will begin by having Kristen Melen swear you

 2  in.

 3                          **SALVADOR MENDOZA**,

 4  called as a witness for the Plaintiff herein, having been first

 5  duly sworn, was examined and testified as follows:

 6          **THE CLERK:**  For the record, please state your first

 7  and last name, and spell both.

 8          **THE WITNESS:**  Salvador, S-A-L-V-A-D-O-R, Mendoza,

 9  M-E-N-D-O-Z-A.

10          **THE CLERK:**  Thank you.

11          **THE COURT:**  Ms. Moran?

12                        **DIRECT EXAMINATION**

13  BY MS. MORAN:

14  Q    Good afternoon, Mr. Mendoza.  My name is Katie Moran.  And

15  I'm a lawyer representing Jesse Perez.

16          **MS. MORAN:**  We would like the record to reflect

17  Mr. Mendoza is testifying today by way of video conference.

18  BY MS. MORAN:

19  Q    We are in a courtroom in San Francisco.  Can you hear and

20  see me okay, Mr. Mendoza?

21  A    Yes, I can.

22  Q    And will you please introduce yourself to the Court?

23  A    My name is Salvador Anthony Mendoza, (Inaudible), 46.

24       (Reporter interruption)

25

1   BY MS. MORAN:

2   Q    Are you currently incarcerated?

3   A    Yes.

4   Q    And are you currently incarcerated because you were

5   convicted of a felony?  Is that right?

6   A    Yes, ma'am.

7   Q    And which prison are you in?

8   A    I'm in Delano, Kern Valley State Prison.

9   Q    And are you housed in the general population there?

10  A    Yes, I am.  Yes.

11  Q    And are you testifying today from Kern Valley?

12  A    Yes, I am.

13  Q    How long have you been housed at Kern Valley?

14  A    I got here July 28th.

15  Q    Is that of 2015, this year?

16  A    Yeah.  Yes.

17  Q    And before you were sent to Kern Valley, where were you

18  housed?

19  A    I was housed in Pelican Bay, D9, Facility 9, Delta Pod,

20  114.

21  Q    And is that in the SHU at Pelican Bay?

22  A    Yes.  Yes.

23  Q    And how long were you in the Pelican Bay SHU?

24  A    Approximately from 2005, October, to 2015.  This year.

25  Q    Do you know Jesse Perez?

1  **A**     Yes, I do.

2  **Q**     And how do you know Mr. Perez?

3  **A**     We were together in Tehachapi in 2001, 2002.

4  **Q**     And is Tehachapi another prison?

5  **A**     Yes, ma'am.

6  **Q**     What year did you meet Mr. Perez?

7  **A**     In 2001.  I -- back in 1999 in B-yard of Tehachapi.

8  **Q**     And did you interact with Mr. Perez while you were at

9  Pelican Bay?

10 **A**     Yes.

11 **Q**     And was your cell near his?

12 **A**     He was my neighbor.  I was in 114 and he was in 113 in

13 Delta pod, D-9, of the SHU at Pelican Bay.

14 **Q**     In October of 2012 were you housed in the Pelican Bay SHU?

15 **A**     Yes, I was.

16 **Q**     Do you recall the events of October 10th, 2012?

17 **A**     Yes, I do.  Clearly.

18 **Q**     What do you recall happened first on October 10th, 2012?

19 **A**     I seen the IGI enter the pod door, four COs enter directly

20 coming towards Mr. Perez's and Rudy Guerrero's cell next to

21 mine.

22 **Q**     From your cell in D-114 could you see officers approaching

23 the cell?

24 **A**     Yes.

25 **Q**     And how is it that you can see officers in the hallway

1   from your cell?

2   **A**   The cell there, the door has a crack and they're also

3   beehive, which, I mean, for beehive, they have holes, like a

4   beehive, and you could see clearly out of your door.

5        I could see clearly all the way to my left to the front

6   door of the pod when you're entering or leaving the pod out of

7   the unit.

8   **Q**   Can you also hear what's going on in the hallway outside

9   of your cell from the inside of your cell?

10  **A**   Yes, I can.

11  **Q**   What about sounds coming from within the cell next door?

12  Would you be able --

13  **A**   Yes, I can hear -- yes, I can hear real clearly through

14  the vent or just normally.  If it's loud enough, you can hear

15  out there through the cell door because of the beehive holes.

16  **Q**   So after you saw the officers approach Mr. Perez's cell,

17  did you hear the officer say anything?

18  **A**   They were screaming all at the same time.  Yelling, "Cuff

19  up, cuff up," you know.

20  **Q**   Do you remember what any of those officers look like?

21  **A**   Yes.  I don't know the names, but I can identify them if I

22  seen them by face.  I do.

23  **Q**   Can you describe them for us?

24  **A**   Well, I know the sergeant was a big fat bald headed CO.

25  And then one of them was -- he looked Mexican.  That was the

1  only ones that I remember because they switch off and on from

2  when I had my little inactive review searches when they came

3  into my house.

4  **Q**    So after you heard the officers say "cuff up," did you

5  hear anything else?

6  **A**    They was just telling them to "cuff up" and then they

7  opened the tray slot.

8  **Q**    So after they opened the tray slot, what happened next?

9  **A**    One of the guys cuffed up right there and after the other,

10  and they escorted them out --

11  **Q**    And what happened --

12  **A**    -- of the unit.

13  **Q**    What happened after they were escorted out?

14  **A**    The COs entered the cell.  All four of them right there

15  entered the cell.  Then I heard a bunch of papers and mumbling

16  and an officer that was in there was stating that, "These

17  knuckleheads should file more lawsuits."  And, "This job is

18  more rewarding," you know.  It's the nature right there.

19  **Q**    What happened after you heard those comments?

20  **A**    The officer was laughing and paper being thrown and books

21  being slammed.  I could hear clearly everyone was throwing

22  stuff around just by the sound effects coming from the vent.

23  **Q**    Did they say anything else?

24  **A**    I heard a couple verbal slurs and profanity, you know.

25  **Q**    So after you heard the profanity and the verbal slurs,

1    what happened next?

2    **A**    They were just continuing.   I heard shuffling of papers.

3    Stuff being tossed around in the house in a search effort.

4    **Q**    Did the officers eventually leave the cell?

5    **A**    They were in there for approximately, for a good little

6    minute.   At least 30 minutes, 40 minutes approximately, around

7    there.

8    **Q**    And after the officers left the cell, what happened next?

9    **A**    Jesse and Mr. Guerrero came back.   They brought them back

10   to the cell.

11   **Q**    And at any point did you hear any of the officers instruct

12   Mr. Guerrero to shop shoving things down the toilet or things

13   of that nature?

14   **A**    No, I didn't hear that.

15   **Q**    Or stop tearing up papers?   Did you hear anything like

16   that?

17   **A**    No.   No.   I sure didn't.

18   **Q**    Did you hear any of the officers tell Mr. Perez to stop

19   moving around?

20   **A**    No.

21   **Q**    Did you see or hear Mr. Perez or Mr. Guerrero engage in

22   any misconduct on October 10th, 2012?

23   **A**    No, I did not.

24   **Q**    And do you recall preparing any written statements

25   describing the events of October 10th, 2012?

1  **A**    Yeah.  A declaration from Mr. Perez of the event that

2  occurred on October 10th, 2012 of what I seen and witnessed and

3  heard.

4  **Q**    And when did you prepare that statement?

5  **A**    This has been two years back.  Right after the incident

6  occurred, so my mind was fresh so I did have it written.

7  **Q**    And did you prepare any other statements that describe the

8  events that day?

9  **A**    Just a declaration.  That was it.  No.

10 **Q**    Has Mr. Perez helped you out with any lawsuits?

11 **A**    Yes.  He has been a big help when I was up there in

12 Pelican Bay.  I filed a civil suit for the injury to my arm --

13 to my hand, excuse me, and a medical.

14 **Q**    How did Mr. Perez help you out?

15 **A**    Assisted me with preparing the legal -- how to proceed in

16 the courts and how to file a petition, a writ of habeas corpus

17 in a civil action, a lawsuit, 1983.

18 **Q**    Did Mr. Perez offer you anything in exchange for your

19 testimony today?

20 **A**    No, ma'am.

21 **Q**    When was the last time you spoke to Mr. Perez?

22 **A**    Oh, since he departed, I departed Delta 9.  They ended up

23 moving him.  The COs moved him out of the unit.

24 **Q**    And when was that?

25 **A**    Shortly after.  I think, like, a month or two after, I

1   believe.  After they went into his house on October 10th, 2012.

2   Q    And have you spoken to Mr. Perez on the phone since then?

3   A    No.

4   Q    Have you written any letters to Mr. Perez since then?

5   A    No.

6   Q    Have you received any letters from Mr. Perez since then?

7   A    No, ma'am.

8   Q    Thank you.  No further questions.

9           THE COURT:  Mr. Nygaard?

10                   CROSS EXAMINATION

11  BY MS. NYGAARD

12  Q    Good afternoon, Mr. Mendoza.

13  A    Good afternoon.

14  Q    Now, have you spoken to Mr. Perez's lawyers in this case

15  at all.

16  A    No, ma'am.  Just for -- when I was at Pelican Bay on a

17  deposition.  I never really spoke to them, but I was just there

18  doing that before this second hearing here.

19  Q    Okay.  Did you speak to his lawyers before that

20  deposition?

21  A    I had received a -- I got a phone call letting me know I

22  was going to have that deposition.  That was it.

23  Q    And do you remember when that phone call was?  Was it

24  approximately the end of 2014?

25  A    I can't recall.  I don't remember really.  I have the

1   papers where they informed me, but I -- I can't give you a

2   certain date.

3   **Q**    But it was before your deposition was taken, correct?

4   **A**    Yes.

5   **Q**    Okay.  And your deposition was taken January 16, 2015?

6   **A**    Yeah, in Pelican Bay.

7   **Q**    Okay.  Now, how many officers did you see enter Mr.

8   Perez's cell after Mr. Perez and Guerrero had been removed from

9   the cell?

10  **A**    There were two.  And then the ones that had escorted them,

11  they came back and went in themselves.  So a total of four.

12  **Q**    Okay.

13          **MS. NYGAARD:**  Your Honor, I'd like to give you Mr.

14  Mendoza's deposition transcript.

15      (Whereupon, document was tendered to the Court.)

16          **MS. NYGAARD:**  And direct to you Page 42, Lines 12

17  through 18.

18          **THE COURT:**  Any objection?

19      (Brief pause.)

20          **MS. MORAN:**  No objection.

21          **MS. NYGAARD:**  Okay.

22  **BY MS. NYGAARD**

23  **Q**    So, Mr. Mendoza, as we said, you had your deposition taken

24  January 16, 2015, correct?

25  **A**    Correct.

1  Q    And were your sworn to tell the truth at that deposition?

2  A    Yes.

3  Q    And did you tell the truth at your deposition?

4  A    Yeah.  I answered all your questions.

5  Q    I would like to read a portion of that transcript starting

6  on Page 42, Line 12:

7          "QUESTION:  Okay.  And so after the officers

8       escorted Guerrero and Perez out to the rotunda, can you

9       tell me what happened after that?

10         "ANSWER:  Well, they entered, the CO.  There was

11      two of them.  They were both the Caucasian ones.  The

12      sergeant went in there and then he left, but the two

13      still remained in there."

14     Mr. Mendoza, you can't specifically recall who made that

15  statement that you overheard coming from Mr. Perez's cell, can

16  you?

17  A    No, I can't because the wall separates.  Only I could just

18  hear through the vent.

19  Q    Okay.  Would you say that you've developed a good

20  friendship with Mr. Perez?

21  A    Yes.

22  Q    And you testified earlier that Mr. Perez has helped you

23  with a lawsuit in the past.  Did Mr. Perez also help you file a

24  complaint about a judge?

25  A    Oh, during my lawsuit.

1  Q    So isn't it true that Mr. Perez helped you file a

2  complaint about a judge?

3  A    Regarding what?

4  Q    Judicial misconduct.

5  A    Yes.  We -- I believe we did file a complaint, but it

6  never was answered.

7  Q    Okay.  And isn't it true that Mr. Perez has also showed

8  you how to present an inmate appeal?

9  A    Yes.  602 grievance.

10  Q   And, in fact, Mr. Perez has assisted you so much that you

11  consider him more or less a tutor, correct?

12  A   Yes.  Yes.  He give me hands-on how to go about -- proceed

13  in the courts.

14  Q   And Mr. Perez has acted as a tutor for you since 2002,

15  correct?

16  A   2002?  No.  He has been helping me since I was in Pelican

17  Bay.

18  Q   Okay.

19          MS. NYGAARD:  Your Honor, I would like to direct your

20  attention to the deposition transcript, Page 34, Lines 3

21  through 5.

22          THE COURT:  Go ahead.

23  BY MS. NYGAARD

24  Q   Okay.  Mr. Mendoza, I'm going to read a portion from your

25  deposition transcript again.

1          **"QUESTION:**  And for how long would you say he

2      acted as your tutor?

3          **"ANSWER:**  Since we were in Tehachapi, back in

4      2002."

5          **MS. NYGAARD:**  Your Honor, I have nothing further.

6          **THE COURT:**  All right.  Any redirect?

7          **MS. MORAN:**  No.

8          **THE COURT:**  Okay.  Thank you, Mr. Mendoza.  We'll go

9      ahead and -- is Stefan still here?  Where is our tech guy?

10     Let me see if I can figure out how to turn you off.

11         (Videoconference disconnected.)

12         **THE COURT:**  Okay.  Do you want to go ahead and resume

13     Mr. Pimentel's testimony, Officer Pimentel's testimony with

14     the -- for another 15, 20 minutes?

15         **MR. LEE:**  Sure, your Honor.

16     May we approach just to ask the Court one logistical

17     question at sidebar?

18         **THE COURT:**  Sure.  Do you need the court reporter?

19         **MR. LEE:**  No, no.

20         (Side bar held off the record.)

21         **MR. LEE:**  Your Honor, we recall Officer Pimentel.

22         **THE COURT:**  Officer Pimentel, you're still under

23     oath.

24     You can go ahead and resume questioning.

25

1              **GUILLERMO PIMENTEL**,

2    called as a witness for the Plaintiff herein, having been

3    previously sworn, resumed the stand and testified further as

4    follows:

5              **DIRECT EXAMINATION RESUMED**

6    **BY MR. LEE**

7    **Q**    Good afternoon, Officer Pimentel.

8    **A**    Good afternoon.

9    **Q**    The process -- just generally speaking, the process of

10   validating an inmate, a prisoner, as an associate of a prison

11   gang is the process of determining whether the CDCR believes

12   that a particular individual is an associate of a prison gang.

13   There is a procedure, correct?

14   **A**    Right.

15   **Q**    And one of your responsibilities as an AIGI was to

16   participate in gathering evidence as part of that process,

17   correct?

18   **A**    For initials?

19   **Q**    For any validation procedure.

20   **A**    The only validation procedure I was doing was the six year

21   active/inactives.

22   **Q**    And so those were for people who were already in the SHU,

23   right?

24   **A**    Correct.

25   **Q**    To determine whether they should remain in the SHU or get

1   out of the SHU?

2   **A**    Right.

3   **Q**    And if the witness could be shown Exhibit 4, which I think

4   is in evidence?

5        (Document displayed)

6   **Q**    Exhibit 4 is a document entitled "Security Threat Group -

7   Prevention, Identification and Management Instructional

8   Memorandum."  Do you see that?

9   **A**    Yes.

10  **Q**    And as you see at the bottom, you'll see it's dated

11  October 10, 2012, correct?

12  **A**    12, not 10.

13  **Q**    Yeah.  Did I misspeak?  October 12, 2012, correct?

14  **A**    (No response.)

15  **Q**    And do you recall receiving this document on or about that

16  date?

17  **A**    I'm sure I received it, yes.

18  **Q**    On or about October --

19  **A**    I don't recall specific dates.

20  **Q**    But is it your experience that if there were new policy

21  being ruled out -- rolled out by the CDCR, you would receive it

22  on or about the date of that policy, correct?

23  **A**    You're talking about date of implementation?

24  **Q**    Just the date on the actual policy.

25  **A**    If we get the policy, that wouldn't necessarily mean it's

1  the date it's going into effect, would it?

2  Q    This policy refers to a -- this document, Exhibit 40,

3  refers to a set of new policies or procedures that CDCR was in

4  the process of implementing for gang validation procedures,

5  correct?

6  A    Correct.

7  Q    And this new set of policies also included procedures

8  relating to the interaction between a validation as a prison

9  gang associate and placement in the SHU, correct?

10  A    Right.

11  Q    And you knew that there were changes coming to these

12  policies -- this particular policy before they actually went

13  into effect, correct?

14  A    Coming, yes.

15  Q    And you knew before October 12 -- strike that.

16       You knew before October, 2012 that the policy changes were

17  coming, correct?

18  A    Yeah.  No specific dates, but I had some idea.

19  Q    And actually that was -- you had some idea before October

20  of 2012, correct?

21  A    Right.

22  Q    And you received training on those changes before they

23  were actually implemented, correct?

24  A    Training?

25  Q    You received briefing on what those policy changes were

PIMENTEL- DIRECT EXAMINATION- LEE

1   going to be before their implementation?

2   **A**     The paperwork.

3   **Q**     Did you receive any training, actual training materials or

4   go to any training sessions?

5   **A**     Training material, if I recall the extent.  Because we

6   were still under the directive to do the old six-year review.

7   **Q**     And you received, during the course of your tenure as an

8   AIGI, annual training on prison gangs, is that correct?

9   **A**     That's correct.

10  **Q**     Is it fair to say that you were aware, as of October,

11  2012, that an inmate who was validated as a prison gang

12  associate would be assigned to the SHU without any

13  corresponding disciplinary action, correct?

14  **A**     Prior to this, yeah.  Correct.

15  **Q**     And by STG we're referring to Security Threat Group,

16  right?

17  **A**     Right.

18  **Q**     And the term -- in case we jumped ahead, the term

19  "Security Threat Group" was the new term under this new policy

20  for what had previously been known as prison gangs essentially?

21  **A**     Right.

22  **Q**     And so before this new set of policies that is contained

23  within this Exhibit 4 came into effect, you were aware that

24  under the old policy an inmate did not require an associated

25  disciplinary action in order to remain in or be sent to the

1    SHU, correct?

2    **A**    Or to be retained, right.

3    **Q**    Right.

4    **A**    Correct.

5    **Q**    And once the new policy came into place, you were aware

6    that an inmate would require, in addition to being validated as

7    a prison gang associate, a particular kind of disciplinary

8    infraction, correct?

9    **A**    Correct.  Once it implemented, it would require that.

10   **Q**    Correct.

11   **A**    Right.

12   **Q**    And that particular kind of disciplinary action was a

13   Serious Rules Violation with an STG nexus, correct?

14   **A**    Correct.

15   **Q**    And so under the new policy, that was a new requirement

16   for a validated associate to have to be -- to be sent to or

17   remain in the SHU, correct?

18   **A**    That's right.

19   **Q**    On October 10th, 2012 you received an email from your

20   supervisor stating that Mr. Perez was to receive a new

21   validation, right?

22   **A**    I believe so.

23   **Q**    If we could show Officer Pimentel what's been previously

24   admitted as Exhibit 68 -- or pre-admitted as Exhibit 68?

25            **THE COURT:**    Okay.

1        (Document displayed)

2   **BY MR. LEE**

3   **Q**    This is an email from David Barneburg, correct?

4   **A**    Correct.

5   **Q**    And David Barneburg was the head of the Institutional Gang

6   Investigation Unit, right?

7   **A**    Yes, he was.

8   **Q**    And so he was your supervisor, right?

9   **A**    Right.

10  **Q**    And it's dated October 10th, 2012, right?

11  **A**    Yes.

12  **Q**    And it's addressed to Officer Burris, right?

13  **A**    Yes.

14  **Q**    And Officer Milligan?

15  **A**    Yes.

16  **Q**    And Officer Milligan was another AIGI, right?

17  **A**    Correct.

18  **Q**    And it's addressed to you, right?

19  **A**    Yes.

20  **Q**    And it's addressed to Anthony Domback, correct?

21  **A**    Yes.

22  **Q**    And Anthony Domback was a sergeant in the Institutional

23  Gang Investigation Unit, right?

24  **A**    Correct.

25  **Q**    And so he was also one of your supervisors?

```
 1   A    Yes.

 2   Q    And the email says -- well, to back up.

 3        This is the email that I asked you about a minute ago, the

 4   request from your supervisor to conduct a new validation for

 5   Mr. Perez, right?

 6   A    Okay.

 7   Q    Is that correct?  Is that your recollection, that this was

 8   the email?

 9   A    That's the only one that I would recall that would have

10   initiated it.

11   Q    And it says -- we see in the middle of the page it says:

12            "Review inmate Jesse Perez K42186, for new" --

13        and the word 'new' is underlined -- "validation

14        (think Castro case)."

15        Do you see that?

16   A    Yes.

17   Q    And you -- Castro case was a lawsuit brought by another

18   prisoner, right?

19   A    Yeah.  When I did my deposition, it flew my -- I couldn't

20   think about it.  Later on when I was looking at the paperwork,

21   I was, like, that's probably what.  It's another inmate that

22   had a case, right.

23   Q    And at the time you received this email, you knew that's

24   what the reference to "Castro case" meant, right?

25   A    I don't recall that.
```

PIMENTEL - DIRECT EXAMINATION / LEE

1  **Q**    You understood that the phrase "think Castro case,"

2  though, meant that Mr. Perez was entitled to a new validation,

3  right?

4  **A**    Well, looking at it now.  But I'm not sure I read that

5  email that day because it was three of us sitting next to each

6  other.  So I might have read that or I might have been told by

7  Officer Burris:  Hey, we need to go do this search for this new

8  validation.  I don't remember if I opened it or I didn't.

9  **Q**    And see in the top, the header, it says "Attachments."  Do

10 you see that?

11 **A**    No.

12 **Q**    Under the "From," "Sent," "To," "Subject."

13 **A**    Oh, "Scan," right.

14 **Q**    "Attachments."

15 **A**    Right.

16 **Q**    And it says, "Scan001.PDF," right?

17 **A**    Right.

18 **Q**    And that was a document that was attached to this email,

19 right?

20 **A**    Yes.

21 **Q**    And that document was a memorandum from a CDCR attorney

22 referencing one of Mr. Perez's lawsuits, right?

23 **A**    Is that what it was?  I don't know for a fact.

24 **Q**    Well, do you recall previously submitting a declaration in

25 this case?

 1  **A**    I believe so.

 2  **Q**    A declaration in -- in support of your motion for summary

 3  judgment.  Do you recall that?

 4  **A**    Oh, right.

 5  **Q**    Would it -- if you -- if you don't remember what that

 6  attachment was, would it refresh your recollection if you were

 7  to see a copy of your declaration?

 8  **A**    Possibly.

 9            **MR. LEE:**  Your Honor?

10            **THE COURT:**  You may.

11            **MR. LEE:**  Your Honor, may I approach?

12            **THE COURT:**  You may.

13        (Whereupon document was tendered to the witness.)

14  **BY MR. LEE**

15  **Q**    Officer Pimentel, I've handed what's been previously

16  marked as Exhibit 27.  Do you see that?

17        Well, there may be an exhibit tag on the reverse on the

18  back?

19  **A**    Yeah, that's where it is.

20  **Q**    And --

21            **MR. LEE:**  Sorry.

22        (Whereupon document was tendered to counsel.)

23            **MS. NYGAARD:**  Thank you.

24            **MR. LEE:**  Sorry.

25

1  **BY MR. LEE**

2  **Q**    This is the declaration you submitted in support of your

3  motion for summary judgment, correct?

4  **A**    Yes, it is.

5  **Q**    And if you could please read Paragraph 2 to yourself and

6  tell me if that refreshes your recollection as to what that

7  attachment to the email was?

8  **A**    "On October 10" --

9  **Q**    Officer Pimentel, you're just supposed to read it to

10  yourself.

11  **A**    Oh, okay.  Sorry.

12      (Brief pause.)

13  **A**    Okay.

14  **Q**    Does that refresh your recollection as to whether the

15  memorandum attached to the email from Mr. Barneburg that was

16  captioned "Scan001.PDF" was, in fact, a memorandum from a CDCR

17  staff attorney referencing a lawsuit by Mr. Perez?

18  **A**    So it was referencing a lawsuit.

19  **Q**    So when you received this email, you knew that Mr. Perez

20  had actually filed a lawsuit, correct?

21  **A**    No.  I don't recall that.  I have been made aware -- if

22  you look at -- if you read in there --

23          **THE COURT:**  Before we continue, why don't you go

24  ahead.  He's now read the declaration in an effort to refresh

25  his recollection.  You can take the declaration back from him.

1          **MR. LEE:**  Sure.

2          **THE COURT:**  And that way we can -- instead of his

3   reading from the declaration, you can probe his recollection.

4          **MR. LEE:**  Sure, sure.

5          **THE COURT:**  So go ahead and approach and take the

6   declaration back from him.

7          **MR. LEE:**  Okay.

8       (Whereupon document was returned to counsel.)

9   **BY MR. LEE**

10  **Q**   So, Officer Pimentel, now that you've had the opportunity

11  to read the declaration, does that refresh your memory as to

12  the fact that the attachment to Mr. Barneburg's email was, in

13  fact, a memorandum from a CDCR attorney referencing Mr. Perez's

14  lawsuit?

15  **A**   That was the attachment, yes.

16  **Q**   You know what a -- I think you've referenced it already,

17  an active/inactive review is --

18  **A**   Yes.

19  **Q**   -- right?

20      And it's a way to review a prisoner who has already been

21  validated as an associate of a prison gang to determine whether

22  they should remain validated?

23  **A**   Correct.

24  **Q**   And this occurs every six years, correct?

25  **A**   Yes.

1  Q    Or at least in 2012 it occurred every six years?

2  A    Right.

3  Q    And in October, 2012 Mr. Perez wasn't scheduled for an

4  active/inactive review, was he?

5  A    Not that I'm aware of.

6  Q    And that's why you received an email requesting a new

7  validation, correct?

8  A    That was what initiated the email.

9  Q    Not an active/inactive review, right?

10 A    Well, I was kind of confused on that one when I went into

11 it.  My whole role was cell search because I didn't do that.

12 Q    But you understood that -- when you received this email,

13 you understood the difference between a new validation and an

14 active/inactive review, right?

15 A    The problem is I don't remember reading that email or

16 whether I -- I came to know about it through my partner.

17 Q    I understand that, but my question is:  At the time you

18 received this email, you understood the difference between an

19 active/inactive review and a new validation, correct?

20 A    Correct.

21 Q    And you knew at the time that Mr. Perez wasn't actually

22 scheduled for active/inactive review?

23 A    I didn't know that.

24 Q    And you're aware of that now; that he wasn't actually

25 scheduled as of -- for an active/inactive review?

 1  **A**    Per testimony.  I don't have any records to research on

 2  it.

 3          **MR. LEE:**  Your Honor, if I can direct the Court's

 4  attention to a portion of Officer Pimentel's deposition, Page

 5  Page 60, Line 25 through Page 61, Line 2.

 6          **THE COURT:**  Can you give me the line number again?

 7          **MR. LEE:**  Sure.

 8          **THE COURT:**  Page 60, Line --

 9          **MR. LEE:**  25, through 61, Line 2.

10          **THE COURT:**  Okay.  Any objection?

11          **MR. SEALS:**  No objection, your Honor.

12  BY MR. LEE

13  **Q**    So, Officer Pimentel, you gave a deposition in this case,

14  correct?

15  **A**    Correct.

16  **Q**    And that was in January of this year, right?

17  **A**    Yes.

18  **Q**    And Ms. Nygaard was there, right?

19  **A**    Yes, she was.

20  **Q**    It took place in a conference room?

21  **A**    Yes, at Pelican Bay.

22  **Q**    And there was a court reporter?

23  **A**    Yes.

24  **Q**    And the court reporter took down everything that was said

25  during that deposition, right?

page

```
 1  A     Correct.

 2  Q     And there was a videographer?  Do you recall that it was

 3  being videotaped?

 4  A     Yes.

 5  Q     And you took an oath to tell the truth during that

 6  deposition, right?

 7  A     Yes.

 8  Q     And it's the same oath that you took this morning,

 9  correct?

10  A     Yes.

11          MR. LEE:  If we can play Page 60, Line 25 through

12  Page 61, Line 2?

13  BY MR. LEE

14  Q     I'm going to ask you to listen to the following question

15  and the following answer that you provided at your deposition.

16        (Videotape played in open court.)

17  Q     And based on that email from your supervisor, you

18  participated in the search of Mr. Perez's cell on October 10th,

19  2012, correct?

20  A     Right.

21  Q     And that -- you participated in it along with Officer

22  Gates?

23  A     Correct.

24  Q     And Officer Gongora?

25  A     Yes.
```

1  Q    And Officer Healy, right?

2  A    Right.

3  Q    Now, after you conducted that search, Mr. Perez was issued

4  a Cell Search Receipt later that day, right?

5  A    Yes.

6         MR. LEE:  If we can show the witness Exhibit 49?

7      (Document displayed)

8  BY MR. LEE

9  Q    Exhibit 49, which has been previously admitted, is the

10 Cell Search Receipt that you issued to Mr. Perez on

11 October 10th, 2012, right?

12 A    Yes.

13 Q    And that was issued later the same day of the cell search,

14 right?

15 A    Right.

16 Q    And you filled this receipt out, correct?

17 A    Yes, I did.

18 Q    And in the bottom right-hand corner where it says

19 "Searched By," the top name, "G. Pimentel", that's your name,

20 correct?

21 A    Yes, it is.

22 Q    And that's your signature?

23 A    Yes, it is.

24 Q    And below that that's Officer Gates' name?

25 A    Gates, yes.

PIMENTEL - DIRECT EXAMINATION - LEE

1  Q    And then Officer Gongora?

2  A    Yes.

3  Q    And if we can go back to the Cell Search Receipt.

4       (Document displayed.)

5  Q    You see there is an entry that says "Condition of Cell."

6  The boxes for "Condition of Cell" aren't actually filled out,

7  are they?

8  A    No.

9  Q    There is a handwritten note that says:

10          "All P/W removed for active/inactive review by

11       IGI."

12       Do you see that?

13 A    Yes.

14 Q    And "P/W" stands for paperwork?

15 A    Yes.

16 Q    And so did -- you wrote that note in there?

17 A    Yes, I did.

18 Q    Even though Mr. Perez wasn't actually due for an

19 active/inactive review that day, correct?

20 A    Right.  But it does acknowledge that the property was

21 removed.

22 Q    The receipt doesn't actually list any of Mr. Perez's legal

23 papers or articles, does it?

24 A    No.

25 Q    And if you see at the bottom of the form there is a

```
 1  tiny -- the very small print at the bottom, which we can blow
 2  up.
 3       (Document enlarged.)
 4  Q    It says:
 5           "Staff are to properly document all items
 6       confiscated during the search and their disposition."
 7       Correct?
 8  A    Yes.
 9  Q    And you didn't do that, correct?
10  A    How do you figure?
11  Q    You didn't actually list all of Mr. Perez's papers, legal
12  papers and other paperwork on the Cell Search Receipt, did you?
13  A    As removed for search, or confiscated as contraband, or
14  what are you talking about?
15  Q    It's not on the Cell Search Receipt at all, is it?
16  A    It says, "All paperwork removed."  So --
17  Q    For the active/inactive review that Mr. Perez wasn't
18  actually receiving that day, correct?
19  A    There could be a stipulation on the active -- you know,
20  but there is a receipt for the property though.
21  Q    And you see on the -- if we can go back to the form, you
22  see the box that says "Disciplinary Documentation"?
23  A    Yes.
24  Q    And there is a box for "CDCR 115."  Do you see that?
25  A    Yes.
```

1  Q    And that is -- CDCR 115 is a Rules Violation Report,

2  correct?

3  A    Correct.

4  Q    A CDCR 128-A is essentially a memorandum documenting some

5  other observation or activity by an inmate?

6  A    Like, a counseling chrono basically.  Just written, yeah.

7  Q    And neither of those boxes is checked, correct?

8  A    Correct.

9  Q    Now, if we could please show witness Exhibit 50?

10       **THE COURT:**  I think before we do that, is now a good

11  time to break or do you -- sometime in the next five minutes,

12  is it a better time to break than now?

13       **MR. LEE:**  Sometime in the next five minutes.

14       **THE COURT:**  Okay.

15  **BY MR. LEE**

16  Q    Exhibit 50, which has been previously admitted, is the

17  Cell Search Receipt that was issued to Mr. Perez the day after

18  the search, correct?

19  A    Yes, it is.

20  Q    And you signed this, correct?

21  A    Yes, I did.

22  Q    And Officer Burris signed it, right?

23  A    Correct.

24  Q    And Officer Burris was another AIGI, right?

25  A    Correct.

1  Q    And this receipt doesn't list any legal papers, does it?

2  A    Like, confiscated?  No, it doesn't list any legal papers

3  at all.

4  Q    And it doesn't list any articles written by Mr. Perez,

5  correct?

6  A    No.

7  Q    And if we look at the box entitled "Disciplinary

8  Documentation," there is no checkmark for "CD 115," is there?

9  A    No.

10        MR. LEE:  I think now would be an appropriate time to

11  break.

12        THE COURT:  Okay, very good.  Why don't we break for

13  the day.

14     Let me remind you of the most important instructions, even

15  though you've probably got them seared into your brain by now

16  already.

17     It's very important that you don't do any outside

18  research; that you not get on the internet, try to learn

19  anything about this case.  Your consideration of the case is

20  limited to the evidence that comes in in the four walls of this

21  courtroom.  Failure to abide by those instructions could result

22  in a mistrial.

23     And as I've said before, you shouldn't communicate with

24  anybody about what happened in the courtroom today or your

25  impressions of it.  Your communications with people should be

1   limited to when you are scheduled to be on jury duty.

2       And with that, thanks very much.  We'll see you tomorrow

3   morning at 8:30.

4       (Jury exits courtroom at 2:15 p.m.)

5           **THE COURT:**  Sorry.  I should have let you step down

6   first.  Sorry about that.  Go ahead.

7       (Witness steps down.)

8           **THE COURT:**  Okay.  What's the plan for tomorrow?

9   What's the schedule?

10          **MR. LEE:**  We have -- well, we'll finish with

11  Mr. Pimentel.

12      We have probably three additional witnesses.  We're still

13  not entirely sure which -- how many defendants we're calling.

14  And then the last -- our last witness will be Richard Subia.

15          **THE COURT:**  Okay.  Your last witness will be Richard

16  Subia.  And then what's the rest of the plan for tomorrow?  I

17  mean, you're supposed to let them know who you're calling

18  tomorrow so they can prepare.

19          **MR. LEE:**  We have.

20          **MS. NYGAARD:**  Well, your Honor --

21          **THE COURT:**  Who are you calling?

22          **MS. NYGAARD:**  I'm sorry.  We were only told of three

23  total defendants.  When he said there might be three additional

24  defendants, I don't know who the third one is.

25          **MR. LEE:**  Okay.  All right.  Well, if that's what we

PROCEEDINGS

```
1   told you, then that's what we'll do.
2            THE COURT:  Okay.  So, Officer Pimentel.  Who else is
3   going to be called tomorrow or is possibly going to be called
4   tomorrow?
5            MR. LEE:  Officer Burris.
6            THE COURT:  Okay.
7            MR. LEE:  And Officer Gates.
8            THE COURT:  Okay.  And then your expert, and that's
9   it for you?
10           MR. LEE:  Yes, your Honor.
11           THE COURT:  And then you'll be done.
12           MR. LEE:  Yes.
13           THE COURT:  Okay.  So in light of that, are you going
14  to have any of your witnesses ready to go tomorrow in case they
15  are done before the end of the day?
16           MS. NYGAARD:  Yes, your Honor.
17           THE COURT:  Okay.  Who?
18           MR. SEALS:  We're going to have Lieutenant Barneburg,
19  that we prepared to testify, and defendants --
20           MS. NYGAARD:  Gongora and Healy.  And we also have
21  Lieutenant Anderson.  So that would be all for Wednesday.
22           THE COURT:  That would be all --
23           MS. NYGAARD:  I don't even think we would get to all
24  of them tomorrow, but we would be ready to go with them.
25           THE COURT:  Other than that, who else do you have?
```

PROCEEDINGS

1   Is it Hubbard?

2            **MS. NYGAARD:**  Yes.  Just Suzan Hubbard, would be the

3   one remaining witness.

4            **THE COURT:**  Okay.  So --

5            **MS. NYGAARD:**  I don't think we'll have time to get to

6   her tomorrow, but...

7            **THE COURT:**  It doesn't look like it.  Although are --

8   you know.  Things have a tendency of getting less repetitive as

9   the witnesses go on.  And so -- but that's -- so, you know, I

10  mean, I think you should think about the possibility of Hubbard

11  being called on Wednesday afternoon.  That seems like it's not

12  totally out of the question the way this is going.  And I don't

13  want to -- us to be in a situation where 1:30 rolls around and

14  we don't have a witness.

15      So why don't you tell Ms. Hubbard to be on notice that she

16  may need to testify tomorrow afternoon.

17           **MS. NYGAARD:**  Okay, I will.  She already knows it's a

18  possibility, so it won't be a surprise.

19           **THE COURT:**  Okay, good.

20      And then we'll get you -- it sounds like we will certainly

21  not get to close tomorrow, but we will get you our proposed --

22  our proposed final jury instructions at some point tomorrow,

23  and we'll talk about them either tomorrow afternoon or first

24  thing Friday morning?  Okay?

25           **MS. NYGAARD:**  Okay.

PROCEEDINGS

1          THE COURT:  All right.  Thank you.

2          THE CLERK:  Court is adjourned.

3      (Whereupon at 2:19 p.m. further proceedings

4       in the above-entitled cause was adjourned until

5       Wednesday, November 18, 2015 at 8:00 a.m.)

6

7                          -   -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

| <u>**PLAINTIFF'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| **PEREZ, JESSE** | | |
| (SWORN) | 191 | 2 |
| Direct Examination by Mr. Benedetto | 191 | 2 |
| Cross Examination by Ms. Nygaard | 271 | 2 |
| Redirect Examination by Mr. Benedetto | 288 | 2 |
| | | |
| **PIMENTEL, GUILLERMO** | | |
| (SWORN) | 295 | 2 |
| Direct Examination by Mr. Lee | 295 | 2 |
| | | |
| **GUERRERO, RUDY** | | |
| (SWORN) | 320 | 2 |
| Direct Examination by Ms. Moran | 320 | 2 |
| Cross Examination by Mr. Seals | 330 | 2 |
| Redirect Examination by Ms. Moran | 336 | 2 |
| Recross Examination by Mr. Seals | 339 | 2 |
| | | |
| **MENDOZA, SALVADOR** | | |
| (SWORN) | 341 | 2 |
| Direct Examination by Ms. Moran | 341 | 2 |
| Cross Examination by Ms. Nygaard | 348 | 2 |
| | | |
| **PIMENTEL, GUILLERMO** | | |
| (PREVIOUSLY SWORN) | 353 | 2 |
| Direct Examination Resumed by Mr. Lee | 353 | 2 |

- - -

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1 | | | 189 | 2 |
| 3 | | | 190 | 2 |
| 4 | | | 190 | 2 |
| 8 | | | 190 | 2 |
| 11 | | | 190 | 2 |
| 22 | | | 190 | 2 |
| 49 | | | 190 | 2 |
| 50 | | | 190 | 2 |
| 68 | | | 190 | 2 |
| 2 | | | 261 | 2 |

–  –  –

## CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Tuesday, November 17, 2015