Volume 3

Pages 378 – 588

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

JESSE PEREZ,                          )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 ) No. C 13-5359 VC
                                      )
A. GATES, et al,                      )
                                      ) San Francisco, California
            Defendants.               ) Wednesday
                                      ) November 18, 2015
_____) 8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          WILMER CUTLER PICKERING HALE DORR, LLP
                            350 South Grand Avenue
                            Suite 2100
                            Los Angeles, California 90071
                    **BY:   RANDALL ROSS LEE, ESQ.**
                            **MATTHEW DONALD BENEDETTO, ESQ.**
                            **KATHLEEN BRIDGET MORAN, ESQ.**


**For Defendant:**          STATE OF CALIFORNIA
                            Office of the Attorney General
                            455 Golden Gate Avenue
                            Suite 11000
                            San Francisco, California 94102
                    **BY:   JENNIFER J. NYGAARD, ESQ.**
                            **ELLIOTT THOMAS SEALS, ESQ.**


*Reported By:* Debra L. Pas, CSR 11916, CRR, RMR
              Belle Ball, CSR 8785, CRR, RMR
              *Official Reporters - US District Court*

```
 1                          P R O C E E D I N G S

 2    NOVEMBER 18, 2015                                      8:10 A.M.

 3         (The following proceedings were held outside of the

 4          presence of the jury)

 5              THE CLERK:  Calling Case 13-CV-5359, Perez versus

 6    Gates, et al.  Counsel, please state your appearances for the

 7    record.

 8              MR. LEE:  Good morning, Your Honor.  Matthew Lee and

 9    Matthew Benedetto and Katie Moran for Mr. Perez, who is

10    present.

11              MS. NYGAARD:  Jennifer Nygaard and Elliott Seals from

12    the California Attorney General's office for defendants.

13              THE COURT:  Good morning.  So you all had an issue

14    for me?

15              MS. NYGAARD:  Just two things.

16              THE COURT:  Okay.  Why don't you come to the podiums

17    so that the court reporter can get you.

18              MR. BENEDETTO:  Good morning.  Plaintiff and the

19    defendants have agreed to preadmit our final two exhibits.

20              THE COURT:  Okay.

21              MR. BENEDETTO:  Which are Exhibits 5, and 77.

22              THE COURT:  Okay.  Admitted.

23         (Trial Exhibits 5 and 77 received in evidence)

24              MR. SEALS:  And defendants had a couple of comments

25    about the jury instructions.  Would you like to hear those now?
```

PROCEEDINGS

```
 1        THE COURT:  Why don't you at least flag the issues

 2  for me, and we may not sort of get into it now, but why don't

 3  you flag the issues for me so I can start pondering them.

 4        MR. SEALS:  So one of the Defendants' concerns is on

 5  the verdict form -- we don't have any objections to the verdict

 6  form b,ut it uses the terms "malicious, oppressive or reckless"

 7  in regards --

 8        THE COURT:  Yeah.  I threw that in there, even though

 9  I assumed that we would not have that -- we probably wouldn't

10  use that until or unless there is a second phase.  But I threw

11  it out there just to see what you were going to say about it.

12        MR. SEALS:  Okay, I think as -- we would like the

13  jury to be instructed on what that term means.

14        THE COURT:  Okay.

15        MR. SEALS:  Before they see that on the verdict form.

16        THE COURT:  So the first question is:  Should the

17  jury be considering that question in this phase?

18      (Off-the-Record discussion between counsel)

19        MR. SEALS:  I don't think defendants have a problem

20  with it, but I might like to reconsider that later today if

21  that's possible.

22        MR. BENEDETTO:  I think we're fine with having them

23  consider it at this point.

24        THE COURT:  It goes to punitive damages, but it --

25  but it is sort of part and parcel of sort of what -- it goes
```

```
 1   more to what they did.  So it seems a little more relevant to

 2   what is being considered during this phase.

 3       So, you know, like I said, I wasn't sure whether that part

 4   of it should be considered by the jury in this phase.  But I do

 5   take your point that if the jury does consider it in this

 6   phase, that we should define those terms.  I assume there's an

 7   instruction.

 8           MR. SEALS:  Yeah.  In the punitive damages

 9   instruction, there is a definition of those terms within the

10   stipulated instruction.

11           THE COURT:  Okay.

12           MR. SEALS:  And the second point, if I can move on?

13           THE COURT:  Sure.

14           MR. SEALS:  Jury Instruction No. 3, defendants

15   believe that it's not sufficient.

16           THE COURT:  Remind me which one that is.

17           MR. SEALS:  Sorry.

18           MS. NYGAARD:  Two or more parties' different legal

19   rights.

20           THE COURT:  Uh-huh.

21           MR. SEALS:  And so defendants had proposed Jury

22   Instruction No. 33 previously to clarify that CDCR and other

23   CDCR employees are --

24           THE COURT:  Yeah, I didn't understand the point of

25   that.  I mean, I even toyed with -- hold on one sec, let me
```

1  take a note.

2      I even toyed with rewriting it to -- the only possible

3  point of an instruction along those lines, I thought, was to

4  instruct the jury that we're not putting Pelican Bay on trial

5  here.  And this is not a case about whether solitary

6  confinement is, itself, unlawful.

7      And I don't know if that was the point behind the --

8          **MR. SEALS:**  Yes, it was, Your Honor.

9          **THE COURT:**  -- submission of your proposed

10  instruction.  But I didn't think that your proposed instruction

11  made that point clear at all.  So I started toying -- I started

12  trying to draft an instruction that made that point more

13  clearly.

14      And after I drafted it, I looked back and I thought to

15  myself:  It's actually quite obvious already that -- from the

16  evidence that's come in and the arguments that's been made,

17  that solitary confinement is not on trial, and what's on trial

18  is what the defendants allegedly did to the plaintiff.  So I

19  thought it was unnecessary. So that's where my thinking was on

20  that.

21      Any comments?

22          **MR. SEALS:**  I would like to respond.

23          **THE COURT:**  Sure.

24          **MR. SEALS:**  I believe during Mr. Perez's testimony

25  yesterday, he mentioned that this wasn't just a lawsuit about

 1 himself, but it was about the culture within Pelican Bay and

 2 within CDCR.  So I believe that sort of led -- that may have

 3 led the jury to believe it's something greater than simply the

 4 defendants.

 5          **THE COURT:**  Uh-huh.

 6          **MR. BENEDETTO:**  I think, that being said, the

 7 defendants' proposed Instruction 33 didn't make clear that --

 8          **THE COURT:**  Yeah I agree with that.  What do you

 9 think about my proposal, though, to just sort of directly say,

10 you know:  You are not to base your verdict on any views you

11 have about solitary confinement or the way things are run by

12 the Department of Corrections.  Your verdict is to be based

13 solely on the evidence about whether the plaintiff has proved

14 his allegations about what the defendants did to him.

15          **MR. BENEDETTO:**  I think the -- the main point there

16 really is captured in Instruction 3, which is that this is a

17 case against individual defendants.

18          **THE COURT:**  Would there be any harm in the

19 instruction I'm proposing?

20          **MR. BENEDETTO:**  We would have to read it to see

21 exactly what the language is.  Certainly, an appreciation of --

22 from plaintiff's perspective, an appreciation of the harm, the

23 sort of magnitude of the threat, solitary confinement and

24 Pelican Bay are at issue, so they're not irrelevant.  So we

25 would be concerned that the instruction not be misleading as to

PROCEEDINGS

```
 1   those elements.
 2             THE COURT:   Sure.
 3             MR. BENEDETTO:   But we are not contending and have
 4   never contended that this case is ever anything other than one
 5   against specific defendants.
 6             THE COURT:   Okay.  Let me give that some thought.
 7   Maybe I'll -- I'll see if I still have the version of what I
 8   drafted, and I'll get that to you guys and see what you think.
 9        And then I removed the stuff about 1983.  And the theory
10   was that every -- you all conceded that it's color of law, and
11   so there's really no need to confuse them by giving them the
12   elements of 1983.  We can just sort of go straight to the First
13   Amendment retaliation question.
14        Does everybody agree that that's a better, more
15   streamlined and efficient way to instruct the jury?
16             MR. SEALS:   I believe so, Your Honor.  My only
17   concern was with Instruction No. 3 and the individual parties.
18   And I believe there was a little bit more explanation of that
19   in the 1983 instruction also.
20        But I would have to go back and --
21             THE COURT:   Well, if you think that there is
22   something lacking from the instruction that they're supposed to
23   consider each defendant separately --
24             MR. SEALS:   Yeah.
25             THE COURT:   -- then we can deal with that.  But my
```

```
 1  question is not about that.  My question is whether you agree
 2  that makes sense that we don't need to instruct them on the
 3  elements of 1983, because it just adds a layer of confusion.
 4          MR. SEALS:  Yeah.  The defendants agree, Your Honor.
 5          THE COURT:  And that sort of gets me to the factual
 6  stipulations.  Is it enough for us to have on the record here,
 7  right now, that the defendants conceded that they were acting
 8  under color of law?
 9      Or does that need to be put on the record by way of the
10  factual stipulation in front of the jury?
11          MR. SEALS:  Defendants would be happy to just put it
12  on the record.
13          THE COURT:  Here.
14          MR. SEALS:  Yes.
15          THE COURT:  So, you concede -- just to be absolutely
16  clear, you concede that the defendants were acting under color
17  of law.
18          MS. NYGAARD:  Yes.
19          MR. SEALS:  Defendants concede that they were acting
20  under color of law.
21          MR. BENEDETTO:  And I would add, Your Honor, that it
22  is one of the stipulations of fact that we intend to read to
23  the jury as part of --
24          THE COURT:  Right.  But I was just wondering, is that
25  necessary, in light of the fact that we're not instructing them
```

1    on the elements of 1983, and in light of the fact that the

2    defendants concede that they were acting under color of law?

3              **MR. BENEDETTO:**  I mean, that's fine.

4              **THE COURT:**  Okay.  And then, you have some other

5    factual stipulations, as I recall?

6              **MR. BENEDETTO:**  Yes.

7              **THE COURT:**  How do you want to proceed with those,

8    and when do you want to proceed with them?

9         And do the --

10        (Off-the-Record discussion between counsel)

11             **MR. BENEDETTO:**  We would propose to read them into

12   the record before we close --

13             **THE COURT:**  Okay.

14             **MR. BENEDETTO:**  Before we rest.

15             **THE COURT:**  That's fine.  Do you want to read them

16   in?  Or do you want me to read them in?

17             **MR. BENEDETTO:**  I'll read them in.

18             **THE COURT:**  You will read them in?

19             **MR. BENEDETTO:**  Yeah.

20             **THE COURT:**  Okay.  Great.  Anything else?

21             **MR. SEALS:**  No.

22             **THE COURT:**  Okay.  We'll see you in about ten

23   minutes.

24             **THE CLERK:**  Court is in recess.

25        (Recess taken from 8:20 a.m. to 8:49 a.m.)

 1          (The following proceedings were held in the presence

 2           of the Jury)

 3               **THE CLERK:**  Please be seated.

 4               **THE COURT:**  Good morning.  I'm sorry about the delay

 5  with breakfast.

 6          Are the plaintiffs ready to resume?  Are you going to

 7  resume now with Officer Pimentel?

 8               **MR. LEE:**  Yes.

 9               **THE COURT:**  Okay.

10          **GUILLERMO PIMENTEL, PLAINTIFF'S WITNESS, RECALLED**

11               **THE COURT:**  All right, Officer Pimentel.  You are

12  still under oath.

13                    **DIRECT EXAMINATION RESUMED**

14  **BY MR. LEE:**

15  **Q**    Good morning, Officer Pimentel.

16  **A**    Good morning.

17  **Q**    I'd like to resume by asking you some questions about the

18  events of October 10, 2012, the cell search of Mr. Perez and

19  Mr. Guerrero's cell.  Do you have those events in mind?

20  **A**    Yes.

21  **Q**    Okay.  You don't remember any of your colleagues giving

22  any direct orders to Mr. Perez during the search, do you?

23  **A**    No.

24  **Q**    And in fact, Mr. Perez was cooperative during the search,

25  correct?

1  **A**    He submitted to handcuffs, so he's cooperative in that

2  aspect.

3  **Q**    And just generally speaking, he was cooperative during the

4  search, correct?

5  **A**    After he was out?

6  **Q**    The question is:  Was he cooperative during the search?

7  **A**    Well, the search took place after he was escorted from the

8  cell, so... So at that point he would have been cooperative.

9  He would be in the holding cell, right?

10  **Q**    And you don't recall him doing anything that would

11  potentially have warranted the issuance of a Serious Rules

12  Violation Report, do you?

13  **A**    I don't recall the cell search, so...

14  **Q**    You don't remember Mr. Guerrero appearing to rip up papers

15  and put them in the toilet during the search, do you?

16  **A**    No, I don't have any recollection of the cell search.

17  **Q**    And you don't recall any conduct by Mr. Guerrero that

18  would potentially have warranted the issuance of a Serious

19  Rules Violation Report, do you?

20  **A**    No.

21        **MR. LEE:**  I would like Exhibit 5 to be shown to the

22  witness, please.

23        **THE COURT:**  You may.

24     (Document displayed)

25

1  BY MR. LEE:

2  Q    Do you have Exhibit 5 up on your screen, Officer Pimentel?

3  A    Yes, I do.

4  Q    And I think you previously testified that many of the

5  prisoners in the SHU are housed alone in their cells.  Correct?

6  A    Correct.

7  Q    And some have cellmates, correct?

8  A    Correct.

9  Q    And if you can turn your attention to this document that's

10  been marked and admitted as Exhibit 5, it is a form entitled

11  "Volunteer Double Celling Request," do you see that?

12  A    Yes.

13  Q    At the top you will see there is a name, "R. Guerrero."

14  Do you see that?

15  A    Yes.

16  Q    And below that is "Jesse Perez," correct?

17  A    Correct.

18  Q    And those are -- next to them, those are their prisoner ID

19  numbers, correct?

20  A    Yes.

21  Q    And next to that are the cells that they were in at the

22  time of this form, at the time the form was submitted, correct?

23  A    Correct.

24  Q    And this form is a form whereby an inmate can request the

25  opportunity to have a cellmate or to be celled with somebody

 1  else, correct?

 2  **A**    Correct.

 3  **Q**    And under the form it says "The above listed inmates are

 4  being processed for occupancy of the same cell."  Right?

 5  **A**    Yes.

 6  **Q**    And:

 7          "Management will determine which cell is used

 8          for the double celling."

 9          Correct?

10  **A**    That's correct.

11  **Q**    And so this form was used by Rudy Guerrero and Jesse Perez

12  to request that they be cellmates, correct?

13  **A**    Yes.

14  **Q**    And if you look at the bottom, you will see that this form

15  was approved, right?

16  **A**    It was approved -- yes, it was.

17  **Q**    And do you recognize that signature as that of David

18  Barneburg?

19  **A**    Correct.

20  **Q**    And David Barneburg was the lieutenant in charge of the

21  IGI unit, correct?

22  **A**    Correct.

23  **Q**    And so he was your supervisor, correct?

24  **A**    Yes, he was.

25  **Q**    And you see at the left where it says, the bottom left,

1   where it says, "Recommend Close Scrutiny by IGI," that is a

2   reference to the IGI unit of which you are a member, correct?

3   **A**   Yes.

4   **Q**   And that indicates to recommend close scrutiny by the IGI

5   of Mr. Perez and Mr. Guerrero.  Correct?

6   **A**   The way I would interpret that is that would be the

7   correctional counselor, because that's who receives that form.

8   And when he forwards it to the lieutenant, he was actually

9   saying recommend close scrutiny by IGI before he approves it.

10      Do you see it?

11  **Q**   That's your interpretation of that form?

12  **A**   Correct.  And so after the IGI reviewed it, the lieutenant

13  signed it off.

14  **Q**   Now, on October 10, 2012, when you were asked to conduct

15  the cell search, you did not know who Mr. Perez was, correct?

16  **A**   I don't recall.

17  **Q**   And you first became aware of Mr. Perez specifically when

18  this lawsuit, the lawsuit that brings us here today was filed,

19  correct?

20      (Document taken off display)

21  **A**   I may have known him through possibly reading his mail or

22  something before, but I don't recall him.

23  **Q**   And your first specific recollection is in connection with

24  this lawsuit?

25  **A**   Could you say that one more time, please?

```
 1  Q    Your first specific knowledge of him was in connection
 2  with this lawsuit, correct?
 3  A    Correct.
 4  Q    And that was in or about 2014, that this lawsuit was
 5  filed?
 6  A    I suppose.  I don't recall the exact date.
 7  Q    And you don't recall that Mr. Perez was so-called "on the
 8  radar" of any of the other AIGIs at the time of the cell
 9  search, correct?
10  A    Correct.
11          MR. LEE:  If the witness could please be shown
12  Exhibit 77, which has been admitted into evidence.
13      (Document displayed)
14          MR. LEE:  Now if we can blow up the first e-mail, the
15  bottom e-mail.  First in time.
16  BY MR. LEE:
17  Q    Showing you what's been marked as Exhibit 77, this is an
18  e-mail from Scott Ellery, correct?
19  A    Correct.
20  Q    And Mr. Ellery was a prison guard or a correctional
21  officer at Pelican Bay at the time of this e-mail, right?
22  A    Correct.
23  Q    And the e-mail is dated Wednesday, September 21, 2011,
24  right?
25  A    Yes, it is.
```

1  Q    And it is to you, correct?

2  A    To me, and John Silveira.

3  Q    And John Silveira was another AIGI, right?

4  A    Co-worker, yes.

5  Q    And you see the subject, it refers to "D9, 215 and 216."

6  You understand that that refers to particular cell numbers?

7  A    Yeah, like the "D9" would be the unit, and then the number

8  would be the corresponding cells.

9  Q    So "215" and "216" would be the corresponding cell

10  numbers, correct?

11  A    Correct, yes.

12  Q    And the e-mail reads:

13        "Hey John & Gill, just wondering if you could do

14      a little cell search on these guys, when I was

15      picking up mail tonight, they both became

16      disrespectful towards me because of a 128 I wrote on

17      Sims last week regarding the hunger strike.  Both

18      Sims and Perez (D9216 & 215) were telling me to get

19      off their tier, saying I was just as corrupt as IGI,

20      anyhoot I would be very happy if you guys could pay

21      them a little visit and clean their house.  Thanks,

22      Scott."

23      Now, you understand that this is a reference to two

24  inmates, one named Sims and one named Perez, right?

25  A    Correct.

PIMENTEL - DIRECT EXAMINATION / LEE

1   Q    And Perez is Mr. Perez, the plaintiff in this case,

2   correct?

3   A    I don't know that for a fact.  Now I know, because I guess

4   it was confirmed that it is him.

5   Q    And the reference to a "128," that refers to a --

6   essentially a counseling report that a correctional officer

7   wrote about Mr. Sims, correct?

8   A    Correct.

9   Q    And you have understood the reference to, quote, "clean

10  their house" to be a reference to a retaliatory cell search,

11  did you not?

12  A    Correct.

13  Q    And you knew this was improper, correct?

14  A    Correct.

15  Q    And you knew that this would have been a violation -- if

16  you had done this, this would have been a violation of prison

17  regulations, correct?

18  A    And code of ethics, yes.

19  Q    And code of ethics.  And you forwarded this, if we can go

20  to the top e-mail or superimpose the top e-mail, you forwarded

21  this to Jeremy Frisk, the next day, correct?

22  A    Correct.

23  Q    And Jeremy Frisk was one of your supervisors at the time,

24  right?

25  A    Correct.

1  Q    And you forwarded it to him because it was an improper

2  request.  Right?

3  A    Correct.

4  Q    And you wanted him to be aware of that, right?

5  A    Yes.

6  Q    Because this search again would have been, had you -- had

7  it been carried out, would have been a violation of prison

8  regulations?

9  A    Correct.

10 Q    And in fact, the request, itself, was a violation of

11 prison regulations, was it not?

12 A    Correct.

13 Q    And the request, itself, was a violation of a code of

14 ethics, correct?

15 A    Correct.

16 Q    Was it unusual to have received a request to conduct a

17 retaliatory cell search?

18 A    Yes.

19 Q    Highly unusual?

20 A    Yes.

21 Q    Extraordinary?

22 A    Yes.

23 Q    Something that would stick out in your mind?

24 A    Yes.

25 Q    And to your knowledge, did Officer Frisk take any action

 1  in response to this?

 2  **A**     I'm not sure.

 3  **Q**     Did you ever follow up with him?

 4  **A**     No.  We -- both me and Silveira informed him, and then he

 5  received the e-mails too.

 6  **Q**     Never asked him if he took any action?

 7  **A**     No, but I made the point of bringing it to his attention,

 8  though.

 9  **Q**     And to your knowledge, was Officer Ellery ever disciplined

10  for having made this request of you?

11  **A**     I'm not sure.

12  **Q**     Is Officer Ellery still a correctional officer at Pelican

13  Bay?

14  **A**     Not at Pelican Bay.

15  **Q**     Is he still a correctional officer with the Department of

16  Corrections?

17  **A**     I'm not sure.

18  **Q**     With the California Department of Corrections?

19  **A**     I'm not sure.  I haven't spoken to him in years.

20  **Q**     To your knowledge, he was not removed from his position

21  because of this e-mail, correct?

22  **A**     Correct.

23  **Q**     And other than sending this to Officer Frisk, did you

24  forward it to anyone else?

25  **A**     No.  That was it.

```
 1  Q    You didn't report it to the warden?

 2  A    No.

 3  Q    You didn't report it to the legal department of Pelican

 4  Bay?

 5  A    No.

 6  Q    You didn't report it to the Attorney General's office?

 7  A    No.

 8  Q    Notwithstanding this extraordinary request you received to

 9  conduct an improper cell search?

10  A    Could you say that -- repeat that, please?

11            MR. LEE:  I have no further questions, Your Honor.

12            THE COURT:  Mr. Seals?

13                        CROSS EXAMINATION

14  BY MR. SEALS:

15  Q    Good morning, ladies and gentlemen of the jury.  Good

16  morning, Mr. Pimentel.

17  A    Good morning.

18  Q    You were just discussing an e-mail you received from

19  Officer Ellery with Mr. Lee.

20       (Document displayed)

21  Q    What did you do when you first saw that e-mail?

22  A    When I came in in the morning?

23  Q    Right.

24  A    Because the e-mail was submitted, like, third watch of the

25  evening prior, so when I came in in the morning I saw the
```

1   e-mail.  And if I recall right, my co-worker about the same

2   time was checking his e-mails.  And it was reported to the

3   first sergeant which was on duty, which was Sergeant Frisk, and

4   then he was sent a copy also.

5   **Q**   And did you report it personally to Sergeant Frisk?

6   **A**   Yes.

7   **Q**   And in person, you actually spoke with him about it?

8   **A**   Yes.

9   **Q**   Now, let me just clarify.  When you received that e-mail,

10   did you search the cell as Ellery had requested?

11   **A**   No.

12   **Q**   And you didn't see that e-mail when it was sent to you,

13   correct?

14   **A**   No.  Not until --

15        **MR. LEE:**  Objection, vague.

16        **THE COURT:**  Overruled.

17   **BY MR. SEALS:**

18   **Q**   What were your work hours around this time?

19   **A**   6:00 to 2:00, 6:00 a.m. to 2:00 p.m.

20   **Q**   And when you received that e-mail, did you know who the

21   inmates were that were referred to?

22   **A**   No, not specifically.

23      (Document taken off display)

24   **Q**   Mr. Lee just showed the e-mail.  Do you recall how the

25   inmates were described in that e-mail?

1   **A**     As disrespectful.

2   **Q**     Do you recall what information was provided to you about

3   the two inmates?

4   **A**     Last names, the unit that they were housed in, and the

5   cells.

6   **Q**     And is "Perez" a fairly common last name?

7             **MR. LEE:**  Objection, foundation.

8             **THE COURT:**  Overruled.

9             **THE WITNESS:**  There's numerous Perezes.

10  **BY MR. SEALS:**

11  **Q**     Did the e-mail contain these inmates' first name?

12  **A**     I don't recall.

13  **Q**     Did the e-mail contain their CDCR numbers?

14  **A**     No.

15  **Q**     After you received this e-mail, did you do any research on

16  who these inmates were?

17  **A**     No.

18  **Q**     When did you become aware that this e-mail referred to

19  Jesse Perez?

20  **A**     During the litigation, when it all surfaced.

21  **Q**     Do you remember which cell this e-mail said Mr. Perez was

22  housed in?

23  **A**     One was 215, one was 216, per the e-mail.

24  **Q**     Was that the same cell that Mr. Perez was housed in when

25  you searched his cell in October of 2012?

1  **A**    No.  That was 113, which is a completely different

2  section.

3  **Q**    And you told Mr. Lee that you didn't follow up on what

4  happened to Mister -- to Officer Ellery after you reported him

5  to your sergeant.  Why didn't you follow up?

6  **A**    Within CDC you have a chain of command.  So if I notify

7  the sergeant, usually it goes through the ranks, and then at a

8  certain level they would notify outside agencies, if required.

9  **Q**    And is that the reason why you didn't notify any other

10  CDCR or Attorney General or other entities regarding the email?

11  **A**    Correct.

12  **Q**    Now I would like to back up and go through some of your

13  duties as an Assistant Institutional Gang Investigator, and

14  talk more about the incident that occurred.

15      In October of 2012, you were an Assistant Institutional

16  Gang Investigator, correct?

17  **A**    Correct.

18  **Q**    And what were your general duties as an Assistant

19  Institutional Gang Investigator?

20  **A**    The first three years of my tenure there consisted of

21  reviewing mail and assisting with cell searches and responding

22  to alarms.  And my final year was conducting active/inactive

23  reviews.

24  **Q**    What is an active/inactive review?

25  **A**    It is an investigation to determine whether an inmate is

1  still active or not within the specific prison gang.

2  Q    And what are some of the steps or what is the procedure

3  for reviewing an inmate's gang status?

4  A    Review of the C file, cell searched, photographs to verify

5  tattoos.  Possibly, maybe, illicit mail that might have been

6  stopped.

7       (Reporter interruption)

8           THE WITNESS:  Stopped mail with gang activity.

9  BY MR. SEALS:

10 Q    Why were cell searches a part of this process?

11 A    It's to look for evidence such as like gang symbols or

12 laundry lists or --

13 Q    You used the term "laundry list."  What does that mean?

14 A    Like rosters.  A roster could be like a list of numerous

15 inmates, like they're all in good standing, and then a lot of

16 times there would be like a separate list with inmates in bad

17 standing.  So...

18 Q    When you say "inmates in bad standing," what does that

19 mean?

20 A    Inmates to be disregarded that come in bad with a gang.

21 Q    So, would a laundry list would be related to gang

22 activity?

23 A    Correct.

24 Q    And did you select which inmates you would review for

25 active/inactive status?

1  **A**    No, they came off a list from the office tech.

2  **Q**    So you would just receive a list of inmates and then

3  perform -- review the inmates on the list?

4  **A**    Correct.  Just go down the list.

5  **Q**    Were you ever asked to review an inmate's gang status that

6  was not on the list?

7  **A**    Just, I wasn't -- well, just the e-mail for Perez which

8  was not on the list.

9  **Q**    But you didn't prepare the validation of Mr. Perez,

10  correct?

11  **A**    No.  I just assisted in the cell search.

12  **Q**    And why did you assist in the cell search on October 10,

13  2012?

14  **A**    Because I was there, and --

15  **Q**    Did somebody ask you to assist with the cell search?

16  **A**    I might have been asked or I might have volunteered.  I

17  don't recall.

18  **Q**    I would like to show you Exhibit 68.

19         **MR. SEALS:**  Preadmitted.  68.

20     (Document displayed)

21  **BY MR. SEALS:**

22  **Q**    Can you see that e-mail?

23  **A**    Yes.

24  **Q**    You received this e-mail from Lieutenant Barneburg on

25  October 10, 2012.  Correct?

1  **A**    Correct.

2  **Q**    And was Mr. Barneburg your supervisor at the time?

3  **A**    Yes, he was.

4  **Q**    Do you remember reviewing this e-mail at the time you

5  received it?

6  **A**    I don't recall if I opened it or not, or if I heard about

7  the search through my co-worker.

8  **Q**    Why wouldn't you have opened the e-mail?

9  **A**    Because there was three of us sitting next to each other,

10  and all three of us were doing active/inactive reviews, and all

11  three of us got the same e-mail.

12       So, say if my co-worker Burris opens it up and says, "Hey,

13  we need to go do the search on this house here," then that's

14  how it would be initiated.

15  **Q**    And you said there were three of you sitting together.

16  Would that be yourself, Officer Burris and Officer Dan

17  Mulligan?

18  **A**    Correct.

19  **Q**    In October of 2012, did you know what the term "think

20  Castro case" meant?

21  **A**    No.

22  **Q**    Were you involved in the *Castro* case in any way?

23  **A**    No.

24  **Q**    Did you review the attachment to this e-mail when you

25  received it?

1  **A**    No, I don't recall opening it.

2  **Q**    Prior to preparing for your deposition in this lawsuit,

3  did you know that the attachment to this e-mail was a

4  settlement memorandum?

5  **A**    No.

6  **Q**    And did you prepare the requested validation of Mr. Perez?

7  **A**    No, I did not.

8  **Q**    Who prepared the validation packet?

9  **A**    Excuse me?

10  **Q**    Who prepared the validation packet?

11  **A**    Officer Burris.

12  **Q**    Do you know why Burris is the one who prepared the packet?

13  **A**    No, I'm not sure.

14  **Q**    Did you ever ask why Mr. Perez was getting a new

15  validation?

16  **A**    No.

17  **Q**    Did you do anything to help with the preparation of this

18  validation package?

19  **A**    No, just the cell search.

20  **Q**    Did you also review some of Mr. Perez's property in

21  connection --

22       (Document taken off display)

23  **A**    Yes, I believe because my name is on the second cell

24  search slip, which leads me to believe that I took part in it.

25  **Q**    Okay.  When you were working as an Assistant Institutional

```
 1   Gang Investigator, was it common for you to search inmates'
 2   cells?
 3   A    Yes.
 4   Q    And were all or most of those searches connected to gang
 5   validations or active/inactive reviews?
 6   A    Most of them, yes.
 7   Q    Approximately how many times did you search a cell while
 8   you were working as an Assistant Institutional Gang
 9   Investigator?
10   A    It was on a daily basis, so over the course of a year,
11   there would be hundreds.
12   Q    And you previously worked as a floor officer at Pelican
13   Bay, correct?
14   A    Correct.
15   Q    When you were working as a floor officer, how often did
16   you conduct cell searches?
17   A    The rule per -- through the DOM, it's required that you do
18   three cell searches per day.  So it would be 15 a week, 60 a
19   month, and over 700 per year.  So...
20   Q    And how long have you worked at Pelican Bay?
21   A    Thirteen years.
22   Q    Does the search of Jesse Perez's cell on October 10, 2012
23   stand out in your memory for any reason?
24   A    No, it doesn't.
25   Q    Do you remember searching Mr. Perez's cell on October 10,
```

PIMENTEL - CROSS-EXAMINATION / SEALS

1  2012?

2  **A**    No.

3  **Q**    How do you know that you were involved in the search of

4  Mr. Perez's cell?

5  **A**    Through the cell search slips.  My name is on there.

6           **MR. SEALS:**  Can we show the witness Exhibit 49 which

7  has been preadmitted?

8           **THE COURT:**  Uh-huh.

9           (Document displayed)

10 **BY MR. SEALS:**

11 **Q**    What is a cell search receipt, Mr. Pimentel?

12 **A**    It is a receipt -- well, there's two copies to it.  And

13 you write down if anything gets removed from the cell.  It's a

14 receipt for the inmate so he knows what was taken, basically,

15 and who was there, and what date, what time.

16 **Q**    And is your handwriting on this cell search receipt?

17 **A**    Yes, it is.

18 **Q**    Is this the receipt that was left for Mr. Perez on

19 October 10, 2012?

20 **A**    Yes, it is.

21 **Q**    Under "CONDITION OF CELL" and under "ITEMS CONFISCATED" is

22 that your handwriting?

23 **A**    Yes, it is.

24           **MR. SEALS:**  Can we blow up that section?

25           (Document displayed)

1  BY MR. SEALS:

2  Q    What was taken from Mr. Perez's cell on October 10, 2012?

3  A    Per the receipt, all paperwork was removed, and then an

4  inmate-manufactured picture frame was confiscated.  Cardboard,

5  empty milk cartons and some trash.

6  Q    Do you always list everything taken from the cell on the

7  cell search receipt?

8  A    Yes.

9  Q    Do you specify the type of paperwork that is taken?

10  A    No, it's just in general.

11  Q    Do you review the paperwork before taking it out of the

12  cell?

13  A    The bulk or -- no.  We take it back to the office and

14  search through it.

15  Q    Should legal documents and articles be listed separately

16  from "All paperwork" on the receipt?

17  A    No, it's -- it's all paper.

18  Q    If paperwork is taken, is it standard procedure to

19  describe the paperwork that is taken?

20  A    No.  There wouldn't be enough room on that sheet there to

21  write it all in fine description.

22  Q    Now, looking at this form, you did not check any of the

23  boxes directly under "CONDITION OF CELL."  Why didn't you check

24  one of those boxes?

25  A    It was an oversight.

1  Q    Did you always check one of those boxes?

2  A    Most of the time, yeah.

3  Q    Does the receipt say why the cell was searched?

4  A    It says "Active/inactive review."

5  Q    Would you have treated this search any differently if you

6  knew it was a new validation?

7  A    It's the same.  It's different paperwork, but as far as

8  the cell search, it's the same search.

9  Q    And at the time of this search, do you remember knowing

10  whether it was a new validation or an active/inactive review?

11  A    No, just -- I guess I had the impression that that's what

12  it was.

13  Q    And why would the searches for an active/inactive review

14  be the same as those for a new validation?

15  A    Because looking for gang-related material, essentially

16  it's the same for either/or, just the criteria is different on

17  the papers for an active/inactive versus an initial.

18  Q    Can you describe a cell search for me?  What is your

19  procedure when you search a cell?

20  A    My search, everything gets moved so you can make sure that

21  everything's done; you move everything from one side to the

22  other.  That way you make sure everything -- you haven't missed

23  anything.  It's kind of like a grid search.

24  Q    And do you search through all of the inmate's clothing and

25  the bedding?

1  **A**    Yes.

2  **Q**    Do you search through their toiletries and other items in

3  the cell?

4  **A**    Yes.

5  **Q**    And do you take anything other than paperwork when you

6  search a cell?

7  **A**    If we discover any contraband, that gets removed also.

8  **Q**    And why do you search the clothing and the bedding and the

9  toiletries in the cell?

10  **A**    We have to eliminate the possibility for dangerous

11  contraband, such as, like, razor blades or weapons.

12  **Q**    During the search did you say anything to Mr. Perez?

13  **A**    I don't recall.

14  **Q**    Did any of the other defendants say anything to Mr. Perez?

15  **A**    They might have.  I -- I don't recall.

16  **Q**    Did you hear any of the officers say anything to the

17  effect of "We're going to keep you in the SHU where you belong"

18  to Mr. Perez?

19         **MR. LEE:**  Objection, leading.

20         **THE COURT:**  Overruled.

21         **THE WITNESS:**  I don't have a recollection of any of

22  them having said that, but something like that would have

23  really stuck in my head as -- just like the Ellery e-mail, you

24  know.

25

1  BY MR. SEALS:

2  Q    And do you have any recollection of hearing an officer say

3  something to the effect of "These knuckleheads should file more

4  lawsuits, it makes this job more fun"?

5  A    No.

6  Q    How about anything to the effect of "Good, keep it that

7  way," in response to Mr. Guerrero saying he didn't file

8  lawsuits?

9  A    No.

10  Q    Do you remember who searched the cell with you that day?

11  A    Per the cell search receipt, it was myself, Officer

12  Gongora, Officer Healy.  And after the paperwork for the

13  lawsuit surfaced, I guess Healy was also there.  Although he is

14  not listed on the receipt.  [Sic]

15  Q    You mentioned that Healy is not listed on the receipt.

16       MR. SEALS:  Can I -- (Inaudible)

17  BY MR. SEALS:

18  Q    Is it standard procedure for all of the officers who enter

19  a cell and search the cell to list their names on the receipt?

20  A    Yes.

21  Q    Do you remember Officer Healy being in the cell with you

22  that day?

23  A    I don't recall the search, so -- but I guess he was there,

24  so --

25  Q    But do you specifically remember him being in the cell

1  with you?

2  **A**    No.

3  **Q**    But you remember him coming to the unit.

4  **A**    Just per the paperwork, he was there.  When the lawsuit

5  surfaced and per reading the lawsuit, it shows that he was

6  there.

7  **Q**    And I asked you a few moments ago about some statements

8  that Mr. Perez claims other officers made.  Did you make any of

9  those statements?

10 **A**    No.

11 **Q**    When you arrived at the cell that day, do you remember

12 seeing Mr. Perez's cellmate, Mr. Guerrero, putting notes into

13 the toilet?

14 **A**    No, I don't recall the cell search.

15 **Q**    On other occasions, have you seen inmates put notes in the

16 toilet?

17 **A**    Yes.

18 **Q**    And why, why do you believe inmates put notes into the

19 toilet?

20 **A**    They're trying to destroy evidence.

21 **Q**    You said "destroy evidence"?

22 **A**    Yes.

23 **Q**    How many times have you seen that?

24 **A**    Numerous.

25 **Q**    Do you remember what Mr. Perez was doing when you arrived

1  at the cell search?

2  **A**    No.

3  **Q**    Why don't you remember?

4  **A**    It's just in the mass quantity of the cell searches we do,

5  it was just another search in the whole --

6  **Q**    Previously you stated that you remembered Mr. Perez being

7  cooperative during the search.  Why do you believe he was

8  cooperative?

9  **A**    Because he submitted to restraints and he was escorted

10  from the cell, so that in my eyes he was compliant.

11  **Q**    What do you consider to be an uncooperative inmate?

12  **A**    If he hadn't submitted to handcuffs then a supervisor

13  would have been notified, and it would have turned into an

14  incident report, and possibly we would have all had to do

15  incident -- write reports.  And so it would have been

16  completely different.

17  **Q**    And was an incident report required in this situation?

18  **A**    Not this one, because he complied and submitted.

19  **Q**    And when a Rules Violation Report is prepared, is that

20  different from an incident report?

21  **A**    Yes.

22  **Q**    Did you take a picture of Mr. Perez after he had been

23  escorted out of his cell that day?

24  **A**    For his -- yes, for his validation package.

25  **Q**    Why would you have taken a picture of Mr. Perez?

1  **A**    Standard procedure, to take different poses of the inmate.

2  **Q**    Why is that standard procedure?

3  **A**    It goes with the validation package, and also it gives you

4  something to compare.  To see if there are any more recent

5  tattoos on him, that he might have put on him, applied himself,

6  which could be used towards his validation.

7  **Q**    Why can tattoos be used towards a validation?

8  **A**    Well, there are certain tattoos that are specific to

9  certain gangs.  And so if -- like I say, for the Mexican Mafia,

10  if he were to tattoo a black hand on his chest, that would be

11  indicative of him becoming a member of the Mexican Mafia.

12       And so if he didn't have it on the prior search and then

13  now he has it this time, then it is indicative that he was made

14  a member.

15  **Q**    And you stated that that would be indicative that he was

16  made a member.

17  **A**    But that's just an example, yeah.

18  **Q**    So that day, did you have a camera that day with you?

19  **A**    Yes.

20  **Q**    But you didn't take a picture of Mr. Perez's cell,

21  correct?

22  **A**    No.

23  **Q**    Why didn't you take a picture of Mr. Perez's cell?

24  **A**    It's not standard procedure.

25  **Q**    Okay.  And after the paperwork had been removed from

1  Mr. Perez's cell, do you remember where that paperwork was

2  taken?

3  **A**    Back to the office.

4  **Q**    Would that be -- I'm sorry.  Are there a couple of offices

5  where Institutional Gang Investigators work?

6  **A**    There's three.  One where the lieutenant and sergeants

7  were at, at the time.  And then there was the room where I was

8  working where active/inactives and initials were conducted.

9  And then there was the mailroom.

10 **Q**    And who worked in your office with you?

11 **A**    In the active/inactive office was myself, Officer Milligan

12 and Officer Burris.

13 **Q**    Did you help review any of the paperwork?

14 **A**    I believe so.

15 **Q**    I would like to show you Exhibit 50 which has already been

16 admitted.

17     (Document displayed)

18 **Q**    Is this another cell search receipt?

19 **A**    Yes.

20 **Q**    And the date on this is October 11, 2012.  Correct?

21 **A**    Correct.

22 **Q**    What was is the purpose of this cell search receipt?

23 **A**    We provide this receipt when we return the property.  And

24 what it does is it gives the inmate a breakdown of what was

25 retained, and it also puts on the record that his property was

 1  returned.

 2  **Q**    And is your handwriting on this receipt?

 3  **A**    Partially on the top and then on the right.

 4  **Q**    And that is your signature, correct?

 5  **A**    Correct.

 6  **Q**    And did you return any of the paperwork to Mr. Perez that

 7  was taken out of his cell?

 8  **A**    Yes.

 9  **Q**    What paperwork was returned?

10  **A**    Everything minus what's listed as retained or confiscated.

11           **MR. SEALS:**  Can we come close --

12       (Document displayed)

13  **BY MR. SEALS:**

14  **Q**    Under "CONDITION OF CELL," can you read that line to me?

15  **A**    Yeah.  It says (As read):

16           **"All paperwork returned on 10-11-12.  Items

17       taken listed below."

18  **Q**    Thank you.  And now, is your handwriting under -- is your

19  handwriting included in this section "ITEMS CONFISCATED"?

20  **A**    Yes, it is.

21           **MR. SEALS:**  Can you blow that up, please.

22       (Document displayed)

23  **BY MR. SEALS:**

24  **Q**    Can you please read to me which items were confiscated?

25  **A**    In my handwriting it says (As read):

```
 1                "Altered magazine pages, excess Title 15 book,

 2         inmate manufactured book covers, elastic, cardboard."

 3         And then down below it looks like Officer Burris's

 4  handwriting, it says (As read):

 5                "Guerrero, 1 address book.  Perez, 1 address

 6         book.  3 pages of home addresses, 2 pages of code.

 7         12 photos of inmates.  1 photocopied gang drawing and

 8         all Nahautl."

 9  Q    What is Nahautl?

10  A    It is a disallowed language that the institution doesn't

11  allow.

12  Q    Did you dispose of any property that was taken out of

13  Mr. Perez's cell?

14  A    I did not.

15  Q    You did not?

16  A    No.

17  Q    Did someone dispose of Mr. Perez's property?

18  A    Burris would have processed it.

19  Q    But on this receipt in the righthand column it says:

20                "Disposed per inmate request."

21         Correct?

22  A    Correct.

23  Q    And is that referring to the top portion that is in your

24  handwriting?

25  A    No, just what's circled.  I believe it says:
```

1          **"**30 magazines, 3 newspapers, and 217 books."

2     **Q**     So that is the circle in the right column below where it

3     says "Disposed per inmate's request."

4     **A**     Correct.

5     **Q**     And looks like there is a signature under the line

6     "Disposed per inmate's request."  Do you know whose signature

7     that is?

8     **A**     The top one, it says "Jesse Perez," and the other one --

9     can't really make it out, but it must be "Guerrero."

10    **Q**     And I believe you just said -- can you say again what you

11    believe the items were that were disposed of?

12    **A**     Altered magazine pages, excess Title 15 book,

13    inmate-manufactured book covers, elastic, cardboard.  And then

14    what's circled is the magazines, newspapers and excess books.

15           And it's signed, if you look at the -- there's like an

16    arrow on the upper one over towards the right where they signed

17    for the stuff on the left side.  And they have the stuff that's

18    on the right down below, where they sign for stuff on the right

19    side.

20    **Q**     So the stuff on the left side -- sorry, strike that

21    question.

22           Why are inmates provided a receipt when the property is

23    returned to them?

24    **A**     It's a record of what -- if we took stuff -- usually if

25    it's a cell search, it's a record of what was taken, if

 1  anything was taken.  And that we were there.

 2      Upon return we do the same thing, so there's something on

 3  paper that shows that we did return the property, and it lists

 4  anything that was removed or held pending investigation.

 5  **Q**    After the cell search, did you know that Officer Gates

 6  wrote Mr. Perez and Mr. Guerrero Rules Violation Reports?

 7  **A**    I don't recall that.

 8  **Q**    Did you discuss this Rules Violation Report with Officer

 9  Gates?

10  **A**    No.

11  **Q**    When Mr. Lee was questioning you earlier today he used the

12  term, quote-unquote, "on the radar."  What does the term "on

13  the radar" mean to you?

14  **A**    Someone that you would spend a lot more time possibly

15  reviewing.

16  **Q**    And before October of 2012, was Mr. Perez on your radar?

17  **A**    No.

18  **Q**    Do you remember having any interactions with Mr. Perez

19  before October 10, 2012?

20  **A**    Not that I recall.

21  **Q**    About how many inmates were housed in the SHU in October,

22  2012?

23  **A**    Approximately 1200.

24          **MR. SEALS:**  I would like to bring up, I believe it's

25  Exhibit 5, the voluntary double celling form that was mentioned

1  by Mr. Lee.

2           **THE COURT:**  Yeah, that's Exhibit 5.

3      (Document displayed)

4  **BY MR. SEALS:**

5  **Q**    You discussed this the form a little bit earlier with

6  Mr. Lee.  I would like to ask you a few more questions about

7  it.

8      Before the course of this litigation, this lawsuit, had

9  you ever seen this double celling form before?

10  **A**    If I was working overtime or something and the inmate

11  submitted it, they would go to the counselor's office.

12  **Q**    But had you specifically seen the one signed by --

13  **A**    No.

14  **Q**    And on the top, Mr. Lee blew up a section of it.  Let me

15  highlight that again.

16      (Document displayed)

17  **Q**    And it states that:

18           "Management will determine which cell is used

19           for the double celling."

20      Were you at that time management?

21  **A**    No.

22  **Q**    Are you at this time management?

23  **A**    No.

24  **Q**    Did you have any role in approving or disapproving this

25  form?

1   A    No, I didn't.

2            **MR. SEALS:**  You can close out of there.

3   **BY MR. SEALS:**

4   Q    And in the bottom left corner it says:

5            "Recommend close scrutiny by IGI."

6        And you stated that "IGI" refers to your unit.

7   A    Correct.

8   Q    Is that the Institutional Gang Investigators?

9   A    Yes, it is.

10  Q    Can that term also refer to a specific person?

11  A    Oh, the IGI or the lieutenant.

12  Q    The IGI?  Who would that be?

13  A    The -- Lieutenant Barneburg at the time.

14  Q    So at Pelican Bay there would be one person who is known

15  as the IGI?

16  A    Right.

17  Q    And your position was an Assistant Institutional Gang

18  Investigator, correct?

19  A    Correct.

20  Q    And that would be known as an AIGI?

21  A    AIGI.

22  Q    When did you become aware of Mr. Perez's new lawsuit that

23  led to this new validation?

24  A    When the litigation surfaced.

25  Q    Would you have cared that Mr. Perez had a previous lawsuit

1  at the time of this cell search?

2  **A**    No.

3  **Q**    Did you trash Mr. Perez's cell on October 10, 2012?

4  **A**    No, I did not.

5  **Q**    Did you follow standard procedures when you searched

6  Mr. Perez's cell on October 10, 2012?

7  **A**    Yes, it was just another search.

8  **Q**    And did you confiscate any articles or legal documents

9  from Mr. Perez's cell on October 10, 2012?

10  **A**    No, just what's listed.

11  **Q**    Did you issue or write Mr. Perez a Rules Violation Report

12  on October 10, 2012?

13  **A**    I didn't.

14       (Reporter interruption)

15           **THE WITNESS:**  I did not.

16  **BY MR. SEALS:**

17  **Q**    Did you retaliate against Mr. Perez because of his

18  previous lawsuit?

19  **A**    No.

20           **MR. SEALS:**  Thank you.

21           **THE COURT:**  Redirect?

22                  **REDIRECT EXAMINATION**

23  **BY MR. LEE:**

24  **Q**    Officer Pimentel, Mr. Seals just asked you whether you

25  confiscated any legal papers or articles during the cell search

1   of Mr. Perez.  Recall that?

2   **A**    Correct.

3   **Q**    And you said you did not.  You just confiscated what was

4   listed.  Right?

5   **A**    Correct.

6   **Q**    And what was listed -- by "what was listed" you were

7   referring to the cell search receipt, correct?

8   **A**    Correct.

9   **Q**    And the cell search receipt that you were just shown,

10  that's Exhibit 49.  Correct?

11  **A**    Is that what -- is that which one it is?

12           **MR. LEE:**  Can we show the witness Exhibit 49, please?

13           (Document displayed)

14           **THE WITNESS:**  Yeah, correct.

15  **BY MR. LEE:**

16  **Q**    And in fact, the only thing that's listed on Exhibit 49 is

17  "All paperwork."  Right?

18  **A**    Correct.

19  **Q**    There's no legal paperwork, no legal brief listed, right?

20  **A**    No, but legal work is made out of paper.

21  **Q**    Right.  And no articles listed, right?

22  **A**    No.

23  **Q**    The only reference is "All paperwork," right?

24  **A**    Correct.

25  **Q**    So you have no basis to know whether or not you seized

1  legal briefs or articles, do you?

2  **A**   It was, you know, in general.  You know, everything was

3  taken.

4  **Q**   But you testified that you did not confiscate any legal

5  brief or papers, didn't you?

6  **A**   Correct.

7  **Q**   And that wasn't true, was it?  Because all you know is

8  that the form lists "paperwork."

9  **A**   No, because when we return the property, if we'd

10  confiscated legal work it would be on the second receipt.  And

11  it's not.

12  **Q**   But you previously testified that you don't necessarily

13  list every piece of paper, right?  Because there isn't enough

14  form -- enough room on the form.  Correct?

15  **A**   When you remove it, correct.

16  **Q**   Even though the there are nine blank lines on this form

17  (Indicating), right?

18  **A**   Correct.

19  **Q**   You were asked by Mr. Seals some questions about your

20  understanding of whether an inmate is cooperative.  Do you

21  recall those questions?

22  **A**   Yes.

23  **Q**   Would you describe an inmate who was willfully resisting

24  or obstructing a peace officer as cooperative?

25  **A**   If you submit to handcuffs.  Yes.  If they ultimate come

 1  out, yes.  Did he delay the officer?  That's a whole different

 2  -- he can be reprimanded by a Rules Violation Report, but it

 3  wouldn't be an incident.

 4       So if he submitted to handcuffs, he was cooperative.  Did

 5  he delay the peace officer?  Yes.

 6  **Q**    And would you describe an inmate who was refusing to obey

 7  orders as cooperative?

 8  **A**    Cooperative, he submitted to handcuffs.  But in another

 9  aspect, he did break institutional procedure.

10         **MR. LEE:**  Can we show Officer Pimentel Exhibit 77

11  again, please.

12       (Document displayed)

13  **BY MR. LEE:**

14  **Q**    I just want to make sure I understand your testimony about

15  this, Officer Pimentel.

16       You testified that this was an unusual request, right?

17  **A**    Yes, it was.

18  **Q**    Highly unusual?

19  **A**    Right.

20  **Q**    Extraordinary, correct?

21  **A**    That's why I reported it within less than an hour.

22  **Q**    And it was requesting you to commit an illegal act.

23  Correct?

24  **A**    Correct.

25  **Q**    And the only reason you didn't follow up to find out what

1  had happened with this is the chain of command.  Is that your

2  testimony?

3  **A**    Say that one more time?

4  **Q**    The only reason you didn't follow up on the request that

5  you commit an extraordinary illegal act was the chain of

6  command.  Is that your testimony?

7  **A**    That's incorrect.

8  **Q**    Well, that was how you testified when Mr. Seals asked you

9  the question.

10  **A**    I reported to my supervisor.

11  **Q**    And the only reason you didn't follow up to find out if

12  your supervisor had done anything with it was the chain of

13  command.  Right?

14  **A**    Yeah.  That's the way the CDCR operates, on a chain of

15  command.

16        **MR. LEE:**  Nothing further, Your Honor.

17        **THE COURT:**  Any recross?

18        **MR. SEALS:**  Yes, Your Honor.

19                    **RECROSS EXAMINATION**

20  BY MR. SEALS:

21  **Q**    I just have a few brief questions, Mr. Pimentel.

22        Mr. Lee just asked you about the difference between con-

23  -- I'm sorry.  He referred to Exhibit 49, and claimed that you

24  did confiscate -- sorry.  Let me strike that question.

25        You stated earlier that you did not confiscate any of

 1  Mr. Perez's legal briefs or articles.  Is that correct?

 2  A     Correct.

 3  Q     And when I used the term "confiscate" earlier, did you

 4  understand that to mean retain after Mr. Perez's other property

 5  was returned?

 6  A     Right.  So when we -- when we take the property out of the

 7  cell it is being removed but only the items that are listed as

 8  confiscated are what's actually confiscated.  Everything else

 9  was taken out for searching.

10  Q     So it is possible that there were some legal documents and

11  articles that were removed from Mr. Perez's cell.

12  A     It's possible.

13  Q     But those were not confiscated.

14  A     Not confiscated.

15        **MR. SEALS:**  Thank you.  No further questions.

16        **THE COURT:**  Anything further?

17        **MR. LEE:**  No, Your Honor.

18        **THE COURT:**  Thank you, Officer Pimentel.

19     (Witness excused)

20        **THE COURT:**  Call your next witness.

21        **MR. LEE:**  Your Honor, we will call Officer Burris to

22  the stand.

23

24

25

1        **SEAN BURRIS**,

2   called as a witness for the Plaintiff herein, having been first

3   duly sworn, was examined and testified as follows:

4           **THE CLERK:**  Thank you.  Please be seated.  For the

5   record, please state your first and last name and spell both.

6           **THE WITNESS:**  Sean Burris.  S-E-A-N, B-U-R-R-I-S.

7           **THE CLERK:**  Thank you.

8           **MR. LEE:**  Your Honor, just to facilitate things, may

9   I approach with (indicating)?

10          **THE COURT:**  Oh, sure.

11                **DIRECT EXAMINATION**

12  BY MR. LEE:

13  Q    Good morning, Officer Burris.

14  A    Good morning.

15  Q    You are a correctional officer at Pelican Bay, right?

16  A    Yes, I am.

17  Q    And you have been a correctional officer there for more

18  than 12 years?

19  A    Yes, I have.

20  Q    And you are also an Assistant Institutional Gang

21  Investigator, correct?

22  A    Yes.

23  Q    Or AIGI?

24  A    Yes.

25  Q    And you've been an AIGI there full-time since about 2008?

BURRIS - DIRECT EXAMINATION / LEE

```
 1  A    Correct.

 2  Q    And you're assigned exclusively to the Security Housing

 3  Unit at Pelican Bay, right?

 4  A    Yes.

 5  Q    And in 2012, your co-defendants, Officer Gates, Officer

 6  Healy, Officer Gongora, and Officer Pimentel were also other

 7  AIGIs, right?

 8  A    That's correct.

 9  Q    And you interacted with them regularly at work, correct?

10  A    Yes.

11  Q    You frequently worked with Officer Gates in 2012, right?

12  A    Yes.

13  Q    And you would describe him as a friend?

14  A    Yes.  He's a friend.

15  Q    And in October of 2012, or 2012, you also worked closely

16  with Officer Gongora?

17  A    Yes.

18  Q    And you have known Officer Gongora for about ten years,

19  read and write?

20  A    Yeah.  Probably, approximately, yes.

21  Q    And you have worked closely with Officer Healy, right?

22  A    Yes.

23  Q    You share an office with Officer Pimentel, right?

24  A    We did for a time, yes.

25  Q    And at least during that time you worked very closely with
```

 1  him, correct?

 2  **A**    Yes.

 3  **Q**    Now, yesterday, there was is various testimony about

 4  something called the Security Threat Group Pilot Program.  Do

 5  you recall generally what I'm referring to?

 6  **A**    Yes.

 7  **Q**    And this was the -- evidenced by, we showed one of the

 8  witnesses a memorandum, announcing or rolling out the Security

 9  Threat Group Pilot Program or STG Pilot Program, it was dated

10  in October of 2012, right?

11  **A**    Correct.

12  **Q**    And just generally speaking, I'm not trying to get into

13  details here but you recall that the STG Pilot Program related

14  to certain new procedures that the CDCR was rolling out for

15  validations, right?

16  **A**    Yeah, that's correct.

17  **Q**    And the STG Pilot Program will also referred to certain

18  new procedures that the CDCR was rolling out that related to

19  how validations would interact with placement in the SHU,

20  correct?

21  **A**    Yes, that's correct.

22  **Q**    And specifically, as of October of 2012, on the date of

23  the search of Mr. Perez and Mr. Guerrero's cell, you were aware

24  that the old policies pre-STG Pilot Program, were still in

25  effect.  Correct?

1    **A**    Yes, that's correct.

2    **Q**    And you learned however, some time in 2011 or 2012, that

3    there were changes to these relevant policies coming that

4    ultimately became the STG Pilot Program.  Right?

5    **A**    Yes, that's correct.

6    **Q**    And you received training on those changes before they

7    were actually implemented, right?

8    **A**    I don't remember specifically, but I'm sure we did.

9    **Q**    And you received annual training on gang validation

10   procedures during your time as an AIGI, correct?

11   **A**    For gang validation procedures?

12   **Q**    Right.

13   **A**    No, I didn't receive annual training on gang validation

14   procedures.

15   **Q**    You participated in training on gang validations in the

16   summer of 2011, right?

17   **A**    I don't recall.

18   **Q**    And you participated in gang validation training on

19   July 17 of 2012, correct?

20   **A**    I don't recall that.

21   **Q**    Do you recall in this case being asked to respond to a

22   number of questions that were posed to you in writing by the

23   attorneys, and your attorney prepared written responses which

24   you then signed?

25        Do you recall that?

 1  **A**    I don't remember, no.

 2  **Q**    Would it refresh your recollection on whether or not you

 3  did that if I were to show you a document?

 4  **A**    It would probably help, yes.

 5  **Q**    Okay.

 6          **MR. LEE:**  May I approach?

 7          **THE COURT:**  You may.

 8      (Document handed up to the Court)

 9      (Witness examines document)

10          **THE WITNESS:**  Okay.

11  **BY MR. LEE:**

12  **Q**    Officer Burris, I have handed you what's been marked for

13  identification as Exhibit 29.  And it's entitled:

14          "Defendant Burris's Response to Plaintiff's

15      First Set of Interrogatories."

16      Do you see that?

17  **A**    Yes.

18  **Q**    And on the last page, is that your signature?

19      (Witness examines document)

20  **A**    On the last page?

21  **Q**    I'm sorry.  On the second-to-last page, where it says:

22          "Verification.  I declare under penalty of

23      perjury that I have read and reviewed the above

24      responses to interrogatories and they are true and

25      correct to the best of my knowledge."

1  **A**    Yes, that's my signature.

2  **Q**    And so, does this refresh your recollection that you

3  prepared certain written responses to written questions that

4  you then signed as part of this litigation?

5  **A**    Yes, it appears so.

6  **Q**    Okay.  And would it -- on the -- you testified a minute

7  ago that you didn't recall specific training.  Remember, I

8  asked you about whether you attended gang validation training

9  in the summer of 2011 and the summer of 2012, and you testified

10  you didn't recall?

11  **A**    At this time I don't recall, no.

12  **Q**    Would it refresh your recollection to review how you

13  answered those questions in this set of interrogatories

14  (Indicating)?

15  **A**    Possibly.

16  **Q**    Okay.  If I could direct your attention to Page 3, where

17  it says "Response to..."  First it says:

18          "Interrogatory No. 3, Describe any training."

19      And then a response to Interrogatory No. 3, which is a

20  list.  And if you could read those to yourself, and let me know

21  when you're done.

22      (Witness examines document)

23  **A**    Okay.

24          **THE COURT:**  Why don't you go ahead and get the

25  document from him now since he's read it.

```
 1              MR. LEE:  Sure.

 2              THE COURT:  He's supposed to be testifying about what

 3   he remembers now.

 4         (Request complied with by Mr. Lee)

 5              MR. LEE:  Thank you.

 6   BY MR. LEE:

 7   Q    Officer Burris, does seeing Exhibit 29 refresh your

 8   recollection as to whether you attended gang validation

 9   training in June of 2011?

10   A    It appears I did.

11   Q    And does reviewing that exhibit refresh your recollection

12   as to whether you attended gang validation training in June of

13   -- or July of 2012?

14   A    It appears I did.

15   Q    Now, you are familiar with Title 15 generally, correct?

16   A    Generally.

17   Q    Okay.  And Title 15 contains the regulations governing the

18   operation of California's adult prisons by the Department of

19   Corrections.  Right?

20   A    That's correct.

21   Q    And Title 15 provides procedures governing cell searches,

22   right?

23   A    Yes, it does.

24   Q    Procedures governing how cell searches are to be

25   conducted?
```

1  **A**     I believe it does.

2  **Q**     And it provides procedures that say among other things

3  that cell searches may not be used for a punitive purpose?

4  **A**     I don't know the exact verbiage but I believe there is

5  something in there to that effect.

6  **Q**     And that cell searches may not be used to the harass an

7  inmate, correct?

8  **A**     Correct.

9  **Q**     And you are aware too that Title 15 provides that every

10  reasonable precaution should be taken to avoid damages to

11  personal property, and to leave an inmate's quarters in good

12  condition upon completion of a search, correct?

13  **A**     I believe.

14  **Q**     And you received training on those procedures, right?

15  **A**     Yes.

16  **Q**     A few questions about the search on October 10, 2012.

17  That day, you were asked to conduct a search of Mr. Perez's and

18  Mr. Guerrero's cell.  Right?

19  **A**     I -- I was not asked to conduct a search, no.

20  **Q**     Well, you received an email from your supervisor that day,

21  Lieutenant Barneburg, asking you to -- stating that Mr. Perez

22  was to receive a new validation, is that right?

23  **A**     Yes, that's correct.

24       **MR. LEE:**  And if we could show Officer Burris Exhibit

25  68.

1      (Document displayed)

2   **BY MR. LEE:**

3   **Q**    You see the email in front of you?

4   **A**    Yes, I do.

5   **Q**    Exhibit 68?

6   **A**    Yes.

7   **Q**    This is the request that you received, you and others

8   received from Lieutenant Barneburg about the validation, right?

9   **A**    That's correct.

10  **Q**    Of Mr. Perez.  Right?

11  **A**    (No audible response)

12     (Reporter interruption)

13          **THE WITNESS:**  Yes.

14  **BY MR. LEE:**

15  **Q**    And it says:

16          "Review Inmate Jesse Perez, K42186, for new..."

17     Underscore "new."

18          "...validation (think Castro case)."

19     Do you see that?

20  **A**    Yes, I do.

21  **Q**    You understood what Lieutenant Barneburg meant when he

22  said "think Castro case," didn't you?

23  **A**    I did, yes.

24  **Q**    And you understood that email to mean that a court had

25  ordered a new validation procedure for Mr. Perez, correct?

1   **A**    I believed at the time that the Court had ordered it, yes.

2   **Q**    And the email you received from Lieutenant Barneburg

3   includes an attachment.  Do you see the reference to an

4   attachment?

5   **A**    Yes, I see that.

6   **Q**    Entitled "scan0001.pdf"?

7   **A**    That's correct.

8   **Q**    And there was, in fact, a document attached to this email,

9   right?

10  **A**    Yes, that's correct.

11  **Q**    And that document was entitled "Request for Settlement

12  Authority" correct?

13  **A**    I don't know exactly what it said, but something to that

14  effect, yes.

15  **Q**    And so you knew that Mister -- when you received this

16  email, you knew that Mr. Perez was settling a lawsuit that he

17  had brought, correct?

18  **A**    I believe there was litigation regarding it.  I didn't

19  know if he had settled it at the time or not.

20  **Q**    But you saw --

21  **A**    I knew there was litigation.

22  **Q**    And you saw the reference to a settlement in the attached

23  document, right?

24  **A**    I don't recall.

25  **Q**    And you're aware that the settlement with Mr. Perez wasn't

```
 1   actually signed until June of 2013, eight months after this
 2   email, correct?
 3   A    On October 10th?
 4   Q    Right.
 5   A    No, I didn't know that.
 6   Q    But you now know that it wasn't signed for eight more
 7   months, correct?
 8   A    I know that now, yes.
 9   Q    Okay.
10        (Document taken off display)
11   Q    Now, you didn't actually conduct the search of the cell on
12   October 10, right?
13   A    That's correct.
14   Q    Officers Gates, Gongora, Pimentel and Healy conducted the
15   search?
16   A    I know Gates, Gongora, and Pimentel did because their
17   names are on the cell search receipt.
18   Q    You don't have a recollection of whether Officer Healy was
19   there?
20   A    I have no recollection.  I was not there.
21   Q    And you don't have a recollection of learning whether he
22   participated?
23   A    No, I do not.
24   Q    You reviewed the property that those officers removed from
25   the cell, is that right?
```

1   **A**   Yes, that's correct.

2   **Q**   That was your role?

3   **A**   Yes, that's correct.

4   **Q**   And you have you determined what property should be

5   confiscated, correct?

6   **A**   That's correct.

7   **Q**   And you determined what property should be returned to

8   Mr. Perez.  Correct?

9   **A**   That's correct.

10  **Q**   And Mr. Perez was issued a second cell search receipt the

11  following day on October 11, correct?

12  **A**   That is correct.

13  **Q**   And you signed that receipt, right?

14  **A**   That is correct.

15  **Q**   You were here a minute ago when we showed Officer Pimentel

16  Exhibit 50, the second cell search receipt.  That was your

17  signature on there, is that correct?

18  **A**   Yes, that's correct.

19  **Q**   Before the day of the search, you had investigated

20  Mr. Perez for a possible violation of prison rules in

21  connection with a hunger strike in 2011, hadn't you?

22  **A**   I had investigated him?  No.

23  **Q**   Correct.

24  **A**   No, I didn't investigate him.

25  **Q**   On or about May 26, 2011, you issued a form known as a

1   Form 128B to Mr. Perez, correct?

2   **A**   I didn't learn about that until my deposition.  I did not

3   recall it until my deposition.

4   **Q**   But in fact, you -- you did prepare that Form 128B for

5   Mr. Perez, correct?

6   **A**   I did.  But it wasn't an investigation.

7   **Q**   Okay.  And a Form 128B is a form essentially used to

8   document certain information about a prisoner?

9   **A**   Yes.  It's an informational document.

10   **Q**   It's also called a "counseling chrono"?

11   **A**   Yes.  That's another term for it, yes.

12   **Q**   And it's essentially a warning to a prisoner, correct?

13   **A**   It can be, but it doesn't have to be.

14   **Q**   It's a first step toward possible disciplinary action,

15   correct?

16   **A**   It can be, yes.

17   **Q**   And it goes into the inmate's central prison file,

18   correct?

19   **A**   That is correct.

20   **Q**   And one of the reasons that you use these forms is to

21   document and keep a record of activity by inmates that is

22   potentially a violation of prison rules.  Right?

23   **A**   That is correct.

24   **Q**   And in terms of your own rule as an AIGI, one of the

25   reasons you complete these forms is to help you monitor

1   potential prison gang activity.  Correct?

2   **A**    That is correct.

3   **Q**    And the subject of the specific Form 128B that you issued

4   to Mr. Perez in May of 2011 was that you had discovered

5   state-issued peanut butter inside a state-issued mattress.

6   Correct?

7   **A**    That is correct.

8   **Q**    And based on that discovery, you concluded that inmates

9   were planning to circumvent established hunger strike protocols

10  by surreptitiously storing food to consume without detection by

11  staff.  Correct?

12  **A**    That is correct.

13  **Q**    Was it a violation of prison rules to have state-issued

14  peanut in a mattress?

15  **A**    It's not against prison rules to have peanut butter in

16  your mattress, but it is against prison rules to tear up a

17  mattress.

18  **Q**    So it had nothing do with peanut butter.  It had to do

19  with the mattress?

20  **A**    No, I would say the chrono had to do with the possible

21  pending hunger strike.

22  **Q**    Okay.  And you believed the peanut butter in the mattress

23  had something to do with the -- would be used during the

24  planned hunger strike.  Correct?

25  **A**    Yes, I believe so.

```
 1  Q    And the form that you wrote up refers to the fact that,

 2  quote:

 3           "Inmates were planning to circumvent established

 4       hunger strike protocols."

 5       Those were protocols established by the inmates?

 6  A    No.  Protocols that the Department of Corrections

 7  establishes.

 8  Q    And the Department of Corrections has protocols

 9  surrounding hunger strikes?

10  A    Yes.

11  Q    The same day you issued the form, you forwarded another

12  version of it to Anthony Dornback, right?

13  A    I believe I did.

14  Q    And Anthony Dornback was your supervisor?

15  A    He was.

16  Q    And the email, you sent an email to Anthony Dornback with

17  an attached version of that Form 128B, right?

18           MR. SEALS:  Objection, Your Honor, Motion in Limine

19  No. 2.

20           THE COURT:  Sustained.

21           MR. LEE:  No further questions.

22                      CROSS EXAMINATION

23  BY MR. SEALS:

24  Q    Good morning, Mr. Burris.

25  A    Good morning.
```

1  **Q**    In October of 2012 you were an Assistant Institutional

2  Gang Investigator at Pelican Bay State Prison, correct?

3  **A**    That is correct.

4  **Q**    And what were your duties as an Assistant Institutional

5  Gang Investigator?

6  **A**    My specific duties were conducting active/inactive reviews

7  and new validations.  I would also on occasion read mail, do

8  initial debrief interviews, cell searches.  There was a

9  magnitude of different things that we did.

10  **Q**    You used the term "debriefing reviews."  Can you explain

11  that?

12  **A**    An initial debrief review investigation is when an inmate

13  of a -- of a prison gang or a street gang decide to

14  disassociate themselves from the gang, and we, including

15  myself, gang investigators, would interview the inmate.

16  **Q**    And you mentioned that you worked on gang validations and

17  active/inactive reviews?  Is that correct?

18  **A**    Yes, that's correct.

19  **Q**    Was that your primary assignment?

20  **A**    My primary assignment was active/inactive reviews and

21  initial validations.

22  **Q**    And when did you begin working as a gang investigator?

23  **A**    I -- came in to Pelican Bay gang investigations unit full

24  time, January or February of 2008, full time.

25      Prior to that, in the summer of 2006 I was brought in for

```
 1    a special assignment to conduct active/inactive reviews.  It
 2    lasted a few months.
 3  Q    When conducting an active/inactive review, is a cell
 4    search standard procedure?
 5  A    Yes, absolutely.
 6  Q    Why is a cell search part of that procedure?
 7  A    It's part of the procedure so we can determine if an
 8    inmate is still active within the gang or inactive within the
 9    gang by locating any gang indicia within his cell.
10  Q    You used the term "gang indicia."  Can you explain what
11    that means?
12  A    Gang indicia is anything from gang-related artwork.  It
13    could be notes, gang-related notes.  Anything of that nature.
14  Q    In October of 2012 you were working on active/inactive
15    reviews, is that correct?
16  A    That is correct.
17  Q    And were you instructed to review Mr. Perez's status as an
18    associate of the Mexican Mafia on October 10th, 2012?
19  A    Yes, I was.
20  Q    Who instructed you to provide that validation?
21  A    I believe it was -- Barneburg, I believe.
22         MR. SEALS:  Can we show the witness Exhibit 68?
23         (Document displayed)
24  BY MR. SEALS
25  Q    Is this the email instructing you to provide Mr. Perez
```

 1 | with a new validation?

 2 | **A**    Yes, it was.

 3 | **Q**    Is this email from Mr. Barneburg?

 4 | **A**    Yes, it is.

 5 | **Q**    Why were you told to provide Mr. Perez with a new

 6 | validation?

 7 |             **MR. LEE:**  Objection, foundation.

 8 |             **THE COURT:**  Sustained.

 9 | **BY MR. SEALS**

10 | **Q**    Does this email provide any reason for why Mr. Perez needs

11 | a new validation?

12 | **A**    The email itself does not, no.

13 | **Q**    Did you have any discussions with Mr. Barneburg regarding

14 | why Mr. Perez was getting a new validation?

15 | **A**    I don't recall any.

16 | **Q**    And this email instructs you to complete this validation

17 | as soon as possible?

18 | **A**    Yes, it says that.

19 | **Q**    What did you do after you received this email from

20 | Mr. Barneburg?

21 | **A**    I don't --

22 | **Q**    In -- I'm sorry.

23 | **A**    I don't know what I did.

24 | **Q**    In relation to the validation of Mr. Perez, do you

25 | remember what steps you took?

1  **A**    I believe I -- I believe I instructed or asked Pimentel,

2  Gates, Gongora to instruct a cell search.

3  **Q**    And did you participate in the cell search?

4  **A**    No, I did not.

5  **Q**    Do you know why you didn't participate in the cell search?

6  **A**    I don't know for sure, but I would say it was probably

7  because I was preparing the validation package.

8  **Q**    After the cell search, some property had been removed from

9  Mr. Perez's cell.  Did you review any of that property?

10  **A**    The property that was --

11  **Q**    That was removed from Mister --

12  **A**    -- retained out of his cell?  Yes, we did.

13           **MR. SEALS:**  Can we show Exhibit 50?

14       (Document displayed)

15  **BY MR. SEALS**

16  **Q**    You stated previously that your signature is on this Cell

17  Search Receipt, correct?

18  **A**    Yes, that's correct.

19  **Q**    And this receipt indicates that -- does this receipt

20  indicate that you reviewed some property and paperwork taken

21  from Mr. Perez's cell?

22  **A**    Yes.

23  **Q**    Why did you review this property?

24  **A**    I was the one doing the validation, conducting the

25  validation itself, so I reviewed the property.

```
 1   Q    Did you confiscate any of Mr. Perez's property or retain
 2   any of the property?
 3   A    Yes, I did.
 4   Q    Why was that?
 5   A    Due to gang activity.
 6   Q    And are the items that were confiscated listed on this
 7   receipt?
 8   A    Yes, they are.
 9   Q    Do you always list all of the items that you confiscate on
10   Cell Search Receipts?
11   A    Absolutely.
12   Q    So it's standard procedure to list all the items that are
13   confiscated?
14   A    Yes.  It's standard procedure to list all the items that
15   you confiscate.
16        MR. SEALS:  Can we blow up this section?
17        (Document enlarged.)
18   BY MR. SEALS
19   Q    Do you see your handwriting in this section that's been
20   enlarged?
21   A    I do.
22   Q    And can you read for me which items you confiscated from
23   Mr. Perez?
24   A    (As read)
25             "One address book, three pages.  Three pages of
```

```
 1        addresses.  Two pages of code.  Twelve photos of
 2        inmates.  One photocopy gang drawing and all
 3        Nahautl."
 4             THE REPORTER:  I'm sorry?
 5             THE WITNESS:  Nahautl.
 6             THE COURT:  Do you want to spell that for the court
 7   reporter?
 8             THE WITNESS:  N-A-H-A-U-T-L.
 9   BY MR. SEALS
10   Q    Since here on the topic of Nahautl, I'll start with that
11   one.  What is Nahautl?
12   A    Nahautl is an archaic language which was -- which was and
13   is in limited use still in Central America, I believe.
14   Q    And why did you confiscate all the Nahautl from Mr. Perez?
15   A    Pelican Bay has a policy that all archaic language is to
16   be confiscated.
17   Q    Do you know why that policy is in place?
18   A    It's in place because inmates utilize Nahautl, Swahili,
19   archaic languages like that, to deliver coded messages.  They
20   utilize it for codes.
21   Q    Do you speak Nahautl?
22   A    No.
23   Q    How did you know that it was Nahautl?
24   A    Nahautl is a very distinct language when it's written out.
25   It has a lot of Xs, Ts, Ls.  It's very distinctive when it's
```

1   written out.

2   **Q**    Have you seen it on multiple occasions?

3   **A**    Yeah.  We see it all the time.

4   **Q**    You also stated that you confiscated one address book from

5   Mr. Perez.  Why might an address book be confiscated?

6   **A**    Due to addresses listed within the address book as being

7   confirmed as being -- utilized to conduct gang activity.

8   **Q**    Can you read the line under "Perez - one address book" for

9   me?

10  **A**    "Three pages" -- "three pages" -- I'm not sure what that

11  word is.  I can't even read my writing.  Three pages of

12  addresses.

13  **Q**    Okay.  And would the reason for confiscating three pages

14  of addresses be similar to that of confiscating an address

15  book?

16  **A**    Yes.  Exactly the same.

17  **Q**    And then you listed, "Two pages of code."  Why would you

18  confiscate two pages of code?

19  **A**    Gang affiliates use code to communicate.

20  **Q**    Next you listed, "12 photos of inmates."

21  **A**    That's correct.

22  **Q**    Why would photos be confiscated?

23  **A**    I believe those photos were of validated inmates.

24  **Q**    When you say validated gang members, do you mean inmates

25  that have been validated as members of a prison gang?

1  **A**    Yes.

2  **Q**    Next is, "One photocopied gang drawing"?

3  **A**    That's correct.

4  **Q**    Why would you confiscate a gang drawing?

5  **A**    We confiscate all gang drawings.  Prison gangs have --

6  each prison gang has very distinct symbols that they utilize to

7  recognize their gang, and this drawing had one of those symbols

8  that's indicative of the Mexican Mafia.

9  **Q**    And did you confiscate any articles from Mr. Perez?

10 **A**    Excuse me?

11 **Q**    Any articles from Mr. Perez?

12 **A**    No.

13 **Q**    Did you confiscate any legal documents from Mr. Perez?

14 **A**    No.

15 **Q**    Under "Condition of Cell," do you see that part of the

16 Cell Search Receipt?

17 **A**    That's correct.

18           **MR. SEALS:**  Can we enlarge that?

19        (Document enlarged.)

20 **BY MR. SEALS**

21 **Q**    Can you read that line to me?

22 **A**    (As read)

23           "All paperwork returned on 10/11/12.  Items taken

24        listed below."

25 **Q**    Does that indicate to you that all of the other paperwork

1   that had been removed from Mr. Perez's cell was returned to

2   him?

3   **A**    That's exactly what it means.

4   **Q**    Thank you.

5       During your time as an Assistant Institutional Gang

6   Investigator, approximately how many validation packets have

7   you prepared?

8   **A**    Hundreds.

9   **Q**    Was there anything unique about the validation of Mr.

10  Perez?

11  **A**    Other than we believed it was Court ordered, there was

12  nothing out of the ordinary.

13  **Q**    Did you know Mr. Perez before receiving the email on

14  October 10th from Mr. Barneburg?

15  **A**    No, I did not.

16  **Q**    Mr. Lee asked you some questions about a chrono that you

17  had prepared, a Form 128-B, regarding peanut butter in Mr.

18  Perez's mattress?

19  **A**    Yes, that's correct.

20  **Q**    Do you recall preparing that form?

21  **A**    No, I do not.  I didn't -- I didn't recall that form until

22  the deposition.

23  **Q**    But now you have -- you have reviewed that form?

24  **A**    I have, yes.

25  **Q**    Okay.  And when you -- can you describe what happened when

1  you prepared that form or why you prepared that form?

2  A    I prepared the form -- it was just information of a

3  possible hunger strike.  That was the only reason it was

4  prepared.

5  Q    Did you meet Mr. Perez when you searched the mattress?

6  A    No.

7  Q    Was the mattress still in Mr. Perez's cell when you

8  searched it?

9  A    No, it was not.

10  Q    How were you asked --  strike that.

11      How were you asked to search Mr. Perez's mattress?

12  A    I believe I was notified by a correctional officer that

13  they had had discovered something hidden inside of a mattress.

14  Q    And how did you know that this mattress was Mr. Perez's?

15  A    The officer told me that's whose it was.

16  Q    So you had no personal knowledge of whose mattress that

17  was?

18  A    No, I did not.

19  Q    How many times have you heard of inmates filing lawsuits?

20  A    All the time.

21  Q    And have you also heard of inmates settling lawsuits?

22  A    Sure.

23  Q    Does it bother you that inmates have constitutional rights

24  and can file lawsuits?

25  A    Doesn't bother me.

1  Q    Have you ever spoken with Mr. Perez?

2  A    Not until I issued him his validation paperwork.

3  Q    Before October 10th, 2012 did you ever speak with Mr.

4  Perez?

5  A    Not that I'm aware of.

6  Q    Before October 10th, 2012 did you ever discuss Mr. Perez

7  with other Assistant Institutional Gang Investigators?

8  A    Not that I'm aware of.

9  Q    Did you retaliate against Mr. Perez because of his

10 previous lawsuit?

11 A    I didn't know about his previous lawsuit.

12 Q    Did you confiscate any of Mr. Perez's documents or

13 articles because you were upset about Mr. Perez's previous

14 lawsuit?

15 A    No.

16 Q    Thank you, Mr. Burris.

17        MR. LEE:  Nothing further your Honor.

18        THE COURT:  Very good.  Thank you, Officer Burris.

19 You may step down.

20     (Witness excused.)

21        THE COURT:  All right.  Now seems like a good time

22 for our morning break.  Why don't we meet back here at 10:30

23 and take a break until then.

24     (Jury exits the courtroom at 10:16 a.m.)

25        THE COURT:  All right.  Who is the next witness going

1  to be?

2          MR. BENEDETTO:  Mr. Subia.

3          THE COURT:  Okay.  And is that the last person you're

4  calling?

5          MR. LEE:  Subject to final confirmation among our

6  team, yes.

7          THE COURT:  Okay.  With respect to Mr. Subia, you

8  know, I'm left after listening to the testimony -- I'm sorry.

9  Everybody does not have to be standing up right now.  Thank

10  you.

11      With respect to Mr. Subia, I'm left wondering what is the

12  point of his testimony about how to do a proper cell search.  I

13  mean, I'm not sure there is any disagreement, based on the

14  evidence so far, about what's proper and what's improper.  It's

15  just a question of what they did.

16      So can you -- can you explain to me a little more about

17  why expert testimony from Subia on this point is helpful to the

18  jury in light of the evidence that's already come in?

19          MR. BENEDETTO:  We think it would be helpful for the

20  jury, particularly on the training side and the significance of

21  the training around Title 15.

22      We've heard testimony from the defendants that there were

23  standard operating procedures that may not be codified or that

24  may be specific to Pelican Bay, and we think it would be

25  helpful for the jury to understand that, the way in which Title

```
 1   15 is sort of the governing document with respect to those

 2   procedures and -- and he might be helpful in that regard.

 3          MR. SEALS:  A brief response, your Honor?

 4          THE COURT:  Yes.

 5          MR. SEALS:  I would just like to comment that

 6   Mr. Subia never worked at Pelican Bay.  So in terms of the --

 7   any testimony --

 8          THE COURT:  Well, he could still -- as I recall from

 9   his background, he could still be familiar with standard

10   operating procedures at Pelican Bay without having worked

11   there.

12          MR. SEALS:  Correct.  But Mr. Benedetto referred to

13   any procedures specific to Pelican Bay.  Mr. Subia wouldn't be

14   able to provide testimony regarding that.

15          MR. BENEDETTO:  He was the boss of the warden at

16   Pelican Bay.

17          THE COURT:  So I'm -- I'm going to -- I mean, the

18   plaintiffs never -- it's not clear to me why his testimony will

19   be helpful in this case.

20      But the plaintiffs never objected to his testifying on

21   this topic, right?

22          MR. BENEDETTO:  The defendants?

23          THE COURT:  Excuse me.  The defendants never objected

24   to his testifying on this particular topic, correct?

25          MR. SEALS:  Correct, your Honor.
```

1          THE COURT:  Okay.  So I'm going to allow it, but I'm

2   not going to allow it to last very long.  So make it quick.

3          MR. BENEDETTO:  Yes, your Honor.

4          THE COURT:  Okay.  Thank you.

5          THE CLERK:  Court is in recess.

6      (Whereupon there was a recess in the proceedings

7        from 10:19 a.m. until 10:31 a.m.)

8          MR. SEALS:  Defendants -- at the close of plaintiff's

9   case-in-chief, defendants intend to make a Rule 50 motion.

10  Would you like that to be made in the presence of the jury or

11  outside of the presence of the jury?

12         THE COURT:  You can make it outside the presence of

13  the jury.

14         MR. SEALS:  So will we take a break after that?

15         THE COURT:  Yeah, like -- well, I don't know if we'll

16  take a break after the expert because I think the expert is

17  going to be short.

18      It's fine to just make your Rule 50 motion.  Then I'll

19  deny it and we can go on.

20         MR. SEALS:  Okay.  I'll make it brief then.

21         THE COURT:  All right.  Say, "We move under Rule 50,"

22  and I'll deny it.

23         MR. SEALS:  Okay.

24         THE CLERK:  Ready?

25         THE COURT:  Yes.

```
 1        (Jury enters courtroom at 10:32 a.m.)

 2             THE COURT:  Go ahead and call your next witness.

 3             MR. BENEDETTO:  Your Honor, the plaintiff calls

 4   Richard Subia.

 5                        RICHARD SUBIA,

 6   called as a witness for the Plaintiff herein, having been first

 7   duly sworn, was examined and testified as follows:

 8             THE WITNESS:  Yes, I do.

 9             THE CLERK:  Thank you.  Please be seated.

10        For the record, please state your first and last name and

11   spell both.

12             THE WITNESS:  Name is Richard Subia.  R-I-C-H-A-R-D.

13   S-U-B-I-A.

14                     DIRECT EXAMINATION

15   BY MR. BENEDETTO

16   Q    Good morning Mr. Subia.

17   A    Good morning.

18   Q    I'd like to start by asking you about your background.

19   A    Okay.

20   Q    Are you currently employed?

21   A    Yes.

22   Q    And where are you currently employed?

23   A    I am the President of Subia Consulting Services, which is

24   a consultant organization that provides consulting services in

25   peace officer, public safety issues to counties, states,
```

1  different agencies throughout the United States.

2  **Q**    And how long have you owned and operated this business?

3  **A**    Approximately, three and a half years.

4  **Q**    What did you do before you started Subia Consulting?

5  **A**    I was an employee with the state of California, with the

6  California Department of Corrections.

7  **Q**    And what was the last position you held at the CDCR?

8  **A**    I was the Acting Director of the Division of Adult

9  Institutions.

10 **Q**    And how long were you employed by the CDCR?

11 **A**    Almost 27 years.  About 26 years and eight or nine months.

12 **Q**    And when did you leave CDCR?

13 **A**    March 31st of 2012.

14 **Q**    Can you explain for the jury how the position of Acting

15 Director of Adult Institutions ranks at the CDCR?

16 **A**    It is the overall position responsible for the operations

17 of all the adult facilities in California, as well as

18 facilities housing offenders in out-of-state facilities.

19       At the time that I was the director, there was about 9500

20 inmates housed in various states.  I was also responsible for

21 managing those offenders.

22 **Q**    What was the process for you to obtain the position of

23 Acting Director?

24 **A**    Well, I was the Deputy Director and it was an appointed

25 position at that time by Governor Brown.  My name was moved

1   forward as the director position, and I was -- my name was

2   submitted to the governor's office for the director position.

3       But to obtain that position you then go through what's

4   called a process through vetting and you have to present

5   yourself in front of the Senate Rules Committee and be

6   appointed to the position.

7   Q    Was Pelican Bay under your supervision as the Acting

8   Director of the Division of Adult Institutions?

9   A    Yes, sir.

10  Q    And you testified that you held the position of Deputy

11  Director of Adult Institutions?

12  A    That's correct.

13  Q    And when did you assume that position?

14  A    In, I believe, December of 2010.

15  Q    And what were your responsibilities as the Deputy

16  Director?

17  A    I need to correct that.  I believe it was December 2009.

18  Q    So how long did you hold the position of Deputy Director?

19  A    Two years.

20  Q    And what were your responsibilities in that role?

21  A    Operational responsibilities of the institutions.  In

22  addition, I was responsible for managing court cases involving

23  medical mental health issues.

24      But the wardens from the institutions worked directly with

25  the associate directors, who then reported to me.  So I was

```
 1  basically still the operations person responsible for all of
 2  the prisons in California.
 3  Q    And what position did you hold before you were the Deputy
 4  Director?
 5  A    I was the Associate Director responsible for -- at first
 6  it was managing 12 institutions.  Then under the reorganization
 7  we divided the institutions up and at that time I was
 8  responsible for managing nine institutions, the 45 inmate fire
 9  camps that are spread out throughout California, as well as 13
10  community correctional facilities that are located throughout
11  California.
12  Q    And how long did you hold the position of Associate
13  Director?
14  A    Two years.
15  Q    What position did you have before becoming an Associate
16  Director?
17  A    I was the warden of Mule Creek State Prison, which is
18  located in Amador County.
19  Q    And when did you become the warden at Mule Creek?
20  A    I believe it was 2006.  I held the position for one year.
21  Q    And can you tell the jury briefly what your
22  responsibilities were as the warden?
23  A    I was responsible for managing an institution, housed
24  Level 1 through Level 4 inmates.  Overall management of the
25  institution operations.
```

```
 1        At that time there was approximately 34 to 4- -- 3400 to
 2   4,000 inmates there.  So responsible for the budget, the
 3   overall operations of the institution.
 4   Q    And what did you do before you became the warden at Mule
 5   Creek?
 6   A    I was the Special Assistant to the Secretary of
 7   Corrections and the Special Assistant to the Undersecretary of
 8   Corrections.
 9   Q    And can you just briefly summarize what your duties were
10   in those two positions?
11   A    When I was the Special Assistant to the Secretary, I was
12   responsible for providing corrections, information to the
13   governor's office and the legislature at that time.  The
14   Secretary of Corrections had mainly a budget background and so
15   he utilized me to assist in making decisions and policy
16   decisions and providing information as it related to custody
17   operations in the institutions.
18        So I spent a lot of time with the legislature in the
19   capital assisting with decisions that had to be made with
20   regard to budget issues with the department or operations of
21   the Department of Corrections.
22   Q    And can you briefly summarize any other positions you've
23   held at the CDCR?
24   A    I began as a correctional officer in 1986.  I was a
25   correctional sergeant, correctional lieutenant, correctional
```

```
1   captain, associate warden, chief deputy warden.  And then it
2   took me to warden and then the positions we discussed.
3        And then within each one of those positions I've held
4   various special classifications doing other assignments, if you
5   want me to go into those.  Those were of the classifications
6   though.
7   Q    Okay.  And you testified that you were hired into the CDCR
8   as a correctional officer, is that right?
9   A    Yes, sir.
10  Q    Is that a line officer?
11  A    Yes, sir.
12  Q    And what -- what prison were you hired into?
13  A    Folsom State Prison.
14  Q    And briefly what were your responsibilities as a
15  correctional officer?
16  A    Day-to-day operations of the facility.  Providing overall
17  security for the prison housing units.  Managing inmate
18  movement.  Inmate population.  Conducting cell searches.
19  Conducting pat down body searches of inmates.  Security checks
20  of buildings.  Ensuring that inmates were in the place that
21  they were supposed to be.
22       Conducting minor investigations; not major, but minor
23  investigations on issues that happened within my building.
24  Responding to emergencies.  Those type of peace officer duties.
25  Q    And during your time at the CDCR, did you have any
```

1    experience managing prison gangs?

2    **A**    Yes.

3    **Q**    And briefly explain what that experience was?

4    **A**    I was the Assistant Gang Investigator and Institution Gang

5    Investigator at California State Prison Solano for

6    approximately three years.  So I managed the unit that was

7    responsible for the gang validations and just the overall

8    operation of the prison, identifying and assisting and

9    management of gangs and disruptive groups within the prison.

10   **Q**    And what year was that?

11   **A**    1990 to 1993.

12   **Q**    How did you become involved in this case?

13   **A**    I was contacted, I believe, either telephonically or via

14   email requesting if I would be interested in consulting on a

15   case, and provided some minor details, and did some

16   communication back and forth with the law office.

17   **Q**    Have you met Mr. Perez, the plaintiff in this case?

18   **A**    No, I have not.

19   **Q**    Do you know any of the defendants?

20   **A**    By name, maybe.  All the names I've read throughout this

21   case, but not that I can recall on a personal level, no.

22   **Q**    Approximately, how many times have you served as an expert

23   witness?

24   **A**    Oh, over 100 probably in the last three years.

25   **Q**    And, briefly, what are the topics on which you've given

1  expert testimony?

2  **A**    In street gangs and prison gangs, prison culture, prison

3  behavior, prison classification system, prison disciplinary

4  system, risk assessment on offenders, both in custody and in

5  the community.

6      I have been a joint parties' expert in a disability act,

7  an ADA case, where I was appointed by both parties.  A couple

8  of other disability type of cases.  In custody death cases.

9  Use of force type of cases.

10  **Q**    Okay.  And have you ever testified on behalf of the CDCR?

11  **A**    Yes.

12  **Q**    In what capacity?

13  **A**    I've testified in the capacity as an employee with CDCR.

14  And then I have been deposed.  Since leaving CDCR, I have been

15  called to depose on a CDCR type case, but all of my --

16  **Q**    On behalf of the CDCR?

17  **A**    Yes.  All of my live testimony in court has -- was when I

18  was employed with CDCR.

19  **Q**    Are you being paid for your services in this case?

20  **A**    I am.

21  **Q**    Have you ever been to Pelican Bay State Prison?

22  **A**    Yes.

23  **Q**    Have you ever been assigned to work at Pelican Bay State

24  Prison?

25  **A**    No, I have not.

1  Q    Do CDCR policies and procedures govern Pelican Bay State
2  Prison?
3  A    Yes, sir.
4  Q    Do CDCR policies and procedures govern the Security
5  Housing Unit at Pelican Bay State Prison?
6  A    Yes.
7  Q    While you were employed at the CDCR, did you conduct cell
8  searches?
9  A    I did.
10 Q    How many, would you say?
11 A    Oh, thousands probably over the years that I worked in the
12 prisons.
13 Q    More than 1,000?  More than 2,000?
14 A    I would assume so.  A lot of time -- a lot of cell
15 searches.  More than I could even count.  I'm sure over a
16 thousand.
17 Q    How many would you say were -- of those cell searches were
18 connected to a gang validation?
19 A    Probably several hundred during the time frame.  Either
20 whether I was involved in assisting somebody who was conducting
21 a validation or whether we were conducting a cell search and it
22 turned into a cell search as it related to validation based on
23 some gang information that became present.  So I'm sure several
24 hundred.
25 Q    Are there CDCR policies that govern how cell searches are

 1  to be conducted?

 2  A    Yes.

 3        MR. BENEDETTO:   I'd like to show the witness an

 4  exhibit that has been pre-admitted as Exhibit 1.

 5        THE COURT:   You may.

 6     (Document displayed)

 7  BY MR. BENEDETTO

 8  Q    Did that pop up on your screen?

 9  A    It did.

10  Q    Are you familiar with this document?

11  A    Yes.

12  Q    And what is it?

13  A    This is a page out of the department's Title 15 California

14  Code of Regulations.   It's the rules and regulations that

15  govern the operation of the Department of Corrections.

16        MR. BENEDETTO:   Tim, can you enlarge 3287?

17     (Document enlarged.)

18  BY MR. BENEDETTO

19  Q    And do you see Section 3287, "Cell, Property and Body

20  Inspections"?

21  A    Yes.

22  Q    And what does this section cover?

23  A    This is one of the department's documents that cover cell,

24  property and body inspections.   When and how those inspections

25  are conducted.   Whether they are cell inspections or

```
 1   inspections of a specific area.  Whether it's an inspection of
 2   a person.
 3        Like I said, it's one of.  There's other documents that
 4   dictate, but this is -- this was one of them.
 5   Q    And was this provision in place when you were a line
 6   correctional officer?
 7   A    Yes.
 8   Q    And was this provision in place when you were the
 9   Director -- Acting Director of Adult Institutions?
10   A    Yes, it was.
11   Q    Is there a different section of Title 15 that explains how
12   an officer is supposed to conduct a search that is part of a
13   gang validation, as opposed to a routine search?
14   A    No.
15   Q    So Section 3287 applies to all cell searches?
16   A    Yes.
17   Q    Does it apply to all correctional officers?
18   A    Yes, it does.
19   Q    Even officers at Pelican Bay?
20   A    Yes, sir.
21   Q    Do correctional officers receive pertaining on how to
22   conduct cell searches?
23   A    Yes, they do.
24   Q    And when do they receive that training?
25   A    They will receive training at the basic Correctional
```

1  Officer Academy.  And the training is more detailed than what

2  you read here because it provides the way a cell search should

3  be done, the way to accomplish it to ensure that you're

4  achieving the task at hand.

5       They also receive training, on-the-job training when they

6  get to the institution.  They are overseen by a supervisor and

7  the supervisors go around the units and monitor that cell

8  inspections are getting done.  And if there is an issue with

9  cell inspections, then they could provide on-the-job training

10  to officers once they are at the location that they have been

11  assigned.

12  **Q**    And the training is mandatory?

13  **A**    Yes.

14  **Q**    Was the training mandatory when you were hired by the

15  CDCR?

16  **A**    Yes, it was.

17  **Q**    And was that training mandatory when you were Acting

18  Director of Adult Institutions?

19  **A**    Yes, it was.

20  **Q**    Did you receive that training?

21  **A**    I did.

22          **MR. BENEDETTO:**  Tim, can we bring back up Exhibit 1

23  and highlight Section 3287, Subsection (a)(2)?

24       (Document displayed)

25

1  **BY MR. BENEDETTO**

2  **Q**    Mr. Subia, do you see that enlarged section?

3  **A**    Yes, I do.

4  **Q**    Do you see the sentence:

5         "Every reasonable precaution will be taken to

6         avoid damage to personal property and to leave the

7         inmate's quarters and property in good order upon

8         completion of the inspection"?

9  **A**    Yes.

10 **Q**    And what's your understanding of this provision?

11 **A**    That when completing a cell search, that you want to take

12 all precautions to ensure that you don't damage property of the

13 inmate.  You try to leave the cell in as close to the same way

14 that you found it when you entered it while conducting your

15 search.

16    That you understand that the property of the inmate is all

17 that they have.  That's part of the training that the officers

18 are given at the academy.  So you want to treat the offender

19 and the offender's property in a dignified way to ensure that

20 you don't create any further problems as a result of damaging

21 somebody's property or disrespecting something that may be

22 personal to them.

23 **Q**    And does Title 15 provide what officers must do if any

24 property is removed from a cell after a search?

25 **A**    It does.

1  Q    And what does it say?

2  A    Any property that's removed should be noted on what is

3  called a Cell Search Receipt or documentation provided to the

4  inmate to inform them of what items were taken.

5       There is also sections that -- in the Title 15 that speak

6  of if that property is going to be utilized for disciplinary

7  purposes, that you indicate such, and that you indicate to the

8  offender the disposition of the property that you took.

9              MR. BENEDETTO:   Tim, can you bring up A-4?

10     (Document displayed)

11 BY MR. BENEDETTO

12 Q    So I have enlarged Subsection (a)(4) which notes:

13         "The inmate will be given a written notice."

14     Do you see that?

15 A    I do.

16 Q    Is that the Cell Search Receipt?

17 A    Yes.

18 Q    (As read)

19         "The notice will also list any contraband picked

20     up or any breach of security noted during the

21     inspection."

22     Is that also right?

23 A    Yes, sir.

24 Q    Have you been asked to provide an expert opinion in this

25 case?

1    **A**    I have.

2    **Q**    And on what topic have you been asked to provide an expert

3    opinion in this case?

4    **A**    On the topic of cell searches and how cell searches are

5    performed and the rules and regulations that govern cell

6    searches.

7    **Q**    And what is the basis for your opinion?

8    **A**    I don't understand the question.

9    **Q**    In coming to your expert opinion, what have you used to --

10   **A**    Okay.  I'm sorry.

11   **Q**    --  on which to base that opinion?

12   **A**    I reviewed the documents that were provided to me as it

13   related to the cell search, the complaint that was filed in the

14   case.

15       I reviewed some responses to some of the interrogatories

16   that were filed in the case.

17       I also reviewed the department's policies and procedures

18   as it related to cell search; the one that we've reviewed,

19   Title 15, as well as sections in the department's operations

20   manual, which is a separate manual that governs the operations

21   of the department.  And then the various documents that were

22   provided under discovery that were sent to me to review.

23   **Q**    Do you have an understanding that Mr. Perez has alleged

24   that on October 10th, 2012 his cell was trashed and certain

25   legal papers and articles were taken and not returned?

1    A    Yes.  I read that.

2    Q    And what is that understanding based on?

3    A    I -- the -- it's based on the information that I read in

4    the complaint that was filed in the case.

5    Q    If, in the course of a cell search, officers threw an

6    inmate's sheets and clothing on the floor of the cell and

7    marked them with their bootprints, would that conduct comply

8    with Title 15?

9    A    No.

10   Q    If, in the course of a cell search, officers spilled all

11   of the contents of an inmate's personal hygiene products on the

12   floor or in the locker, would that conduct comply with Title

13   15?

14   A    No.

15   Q    If, in the course of a cell search, an officer took

16   property, certain property belonging to an inmate that was not

17   contraband and did not return that property, would that conduct

18   comply with Title 15?

19   A    No, it would not.

20   Q    If, after a search was conducted, officers removed certain

21   property from an inmate's cell and did not identify or list

22   that property on a Cell Search Receipt, would that conduct

23   comply with Title 15?

24   A    As long as the property was not illegal contraband.  If it

25   was illegal contraband, then that would fall under a different

 1 | section.  But if it was the inmate's property, it was legal

 2 | property and/or state property that was provided to the inmate,

 3 | it should have been listed on the receipt.

 4 | **Q**    If the search in this case was, in fact, carried out in

 5 | the manner described by Mr. Perez, can you identify for the

 6 | jury any legitimate reason that would justify such a search?

 7 | **A**    No.

 8 | **Q**    No further questions.

 9 |              **THE COURT:**  Cross?

10 |              **MR. SEALS:**  Yes, your Honor.

11 |                       **CROSS EXAMINATION**

12 | **BY MR. SEALS**

13 | **Q**    Good morning, Mr. Subia.

14 | **A**    Good morning.

15 | **Q**    You testified earlier that you never worked at Pelican

16 | Bay, correct?

17 | **A**    Correct.

18 | **Q**    So you've never searched a cell in the SHU of Pelican Bay,

19 | correct?

20 | **A**    Not at Pelican Bay, no, but in a SHU I have.

21 | **Q**    But you've never searched a cell in the SHU of Pelican

22 | Bay?

23 | **A**    No.

24 | **Q**    When is the last time that you searched a cell?

25 | **A**    I would say 2011 or 2012.

1  Q    When is the last time you conducted a search that was

2  related to a gang validation?

3  A    2005.  Around that time frame, 2004, 2005.

4  Q    And when officers are preparing a gang validation, one of

5  the first steps in that process is to conduct a cell search,

6  correct?

7  A    Yes.

8  Q    And you testified earlier that you are being paid for your

9  testimony by plaintiff, correct?

10 A    Yes, sir.

11 Q    How much are you being paid?

12 A    I get paid $200 an hour for consultation and testimony in

13 a case.

14 Q    And is there a minimum amount for testimony that you

15 provide at court?

16 A    Yes.  $1,000 a day.

17 Q    So for your testimony today you will be paid at least

18 $1,000?

19 A    Correct.

20        MR. SEALS:  No further questions.

21        MR. BENEDETTO:  Nothing further.

22        THE COURT:  Thank you.

23     (Witness excused.)

24        MR. BENEDETTO:  Your Honor, before plaintiff rests,

25 we would like to read the Stipulations of Facts to the jury.

1      **THE COURT:**  You may.

2          And let me just tell you, members of the jury, that in

3    order to make the process more efficient for you, the parties

4    get together before the trial and identify facts in the case

5    that they can agree on so that they don't need to put on a lot

6    of evidence and sort of have a lot of back-and-forth in front

7    of you.

8          So the parties in this case have agreed on certain facts,

9    and Mr. Benedetto is now going to read the factual stipulations

10   to you and you should treat what he reads you as true, both

11   sides having agreed to it.

12         **MR. BENEDETTO:**  Thank you, your Honor.

13         In 2003, while at the California Correctional Institution,

14   plaintiff was validated by the California Department of

15   Corrections and Rehabilitation, or CDCR, as an associate of the

16   Mexican Mafia prison gang and transferred to the Security

17   Housing Unit, or SHU, at Pelican Bay State Prison, or Pelican

18   Bay.

19         Validation is a procedure where CDCR investigators review

20   information and make a determination, based on the information,

21   whether an inmate is a member, associate or affiliate of a

22   particular prison gang.

23         In 2005 plaintiff filed a lawsuit against the officers at

24   the California Correctional Institution involved in the

25   validation process alleging that his gang validation and

 1   assignment to the SHU violated his constitutional rights.  The

 2   filing of this lawsuit is protected conduct under the First

 3   Amendment.

 4        In October, 2012, defendants were employed as correctional

 5   officers at Pelican Bay working as Assistant Institutional Gang

 6   Investigators, or IGIs.

 7        On October 10th, 2012 plaintiff was housed in the SHU at

 8   Pelican Bay.

 9        Plaintiff's cellmate on October 10th, 2012 was Rudy

10   Guerrero.

11        Salvador Mendoza was housed in the cell adjacent to

12   plaintiff and Guerrero on October 10th, 2012.

13        On October 10th, 2012 defendants Gates, Gongora, Healy and

14   Pimentel conducted a search of plaintiff's cell and removed

15   property belonging both to plaintiff and to his cellmate Rudy

16   Guerrero.

17        CDCR policy states that cell searches are necessary in

18   order to detect and control serious contraband and to maintain

19   institution security; that searches should not be used as a

20   punitive measure or to harass an inmate; that every reasonable

21   precaution shall be taken to avoid damaging personal property

22   and that an inmate's quarters and property shall be left in

23   good order upon completion of a cell search.

24        Defendant Burris reviewed the property removed from

25   plaintiff's cell as part of plaintiff's gang validation.

SUBIA - CROSS EXAMINATION / SEALS

```
1       On October 11th, 2012 plaintiff was issued a Cell Search

2  Receipt signed by defendants Burris and Pimentel.

3       On October 21st, 2012 plaintiff was issued a Serious RVR,

4  authored by defendant Gates, for allegedly willfully resisting

5  or obstructing a peace officer during the October 10th, 2012

6  search.

7       At the time the RVR was issued under changes to prison

8  regulations scheduled to be implemented in a few months, a

9  prison gang associate found guilty of a Serious Rules Violation

10 Report with a gang connection, who was otherwise eligible for

11 placement in the General Population, could be assigned to the

12 SHU for up to three years.  As of October, 2012 plaintiff did

13 not have any Serious RVRs with a gang connection.  The RVR was

14 dismissed on November 18, 2012.

15            THE COURT:  Anything further from the plaintiffs?

16            MR. LEE:  No, your Honor.  Plaintiff rests.

17            MR. SEALS:  Defendants move under Rule 50 for a

18 judgment as a matter of law.

19            THE COURT:  Denied.

20       Let's see, 11:00 o'clock.  Do the defendants want to call

21 their first witness?

22            MS. NYGAARD:  Yes.  Defendant will call Associate

23 Warden Dave Barneburg.

24

25
```

 1                    **DAVID BARNEBURG**,

 2  called as a witness for the Defendant herein, having been first

 3  duly sworn, was examined and testified as follows:

 4            **THE WITNESS:**  I do.

 5            **THE CLERK:**  Thank you.  Please be seated.

 6       For the record, please state your first and last name and

 7  spell both.

 8            **THE WITNESS:**  My name is David Barneburg.  D-A-V-I-D,

 9  B-A-R-N-E-B-U-R-G.

10            **THE CLERK:**  Thank you.

11                    <u>**DIRECT EXAMINATION**</u>

12  BY MS. NYGAARD

13  Q    Good morning, Mr. Barneburg.

14  A    Good morning.

15  Q    Where do you currently work?

16  A    I work for the California Department of Corrections and

17  Rehabilitation at Pelican Bay State Prison.

18  Q    And how long have you worked at Pelican Bay?

19  A    Just over 18 years.

20  Q    And what is your current position there?

21  A    I am the Associate Warden of Healthcare and Operations.

22  Q    And what positions did you hold at Pelican Bay before

23  becoming an Associate Warden?

24  A    Multiple.  I started out as an officer at Pelican Bay

25  State Prison working various positions, from floor positions on

1   the General Population, Security Housing Unit, Administrative

2   Segregation, Psychiatric Services Unit; a variety of positions

3   throughout the institution.

4       I promoted to correctional sergeant after about eight

5   years as an officer.  In that position I held, again, positions

6   on the General Population, Security Housing Unit.

7       I worked as an outside patrol sergeant, visiting sergeant,

8   and then as an Assistant Institutional Gang Investigator in

9   ISU.

10      I promoted to Lieutenant.  Again, several positions; watch

11  Commander, Institutional Gang Investigator, Yard Lieutenant.

12      I promoted to Captain.  I held the position as the ISU

13  Captain, Investigator Services Unit Captain, the Healthcare

14  Access Unit captain, and then I promoted to Associate Warden

15  this year.

16  **Q**   Okay.  And in October of 2012, what position did you hold?

17  **A**   I was a Correctional Lieutenant assigned to Institutional

18  Gang Investigation.

19  **Q**   Okay.  And was that also known as the Institutional Gang

20  Investigator?

21  **A**   Yes.  IGI is two things actually.  It's the Institutional

22  Gang Investigator and Institutional Gang Investigation.  The

23  acronym serves as both.

24  **Q**   And what were your duties as the assistant -- excuse me.

25  What was your duties as the Institutional Gang Investigator?

1  A      To oversee the Institutional Gang Investigations Unit.  I

2  reported to a captain in the unit.  We managed the gang

3  management model at Pelican Bay.  I consulted the warden on

4  gang trends.

5      I liasoned with my counterparts at different institutions.

6  Every institution has an Institutional Gang Investigator.  So

7  it was my job to liaison with them.  Also, trade information

8  back and forth.

9      And, also, deal with outside law enforcements agencies,

10  the Office of Correctional Safety.  It's a job that has a wide

11  berth.

12  Q      Okay.  Did you supervisor the Assistant Institutional Gang

13  Investigators?

14  A      I supervised sergeants who supervised officers.

15  Q      Okay.  And how many years did you work in the

16  Institutional Gang Investigations Unit?

17  A      Cumulatively?

18  Q      Yes.

19  A      Just over about 10 years.

20  Q      And how many of those years were you the Institutional

21  Gang Investigator?

22  A      About four, four and a half, somewhere in there.

23  Q      In October of 2012, were you the essentially second line

24  supervisor to Defendants Burris, Gates, Gongora, Healy and

25  Pimentel?

1  **A**     Yes.

2  **Q**     So you were their sergeant's supervisor?

3  **A**     Correct.

4  **Q**     Okay.  But did you have any supervisory responsibilities

5  for those five officers?

6  **A**     Not directly.  I was their second line supervisor.

7  **Q**     Okay.  And could you explain how Assistant Institutional

8  Gang Investigators are selected to come work in the unit?

9  **A**     In Institutional Gang Investigations -- well, let me back

10 up.

11      Across the institution for officers you have a split of

12 positions, some of which are deemed management jobs and some of

13 which are open to seniority bid.  So 70 percent of the

14 positions at the institution are open to seniority bid and

15 about 30 percent the supervisors for the respective area can

16 place officers of their choosing in them.

17      And we had the luxury at Gang Investigations, because it

18 was a high volume work and detail-oriented work, that we had --

19 all of our positions at the officer's level were what we call

20 30 percent jobs.  We could pick who we want in there.

21      So we canvassed staff whenever we had a vacancy for an

22 Institutional Gang Investigations officer or anyone in the

23 Investigative Services Unit.  We would release a memo to the

24 officers stating there was a vacancy and if they were

25 interested, please submit a memorandum of interest and tell us

 1   why you wanted to come to Institutional Gang Investigations.

 2        We did that because writing skills are important, and we

 3   want to see how a person can put their thoughts on paper.  If

 4   they can string together, you know, three coherent sentences,

 5   that's great.

 6        So we review those memorandums and from there the

 7   sergeants select officers based upon their writing skills,

 8   their job performance.  They will talk to their supervisors.

 9   We're looking for -- for intelligent people who know how to

10   write.

11   Q    And could you please briefly describe the duties of an

12   Assistant Institutional Gang Investigator?

13   A    It's changed over the years so much.  There's --

14   Q    In 2012?

15   A    In 2012 there were several duties.  The Institutional Gang

16   Investigators are kind of the second line for gathering gang

17   intelligence for -- for the administration for CDCR basically.

18   The first line will be the folks that are actually out in the

19   units, the floor officers, that house inmates.

20        But the Institutional Gang Investigators are located in

21   the office and they review mail from inmates, both in the

22   General Population and in the Security Housing Unit, all over

23   the institution.

24        They conduct investigations into gang activity, criminal

25   activity.  They conduct -- they gather intelligence for outside

```
 1   law enforcement agencies for -- and to disseminate at
 2   California Gang Task Force meetings.
 3        They sometimes do special assignments and depending upon
 4   the needs of the institution or requests from outside law
 5   enforcement agencies or the Office of Correctional Safety.
 6   Q   And do officers receive any training when they come to
 7   work as Assistant IGIs?
 8   A   The training in gangs, it kinds of starts the day that you
 9   arrive at the institution from new employee orientation.
10        So an officer that works at Pelican Bay is exposed to very
11   high level gang members from the inception, from coming to
12   Pelican Bay.  So that's kind of unique in and of itself, just
13   by the nature of the inmates being housed in 2012.
14        After that, you know, you do a lot of mentoring with
15   your -- with your counterparts, with other officers, with your
16   first line supervisor, with the sergeants.  You will be given
17   expectations from your sergeants.  There is a two-week basic
18   investigations course that can be attended, which is hosted by
19   the Office of Correctional Safety, which we send our staff to
20   and then ongoing training at the California Gang Task Force,
21   which provided training on a variety of subjects on a monthly
22   basis.
23   Q   And do officers receive any specialized training on how to
24   conduct cell searches with -- in conjunction with a gang
25   validation active/inactive review?
```

1   A    The way that ISU did cell searches in general -- not only

2   for Institutional Gang Investigations, but for ISU up in the

3   General Population also -- we were very, very thorough.  We

4   were very, very detail oriented.

5       We generally could find very, very small items that line

6   staff generally couldn't find in the cells.  We were very, very

7   thorough in our practice.  And we did take a lot more time to

8   search cells than line staff.

9   Q    Is there a reason why the cell searches would be more

10  thorough?

11  A    Because inmates, generally speaking, know when an officer

12  comes into the cell, we're going to hit hot spots to search.

13  There are common places to hide contraband.

14      So the things that are -- so things that are important to

15  be hidden from staff, they go to great lengths to hide those

16  things.  Inside of air vents.  Inside the chase of the toilet,

17  the actual plumbing of the toilet, which is difficult to find.

18  Within paperwork, glued in between pages.  Glued inside

19  magazine pages that you split apart.  Something that a cursory

20  search just would not find.

21      So when it's important to an inmate or it's important to a

22  gang member to hide things like membership rosters or

23  constitutions or hit lists, things of that nature, they will

24  generally go to great lengths to try and secrete those in the

25  cell to avoid detection.

1  Q    Okay.  Now, I'd like to talk to you a little bit about the

2  Security Housing Unit at Pelican Bay State Prison.  What is the

3  Security Housing Unit?

4  A    The Security Housing Unit houses maximum custody inmates,

5  Level 4 max custody.  And at the time we housed two different

6  types of inmates in the Security Housing Unit.  We housed

7  inmates who were there on what we call a MERD, which is when

8  you've committed a reportable offense within the institution,

9  you go to a Senior Hearing Officer for a disciplinary report

10 and you're basically given a sentence within prison.  It's an

11 administrative sentence.  And you go to the Security Housing

12 Unit because you have been deemed a threat to the inmate

13 population or to the safety and security of the institution.

14 Things like committing an inmate assault.  Being found with a

15 weapon.  Being found with drugs.  That would have you sent to

16 the Security Housing Unit for a determinate term.  You do a

17 6-month term, a 12-month term and so forth.

18      We also house validated gang members who were there on

19 indeterminate status, meaning they have been validated as

20 either a member or an associate of a recognized California

21 prison gang.  And they were housed in the Security Housing Unit

22 because they were, once again, deemed a threat to safety and

23 security of the institution, each other, the line staff and

24 other inmates.

25 Q    What do you mean by a "recognized prison gang"?

```
 1   A    At the time there were seven prison gangs that were

 2   recognized by the Office of Correctional Safety as gangs that

 3   were formed within the California Department of Corrections;

 4   that were recognized as prison gangs; that had gone through a

 5   vetting process.  Position papers were written describing how

 6   the gang started, its membership started.  And the California

 7   Department of Corrections formally recognized them as a

 8   California prison gang, having its origins in prison, organized

 9   in prison and was a threat to the prison.

10   Q    And was the Mexican Mafia one of those prison gangs?

11   A    Yes.

12   Q    Okay.  Are you familiar with the layout of the cells in

13   the Security Housing Unit?

14   A    Yes.

15   Q    And I may also use the term "SHU."  Is that an acronym for

16   Security Housing Unit?

17   A    SHU is an acronym, a very commonly used acronym for

18   Security Housing Unit.

19   Q    Okay.  And how many times have you seen the inside of a

20   SHU cell?

21   A    Thousands.

22   Q    Okay.  I'd like to show Exhibit No. 22.

23        (Document displayed)

24   Q    Would you say this is an accurate interpretation of a SHU

25   cell?
```

1  **A**    Yes.

2  **Q**    And how much space is there between the toilet and the

3  food port?

4       And, actually, if you could just first draw on this with

5  your finger where the -- where the door is with the food port

6  in it?

7  **A**    The door is located here (indicating).  And then it's

8  got -- that's where the port is.  And then there is a space

9  between the wall -- excuse me, the wall and door here

10  (indicating).

11  **Q**    Okay.  And how much space is between the toilet and the

12  wall?

13  **A**    Between the toilet and the wall directly in front of it,

14  probably 18 inches, maybe 2 feet.

15  **Q**    Okay.  And how much from the -- here, I'm going to point.

16       From the front of the toilet, where somebody would stand

17  if they were using the facilities, how much space is there

18  between that and the cuff port, approximately?

19  **A**    From the -- from the front of the toilet to the cuff port,

20  it's an estimate, probably two-and-a-half or three feet.

21  **Q**    Okay.  And would you say there is enough space for a

22  person to be in front of the toilet and another individual near

23  the -- by the door?

24  **A**    If there were two people in the cell?

25  **Q**    Yes.

1  **A**    Yes.

2  **Q**    Okay.

3         **MS. NYGAARD:**  You can take that exhibit down.

4         (Document removed from display.)

5  **BY MS. NYGAARD**

6  **Q**    Do you know how many inmates were housed in the Security

7  Housing Unit at Pelican Bay in October, 2012?

8  **A**    I can approximate.

9  **Q**    Please.

10  **A**    About a thousand.

11  **Q**    And do you know how many inmates housed in the SHU in

12  October of 2012 had the last name Perez?

13  **A**    I do.  I know there were more than 10.

14  **Q**    How do you know this?

15  **A**    Because I searched records to out.

16  **Q**    Okay.  Is trash collected from inmates in the SHU on a

17  daily basis?

18  **A**    Yes.

19  **Q**    How many times per day?

20  **A**    At least twice a day, during trash and tray pick up in the

21  morning meal and, again, at the evening meal.

22  **Q**    And how does that process work?

23  **A**    Floor officers assigned to the respective housing unit,

24  they feed a plastic tray, which contains food, out into every

25  pod in the morning and in the evening.  In the morning the -- a

1  lunch bag is also delivered with a morning meal.

2      And they enter each pod.  There is four cells on the

3  bottom.  There is four cells on the top.  And they will open up

4  each food port.  Hand the occupants of the cell their morning

5  meal and their lunch.  Close the food port and continue down

6  the tier and then complete the upper tier.  Exit the pod and

7  then move on to the next pod.  There are six pods in the unit,

8  so it's time consuming.

9      By the time you get around to all six pods, that will give

10 the officers time to wipe some sweat off their brow and take a

11 short break and then they can go back and start in A Pod again

12 and complete trash and tray pickup.  At which time they'll take

13 a trash can.  Open up each individual food port again.  Collect

14 the food trays and any trash the inmates have at that point and

15 dispose of it in the trash cans.

16 Q   And is that the same process in another time of the day?

17 A   Yes, for the evening meal.

18 Q   Okay.  And they are just not collecting food scraps or

19 things like that.  They could collect other garbage, too?

20 A   All types of garbage comes out at trash and tray pickup;

21 paper, old newspapers.  Any trash that's accumulated in their

22 cell that they want to dispose of, that's the manner which they

23 can.

24 Q   Okay.  So I would now like to draw your attention to

25 October 10th, 2012.  And I would like to show you what's

1  previously been admitted as Exhibit 68.

2      (Document displayed)

3  Q    Do you recognize this document?

4  A    I do.

5  Q    And what is it?

6  A    That's an email sent from myself as a Correctional

7  Lieutenant and Institutional Gang Investigator.  It was sent

8  from me to Officer Burris, Officer Milligan, Officer Pimentel,

9  and Sergeant Dornback regarding inmate Jesse Perez, with his

10 CDC number.  And it was sent on Wednesday October 10th at

11 12:34 p.m.

12 Q    Okay.  And could you please read the text of the email

13 that you sent?

14 A    (As read)

15         "FYI" -- for your information -- "review inmate

16      Jesse Perez K42186 for" -- underlined -- "new

17      validation.  (Think Castro case.)  This needs to be

18      completed as soon as possible for the submission to

19      Rancho Cordova.  See attached."

20      And there is an attachment to the document.

21 Q    Okay.  And why did you send this email to Burris,

22 Milligan, Pimentel and Dornback?

23 A    Because I had received an email from my counterpart at

24 California Correctional Institution, CCI at Tehachapi, whose

25 name was Josh Tyree, also a Lieutenant, also the Institutional

1   Gang Investigator.

2       He had sent me an email saying that Rancho Cordova was

3   requesting a new validation as a result of a court case for Mr.

4   Perez.  And they thought that he had been housed at CCI

5   Tehachapi, but he was no longer there.  He had been transferred

6   to Pelican Bay, and asked -- said that I would be contacted by

7   John Prelip, who was a senior special agent at the Office of

8   Correctional Safety, and he would be asking for us to complete

9   a cell search -- excuse me, complete a validation review.

10  **Q**   Okay.  Did they explain to you the reason that the

11  validation needed to be completed?

12  **A**   It was my understanding it was part of the court case,

13  which is why I put the "Castro" reference in there.  We had one

14  a couple years earlier -- it was very similar -- in which the

15  courts had requested a new validation for an inmate that had

16  been previously validated, but have a new review and treat it

17  as if it were a new validation.

18      So, for me, that was shorthand when I said "think Castro

19  case," just to give them a point of reference, because

20  otherwise I would have questions like, "Why are we doing a

21  validation on this guy?"  "It's a new validation.  He's already

22  validated."  It shortcut all those questions, put it in

23  context.

24  **Q**   Okay.  And sitting here today, do you know whether there

25  actually was a settlement agreement or a court order requiring

1    that validation be conducted on October 10th?

2    **A**    Now I know that there was not an agreement at the time,

3    no.

4    **Q**    Okay.  But at the time you understood that there was a

5    settlement agreement or court order?

6    **A**    I understood that they had attached a -- I think a request

7    for settlement agreement from Rancho Cordova and that John

8    Prelip had asked that we expedite a validation review for the

9    courts.

10   **Q**    And did you have any reason to question Mr. Prelip on why

11   you were being instructed to do the validation?

12   **A**    No.

13   **Q**    And in this email you just sent to the four individuals,

14   Burris, Milligan, Pimentel and Dornback, you didn't

15   specifically instruct any one person to conduct the validation.

16   Why not?

17   **A**    I'm a second line supervisor.  I included a sergeant, who

18   is a first line supervisor, in the email chain.  It would have

19   been my expectation that the first line supervisor provide

20   direction as he see fit to make sure the job that I gave him

21   was completed.

22   **Q**    Okay.  And could you please briefly describe what the gang

23   validation process was in October, 2012?

24   **A**    Which type of gang validation?  An active/inactive review

25   or new validation?

1  Q    Let's start with a new validation.

2  A    In 2012 a new validation would consist of gathering

3  information on an inmate that we suspected to be benefiting,

4  working with a prison gang, one of the recognized prison gangs.

5       So we -- we would get sources of information from a

6  multitude of places.  We can have already existing

7  documentation, which is contained in a C-File, which could have

8  been completed by other Institutional Gang Investigators or

9  assistants.  It could have been completed by a line staff.

10 Anyone can put information in a Central File.  So we would do a

11 Central File review and see if there is any existing

12 information.

13      Then we would conduct a cell search of the inmate who we

14 were investigating and see if there are -- was any gang

15 information in his personal possession.  So we would search the

16 cell, search his paperwork, all of his property, search his

17 person.  Then take all that information and then complete

18 documents on what we found, if anything.

19      We may contact the Office of Correctional Safety to see if

20 they have any information.  We might contact outside law

21 enforcement, if the inmate has been out of custody or out to

22 court any time recently, and see if they have any information

23 contained in their -- in their files.

24      And when we have information which we think would be

25 sufficient to validate the inmate, we would compile all that

1    information into a validation package.

2        What we would do at that point is reference all the

3    documents in a -- in chronological order and serve the inmate

4    with all of the information that we're going to use for -- for

5    a validation.  And he would have the opportunity to look at

6    that information and to provide a rebuttal to that information.

7        So once the rebuttal is received, it would be reviewed by

8    the Assistant IGI, the investigator.  And they would do a

9    master document showing all the validation points; which ones

10   were accepted, which ones were rejected, if there was anything

11   in the rebuttal that would cause one to be rejected.

12       That would all go up to the Institutional Gang

13   Investigator at the time, which would have been me, and then I

14   would review it.  If I had questions about any of the

15   validation points, if I didn't think they met policy, I would

16   choose to remove them from the validation package, if they

17   weren't sufficient, if I didn't think they met policy

18   requirements and -- or I would move forward with a validation

19   package.

20       At the end of the validation package, we would -- we would

21   compile what we call Q-Forms, which is the inmate's vital

22   statistics; his picture, height, weight, his street name,

23   whichever he belongs to, if he did belong to a street gang,

24   which gang we're validating him as.  We would take photographs

25   of the inmate and submit all those, body markings, to OCS.

 1        We would package it all up.  I would sign off on it, if it

 2   met the criteria in Title 15 for submission to the Office of

 3   Correctional Safety, and then I would submit it to the Rancho

 4   Cordova office for their consideration.

 5   Q    Okay.  And in that email that you sent on October 10th,

 6   2012 you said, "This needs to be completed as soon as

 7   possible."

 8        Why did you say "as soon as possible"?

 9   A    Because Mr. Prelip asked that it be completed as soon as

10   possible.

11   Q    Okay.  And did you know who Mr. Perez was when you sent

12   the email out on October 10th, 2012?

13   A    No.  I just saw his name and CDC number.  I looked him up

14   to make sure he was housed as Pelican Bay.  But no, I had not.

15   Q    Okay.  So to your knowledge, you didn't have any personal

16   interactions with Mr. Perez?

17   A    Well, that's tough because I looked at a lot of inmates

18   and I looked at a lot of paperwork coming across my desk.

19        But as an officer and a sergeant doing appeals with

20   inmates and -- and documents and, you know, I do bus reviews,

21   coming and going through receiving and release.  So I have a

22   contact with thousands of inmates.  But he didn't particularly

23   stick out in my mind, no.

24   Q    Okay.  And how many cell searches have you conducted over

25   your career?

1   **A**      Personally?

2   **Q**      Yes.

3   **A**      Hundreds.

4   **Q**      And could you please briefly describe how a cell is

5   searched when it's being done in conjunction with a gang

6   validation proceeding?

7   **A**      Whenever any ISU members go into a cell search, we had a

8   routine we'd go through.  It was systematic.  And it worked

9   well for us.

10       So what we would do, whether it would be on the General

11  Population or in the Security Housing Unit, we would approach

12  the cell with enough officers to safely remove the inmates.  We

13  would tell the inmate to turn on his bright lights, so we could

14  see within the cell.  We would instruct the inmates to come to

15  the cell front and submit to an unclothed body search, which

16  consists of removing all their clothes, handing it through an

17  open security port to the officers outside.  One officer would

18  search the clothes, while another officer inspected the body of

19  the inmate.

20       If there were two inmates in the cell, we would give him

21  his clothes back.  He would step to the back of the cell.  And

22  then that process would be repeated by the second inmate in the

23  cell.

24       Once we were assured or reasonably confident -- you can

25  never be sure -- that the inmate didn't have any contraband on

1    him, we would secure him in restraints and signal to a control

2    booth officer, who operates all of the doors, to open the cell

3    door.  We would have the inmates turn around, back out of the

4    cell, and step to the side, at which point we would conduct a

5    clothed body search of the inmate.  It's a secondary search

6    outside of the cell to make sure that while the inmate was

7    standing in the back of the cell, he hadn't grabbed anything.

8    He hadn't secreted anything else on his person.  So we would

9    conduct a clothed body search outside of the cell.

10        The officers would escort the inmates out to a secure

11   area, usually a holding cell, and secure them in that area and

12   remove the restraints, and then explain to them:  Hey, we're

13   here for a cell search.  We're going to be in your house.  Here

14   is what we're going to do.  We're going to search your house.

15   We're going to take all your paperwork.  And I'll come back and

16   tell you what we found.  So, and then at that point we would go

17   ahead and search the cell.

18        Usually what we did, we would push in a cart with milk

19   crates on it.  It was the easiest way we found to do it.  We

20   would stack milk crates up inside the cell and take all of the

21   paperwork that was in the cell and stack it within those milk

22   crates and then push it out onto the tier and then we would

23   search the remaining items in the cell.

24        We would search the clothing and the bedding.  The

25   physical structure of the cell.  The shelving units.  The bunk.

1  The sink inside the toilet.  Behind the mirror, if there was

2  one.  Every aspect of the cell.  All the canteen.  All the

3  cosmetics would be searched.

4      And once we had gathered any contraband that had been

5  found, if any, we would document all that on a Cell Search

6  Receipt.  And, also, make notation on the Cell Search Receipt

7  that all of the paperwork had been confiscated for further

8  review.

9      It takes a lot of time to thoroughly search paperwork.

10  Some inmates have thousands and thousands and thousands of

11  pages of documents in their cell.  And it doesn't make too much

12  sense for two or three officers to sit in a cell and try and

13  search page-by-page-by-page while an inmate is sitting in a

14  holding cell.

15      So it was more efficient for us and less -- more

16  convenient for the inmate for us to remove that paperwork,

17  re-house the inmates, and make a notation on the Cell Search

18  Receipt:  We'll bring your paperwork back as soon as we finish

19  searching it.

20      Ideally, we like to have that done the same day, but

21  sometimes it would take a day or sometimes two, depending on

22  the amount of paperwork that was in the cell.

23  **BY MS. NYGAARD**

24  **Q**    Would each -- I'm sorry.

25      Would each peace of paper need to be noted on a Cell

1   Search Receipt when it's taken from the cell?

2   A    Each piece of paper?

3   Q    Yes.

4   A    Logistically, I think, that would be impossible to say

5   that I -- I mean, I took 3,276 pages from your cell.  That

6   would kind of defeat the purpose of taking all that; sitting in

7   a cell and counting it.

8        So the inmate would understand.  And we'd show him:  We're

9   taking all your paperwork and I will return it as soon as we're

10  done searching it.

11       Now, if anything was done in that paperwork, we would

12  submit a secondary Cell Search Receipt explaining what we had

13  taken out of that property.

14  Q    Okay.  And so continuing with the cell search.  You've

15  discussed how they, you know, search within walls, sink, you

16  know, that kind of stuff.

17       Do officers look through sheets and other bedding?

18  A    Clothing, bedding, canteen, cosmetics.  Everything that's

19  left in the cell other than paperwork, yes, would be searched.

20  Q    And --

21  A    The mattress.

22  Q    And why would sheets be looked through?

23  A    Because it's a very common place to hide very small

24  contraband and sometimes dangerous contraband.  Running your

25  fingers through the seams of a sheet, it's very easy to get

1  stuck by a hypodermic needle or sewing needles.  Inmates make

2  their own sewing needles sometimes out of something as

3  innocuous as a paperclip.  Or, like I said, a hypodermic

4  syringe could be secreted in there.

5      The mattress is a very common place to find contraband.

6  So you have to check all the seams very meticulously to see if

7  the inmate -- that the inside of the mattress hasn't been

8  accessed.

9      All of the clothing.  We found tattoo guns and hit kits

10 and drugs rolled up within socks.  We found any manner of

11 contraband located in the personal property of inmates.

12 **Q**    And why would they search through toiletries, such as

13 shampoo?

14 **A**    Because, again, the place where it is probably the most

15 inconvenient to look is usually a very good place to hide

16 contraband.

17     Like, in the Security Housing Unit when an inmate got his

18 canteen, they wouldn't be given the actual -- the plastic

19 shampoo bottle because a shampoo bottle can be melted down into

20 a weapon, and a very dangerous weapon.

21     So that shampoo or that lotion would be put into what we

22 call a canteen cup, which is a round paper cup.  It holds about

23 a pint.  And it would be put into that and the inmates would

24 have these stacks of canteen cups stored in their cell.

25     So things like lotion, you can't see through it.  You can

1   run a metal detector over it and if there is no metal in it,

2   you're not going to find anything.  But it's a great place to

3   hide inmate notes wrapped up in cellophane or tattoo motors

4   taken out of a Walkman radio or out of a CD player.  It's a

5   great place to hide razor blades that are taken out of the

6   razors that we give them every evening.

7        So every one of those has to be either poured into another

8   cup and searched or probed to make sure there is no contraband

9   inside.

10  **Q**   And is it possible when they are searching through the

11  soap in a cup that some of it could spill out?

12  **A**   Sure, it's possible.

13  **Q**   Okay.  Are officers required to leave a cell in the exact

14  condition that they found?

15  **A**   No.  They are expected to leave it in an orderly

16  condition.  And that would be my expectation, also.

17  **Q**   Okay.  And I would like to now bring up Exhibit 1.

18       (Document displayed.)

19  **Q**   Now, are you familiar with the section -- I'm blind.  I'm

20  sorry.  I can't read the number.

21       This is a section in the Title 15 regarding cell searches.

22  Are you familiar with this?

23       **MS. NYGAARD:**  Could you please bring that back up?

24       (Document enlarged.)

25  **A**   Yes.

1  BY MS. NYGAARD

2  Q    The section that's being highlighted, there is a sentence

3  it says:

4         "Every reasonable precaution will be taken to

5         avoid damage to personal property and to leave the

6         inmate's quarters and property in good order upon

7         completion of the inspection."

8       What is your understanding of "in good order"?

9  A    Any thorough search of a cell is going to leave that cell

10 in a state that you could tell it has been searched.  Just like

11 if the police execute a search warrant on your home, you're

12 going to tell the police have been through your underwear

13 drawer.  That's the nature of a search.

14      So when we go in to search a cell, if the socks are rolled

15 up in a nice tight ball, we're going to unroll those socks and

16 make sure there is no contraband hidden within and then

17 probably stack them on the bunk.  That's the way I always did

18 it.  I would take all the clothing, unroll it and stack it up

19 on the bunk.  Because that inmate is going to roll the socks

20 back up and put it back in the way that he wants it.  If I roll

21 it back up and try and put it back the way that I want it, he's

22 probably going to do it anyway.  He's got a particular way of

23 doing things.  And I would probably do the same thing if I was

24 an inmate.

25      So whenever I search through all the clothing, I would

1   unroll it, search it, make sure there is no contraband, and set

2   it over on the side of the bunk.  I knew that was my clean

3   area.  Everything that had been searched there is clean.  And I

4   would move on methodically searching all of the property in the

5   cell.  Move on to the cosmetics and do that in the same manner.

6        So when I left a cell, it would be orderly.  Everything

7   would be stacked up neatly on the bunk.  The cosmetics would be

8   on the bunk.  The mattress would probably be -- both mattresses

9   would probably be up on the upper bunk and, you know, it would

10  be in good order.

11  **Q**   And would the sheets be put back on the mattresses?

12  **A**   No.

13  **Q**   If an inmate is unhappy with the condition of his cell

14  after a search, does he have a way to make a complaint?

15  **A**   Several.

16  **Q**   What are those ways?

17  **A**   The first thing that you usually hear from that is upon

18  the return to the cell, when the -- the officers have to

19  return the inmate to the cell which they just searched.

20       So if you've left a cell which is not in good order, the

21  inmate is going to give an immediate complaint to the officer

22  then and there.

23       If he gets no response there or not what he deems an

24  adequate response or explanation from the officers that are

25  escorting him, he would talk to his floor officers.  He can ask

1  to speak to the sergeant which is responsible for that specific

2  corridor in which the inmate lives.

3      He can file a CDC 602 form, which is an inmate appeal

4  form, which goes up through the chain.  It's investigated.  And

5  if there is any -- any information to support the inmate's

6  claim, then the inmate can be paid for anything that's been

7  damaged or officers can be reprimanded.

8  **Q**   Could you approximate on average how many cell searches an

9  assistant IGI conducts per week?

10 **A**   It depends on a caseload at any given time of

11 active/inactive reviews and new validations that we have.  But

12 any given IGI officer, if he's doing validations, he's probably

13 doing four or five searches a week, I would think would be

14 reasonable.

15 **Q**   And have you ever seen an inmate putting something in the

16 toilet when officers come to search the cell?

17 **A**   Multiple times.  It's one of the only ways to dispose of

18 contraband in the cell and not have it found, if you don't want

19 it discovered.

20 **Q**   Okay.  And why do inmates have to take their clothing off

21 before a cell search?

22 **A**   Because, as I said before, any manner in which you can

23 secrete contraband will be secreted.  Now, I've found inmates

24 that take contraband and secure it between the cheeks of their

25 buttocks.  I've seen an inmate tuck knives underneath their

1  arm.  I've seen inmates hide razor blades in their mouth.  I've

2  seen inmates hide notes in their mouths.  Drugs in their

3  mouths.

4      So an unclothed body search is a level of a personal

5  search of an inmate to ensure he has no contraband either in

6  his clothing, on his person, secreted in his mouth, in his

7  ears, anywhere on his person.

8  **Q**   So that's standard procedure?

9  **A**   Yes.

10 **Q**   Okay.  I would like to now show you what's been previously

11 admitted as Exhibit 49.

12     (Document displayed)

13 **Q**   Now, this is a Cell Search Receipt form, correct?

14 **A**   Yes.

15 **Q**   And I just put an arrow on the portion there where there

16 is a box for "Disciplinary Documentation."  Do you see that?

17 **A**   I do.

18 **Q**   And there is also a box for CDC 115.  What's a CDC 115?

19 **A**   It's a Rules Violation Report.  It's a document that's

20 written for any serious or administrative rules violation,

21 which results in documentation and could have sanctions taken

22 against the inmate by a Senior Hearing Officer or a Hearing

23 Officer.

24 **Q**   Now, if an inmate is going to receive a 115 RVR based upon

25 conduct during a cell search, would the officer be required to

1  mark this box on the property receipt form?

2  A    What you usually see there is a 115 or a 128 being

3  generated because of contraband found in the cell.

4      In this circumstance you don't always know because you

5  haven't searched all the contraband yet or all the property

6  yet.  Some of the paperwork is being taken.

7      So unless there was an item found in the cell that was

8  contraband, they probably wouldn't have filled that out.

9  Q    Now, what if the officer observed behavior that he felt

10  would warrant a 115.  Would he have had to have completed this

11  -- mark that box at the time the Cell Search Receipt was

12  completed?

13  A    There is no requirement.  It's -- sometimes it is checked

14  and sometimes it's not.

15  Q    Okay.  Thank you.

16      I would like to direct your attention to what we have been

17  talking about during this trial as the STG program.  Are you

18  familiar with that?

19  A    I am.

20  Q    The Security Threat Group Pilot Program?

21  A    Yes.

22  Q    Okay.  And do you know when that program was implemented?

23  A    It was implemented, the first stages of it, in 2011 and

24  2012, if I'm not mistaken.  It was a long time ago.

25  Q    Okay.  I'd like to bring up Trial Exhibit No. 4.

1       (Document displayed)

2    Q     And if we can see in the bottom right-hand corner it says,

3    "Endorsed Approved, October 18, 2012."

4    A     Yes.

5    Q     Do you have any idea what that stamp means?

6    A     That means that the regulation was endorsed and approved

7    on October 18th of 2012.

8    Q     All right.  So anything that had been proposed wasn't

9    actually finalized until October 18, 2012 --

10   A     That would be --

11   Q     -- to your understanding?

12   A     That would be my understanding.

13   Q     Okay.

14   A     I'd have to read the entire document though.

15   Q     And did you receive any training on this STG program

16   before October 10th, 2012?

17   A     I went down to Sacramento on a couple of different

18   occasions; once to be part of a work group for the -- for the

19   STG program, and then I went down again with some counterparts

20   from Pelican Bay, with three other people, for a training prior

21   to its implementation, yes.

22   Q     Do you know when that training was?

23   A     Not specifically, no.

24   Q     Approximately?

25   A     It was around the same time, I'm sure, that this came out.

1  Q    And you mentioned that you also went with three others

2  from Pelican Bay.  Were Burris, Gates, Gongora, Healy or

3  Pimentel those officers, any of the three?

4  A    No.

5  Q    Okay.  So after you had these trainings, do you know

6  whether you spoke to the Assistant IGIs about what you learned

7  at the trainings?

8  A    I'm not sure if I spoke specifically about the trainings,

9  but I would have come back and gave them a briefing as to what

10 occurred at the trainings and what information was being put

11 out, yes.

12 Q    So would you have provided them with any details of

13 specific policy details?

14 A    In coming back, what I would have done -- because it

15 wasn't policy yet.  And it was a very difficult time within --

16 within IGI because rules were changing.  Things that we had

17 been doing for years and years were changing very rapidly.

18     So I thought it was important not to muddy the waters and

19 to really make it clear that we have existing regulations that

20 we have to follow.  And in coming back from the training like

21 this, it's -- it's a big culture change within CDCR in general

22 to take a different tack in this type of gang investigation.

23     So, yes, I would have come back and spoken in general

24 terms about the training.  I would have answered any questions

25 that they had about the training, but with the understanding

1  that we still have to follow existing policy.

2  **Q**    And was it your understanding that this STG program was

3  going to be implemented in phases?

4  **A**    Yes.

5         **MS. NYGAARD:**  Could you please bring up the page

6  marked DEF 2247?  You can scroll through.

7      (Document displayed)

8  **BY MS. NYGAARD**

9  **Q**    Do you know if you've ever seen this portion of the Pilot

10  Program?

11  **A**    Yes.

12  **Q**    And does this indicate to you when the part of the STG

13  policy regarding Disciplinary Matrix was going to be

14  implemented?

15  **A**    Section 400 deals with validation.  It's a very long

16  document.  It was on Page 12 and it says:

17         "This section will be implemented in Phase 2,

18      which is expected to begin December 2012/

19      January 2013."

20  **Q**    Okay.  And then a little bit further down there is

21  Section 600.

22  **A**    (As read)

23         "STG Disciplinary Matrix for STG Related Behavior

24      or Activity, Page 21.  This section will be

25      implemented in Phase 2, which is expected to begin

1    December 2012/January 2013."

2  **Q**    And do you know what this -- when this was actually

3  implemented?

4  **A**    I believe it was after January 2013.  If memory serves me

5  correctly, I want to say it was February or March of '13.

6    They didn't exactly stay on track with their roll out.  It

7  was a pretty complex program.  So it took some time to put it

8  all together.

9  **Q**    And do you know what STG Disciplinary Matrix is?

10  **A**    Yes.

11  **Q**    And what is that?

12  **A**    That's a Disciplinary Matrix, which I believe is

13  incorporated later in this document, which related different

14  disciplinary behavior and as it related to -- it spoke

15  specifically about having a nexus to gang activity.

16    So there was specific verbiage in there for things such as

17  being -- an inmate being discovered in personal possession of,

18  like, a membership roster, which was never really in Title 15

19  before.  It would just be under -- under "Written Material"

20  before in Title 15.

21    So this talked about very specific disciplinary action

22  taken against an inmate for specific personal behavior.

23  **Q**    And in October of 2012, would the Assistant Institutional

24  Gang Investigators have been instructed to start following the

25  Disciplinary Matrix?

1  **A**   No.  It wouldn't have been accepted by anyone if they had.

2  **Q**   Okay.

3       **MS. NYGAARD:**  I have no further questions.

4       **THE COURT:**  Okay.  Thank you.

5     Probably a good time to break for lunch, but before you

6  do, will you have cross?

7       **MR. BENEDETTO:**  Yes, your Honor.

8       **THE COURT:**  Okay.  So we can't let you go quite yet,

9  but we'll break for lunch right now and we'll come back at

10  12:30.  12:30.

11     (Jury exits courtroom at 11:47 a.m.)

12       **THE COURT:**  Okay.  I have a new set of proposed jury

13  instructions and verdict form with the two potential

14  instructions that we talked about.  You guys can take a look at

15  it over lunch and talk to me about it when we -- I think

16  probably the best time to chat about it would be at 12:30

17  before we bring the jury back in.

18     If you think it would be better for you to have more time

19  and you would rather do it at the end of the day, that's fine,

20  too.  But what I want to hear from you on is those two

21  instructions and any other nitpicks to the jury instructions

22  that you might have.

23       **MR. LEE:**  We would never have nitpicks, your Honor.

24       **THE COURT:**  Well, you should.  I encourage you to be

25  nitpicky.

1          **MR. LEE:**  We would prefer at the end of the day, just

2     to give us time to collect our thoughts and get a sandwich.

3          **THE COURT:**  That's totally fine.  Thank you.

4          **THE CLERK:**  Court is in recess.

5        (Whereupon at 11:48 a.m. proceedings

6         were adjourned for noon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2   NOVEMBER 18, 2015                              12:32 P.M.
 3       (The following proceedings were held outside of the
 4        presence of the jury)
 5           THE CLERK:  Remain seated, come to order.  Court is
 6   back in session.
 7           THE COURT:  Okay, all set?
 8       (No response)
 9           THE COURT:  Bring them in.
10       (Jury enters the courtroom at 12:33 p.m.)
11           THE CLERK:  Please be seated.
12           THE COURT:  Okay.  Do you want to resume?
13           MR. BENEDETTO:  Your Honor, may I approach with the
14   -- (Indicating)?
15           THE COURT:  Oh, yes, thank you.
16       (Document handed up to the Court)
17           THE COURT:  Mr. Benedetto, sorry to interrupt.  Looks
18   like you gave me two of the same thing.  Did you mean to do
19   that?
20           MR. BENEDETTO:  I did.
21           THE COURT:  All right.  Fine.  Thank you.
22                     CROSS EXAMINATION
23   BY MR. BENEDETTO:
24   Q    Good afternoon, Mr. Barneburg.
25   A    Good afternoon.
```

1  Q    In 2012, you were a correctional lieutenant at Pelican

2  Bay, is that right?

3  A    Yes, sir.

4  Q    And as a correctional lieutenant, you had many different

5  responsibilities.  Is that fair to say?

6  A    Yes.

7  Q    And one of those responsibilities was to act as the

8  institution's Institutional Gang Investigator, is that right?

9  A    Yes.

10  Q    And that is the IGI?

11  A    Yes, sir.

12  Q    And you assumed that position of IGI in November of 2009,

13  is that right?

14  A    That's correct.

15  Q    And one of your responsibilities as the IGI was

16  supervising the Institutional Gang Investigations Unit.  Is

17  that right?

18  A    Yes.

19  Q    And you were also responsible for training guards in the

20  investigations unit, is that right?

21  A    I was responsible for training first-line supervisors,

22  sergeants who then provided training to guards.  But I also

23  provided training to correctional officers.

24  Q    And you were, as a general matter, responsible for

25  managing the gang investigations model at Pelican Bay, is that

 1  right?

 2  **A**     Yes.

 3  **Q**     When you were the IGI, the assistant IGIs reported to you.

 4  Is that fair to say?

 5  **A**     The sergeants reported to me.

 6  **Q**     And the AIGIs reported to the sergeants?

 7  **A**     Correct.

 8  **Q**     So with respect to an Assistant IGI, you were their

 9  bosses' boss.  Is that right?

10  **A**     Yes.

11  **Q**     So in a way they still did report to you, is that right?

12  **A**     I had responsibility over the entire unit.

13  **Q**     And so if you set out an order or a command that would

14  need to be carried out by an Assistant IGI, you would expect

15  that Assistant IGI to, in fact, carry out that order.  Is that

16  right?

17  **A**     Certainly.

18  **Q**     In 2012, Anthony Gates was an AIGI, is that right?

19  **A**     Yes.

20  **Q**     And in 2012, Daniel Gongora was an AIGI.  Is that right?

21  **A**     Yes.

22  **Q**     And in 2012, Guillermo Pimentel was an AIGI, is that

23  right?

24  **A**     Yes, sir.

25  **Q**     And in 2012, Sean Burris was also an AIGI, is that right?

1   **A**    Yes.

2   **Q**    And in 2012, Eric Healy was an AIGI, is that right?

3   **A**    Yes.

4   **Q**    So to recap, in 2012, all of the defendants were under

5   your supervision.  Is that correct to say?

6   **A**    They were directly supervised by sergeants.  I supervised

7   the sergeants.

8   **Q**    You were their bosses' boss.

9   **A**    Correct.

10  **Q**    In 2012, there were seven AIGIs at Pelican Bay, is that

11  accurate?

12  **A**    That sounds correct.

13  **Q**    Okay.  So, you talked earlier before the lunch with

14  Ms. Nygaard about the search that happened on October 10, 2012.

15  Do you remember that testimony?

16  **A**    Yes, sir.

17  **Q**    And you issued the order that Mr. Perez's validation would

18  begin that day, is that right?

19  **A**    Yes.

20  **Q**    And the cell search that was conducted on that day was

21  part of that validation.  Is that right?

22  **A**    Yes.

23          **MR. BENEDETTO:**  Tim, can you bring up 68?

24          (Document displayed)

25

 1  BY MR. BENEDETTO:

 2  Q    And you spent some time with Ms. Nygaard talking about

 3  this email.  Do you remember that?

 4  A    Yes.

 5  Q    And you testified that prior to sending this email, you

 6  had had correspondence with a Josh Tyree at CCI, is that right?

 7  A    Yes.

 8  Q    And you testified that Mr. Tyree, who is -- well, what is

 9  Mr. Tyree's title?

10  A    He is a correctional lieutenant.  And at the time, he was

11  the sitting Institutional Gang Investigator at Tehachapi.

12  Q    So he was your counterpart at CCI?

13  A    Yes.

14  Q    And it was your testimony that Mr. Tyree thought that

15  Mr. Perez was actually at CCI, is that right?

16  A    That was my understanding.

17  Q    But Mr. Perez had been at Pelican Bay for almost nine

18  years by 2012.  Is that right?

19  A    I don't know.  I would have to check records.

20  Q    You are not aware of that.

21  A    No.

22  Q    So you authored this email and you sent it to Mr. Burris.

23  Is that right?

24  A    Yes.

25  Q    And you sent it directly to him, right?

1    **A**    Correct.

2    **Q**    Even though there's someone between you and him.  Is that

3    right?

4    **A**    Yes.

5    **Q**    And you sent this email to Dan Milligan, is that right?

6    **A**    Yes.

7    **Q**    Even though there's someone between you and him.

8    **A**    Yes.

9    **Q**    And the same with Mr. Pimentel?

10    **A**    Yes.

11    **Q**    You -- you testified that this email included an

12    attachment that was a request for settlement authority.  Is

13    that right?

14    **A**    Yes.

15    **Q**    This morning, before we got to this email, you provided

16    some testimony about the qualities that you look for in an

17    AIGI.  Do you remember that?

18    **A**    I do.

19    **Q**    Writing skills; you look for intelligent people, is that

20    right?

21    **A**    Yes.

22    **Q**    Who can string a few sentences together?  Not a bad

23    benchmark.

24    **A**    (Nods head)

25    **Q**    Critical thinking, are critical-thinking skills important

1    as well?

2  **A**    Certainly.

3  **Q**    So, this email ends with the phrase:

4           **"**See attached.**"**

5        Would you expect an intelligent AIGI who received this

6    email to, in fact, read what you instructed him to see in the

7    attachment?

8  **A**    Yes.

9  **Q**    And would an intelligent AIGI know what you meant by the

10   phrase "think Castro case"?

11  **A**    I would think so, given the context.

12  **Q**    That would be something as -- that a critically thinking

13   AIGI would know in October of 2012.  Right?

14  **A**    I would think by reading "think Castro case" they would

15   understand that a -- the court was involved in this inmate's

16   validation, and the courts had intervened in a way to request a

17   new validation.  So it was about context.

18  **Q**    And an intelligent AIGI would know that a document

19   entitled "Request for Settlement Authority" is different from

20   an actual settlement.  Isn't that right?

21  **A**    I don't know.  I'm not sure if any of them had actually

22   seen a request for settlement before.  I don't know, up until

23   that point, if I had ever seen a request for settlement

24   authority.

25  **Q**    Would you think that an intelligent AIGI would confuse a

1   request for settlement authority with a court order?

2   **A**    I don't know.

3   **Q**    You testified a little bit about search procedures.  Do

4   you remember that?

5   **A**    Yes.

6        (Document taken off display)

7   **Q**    It's fair to say that you are familiar with Title 15?

8   **A**    Yes, sir.

9   **Q**    And so you know that Title 15 provides the regulations

10  that govern the adult prisons in this state.  Is that right?

11  **A**    Yes.

12  **Q**    And you are aware that prison officials must comply with

13  Title 15.  Is that right?

14  **A**    Yes.

15  **Q**    And you have been trained on those provisions?

16  **A**    Yes.

17  **Q**    And all of the people who are one level below Mister --

18  Sergeant Dornback, they have been trained on the provisions of

19  Title 15, too, is that right?

20  **A**    Yes.

21  **Q**    And you were trained that cell searches were to be

22  performed in a certain way.  Is that right?

23  **A**    Yes.

24  **Q**    That every reasonable precaution was to be taken to avoid

25  damage to personal property, and to leave an inmate's cell and

1   property in good order.  Is that correct?

2   **A**    Yes.

3   **Q**    And that's how you were trained.

4   **A**    Yes.

5   **Q**    And you provided a definition of what "good order" would

6   mean to you.  Is that right?

7   **A**    Correct.

8   **Q**    Do you remember that testimony?  That sometimes the cell

9   is going to look like it got searched, right?

10  **A**    Yes.

11  **Q**    Does your definition of "good order" include clothing

12  thrown on the floor?

13  **A**    Strewn about on the floor?

14  **Q**    Strewn about.

15  **A**    No.

16  **Q**    Does your definition of "good order" include clothing

17  strewn about on the floor and covered in bootprints?

18  **A**    No.

19  **Q**    Does your definition of "good order" include an inmate's

20  sheets thrown on the floor?

21  **A**    No.

22  **Q**    You testified also for a few minutes about the STG Pilot

23  Program.  Do you remember that?

24  **A**    Yes.

25  **Q**    And while you were the IGI, you played a consulting role

1  with the development of that program.  Is that right?

2  A    Yes.

3  Q    And you were involved in reviewing drafts of the

4  instructional memorandum that Ms. Nygaard showed you as Exhibit

5  4, is that right?

6  A    I don't recall if I actually saw drafts of that memo.  I

7  don't think I actually saw drafts of the final memo that came

8  out.

9       But I worked with my Chief Deputy Warden -- whose name was

10  Mark Cook -- on conference calls to answer questions to

11  headquarters about how the policy would be implemented, or

12  practical problems with the policy of the level of

13  implementation.

14       So I may have seen it; I may not have.  I don't recall.

15  Q    So is it your testimony that you -- you may have?  Or you

16  did?

17  A    I don't recall.  I might have.

18          MR. BENEDETTO:  Your Honor, I would like to direct

19  the Court's attention to Page 16, Lines 5 to 10 of

20  Mr. Barneburg's deposition.

21          MS. NYGAARD:  No objection.

22  BY MR. BENEDETTO:

23  Q    And do you recall being deposed in this case?

24  A    Yes.

25  Q    I was there, right?

```
 1  A    Correct.

 2  Q    And Ms. Nygaard was there?

 3  A    Yes, sir.

 4  Q    And we were in a tiny conference room in Crescent City?

 5  A    It was rather small.

 6  Q    And that was in January of this year.  Right?

 7  A    Yes, sir.

 8  Q    And there was a court reporter there?

 9  A    Yes.

10  Q    And a videographer?

11  A    Yes.

12  Q    And you took an oath when you were deposed, is that right?

13  A    I did.

14  Q    And it's the same oath you took this morning before lunch.

15  Is that right?

16  A    Yes.

17         MR. BENEDETTO:  Your Honor, may I read from the

18  transcript?

19         THE COURT:  You may.

20  BY MR. BENEDETTO

21  Q    This is from Page 16, Lines 5 to 10:

22         "QUESTION:  And did you see drafts of the

23      memorandum before it was actually finalized and

24      launched?

25         "ANSWER:  Yes.
```

1          "QUESTION:  And did you provide feedback on those

2       drafts?

3          "ANSWER:  I provided feedback to my Chief Deputy

4       Warden and Warden."

5    BY MR. BENEDETTO:

6    Q    You testified that you had participated in a work group

7    some time in 2011, is that right?

8    A    Yes.

9    Q    And that you recalled something about a training before

10   October of 2012 with three other individuals from Pelican Bay?

11   A    There were three or four.

12   Q    But none of the defendants, is that right?

13   A    Not that I recall, no.

14   Q    And the defendants were five of the seven AIGIs at the

15   time.  Is that right?

16   A    Yes.

17   Q    And you testified that you did not want to muddy the

18   waters with information that you had learned at that training?

19   Is that accurate?

20   A    Yes.

21   Q    So is it your testimony that it was your decision to not

22   provide information to the AIGIs in your institution that was

23   relevant to the rollout of the STG Pilot Program?

24   A    That wasn't my testimony.

25   Q    Well, was it your testimony that -- or is it your

1  testimony that more information to be provided to AIGIs at a

2  time when the rules were changing quickly would, in fact, muddy

3  the waters?

4  A    What I said was that I came back from the training, and I

5  would have met with the AIGIs.  Answered questions they had

6  about the -- about changes in policy.

7       But everything was changing so rapidly at the time, I

8  didn't know if it was going to stay as it was written at that

9  training, or change months from now, or change two months from

10 now.

11      So I would answer questions, provide them an overview of

12 the training that we went to.  And, but with the instruction

13 they continue to follow policy as written until it is formally

14 changed and implemented.

15 Q    And some point between when you met with the AIGIs as you

16 just testified, and October 10th, 2012, they received training

17 on the STG program.  Isn't that right?

18 A    I'm sorry; I don't think I understand your question.

19 Q    Is it correct that at some time between when you returned

20 from the meeting that you just discussed and October 10th,

21 2012, the AIGIs at Pelican Bay were trained on the overview of

22 the STG Pilot Program?

23 A    Do you know the date of the meeting?

24 Q    Do you?

25 A    Not off the top of my head, no.

1  Q    Is it your testimony that --

2           MR. BENEDETTO:  Tim, can you bring up 4?

3      (Document displayed)

4  BY MR. BENEDETTO:

5  Q    Do you recognize Exhibit 4?

6  A    It's the exhibit I saw earlier.  Yes.

7  Q    Yes.  And Ms. Nygaard asked you about the endorsement

8  stamp on the first page.  Do you remember that?

9  A    Yes.

10          MR. BENEDETTO:  Tim, can you go to the second page?

11     (Document displayed)

12          MR. BENEDETTO:  And highlight October 12, 2012.

13 BY MR. BENEDETTO:

14 Q    And this page bears a different date, isn't that right?

15 A    Yes.

16 Q    Is it your testimony that the publication of this document

17 in October of 2012 would have come as a surprise to the AIGIs

18 at Pelican Bay?

19 A    No.  Not at all.

20 Q    So they knew about it.

21 A    Yes.

22 Q    Ms. Nygaard asked you about the number of inmates who were

23 in the Pelican Bay SHU.  Do you recall that testimony?

24 A    Yes.

25 Q    I think you said there were about a thousand?

1  **A**     Approximately.

2  **Q**     And Ms. Nygaard asked you how many of those individuals

3  had the surname of Perez.  Do you remember that?

4  **A**     Yes.

5  **Q**     And you said that there were about ten?

6  **A**     Yes.

7  **Q**     How many of those individuals with the surname Perez had

8  been in the Pelican Bay SHU for nearly ten years?

9  **A**     I knew of -- I knew of three.

10           **MR. BENEDETTO:**  No further questions.

11                   <u>**REDIRECT EXAMINATION**</u>

12  BY MS. NYGAARD:

13  **Q**     Hello again.

14  **A**     Hello.

15  **Q**     So in that October 10, 2012 email, you had directed that

16  to Sean Burris, and Guillermo Pimentel, who we know were

17  Assistant Institutional Gang Investigators.

18           You also directed that to Dan Milligan.  Who is he?

19  **A**     Dan Milligan was an officer working in the IGI unit at the

20  time.  He was also an Assistant Institutional Gang

21  Investigator.

22  **Q**     And that email was also sent to Anthony Dornback.  Who was

23  Anthony Dornback?

24  **A**     Anthony Dornback was a sergeant assigned to institutional

25  gang investigations.  He was also an Assistant Institutional

 1  Gang Investigator, and he directly supervised the officers that

 2  I sent it to.

 3  **Q**    Okay.  So, why did you include Burris, Pimentel and

 4  Milligan in this email, and not just send it to Dornback?

 5  **A**    Because at the time, we had our officers split up into --

 6  have different responsibilities.  We had officers that were

 7  doing mail review, and officers that worked primarily on

 8  validations.  I knew who those officers were.

 9        So for the sake of efficiency, rather than send an email

10  only to a supervisor and then have him disperse it out, I sent

11  it to the officers that I knew it would be assigned to, and

12  then I included their supervisor, their direct supervisor in

13  the email chain, in case he had any questions for me or

14  disagreed with them doing it.

15  **Q**    And would all four of these email recipients had to have

16  read your email and opened the attachments in order to have

17  Mr. Perez's gang validation completed?

18              **MR. BENEDETTO:**  Objection, foundation.

19              **THE COURT:**  Overruled.

20              **THE WITNESS:**  Can you repeat the question?

21  **BY MS. NYGAARD:**

22  **Q**    Yes.  Would all four of these recipients, Burris,

23  Milligan, Pimentel and Dornback, would they all had to have

24  read your email and the attachment before Mr. Perez's gang

25  validation could be completed?

 1  A    Not necessarily.

 2  Q    Have you had any formal legal training?

 3  A    No.

 4  Q    Okay.  And do you recall who the other Pelican Bay

 5  employees were who had attended that STG training that we have

 6  been talking about?

 7  A    I recall a couple.  I know that my supervisor went with

 8  me.  He was a captain at the time.  His name was Rawland Swift.

 9  I took Jeremy Frisk with me.  He was one of my sergeants that

10  worked in the unit who later became the lieutenant.

11       And there was one other person, but I don't recall who it

12  was.

13  Q    And do you know if the STG policy has been fully

14  implemented yet?

15  A    Yes.

16  Q    And is the final version identical to the pilot program,

17  or has there been changes made?

18  A    There have been changes made.

19  Q    Okay.

20           MS. NYGAARD:  Just one moment.

21       (Reporter interruption)

22           THE WITNESS:  R-A-W-L-A-N-D, S-W-I-F-T.

23           MS. NYGAARD:  I have nothing further.

24           MR. BENEDETTO:  Nothing further.

25           THE COURT:  Okay.  Thank you very much.

1    **THE WITNESS:**  Thank you, sir.

2        (Witness excused)

3    **THE COURT:**  Would defendants like to call their next

4  witness?

5    **MS. NYGAARD:**  Yes.  Defendants would call counselor

6  Dan Gongora.

7                    <u>**DANIEL GONGORA**</u>,

8  called as a witness for the Defendant herein, having been first

9  duly sworn, was examined and testified as follows:

10    **THE CLERK:**  Thank you.  Please be seated.

11      For the record, please state your first and last name, and

12  spell both.

13    **THE WITNESS:**  Daniel, D-A-N-I-E-L Gongora,

14  G-O-N-G-O-R-A.

15    **THE CLERK:**  Thank you.

16                    <u>**DIRECT EXAMINATION**</u>

17  BY MS. NYGAARD:

18  **Q**    Good afternoon, Mr. Gongora.

19  **A**    Good afternoon, Ms. Nygaard.

20  **Q**    Where do you currently work?

21  **A**    I'm a correctional counselor in the SHU, Pelican Bay State

22  Prison.

23  **Q**    Okay.  And how long have you worked at Pelican Bay?

24  **A**    I worked there for approximately -- I have been working

25  there for approximately ten years.

1  Q    And what positions have you held at Pelican Bay?

2  A    Medical technical assistant, which is a nurse/correctional

3  officer, a sworn position.  Correctional officer, correctional

4  counselor, and correctional sergeant.

5  Q    Okay, and you said right now that you are currently a

6  correctional counselor.  Was that a promotion?

7  A    Yes.

8  Q    And how long have you been a correctional counselor?

9  A    Approximately six months.

10 Q    And what did you do before coming to work for CDCR?

11 A    I was an HIV coordinator with the County of Orange.

12 Q    And how long did you do that?

13 A    I did that for approximately seven years.

14 Q    And what was your title there?

15 A    I was actually a Licensed Vocational Nurse, but I worked

16 as a HIV coordinator, providing HIV testing and hepatitis

17 testing.  And syphilis testing.  And I think I just did say

18 "education."

19 Q    Okay.  And do you currently have any other jobs besides a

20 counselor at Pelican Bay?

21 A    I am currently a Reserve Deputy Sheriff with Del Norte

22 County.  I'm also a volunteer firefighter.

23 Q    Anything else?

24 A    I'm also a -- I guess they call it an assistant professor

25 with College of the Redwoods.

1  Q    Okay.  What do you teach there?

2  A    I teach Prison Gangs and Inmate Subcultures.

3  Q    Now, have you received any training on how to search a

4  cell?

5  A    Yes, I did.

6  Q    And when was that training?

7  A    I can't recall the exact date, but it was during my time

8  when I attended the basic academy.

9  Q    And on October 10, 2012, were you assigned to work as an

10 Assistant Institutional Gang Investigator?

11 A    Yes, ma'am.

12 Q    And how long did you work as an Assistant Institutional

13 Gang Investigator.

14 A    Approximately four years.

15 Q    And how did you come about being assigned to the position

16 of Assistant Institutional Gang Investigator?

17 A    I was contacted by Sergeant Frisk at my workplace at

18 Pelican Bay, and he asked me if I wanted to work in the unit as

19 an Assistant IGI.

20 Q    And is that the typical procedure for any correctional

21 officer assignment?

22 A    It's a -- as AW Barneburg said, it's a specialized

23 position, it's a 30 percent position.  And the people that are

24 asked into the unit usually have a good work record, good work

25 ethic, hold themselves to a higher standard.

 1  **Q**    And what were your duties as an Assistant Institutional

 2 Gang Investigator?

 3  **A**    I actually worked in the mailroom or the intel room where

 4 the -- reading mail, possibly trying to break codes, cell

 5 searches.  Assist the other IGIs with different tasks that they

 6 had.  It was just a whole gamut of things.

 7  **Q**    And did you receive any special training on how to search

 8 a cell once you became an Assistant IGI?

 9  **A**    Yes, I did.

10  **Q**    And what type of training was that?

11  **A**    It was mostly on-the-job training.  When you start as an

12 IGI there's a lot of stuff you don't know.  And basically it's

13 the senior officers that will guide you on how to do a cell

14 search.  Or how -- how we would do cell searches.

15  **Q**    Okay.  So I would like to direct your attention to

16 October 10, 2012.

17  **A**    Yes.

18  **Q**    Did you search Mr. Perez's cell on that date?

19  **A**    Yes.

20  **Q**    And how was it that you came about participating in the

21 cell search?

22  **A**    Um, I recall that I was -- myself, Officer Healy and

23 Officer Gates were in our office, and Sean Burris and Guill- --

24 Officer Pimentel came in and asked us for a cell search.  To

25 help with a cell search.  Later, through the testimony,

1  apparently Sean Burris wasn't there.  He didn't come into the

2  office.

3  Q    Okay.  Were you told the reason why the search needed to

4  be done?

5  A    Just that he -- that an inmate needed a new validation.

6  And that there was a court order to do it.  That was it.

7  Q    And did you question why there was a court order?

8  A    No.

9  Q    Is it standard procedure to conduct a cell search as part

10  of a validation proceeding?

11  A    Yes.

12  Q    And were you informed anything about Mr. Perez's lawsuit

13  or court case?

14  A    I'm sorry; could you repeat the question?

15  Q    Were you informed about any details of Mr. Perez's pending

16  lawsuit?

17  A    No.

18  Q    At that time?

19  A    No, I wasn't.

20  Q    Okay.  Did you know Mr. Perez before the search on

21  October 10th?

22  A    No.

23  Q    And how soon after you were asked to do the search did you

24  actually go down to the cell to conduct the search?

25  A    Probably -- my recollection is probably be five to ten

 1  minutes.

 2  **Q**    And were you aware that Mr. Perez had filed a lawsuit in

 3  2005?

 4  **A**    No.

 5  **Q**    How many cell searches have you conducted in your career?

 6  **A**    I would say probably about 200, rough number.  Maybe a

 7  little more.

 8  **Q**    And on average, how many cell searches did you conduct as

 9  an Assistant IGI per week?

10  **A**    Per week, four, maybe five.

11  **Q**    So please describe what happened when you approached

12  Mr. Perez's cell.

13  **A**    As we approached the cell, it was -- I don't know the

14  exact order of the officers.  I know I was towards the back.

15  And as we walked in to the cell, I haired somebody say in

16  Spanish, "Hurry up."

17        And I looked into the cell, and I saw a person tearing up

18  papers and pushing them into the toilet (Indicating), who was

19  later identified as Guerrero.  And Perez was standing in --

20  **Q**    I'm going to pull up a diagram, Trial Exhibit 22.

21  **A**    Okay.

22        (Document displayed)

23  **Q**    So could you please draw on this diagram where you said

24  the person was identified as Guerrero, where he was located?

25  **A**    I believe he was about right here (Indicating).

1  Q    And where was Mr. Perez?

2  A    Mr. Perez, about right here (Indicating).  But he's kind

3  of moving like that, in that kind of direction (Indicating).

4  Back and forth.

5  Q    Okay.  And you said that you had heard somebody say "Hurry

6  up"?

7  A    "Hurry up" in Spanish, yes.

8  Q    Do you speak Spanish?

9  A    Yes, ma'am, I do.

10 Q    And do you know who the person was that said that?

11 A    I can't positively say it was Perez, but my location where

12 I was at and the actions that were going on in the cell, I

13 would assume that was Mr. Perez.

14 Q    And why would you make that assumption?

15 A    Because the -- Guerrero was tearing up kites and putting

16 them inside -- or tearing up the paper, putting them inside the

17 toilet.

18 Q    And as you approached the cell, which other officers

19 accompanied you?

20 A    Again, I believe it was Officers Burris, Pimentel, Healy

21 and Gates.  But through the testimony, I -- Burris wasn't

22 there.  Officer Burris wasn't there.

23 Q    And did you give Mr. Perez any orders as you approached

24 the cell?

25 A    I don't remember.

```
 1  Q    Did you hear anybody else give him any orders?

 2  A    I heard somebody give him an order.  I don't know who it

 3  was.

 4  Q    And what was the order?

 5  A    To cuff up.

 6  Q    And was that order given one time?

 7  A    No, it was given multiple times, I believe.

 8  Q    Now, in your experience, if an inmate complies with the

 9  first order that he's given to cuff up, would he be given

10  repeated orders to continue to cuff up?

11  A    No.  Usually you just tell them to cuff up; they would

12  just -- "Hold on a second," put down their cup of coffee, and

13  cuff up.

14  Q    Now, is a cell door perforated?

15  A    Yes, ma'am.

16  Q    Can you see through the holes into the cell?

17  A    Yes, ma'am.

18  Q    Is your view affected by whether you are standing on an

19  angle or straight on?

20  A    Not usually, no.  The only time that it's really hard to

21  see is when they have the lights off inside the cell.

22  Q    Okay.  And do you know if the lights were off on

23  October 10, 2012, or on?

24  A    I believe they were on because I could see straight into

25  the cell.
```

1   Q    Okay.  And while Mr. Guerrero was at the toilet, pushing

2   paper inside the toilet, what was Mr. Perez doing?

3   A    He was attempting to cover him.  Cover him by moving back

4   and forth, trying to stop us from seeing what Mr. Guerrero was

5   doing.

6   Q    Okay.  Is it -- strike that.

7        Do you know if the water was turned off to the cell before

8   you went into this --

9   A    It was.

10  Q    And why would the water be turned off?

11  A    Simply for the fact that if you shut off the water, they

12  try to flush any type of evidence or contraband, it won't be

13  able to flush.  The water will stay inside the toilet.

14  Q    Now, is it standard procedure to turn the water off before

15  doing a cell search?

16  A    It is, but sometimes they're faster than us and we don't

17  get it off in time.

18  Q    And in this instance, was the water turned off to the

19  cell?

20  A    Yes.

21  Q    Were Mr. Perez and Guerrero eventually handcuffed and

22  escorted out of the cell?

23  A    Yes.

24  Q    So after they were taken out of the cell, do you know

25  where they went?

1   **A**    I believe they went to the holding cell.

2   **Q**    And did you go into their cell and search it at that time?

3   **A**    I believe I tried to start getting some of the paper out

4   of the toilet and putting it on paper towels.

5   **Q**    Okay.

6   **A**    And --

7   **Q**    So you dug your hands into the toilet?

8   **A**    Yes.

9   **Q**    And you pulled out papers?

10  **A**    Most of them.  The other officers came and helped me.

11  **Q**    And what did you do with the papers that you had pulled

12  out of the toilet?

13  **A**    I believe we put them on paper towels just so the water

14  will -- start soaking them up, to dry them out.

15  **Q**    And at that time could you read the contents of the

16  papers?

17  **A**    No.

18  **Q**    And why is that?

19  **A**    The papers were torn up.  We couldn't put them together to

20  see.  We just took them out and saved them.

21  **Q**    Now, would you later try to put them together?

22  **A**    I -- ideally, you would.  But I didn't do it that time.

23  **Q**    Okay.  And besides pulling the papers out of the toilet,

24  do you remember anything else about searching Mr. Perez's cell?

25  **A**    Nothing out of the ordinary, no.

1  Q    Okay.  So, how do you ordinarily search a cell?

2  A    For an active/inactive review, we have basically a cart

3  with foldable milk crates.  And we put the milk crates -- open

4  up a milk crate, bring it inside the cell, put the papers in

5  there.  Anything we're going to take, we put in the milk

6  crates, and we just put them out there on the cart.

7       But what we do is we ask the inmates, "Hey, which one is

8  your side, and which one is" -- you know, "Which side is which

9  side?"  And we try to keep property separated.  So...

10 Q    Okay.  And so, so how do you -- do you look through

11 certain things in the cell?

12 A    Yes.  We search the mattresses, we search the sheets, we

13 search the cuffs of the -- the cuffs of shirts or the collars.

14 The seams of the blanket -- not blankets, but the sheets.  We

15 search in the cubbyholes.

16 Q    Now, you were here when Associate Warden Barneburg was

17 testifying, correct?

18 A    Yes, ma'am.

19 Q    And you heard his description of how a cell search is done

20 for a validation proceeding?

21 A    Uh-huh.

22 Q    Would you have anything to add to that?

23 A    Not necessarily, no.

24 Q    Do you agree with his description?

25 A    Yes.

1  Q    And would you have conducted the cell search any

2  differently for an active/inactive review versus a new

3  validation?

4  A    No.

5  Q    And why not?

6  A    Basically it's the same, it's the same way.  You search

7  the cell, you pull the property.  And then it gets searched.

8  However, as a floor officer doing just a regular cell search,

9  you're not taking the stuff out of the cell; you're basically

10 searching everything in the cell and then just walking out.

11 Q    Okay.  Do you remember the condition of the cell when you

12 left it?

13 A    No, I don't.

14 Q    Would you have left sheets laying on the floor?

15 A    No.

16 Q    Would you have left clothes laying on the floor?

17 A    No.

18 Q    Would you have left a mattress on the floor?

19 A    No.

20 Q    Would you have put dirty bootprints all over clothing?

21 A    No.

22 Q    Would you have put your dirty bootprints on sheets?

23 A    No.

24 Q    And how can you be sure that you would not do those

25 things?

1  **A**    Number one, working for IGI is a privilege.  Working for

2  -- within that unit is actually -- it's an honorable unit to

3  work for.  And to bring any type of -- to do that would just

4  bring discredit upon IGI, upon the lieutenant, and especially

5  upon the warden.

6  **Q**    So are you confident that you can say you did not trash

7  Mr. Perez's cell?

8  **A**    I am confident.

9  **Q**    Do you know if you spilled any shampoo or soap during the

10  search?

11  **A**    No.

12  **Q**    Have you ever spilled shampoo or soap during a search?

13  **A**    Soap or shampoo or cereal, some, I have.

14  **Q**    And what is your standard procedure if something like that

15  spills?

16  **A**    I don't know if it's a standard procedure, but what I do

17  is if I do search a cell and I do spill some shampoo or

18  something, I'll try to clean it up.

19      When I get the inmate, bring him back into the cell, I'll

20  tell him, "Hey, I spilled some shampoo or spilled some cereal.

21  It's no disrespect, it's just -- it happened."  Usually, nine

22  times out of ten, they're okay with it.

23  **Q**    Now, while you were in the cell doing the search, did you

24  say "These knuckleheads should file lawsuits more often, makes

25  this job a lot more rewarding"?

 1   **A**    No.

 2   **Q**    Or something like that?

 3   **A**    No.

 4   **Q**    No?

 5   **A**    No.

 6   **Q**    Did you hear some other officer make that statement?

 7   **A**    No.

 8   **Q**    And is that the type of statement you would have

 9   remembered an officer making?

10   **A**    Yes.

11   **Q**    Why is that?

12   **A**    It's a derogatory statement, and that, we wouldn't -- we

13   wouldn't do that.

14   **Q**    Did you hear anyone ask Mr. Guerrero whether he was into

15   filing lawsuits too?

16   **A**    No.

17   **Q**    And again, is that the type of statement you would have

18   remembered?

19   **A**    Yes.

20   **Q**    And why?

21   **A**    It's a derogatory statement, something that we wouldn't

22   say.

23   **Q**    Now, have you heard of inmates filing lawsuits before?

24   **A**    Yes.

25   **Q**    Have you heard of inmates entering into settlement

1   agreements?

2   **A**     Yes.

3   **Q**     And do you care whether an inmate files a lawsuit?

4   **A**     No.

5   **Q**     Do you care whether an inmate settles a case or wins a

6   case at trial?

7   **A**     No.

8   **Q**     Did you hear anyone say to Mr. Perez, "You might have been

9   able to collect from us before, but get comfortable because

10  we're going to make sure you stay where you belong"?

11  **A**     No.

12  **Q**     And you didn't make that statement?

13  **A**     I did not make that statement, no.

14  **Q**     Is that the type of statement you would have remembered?

15  **A**     Yes.

16  **Q**     And again, why would you remember that?

17  **A**     It's a -- it's a derogatory statement.  It's something

18  that the officers that I work with and myself would not say.

19  It's just -- we're there to do a job, and you know, complete

20  our job and leave.

21  **Q**     And did it matter to you whether Mr. Perez stayed housed

22  in the SHU?

23  **A**     No.

24  **Q**     Do you have any vested interest in where an inmate is

25  housed?

1   **A**    Right now, as a correctional counselor, yes, because

2   that's my job, is to house inmates in other prisons.  Take them

3   into a community and have them housed in different prisons.

4   **Q**    But as an Assistant Institutional Gang Investigator, did

5   you have any interest in where an inmate was housed?

6   **A**    No.

7   **Q**    So, after you continued -- excuse me.  After you finished

8   searching Mr. Perez's cell, did you take any property with you?

9   **A**    The property that was on the cart, yes.

10  **Q**    Okay.  And what did you do with that property?

11  **A**    I believe we took it to Sean Burris's and Officer

12  Pimentel's office.

13  **Q**    I would like to show you Exhibit 49.

14       (Document displayed)

15  **Q**    Do you recognize this document?

16  **A**    Yes.

17  **Q**    And what is it?

18  **A**    It's a cell search receipt.

19  **Q**    And is your signature down in the bottom right-hand

20  corner?

21  **A**    Yes, it is.

22  **Q**    Is your handwriting anywhere else on this document?

23       (Witness examines document)

24  **Q**    Do you need your glasses?

25  **A**    No.  I can see it's not.

1  Q   Okay.

2  A   Just at the bottom.

3  Q   Okay.  On the document, under "Condition of Cell" it says:

4       "All p/w..."

5       Which is paperwork, correct?

6  A   Paperwork.

7  Q   (As read)

8       "All paperwork removed for active/inactive

9       review by IGI."

10 A   Yes.

11 Q   So when you removed the paperwork, did you review every

12 single piece of paper before you put it in the cart?

13 A   No.

14 Q   And why not?

15 A   It would be time-consuming to try to look through

16 paperwork.

17     I don't particularly know how much he had, Mr. Perez had,

18 but some of the cell searches, they just -- stacks and stacks

19 of legal documents.  I mean, just -- you know, just manila

20 folders full of paperwork.

21 Q   And there are several lines here under "Items

22 confiscated."

23 A   Yes.

24     **MS. NYGAARD:**  Could you blow that up, please?

25     (Document displayed)

1    BY MS. NYGAARD:

2    Q    So, there are multiple lines here (Indicating).  Why

3    didn't you write down the papers that you took from Mr. Perez's

4    cell on those lines?

5    A    Again, it was just too much.  I mean, it's just --

6    "paperwork" is kind of the catchall.

7    Q    And is it standard procedure just to remove all the

8    paperwork?

9    A    Yes.

10   Q    And not identify every single piece you took?

11   A    Yes.

12   Q    So after the property was dropped off, did you have any

13   further involvement, reviewing the property?

14   A    No.

15   Q    Did you have any further involvement with Mr. Perez after

16   this search?

17   A    No.

18   Q    Now when Mr. Perez was returned to his cell, did you hear

19   him complain about the condition of the cell?

20   A    Not that I can recall, no.

21   Q    And would you have been within earshot?

22   A    Yes.

23   Q    Okay.

24          MS. NYGAARD:  We can close this document, please.

25

1  BY MS. NYGAARD:

2  Q    Do you recall speaking to anyone, any other officer about

3  issuing Mr. Perez a Rules Violation Report for his conduct that

4  day?

5       (Document taken off display)

6  A    No.

7  Q    Do you know whether Mr. Perez did receive a Rules

8  Violation Report?

9  A    I don't think so, no.

10 Q    Have you ever heard that Mr. Perez was issued a Rules

11 Violation Report?

12 A    In this testimony, yes.

13 Q    So during the course of this lawsuit you learned that he

14 had been issued an RVR?

15 A    During the lawsuit, yes.

16 Q    Would you have issued Mr. Perez an RVR for his actions

17 that day?

18 A    No.

19 Q    And why not?

20 A    Just, I was more interested in what was in the toilet, as

21 far as the intel that you would get, the intelligence that you

22 would get.  No, I just didn't, or I wouldn't have.

23      It's kind of a common occurrence sometimes.  You've got

24 pick your battles.

25 Q    So do you think that Officer Gates, who's the one who

 1  wrote the RVR, did anything inappropriate by writing it up?

 2  **A**    No.

 3  **Q**    And why not?

 4  **A**    He -- he was -- he made the decision to write him up.  I

 5  can't -- I'm not going to second-guess him.

 6  **Q**    Before the cell search on October 10th, had you heard

 7  anything about the upcoming changes to the prison gang

 8  validation policies?

 9  **A**    Yes.

10  **Q**    But at that time, had you received any training on the

11  upcoming policies?

12  **A**    I think I received -- more talk than anything, just kind

13  of what's coming down -- coming down the road as far as the

14  gang validations and such.

15  **Q**    Did you know any specific details of the changes that were

16  coming?

17  **A**    A few.  Just, basically on the validation, which is they

18  had to have certain -- certain criteria that their -- their --

19  that was going to come down.

20       But again, doing the validation wasn't my job.  I was more

21  reading the mail, doing some investigations other -- other than

22  the validations.

23  **Q**    Okay.  And did you know anything about a disciplinary

24  matrix component to the new policy?

25  **A**    I knew about it, but again, it was constantly changing,

 1  you know.  It was just one thing after another.

 2  Q    Did you know any specific details of the proposed policy?

 3  A    No.  Not specific.

 4       MS. NYGAARD:  If I could just have one moment?

 5       THE COURT:  Sure.

 6       (Off-the-Record discussion between counsel)

 7       MS. NYGAARD:  I have nothing further.

 8       MS. MORAN:  Your Honor, may I approach with the

 9  deposition transcript?

10       THE COURT:  Sure.

11       Ms. Moran?

12                    **CROSS EXAMINATION**

13  BY MS. MORAN:

14  Q    Good afternoon, Mr. Gongora.

15  A    Good afternoon.

16  Q    You are a prison guard at Pelican Bay, correct?

17  A    Yes, ma'am.

18  Q    And you have been a prison guard for about ten years, is

19  that right?

20  A    About -- about seven years.

21  Q    And in 2012, Mr. Gates, Mr. Healy and Mr. Pimentel,

22  Mr. Burris and yourself were five out of the seven AIGIs at

23  Pelican Bay.  Is that correct?

24  A    Yes.

25  Q    And one of your duties -- in fact, one of your main

1  duties -- was to read the SHU inmates' mail.  Isn't that

2  correct?

3  **A**    Yes.

4  **Q**    And you worked very closely with your co-defendants, is

5  that right?

6  **A**    Yes.

7  **Q**    And you shared an office with Mr. Healy and Mr. Gates.  Is

8  that right?

9  **A**    Yes.

10 **Q**    And you're friends with Mr. Gates.

11 **A**    Yes.

12 **Q**    And it was important for AIGIs to work together and share

13 information with each other.  Isn't that right?

14 **A**    For the most part, yes.

15 **Q**    And you're familiar with the validation procedures.  Isn't

16 that correct?

17 **A**    I am somewhat familiar with it.  Again, it wasn't my job.

18 I had a rudimentary understanding of it.

19 **Q**    Well, do you understand that in 2012, a validated

20 associate was automatically assigned to the SHU?

21 **A**    Yes.

22 **Q**    And that was true even if that validated associate had no

23 serious rules violations in his file.  Isn't that right?

24 **A**    Yes.

25 **Q**    And you're familiar with the STG program?

1   **A**    Yes.

2   **Q**    And under the STG program, a validated associate can only

3   be assigned to the SHU if he had a serious rules violation with

4   a nexus activity, or a connection -- a nexus to gang activity.

5   Is that right?

6           **MS. NYGAARD:**  Objection, beyond the scope of direct.

7           **THE COURT:**  Overruled.

8           **THE WITNESS:**  I know now, yes.

9   **BY MS. MORAN:**

10  **Q**    And it was your understanding that the changes implemented

11  by the STG pilot program was one of the responses by the CDCR

12  to the 2011 hunger strikes.  Is that correct?

13  **A**    Yes.

14  **Q**    And you learned that the CDCR was going to come up with

15  that new program as early as 2011.  Is that correct?

16  **A**    It was in the works at that time, yes.

17  **Q**    And you learned that it was coming as early as 2011.

18  **A**    There was a -- talk about it, but it wasn't set in stone.

19  But there was a lot of talk about it, yes.

20  **Q**    And you knew that in 2011.

21  **A**    Yes.

22  **Q**    And you were trained on this policy, weren't you?

23  **A**    On the new STG?

24  **Q**    On the STG policy.

25  **A**    Yes.

1  Q    And in fact, you were trained on the STG program as early

2  as February 2nd, 2012.  Correct?

3  A    I -- I would agree.  I can't remember the actual date, but

4  -- okay.

5  Q    And in fact, you attended a training in July of 2012, and

6  there was discussion of the STG program at this training as

7  well.  Correct?

8  A    You would have to tell me which training it was in July.

9  Q    You attended multiple gang trainings in July of 2012?

10  A    There's different types of trainings.  The California Gang

11  Task Force had -- I went to a few of those, and I had -- there

12  was training there.

13       But, not necessarily with the STG.  There was talk of it,

14  but there was no actual training.  It was just more of

15  everybody gets together and talks about the gang trends that

16  are happening within the state.

17  Q    And so at that gang validation training, in July of 2012,

18  there was discussion of the new STG program that was to be

19  launched?

20  A    Possibly, yes.  Uh-huh.

21  Q    And all of the -- and all of the IGIs are expected to

22  attend these trainings, aren't they?

23  A    I would assume so, yes.

24  Q    Mr. Gongora, you searched Mr. Perez's cell on October 10,

25  2012, didn't you?

1  A    Yes.

2  Q    And you understood the reason for that search was because

3  he had won a court case.  Isn't that right?

4  A    I don't know that he won a court case.  I remember

5  somebody coming in and saying that there was a court decision

6  or something of that sort, and that we had to do a new

7  validation.  That was it.

8  Q    So on October 10, 2012, is it your testimony that you did

9  not know that he had won a court case?

10  A    I wouldn't say it was a -- won a court case.  There was a

11  court -- something from a court that said we had to do a new

12  validation.

13  Q    But you didn't know or it was not your understanding in

14  October, 2012, that Mr. Perez had won a new court case.

15  A    I really couldn't tell you.  Again, when the officers came

16  and said we had to do new -- we had to do a cell search it was

17  because he had -- there was a court -- something from the Court

18  had come through and we had to do a new validation.  It wasn't

19  specifically he won a court case.

20       Or a court order, I remember should say.  There was a

21  court order we had to do a new validation.

22  Q    And you don't recall anyone giving Mr. Perez any orders

23  during the search?  Or do you?

24  A    I do remember.  I don't know who it was.

25            MS. MORAN:  Your Honor, can I direct your attention

```
 1   to Mr. Gongora's -- Page 66, 24 through 67?  I'm sorry.  66,
 2   Line 24 through 67, Line 1.
 3              THE COURT:  Any objection?
 4              MS. NYGAARD:  No objection.
 5        (Portion of videotaped deposition played in open
 6         court, not reported)
 7   BY MS. MORAN:
 8   Q    And you didn't witness any conduct by Mr. Perez that would
 9   have warranted the issuance of an RVR, did you?
10   A    No.
11   Q    And you testified earlier that when you were approaching
12   Mr. Perez's cell, you heard him say "Hurry up" in Spanish.  Is
13   that correct?
14   A    I heard somebody say "Hurry up" in Spanish.
15   Q    Do you recall after October 10th whether there was anyone
16   that investigated, speaking to an investigator about the RVR?
17   A    No.
18   Q    You don't recall speaking to Correctional Officer Barker?
19   A    No.
20   Q    Would it refresh your recollection if I could show you a
21   document?
22   A    Yes, please.
23              MS. MORAN:  May I approach?
24              THE COURT:  You may.
25              MS. NYGAARD:  Objection, Your Honor.
```

```
 1              THE COURT:  All right.  Before you approach, let me
 2    take a look.
 3          (Document handed up to the Court)
 4              THE COURT:  Quick sidebar?
 5          (Whereupon, the following proceedings were held at
 6           sidebar.)
 7              THE COURT:  All right, so what is this?
 8              MS. MORAN:  This is an -- this is a document that's
 9    kept by the CDCR in the their ordinary course.
10              MS. NYGAARD:  No, it's not.
11              MS. MORAN:  It's a CDCR document.
12              THE COURT:  Sorry?
13              MS. MORAN:  It's a CDCR document, on CDCR forms.  It
14    was not identified in this matter by defendants, and it came to
15    our attention after the close of discovery.  And we sent it to
16    defendants.
17              THE COURT:  Uh-huh.
18              MS. MORAN:  We do not intend to use it as an exhibit.
19    We intend to use it solely for the purpose of refreshing
20    Mr. Gongora's recollection.
21              THE COURT:  Okay.
22              MS. MORAN:  As to his conversation with Mr. Barker.
23              THE COURT:  So who is the author of this?
24              MS. MORAN:  Mr. Barker.
25              THE COURT:  And I'm seeing "sample interview
```

 1  summaries."  Is this a sample interview summary?

 2          **MS. MORAN:**  No.  This is written by Correctional

 3  Officer Barker, and it's notes from his interviews with various

 4  defendants after the events.

 5          (The Court examines document)

 6          **THE COURT:**  Okay.

 7          **MS. NYGAARD:**  Your Honor, Mr. Barker is not here to

 8  authenticate this document.  This was not turned over in

 9  discovery because this is not something that was retained

10  within CDCR records.  This was something that would have been

11  given to Mr. Perez when he left his RVR hearings.

12      This is not -- this was not something that we had to turn

13  over because we didn't -- CDCR didn't even have it.  So, we

14  have nobody to authenticate that this (Indicating) is even an

15  accurate statement that Mr. Barker reported.

16          **MS. MORAN:**  Your Honor, I don't think we need to

17  authenticate it because if it is not, in fact, an -- it will

18  not refresh Mr. Gongora's recollection as to that conversation.

19          **THE COURT:**  I think that you can put it in front of

20  him to refresh, see if it -- ask him if it refreshes his

21  recollection.  But you shouldn't be engaging -- you've seen how

22  I have dealt with this so far in trial.  It's very common

23  for -- and proper, I think -- to key documents in front of the

24  witnesses when they start testifying again.

25      So put it in front of him, let him read it, ask him if it

 1  refreshes his recollection.  If the answer is no, that's the

 2  end of the matter.  And if the answer is yes, go get the

 3  document from him and then start asking him questions.

 4         **MS. MORAN:**  Okay.

 5         **THE COURT:**  Okay.

 6         **MS. MORAN:**  Thank you.

 7      (Conclusion of sidebar discussion; the following

 8       proceedings were held in the presence and hearing of

 9       the jury:)

10         **THE COURT:**  You may approach.

11      (Whereupon document was tendered to the witness.)

12  **BY MS. MORAN**

13  **Q**   Mr. Gongora, please take a moment to read through this

14  document.

15      (Witness complied.)

16  **A**   Do you want me to review the whole document or just

17  certain parts of it?

18         **THE COURT:**  Whatever you're comfortable with.  Take

19  as much time as you need to take.

20      (Brief pause.)

21         **THE WITNESS:**  Okay.

22  **BY MS. MORAN**

23  **Q**   Mr. Gongora, does seeing this document refresh your

24  recollection as to an interview you had with Correctional

25  Officer Barker on October 24, 2012?

1  **A**    No.

2  **Q**    Thank you.  No further questions.

3  <u>**REDIRECT EXAMINATION**</u>

4  **BY MS. NYGAARD**

5  **Q**    So on October 10th, 2012, what did you know about Mr.

6  Perez's lawsuit?

7  **A**    About his lawsuit?

8  **Q**    The previous lawsuit.

9  **A**    I knew nothing about the previous lawsuit.

10 **Q**    Thank you, nothing further.

11 <u>**RECROSS EXAMINATION**</u>

12 **BY MS. MORAN**

13 **Q**    Mr. Gongora, you just testified that on October 10th, 2012

14 you knew nothing about Mr. Perez's lawsuit, is that correct?

15 **A**    The previous lawsuit, I think it was in 2008.

16 **Q**    Mr. Perez's previous lawsuit on October 10th, 2012, you

17 just testified that you knew nothing about it, is that correct?

18 **A**    Which lawsuit are we talking about?  That's -- that's the

19 question.  I don't know which one you're talking about.

20 **Q**    We're not talking about this one, right, since that hadn't

21 been filed.

22      On October 10th of 2012, you testified that you didn't

23 know anything about Mr. Perez's lawsuit?

24 **A**    I didn't know about a lawsuit, just about a Court order,

25 if that's what you're speaking of.  A Court order to do a new

1  cell search, that's what I'm talking about.  I don't know if it

2  came from a lawsuit.

3  **Q**    And you did not know if he had won a new court case?

4  **A**    That I don't know.

5  **Q**    Okay.  Can I direct the Court's attention to Page 62,

6  Lines 23, and Page 63 through -- Page 63, Line 4.

7            **THE COURT:**  Page 62, line what?

8            **MS. MORAN:**  Line 23.

9            **THE COURT:**  Okay.  To Page 63, Line 4, is that what

10  you said?

11            **MS. MORAN:**  Yes.

12      (Brief pause.)

13            **MS. NYGAARD:**  No objection.

14      (Videotape played in open court.)

15            **MS. MORAN:**  No further questions.

16            **THE COURT:**  Anything further?

17            **MS. NYGAARD:**  Nothing further.

18            **THE COURT:**  Thank you, Officer Gongora.

19      (Witness excused.)

20            **THE COURT:**  Call your next witness.

21            **MR. SEALS:**  Defendants call sergeant Eric Healy.

22                    **ERIC HEALY**,

23  called as a witness for the Defendant herein, having been first

24  duly sworn, was examined and testified as follows:

25            **THE WITNESS:**  I do.

1    **THE CLERK:**  Thank you.  Please be seated.

2    For the record please state your first and last name and

3 spell both.

4    **THE WITNESS:**  Eric Healy.  E-R-I-C.  H-E-A-L-Y.

5    **THE CLERK:**  Thank you.

6    <u>**DIRECT EXAMINATION**</u>

7 BY MR. SEALS

8  Q   Good afternoon, Mr. Healy.

9  A   Good afternoon.

10 Q   Where do you currently work?

11 A   Pelican Bay State Prison.

12 Q   How long have you worked at Pelican Bay?

13 A   I have been there for 12 years.

14 Q   And do you have any other jobs?

15 A   No.

16 Q   Do you do any volunteer work outside of your work at

17 Pelican Bay?

18    **MR. BENEDETTO:**  Objection, relevance.

19    **MR. SEALS:**  Background.

20    **THE COURT:**  Sustained.

21 BY MR. SEALS

22 Q   What did you do before working at the CDCR?

23 A   I was a paramedic at Del Norte Ambulance.

24 Q   And what is your current title?

25 A   I'm a Sergeant.

1  Q     And in October of 2012 what was your position?

2  A     I was a correctional officer.

3  Q     And what was your assignment in that position?

4  A     I was an Assistant Institutional Gang Investigator.

5  Q     As Assistant Institutional Gang Investigator, what was

6  your duties?

7  A     One of my main duties was reading outgoing and ingoing

8  correspondences, investigations, as well as cell searches,

9  alarms.  There was a gamut of things we had to do.

10 Q     How often would you search cells as an Assistant

11 Institutional Gang Investigator?

12 A     Quite often.

13 Q     Can you give me an estimate of how many times you searched

14 a cell?

15 A     The whole duration?  I would say hundreds.

16 Q     Did you always search cells with Officers Gates, Gongora

17 and Pimentel?

18 A     Not always the same crew, no.

19 Q     Was that a common group for you to go search a cell with?

20 A     More or less.

21 Q     Did you ever work as a floor officer in the Security

22 Housing Unit?

23 A     Yes, I did.

24 Q     And did you also perform cell searches as a floor officer?

25 A     It was required to do three a day.

1  Q    Three per day, you said?

2  A    Yes.

3  Q    And how long were you a floor officer in the Security

4  Housing Unit?

5  A    I couldn't tell you exactly how long.

6  Q    Approximately?

7  A    I would say two to three years.

8  Q    Did you do any searches differently after you became an

9  Assistant Institutional Gang Investigator?

10 A    Yes.  They were more thorough.

11 Q    Were you trained on how to do searches more thoroughly?

12 A    Yes, we were.

13 Q    And why are the searches more thorough?

14 A    As Dave Barneburg mentioned before, it was for those basic

15 reasons.  Because them trying to conceal information and

16 anything that was gang related from us, they would go to great

17 lengths to go undetected.

18 Q    On October 10th, 2012 you searched -- or on October 10th,

19 2012 you went to Mr. Perez's cell because of a request to

20 search the cell, correct?

21 A    Yes.

22 Q    Can you tell me what you remember from that cell search?

23 A    The portion that I remember is walking up to the cell, and

24 Guerrero at the front of the toilet, and he had his hands in

25 the toilet and he was ripping up paper.

1  Q    And would the water have been turned off at that time?

2  A    Yes.  That's always a practice of ours going up to a cell,

3  is to turn off the water.

4  Q    When is the water turned off?

5  A    As we're coming up to the cell, one of us would go turn

6  off the water and the rest of us would approach the cell.

7  Q    Do you remember if you turned off the water that day?

8  A    I didn't.

9  Q    Do you remember who did turn off the water?

10  A    I don't.

11  Q    And you said you saw Mr. Guerrero putting notes or papers

12  into the toilet, is that correct?

13  A    Yes.

14  Q    Did you give Mr. Guerrero any orders?

15  A    I gave him many orders to get his hands out of the toilet

16  and quit ripping up the paper.

17  Q    Did Mr. Guerrero comply with those orders?

18  A    No.

19  Q    Did you give any orders to Mr. Perez at that time?

20  A    I don't recall.

21  Q    Do you remember what Mr. Perez was doing at that time?

22  A    Yes.  I remember him kind of weaving back and forth trying

23  to obstruct our view of what Guerrero was doing.

24  Q    You said "weaving back and forth."

25        MR. SEALS:  I would like to bring up Trial Exhibit

```
 1  22.

 2       (Document displayed)

 3  BY MR. SEALS

 4  Q    Do you recognize this diagram?

 5  A    Yes.

 6  Q    Does this appear to be a fair representation of a cell in

 7  the Security Housing Unit?

 8  A    Yes.

 9  Q    Can you mark on this diagram where you remember Mr.

10  Guerrero being when you approached the cell?

11  A    Right there (indicating).

12  Q    And can you mark on the cell where Mr. Perez was moving?

13  A    Back and forth between there (indicating).

14  Q    And do you remember where you were standing at that time?

15  A    I was standing right there (indicating).

16  Q    So from your point of view, you could see Mr. Guerrero,

17  correct?

18  A    I could see him clearly.

19  Q    And did you hear Mr. Perez say anything to Mr. Guerrero?

20  A    No.

21  Q    Backing up a little bit.  Do you remember why you were

22  told to do a cell search on October 10th, 2012?

23  A    We were asked to assist, and it was a normal day's

24  business.  So I think I initially thought that that was

25  probably an inactive/active review.  But it was either an
```

1   inactive/active review or a validation, more than likely.

2   Q    Do you remember who asked you to assist?

3   A    It's vague, but I believe Burris did.

4   Q    Do you remember being told why Mr. Perez's cell needed to

5   be searched?

6   A    No.

7   Q    Was it common for Officer Burris to ask you to assist with

8   a cell search?

9   A    Yes.

10  Q    Did you think there was anything out of the ordinary --

11  A    No, it's a normal day's business.

12  Q    Thank you.

13       And as an IGI, are you guys -- can you search an inmate's

14  cell at any time on any day?

15  A    Yes.

16  Q    Do you recall what you did after -- do you recall what

17  happened after ordering Mr. Guerrero to stop putting notes into

18  the toilet and after Mr. Perez was moving back and forth in

19  your way?

20  A    It gets vague from that point on.  I know that eventually

21  they both submitted to handcuffs and they were escorted out to

22  the rotunda.

23  Q    Do you remember escorting them out to the rotunda?

24  A    It's very vague.

25  Q    And just briefly, what is a rotunda?

1   **A**    The rotunda is the area around the control booth, which

2   controls all the pods which the inmates are housed in.  So they

3   are brought out to that area where one can be secured in a

4   holding cell while pictures were being taken of the other,

5   the one that the validation of the inactive/active review was

6   being done on.

7   **Q**    And then after they were escorted out to the rotunda, do

8   you remember going back to the cell?

9   **A**    No.

10  **Q**    Do you remember taking the papers out of the toilet that

11  day?

12  **A**    No.

13  **Q**    Do you remember participating in the cell search at all?

14  **A**    No.

15  **Q**    I'd like to show you Exhibit 49.

16       (Document displayed.)

17  **Q**    Do you recognize what this exhibit is?

18  **A**    Yes.  It's a search receipt.

19  **Q**    And is it your standard practice to sign a search receipt

20  whenever you're involved in the search?

21  **A**    Everybody that's involved with the cell search signs the

22  document.

23  **Q**    Okay.  And this is the search receipt from the search of

24  Mr. Perez's cell on October 10th, 2012, correct?

25  **A**    Yes, it is.

1  Q    Do you see your signature anywhere on this document?

2  A    No.

3  Q    So --

4  A    And even though there is only three spaces, if we did have

5  to put another signature in there, we would make room one way

6  or another.  Maybe two into one space or above or below.

7  Q    So there have been instances where more than three people

8  have signed a form such as this?

9  A    Yes.

10  Q    So sitting here today, do you believe that you went back

11  and actually searched Mr. Perez's cell on that day?

12  A    No, I didn't.

13  Q    Do you remember speaking with Mr. Perez or Mr. Guerrero at

14  any time during the cell search?

15  A    I don't.

16  Q    Earlier you testified that you gave some orders to Mr.

17  Guerrero, but do you recall any -- just --

18  A    Afterwards, no, I don't.

19  Q    Okay, thank you.

20      And do you remember asking Mr. Guerrero if he was into

21  filing lawsuits?

22  A    I didn't.

23  Q    Is that something that you would ever ask an inmate?

24  A    No.

25  Q    Do you remember responding to Mr. Guerrero, "Good, keep it

1  that way"?

2  **A**    I didn't.

3  **Q**    Did you hear any other officers make comments such as

4  those?

5  **A**    No, I didn't.

6  **Q**    Did you hear any officers make comments such as, "Good,

7  we're going to try to keep you in the SHU where you belong"?

8  **A**    No, I didn't.

9  **Q**    Did you make a comment such as that?

10 **A**    No, I didn't.

11 **Q**    Did you hear any officers make a comment such as, "These

12 knuckleheads should file more lawsuits"?

13 **A**    No, I didn't.

14 **Q**    And would you remember if you heard comments such as

15 those?

16 **A**    Yes, I would.  That would be very unbecoming.

17 **Q**    So those -- those would be an unusual comment to make

18 during a cell search?

19 **A**    Most definitely.

20 **Q**    And at the time of the lawsuit -- at the time of the

21 search on October 10th, 2012, did you know that Mr. Perez had a

22 lawsuit?

23 **A**    No.

24 **Q**    Would you have cared if Mr. Perez or his cellmate, Mr.

25 Guerrero, had lawsuits?

```
 1  A    No.

 2  Q    Would you have cared if they had settled any lawsuits?

 3  A    No.

 4  Q    Are you aware that inmates do file lawsuits?

 5  A    Yes.

 6  Q    And have you heard that that happens regularly?

 7  A    Yes.

 8  Q    Have you heard of inmates settling lawsuits?

 9  A    Yes.

10  Q    And do you have any opinion about that?

11  A    No.

12  Q    Now, on October 10th, 2012, you said you recalled seeing

13  Guerrero put notes into the toilet and Perez moving about the

14  cell in front of Mr. Guerrero?

15  A    Yes.

16  Q    Did you write Mr. Perez or Mr. Guerrero a Rules Violation

17  Report?

18  A    No.

19  Q    Why didn't you write a report?

20  A    Must be for the reason that Gates did that.

21  Q    Do you remember any discussions about that with Officer

22  Gates?

23  A    I don't.

24  Q    Would it be typical for you to have that discussion with

25  another officer?
```

1   **A**    Yes.

2   **Q**    And --

3   **A**    It doesn't -- we both shouldn't write on it.  Someone

4   usually...

5   **Q**    Would that be the purpose of that discussion?

6   **A**    Yes.

7   **Q**    And is the issuance of a Rules Violation Report at the

8   discretion of each officer based on what they personally saw?

9   **A**    Yes.

10  **Q**    When do you consider it appropriate for officers to issue

11  Rules Violation Reports?

12  **A**    When they are breaking rules.

13  **Q**    When --

14  **A**    Rules or regulations.  Inmates.

15  **Q**    Okay.  Have you ever written a Rules Violation Report that

16  was later dismissed?

17  **A**    Yes.

18  **Q**    Has that happened more than once?

19  **A**    Yes.

20  **Q**    Do you care if one of your Rules Violation Reports are

21  dismissed?

22  **A**    No, but I take it as a learning experience.

23  **Q**    In October, 2012 -- before October 10th, 2012, did you

24  know Mr. Perez?

25  **A**    No.

1  Q    Did you have any interest in where Mr. Perez was housed?

2  A    No.

3  Q    Did you have any interest in keeping him in the Security

4  Housing Unit?

5  A    No.

6  Q    You testified that you don't believe that you actually

7  went into the cell and performed the cell search on

8  October 10th, 2012 --

9  A    Yes.

10  Q    -- is that correct?

11      Do you know why you wouldn't have participated in the cell

12  search?

13  A    There could be many reasons, but there was three already

14  in there doing the cell search.  There was no reason for

15  someone else to be in there.

16  Q    Are three officers sufficient to --

17  A    Right, right.

18  Q    And so did you have any role in taking the paperwork out

19  of Mr. Perez's cell that day?

20  A    No.  Otherwise, I would have been on the Cell Search

21  Receipt.

22  Q    And did you review any of the paperwork taken out of

23  Mr. Perez's cell?

24  A    No.

25  Q    Did you trash Mr. Perez's cell?

 1  A    Definitely not.

 2  Q    Did you retaliate against Mr. Perez in any way because of

 3  his previous lawsuit?

 4  A    Absolutely not.

 5           MR. SEALS:  No further questions.

 6           THE COURT:  Thank you.

 7       Cross?

 8           MR. BENEDETTO:  Brief, your Honor.

 9       (Brief pause.)

10           MR. BENEDETTO:  May I approach with the transcript?

11           THE COURT:  Yes.

12       (Whereupon, document was tendered to the Court.)

13           THE COURT:  Thank you.

14                     **CROSS EXAMINATION**

15  BY MR. BENEDETTO

16  Q    Good afternoon, Officer Healy.

17  A    Good afternoon.

18  Q    You just told Mr. Seals that you remember Mr. Guerrero

19  tearing up paper and putting it into the toilet as you arrived

20  at his cell on October 10th, 2012, is that right?

21  A    Yes.

22  Q    And you just testified that you remember Mr. Perez weaving

23  back and forth in front of or blocking Mr. Guerrero, is that

24  right?

25  A    Yes.

1  Q    And you just testified, did you not, that you saw or

2  remember seeing Mr. Guerrero clearly, is that right?

3  A    Yes.

4  Q    But you don't remember whether it was three or four

5  officers, including yourself, who even did the search, is that

6  right?

7  A    I'm going off the Cell Search Receipt that three people

8  did the search.

9  Q    It's your testimony now that it was absolutely three

10 people who did the search?

11 A    Yes.  Otherwise, other people would have been included on

12 the Cell Search Receipt.

13         MR. BENEDETTO:  Your Honor, if I may direct the

14 Court's attention to a portion of Officer Healy's deposition,

15 Page 60, Lines 16 through 19.

16         MR. SEALS:  No objection, your Honor.

17         THE COURT:  Okay.

18 BY MR. BENEDETTO

19 Q    Officer Healy, you gave a deposition in this case?

20 A    Yes.

21 Q    And it was in January of this year?

22 A    Yes.

23 Q    I was there?

24 A    Yes.

25 Q    Ms. Nygaard was there?

1    A    Yes.

2    Q    We were in a conference room together; do you remember

3    that?

4    A    Yes, I do.

5    Q    And there was a court reporter there as well?

6    A    Yes, there was.

7    Q    And a videographer?

8    A    Yes.

9    Q    And you took an oath to tell the truth during that

10   deposition, is that right?

11   A    Yes, I did.

12   Q    And it's the same oath you took today, correct?

13   A    Yes.

14        MR. BENEDETTO:  Tim, if you will, play Lines 16

15   through 19 of Page 60.

16        (Videotape played in open court.)

17   BY MR. BENEDETTO

18   Q    And, Officer Healy, you don't remember what Mr. Perez's

19   cell itself looked like when you approached it, is that right?

20   A    I'm not quite understanding.  You mean, the contents of

21   what's in the cell?

22   Q    What the condition of the cell was.

23   A    No.

24   Q    And you don't recall where Mr. Perez was in the cell when

25   you first approached it, do you?

1    **A**    I don't recall that.

2    **Q**    And you don't remember where Mr. Guerrero was when you

3    first approached the cell either, do you?

4    **A**    Yes, I do.  He was in front of the toilet tearing up

5    kites.

6    **Q**    As you initially walked up, he was in front of the toilet;

7    is that your testimony?

8    **A**    Yes.

9            **MR. BENEDETTO:**  Your Honor, I would direct the

10   Court's attention to Page 62, Lines 21 to 22 of Officer Healy's

11   deposition.

12           **THE COURT:**  Okay.

13           **MR. SEALS:**  I would object, your Honor.  That's not

14   the full --

15           **THE COURT:**  You want to suggest for completeness

16   additional lines to be read?

17           **MR. SEALS:**  Yes.  Page 61, Lines 17 through 20.

18           **MR. BENEDETTO:**  61?

19           **MR. SEALS:**  Page 61, Lines 17 through 20.

20           **THE COURT:**  Both of those can be displayed.

21           **MR. BENEDETTO:**  Okay, or read.  I will read the

22   Page 61 and we'll play Page 62.

23           **THE COURT:**  Why don't you read both of them?

24           **MR. BENEDETTO:**  Okay.

25

1   BY MR. BENEDETTO

2   Q    I'm going to read from your deposition transcript.  This

3   is Page 61, Lines 17 through 22:

4           "QUESTION:  Okay.  Do you remember what you saw

5       when you first got to Mr. Perez's cell?

6           "ANSWER:  If you are speaking to the cellmate

7       ripping up the inmate manufactured note, yes.

8           "QUESTION:  So you remember seeing that?

9           "ANSWER:  Yes."

10      And the next is Page 62, Lines 21 to 22:

11          "QUESTION:  Do you remember where Mr. Guerrero

12      was?

13          "ANSWER:  Initially when we walked up, no."

14      And it's your testimony that you don't recall Mr. Perez --

15  strike that.

16      It's your testimony that you don't recall yourself giving

17  Mr. Perez any orders while he was weaving between the door and

18  Mr. Guerrero, is that right?

19  A    At this point, I don't recall that.

20  Q    And you don't remember whether you escorted Mr. Perez and

21  Mr. Guerrero out of the cell or if you stayed in the cell and

22  searched the cell, is that correct?

23  A    I didn't stay in the cell and search the cell.

24  Q    Do you remember whether you accompanied Mr. Perez and Mr.

25  Guerrero elsewhere?

PROCEEDINGS

1   A    As far as the escort to the rotunda?

2   Q    Yes.

3   A    Probably.

4   Q    As for the paper recovered from the toilet, you don't

5   recall whether it was you who recovered that paper or whether

6   it was one of your fellow officers, is that right?

7   A    I don't recall recovering that paperwork.

8   Q    And you don't know how long the search actually lasted, do

9   you?

10  A    I couldn't say.

11  Q    And you don't remember whether anyone, including yourself,

12  conducted a visual inspection of Mr. Perez's body, is that

13  right?

14  A    I don't remember.

15  Q    And you don't recall whether anyone took photographs of

16  Mr. Perez on October 10th, is that right?

17  A    I don't recall who exactly took the photographs, no.

18         MR. BENEDETTO:  That's all I have.

19         MR. SEALS:  No redirect, your Honor.

20         THE COURT:  No redirect?  Okay.

21     Thank you, Sergeant Healy.

22         THE WITNESS:  All right.

23     (Witness excused.)

24         THE COURT:  Okay.  This seems like a good time to

25  wrap up for the day.

PROCEEDINGS

1    Remember that we are not in trial tomorrow, so you have

2    the day off or the day to do whatever it is you do in your real

3    lives.  And be back here on Friday morning at -- we'll start at

4    8:30.

5    And, again, remember the admonitions that are probably

6    seared into your brain now to not have any communications with

7    anybody about what's going on in this trial, not to try to

8    learn anything about this trial or Pelican Bay or anything like

9    that.  Just sort of sequester yourself from any outside

10   information and -- because your job is to consider only the

11   evidence that you hear here in this courtroom.

12   And with that admonition, we will see you on Friday

13   morning.

14        (Jury exits courtroom at 2:06 p.m.)

15        **THE COURT:**  All right.  So the defense has two

16   witnesses left, is that right?

17        **MS. NYGAARD:**  I'm sorry?

18        **THE COURT:**  You have two witnesses left?

19        **MS. NYGAARD:**  Three.

20        **THE COURT:**  Okay.  So I'm forgetting somebody.

21        **MS. NYGAARD:**  Gates, Sergeant Gates, lieutenant

22   Anderson and Suzan Hubbard.

23        **THE COURT:**  I forgot about Lieutenant Anderson.

24        **MS. NYGAARD:**  Yes.

25        **THE COURT:**  So you have three witnesses.

```
 1        So, and then are you in a position to be able to say

 2   whether you will have any rebuttal witnesses at this point?

 3            MR. LEE:  We're not in a position to say yet.

 4            THE COURT:  Okay.  So you should -- you should plan

 5   on closing Friday.  I mean, I suppose there is a possibility it

 6   won't happen, but it seems likely that it will happen.  So plan

 7   on closing on Friday.

 8        And do you want to talk about jury instructions now?  Do

 9   you want to talk about them first thing Friday morning?  What's

10   your preference?

11            MS. NYGAARD:  We would like to talk now.  And I also

12   have another issue to bring up about closings.

13            THE COURT:  Sure.  Do you want to step to the podium

14   so that you could be heard by the court reporter?

15            MS. NYGAARD:  Yes.

16        So, first, on -- for closing, defendants believe that

17   plaintiff has definitely put at issue now Mr. Perez's sentence.

18   This is all within Exhibit 5, the document that they used

19   during trial.

20        It has Mr. Perez's sentence clearly listed on there.  It

21   also has Mr. Perez's and Mr. Guerrero's street gang affiliation

22   and the fact that they are EME associates all marked on there.

23   So we believe that it's appropriate for us to bring that up in

24   closing since they put this document into evidence.

25            THE COURT:  Well, what I'm seeing just from -- I'm
```

1 not sure I really scrutinized this document, but I see "gang

2 affiliation validated" and -- which is no secret.  I'm seeing

3 reference to having been validated.

4     Where was the reference to membership in a street gang

5 before incarceration?

6          **MS. NYGAARD:**  Right above.  Where it says "EME

7 associates," right above that.  "North Side Colton Member."

8 "North Side Colton Member."  Under both inmates.

9          **THE COURT:**  That is -- and this is -- whose writing

10 is this?

11          **MS. NYGAARD:**  That, I couldn't tell you.  I'm -- it's

12 looking like it might be the Short, D. Short, but --

13          **THE COURT:**  Okay.  So this is not an admission by

14 Mr. Perez that he was a North Side Colton member before he

15 became incarcerated?

16          **MS. NYGAARD:**  No.  But it's evidence that the CDCR

17 had documentation that these guys both were members.

18          **THE COURT:**  Okay.

19     Response.

20          **MR. BENEDETTO:**  I mean, we -- we didn't ask the

21 witness, obviously, anything about that.  We haven't gone into

22 that.  We sort of policed ourselves in terms of adhering to the

23 Court's order on the motion in limine.

24     And we have used this exhibit only for the purpose of --

25 of inquiring as to what the IGI's, what sort of scrutiny they

1   may have been paying to Mr. Perez before the cell search.

2             **THE COURT:**  Okay.  I don't think the presence of this

3   reference by an unknown CDCR staffer opens -- changes my motion

4   in limine ruling that reference to membership in a street gang

5   would -- should be excluded under Rule 403.

6         So you should not -- you may not make any mention of that

7   in your closing argument.

8             **MS. NYGAARD:**  All right.  How about his sentence?

9   "19 to life" is written on this form.  It's an official CDCR

10  document.

11            **THE COURT:**  Same thing.  Frankly, it might have been

12  different if the plaintiffs had put in this document and you

13  had used it to lay a foundation and establish that he had been

14  sentenced for 19 to life.  At that point I might feel

15  differently about it.

16        But there is no actual, sort of authenticated, you know,

17  evidence that he's serving a sentence of 19 to life.  So I

18  guess my -- the same ruling applies.

19            **MS. NYGAARD:**  Okay.

20            **THE COURT:**  And so don't be blowing that up on --

21            **MS. NYGAARD:**  I will not.

22            **THE COURT:**  Don't try and sneak it in during your

23  closing.

24        Anything else?

25            **MR. SEALS:**  Just the jury instructions, I believe.

PROCEEDINGS

```
 1              THE COURT:  Okay.

 2              MR. SEALS:  So for No. 20, defendants have no

 3   objections to instruction No. 20.

 4              THE COURT:  Okay.

 5              MR. BENEDETTO:  No objection from plaintiff.

 6              MR. SEALS:  No. 21.  Defendants would like a slight

 7   modification to No. 21.

 8              THE COURT:  Okay.

 9              MR. SEALS:  In the last sentence the second half it

10   says:

11         "Must not be influenced by any personal agreement

12      or disagreement you may have with the California

13      Department of Corrections policies regarding solitary

14      confinement."

15      We would request that the term "regarding solitary

16   confinement" be removed because this case isn't really about

17   solitary confinement.  I think it just sort of flags that it's

18   more general policies.

19      And we would also like to add in "Pelican Bay."  So:

20   "...you may have with the California Department of Corrections

21   policies or Pelican Bay policies," period.

22              THE COURT:  I wouldn't really be inclined to put "or

23   Pelican Bay policies."

24      But what's your reaction to this?  I haven't even heard

25   yet whether you object to this proposed instruction.
```

```
1         MR. BENEDETTO:  Well, we believe that there are no
2  difference between the two policies.  So we would want "CDCR
3  policies."
4      And -- I mean, we have no objection to the proposed
5  instruction as it's written.
6         THE COURT:  Okay.  So I would be inclined to -- I
7  mean, I don't think it's a big deal, but I would be inclined to
8  just delete "regarding solitary confinement."
9         MR. BENEDETTO:  That's okay.
10         MR. SEALS:  That's okay with defendants.
11         MS. NYGAARD:  Yes.
12         THE COURT:  Okay.  Any other aspects of the
13  instructions that caused concern for anybody?
14         MR. SEALS:  Not at this moment.
15         MR. BENEDETTO:  No, your Honor.
16         THE COURT:  Okay.  Good.  So we will prepare those as
17  the final and we'll get a -- we will refile a final -- final
18  jury instructions and final verdict form.  We will refile that
19  tomorrow or something like that, just with that change and
20  any -- we'll do a proofread and fix any typos or anything like
21  that.  That will be the only change.
22      If there is anything more substantive, I'll bring it to
23  your attention on Friday morning.
24      And other than that, we'll resume on Friday morning.  I
25  presume that we'll close on Friday morning -- or on Friday
```

 1  morning or afternoon.

 2       And what did I say?  How much time did I say I was going

 3  to give each of you?  I think it was 45 minutes.

 4            MS. NYGAARD:  For closing, I don't think you said

 5  yet.

 6            MR. BENEDETTO:  Yeah, we don't --

 7            THE COURT:  In my mind I said 45 minutes each.  So

 8  that's what we'll stick with, is 45 minutes each.

 9            MR. LEE:  Your Honor, does the Court instruct the

10  jury before or after close?

11            THE COURT:  Oh, I'll instruct the jury before

12  closings.  And I suppose I will read all of the instructions.

13  I mean, I may -- I may skip over anything that I read to them

14  before the start of trial, just to sort of -- in the interest

15  of efficiency.

16       We have some of them in writing that we gave them before

17  the start of trial, and they will be able to bring those back

18  into the jury room with them.

19       But I'll probably, just to save time, avoid rereading

20  those and go straight to the ones that they haven't heard yet.

21  But maybe I'll read some of them.  I don't know.  I'll see how

22  we feel on Friday.

23       Anything else?

24            MR. BENEDETTO:  No.

25            MS. NYGAARD:  No.

1            **THE COURT:**  All right.  Thank you.

2            **THE CLERK:**  Court is adjourned.

3       (Whereupon at 2:15 p.m. further proceedings were

4        were adjourned until Friday, November 20, 2015 at

5        8:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **PIMENTEL, GUILLERMO** | | |
| (RECALLED) | 387 | 3 |
| Direct Examination Resumed by Mr. Lee | 387 | 3 |
| Cross Examination by Mr. Seals | 397 | 3 |
| Redirect Examination by Mr. Lee | 421 | 3 |
| Recross Examination by Mr. Seals | 425 | 3 |
| | | |
| **BURRIS, SEAN** | | |
| (SWORN) | 427 | 3 |
| Direct Examination by Mr. Lee | 427 | 3 |
| Cross Examination by Mr. Seals | 441 | 3 |
| | | |
| **SUBIA, RICHARD** | | |
| (SWORN) | 456 | 3 |
| Direct Examination by Mr. Benedetto | 456 | 3 |
| Cross Examination by Mr. Seals | 472 | 3 |

- - -

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **BARNEBURG, DAVID** | | |
| (SWORN) | 477 | 3 |
| Direct Examination by Ms. Nygaard | 477 | 3 |
| Cross Examination by Mr. Benedetto | 512 | 3 |
| Redirect Examination by Ms. Nygaard | 526 | 3 |
| | | |
| **GONGORA, DANIEL** | | |
| (SWORN) | 529 | 3 |
| Direct Examination by Ms. Nygaard | 529 | 3 |
| Cross Examination by Ms. Moran | 549 | 3 |
| Redirect Examination by Ms. Nygaard | 549 | 3 |
| Recross Examination by Ms. Moran | 558 | 3 |
| Recross Examination Resumed by Ms. Moran | 558 | 3 |
| | | |
| **HEALY, ERIC** | | |
| (SWORN) | 559 | 3 |
| Direct Examination by Mr. Seals | 560 | 3 |
| Cross Examination by Mr. Benedetto | 572 | 3 |

- - -

## <u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>VOL.</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|---|
| 5 | | | 379 | 3 |
| 77 | | | 379 | 3 |

– – –

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Wednesday, November 18, 2015