Volume 4

Pages 589 – 757

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

JESSE PEREZ,                          )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 ) No. C 13-5359 VC
                                      )
A. GATES, et al,                      )
                                      )  San Francisco, California
            Defendants.               )  Friday
                                      )  November 20, 2015
_____)  8:00 a.m.

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          WILMER CUTLER PICKERING HALE DORR, LLP
                            350 South Grand Avenue
                            Suite 2100
                            Los Angeles, California 90071
                     BY:    **RANDALL ROSS LEE, ESQ.**
                            **MATTHEW DONALD BENEDETTO, ESQ.**
                            **KATHLEEN BRIDGET MORAN, ESQ.**


**For Defendant:**          STATE OF CALIFORNIA
                            Office of the Attorney General
                            455 Golden Gate Avenue
                            Suite 11000
                            San Francisco, California 94102
                     BY:    **JENNIFER J. NYGAARD, ESQ.**
                            **ELLIOTT THOMAS SEALS, ESQ.**



*Reported By:*  Debra L. Pas, CSR 11916, CRR, RMR
               Belle Ball, CSR 8785, CRR, RMR
               *Official Reporters - US District Court*

```
 1              P R O C E E D I N G S

 2   NOVEMBER 20, 2015                              8:32 A.M.

 3             THE CLERK:  Calling 13-CV-5359, Perez v. Gates,

 4   et al.  Counsel, please state your appearances for the record.

 5             MR. LEE:  Good morning, Your Honor.  Randall Lee,

 6   Matthew Benedetto and Katie Moran for Mr. Perez, who is

 7   present.

 8             THE COURT:  Good morning.

 9             MS. NYGAARD:  Good morning, Your Honor.  Jennifer

10   Nygaard from the California Attorney General's office, also

11   with Elliott Seals from the Attorney General's office,

12   representing the five defendants who are here in Court.

13             THE COURT:  Good morning.  All right, should we bring

14   in the jury?

15        (The following proceedings were held in the presence

16         of the Jury)

17             THE CLERK:  Please be seated.

18             THE COURT:  All right.  Would the defense like to

19   call their next witness.

20             MS. NYGAARD:  Yes, defendants will call Sergeant

21   Anthony Gates.

22                      ANTHONY GATES,

23   called as a witness for the Defendant herein, having been first

24   duly sworn, was examined and testified as follows:

25             THE CLERK:  For the record, please state your first
```

1    and last name and spell both.

2             **THE WITNESS:**  Anthony Gates, A-N-T-H-O-N-Y,

3    G-A-T-E-S.

4             **THE CLERK:**  Thank you.

5             **THE WITNESS:**  Everybody's looking at me.

6                        **<u>DIRECT EXAMINATION</u>**

7    **BY MS. NYGAARD:**

8    **Q**    Good morning, Sergeant Gates.

9    **A**    Good morning.

10   **Q**    Where do you work?

11   **A**    Pelican Bay State Prison.

12   **Q**    And how long have you worked at Pelican Bay?

13   **A**    Nine-plus years, just under ten years.

14   **Q**    And, what jobs did you do before working at Pelican Bay?

15   **A**    I was a truck driver, I was a lineman, telecommunications,

16   built phone company head-ins.

17   **Q**    What positions have you held at Pelican Bay?

18   **A**    Correctional officer and correctional sergeant.

19   **Q**    And are you currently a sergeant?

20   **A**    Yes.

21   **Q**    And was that a promotion?

22   **A**    Yes.

23   **Q**    On October 10, 2012, what position did you hold?

24   **A**    Correctional officer.

25   **Q**    And were you assigned to any particular assignment?

1  **A**    I was assigned to the Institutional Gang Investigations

2  Unit.

3  **Q**    And were you working as an Assistant Institutional Gang

4  Investigator within that unit?

5  **A**    Yes.

6  **Q**    And, how did you come about to be working as an Assistant

7  IGI?

8  **A**    One of the supervisors in there at the time, I don't

9  remember which one it was, asked me to apply.

10  **Q**    Okay.  And, what were your duties as an Assistant IGI?

11  **A**    Conducting investigations.  Not a whole lot on the

12  validation side, but normal investigations, crimes, crime scene

13  evidence.  Liaison with outside law enforcement.  Gather

14  intelligence.  Cell searches, read mail.  Watch videos.  Listen

15  to the telephone calls.

16  **Q**    And did you receive any specialized training when you

17  became an Assistant IGI?

18  **A**    On the job, yeah.

19  **Q**    And have you ever received any training on how to conduct

20  a cell search?

21  **A**    Yes.

22  **Q**    And when was that?

23  **A**    I receive a real basic training during the basic

24  correctional academy.  And on-the-job training when you get to

25  Pelican Bay with your co-workers.  And also when you come into

 1 the unit, the IGI unit, they also show you how.

 2 **Q**    Okay.  And how many cell searches would you say you have

 3 conducted throughout your career?

 4 **A**    A lot.  A thousand.  I -- I don't know.

 5 **Q**    Okay.  And, were those searches conducted as both a floor

 6 correctional officer and as an Assistant IGI?

 7 **A**    Yes.

 8 **Q**    And is there any difference in the way a search is

 9 conducted when it's being done as part of a gang validation

10 proceeding within IGI?

11 **A**    Yes.

12 **Q**    And how is it different than a regular floor officer

13 search?

14 **A**    When you're a regular floor officer, you're required to do

15 three cell searches a day in between the millions of other

16 duties that you have.  So you're walking in, you're walking

17 out, so that you can sign that you did your job.

18      For us, we're actually looking for things, so we do it

19 much more thoroughly.

20 **Q**    And would you conduct a search any differently if it was

21 being done for an active/inactive review versus a new gang

22 validation?

23 **A**    It's the same search.  We are looking for the same items.

24 **Q**    I would like to direct your attention to October 10, 2012.

25 Did you search Mr. Perez's cell on that date?

1   **A**     Yes, I did.

2   **Q**     And how did you come about searching his cell?

3   **A**     I believe I was sitting in my office, doing my job.

4   Somebody knocked on my door and said "Hey, I need three guys to

5   go with me for a cell search."

6   **Q**     And did they tell you the reason for the cell search?

7   **A**     I don't believe they did.

8   **Q**     Did you have any idea why you might be going to search his

9   cell?

10  **A**     No.  It was a common occurrence.

11  **Q**     Did they tell you anything about a legal case that

12  Mr. Perez had pending?

13  **A**     No.

14  **Q**     Did you know that Mr. Perez had filed a lawsuit in 2005?

15  **A**     I do, now.  But I didn't at the time.

16  **Q**     Okay.  Have you known inmates to file lawsuits against

17  prison staff before?

18  **A**     Every day.

19  **Q**     Have you known inmates to settle lawsuits?

20  **A**     Yes.

21  **Q**     Does it matter to you whether an inmate files a lawsuit?

22  **A**     As long as it doesn't include me, it does not matter to

23  me.

24  **Q**     Does it matter to you whether inmates settle lawsuits?

25  **A**     Again, as long as I'm not involved in a lawsuit, I have no

 1  interest.

 2  **Q**    And you were not involved in any previous lawsuit brought

 3  by Mr. Perez?

 4  **A**    No.

 5  **Q**    Have you ever retaliated against an inmate for filing a

 6  lawsuit or settling a case?

 7  **A**    No.

 8  **Q**    Did you know Mr. Perez before you were asked to search his

 9  cell on October 10, 2012?

10  **A**    No.

11  **Q**    Do you know how soon after you were asked that you

12  actually went down to Mr. Perez's cell?

13  **A**    I can't give an exact time, but I would imagine within

14  five minutes of going, "Oh not again, another cell search,

15  blah, blah, blah," we probably walked down there.

16  **Q**    Okay, and do you remember which other officers went with

17  you?

18  **A**    Yeah.  Sergeant Eric Healy -- at the time, Officer Eric

19  Healy, Correctional Counselor Gongora, and Correctional Officer

20  Pimentel.

21  **Q**    Could you please describe what happened when you

22  approached Mr. Perez's cell?

23  **A**    I mean, it was three and a half years ago.  I remember

24  Guerrero tearing up notes.  Surprisingly, I didn't notice him

25  right away.  It wasn't until another officer said "Hey, stop

1  that" that I kind of turned my attention to him.  I witnessed

2  him tearing up the notes.  I gave him multiple direct orders to

3  stop.  Along with other officers giving him multiple direct

4  orders to stop.

5       I believe I directed Mr. Perez to go to the back of the

6  cell while his inmate -- his cellmate destroyed the prop- --

7  the evidence.  Which actually, I believe at first he did follow

8  my instruction and walked back towards the back of the cell,

9  and then he turned back around and came back towards the door

10  front.  That happened repeatedly.

11       We would tell him to go to the back of the cell, and he

12  would come back to the door front to block -- in an effort to

13  block not only our view, but also our ability to use chemical

14  agents on his cellmate.

15  **Q**    I would like to show you what's previously been admitted

16  as Exhibit 22.

17       (Document displayed)

18  **Q**    Does this look like a fair and accurate representation of

19  a SHU cell?

20  **A**    Yes, it does.

21  **Q**    And so, drawing on the screen, could you please show me

22  first where Mr. Guerrero was when he was tearing up notes?

23  **A**    Mr. Guerrero was on both knees, leaning over --

24  (Indicating), oh I don't know if I did something wrong there.

25  **Q**    I think you can tap it again.  Okay.

1  **A**     Leaning over the toilet.  His knees were on the ground

2  around that general area.  I'm actually hitting a little closer

3  to the toilet than it's showing up, but it's showing up there

4  (Indicating).  Around that area of the toilet.  He was leaning

5  the upper portion of his body over the toilet.

6  **Q**     And, where was Mr. Perez?  Could you please show us the

7  path that Mr. Perez was taking?

8  **A**     Mr. Perez continually walked back and forth from here to

9  about midway in the cell (Indicating) and back, repeatedly,

10  throughout the multiple-minute process while his cellmate

11  destroyed evidence in front of us.

12  **Q**     And now, where were you standing during this?

13  **A**     I believe I started out over here (Indicating) right next

14  to the cuff port.  But I did eventually at some point, to get a

15  better view, move over into here (Indicating).

16  **Q**     Okay.  And is the cell door perforated?

17  **A**     The cell door is perforated.

18  **Q**     And can you see through the holes into the cell?

19  **A**     Yes.

20  **Q**     Is your view affected by whether you are standing on an

21  angle or straight on?

22  **A**     I think it is, yes.  If you're on an angle toward the door

23  it doesn't completely take your view away but it does obscure

24  it.  Just like watching one of the old big screens, it gets a

25  little dark when you're over to the side.  You can still see

 1 the picture, but it gets a little worse.

 2 **Q**   Is that the reason why you moved over from the cuff port a

 3 little bit closer to the front of the toilet?

 4 **A**   It is.

 5 **Q**   So were you able to see Mr. Guerrero through the

 6 perforations?

 7 **A**   Yes, I was.

 8 **Q**   And were you able to see Mr. Perez through the

 9 perforations?

10 **A**   Yes, I was.  Clearly.

11 **Q**   Were any direct orders given to Mr. Perez?

12 **A**   Multiple direct orders by me and some of the fellow

13 officers.  I can't say who exactly said anything; you're kind

14 of in the moment, you're kind of in the incident at the time.

15 But I heard multiple people giving orders.

16         **MS. NYGAARD:**  You can take this down.

17    (Document taken off display)

18 **BY MS. NYGAARD:**

19 **Q**   And what orders were given to Mr. Perez?

20 **A**   "Get back to the -- back of the cell, take it to the back

21 of the cell, move away from your cellmate."  I believe "Shut

22 up," I believe I gave the order to shut up, because Perez was

23 instructing his cellmate to tear it up smaller and push it

24 further in to the toilet.  I believe I told him to shut up.

25 **Q**   Now, did Mr. Perez comply with any of those orders?

1  **A**     Eventually, yes.  Yes.  But not when I gave the orders.

2  It's not common for us to have to give orders more than once to

3  an inmate who is complying.

4       But they did both eventually comply, and do what we told

5  them to do, and come cuff up, yes, after multiple orders.

6  **Q**     So after they were in handcuffs, both of them, Mr. Perez

7  and Guerrero, then what happened?

8  **A**     We escorted them from the cell to a holding cell out in

9  the rotunda.

10  **Q**     Did you search them before you took them to the holding

11  cell?

12  **A**     I don't remember.  It would be normal procedure to search

13  the inmates, a stripped body search of the inmates before we

14  take them from the cell.  But because of the incident where

15  they were destroying evidence, we may have just wanted to get

16  them out of the cell as quickly as possible.

17       We might have skipped it.  But we may have done it as

18  well.

19  **Q**     Okay.  And why would it be a normal procedure to have an

20  inmate strip out of their clothing before being removed from

21  the cell?

22  **A**     I -- I don't know why that rule is made.  That is policy

23  at Pelican Bay -- not for IGI, for Pelican Bay.  Any time the

24  inmate is going to leave their cell when there's contact with

25  other people, he will be strip-searched.  Every time.

1  Q    And is he also, an inmate in the SHU, also required to be

2  placed in handcuffs before being moved out to the rotunda?

3  A    That is correct.  Any time they are coming out to the cell

4  and there's anybody else going to be present -- in other words,

5  if they're coming out for the shower and the pod door is going

6  to be closed and they're the only inmate out, the control

7  officer can kick them out and they can walk freely and visit

8  with other inmates.  Normally, every day they would get that

9  opportunities.

10      But if they're coming out and an officer is going to

11  escort them somewhere, or if they're going to the medical, the

12  nurse, they will come out in handcuffs after being

13  strip-searched.

14  Q    So the strip search is a standard procedure.

15  A    Yes.

16  Q    And the placing in handcuffs is a standard procedure also?

17  A    Absolutely standard.  Required.

18  Q    Now, if an inmate is compliant to your order to cuff up,

19  how many times would you give him that order?

20  A    I'm sorry; if an inmate is compliant?

21  Q    Correct.

22  A    Once.

23  Q    Okay.  So after Mr. Perez and Guerrero were removed from

24  the cell, did you search the cell?

25  A    I would imagine I did, yeah.

1   Q    So you can't specifically remember doing --

2   A    No, no; three and a half years.  No.  This was one of

3   dozens of cell searches where inmates destroyed property right

4   in front of me.  It was one in thousands of cell searches I

5   have done.

6        I don't specifically remember his cell and his property.

7   I don't.  I didn't know I was going to need to, three and a

8   half years ago, unfortunately.

9   Q    So now we've seen, previously admitted into evidence

10  during this trial, a cell search receipt --

11  A    Yes.

12  Q    -- which is -- which is Exhibit 49.  And we'll get that

13  called up here.

14       (Document displayed)

15  Q    So, down in the bottom right-hand corner, there is a

16  "SEARCHED BY" box.  And let's get that pulled up.

17  A    I can see it.

18  Q    Is that your signature in the box?

19  A    Yes, it is.

20  Q    And, so, does that indicate to you that you participated

21  in a search?

22  A    Yes.

23  Q    And how so?

24  A    I would imagine I helped search the cell.  It's hard to

25  say.  We don't all four go in.

 1       There's just no way we can accomplish any work with four

 2  of us if there, and me and Dan being two of the four, there's

 3  -- it's just not reasonable for all four of us to be in there.

 4  So all four of us were there.

 5       Did all four of us go in the cell?  I can't tell you.  I

 6  probably went in the cell, and I probably searched his cell.

 7  **Q**    So is it standard procedure to sign your name to a cell

 8  search receipt if you participated in the search?

 9  **A**    Yes.

10  **Q**    Okay.  Now.  You said you don't specifically recall

11  actually doing the search.  So could you please describe what

12  your standard procedure is when you do conduct a cell search as

13  part of a gang validation package?

14  **A**    Yes.  My standard procedure is I'll enter the cell.  The

15  first thing I'll do is I'll take everything that we're going to

16  remove from the cell, because we're going take all of the

17  inmates' personal paperwork, books, magazines.  Anything that

18  he can hide things in that he's not going to need immediately,

19  we take with us.

20       Everything else such as their linen, clothing, canteen,

21  hygiene, stuff that they are going to need possibly before we

22  get their property back, we leave in the cell, and we search in

23  the cell.  The way I do it is I start on one side, and I work

24  my way to the other side.  That way I know everything on my

25  left or right side is done, so I don't end up searching things

1  that other officers have already searched.

2  **Q**    And so, do you search through every item of clothing?

3  **A**    Absolutely.

4  **Q**    And, how do you do that?

5  **A**    I unfold every piece of clothing, and I search the seams

6  of every piece of clothing.  That's generally the common area.

7  Seams of pants, or in his case, jumpsuits.  Pocket areas.  The

8  string portions that they tie, they make little pockets in

9  that.  Search every piece.  Unfold every sock.

10 **Q**    Now, you said -- you used the term "That's a common area"

11 when describing seams.  What do you mean by that?

12 **A**    Common area for inmates to conceal contraband.

13 **Q**    And what type of contraband can be concealed in a place

14 like that?

15 **A**    You find notes, you find needles, you find razors.  Drugs.

16 **Q**    And do you also search through their toiletry items, such

17 as shampoo?

18 **A**    Absolutely.

19 **Q**    And how do you search that?

20 **A**    It's pretty common to pour from one cup to another.  I

21 generally don't.  I can generally see through the shampoo.

22 I'll hit it with my light at the bottom of the cup and look in

23 it, but I don't know if that is just a lazy way that I do it or

24 not, but that's what I generally do.  But a lot of people do

25 pour it from one cup to another, so they can see through it

1    better.

2         Coffee, they also keep in the same kind of cups.  Coffee I

3    do pour from one cup to another, just because it's not as

4    messy.

5    **Q**    And do you sometimes spill toiletries or coffee?

6    **A**    I can't say that ever -- I can ever remember spilling

7    toiletry, but I spilled coffee.

8    **Q**    And what is your normal practice if you spill coffee?

9    **A**    In the one case that I can remember spilling coffee, I

10   cleaned it up, and I told the inmate when I escorted him back,

11   "Hey, I spilled -- it was a very small amount, I spilled some

12   coffee.  It was an accident.  I apologize."

13        I've never had anyone get upset about it.  I mean, it

14   happens.  It wasn't intentional.

15   **Q**    Do you also search through sheets?

16   **A**    Yes.

17   **Q**    Do you search through mattresses?

18   **A**    Yes.

19   **Q**    How do you check a mattress?

20   **A**    All I'm really looking for in a mattress is I look at the

21   seams, and I look for rips in the mattress.  If there are rips

22   in the mattress, we can remove the mattress from the cell and

23   take it to a fluoroscope machine, which is an x-ray machine

24   like you would pass your bag through when you come here.

25        And it can check it for contraband.

1  Q    Is it a violation of prison policy to -- for an inmate to

2  cut open a mattress or put a hole in it?

3  A    Yes.

4  Q    Okay.  Do you collect paperwork from the cell?

5  A    Absolutely.  All of it.  Even what's in the trash.  All

6  paper in the cell gets removed.

7  Q    And do you take time to read through the paperwork before

8  you remove it from the cell?

9  A    No.  That's the purpose of removing it from the cell.

10 Q    And so, why don't you take the time to read through it?

11 A    You know, I mean.  It's not comfortable being in a cell.

12 It's not comfortable.  It's generally fairly warm in there when

13 you're wearing a bulletproof vest and all your gear.  It's hot

14 in there.

15      And to search the average inmate's paperwork could take

16 anywhere from three to 23 hours.  The inmate doesn't want to

17 sit in the holding cell where he can't sit down for 23 hours,

18 and I don't want to sit in his cell for 23 hours.  And I don't

19 want to miss anything.

20 Q    Okay.  And on that cell search receipt that we had just

21 been looking at previously, we've heard other people testify

22 throughout this trial that the form shows that all paperwork

23 was taken.  Each paper was not itemized on that receipt.

24      Would that be required?  At the time you are removing it

25 from the cell, would you be required to itemize every piece of

1  paper?

2  **A**    No.

3  **Q**    Okay.

4  **A**    That would not be required.  And it wouldn't be feasibly

5  possible to list every piece of paper that's in the cell.

6  **Q**    Did you trash Mr. Perez's cell?

7  **A**    No.

8  **Q**    How can you be certain?

9  **A**    It's so routine, the cell searches are so routine.  One is

10  never different from the other, unless the inmates are causing

11  an incident.  Then there's something memorable about it.

12      You go in, you start on the left, you work your way to the

13  right.  Every one's the same one.

14  **Q**    And during this search, did you at any point say something

15  to the effect "These knuckleheads should file lawsuits more

16  often, makes our job more rewarding"?

17  **A**    No.  And for the record, I don't speak like that.

18  **Q**    What do you mean?

19  **A**    Oh, God, I don't know what to say.  I'm not Ward Cleaver.

20  I don't talk like that.  It's just not the way something would

21  come out of my mouth.

22  **Q**    So, you wouldn't call people "knuckleheads"?

23  **A**    No.

24  **Q**    Okay.  Did you hear anybody else, any of the other

25  officers make that "knucklehead" statement?

1   A    No.

2   Q    Is that a type of statement you would have remembered

3   hearing somebody make?

4   A    I would have been shocked.

5   Q    And why?

6   A    We don't operate like that.  That's why we have the

7   respect that we do, is because we don't operate like that.

8   Q    And during the search did you ask Mr. Guerrero,

9   Mr. Perez's cellmate, whether he was into filing lawsuits?

10  A    No.

11  Q    Did you hear anybody else ask Mr. Guerrero that?

12  A    No.

13  Q    Is that the type of statement you would remember hearing

14  somebody make?

15  A    I believe so.

16  Q    And why is that?

17  A    Again, I would have been ashamed of that officer.  And I

18  believe I would have remembered it.  And we would've probably

19  had words when we got back to the office.

20  Q    And did you say to Mr. Perez, "You might have been able to

21  collect from us before, but get comfortable because we're going

22  to make sure you stay in the SHU where you belong"?

23  A    No, I didn't.  And again, I don't talk like that.

24  Q    Did it matter to you whether Mr. Perez continued to stay

25  housed in the SHU?

1  **A**    No, and it still doesn't.  I don't even know where he's

2  housed now.  No idea.

3  **Q**    Do you have a vested interest in where an inmate is

4  housed?

5  **A**    No.

6  **Q**    So after the property was removed from Mr. Perez's cell,

7  did you know what you did with the property?

8  **A**    Off of memory, I -- I don't know, but I could probably

9  take a pretty solid guess.

10  **Q**    So what would your standard procedure be?

11  **A**    Standard procedure is we are going to take it back to

12  either our office, or there's actually a boardroom across from

13  our office that has big long tables in it and a lot more room,

14  that nobody uses.

15       Generally we take it back to one of our offices or that

16  boardroom, and everybody will sit down and start going through

17  it.

18  **Q**    And do you recall whether you reviewed Mr. Perez's papers?

19  **A**    I don't recall, but I would have to guess that on this

20  instance, I did not.

21  **Q**    And how are you guessing you didn't in this instance?

22  **A**    Because I wrote the RVR.  I'm fairly lazy when it comes to

23  cell searches.  If I can get out of it, I will.  I don't much

24  care for it.

25       So if there's a report to write such as an RVR for

1  destroying property right in front of me, I will generally be

2  somebody who volunteers to sit down and do the paperwork, which

3  most other people don't like the paperwork side of.  I don't

4  really like the searching side of it, so I generally volunteer

5  to do the RVRs.  Or whatever paperwork we are going to have to

6  do off a search if something happened, I generally volunteer.

7  I don't mind writing the report.

8           **THE COURT:**  Sergeant Gates, you might try to slow

9  down a little bit so the court reporter --

10          **THE WITNESS:**  Sorry.

11          **THE COURT:**  -- can --

12          **THE WITNESS:**  I apologize.

13  **BY MS. NYGAARD:**

14  **Q**   So we have also seen Exhibit 50 during this trial which is

15  the property receipt that Mr. Perez was given the next day.

16  And your signature's not on that.

17       So is that a good indication to you that you did not

18  search through his paperwork?

19  **A**   That also tells me that chances are I did not search

20  through his paperwork.  Sorry.

21  **Q**   Did you have any further interaction with Mr. Perez after

22  the cell search?

23  **A**   I don't believe I have ever seen him again until he walked

24  into the courtroom.  To my knowledge.

25  **Q**   And did you hear Mr. Perez complain about the condition of

```
 1  his cell when he returned to --

 2  A    No.

 3  Q    Now I would like to direct your attention to the RVR that

 4  you mentioned that you had written up for Mr. Perez.

 5  A    It was a good RVR.

 6  Q    So did you write Mr. Perez an RVR?

 7  A    I did.

 8  Q    Did you write Mr. Guerrero an RVR?

 9  A    It's the same RVR.  You just put both inmates' name on it.

10  But, yes.

11  Q    And, do you know when you wrote it -- wrote them?

12  A    The same day.  That's why I didn't have to search the

13  property.

14  Q    Did you discuss writing Mr. Perez a Rules Violation Report

15  with anybody?

16  A    If I did, it would have been something to the effect of "I

17  have the rule -- I got the RVR."  So that I don't have to

18  search the property.

19  Q    Okay.  And why did you write Mr. Perez an RVR?

20  A    Because he broke the rules right in front of me.

21  Q    And what rules did he break?

22  A    He -- he hindered my ability to do my job in giving his

23  cellmate instruction, and honestly, my ability to use chemical

24  agents on his cellmate for destroying possibly dangerous

25  contraband that may end up getting somebody killed, and
```

1  stopping him from his action.  Perez hindered my ability to do

2  that.

3  **Q**    So, how would papers being shoved into a toilet possibly

4  lead to somebody being killed?

5  **A**    That's our -- that is our purpose.  That's our purpose for

6  getting those.  Those inmate-generated notes, we consider -- we

7  call them "kites" -- that's how hits and assaults are passed

8  from one inmate to another.

9        If we can stop that from happening, if we can get those

10 kites, we can recognize a threat, and we can go to that inmate

11 that's on there and give him the opportunity to lock up on his

12 own, for his own protection.

13        **MS. NYGAARD:**  So if we could call back up that cell

14 search receipt, Exhibit No. 49, please.

15      (Document displayed)

16        **MS. NYGAARD:**  And there is a box on here for

17 "DISCIPLINARY DOCUMENTATION".  Pull that up.

18      (Document displayed)

19 **BY MS. NYGAARD:**

20 **Q**    There's nothing checked or written in this box.  Correct?

21 **A**    That's correct.

22 **Q**    So is the CDC 115 the same thing as a Rules Violation

23 Report?

24 **A**    That's what it's referring to, yes.

25 **Q**    So why didn't you check that box on this property receipt?

1   **A**     There's multiple reasons I did not check that box on that

2   property receipt.

3       First, I didn't fill out this property receipt.  I merely

4   signed it.  Second of all, if you see next to the box it says

5   "FOR."  I didn't know everything I was going to write him up

6   for at the time.

7       Let me explain that to you a little bit.  So far we have

8   got him for delaying a peace officer for his actions while his

9   cellmate destroyed property.  You're pretty sure that if

10  they're willing to get chemical agents, which they were

11  expecting and didn't get, if they were willing to take the

12  chemical agents, it's something very important on those --

13  those notes.  We know it's going to be gang related.

14      But I can't say that at the time of filling this out,

15  because we have to take them back, dry them, piece them

16  together, read the contents.  Also --

17          **MR. LEE:**  Your Honor, I object to this whole response

18  as totally non-responsive and speculative.

19          **THE COURT:**  Overruled.

20          **THE WITNESS:**  Also, I believe they had quite a bit of

21  property.  We had quite a bit of searching to do.  There might

22  have been ten other things in his property that he was going to

23  get written up for.

24      We don't write them 12 RVRs; that's considered stacking.

25  We write them one RVR that would include everything wrong in

 1   that incident.  I can't tell you what I'm going to write him up

 2   for at that time because we might have had 12 hours left of

 3   searching his property before I knew what we were searching him

 4   for.

 5        Additionally, at the time, it says "OFFICER."  That's for

 6   the officer that is going to write him up.  Probably didn't

 7   know which one of us was going to write him up at the time; we

 8   just knew that one of us were.

 9             MS. NYGAARD:  Okay, thank you.  We can remove the

10   document.

11        (Document taken off display)

12   BY MS. NYGAARD:

13   Q   So please describe the process of what happened after you

14   decided to write the RVR.

15   A   I -- I get to go to my nice comfortable chair at my desk

16   and write, while they sit in uncomfortable chairs and search

17   the property.

18             THE COURT:  Sergeant Gates, sorry to interrupt, but

19   I'll remind again you to try to slow down a little bit.  I know

20   the --

21             THE WITNESS:  Sorry.  I'm nervous.

22             THE COURT:  Very common, very common.

23   BY MS. NYGAARD:

24   Q   So you go back to your computer.  And so then what happens

25   when you are at your computer?

**A**    I write the RVR.  I write my document.  I send it to a
supervisor who will read it and decide whether it meets
criteria.  If it's good, he will tell me go ahead and print it.

      I'll print it out.  I'll sign it.  I'll take it to the
disciplinary SNE's office.  Drop it in the in-box.  That's it.

**Q**    And then, do you know what the disciplinary office does
with the Rules Violation Report when you drop it off?

**A**    The disciplinary officer will type it up on a different
type of paper, like triplicate type paper.

      It will then be sent to a correctional counselor, who
will -- actually, I think it's a CC2 -- who will read the
document, make sure that the criteria contained in the body of
the report meets requirements for the heading.  And then he'll
classify it.  So he'll decide whether it's a serious RVR or an
administrative RVR.  And he'll check the box and sign.

      Then it will go back to the disciplinary SNE who'll take
it to the inmate.  Has 15 days, I believe, to take it to the
inmate, and issue it to the inmate.

**Q**    Okay.  For clarification, you mentioned a CC2.  What is
that?

**A**    A Correctional Counselor 2.  Like a correctional --
correctional counselor's supervisor.

**Q**    So there's multiple layers of review before the RVR is
finalized?

**A**    Yes.

1  Q    And I would like to have you take a look at what's

2  previously been admitted as Trial Exhibit No. 2.

3       (Document displayed)

4  Q    Is this the Rules Violation Report that you wrote?

5  A    I -- I -- yes.

6  Q    And it says "REPORTING EMPLOYEE."  It has your name there,

7  "A. Gates, Correctional Officer"?

8  A    Yes.

9  Q    And then there is a date next to it, "10-14-12"?

10  A    Yes.

11  Q    What does that 10-14 date indicate?

12  A    10-14 is the date that I signed the disciplinary SNE's

13  final copy.

14  Q    So then after you signed it on 10-14, did you play any

15  further role in getting it issued to Mr. Perez?

16  A    I'm sorry?

17  Q    Let me rephrase that.  After you signed that on 10-14, was

18  that the end of your involvement with the Rules Violation

19  Report?

20  A    Yes.  Yes.

21  Q    Okay.  Now, you previously mentioned there's a box on here

22  for "SERIOUS" or "ADMINISTRATIVE."  And you previously

23  mentioned that somebody else makes that determination of how

24  that should be classified.  Correct?

25  A    Yes.

1  Q    So you didn't mark "SERIOUS" on this form?

2  A    No.  Somebody higher rank decides that.

3  Q    And is that standard procedure for somebody else, rather

4  than the reporting officer, to decide how it's classified?

5  A    Yeah.  CC2, I want to believe that's lateral to what --

6  like almost a captain or something.  Yeah, that's somebody much

7  higher than me, decides that.

8  Q    Okay.  Now I would like to direct your attention to the

9  second page of your Rules Violation Report.

10      (Document displayed)

11  Q    And there's a sentence in here that I'm going to ask

12  Jocelyn to bring up, starting with "Hearing this..."

13      (Document displayed)

14  Q    So if you could start where it's underlined, the word

15  "Hearing," could you please start reading there?

16  A    (As read)

17         "Hearing this, I turned my attention to Inmate

18      Guerrero who was crouched down in front of the toilet

19      with his back to the cell front in an attempt to hide

20      his actions."

21  Q    And can you please read the next sentence?

22  A    (As read)

23         "I saw Inmate Guerrero tearing small pieces of

24      paper and trying to force the paper down the toilet.

25      As Officer Pimentel had already shut the water supply

 1          to Cell 113 off, Inmate..."

 2   **Q**    And there's a little bit more to that, but we can stop

 3   right there.

 4          You described Guerrero as being crouched down in front of

 5   the toilet with his back to the cell front.

 6   **A**    Yes.

 7   **Q**    Now, what do you mean by that?

 8   **A**    Hindsight, that was not a very good description.  His back

 9   was towards the cuff port, which is on the cell front, but

10   unfortunately the term "cell front" is a much broader term.

11          His back was towards the door front, towards the cuff

12   port.

13   **Q**    Okay.  Now if we could go back to the first page of this

14   Rules Violation Report.  There is a box near the top that says

15   "SPECIFIC ACT."

16          Could you please read what you wrote in there?

17   **A**    "WILLFULLY RESISTING, OBSTRUCTING A PEACE OFFICER."

18   **Q**    And why did you put that as a specific act?

19   **A**    Because that's what he did.

20   **Q**    And how did he willfully resist or obstruct a peace

21   officer, Mr. Perez?

22   **A**    By not following my order.  Mr. Perez willfully obstructed

23   my ability to use force against his cellmate.

24          He also instigated his cellmate to continue shoving the

25   paper further down: "Make that smaller, that's not torn up

 1    enough, make it smaller, push it further."

 2    Q    Now I would like to direct your attention to what has been

 3    previously admitted as Trial Exhibit No. 4.

 4         (Document displayed)

 5    Q    And would like to go specifically to the page that is

 6    marked DEF2263.

 7         (Document displayed)

 8    Q    Now, this is what has been previously shown throughout the

 9    trial and referred to as the STG policy or pilot program.  I

10    would like to direct your attention towards the bottom of this

11    page.

12         (Document displayed)

13    Q    This is referencing the STG disciplinary matrix that we

14    have also heard about in this trial.  Could you please read the

15    -- these two sentences?

16    A    (As read)

17              "Section 600.1.  STG Disciplinary Matrix.

18              "The following behaviors and activities qualify

19         as STG behavior, when a nexus has been established

20         between the behavior and an identified STG.  The

21         nexus shall be clearly articulated in the specific

22         act, as well as clearly described within the

23         narrative of the associated RVR and findings of the

24         senior hearing officer/hearing officer (SHO/HO)."

25    Q    Okay, thank you.  Now I would like to go back to Exhibit

```
 1   2.

 2         (Document displayed)

 3   Q    Let's take a look at the "SPECIFIC ACTS" box.  Is a gang

 4   nexus clearly articulated in that box?

 5   A    No.

 6   Q    Okay.  Thank you.  Did you also write an RVR for

 7   Mr. Guerrero?

 8   A    It's the same RVR; yes.

 9   Q    Okay.  Did you attend the hearing on Mr. Perez's Rules

10   Violation Report?

11   A    No.

12   Q    And why not?

13   A    I -- the officer only gets to go to the hearing if the

14   senior hearing officer or the inmate requests him as a witness.

15   Q    And were you ever notified that you had been requested?

16   A    No.

17   Q    Did you follow up on what happened at the disciplinary

18   hearing on Mr. Perez's RVR?

19   A    No.

20   Q    Now we have heard throughout this trial that the Rules

21   Violation Report was dismissed.  When did you first learn that

22   it had been dismissed?

23   A    I believe you told me.

24   Q    Okay.  Was that after -- when would that have been?

25   A    During the beginning of this process, for this court case.
```

1  Q    Okay.  Before October 10, 2012, had you heard anything

2  about the upcoming changes to the prison gang validation

3  policies, the STG policies we just discussed?

4  A    Probably, I -- I would imagine I probably heard something.

5  Q    Okay.  But at that time had you received any specific

6  training on the policies?

7  A    No.

8  Q    Did you know any details of the --

9  A    Rumor.  Rumor.

10 Q    Okay.  So you knew they were coming down the pipeline?  Is

11 that fair to say?

12 A    You knew it was coming, and you knew it was changing every

13 day, because people were complaining.

14 Q    Did the upcoming policy changes play any role in your

15 decision to write Mr. Perez an RVR?

16 A    No.  That's why I didn't put a specific gang nexus in the

17 box.

18 Q    And did you write Mr. Perez an RVR because you wanted to

19 make sure he stayed housed in the SHU?

20 A    No.  The gang-related kites would have been plenty for

21 that.

22        **MS. NYGAARD:**  I have no further questions.  Thank

23 you.

24        **THE WITNESS:**  Thanks.

25        **MR. LEE:**  Your Honor, we have deposition testimony.

```
 1         (Document handed up to the Court)

 2                    CROSS EXAMINATION

 3   BY MR. LEE:

 4   Q    Good morning, Sergeant Gates.

 5   A    Good morning.

 6   Q    During the search of Mr. Perez's cell on October 10th,

 7   Mr. Perez told you that he had a lawsuit pending.  Correct?

 8   A    I don't know.  Maybe.

 9   Q    You are not denying that he may have told you he had a

10   lawsuit pending?

11   A    He could have, yeah.

12   Q    Do you remember?

13   A    No, that's why I said "Maybe."  I don't remember.

14   Q    Do you remember being asked to respond to a number of

15   written questions during the pendency of this litigation?

16   A    I don't remember, but it would have been common.

17   Q    And you remember reviewing written questions that were

18   posed by us, by the plaintiff, and reviewing the answers, and

19   signing your name to the answers under penalty of perjury?

20   A    I'm sorry; are you talking about the I -- are you

21   referring to the IE?

22   Q    I'm referring to interrogatories --

23   A    Oh.

24   Q    -- which are written questions --

25   A    Oh, yes.
```

 1  Q    -- that we -- we gave to you and asked you to respond to

 2  in writing.  Do you remember doing that?

 3  A    I remember that it happened, yes.

 4  Q    Okay.  And do you remember signing, reviewing the

 5  responses and signing the responses under penalty of perjury

 6  with your name?  Do you remember that?

 7  A    Not the specific act, but yes, I know that it happened.

 8       MR. LEE:  Your Honor, may --

 9       (Document handed up to the Court)

10       MR. LEE:  Directing the Court's attention to

11  Interrogatory No. 11, which is on Page 8.

12       THE COURT:  Okay.

13       MR. LEE:  And Your Honor, may I approach just to have

14  him authenticate his signature?

15       THE COURT:  Sure.

16       (Witness examines document)

17       THE WITNESS:  What page?  That page?

18  BY MR. LEE:

19  Q    Sergeant Gates, I've handed you what has been marked for

20  identification as Exhibit 30.

21       And on the first page, do you see, it says "Defendant

22  Gates's Response to Plaintiff's First Set of Interrogatories"?

23  Do you see that?

24  A    Yes.

25  Q    And if you could turn to Page 10.

```
 1        (Request complied with by the Witness)

 2  Q     Page 10 says (As read):

 3            "Verification.  I declare under penalty of

 4        perjury that I have read and reviewed the above

 5        responses to interrogatories and they are true and

 6        correct to the best of my knowledge."

 7        Do you see that?

 8  A     Yes.

 9  Q     And is that your signature there, right?

10  A     Yep, yep.

11  Q     I want to read to you the question and your answer that

12  you signed under penalty of perjury (As read):

13            "QUESTION:  Describe your knowledge of Plaintiff's

14        previous litigation against CDCR, including the date

15        you acquired this knowledge and the circumstances under

16        which you acquired said knowledge."

17        And the response:

18            "ANSWER:  Without waiving this objection,

19        Defendant responds that he had no knowledge of

20        Plaintiff's previous litigation against CDCR, until

21        Plaintiff mentioned to Defendant that he had a pending

22        lawsuit while defendant was searching Plaintiff's cell

23        on October 10, 2012.  Defendant does not recall

24        Plaintiff providing any specific details about the

25        litigation.  Defendant had no further knowledge of
```

```
 1        Plaintiff's previous litigation until he was served

 2        with the complaint in this action."

 3  A    That's what I said.

 4  Q    Well, no, you said you didn't remember, but --

 5  A    I don't remember.  But ten or eleven months ago when we

 6  did this (Indicating), I must have remembered.

 7  Q    Now I want to turn your attention to the events of the

 8  cell search on October 10th.  You and Officers Pimentel,

 9  Gongora and Gates (sic) approached the front of the cell

10  occupied by both Mr. Perez and Mr. Guerrero.  Correct?

11  A    Can you say who it was again?

12  Q    You, Officers Pimentel, Gongora and Gates --

13  A    And Healy, yes.

14  Q    I'm sorry, and Healy -- you're right -- approached the

15  front of the cell occupied by both Mr. Perez and Mr. Guerrero.

16  Correct?

17  A    That's correct.

18  Q    And when you got to the cell front, Officer Pimentel

19  identified yourselves and informed Mr. Perez and Mr. Guerrero

20  that you would be doing a cell search for a validation review

21  of Mr. Perez.  Correct?

22  A    I -- maybe?  I don't know.  I don't remember that, but I

23  would imagine that would be something we would normally do.

24  Q    And you then ordered Mr. Perez to come to the front of the

25  cell for an unclothed body search, and to be placed in
```

 1  handcuffs.  Correct?

 2  **A**    That would be common.  I don't remember, but yes, that

 3  would be the common procedure.

 4  **Q**    And at that point, Mr. Perez followed your order promptly

 5  and walked up to the front of the cell, correct?

 6  **A**    Maybe.  I don't know.  I don't remember.  Three and a half

 7  years ago, one of a thousand cell searches.  I -- I don't

 8  recall this one specifically.

 9  **Q**    Okay.

10         **MR. LEE:**  Can we have Exhibit 2 placed on the screen,

11  please?

12      (Document displayed)

13         **MR. LEE:**  And Tim, if we can blow up the top box, the

14  last two sentences.

15  **BY MR. LEE:**

16  **Q**    Do you see where it says (As read):

17         "I then issued Perez a direct order to come to

18         the cell front for an unclothed body search and to be

19         placed in to handcuffs for a cell search"?

20  **A**    Yes.

21  **Q**    (As read)

22         "Perez followed my order promptly and walked up

23         to the cell front."

24         Do you see that?

25  **A**    Yes.

1  Q    And as you were informing Mr. Perez of what clothing he

2  could wear when he was removed from the cell, you heard Officer

3  Healy order Mr. Guerrero to remove his hands from the toilet.

4  Correct?

5  A    That sounds right.

6  Q    And at that point, you turned around, and you saw

7  Mr. Guerrero crouched down, tearing up paper and putting it in

8  the toilet.  Right?

9  A    That sounds -- yes.

10 Q    And by then, the water had already been turned off,

11 correct?

12 A    The water was off.

13 Q    And Mr. Guerrero continued to do that even though he had

14 been ordered to stop.  Right?

15 A    Yes, he did.

16 Q    And you said it's a common occurrence; you have seen it

17 dozens of times that inmates do that, correct?

18 A    Yes.

19      (Document taken off display)

20 Q    And while Mr. Guerrero was doing that, you heard Mr. Perez

21 tell Mr. Guerrero to push the paper further down into the

22 toilet.  Right?

23 A    I did.

24 Q    You heard that, yourself?

25 A    I did.

1  Q    Okay.  And what language was Mr. Perez speaking?

2  A    English.

3  Q    And did you hear him speak Spanish at the time?

4  A    He might have.  I -- I don't recall any Spanish, but he

5  might have.

6  Q    But you don't recall that?

7  A    No.

8  Q    And you also observed Mr. Perez repeatedly move from the

9  cell front to attempt to mask his cellmate's actions, right?

10  A    I did.

11  Q    And you ordered Mr. Perez to move back from the cell front

12  so that he wasn't blocking the view of Mr. Guerrero, correct?

13  A    Multiple times.

14  Q    And you testified a while ago that you ordered Mr. Perez

15  to move back.  But in fact, you ordered Mr. Perez to move to

16  the front of the cell, correct?

17  A    It's a trick question because yes, I did give him both

18  orders, at different times.  But --

19  Q    The only order that's reflected in your Rules Violation

20  Report is the order to move to the front of the cell, correct?

21  A    I -- I would have to read the whole report, but I'm

22  willing to say that yeah, that's probably correct.

23  Q    And you didn't write in the report that you ordered him to

24  move to the back of the cell, did you?

25  A    I did not write every step that was taken, no.

1      That would take an extremely long time.

2  Q    And each time you asked Mr. Perez to do that, to move to

3  the front of the cell, he complied.  Correct?

4  A    I don't know every time, but I never -- I only asked him

5  to come to the front of the cell twice, so I would say yes.  I

6  asked him to come to the front of the cell when I thought it

7  was going to be a routine cell search and I was going to do an

8  unclothed body search on him, and I asked him to come to the

9  front of the cell when they were both handcuffed and being

10 taken out.  The rest of the time I was asking him to go to the

11 back of the cell.  So yes, I would say he complied every time I

12 asked him to come to the front of the cell.

13 Q    And each time you asked him to move to the back of the

14 cell he complied, right?

15 A    Most of them he did, yeah, and then he would come right

16 back up.

17 Q    So you would ask him, he would comply, and then he would

18 move back in front of Mr. Guerrero, right?

19 A    That's the reason to have to continually ask him over and

20 over, yes.

21 Q    And this happened several times?

22 A    Several times.

23 Q    And this lasted for --

24 A    Minutes.  You know, seems like a short time, probably a

25 couple of minutes seems like a short time.  But when you're in

1   the middle of an incident like that, it's actually a very long

2   time for an inmate to blatantly disregard your orders and

3   disobey you.  Yes, minutes.

4   **Q**    A couple of minutes?

5   **A**    Yeah.

6   **Q**    And eventually, Mr. Perez did comply with the order to

7   cuff up, right?

8   **A**    Eventually they both did, yes.

9   **Q**    Even though it wasn't quite the way --

10  **A**    Didn't go the way it was supposed to, no.

11  **Q**    And you removed him from the cell at that point and

12  escorted him to the rotunda, correct?

13  **A**    I would think, yeah.  I don't technically remember being

14  on the escort, but I would have to assume that I was, yes.

15  **Q**    And then the cell was searched thoroughly, correct?

16  **A**    Thoroughly.

17  **Q**    And all four of you, yourself, Officer Healy, Officer

18  Gongora, and Officer Pimentel, searched the cell.  Correct?

19  **A**    Possibly.

20  **Q**    And, the entire search, entire cell search lasted about

21  ten minutes, correct?

22  **A**    I couldn't tell you.  Sounds about right.  Sounds about

23  normal for a cell search.  It would take hours if we were to

24  search everything in the cell.  But yeah, about ten minutes to

25  pack everything up and search clothing and stuff.

GATES - CROSS EXAMINATION / LEE

```
 1   Q    And there was no further incident in connection with the
 2   search, right?
 3   A    No.
 4   Q    No further refusal to follow orders by Mr. Perez?
 5   A    Not that I can recall.
 6   Q    You did not have to call in any additional officers to
 7   help with the search, correct?
 8   A    No.  Four would have been plenty.
 9   Q    It was just the original four who did the search?
10   A    As far as I know, yeah.  Did we all go in?  I doubt it.
11   But, did all of us go in at some point?  Maybe?  I couldn't
12   tell you for sure.
13   Q    And you were able to remove the papers from the toilet,
14   correct?
15   A    We got most of it, yeah.
16   Q    And you later determined that the papers that Mr. Guerrero
17   had put in the toilet were so-called gang kites, correct?
18   A    Absolutely.
19   Q    And so you were able to piece together the papers and read
20   them, right?
21   A    I -- I didn't, but yeah, somebody was able to piece them
22   together and read them.  A lot of the times we send them to the
23   FBI, have them do it.
24   Q    But in this case you were able to determine --
25   A    I don't know --
```

1  Q    -- what was on those papers?

2  A    I don't know who did, but somebody did, yes.

3  Q    And during the search, Mr. Perez did not use any force or

4  violence on anyone, did he?

5  A    Nope.  Nor did we.

6  Q    And he did not attempt to use any force or violence, did

7  he?

8  A    No.

9  Q    And you did not -- none of the officers had to use force

10  or violence in order to carry out the cell search, correct?

11  A    No.

12  Q    And none of the officers had to use Mace in order to carry

13  out the cell search, correct?

14  A    Nobody had to.  But it was definitely an option at one

15  point.

16  Q    Well, it's always an option, correct?

17  A    No.  No.  Has to meet very specific criteria.

18  Q    But you don't recall thinking about using Mace at the

19  time?

20  A    Yes, yes, I did.

21  Q    You specifically recall thinking about using Mace at the

22  time?

23  A    Absolutely.  And if Perez would have gotten out of the

24  way, I would have used pepper spray on his cellmate, Guerrero.

25  Yes, I would have.

 1          **MR. LEE:**  Your Honor, direct the Court's attention to

 2    Page 55, Line 7 through 12.

 3       (Reporter interruption)

 4          **THE WITNESS:**  I'm sorry; I'm sorry.  Nervous.  I'm

 5    sorry.

 6          **JUROR NO. 3:**  Counsel, excuse me.  If you are not

 7    using this machine (Indicating), could you turn this light off,

 8    please?

 9       (Request complied with by Mr. Lee)

10          **JUROR NO. 3:**  Thank you so much.

11          **THE COURT:**  Could you give me the line numbers again,

12    please?

13          **MR. LEE:**  Sorry.  55, Lines 7 through 12.

14          **THE COURT:**  Any objection?

15          **MS. NYGAARD:**  Just one moment, please.

16          **THE COURT:**  Sure.

17          **MS. NYGAARD:**  I would like the inclusion of Lines 13

18    through 16.

19          **THE COURT:**  That's fine.

20    **BY MR. LEE:**

21    **Q**    Sergeant Gates, you recall giving a deposition in this

22    case, right?

23    **A**    I do.

24    **Q**    And we've already heard a number of your fellow

25    co-defendants testify about what a deposition is.  You recall

1   that deposition in particular?

2   **A**    Yes, I recall.

3   **Q**    And you recall taking an oath to answer the questions

4   truthfully, to the best of your ability, correct?

5   **A**    To the best of my ability.

6   **Q**    And it was the same oath that you took in the deposition

7   as the oath you took just earlier this morning, correct?

8   **A**    That sounds right.

9   **Q**    And you were asked questions by one of Mr. Perez's

10  lawyers, and Ms. Nygaard was there, right?

11  **A**    That's correct.

12  **Q**    Okay.  I'm going to read a portion of your deposition

13  transcript (As read):

14        **"QUESTION:**  And did anyone use Mace in this

15        instance?

16        **"ANSWER:**  I don't think we did.  I don't think we

17        did.  I could be wrong, maybe.

18        **"QUESTION:**  Did you -- do you recall thinking at

19        the time that you might use it?

20        **"ANSWER:**  I don't recall.

21        **"QUESTION:**  Did you feel as though what you have

22        described to me in terms of what was happening in the

23        cell, that there were grounds for immediate use of

24        force?

25        **"ANSWER:**  Yes, during the time -- or during the

```
 1        rules at the time, yes."

 2   A    Yes --

 3             THE COURT:   Sergeant Gates, he hasn't asked you a

 4   question.

 5   BY MR. LEE:

 6   Q    After the search was conducted, you did not find any drugs

 7   in the cell, correct?

 8   A    Drugs?

 9   Q    Drugs.

10   A    No.

11   Q    You did not find any alcohol in the cell, did you?

12   A    Not that I recall.

13   Q    You did not find any weapons in the cell, did you?

14   A    Not that I recall.

15   Q    You did not find any razor blades in the cell, did you?

16   A    Not that I recall.

17   Q    Or needles?

18   A    No.

19   Q    And Mr. Perez's actions did not cause a security breach at

20   Pelican Bay, did it?

21   A    No.

22   Q    And the events of the cell search did not seriously

23   disrupt Pelican Bay's operations, did they?

24   A    They disrupted ours, but Pelican Bay's?  No.

25   Q    Pelican Bay's operations.  The operations of the prison.
```

1  They did not disrupt the operations of the prison, correct?

2  **A**    No.  Other than the ones that we were trying to perform.

3  **Q**    And after the search, you decided to issue a Rules

4  Violation Report.  Correct?

5  **A**    That's right.

6  **Q**    And that's what's known as a CDC 115?

7  **A**    Yes.

8  **Q**    And, a CDC 115 can be classified as either

9  "administrative" or "serious."  Correct?

10 **A**    That's correct.

11 **Q**    And a CDCR follows a system of what's known as progressive

12 discipline, correct?

13 **A**    Correct.

14 **Q**    And that means for infractions or misconduct by an inmate,

15 there are different levels of discipline.  And, and there are

16 levels of increasing severity, correct?

17 **A**    Yeah, I would imagine.

18 **Q**    That's what progressive discipline means, correct?

19 **A**    Okay.

20 **Q**    And within that system, a Serious RVR within the

21 disciplinary system, a Serious RVR is the most serious form of

22 inmate discipline there is.  Right?

23 **A**    As far as CDC is concerned, yes.  It's not a DA referral,

24 which I guess would be more but --

25 **Q**    Within the prison?

 1  **A**    As far as us, yes.

 2  **Q**    It is the most serious.  Now, the least serious form would

 3  be what's known as a verbal counseling, correct?

 4  **A**    Correct.

 5  **Q**    And then there's a counseling memo, correct?  That would

 6  be the next most serious form of discipline, is a counseling

 7  memo?

 8  **A**    Yeah.  It's not really considered discipline, but yes.

 9  It's --

10  **Q**    But that --

11  **A**    You're speaking of a 128B.

12  **Q**    Correct.

13  **A**    It's informative.  It's not really -- we don't consider it

14  disciplinary, but yeah.

15  **Q**    But in terms of taking some action in response to --

16  **A**    (Inaudible)

17      (Reporter interruption)

18  **BY MR. LEE:**

19  **Q**    In terms of taking some action in response to potential

20  misconduct by an inmate, the so-called counseling memo would be

21  the next step.  Correct?

22  **A**    Yes.

23  **Q**    And then the next step after that would be an

24  administrative rules violation.  Correct?

25  **A**    Yes.

1  **Q**    And then, and then after that is a serious rules

2  violation, right?

3  **A**    That would be, to my knowledge, the way it would go.

4  **Q**    And a serious rules violation then is more serious than

5  any of the other options under the progressive discipline

6  system, correct?

7  **A**    That's correct.

8  **Q**    And you understood at the time that there is a difference

9  between a serious rules violation and an administrative rules

10  violation, right?

11  **A**    That's correct.

12  **Q**    And you understood at the time that the criteria for a

13  serious rules violation are spelled out in California law,

14  correct?

15  **A**    Yes.

16  **Q**    Specifically, they're spelled out in Title 15 of the Code

17  of California Regulations.

18  **A**    That's correct.

19  **Q**    And you have to comply with Title 15, right?

20  **A**    That's correct.

21  **Q**    And you have to comply with Title 15, right?

22  **A**    That's correct.

23  **Q**    And you have to -- and in deciding whether misconduct

24  warrants an RVR, you have only a limited amount of discretion,

25  correct.  Because you have to comply with Title 15, right?

```
 1  A    I have limited discretion on deciding if an incident

 2  warrants an RVR?  I can --

 3  Q    If a incident warrants -- you have -- in deciding whether

 4  an incident warrants a Serious RVR, you have limited discretion

 5  because you have to follow what's set forth in Title 15,

 6  correct?

 7  A    I don't decide whether it's Serious or Administrative.

 8  Q    But you're aware that the CDCR has to follow Title 15 --

 9  A    Yes.

10  Q    -- in classifying whether a violation is Serious?

11  A    Yes.

12  Q    And you're familiar with something called the CDCR

13  Operations Manual, correct?

14  A    Yes, yes.

15  Q    And the Operations Manual is another source of regulations

16  as to how prisons within the CDCR are to operate?

17  A    Yes.

18  Q    And you're aware that the Operations Manual also defines a

19  Serious Rules Violation and an Administrative Rules Violation,

20  correct?

21  A    I would imagine it does.  I'm not aware of it, but, yes.

22  I would assume it's in there.

23  Q    And you're aware that what's in there, the Operations

24  Manual, the Operations Manual criteria for a Serious Rules

25  Violation and an Administrative Rules Violation, parallel and
```

GATES - CROSS EXAMINATION / LEE

```
 1  are the same as what's in Title 15, correct?

 2  A    It sounds right.

 3  Q    And you've received training on these regulations, right?

 4  A    Yes.

 5  Q    And you've received training on the criteria for a Rules

 6  Violation, right?

 7  A    Yes.

 8  Q    And you've received training on the difference between a

 9  Serious Rules Violation and an Administrative Rules Violation,

10  correct?

11  A    Yes.  Even though I don't decide which is which, I have

12  received training, yes.

13  Q    And under Title 15 of the California Code of Regulations,

14  you know that for inmate misconduct to be classified as Serious

15  on a RVR, it must involve one of the following circumstances:

16       One, use of force or violence again another person.

17       Two, a breach of or hazard to facility, security.

18       Three, a serious disruption of facility operations.

19       Four, the introduction, distribution, possession or use of

20  controlled substances, alcohol or dangerous contraband, or;

21       Five, an attempt or threat to carry out any of these acts

22  coupled with a present ability to carry out the threat or

23  attempt, if not prevented from doing so.

24       You're aware that one of those criteria must be present

25  for inmate misconduct to be classified as a Serious Rules
```

1  Violation, are you not?

2  **A**    Yes.

3  **Q**    And, in fact, Lieutenant Anderson concluded that none of

4  those criteria, none of the criteria for a Serious Rules

5  Violation had been met in this case, correct?

6  **A**    That was his choice.

7  **Q**    And you also know that Lieutenant Anderson contemplated

8  whether a less serious charge of refusal to follow orders would

9  have been the more appropriate charge, right?

10  **A**    And he would have had the right to bump it down to that.

11  **Q**    Correct.

12  **A**    That would have been his discretion.

13  **Q**    And you know that the offense of a refusal to follow

14  orders would not be -- would not be a Serious Rules Violation,

15  correct?

16  **A**    I do.

17  **Q**    And you would agree that based on the facts that you

18  alleged in the RVR, the most -- the more appropriate charge

19  would have been a refusal to follow orders, correct?

20  **A**    No.

21  **Q**    You disagree with that?

22  **A**    I disagree with that.

23  **Q**    And so you disagree with Lieutenant Anderson on that?

24  **A**    I do, yes.  It's my job to write the RVR.  It's his job to

25  decide whether it's guilty or innocent.  That's the way it

 1  works.  I don't get to choose.

 2  **Q**    And you know that Lieutenant Anderson, after considering

 3  whether the less serious charge of refusal to obey orders would

 4  have been more appropriate, concluded that Mr. Perez was not

 5  guilty even of that lesser charge, right?

 6  **A**    And that's his discretion.  I disagree.

 7  **Q**    You -- to this day, you disagree with Lieutenant Anderson?

 8  **A**    Absolutely.

 9  **Q**    And you know that if Mr. Perez had been found guilty of

10  the Serious Rules Violation, he could have been placed into

11  immediate segregation, correct?

12  **A**    He was in segregation.

13  **Q**    He could have been removed from his cell and not had

14  another cellmate, correct?

15  **A**    You say that could happen, and I guess it could happen,

16  but I can see no reason why he would have lost his cellmate

17  over it, no --

18  **Q**    And if he had been found --

19  **A**    -- I don't know why that would have happened.

20  **Q**    And you know that if Mr. Perez had been found guilty of a

21  Serious RVR, he could have lost credit, time credit against his

22  prison sentence, correct?

23  **A**    I would imagine he could, but I don't believe he's getting

24  any time credit in the SHU.  So he would have not had much to

25  lose.

1  **Q**    And you know that if Mr. Perez had been found guilty of

2  the Serious RVR, it could have affected any future housing

3  placement, correct?

4  **A**    I suppose it could.  I don't think you can get locked up

5  for disobeying orders and obstructing an officer.  But if you

6  say you can, then okay, you can.  I don't know.

7  **Q**    And you know that if Mr. Perez had been found guilty of a

8  Serious RVR, he could have been referred to the District

9  Attorney for criminal prosecution, correct?

10  **A**    Yes.  RVRs can go to the D.A. for referral.  That

11  happened; not with mine, but they could have.

12  **Q**    And you know that if Mr. Perez had been found guilty of a

13  Serious RVR, that he would have -- it would have resulted in

14  three more years in the SHU under the new present prison --

15  under the new STG policy, correct?

16  **A**    No.  I didn't know that.

17  **Q**    You were aware -- you were here in court when we read to

18  the jury the stipulated facts, right?  And you understand that

19  those stipulated facts are agreements between plaintiff and the

20  defendants, correct?

21  **A**    Yes.  I understand --

22        **MS. NYGAARD:**  Objection, your Honor.

23  **A**    -- what you're saying, but I did not know at the time --

24        **MS. NYGAARD:**  Objection.

25  **A**    -- the rules to the new policy.

 1          **THE COURT:**  Sergeant Gates, I'll ask you to slow down

 2  a little bit.  Try not to talk over either of the lawyers,

 3  either when your lawyer is objecting or when Mr. Lee is asking

 4  you questions.

 5      Objection overruled.

 6  **BY MR. LEE**

 7  **Q**    And you know today that if Mr. Perez had been found guilty

 8  of a Serious RVR, it would have resulted in placement in the

 9  SHU for an additional three years under the STG policy,

10  correct?

11  **A**    If it had a gang nexus, which this RVR did not, that would

12  be correct.

13  **Q**    You're disputing that this RVR had a gang nexus?

14  **A**    It would have to be listed in the box at the top where the

15  "Specific Offense" is for it to count against his validation,

16  and it is not listed.

17  **Q**    You knew that at the time you wrote the RVR, you knew that

18  in order to keep Mr. Perez in the SHU, you had to bring a

19  Serious charge, the most Serious charge, correct?

20  **A**    I did not have to bring any charge against Mr. Perez to

21  keep him in the SHU at that time.  None.  Zero charges.  He did

22  not need an RVR to stay in the SHU.

23      He simply needed a simple document, any document written

24  that day, written two years before that day, in his C-file, a

25  non-rules violation document, anything that suggested gang

 1  activity within six years would have kept him in SHU.  Not my

 2  RVR.  Not anything else.  Any document, period.

 3  **Q**    And that was your objective in writing this report, wasn't

 4  it?

 5  **A**    The RVR could have only been used if the gang nexus was

 6  listed in the "Specific Offense" box, which it is not.

 7  **Q**    Now, Sergeant Gates, the original Serious RVR report that

 8  you wrote was destroyed by CDCR, correct?

 9  **A**    I -- I don't know.  I turned it in.  I don't know what

10  happens to it after that.

11  **Q**    You know that RVRs that are dismissed are destroyed,

12  correct?

13  **A**    I don't know that.

14  **Q**    And you know that the CDCR doesn't keep any copies of any

15  dismissed RVRs, correct?

16  **A**    I don't know that, no.

17  **Q**    And you know that the report that was issued by Lieutenant

18  Anderson, Exhibit 3, was also destroyed by CDCR, correct?

19  **A**    I don't -- again, I don't know that.  I have no idea what

20  they do with it.  I write them.  I'm done with them.

21  **Q**    And you know that there is no record of how many Serious

22  RVRs are actually dismissed, correct?

23  **A**    I have no idea.

24  **Q**    Have you previously had RVRs that were dismissed?

25  **A**    Yes.

1  Q    Have you previously had Serious RVRs that were dismissed?

2  A    I don't know.  The Serious or Administrative portion of

3  that is determined after it leaves my hands.  So I don't know

4  which ones -- what they were when they were dismissed, I have

5  no idea.

6  Q    Approximately, how many RVRs would you say you've written

7  that have been later dismissed?

8  A    Again, I have no idea.  Most of them, as long as the

9  inmate doesn't call me as a witness, I have no idea what

10  happens with them.  My job is to write them and turn them in.

11  That's it.

12  Q    But any -- you know that any dismissed RVR would have been

13  destroyed by CDCR, correct?

14  A    I don't -- I don't know that.  I believe you, but I don't

15  know that.

16       MR. BENEDETTO:  And if we could pull up Exhibit 2,

17  please?

18       (Document displayed)

19  BY MR. BENEDETTO

20  Q    You know that the only reason we have this Serious RVR,

21  the only reason we have a copy is because Mr. Perez kept a copy

22  for his own records, correct?

23  A    No, I don't know that.  I mean, I believe you, but I have

24  no idea how you got it.

25       MR. BENEDETTO:  And if could you turn to Exhibit 3?

1          (Document displayed.)

2     **BY MR. BENEDETTO**

3     **Q**     You know that Exhibit 3 is the decision by Lieutenant

4     Anderson dismissing both the -- dismissing the RVR, as you

5     wrote it, and also concluding that even a less serious charge

6     of refusal to obey orders would not have been supported,

7     correct?  That's what Exhibit 3 is, right?

8     **A**     Let me read it.  Can we make it bigger?

9          (Document enlarged.)

10         (Brief pause.)

11    **Q**     Well, if we could go to --

12              **MR. BENEDETTO:**  Tim, if you could blow up Paragraph C

13    and D?

14              **THE COURT:**  He can take as much time as he needs to

15    read the document.

16    **A**     I don't recall ever seeing this.  Before I agree to

17    anything...

18         (Brief pause.)

19    **A**     Yes.

20              **MR. LEE:**  And, Tim, if we could move it over a

21    little?  At least on this monitor the right side is cut off.  A

22    little bit more.  A little bit more.  It's still cut off.

23         Okay.

24         (Document displayed.)

25

 1   BY MR. BENEDETTO

 2   Q    You see at the bottom of Paragraph C it says:

 3        "Because this incident did not require additional

 4        staff response or result in a significant delay, this

 5        SHO, Senior Hearing Officer, believes the lesser

 6        included Division F offense, refusal to obey orders,

 7        is more appropriate."

 8        Do you see that?

 9   A    I see that.

10   Q    And you see it goes on to say, the second sentence of

11   Paragraph D:

12        "Based on this SHO's interpretation of Officer

13        Gates' report, it does appear plausible that Perez

14        would be able to move between his cellmate and the

15        cell front.  Although it is likely that Perez would

16        want to mask Guerrero's actions, he clearly did not."

17        Do you see that?

18   A    I see it.

19   Q    And you see it goes on to say:

20        "As there was no significant delay in program and

21        no additional staff response, the criteria for the

22        charge of willfully resisting, delaying or

23        obstructing any peace officer in the performance of

24        duty was not met and, therefore, a lesser included

25        charge was considered."

1    Do you see that?

2  A    I see it, and I disagree with his decision.

3  Q    And you see the last sentence says:

4        "However, as it is not clear that Perez

5    specifically disobeyed any direct order, this SHO

6    finds that there is not sufficient evidence to

7    support the lesser included charge of refusal to obey

8    orders."

9    Do you see that?

10 A    I see it.

11 Q    And you know that this report, this decision by Lieutenant

12 Anderson, was destroyed by CDCR, correct?

13 A    I don't know that.  No matter -- I still don't know that.

14 Q    And the only reason, the only reason we have a copy of

15 this and the only reason we can see Lieutenant Anderson's

16 decision is that Mr. Perez was smart enough to keep a copy for

17 his own records, correct?

18 A    I don't know that.

19        MR. LEE:  I have no further questions, your Honor.

20        THE COURT:  Any redirect?

21        MS. NYGAARD:  Yes.

22                    **REDIRECT EXAMINATION**

23 BY MS. NYGAARD

24 Q    Sergeant Gates, why would the RVR not have been referred

25 to the District Attorney's Office?

1   **A**    The inmates at Pelican Bay are generally doing a life

2   sentence.  I don't know what Mr. Perez's sentence is, but

3   most -- I think 85 percent of the inmates at Pelican Bay are

4   doing a life sentence.  There is really no point in clogging

5   our D.A.'s caseload with stuff that they are just going to

6   refuse anyways.

7        So, in other words, prosecuting an inmate with a life

8   sentence for whatever he's in for now, there is no point in

9   prosecuting an inmate for something they are going to give him

10  six months in jail for.  Some things, there is no point.

11  **Q**    Okay.  Thank you.  Nothing further.

12            **THE COURT:**  Any recross?

13            **MR. LEE:**  No, your Honor.

14            **THE COURT:**  Thank you, Sergeant Gates.

15            **THE WITNESS:**  Sorry again to the court reporter.

16       (Witness excused.)

17            **THE COURT:**  You want to call your next witness?

18            **MS. NYGAARD:**  Yes.  Defendants call Lieutenant

19  Anderson.

20                      **JUDD ANDERSON**,

21  called as a witness for the Defendant herein, having been first

22  duly sworn, was examined and testified as follows:

23            **THE WITNESS:**  I do.

24            **THE CLERK:**  Thank you.  Please be seated.

25       For the record, please state your first and last name and

1  spell both.

2          **THE WITNESS:**  Judd Anderson.  J-U-D-D.

3  A-N-D-E-R-S-O-N.

4          **THE CLERK:**  Thank you.

5                    **DIRECT EXAMINATION**

6  BY MS. NYGAARD

7  Q    Good morning, Mr. Anderson.  Where do you currently work?

8  A    I'm at California State Prison, Los Angeles County.

9  Q    And what is your current occupation?

10 A    I'm a Correctional Lieutenant.

11 Q    And how long have you been a Correctional Lieutenant?

12 A    Just over six years.

13 Q    And did you work at any prisons before the one you just

14 are currently at?

15 A    Yes, I did.

16 Q    And which prisons are those?

17 A    I started at Salinas Valley.  Transferred to Pelican Bay.

18 California City for the activation.  And then Los Angeles

19 County.

20 Q    Okay.  And when did you work at Pelican Bay State Prison?

21 A    From 2005 to 2009.

22 Q    And when were you first hired by the California Department

23 of Corrections and Rehabilitation?

24 A    It was in 2000.  October of 2000.

25 Q    And what positions have you held within, I'll call it

1  CDCR?

2  **A**    I have been a correctional officer, correctional sergeant

3  and lieutenant.

4  **Q**    And what did you do before your employment with CDCR?

5  **A**    I was in the Marine Corps and did construction after that

6  for a short time.

7  **Q**    Okay.  Lieutenant Anderson, could you please briefly

8  describe what a Rules Violation Report is?

9  **A**    It's a form we use to document misconduct that's more

10  serious in nature.

11  **Q**    And who's responsible for writing a Rules Violation

12  Report?

13  **A**    Any -- any staff member can write one.  Generally,

14  officers write them, but any staff member can write a Rules

15  Violation Report.

16  **Q**    Okay.  And so when a staff member decides to write a Rules

17  Violation Report, is there a review process that that RVR goes

18  through?

19  **A**    Yes, there is.

20  **Q**    And can you please describe that process?

21  **A**    They would write what's a rough draft, we call it a rough

22  draft, and that would be reviewed by a sergeant, first line

23  supervisor.

24      Once that's approved, it would go to -- back to the

25  officer to review again.  Then it would go to a classifying

1  official before it actually gets to the Senior Hearing Officer.

2  **Q**    And what do you mean by a "classifying official"?

3  **A**    Somebody at the -- at the rank -- well, somebody that's

4  certified to hear 115s, a Senior Hearing Officer.  Generally,

5  it would be another lieutenant.  It could be a captain or a

6  correctional counselor.

7  **Q**    And so what's the role of the classifying official?

8  **A**    They are going to review it and determine whether or not

9  the violation is Serious or Administrative.

10  **Q**    So a staff member who wrote the Rules Violation Report

11  doesn't make that determination?

12  **A**    No.

13  **Q**    At what point does the Rules Violation Report get issued

14  to the inmate?

15  **A**    After its gone through these layers of review and it's

16  been signed off and classified, then the inmate will get his

17  initial copy of the Rules Violation Report.

18  **Q**    And then could you explain what happens after the inmate

19  is issued the Rules Violation Report?

20  **A**    Well, at that point -- at that point we have 30 days to

21  hear the -- to adjudicate it, the Senior Hearing Officer.

22  **Q**    And what do you mean by "adjudicate" it?

23  **A**    We're going to sit down with the inmate and we're going to

24  hold a hearing.

25  **Q**    Have you served as a Hearing Officer for Rules Violation

1    Report hearings?

2    **A**    Yes, I have.

3    **Q**    Is there a difference between a Hearing Officer and a

4    Senior Hearing Officer?

5    **A**    Yes, there is.

6    **Q**    And what's the difference?

7    **A**    A Hearing Officer is going to be a sergeant.  That's

8    usually the top, top guy that's going to hear it the

9    Administrative 115s.

10        A Senior Hearing Officer is going to be a lieutenant.  And

11   so they will hear -- they could hear both, but a Senior Hearing

12   Officer would generally hear the Serious RVRs.

13   **Q**    Does a lieutenant rank higher than a sergeant?

14   **A**    Yes, it does.

15   **Q**    And do you serve as a Senior Hearing Officer?

16   **A**    Yes, I do.

17   **Q**    And did you have to become certified to become a Senior

18   Hearing Officer?

19   **A**    Yes, you do.

20   **Q**    And what was the process for that?

21   **A**    You have to -- you go through a probationary period where

22   you sit in with another Senior Hearing Officer, kind of the OJT

23   thing.  And then it's followed up by -- they kind of monitor

24   you, make sure that you're doing the 115s right.  They are

25   going to sit in with you.  And then you become certified.

1  Q     And you said "OJT."  What does that mean?

2  A     On-the-job training.

3  Q     And when did you become certified as a Senior Hearing

4  Officer?

5  A     I would say it was 2009, maybe 2008.

6  Q     How many Rules Violation Report disciplinary hearings have

7  you presided over?

8  A     In my career?

9  Q     Yes.

10 A     I couldn't put a number.  Hundreds.  Hundreds.  High

11 hundreds.

12 Q     Okay.  On average, how many Rules Violation Report

13 hearings do you hear a month?

14 A     Probably now between -- now and that, probably between

15 present and 30, maybe more.

16 Q     Did that number vary at different prisons?

17 A     It did.  And with changes in policy, with drug -- the drug

18 testing and everything now, so it's a lot higher.

19 Q     Did you preside over a disciplinary hearing on

20 November 18th, 2012 for a Rules Violation Report that had been

21 issued to Jesse Perez, the plaintiff in this case?

22 A     I did.

23 Q     And was that Rules Violation Report issued for conduct

24 that had occurred on October 10th, 2012?

25 A     Yes.

Case 3:13-cv-05359-VC  Document 176  Filed 11/24/15  Page 67 of 170

1  Q    Do you have any memory of this hearing?

2  A    Vaguely.

3  Q    Have you reviewed any documents to help refresh your

4  memory of the hearing?

5  A    I have.

6  Q    And what documents have those been?

7  A    The 115, the Rules Violation Report that was provided to

8  me, the investigative employee's report.

9  Q    Anything else?

10  A    As far as -- to refresh my memory?  No.  I mean, I think I

11  looked at the other hearing that was held.  You know, they were

12  both charged, both inmates were charged.

13  Q    Okay.  And did you issue a final ruling in this case, or

14  on the disciplinary hearing?

15  A    I did.

16  Q    And did you look at that document, also?

17  A    Yes.

18  Q    Okay.  So I'd like to show you what has been previously

19  marked as Trial Exhibit No. 3.

20      (Document displayed)

21  Q    Do you recognize this document?

22  A    Yes, I do.

23  Q    And what is it?

24  A    Excuse me.  It's my findings or disposition in the case.

25  Q    Did you know Mr. Perez before the hearing?

1  **A**    No, I did not.

2  **Q**    Now, could you please describe -- first of all, did you

3  find Mr. Perez guilty or not guilty?

4  **A**    I found him not guilty.

5  **Q**    And could you please explain why you found him not guilty

6  of the RVR?

7  **A**    A 115 is supposed to be a stand-alone document.  So I

8  didn't feel that there was enough information contained in the

9  report to substantiate the charge, so I dismissed it.

10 **Q**    And why did you feel there wasn't enough information in

11 this report?

12 **A**    Pelican Bay has -- it's an institutional policy, where

13 they state that -- there are certain criteria outside of what

14 the general charge would be, and it's -- there wasn't any

15 additional staff response, and it didn't cause the significant

16 delay -- or at least the significant delay wasn't outlined in

17 the 115.  That was the basis of my decision.

18 **Q**    Now, Mr. Perez was initially charged with willfully

19 obstructing -- willfully resisting, delaying or obstructing a

20 peace officer, is that correct?

21 **A**    Correct.

22 **Q**    Okay.  And did you also consider a lesser charge?

23 **A**    I did.

24 **Q**    And what was that charge?

25 **A**    Refusal to obey orders.

1  Q    And why did you consider the lesser charge?

2  A    Because I thought that information was also contained in

3  there.  Those facts were also in the report.

4       Certainly, for the other inmate that was being charged, I

5  just -- it just wasn't enough to find him guilty of it.

6  Q    Now, looking at the very bottom of this page, it says

7  "Request for Witnesses."

8           MS. NYGAARD:  And then let's go to the next page?

9       (Document displayed)

10 BY MS. NYGAARD

11 Q    The very top it says:

12          "Although the inmate requested witnesses prior to

13       the hearing, Perez waived all witnesses in the

14       hearing.  The SHO requested none."

15       Would Officer Gates, who authored the RVR, had been --

16 would he have been required to attend the disciplinary hearing?

17 A    He could be called as a witness, but he couldn't attend

18 the hearing.  That's a due process violation.  He can't be

19 there for the hearing, but he can be called as a witness.

20 Q    Okay.  And do you know whether Gates was one of the

21 witnesses that Mr. Perez had requested?

22 A    I believe he was, yes.

23 Q    Okay.  And so why did you go forward with the hearing

24 without Mr. Gates, Officer Gates being present?

25 A    Because I explained I was leaning towards finding him not

1  guilty and dismissing it.  And he agreed that there's no reason

2  to call witnesses if that was the case.  That would be the only

3  reason for him to call a witness.

4  Q    Okay.  And why did you not call Officer Gates?

5  A    I'll go back and say the 115 is a stand-alone document.

6  And I would call the officer in to clarify a certain issue if I

7  needed to, but I didn't feel there was enough stuff covered in

8  there to even clarify it.

9  Q    Okay.  Now, if we go to the bottom of this page -- excuse

10  me.  The section right below where we were, "Video and Photo

11  Evidence."

12  A    Yes.

13  Q    It says:

14       "Copies of photographs were used as evidence in

15       this disciplinary hearing."

16       Do you know what the photographs were of?

17  A    It was whatever was torn up and thrown in the toilet.

18  Q    So these were documents that officers had provided that

19  they had pulled out of the toilet during the search, is that

20  correct?

21  A    I think that the picture was -- actually provided more

22  because -- because the inmate was refusing to do something.  It

23  wasn't due to the specific charge of anything that dealt with

24  what was written on it.

25       So I think the fact that they showed pictures of something

1  that was torn up and thrown in the toilet, really was --

2  substantiated what their charge was.  It was irrelevant what

3  was written on it based on what he was being charged with.

4  Q    So were you focused at all on the contents of the papers?

5  A    No, not at all.

6  Q    And why not?

7  A    Because he wasn't being charged with anything related to

8  the content of what was written on there.  He was being charged

9  with obstructing, delaying --

10  Q    Okay.

11  A    -- refusing.

12  Q    Then I'd like to go to the next page of your disposition,

13  under Section D?

14       MS. NYGAARD:  If you could just pull up -- no,

15  Section D, please.

16       (Document enlarged.)

17       MS. NYGAARD:  Thank you.

18  BY MS. NYGAARD

19  Q    It says here:

20       "It is reported that Perez immediately followed

21       instruction when it was given.  This SHO also

22       considered the hearing testimony of Perez,

23       considering the distance between the toilet and the

24       cell front.  Based on this SHO's interpretation of

25       Officer Gates' report, it does appear plausible that

1          Perez would be able to move between his cellmate and

2          the cell front."

3      So could you please tell us what the testimony of Mr.

4  Perez was concerning the distance from the toilet to the cell

5  front?

6  A    I believe he was alleging that he couldn't fit between

7  there.  There was no way for him to fit in between the toilet

8  and the door.

9  Q    Have you been in a cell in the SHU at Pelican Bay?

10 A    Yes, I have.

11 Q    How many times?

12 A    Numerous.

13 Q    And could an inmate be at the toilet and have another one

14 between the toilet and the cell front?  Is that physically

15 possible?

16 A    Yes, it is.

17 Q    Okay.  And is that why you wrote that:

18          "It does appear plausible that Perez would be

19          able to move between his cellmate and the cell

20          front"?

21 A    Yes, that's correct.

22 Q    Now, Mr. Perez's cellmate, Rudy Guerrero, was also issued

23 a Rules Violation Report stemming from the same October

24 incident; do you remember that?

25 A    Yes, I do.

Q    And were you the Hearing Officer for that disciplinary

hearing also?

A    Yes, I was.

Q    And do you remember what Mr. Guerrero was charged with?

A    He was charged with the same, same charge:  Willfully

resisting, obstructing, delaying.

Q    And what was the result of that hearing?

A    I found him guilty of a lesser included charge of refusal

to obey orders.

Q    And why did you determine that Guerrero was guilty of a

lesser charge?

A    Again, for the same reason:  The criteria at Pelican Bay,

or the institutional policy; that there wasn't additional staff

response and it didn't cause a significant delay, or it wasn't

outlined as far as a significant delay.

Q    Now, did you review the same papers that had been pulled

from the toilet at Mr. Guerrero's hearing?

A    I didn't review the papers.  I just looked at the picture

of what was in the toilet.

Q    Okay.  But you were given photographs before the hearing?

A    Correct.

Q    Now, have you ever dismissed an RVR before Mr. Perez's?

A    Yes, I have.

Q    And is it uncommon for you to dismiss a RVR?

A    It's -- it's not uncommon.  It happens.  I would say

Case 3:13-cv-05359-VC  Document 176  Filed 11/24/15  Page 74 of 170

1   finding him guilty is probably more prevalent from the -- not

2   dismissing is more prevalent, but no, it happens, we dismiss

3   them.

4   **Q**    Okay.  And based on your experience as a Senior Hearing

5   Officer, did Officer Gates do anything inappropriate by writing

6   Mr. Perez the RVR?

7   **A**    No --

8            **MR. BENEDETTO:**  Objection.

9   **A**    -- not at all.

10           **THE COURT:**  Sustained.

11           **MS. NYGAARD:**  Okay.  Just one moment.

12       (Brief pause.)

13  **BY MS. NYGAARD**

14  **Q**    Now, Mr. Perez and Mr. Guerrero were both issued RVRs for

15  the October incident we just discussed, correct?

16  **A**    Correct.

17  **Q**    Now, do you recall whether the RVRs -- was it the same RVR

18  that was used for both of them?  The same report?

19  **A**    I couldn't tell you if it was the exact same.

20  **Q**    Okay.  But they were both written up for the same

21  incident, correct?

22  **A**    Correct.

23  **Q**    Now, is it standard procedure for an officer to write both

24  inmates involved in an incident an RVR?

25  **A**    Yes, it is.

1  Q    And why is that?

2  A    Because, generally, when you have two inmates in a cell,

3  one of them is going to claim responsibility for something.

4  The other one is going to say, "It wasn't me."

5       And they are both likely to know what was going on.  And

6  so we charge both of them and then let it go to the Senior

7  Hearing Officer to determine -- you know, they have to -- the

8  burden of proof falls on them to prove that they didn't know

9  what was going on in there.

10 Q    Okay.  So would you say that that's kind of a standard

11 procedure, to write both of the inmates up?

12 A    Absolutely.

13      (Brief pause.)

14 Q    Is it inappropriate for an officer to write an RVR that is

15 later dismissed?

16      MR. BENEDETTO:  Objection.

17      THE COURT:  Overruled.

18 A    No, not at all.

19 BY MS. NYGAARD

20 Q    And why not?

21 A    That's part of the due process.  We report misconduct and

22 it goes through a whole checks and balances to make it up to

23 even being heard.

24      So if it's inappropriate, it would have been screened out

25 at a lower level.

1  Q   Okay.  And what do you mean by "screened out at a lower

2  level"?

3  A   When an officer brings something to the sergeant and says,

4  "I want to change an inmate with something," most sergeants are

5  going to look at it and if it's inappropriate or wrong, they

6  are going to say no, or they are going to check the box to

7  lower it and make it something else, a 128 or informational, or

8  they are just going to throw it out and say you didn't meet the

9  charge.

10 Q   Okay.

11         MS. NYGAARD:  I have nothing further.  Thank you.

12         THE COURT:  Okay.  Now is a good time, I think, for

13 our morning break.  Why don't we resume at 10:30?

14     (Jury exits courtroom at 10:14 a.m.)

15         THE COURT:  Lieutenant, you're free to step down for

16 the break, of course.

17     (Witness steps down.)

18         THE COURT:  Okay.  We'll see you -- let me ask you.

19 Maybe we should talk a little bit about scheduling.  Please be

20 seated.

21     So we'll go -- we'll take a break until 10:30.  We have

22 the lieutenant and then we have one more witness, right?

23         MS. NYGAARD:  Yes, your Honor.  Defense will rest

24 after Lieutenant Anderson.

25         THE COURT:  Okay.  So if the defense rests after

 1  Lieutenant Anderson, we're talking about -- I assume we don't

 2  have much more than, like, 15 minute or something with

 3  Lieutenant Anderson.

 4      Will there be any rebuttal witnesses?

 5          **MR. LEE:**  There may, your Honor.  We'll confer at the

 6  break.  But if there is, it will be very short; ten minutes.

 7          **THE COURT:**  Okay.  So then I -- I guess what I would

 8  propose to do, kind of to go easy on the lawyers primarily, is

 9  when we finish up with the evidence, I will instruct the jury,

10  then send them to an early lunch you've a little time to

11  prepare your closing.

12      Then what I would propose is we do -- and maybe we will

13  give them an hour lunch instead of 45 minutes or something like

14  that.  And then we'll -- we can close, and I think after

15  closings, I would propose to send them home and not have them

16  begin deliberations this afternoon.

17      Because my guess is that we'll probably be done with

18  closings, you know, at around 2:00, maybe a little bit before

19  2:00 o'clock.  And I'm not sure that it makes sense to have

20  them start deliberating sort of almost at the end of the day on

21  Friday.  I think it probably makes more sense to have them

22  start deliberating on Monday morning.

23      How does that sound to everybody?

24          **MR. LEE:**  I mean, we defer to the Court on that.  I

25  don't have a sense of whether the jury would like to spend a

 1  few hours, whether they are willing to go to 5:00, or whether

 2  they would really rather, you know, just get out of here at

 3  2:00, 2:30 whenever.  So we would defer to the Court.

 4      **MS. NYGAARD:**  Defendants' position would be if the

 5  jury wants to start deliberating today, to let them start with

 6  that.  We have a lot of officers here who live way up state and

 7  if the jury were to come back today, then they could go home

 8  for the weekend.

 9      **THE COURT:**  I mean, the only thing I worry about is

10  people sort of feeling rushed.  You know, we have an hour and a

11  half to deliberate on Friday afternoon, and we've got to get

12  our -- you know, let's just get it done.  That's the concern

13  that I have with beginning deliberations, you know, sort of

14  towards the end of the day.

15      So let me think about that a little bit.

16      Okay.  See you at 10:30.

17      **THE CLERK:**  Court is in recess.

18      (Whereupon there was a recess in the proceedings

19       from 10:18 a.m. until 10:36 a.m.)

20      **THE COURT:**  Just to let you know, one of the jurors,

21  Ms. Jones, we just had a brief conversation out there.  She

22  mentioned that her screen wasn't working.  So I told her she

23  should feel free to go ahead to switch to another seat during

24  the testimony if she needs to to view the documents.

25      So I just wanted to let you know so that you don't get

 1  concerned if she starts moving around.

 2          **MS. NYGAARD:**  Okay.

 3          **THE COURT:**  Anything else before we call them back

 4  in?

 5          **MR. LEE:**  Yes, your Honor.  Just briefly.

 6      We are going to have a rebuttal case.  We're going to call

 7  Mr. Perez back to the stand.  So we'll have to clear the court

 8  after for a short --

 9          **THE COURT:**  Yep.  Yep.  So we will do a break after

10  the defense's testimony is done.  And then how long a break do

11  we need to get Mr. Perez set up.  Ten minutes?  Five minutes?

12      Ten?

13          **THE SHERIFF:**  Sure.

14          **THE COURT:**  Okay.

15          **MR. LEE:**  That's fine.

16          **MS. NYGAARD:**  Five minutes probably is enough to get

17  him from here to here.

18          **MR. LEE:**  However long the officers need.

19          **THE SHERIFF:**  Whatever it takes.

20          **THE COURT:**  You tell me.

21          **THE SHERIFF:**  Five minutes.

22          **THE COURT:**  Okay.

23      (Jury enters courtroom at 10:37 a.m.)

24          **THE CLERK:**  Please be seated.

25          **THE COURT:**  Have a seat.  You're still under oath.

 1              **THE WITNESS:**  Yes, sir.

 2                        <u>**CROSS EXAMINATION**</u>

 3   BY MR. BENEDETTO

 4   **Q**    Good morning, Lieutenant Anderson.

 5   **A**    Good morning.

 6   **Q**    You didn't participate in the cell search that is at issue

 7   here, is that right?

 8   **A**    Did I participate in the cell search?

 9   **Q**    Yes.

10   **A**    No.

11   **Q**    And you weren't a witness to the cell search, right?

12   **A**    No.

13   **Q**    If your role as the Senior Hearing Officer was to be an

14   independent judge of the allegations in the RVR, is that right?

15   **A**    Correct.

16   **Q**    And you're supposed to be fair and impartial, right?

17   **A**    Correct.

18   **Q**    And, in fact, you've received training on how to be a

19   Hearing Officer, is that correct?

20   **A**    That's correct.

21   **Q**    And at the hearing you reviewed evidence offered to

22   support the charge in the RVR, is that right?

23   **A**    Can you say that again?

24   **Q**    Sure.

25          In reaching a determination of the merits of the RVR you

1  reviewed certain kinds of evidence to support the charge in the

2  RVR, is that right?

3  **A**     Certain kinds?  I reviewed the RVR.

4  **Q**     You considered the testimony of Mr. Perez, is that right?

5  **A**     Correct.

6  **Q**     And you considered the written testimony of Officer Gates,

7  is that right?

8  **A**     Correct.

9  **Q**     Now, Officer Gates was the person who selected the charge

10  of willful obstruction, is that right?

11  **A**     I don't know.

12  **Q**     Do you have any reason to believe that someone other than

13  Officer Gates selected the charge of willful obstruction?

14  **A**     There is no way for me to know.

15  **Q**     In your experience, is it the case that an officer other

16  than the officer who drafts the RVR selects the charge that is

17  what the RVR is about?

18  **A**     The short answer is no.  A supervisor can change it.  It

19  could be changed.  It's not ultimately up to the officer --

20  **Q**     Not changed, but initially selected.

21  **A**     It can -- can the officer initially select it, what the

22  charge is?

23  **Q**     Yes.

24  **A**     Yes.

25  **Q**     You also considered photographic evidence, is that right?

1  **A**   I spoke to it, yes.  I didn't consider it.  It didn't have

2  much bearing on what he's being charged with.

3  **Q**   You considered photographic evidence though didn't you?

4  **A**   Correct.

5  **Q**   And you've heard of the phrase "a kite" isn't that right?

6  **A**   I have.

7  **Q**   And a kite is slang for gang-related papers, isn't that

8  right?

9  **A**   Kite is slang for a note that inmates pass.  Whether or

10  not it's gang related, I don't know.  It depends.

11  **Q**   You've heard of a kite referring to gang-related papers,

12  isn't that right?

13  **A**   Yes and no.  It's not only gang-related papers.  But, yes,

14  I've heard of that, yes.

15  **Q**   And you've also considered institutional policy, is that

16  right?

17  **A**   Correct.

18  **Q**   Now, in evaluating the merits of the RVR, you used what is

19  known as a preponderance of the evidence standard, is that

20  right?

21  **A**   That's correct.

22  **Q**   And that means that the evidence just has to tip the

23  scales, is that right?

24  **A**   Correct.  One way or the other.

25  **Q**   Something like 50 percent and a feather in favor of one

 1  side or the other, is that right?

 2  **A**    You could put it that way.

 3  **Q**    And you concluded that the allegations made by Officer

 4  Gates couldn't even be met under that standard, isn't that

 5  right?

 6  **A**    Under a preponderance of the evidence -- I don't think

 7  that they were meth, no.

 8  **Q**    Right.  And you used the preponderance standard to make

 9  that conclusion, isn't that right?

10  **A**    Correct.

11  **Q**    So the evidence put forth by Officer Gates in the RVR

12  didn't tip the scales in his favor at all, isn't that right?

13  **A**    In whose favor?

14  **Q**    In favor of Officer Gates.

15  **A**    He -- it's not really his favor.  He's reporting

16  misconduct.  It's not -- it's not like he wins or loses.  It's

17  not his favor.  Does that make sense?

18  **Q**    Sure.  But the evidence that you reviewed, you found

19  didn't tip the scales in favor of the merit of the allegations

20  that on made in the RVR, isn't that right?

21  **A**    The charges weren't substantiated in there.  I didn't

22  think it was adequate to substantiate the charge.

23  **Q**    Not enough facts?

24  **A**    Just wasn't there.

25  **Q**    You testified that it is standard policy to charge both

1   inmates, if they are cellmates, with the same RVR, is that

2   right?

3   **A**     They would both be charged.  Whether it's the same, not

4   always; but they would both be charged, yes.

5   **Q**     Not always.  That's not always the case?

6   **A**     That what?  That they are both charged?

7   **Q**     Right.

8   **A**     "All misconduct is reported."  So, yes.  I guess it would

9   be.  But whether it's the same charge or not, I couldn't tell

10  you.

11  **Q**     All right.  Just so I'm understanding your testimony.

12        Is it your testimony that when there is misconduct that

13  involves both cellmates in one cell, it is always the case that

14  both inmates are charged with the same offense?  "Yes" or "no"?

15  **A**     Yes.

16  **Q**     And was that one of the policies that you considered when

17  you evaluated the merits of the RVRs that were issued by

18  Officer Gates?

19  **A**     I didn't -- I didn't consider that policy, no.

20  **Q**     And that policy is not in Title 15, isn't that right?

21  **A**     Title 15 says, "All misconduct will be reported."

22  **Q**     Does Title 15 say that all misconduct involving two

23  cellmates must be -- must be reflected in RVRs issued to both

24  inmates with the same offense?

25  **A**     What you specifically said?  No.

1  Q    And that procedure or that policy is also not listed in

2  the CDCR Operations Manual, isn't that true?

3  A    The Operations Manual?

4  Q    Yes.

5  A    The DOM?

6  Q    Yes, the DOM.

7  A    Again, it says, "All misconduct will be reported."

8  Q    But the DOM does not say that it is standard procedure to

9  charge both cellmates with the same offense when there is

10  misconduct that may involve only one of them, isn't that right?

11  A    No, not really.  It says, "All misconduct is reported."

12  It doesn't get specific as to two cellmates in a cell; just all

13  misconduct.

14  Q    Well, let me ask a different question or ask the same

15  question differently.

16      Where is it reduced in writing that when there is

17  misconduct potentially involving two cellmates in one cell,

18  that both of them must be charged with the same offense in

19  separate RVRs?

20  A    It would be the California Code of Regulations.

21  Q    Isn't that Title 15?

22  A    Correct.

23  Q    But it's not in Title 15.

24  A    "All misconduct will be reported."  That's...

25  Q    You testified, I believe, that you didn't believe there

1   was enough information in the 115 authored by Officer Gates to

2   ask Officer Gates to clarify the contents of the RVR, is that

3   right?

4   **A**   Correct.  It's a stand-alone document, correct.

5   **Q**   So in your estimation, the 115 was so deficient that it

6   wasn't worth your time to have Officer Gates explain why the

7   RVR was appropriate, isn't that right?

8   **A**   No.

9   **Q**   No further questions.

10                  **REDIRECT EXAMINATION**

11  **BY MS. NYGAARD**

12  **Q**   Lieutenant Anderson, even though it isn't in Title 15

13  specifically, is it still standard procedure to write-up both

14  inmates who are involved in an incident in a cell?

15  **A**   Yes, it is.

16  **Q**   And would there ever be a time when both inmates did not

17  need to get written up?

18  **A**   It -- if it was specific to one inmate, then yes.  If you

19  had attempted murder or something, you're not going to charge

20  the other inmate in the cell with being part of the attempted

21  murder.

22      But generally all misconduct, both inmates know about it.

23  They know what's going on in there and so they are both

24  culpable for it.

25  **Q**   All right.  Thank you.  No further questions.

```
 1              MR. BENEDETTO:  Nothing further.

 2              THE COURT:  Okay.  Thank you, lieutenant.

 3         (Witness excused.)

 4              THE COURT:  Anything further from the defense?

 5              MS. NYGAARD:  Defendants rest.

 6              THE COURT:  Okay.  We are going to take -- I'm sorry

 7    to shuttle you in and out, but we're going to take a quick

 8    five-minute break and resume with a little bit more testimony

 9    from the plaintiffs and then we'll be wrapped up.

10         (Jury exits courtroom at 10:48 a.m.)

11              THE COURT:  Okay.  Back in a few.

12         (Whereupon there was a recess in the proceedings

13          from 10:48 a.m. until 10:54 a.m.)

14              MR. LEE:  Plaintiff calls Jesse Perez.

15              THE COURT:  Mr. Perez, you're still under oath.

16              THE WITNESS:  Yes.

17                        JESSE PEREZ,

18    called as a witness for the Plaintiff herein, having been

19    previously sworn, resumed the stand and testified further as

20    follows:

21                      DIRECT EXAMINATION

22    BY MR. BENEDETTO

23    Q    Good morning, Mr. Perez.

24    A    Good morning.

25    Q    Do you recall testimony from Lieutenant Barneburg
```

 1  regarding all of the ways a prisoner might let the prison know

 2  that he was unhappy with the condition of his cell after a cell

 3  search?

 4  **A**    I do.

 5  **Q**    And do you remember that lieutenant Barneburg testified

 6  that the prisoner could tell the line officer or he could tell

 7  the sergeant, he could tell various staff members?

 8  **A**    I do.

 9  **Q**    Did you tell the officers who completed the search on

10  October 10th, 2012 that you were unhappy with the condition of

11  your cell?

12  **A**    After Officer Gates had informed me they were going to do

13  everything they can to keep me in solitary, I thought it was

14  pretty much pointless to do so at that point.

15  **Q**    So the answer is no?

16  **A**    Yes.  No.

17  **Q**    And did you tell the floor officers who did not complete

18  the search that you were unhappy with the condition of your

19  cell on October 10th, 2012?

20  **A**    No.

21  **Q**    And why not?

22  **A**    You would have to understand.  In prison members of the

23  IGI unit are pretty much, if I could use the analogy, the cool

24  kids in high school.  So pretty much what they say goes.

25  Nobody is going to question it.

1   Q    And did you tell the sergeant about the condition of your

2   cell on October 10th, 2012?

3   A    No.

4   Q    And why not?

5   A    Pretty much the same reason.  Nobody is going to question

6   none of their actions.

7   Q    Do you remember testimony from Lieutenant Barneburg

8   regarding the 602 grievance process?

9   A    Yes.

10  Q    And briefly, what is the 602 process?

11  A    The 602 process is a process that a prisoner can actually

12  engage in to object or grieve any action by the department.

13  Q    Did you file a 602 grievance describing what happened to

14  your cell on October 10th, 2012?

15  A    Yes, I did.

16  Q    And you filed it just a few weeks after October 10th,

17  2012, isn't that right?

18  A    Yes.

19  Q    Do you remember the date that you filed the grievance?

20  A    I believe it was October 28, 2012.

21  Q    And did you write in that grievance, dated October 28th,

22  2012, that your cell had been trashed on October 10th?

23  A    Yes, I did.

24  Q    And did you write in that grievance the names of the

25  officers whom you believed trashed your cell?

1   A    Yes, I did.

2   Q    And did you list the five defendants?

3   A    Yes, I did.

4   Q    Officer Gongora?

5   A    Yes.

6   Q    Officer Healy?

7   A    Yes.

8   Q    Officer Pimentel?

9   A    Yes.

10  Q    Officer Gates?

11  A    Yes.

12  Q    Officer Burris?

13  A    Yes.

14          MR. BENEDETTO:  Your Honor, I would like to show the

15  witness a document that has been marked for identification as

16  Trial Exhibit 47.

17       (Whereupon, document was tendered to the Court.)

18          THE COURT:  Any objection?

19          MS. NYGAARD:  No objection.

20          MR. SEALS:  No objection.

21          THE COURT:  Okay.  You can approach or you can

22  publish it to him.

23          MR. BENEDETTO:  Just to show -- just to show the

24  witness.

25          MR. SEALS:  I'm sorry, your Honor.  We understood

 1  this to be used to refresh his recollection.

 2       Is it only being shown to Mr. Perez?

 3           **MR. BENEDETTO:**  Just to Mr. Perez.

 4       (Document displayed to the witness.)

 5  **BY MR. BENEDETTO**

 6  **Q**   Is it on your screen, Jesse?

 7  **A**   Yes.

 8  **Q**   This document, on the very, very top left-hand corner

 9  says:

10           "State of California, Inmate/Parolee Appeal,

11       CDCR 602."

12       Is that right?

13  **A**   That's correct.

14           **MS. NYGAARD:**  Objection, your Honor.  He's testifying

15  about a document that's -- reading from a document --

16           **THE COURT:**  Sustained.

17           **MS. NYGAARD:**  -- 0that's being used --

18           **THE COURT:**  Sustained.

19           **MR. BENEDETTO:**  May I lay a foundation for the

20  document, your Honor?

21           **THE COURT:**  Why don't we do a quick sidebar?

22       (Proceedings held at side bar.)

23           **THE COURT:**  Okay.  So with that dialogue, I started

24  to get confused with whether you were trying to use it to

25  refresh recollection or whether you were laying a foundation to

 1  get it admitted.

 2          **MR. BENEDETTO:**  I want to lay a foundation to get it

 3  admitted.

 4          **THE COURT:**  Okay.  And since we're here, do you want

 5  to give me the theory?

 6          **MR. BENEDETTO:**  Sure.

 7      The theory is that it is documentary evidence of the fact

 8  that the prison was on notice as of October 28th, 2012 that

 9  Mr. Perez had, in fact, grieved the trashing of his cell, which

10  is contrary to the implication, after the testimony of

11  Lieutenant Barneburg, that there were these various procedures

12  available to Mr. Perez and he didn't avail him of those

13  procedures.

14          **MS. NYGAARD:**  No.  That's not what Mister --

15          **THE COURT:**  Don't interrupt.

16          **MR. BENEDETTO:**  I'm not offering it for the truth

17  either that his cell was actually trashed.

18          **THE COURT:**  I understand that.

19      But can you summarize for me Lieutenant Barneburg's

20  testimony on that point, because I'm not sure I took that away

21  from his testimony.

22          **MR. BENEDETTO:**  He testified about -- you know, that

23  the 602 appeal process is available; that it's investigative;

24  that, you know, a prisoner could be recompensed for any damage,

25  and the -- we could not cross Lieutenant Barneburg on whether

1   Jesse had, in fact, filed a 602 in this case because he

2   wouldn't have personal knowledge of that.

3        But I believe that the -- that the misimpression from that

4   testimony that the jury could have is that, in fact, this

5   grievance was available to Mr. Perez and he didn't avail

6   himself of that procedure.

7             THE COURT:  Okay.

8             MS. NYGAARD:  Your Honor, we brought up the 602 in

9   our cross examination of Mr. Perez.

10       We're not saying he never filed one.  In fact, I

11  specifically mentioned it and asked him, you know, that he

12  didn't specifically request certain things in this.

13       Lieutenant Barneburg didn't say that Mr. Perez had never

14  submitted a 602.  His testimony was purely to say that there

15  are avenues for an inmate to grieve -- or to complain.

16       So we don't believe this has any --

17            THE COURT:  Do you want to stipulate that he, in

18  fact, filed a grievance?

19            MS. NYGAARD:  We have no problem stipulating to that.

20            THE COURT:  Does that address your problem?

21            MR. BENEDETTO:  What do you think about it?

22            MR. LEE:  I mean --

23            THE COURT:  Could I ask one more question before you

24  talk about that?

25       What is the -- do you see any harm to this document being

1  admitted as a prejudice to the defendant in any way --

2  defendants in any way?

3       **MR. SEALS:**  We believe it's a hearsay document --

4       **THE COURT:**  But it's not being offered to prove the

5  truth of what's in there.  It's being offered to rebut any

6  suggestions that he didn't avail himself of the avenues to

7  complain.

8     So my question is whether you believe it would be

9  prejudicial to the defendants in any way to admit this

10 document?

11      **MR. SEALS:**  We do believe it would be prejudicial.

12 We believe they are trying to admit it into evidence to support

13 Mr. Perez's story, which was also written down in this paper.

14 We never presented any evidence that he did not file the 602.

15      **MR. BENEDETTO:**  If it were admitted into evidence,

16 your Honor, I wouldn't ask Mr. Perez any other questions about

17 it.

18      **THE COURT:**  Okay.  Then the stipulation should

19 satisfy you.

20      **MR. BENEDETTO:**  We would like it admitted though.

21      **THE COURT:**  I understand.  But -- but if -- if -- I

22 don't believe that there has been any testimony or implication

23 that Mr. Perez made this up later, right?  And if -- you know,

24 if there had been, then this would be appropriate as to prior

25 inconsistent statement to the extent that Barneburg replied

 1  that he didn't avail himself of any avenue of complaining -- of

 2  complaint.  If they stipulate that he did, then that should

 3  alleviate any concern that you have.

 4          **MR. BENEDETTO:**  Okay.

 5          **THE COURT:**  Okay.  So you can -- after Mr. Perez gets

 6  done testifying, the two of you can create a stipulation and

 7  we'll read that to the jury.

 8          **MS. NYGAARD:**  A stipulation that he submitted the

 9  Inmate Appeal?

10          **MR. BENEDETTO:**  Yes.

11          **MS. NYGAARD:**  Yes.

12          **MR. SEALS:**  On October 28th.

13          **MR. BENEDETTO:**  On October 28th.

14          **THE COURT:**  Okay?

15          **MR. BENEDETTO:**  Okay.

16          **THE COURT:**  Thanks.

17          **MR. BENEDETTO:**  Thank you, your Honor.

18      (Proceedings held in open court.)

19  **BY MR. BENEDETTO**

20  **Q**   Mr. Perez, you filed a 602 grievance regarding what you

21  believe was the trashing of your cell on October 10th, 2012, is

22  that right?

23  **A**   Yes.

24          **MR. SEALS:**  Objection, misstates --

25          **THE COURT:**  Overruled.

 1          **MR. SEALS:**  -- the testimony.

 2          **THE COURT:**  Overruled.

 3 BY MR. BENEDETTO

 4 Q    And did the prison address your concerns?

 5 A    Not at all.

 6 Q    Did you pursue -- are you aware whether a 602 grievance

 7 can be pursued at various levels through the prison?

 8 A    It must be, if you're unsatisfied with the lower level

 9 response.

10 Q    And at every level of appeal, did the prison address your

11 concerns?

12 A    Not at all.

13 Q    Did you have any recourse, other than the filing of this

14 lawsuit, to seek the relief that you put into your 602

15 grievance?

16 A    No, I did not.

17          **MR. BENEDETTO:**  No further questions.

18                    **CROSS EXAMINATION**

19 BY MS. NYGAARD

20 Q    Good morning, Mr. Perez.

21 A    Good morning, Ms. Nygaard.

22 Q    Did you submit your Inmate Appeal on October 28th, 2012?

23 A    I believe so.

24 Q    And are you familiar with an Emergency Inmate Appeal

25 process?

1  A    I'm not entirely familiar with it, but I believe I've

2  heard about it.

3  Q    And you did not submit this Inmate Appeal as an emergency,

4  did you?

5  A    I believe that it was submitted just as a regular 602.

6  Q    Okay.  Thank you.  Nothing further.

7          MR. BENEDETTO:  Briefly.

8                    **REDIRECT EXAMINATION**

9  BY MR. BENEDETTO:

10 Q    Mr. Perez, are you aware that there are rules specifying

11 the time within which you must file a 602?

12 A    Yes.  It must be filed within 30 days after the incident

13 that you're objecting to.

14 Q    And did you file it within those 30 days?

15 A    Yes, I did.

16         MR. BENEDETTO:  Nothing further.

17         MS. NYGAARD:  Nothing.

18         THE COURT:  Okay.

19     (Witness excused.)

20         THE COURT:  We will take another very brief

21 five-minute break.  Everybody can remain seated.  Sorry again

22 to shuttle you in and out, but we'll have you back in five

23 minutes.

24     (Jury exits the courtroom at 11:07 a.m.)

25         THE COURT:  Okay.  Will there be anything further

```
 1   from the plaintiff?

 2           MR. BENEDETTO:  No, your Honor.

 3           MR. LEE:  No, your Honor.  We're working on a

 4   proposed stipulation right now.

 5           THE COURT:  Okay.  Go ahead and work on the proposed

 6   stipulation.  If you agree to it, you don't need to show it to

 7   me.  You can just read it to the jury.

 8       We'll be back in five minutes, and then I'll instruct them

 9   and send them to lunch.

10           MR. LEE:  Okay.

11           THE COURT:  Is there any objection to my telling them

12   that they are free, if they wish, to elect a foreperson during

13   the lunch hour?

14           MR. LEE:  No objection, your Honor.

15           MS. NYGAARD:  No objection.

16           THE COURT:  Okay.

17           THE CLERK:  Court is in recess.

18       (Whereupon there was a recess in the proceedings

19        from 11:08 a.m. until 11:14 a.m.)

20           THE COURT:  You agree on -- you came to agreement on

21   a stipulation?

22           MS. NYGAARD:  I think so.  Let me just double check.

23       (Brief pause.)

24           MR. BENEDETTO:  Yes, your Honor.

25           THE COURT:  Okay.  Go ahead and bring in the jury.
```

PROCEEDINGS

```
 1        (Jury enters courtroom at 11:14 a.m.)
 2             THE COURT:  Okay.  Anything else, Mr. Benedetto?
 3             MR. BENEDETTO:  The parties have reached one
 4   additional stipulation.
 5             THE COURT:  So, again, this is a factual stipulation
 6   that the parties have agreed to and it's been reached in order
 7   to avoid spending more of your time having you consider live
 8   testimony.  So this is something that you should consider as
 9   having been proved.
10             MR. BENEDETTO:  On October 28th, 2012, Mr. Perez
11   filed an inmate grievance on CDCR Form 602 alleging that his
12   cell had been trashed by defendants Gates, Gongora, Healy and
13   Pimentel on October 10, 2012.
14             THE COURT:  Anything further from the plaintiff?
15             MR. BENEDETTO:  No, your Honor.
16             MR. LEE:  No, your Honor.  Plaintiff rests your
17   Honor.
18             THE COURT:  Okay.  All right.  So we've now reached
19   the close of the evidentiary stage of the trial.  And so let me
20   talk to you a minute about how we're going to proceed from
21   here.  It's a little after 11:15 right now.  So what we're
22   going to do is I'm going to read you the instructions that will
23   govern your deliberation is in this case.  You'll have a
24   written copy of these instructions with you in the jury room,
25   so do not feel the need to take notes at all when I'm reading
```

PROCEEDINGS

```
 1  you these instructions.  That will take a little bit of time to
 2  read you the instructions.
 3      Then I thought rather than going straight to closing
 4  arguments, we would give the lawyers a break and we would let
 5  them prepare their closing arguments during the lunch hour.  So
 6  I'll send you out for a somewhat early lunch probably.
 7      We will take a lunch break.  We'll come back after lunch
 8  and the lawyers after lunch will present their closing
 9  arguments to you.  Each side has been given 45 minutes for
10  closing arguments.  Okay?
11      So that will probably get us to somewhere between 1:30 and
12  2:00 o'clock I'm guessing, okay?  So at that point it will be
13  your choice whether to begin deliberating or to go home and
14  come back on Monday and begin your deliberations on Monday.
15      As I told you at the beginning of this process, we
16  guarantee to have you out of here before 2:30 every day, except
17  if you choose during deliberations to go beyond that time.  So
18  that will be your choice.
19      And you will -- as part of -- the first thing you're
20  suppose to do when you begin your deliberations is to elect a
21  foreperson.  If you wish during the lunch break, you can elect
22  a foreperson and -- but regardless of whether you elect a
23  foreperson or not, I would ask you during the lunch break to
24  discuss among yourselves whether you wish to begin deliberating
25  immediately after closing arguments or whether you prefer to go
```

FINAL JURY INSTRUCTIONS

1  home after closing arguments and begin deliberating on Monday.

2       It might be easier to elect a foreperson first, to

3  communicate that to us, but it's -- it's actually really not

4  necessary.  All you have to do is just communicate to Kristen.

5  Any one of you or all of you can communicate to Kristen back

6  there what you would prefer, as far as your scheduling

7  preference.  So if it seems like it will be a time consuming

8  process to elect the foreperson during lunch, as I think about

9  it, no need to really bother doing that.

10      So let me instruct you.

11                    **FINAL JURY INSTRUCTIONS**

12           **THE COURT:**  Now that you've heard all the evidence,

13  it's my duty to instruct you about the law of the case.  You

14  must not infer from these instructions or from anything that I

15  may say or do or from anything that I may have done or said as

16  indicating that I have an opinion regarding the evidence or

17  what your verdict should be.  It is your duty to find the facts

18  from all the evidence in this case.  To those facts you will

19  apply the law as I give it to you in these instructions.

20      You must follow the law as I give it to you, whether you

21  agree witness or not.  And you must not be influenced by any

22  personal likes or dislikes, opinions, prejudices or sympathy.

23  That means that you must decide the case solely on the evidence

24  before you.  You will recall that you took an oath at the

25  beginning of this process to do that.

FINAL JURY INSTRUCTIONS

1   In following my instructions it's important that you

2   follow all of them and not single out some and ignore others.

3   They are all important.

4       Regarding the burden of proof, preponderance of evidence.

5   We talked about that.  This case is governed by the

6   preponderance of the evidence burden of proof.  When a party

7   has the burden of proof on any claim by a preponderance of the

8   evidence, it means you must be persuaded by all the evidence

9   that the claim is more probably true than not true.  You should

10  base your decision on all of the evidence regardless of which

11  party presented it.

12      You should decide the case as to each defendant

13  separately.  Unless otherwise stated, the instructions apply to

14  all parties.

15      The evidence you are to consider in deciding what the

16  facts are consists of:

17      The sworn testimony of any witness;

18      The exhibits which are received into evidence;

19      And any facts to which the lawyers have agreed.

20      But in reaching your verdict you may consider only the

21  testimony and exhibits received into evidence and the factual

22  stipulations reached.

23      Certain things are not evidence and you may not consider

24  them in deciding what the facts are.

25      Arguments and stayed by lawyers are not evidence.  The

1   lawyers are not witnesses.  What they have said in their

2   opening statements, what they will say during their closing

3   arguments and what they have said at other times is intended to

4   help you interpret the evidence, but it is not evidence.  If

5   the facts as you remember them differ from the way the lawyers

6   have stated them, your memory of them controls.

7       Questions and objections by lawyers are not evidence.  As

8   you noticed during trial, attorneys have a duty to their

9   clients to object when they believe a question is improper

10  under the Rules of Evidence.  You should not be influenced by

11  the objection or by my ruling on the objection.

12      Anything you may have seen or heard when the Court was not

13  in session is not evidence.  You are to decide the case solely

14  on the evidence received at trial.

15      In deciding the facts of this case you may have to decide

16  which testimony to believe and which testimony not to believe.

17  You may believe everything a witness says, or part of it, or

18  none of it.  Proof of a fact does not necessarily depend on the

19  number of witnesses who testify about it.

20      In considering the testimony of any witness, you may take

21  into account:

22      The opportunity and ability of the witness to the see or

23  hear or know the things testified to;

24      The witness's memory;

25      The witness's manner while testifying;

1      The witness's interest in the outcome of the case, and any

2   bias or prejudice;

3      Whether other evidence contradicted the witness's

4   testimony;

5      The reasonableness of the witness's testimony in light of

6   all the evidence;

7      And any other factors that bear on believability.

8      The weight of the evidence as to a fact does not

9   necessarily depend on the number of witnesses who testify about

10  it.

11     As I've mentioned, the parties have agreed to certain

12  facts that were read to you.  You should, therefore, treat

13  these facts as having been proved.

14     The evidence that a witness has been convicted of a crime

15  on a prior occasion may be considered, along with all other

16  evidence, in deciding whether or not to believe the witness and

17  how much weight to give the testimony of the witness and for no

18  other purpose.

19     Some witnesses, because of education or experience, are

20  permitted to state opinions and the reasons for those opinions.

21  Opinion testimony should be judged like any other testimony.

22  You may accept it or reject it and give it as much weight as

23  you think it deserves considering the witness's education and

24  experience, the reasons given for the opinion, and all the

25  other evidence in the case.

```
 1        When you begin your deliberations, you should elect one
 2   member of the jury as your presiding juror or foreperson.  That
 3   person will preside over the deliberations and speak for you
 4   here in court.  You will then discuss the case with your fellow
 5   jurors to reach agreement, if you can do so.  Your verdict must
 6   be unanimous.
 7        Each of you must decide the case for yourself, but you
 8   should do so only after you have considered all of the
 9   evidence, discussed it fully with the other jurors, and
10   listened to the views of your fellow jurors.  Do not hesitate
11   to change your opinion if the discussion persuades you that you
12   should.  Do not come to a decision simply because other jurors
13   think it's right.  It's important that you attempt to reach a
14   unanimous verdict, but, of course, only if each of you can do
15   so after having made your own conscientious decision.  Do not
16   change an honest belief about the weight and effect of the
17   evidence simply to reach a verdict.
18        I'm not going to read this instruction again because I've
19   told it to you so many times, but I'll just remind you that now
20   is the most important time -- the whole time it's very
21   important, but now it's even more critical that you not
22   communicate with anybody about what's gone on in trial, and you
23   do not try to do any outside research, and you make sure that
24   you conduct yourselves -- yourselves in a way that allows you
25   to decide the case based only on the evidence you heard in the
```

1    courtroom.

2        If it becomes necessary during your deliberations to

3    communicate with me, you may send a note through the Courtroom

4    Deputy, Kristen, signed by your presiding juror or by one or

5    more members of the jury.  No member of the jury should ever

6    attempt to communicate with me except by a signed writing.  I

7    will communicate with any member -- I will communicate with any

8    member of the jury on anything concerning the case only in

9    writing or here in open court.

10       If you send out a question, I will consult with the

11   parties before answering it, which may take some time.  You may

12   continue your deliberations while waiting for me to answer any

13   question.  Remember, that you are not to tell anyone, including

14   me, how the jury stands, numerically or otherwise, until after

15   you have reached a unanimous verdict or have been discharged.

16   Do not disclose any vote count in any note to the Court.

17       A verdict form has been prepared for you.  After you've

18   reached a unanimous agreement on a verdict, your presiding

19   juror will fill in the form that has been given to you, sign it

20   and date it, and advise the Court that you are ready to return

21   to the courtroom.

22       Let's talk about the substantive law regarding the First

23   Amendment.

24       As previously explained, the plaintiff has the burden to

25   prove that the acts of the defendants deprived him of

 1  particular rights under the United States Constitution.  In

 2  this case the plaintiff, Mr. Perez, alleges that the

 3  defendants, Gates, Gongora, Healy, Pimentel and Burris,

 4  deprived him of his rights under the First Amendment to the

 5  Constitution by retaliating against him for having previously

 6  filed a lawsuit.

 7      To prove that a defendant deprived Perez of his First

 8  Amendment rights, Perez must prove the following elements by a

 9  preponderance of the evidence:

10      One, Perez engaged in conduct protected under of the First

11  Amendment.

12      Two, the defendant took some adverse action against

13  Mr. Perez.

14      Three, the adverse action would chill an inmate of

15  ordinary firmness from future First Amendment activities.

16      Four, Perez's protected conduct was a substantial or

17  motivating factor for the adverse action by the defendant.

18      And, five, the action did not reasonably advance a

19  legitimate correctional goal.

20      With respect to that first element, whether Perez engaged

21  in conduct protected under the First Amendment, I instruct you

22  that Perez's conduct in this case, filing a lawsuit, was

23  protected under the First Amendment and, therefore, the first

24  element requires no proof.

25      The second element of a first amendment retaliation claim,

1    as I just mentioned, is adverse action.  An adverse action is

2    one that results in any harm to a plaintiff that is more than

3    minimal.  A threat of more than minimal harm may also

4    constitute an adverse action regardless of whether it's carried

5    out.

6         To prove the third element of a First Amendment

7    retaliation claim, Perez must show that the adverse action

8    taken by any of the defendants would chill or silence an inmate

9    of ordinary firmness from future First Amendment activities.

10        To chill in this context means to deter a person from

11   engaging in future activities protected by the First Amendment.

12   Therefore, if you find that the action a defendant took would

13   have chilled an inmate of ordinary firmness, Perez has proven

14   this element as to that defendant even if Perez himself

15   continued to engage in protected conduct.

16        Substantial or motivating factor.  A substantial or

17   motivating factor is a significant fact.

18        The fifth element, legitimate correctional goal.  To

19   prevail on his retaliation claim as to any defendant, Perez

20   must also prove the fifth element; namely, that the defendants'

21   conduct did not advance a legitimate correctional goal.

22   Retaliation is not a legitimate correctional goal.  Legitimate

23   correctional goals can include things like preserving

24   institutional security or stopping prison gang activity.

25        Using prison procedures as a pretext to punish inmates who

1  engage in First Amendment activity does not advance a

2  legitimate correctional interest even if prison regulations

3  allow the defendants to use the procedure.

4       The issue of conspiracy.  In addition to alleging that

5  each defendant individually retaliated against him, Perez also

6  alleges that the defendants entered into a conspiracy to

7  retaliate against him.  You may find that all five of the

8  defendants or some of the defendants or none of the defendants

9  entered into a conspiracy.

10      To prove a conspiracy, Perez must show by a preponderance

11 of the evidence that two or more defendants reached an

12 agreement or meeting of the minds to violate Perez's rights.

13 To be liable, each participant in the conspiracy need not know

14 the exact details of the plan, but each participant must at

15 least share the common objective of the conspiracy.  It is

16 sufficient if the defendants shared a common objective, even if

17 they did not reach an express agreement.  The agreement need

18 not be overt and may be inferred based on circumstantial

19 evidence.

20      If you find that any defendant violated the plaintiff's

21 First Amendment rights and/or conspired to violate his First

22 Amendment rights, you will also be asked to decide whether the

23 defendants' conduct was malicious, oppressive or in reckless

24 disregard of the plaintiff's First Amendment rights.

25      Conduct is malicious if it was accompanied by ill-will or

1  spite or if it was for the purpose of injuring the plaintiff.

2  Conduct is in reckless disregard of the plaintiff's rights if,

3  under the circumstances, it reflects complete indifference to

4  the plaintiff's safety or his rights or if the defendant acts

5  in the face of a perceived risk that his actions will violate

6  the plaintiff's rights under federal law.

7       An act or omission is oppressive if the defendant injures

8  or damages or otherwise violates the rights of the plaintiff

9  with unnecessary harshness or severity, such as by the misuse

10 or abuse of authority or power or by taking advantage of some

11 weakness or disability or misfortune of the plaintiff.

12      Finally, this case is about whether any or all of the

13 defendants retaliated against and/or conspired to retaliate

14 against the plaintiff, Jesse Perez, for the exercise of his

15 First Amendment rights.  Any decision you make should,

16 therefore, be based solely on your application of the law of

17 First Amendment retaliation and conspiracy, as I have given it

18 to you, to the evidence adduced at trial and must not be

19 influenced by any personal agreement or disagreement you may

20 have with the California Department of Corrections' policies.

21      And with that, we will take a lunch break.  As I said,

22 really, the only thing you need to do is chat amongst

23 yourselves about whether you wish to begin deliberations

24 immediately following closing arguments or you wish to begin

25 deliberations on Monday morning.

PROCEEDINGS

```
 1        We will take a lunch break until 12:30, take a slightly

 2   longer lunch break today until 12:30, and at 12:30 we will

 3   begin with closing arguments.

 4        (Jury exits courtroom at 11:35 a.m.)

 5            THE COURT:  Anything, anything further to discuss?

 6            MR. LEE:  Just wanted to clarify, your Honor, that in

 7   addition to the 45 minutes of argument on either side, I will

 8   have a rebuttal argument, too.

 9            THE COURT:  Yeah.  And I -- that crossed my mind just

10   before you asked about it.  How much time would it be

11   appropriate to give you for rebuttal?

12            MR. LEE:  Twenty minutes?

13            THE COURT:  I was sort of thinking 15.

14            MS. NYGAARD:  We think 20 is excessive, your Honor.

15            THE COURT:  15 minutes for rebuttal.

16            MR. LEE:  All right.  Very well.

17            THE CLERK:  Court is in recess.

18        (Whereupon at 11:36 a.m.proceedings

19         were adjourned for noon recess.)

20

21

22

23

24

25
```

1                          **P R O C E E D I N G S**

2    **November 20, 2015**                                    **12:32 p.m.**

3         (The following proceedings were held outside of the

4          presence of the Jury)

5              **THE CLERK:**  Remain seated, come to order; court is

6    back in session.

7              **THE COURT:**  One second.  It was an exceedingly minor

8    thing, but I thought I would mention it.  On the First

9    Amendment instruction where it lists the five elements, there

10   was one superfluous word which I crossed out, the word

11   "additionally."

12        Did you see that?

13             **MS. NYGAARD:**  Yes.

14             **MR. BENEDETTO:**  Yes, yes.

15             **THE COURT:**  All right.  Bring in the jury.

16        (A pause in the proceedings)

17        (Off-the-Record discussion between the Court and

18          Clerk)

19             **THE COURT:**  I told her to tell them that they could

20   decide it after closings if they want.  And if there was an

21   irreconcilable disagreement, I'll decide for them.

22             **MR. LEE:**  Not a good sign if they can't --

23             **THE COURT:**  Good start to the deliberations.

24        (A pause in the proceedings)

25        (The following proceedings were held in the presence

1      of the Jury)

2           **THE CLERK:**  Please be seated.

3           **THE COURT:**  All right.  Mister -- is it going to be

4    Mr. Benedetto?

5           **MR. BENEDETTO:**  Yes, Your Honor.

6      (Photograph displayed)

7                          <u>**CLOSING ARGUMENT**</u>

8    BY MR. BENEDETTO:

9      Good afternoon, ladies and gentlemen.

10     There's a story in Greek mythology about a man named

11   Sisyphus.  In the myth, Sisyphus was punished by having to roll

12   a giant boulder up a hill, only to have the boulder roll back

13   down the hill as soon as he reached the top.

14     For all of eternity, alone and lonely, Sisyphus pushed

15   that boulder each and every day, only to discover each and

16   every time that his punishment would not change.  The boulder

17   would roll back down the hill again.

18     My client, Jesse Perez, pushed his own boulder up a very

19   steep hill for the better part of a decade.  He was alone.  But

20   he was determined to get to the top of that hill.  And as the

21   evidence shows, one day in October of 2012, he did just that.

22   He learned that the lawsuit he had filed against prison

23   officials in 2005 was going to be settled.

24     For Jesse Perez, with a seventh-grade education, locked in

25   a concrete box for 22 1/2 hours a day, 157 1/2 hours a week,

1  8,212 1/2 hours a year, that was his own version of reaching

2  the top of that hill.  He could finally see way out of the SHU.

3  It was a view he had been fighting to see for a very long time.

4       But like Sisyphus, Jesse Perez was not going to be so

5  lucky.  The defendants in this case decided to push that

6  boulder back down the very long and very steep hill.  The

7  defendants decided to punish Mr. Perez for all of that hard

8  work.  For all of that determination to prove that he deserved

9  more than a life alone and forgotten, each long day the same as

10 the next, contemplating a fate that ultimately would never

11 change.

12      Four days ago, my colleague Randall Lee told you that the

13 evidence would show that each of these defendants, Mr. Burris,

14 Mr. Pimentel, Mr. Gates, Mr. Gongora and Mr. Healy, violated my

15 client's First-Amendment rights by taking matters into their

16 own hands.

17      We have made that case.  We thank you for paying such

18 close attention over the course of these four days.  Soon, you

19 will have the opportunity for the first time as a jury to

20 discuss this case, and the evidence that has been presented to

21 you.

22      We know you as a jury will take this charge very

23 seriously.  It is the centerpiece of justice in this country.

24 You have the power to pulverize that rock that Jesse Perez

25 pushed every day for seven years.  You have the power to say

1  these defendants crossed the line.  The evidence in this case

2  compels you to do so.

3      I want to spend my time this afternoon walking through the

4  evidence and explaining how we have met our burden to prove

5  that the defendants retaliated against Mr. Perez.  The Court

6  has already instructed you on the law that you will have to

7  apply in this case.  You have learned that the plaintiff has

8  the burden of proof.  That means we have to prove that it is

9  more probably true than not that the defendants retaliated

10  against Mr. Perez.

11      This is not a criminal trial.  The test is not beyond a

12  reasonable doubt.  The test, as Lieutenant Anderson described

13  this morning, the test is whether the evidence in this case has

14  tipped the scale ever so slightly in Mr. Perez's favor.

15      Let me tell you how we have met that burden.  Let's start

16  at the top of the hill, in October of 2012.  That month in 2012

17  was an important one, both for Mr. Perez and for the CDCR.

18  Mr. Perez learned in October, 2012, that he had achieved what

19  he believed was a victory in a lawsuit he had filed back in

20  2005 against gang investigators and CDCR officials.  He told

21  you that he filed that lawsuit because he believed that his

22  validation as a prison gang associate violated his

23  constitutional rights.

24      The State of California fought that lawsuit for seven

25  years.  Mr. Perez did not have a lawyer.  He did not have any

1  formal legal training.  As he told you, Mr. Perez did not make

2  it past the seventh grade.  For him, filing the lawsuit was

3  like learning to put together a 100-piece jigsaw puzzle in the

4  dark.

5      Just imagine what the view from the top of that hill must

6  have been like for him.  Because even in the SHU -- because in

7  the SHU, as Officer Pimentel told you, Mr. Perez had no view of

8  anything.

9      There is just no dispute that the space which confined

10 Mr. Perez for nearly ten years was eight feet by ten.  It had

11 no windows.  It had concrete slabs for a bed.  It was a

12 concrete box.  It was Mr. Perez's entire world for ten years.

13 It was his home.  He ate there, he slept there, he exercised

14 there, he read there, he worked on developing his art skills

15 there.

16     There, he imagined what that view from the top of the hill

17 would be like, one day.

18     Why was Mr. Perez in solitary confinement to begin with?

19 As Mr. Perez testified, when he was incarcerated at a prison

20 other than Pelican Bay, a gang investigator decided he was

21 affiliated with a prison gang as a gang associate.  That was

22 2003.  At the time, that was all it took for Mr. Perez to be

23 sent to the SHU for an indeterminate sentence.  "Indeterminate"

24 means no end.  Potentially, forever.

25     As Mr. Perez testified, he knew he would stay in the

1  Security Housing Unit until the IGI would determine that he was

2  no longer an associate, or he died.  This was the bottom of the

3  hill.

4      For the better part of ten years, he had no contact with

5  anyone other than prison guards.  He could not take classes or

6  eat with other inmates.  He was able to exercise 90 minutes a

7  day in a cement box that looked like that (Indicating).

8      He had no contact visits with his family.  When his family

9  was able to make the trip to Pelican Bay, he had to see them

10  from behind a glass barrier, surrounded by prison guards.  He

11  couldn't hug, he couldn't hold their hands, or even play cards

12  with them.

13      He could not use the phone.  He told you that he was not

14  even granted an exception to use the phone when his brother was

15  involved in a roadside bomb when deployed in Iraq.

16      He was cut off from the life of his family.  Rather than

17  being an active participant in their lives, he was relegated to

18  merely observing.  He would hear about what took place in his

19  family weeks after the event happened.

20      Mr. Perez knew he needed to fight his way back in.  He

21  didn't want to be a stranger to the people he loved the most.

22      So what did Mr. Perez do?  Did he give up?  Did he lose

23  his mind?  No.  He told you that he observed other inmates in

24  the SHU have total mental breakdowns.  Not Jesse Perez.  He got

25  stronger.  And like Sisyphus, he also got to work.

1    He didn't know much, but he believed that his validation

2    as a gang associate violated his constitutional rights.  He

3    told you that he taught himself of enough of the law to file a

4    lawsuit to make that case.  He did so by going to what the

5    Pelican Bay SHU called a library.  Mr. Perez told you it was a

6    metal cage that looked like a coffin standing right side up.

7    Jesse Perez taught himself the law, page by page, book by

8    book, passed to him through a slot in a cage.  He started to

9    push that rock.  He filed motions, responses, oppositions.  He

10   litigated the case for years, by himself, through the mail.  By

11   hand.  No computer, no word processor, no legal background.  He

12   won a significant victory in the trial court when a federal

13   judge ruled in his favor and held that there was sufficient

14   evidence to go to trial against the CDCR officials he had sued.

15   He kept pushing that rock higher and higher up the hill.

16   The State of California pushed back and appealed the

17   Court's decision.  While the appeal was pending, the State

18   asked Mr. Perez if he would be interested in settling the case.

19   They soon began negotiating a settlement.

20   Remember what the view from the top of that hill would

21   mean to Mr. Perez.  It would mean hope.  Hope that there was a

22   way out of solitary confinement.  So at the center of

23   Mr. Perez's settlement demands was something specific and

24   meaningful.  He wanted a new gang validation under new gang

25   management policies that the CDCR was going to implement.  This

 1  was the STG Pilot Program.  You heard Mr. Perez testify that a

 2  new validation under these new policies was his primary demand

 3  in the ongoing negotiations.

 4      You heard testimony from Mr. Perez and Mr. Barneburg about

 5  the STG Pilot Program.  It was an overhaul of CDCR's gang

 6  management policies.  Mr. Barneburg described it as a big

 7  culture change within the CDCR.  In fact, he said it was a very

 8  difficult time within IGI because rules were changing.  Things

 9  that they had been doing for years and years were changing very

10  rapidly.

11      All of the nuts and bolts of this program are not

12  important for you in this the case.  What is crucial is that

13  the new policy changed how prison gang associates were assigned

14  to the SHU.  This is not in dispute.

15      In 2003, you will remember, Jesse Perez was assigned to

16  the SHU automatically upon his validation as a prison gang

17  associate.  That changed with the STG Pilot Program.

18      Under the new policy, an inmate who was validated as a

19  prison gang associate will also needed to have a serious rules

20  violation with some connection to a prison gang in his prison

21  file.

22      Why did Mr. Perez care about this new policy?  Because he

23  knew that he did not have in his file a serious rules violation

24  with a prison gang connection.  He knew that if he was provided

25  a new validation, under the new policy, he could get out of the

 1  SHU.

 2      In October, 2012, Mr. Perez learned that the State of

 3  California had agreed to his settlement demands.  Once the new

 4  policy was in effect, he would receive his new validation.

 5  Jesse Perez was almost at the top of the hill, and the view

 6  looked good.

 7      I told you that month, October, 2012, was important also

 8  for the CDCR.  That was because on October 12th, the CDCR

 9  published a memorandum announcing the STG Pilot Program.

10      You will have Exhibit 4 with you in the jury room.  You

11  heard Mr. Barneburg, the former institutional gang investigator

12  at Pelican Bay, talk to you about the new program.

13  Mr. Barneburg told you that the defendants knew about it.

14      Was the publication of the STG program memorandum in

15  October 2012 a surprise to the defendants?  Not at all.  That's

16  what Mr. Barneburg told you.

17      Officer Gongora told you that there was a lot of talk

18  about the program, as early as 2011.  He told you that the

19  program was one of the responses by the CDCR to the 2011 hunger

20  strikes at Pelican Bay.  And that the program was discussed

21  during trainings in February and July, 2012.

22      Mr. Burris also told you that he learned some time in 2011

23  or 2012 that this were changes coming, and that he was sure

24  that he was trained on those changes before they were

25  implemented.

```
 1         And of course, it makes sense that gang investigators
 2   heard about this program before it was implemented.  When the
 3   CDCR implements a program like this, which was a massive
 4   overhaul of the policies that were formerly in place, it is
 5   going to tell all of its employees who are responsible for
 6   carrying out the new policy.  If not, how else would they know
 7   what the new policies are and how they are different?
 8         Mr. Perez told you that he knew about the STG program
 9   since late 2011.  He cared about the CDCR's housing policy
10   because of his lawsuit.  He told you he read six drafts of the
11   memorandum before it was finalized.  That was his way out of
12   the SHU, or so he thought.
13         On October 10, 2012, these defendants began to push that
14   rock back down the hill while Mr. Perez stood by, powerless,
15   yet again.
16         Remember, on October 10, 2012, Mr. Perez was still engaged
17   in settlement negotiations.  There was no court order.  There
18   was no executed settlement agreement.
19         You heard from Mr. Barneburg that on the day he ordered
20   Mr. Burris and Mr. Pimentel to begin a new validation of
21   Mr. Perez.  That was Exhibit 68.
22         Tim, can you show that?
23         (Document displayed)
24         MR. BENEDETTO:  "Think Castro case."  Mr. Barneburg
25   told you that he expected the gang investigators he worked
```

 1  with, intelligent people who can string three sentences

 2  together, to know what "think Castro case" meant.  That doesn't

 3  seem too hard, since the email notes that *Castro* is a case.

 4  You don't need a law degree to know that.

 5      Mr. Barneburg also expected that intelligent AIGIs would

 6  open the email's attachment, which was a document that

 7  referenced Mr. Perez's lawsuit.  Mr. Burris testified that he

 8  thought Mr. Perez had a court order as of October 10, 2012, to

 9  receive a new validation.

10      Mr. Gongora testified that the cell search was taking

11  place because of a court case.  But you heard that in his

12  deposition, Mr. Gongora testified that he believed Mr. Perez

13  had won a new court case.

14      You can conclude from this evidence that before any search

15  began on October 10, 2012, Mr. Burris, Mister -- Mr. Pimentel

16  and Mr. Gongora knew that Mr. Perez had filed a lawsuit against

17  the CDCR.  Their supervisor, Mr. Barneburg, knew that too.  He

18  received the request for settlement authority from Mr. Perez's

19  2005 lawsuit.  He sent that memorandum to Mr. Burris and

20  Mr. Pimentel.  "See attached."  He told you he expected they

21  would read it.  These defendants followed orders.

22      But Mr. Perez wasn't entitled to a new validation yet.

23      (Document taken off display)

24          **MR. BENEDETTO:**  His settlement was not final until

25  June of 2013.  That is eight months later.  That there was no

1   court order with requiring a new validation.  The entire basis

2   for Mr. Barneburg's order on October 10, 2012, was just wrong.

3   As you might imagine, Mr. Perez had no idea why officers

4   appeared at his cell that day to conduct a validation search.

5        In addition to the retaliation claim, Mr. Perez has

6   brought a conspiracy claim in this the case.  That means you

7   can find that the defendants conspired to retaliate against

8   Mr. Perez, if you find that their conduct resulted from an

9   agreement they reached.

10       The Court has instructed you that the agreement doesn't

11  have to be overt or express.  It is enough if Mr. Perez shows

12  that the defendants shared a common objective:  To teach

13  Mr. Perez a lesson.  Not every defendant has to know the exact

14  details of the plan.

15       There's no smoking-gun email I can show you to prove a

16  conspiracy.  But you have something else.  You have facts.

17  Facts that fit together in a very particular way.

18       The defendants worked closely together.  Some of them,

19  every day.  Fact.

20       They shared offices.  Fact.

21       They shared information as gang investigators to keep tabs

22  on inmates.  Fact.

23       They were friends.  Another fact.

24       You can consider all of this evidence, that defendants

25  acted together, and infer that a conspiracy was formed.  Ask

1  yourselves:  Does any of this make sense if the defendants are

2  not working together?

3      Four of the defendants, Mr. Gates, Mr. Healy,

4  Mr. Pimentel, and Mr. Gongora, showed up to Mr. Perez's cell.

5  They ordered him to strip down.  He complied.  They ordered him

6  to cuff up.  He complied.  They ordered Mr. Guerrero to cuff

7  up.  He complied.

8      In October, 2012, Mr. Perez had a cellmate.  Mr. Guerrero

9  testified on Tuesday.  The request for Mr. Perez and

10  Mr. Guerrero to occupy the same cell as cellmates, went all the

11  way up to the institutional gang investigator at Pelican Bay,

12  Mr. Barneburg.  That was in May, with 2012.  About five months

13  before this search.

14      We showed you a document about that.  Remember that

15  document?  "Recommend close scrutiny by IGI."

16      Close scrutiny of whom?  Mr. Perez and Mr. Guerrero.  By

17  whom?  The IGI at Pelican Bay.  The defendants were five of the

18  seven AIGIs at Pelican Bay in October of 2012.  Mr. Barneburg

19  was the lieutenant in charge of the unit.  They followed his

20  orders.

21      Mr. Barneburg testified that when he gave an order, he

22  expected that it would be followed.  "Recommend close scrutiny

23  by IGI."  If not by defendants, then by whom?

24      As both Mr. Perez and Mr. Guerrero testified, they were

25  escorted out of their cell by officers Gates and Healy to

```
 1  separate holding cell while the search of their cell was
 2  conducted. Mr.  Pimentel, Mr. Gates and Mr. Gongora completed
 3  the search.
 4      Mr. Healy did not sign the cell search receipt but
 5  Mr. Perez, Mr. Gates and Mr. Gongora put him there at the
 6  search too.
 7      Mr. Perez testified that when he was out of his cell, he
 8  told Mr. Gates that he needed any paperwork in his cell
 9  returned to him because he had a lawsuit pending.  Mr. Perez
10  told you that Mr. Gates said something to the effect of "You
11  might have been able to collect from us, but get comfortable,
12  because we're going to make sure you stay here where you
13  belong."
14      Mr. Perez told you that he understood Mr. Gates to be
15  saying that he was going make sure he stayed in solitary
16  confinement.  Mr. Perez knew -- he was told -- that defendants
17  thought where he belonged was the SHU.  At the bottom of the
18  hill.
19      Mr. Guerrero testified that while he was separated from
20  Jesse in the holding cell, Mr. Healy asked him if he was into
21  filing lawsuits too.  Mr. Guerrero said that he wasn't.
22  Mr. Guerrero testified that Mr. Healy said "Good for you.  Keep
23  it that way."
24      What's the message here?  Lawsuits aren't tolerated in the
25  SHU.
```

1      This testimony from Mr. Perez and Mr. Guerrero proves that

2    defendants Gates and Healy also knew about Mr. Perez's lawsuit.

3    Mr. Perez was now going realize that he was losing his grip on

4    that boulder.  Just when he thought he had achieved a victory

5    in his lawsuit, the defendants were showing him the power they

6    had and that they were willing to use it to teach him a lesson.

7    Mr. Gates was reminding him that he had a certain fate, being

8    in the SHU, and he better get used to it.  Get comfortable.

9    The rock started to slide.

10      Mr. Perez and Mr. Guerrero both testified that when they

11   returned to their cell it was trashed.  Their mattresses were

12   overturned, the sheets were on the floor, they were covered in

13   bootprints.  Their clothing was on the floor.  It too was

14   covered in bootprints.  Their toiletries, shampoo and that sort

15   of thing spilled all over the locker.  Mr. Perez told you that

16   it was a cell search unlike anything -- or any other cell

17   search he had ever experienced.

18      Mr. Subia testified as an expert for Mr. Perez.  He spent

19   26 years at the CDCR, rising through the ranks from a

20   correctional officer to the Acting Director of the Division of

21   Adult Institutions.  He was the boss of every warden in the

22   state.  He was also a gang investigator.  Mr. Subia told you

23   that he, himself, completed at least a thousand cell searches,

24   most recently in 2011 or 2012.

25      First, he told you that the rules are the same, whether or

```
 1  not a cell search is being conducted for a gang validation.
 2  There is no gang validation exception to Title 15.  There is no
 3  Pelican Bay exception to Title 15.
 4      He told you take the CDCR regulations require that guards
 5  make every effort to respect inmates' property and their cells.
 6  He told you that guards are required to leave the cell in as
 7  close to the same way that you found it.  He testified that all
 8  of the correctional officers in the state are trained on proper
 9  cell search procedures.
10      The defendants were trained on these procedures.
11      This was not a proper cell search.  Mr. Perez told you he
12  kept his cell organized.  The defendants had trashed his home.
13  You won't see any photographs of Mr. Perez's cell.  This is not
14  CSI.  Inmates are not allowed to have cameras.  The defendants
15  could have documented the search that day, could have recorded
16  it, could have shown you photos.  But they didn't.  Mr. Perez
17  couldn't do that.
18      Why don't correctional officers videotape cell searches?
19  You can guess why that may be.  But the absence of photographic
20  evidence in this case can't be held against Mr. Perez.
21      Mr. Perez gave you eyewitness testimony instead.  Salvador
22  Mendoza, the inmate in the cell right next-door, heard exactly
23  what the defendants were doing.  You see, there is an air vent
24  that connects these cells.  Sounds carry.  Voices carry.
25      Mr. Mendoza testified on Tuesday.  He told you that while
```

1  the search was being conducted, he heard the sound of papers

2  and books being thrown around.  He said he heard one of the

3  officers say something to of "These knuckleheads should file

4  more lawsuits because it makes this job more rewarding."  He

5  said he heard the other officer laugh.  What wasn't left on the

6  floor of Mr. Perez's cell, the defendants had taken.

7      Mr. Perez told you that he saw two carts full of his

8  property and Mr. Guerrero's property taken out of the housing

9  pod.  And you saw the receipts that were given to Mr. Perez to

10  document what the defendants had taken from his cell.  One

11  receipt dated October 10th, and one dated October 11th, when

12  certain items were returned to him.  These were Exhibits 49 and

13  50.

14      Tim.

15      (Documents displayed)

16      **MR. BENEDETTO:**  Title 15 says that the inmate is

17  supposed to be notified of everything removed from his cell.

18  You will see on both of these receipts, the box that says

19  "DISCIPLINARY DOCUMENTATION" is empty.

20      The box for CDC 115 has not been checked on either

21  receipt.  You will also see that the defendants did not list

22  any kites as having been found in Mr. Perez's cell on

23  October 10th.

24      Mr. Barneburg told that you the box for 115 is usually

25  used when contraband was found during a cell search.  He said

1    in this circumstance, you don't always know because you haven't

2    searched all the contraband yet or all the property yet.

3        Mr. Gates gave extended testimony for why this box wasn't

4    checked on Exhibit 49 on the left.  He said it was just too

5    soon.  But if you look at Exhibit 50 -- Would you highlight the

6    date?

7        (Document displayed)

8            MR. BENEDETTO:  -- which is dated the next day, this

9    was after Mr. Burris reviewed Mr. Perez's property.  This was

10   after Mr. Burris said that he confiscated some of Mr. Perez's

11   property that he believed was gang related.  Mr. Burris had

12   searched all of Mr. Perez's property.  That box for 115 is

13   still not checked (Indicating).

14       The receipts also do not list Mr. Perez's legal papers

15   that were prepared in connection with the appeal of his

16   lawsuit.  Remember, in October of 2012, his appeal was still

17   pending.  He of course kept all of the materials prepared for

18   that appeal.  He told you that.  Some of these papers were

19   never returned.

20       The receipts also do not list four articles Mr. Perez had

21   written about long-term solitary confinement.  Mr. Perez told

22   you that he kept his legal papers and his articles together.

23   Mr. Perez never saw these articles again.

24       Let's look again at Exhibit 50.

25       Tim, can you enlarge under "ITEMS CONFISCATED"?

1        (Document displayed)

2            **MR. BENEDETTO:**  "Excess Title 15 book.

3        Tim, can you highlight that?

4        The defendants took an extra Title 15 that Mr. Perez had.

5    Mr. Perez apparently had too many regulations.  That's not

6    standard operating procedure at Pelican Bay.

7        The defendants should have kept that extra copy of Title

8    15 for themselves, because the evidence has shown they haven't

9    read it in quite a while.

10       So why do we care?  It's a messy cell, and some papers

11   that were never returned.  But the evidence shows this case

12   isn't about just a trashed cell.  It gets worse.

13       On October 21, 2012, Mr. Gates issued Mr. Perez a Serious

14   Rules Violation Report, for willfully obstructing a peace

15   officer during the October 10th search.  The same Mr. Gates who

16   told Jesse ten days before that he would keep him where he

17   belongs.

18       Mr. Gates says that Jesse was obstructing the officers

19   while Mr. Guerrero stuffed gang material down the toilet.  Gang

20   kites.  That's a serious rules violation with a gang

21   connection.  That was at least three more years in the SHU.

22   That is a stipulated fact in this case.

23       Suddenly, Mr. Perez saw himself at the very bottom of at

24   that hill again.  The defendants had pushed that rock over him.

25       Mr. Perez told you he was not issued the RVR until

1  October 21st.  That's plenty of time for the defendants to put

2  a story together to justify a serious RVR.  But defendants

3  couldn't keep their stories straight at trial.

4       Mr. Pimentel, who is not part of the IGI any longer,

5  testified that he did not remember Mr. Perez acting in any way

6  that would warrant an RVR.  He told you that Mr. Perez

7  submitted to handcuffs.  He said that was cooperative.  He told

8  you he did not remember any of his colleagues given any direct

9  orders to Mr. Perez.  He told you he did not remember

10 Mr. Guerrero appearing to rip up papers to put them in the

11 toilet.

12      Mr. Gongora testified that he did not see Mr. Perez do

13 anything that would warrant the issuance of an RVR.  Mr. Healy

14 did not remember a single thing at all about the search except

15 what Mr. Gates said happened in the RVR.

16      Can you believe that?  The defendants can't even keep

17 straight what language they said Mr. Perez was speaking.

18 Mr. Gongora said Spanish.  Mr. Gates said English.

19      Did Jesse give up?  No.  He challenged Mr. Gates at a

20 hearing on the RVR.  These hearings are presided over by other

21 correctional officers no, civilians.  Mr. Anderson, Lieutenant

22 Anderson was the senior hearing officer.  He is a correctional

23 officer.  He dismissed the RVR, found Jesse not guilty.

24      But Mr. Anderson did more than that.  He put in his

25 report, which you have as Exhibit 3 only because Jesse kept a

1  copy of it for himself, that Mr. Gates charged Jesse with the

2  wrong offense.  Over-charged him.  Excessively charged him.

3      Mr. Anderson has been hearing officer at, he said,

4  hundreds of hearings.  He testified for the defendants.  Even

5  if the events happened exactly as Gates said that they did,

6  Lieutenant Anderson concluded that Mr. Perez would not be

7  guilty of the willful-obstruction offense.  Mr. Anderson even

8  said that Mr. Perez did not refuse to obey any orders.

9      The RVR did not tip the scale in the slightest in favor of

10  what Officer Gates said happened.  That's the burden of proof

11  in this case.  Mr. Gates was 0 for 2.  His colleague confirmed

12  it.  Was Mr. Gates reprimanded for that?  No.  He was promoted.

13      The evidence shows and allows you to conclude that when

14  Officer Gates issued the serious RVR on October 21, 2012, gang

15  investigators knew that the STG program was going to be

16  implemented, and soon.  One of the defining features of that

17  program is that it required an inmate to have a serious RVR

18  with a gang nexus to be assigned to the SHU.

19      Mr. Gates was trying to make good on his promise.  Without

20  that serious RVR, Jesse was released from the SHU in December,

21  2013.  He got his new validation under new procedures, pursuant

22  to the settlement that was made final in June, 2013.

23      The Court has instructed you on what lawyers like to call

24  the elements of the case.  All that means is what Mr. Perez has

25  to prove.  Broken down into parts.  Let's go, one part at a

1  time.

2      The first is:  Proof of First Amendment activity.  That's

3  not in dispute.  Mr. Perez's 2005 lawsuit is First Amendment

4  activity, and the Constitution protects it.

5      The second is:  Did the -- did the defendants take some

6  adverse action against Mr. Perez?  An adverse action is

7  anything that results in harm to Mr. Perez that is more than

8  minimal.

9      The evidence you have before you shows that the answer is

10  yes.  You have evidence of the trashing of Mr. Perez's cell,

11  Mr. Perez and Mr. Guerrero told you about that.  Remember, they

12  don't have cameras.  They can't give you photographic proof.

13      You have evidence of the RVR issued by Mr. Gates that

14  would have kept Mr. Perez in the SHU because it alleged a

15  serious violation with a gang connection.

16      You have evidence that Mr. Gates issued that RVR after he

17  threatened to make sure that Jesse stay in the SHU where he

18  belonged.  The Court instructed you that a threat of more than

19  minimal harm may be an adverse action, too.

20      Because this is a retaliation case, we must prove that the

21  defendants took those adverse actions because of Mr. Perez's

22  lawsuit.  That's what the law calls "causation."  Mr. Perez

23  does not have to show that his lawsuit was the only thing that

24  motivated the defendants to do what they did.  If Mr. Perez

25  shows that his lawsuit was a substantial or a significant

 1  factor in causing the defendants to take any adverse action

 2  against him, he has proven this element.

 3      The last two elements are important and they illustrate

 4  why we are here today in this courtroom.  Let me take them in

 5  order.  The first is that Mr. Perez has though to show that the

 6  defendants' actions would chill, silence or deter the future

 7  First Amendment conduct of an ordinary prisoner.

 8      Not every prisoner, especially not every prisoner who has

 9  been in solitary confinement for months, let alone years, has

10  Mr. Perez's strength and sheer determination to survive.  He

11  refused to give up.

12      The question you must ask yourselves is whether the

13  defendants' trashing of his cell, the issuance of an RVR that

14  could keep a prisoner in the SHU, would that cause a prisoner

15  of ordinary firmness to think twice about filing lawsuit?  The

16  answer is yes.

17      Lastly, Mr. Perez must show that the defendants' conduct

18  did not advance a legitimate correctional goal.  I suspect that

19  counsel for the defendants will stand where I'm standing and

20  say that the defendants were just doing their job.  It's hard

21  job.  It's a donning rows job.  Counsel will tell you that it's

22  legitimate and important to make sure that the prisons are safe

23  and free of gang activity.  They had standard operating

24  procedures and they followed them.

25      We are not saying that the defendants do not have

1  important jobs.  They do.  The job can be dangerous.  But in

2  this case, based on the evidence you have before you, these

3  defendants crossed the line.  When First Amendment speech is at

4  stake, retaliation is never legitimate.  The Court told you,

5  retaliation is not a legitimate correctional goal.

6      How we as a community, as civic-minded people allow our

7  prisons to be managed reflects or the society we think we

8  deserve.  Punishing prisoners because they file lawsuits, ask

9  yourselves whether that is worthy of our aspiration.

10     Why else do we care?  Well, these defendants have

11 selective memories when it comes to Jesse Perez.  Mr. Burris

12 said he did not know Mr. Perez until he was asked to validate

13 him in 2012.  But he issued a gang chrono, a counseling chrono

14 to Jesse in connection with the 2011 hunger strikes.  He told

15 you that that chrono goes in an inmate's central prison file.

16 It can be a first step to possible disciplinary action.

17     Mr. Pimentel also testified that Mr. Perez was not on his

18 radar before October of 2012.  But you remember that email we

19 showed you from a prison guard at Pelican Bay named Scott

20 Ellery to Mr. Pimentel.  That was Exhibit 77.

21     (Document displayed)

22         **MR. BENEDETTO:**  In that email Mr. Perez asked

23 Mr. Pimentel, Mister -- Mr. Ellery asked Mr. Pimentel to do a

24 little cell search on Mr. Perez and another inmate.  Pay them a

25 visit and clean their house.

```
 1        Mr. Pimentel told you that this request for a retaliatory
 2   cell search was extraordinary.  He recognized it as illegal.
 3   But Mr. Pimentel told you that he does not know if Scott Ellery
 4   was ever punished.  He did not follow up to ask.  He did not
 5   report the incident to legal authorities.  There was a chain of
 6   command to follow.
 7        (Document taken off display)
 8        MR. BENEDETTO:  Too many of us take our
 9   First-Amendment rights for granted.  We tweet, Facebook, and
10   Instagram all day long.  And we don't think twice about it.  We
11   live in the age of social media.  We are all connected.  We
12   forget what it means to be punished for speaking our mind.
13        That is a right the United States Constitution protects
14   for everyone.  Even those who are in prison.  Regardless of how
15   you might feel about prisoners, the Constitution has not turned
16   its back on them.  And you mustn't, either.
17        Jesse Perez wasn't connected.  Far from it, far from
18   everyone.  He was cut off from those he cared about the most
19   and from the outside world, locked away in a concrete prison,
20   size eight feet by ten.  But he knew his rights and he fought
21   for them.  And he had success.  A federal judge listened.  The
22   State of California was forced to listen.  They wanted to
23   settle his case.
24        The evidence has shown that the defendants did not like
25   that.  The evidence has shown that the defendants did not want
```

1   Mr. Perez to reach the top of that hill.

2        Ladies and gentlemen, next week is Thanksgiving.  We all

3   get to spend a day with our family and friends, giving thanks

4   for the gifts we are lucky enough to have been given.

5   Mr. Perez will not have a Thanksgiving like ours.  But he is

6   thankful for his day in court, for the chance he has under our

7   Constitution to tell his story to a group of his peers.  To

8   you.  As his lawyers, we are thankful for the attention you

9   have given this important matter.

10       Pelican Bay does not have or make its own rules.  We pay

11  for Pelican Bay.  It belongs to all of us as taxpayers.  The

12  guards who work there must follow the rules like we all must.

13  These defendants must follow the rules.

14       What is out of sight can no longer be out of mind.  You

15  have the power to tell these defendants:  This won't stand.

16  This cannot stand.

17       We, as a community, deserve better.  Now is the time.  The

18  view from the top of the hill has never been brighter.

19       Ladies and gentlemen, we ask that you return a verdict in

20  favor of Mr. Perez, and against all of the defendants.

21       Thank you.

22            **THE COURT:**  Ms. Nygaard?

23                   **CLOSING ARGUMENT**

24  **BY MS. NYGAARD:**

25       Good afternoon, ladies and gentlemen.  Plaintiff's story

CLOSING ARGUMENT / NYGAARD

1  simply does not make sense.  Why would these five correctional
2  officers (Indicating) who didn't even know Mr. Perez, decide to
3  retaliate against him simply because he had a lawsuit against
4  other correctional officers at another prison?

5       Inmates filing lawsuits and inmates settling lawsuits is
6  nothing unusual.  These officers all testified that they have
7  heard of inmates filing lawsuits, and settling cases before.
8  So why in this case would they decide to retaliate and conspire
9  to retaliate against an inmate that they didn't he even know?
10 Plaintiff's story simply does not make sense and the evidence
11 does not support it.

12      When we first started this trial on Monday, my colleague
13 Elliott Seals stood before you and made you three promises.  He
14 promised that by the end of the trial the evidence would prove
15 that defendants were following standard procedure when they
16 searched Mr. Perez's cell, that the defendants were following
17 standard procedure when they confiscated his paperwork, and
18 that the defendants were following standard procedure when they
19 issued Mr. Perez a Rules Violation Report.

20      After hearing all the evidence, you now know that we kept
21 our promise.

22      Now, Officers Gates, Gongora, Healy and Pimentel went down
23 to Mr. Perez's cell on October 10, 2012, to conduct a search of
24 his cell.  The reason they went is that their supervisor,
25 Lieutenant Barneburg, had instructed that a new validation

1    proceeding needed to be conducted for Mr. Perez as soon as

2    possible.

3        Now Mr. Barneburg had some incorrect information.  He

4    believed and had been told that there was a settlement

5    agreement in place or a court order that required his

6    validation.  You heard now Associate Warden Barneburg testify

7    the other day that he knows now that there was no settlement

8    agreement in place.

9        However, these five defendants in this case cannot be held

10   responsible for a mistake that Associate Warden Barneburg and

11   others at CDCR had made.  They believed that they needed to do

12   a cell search based upon a new validation.  And not even all of

13   them knew about Mr. Perez's lawsuit.

14       The evidence shows that Officers Burris and Pimentel had

15   received an email from Barneburg, instructing that the new

16   validation be completed.

17       And you heard that Officer Burris remembers reading that

18   email.  However, Officer Pimentel does not even recall reading

19   that email.  So, he's not even sure that there was a lawsuit or

20   why he was going to do this.

21       And I -- sounds a little crazy, like why would somebody

22   not open an email?  But Officer Pimentel explained that he sat

23   in the office with the other two gentlemen who were on that

24   email, and if one of them had opened it and said "Hey, we need

25   to go do a new validation," there would have been no reason for

 1   him to open the email, and all the attachments included.

 2        So the evidence shows then that Officers Pimentel, Gates,

 3   Gongora and Healy went down to Mr. Perez's cell to remove him

 4   from the cell, so that they could search his cell.  The

 5   evidence shows that a cell search is one of the first steps in

 6   a validation proceeding.  Even plaintiff's expert witness,

 7   Richard Subia testified to that.

 8        Now, whether or not the officers got to the cell, they

 9   observed Mr. Perez's cellmate, Rudy Guerrero, crouched down in

10   front of the toilet, shoving papers inside (Indicating).  And

11   they observed Mr. Perez weaving back and forth (Indicating), in

12   an attempt to block their view.  Officers Gongora, Gates, and

13   Healy all testified to this.

14        Now, Officer Pimentel testified that he couldn't even

15   remember doing the cell search.  Now, that might sound, you

16   know, unusual that somebody wouldn't remember an inmate at the

17   toilet shoving his hands in.  But Officer Pimentel has

18   conducted hundreds of cell searches along with all the other

19   remaining defendants this case throughout their careers, and it

20   is not even unusual to find an inmate when you go to do a cell

21   search, with his hands in the toilet trying to destroy

22   contraband.

23        You they were the water is shut off to the cell before

24   they do the search, specifically for this purpose.  And that

25   was done in this case, too.

```
 1        And then you heard that the eventually, the officers
 2   removed Mr. Perez and Mr. Guerrero from the cell so that they
 3   could search the cell.  Now, after the cell search was
 4   conducted, a couple days later, Mr. Perez -- or a few weeks
 5   later, Mr. Perez was issued a Rules Violation Report that was
 6   written by Officer Gates.
 7        But Officer Gates testified that he wrote that report
 8   shortly after the incident, and the reason he wrote it is that
 9   Mr. Perez was interfering, he was obstructing their the ability
10   to see what Mr. Guerrero was shoving in the toilet and
11   obstructing Officer Gates's ability to use force if necessary
12   to stop Mr. Guerrero from shoving papers down the toilet.
13        And you also heard that it's very important to stop
14   inmates from shoving papers inside the toilet as Officer Gates
15   testified today, the information on that could be used to kill
16   somebody.  So this is a very serious allegation to have an
17   inmate at the toilet, shoving papers in, and having another one
18   trying to stop the officers from getting that evidence that
19   they were shoving into the toilet.
20        And you heard testimony that some of the defendants
21   remember hearing Mr. Perez say "Hurry up" or something that to
22   that effect to Mr. Guerrero.
23        Now, whether that was said in Spanish or English or both
24   is not relevant.  What's relevant that is the officers heard
25   Mr. Perez give specific instructions to his cellmate to keep
```

 1  shoving the papers in, "Hurry up, shove them in further."

 2      So throughout the course of the trial, Perez and his

 3  attorneys have used the term "Solitary confinement."

 4      (Photograph taken off display)

 5          **MS. NYGAARD:**  And they have displayed large blown-up

 6  photographs of parts of the Security Housing Unit.  And they

 7  have used the term "cement box" and "concrete prison."  Why

 8  have they been doing this?  They have been doing this to sway

 9  your sympathy.

10      This case is not about whether you agree with whether

11  inmates should be housed in the Security Housing Unit at

12  Pelican Bay.  This case is not about whether you agree with the

13  practice of the gang validation process.  This case also not

14  about whether -- how long Mr. Perez had been housed in the

15  Security Housing Unit.

16      What this case is about is whether these five officers

17  (Indicating) retaliated and conspired to retaliate against

18  Mr. Perez.  And the evidence simply does not support it.

19      As you have heard, Mr. Perez has the burden of proof in

20  this case.  He must prove by a preponderance of the evidence,

21  which means he must show that it's more probably true than not

22  that defendants retaliated and conspired to retaliate against

23  him.  He simply has not met that burden.

24      Now, you will shortly be asked to deliberate, and at the

25  end of the deliberations you will be completing a verdict form.

1          (Document displayed)

2          **MS. NYGAARD:**  The first page of the verdict form has

3    a question, Question 1:

4          "Did the plaintiff Jesse Perez prove by a

5          preponderance of the evidence that one or more of the

6          defendants violated Perez's First-Amendment rights?"

7          And each individual defendant is listed below, with a box

8    for yes or no.

9          You must decide each individual's role separately in this

10   case.  And, Jesse Perez must have proven by a preponderance of

11   the evidence that each individual defendant violated

12   Mr. Perez's First-Amendment rights.

13         (Document taken off display)

14         (Document displayed)

15         **MS. NYGAARD:**  Now, in order to determine that, you

16   need to know the elements of the retaliation claim.  I know you

17   have heard this before, this afternoon, but it's very

18   important, so I'm going to repeat and highlight some things for

19   you.

20         Mr. Perez must prove by a preponderance of the evidence

21   that, one, Perez was engaged in a protected conduct under the

22   First Amendment.  Now, we all agree that the lawsuit that he

23   had filed is a protected conduct under the First Amendment.  So

24   he has met the first element.

25         However, Mr. Perez must also prove the remaining four

1  elements for each defendant.  And those elements are that the

2  Defendant took some adverse action against Perez, the adverse

3  action would chill an inmate of ordinary firmness from future

4  First-Amendment activities, that Perez's protected conduct was

5  a substantial or motivating factor for the adverse action by

6  the Defendant, and the action did not reasonably advance a

7  legitimate correctional goal.

8       Now, let's take each of these ones, each of these elements

9  separately.

10      (Document taken off display)

11          **MS. NYGAARD:**  An adverse action is one that results

12 in any harm to the plaintiff that is more than minimal.  A

13 threat of more than minimal harm may also constitute an adverse

14 action.

15      Now, here, Mr. Perez alleges that defendants trashed his

16 cell.  Specifically, he claims that Officers Gates, Gongora,

17 Healy and Pimentel trashed (Indicating quotation marks) his

18 cell.  But the evidence simply does not support this.  First,

19 let's take Officer Healy.  There's no evidence that Officer

20 Healy participated in the search of Mr. Perez's cell.  Now,

21 it's undisputed that he went down at the beginning to escort

22 Mr. Perez and Guerrero out of the cell.  But there's no

23 evidence that he actually went back into the cell and conducted

24 the search.  You heard testimony from Sergeant Healy that he

25 doesn't recall searching the cell and that his name would have

1    been on the bottom of the property receipt form, which was

2    Exhibit 49, because it's standard procedure to sign your name

3    any time that you search a cell.

4         And Mr. Healy's signature is not on that the form.

5         You also heard Officer Gates testify this morning that

6    it's highly unlikely that all four of the officers were in the

7    cell, and he compared, you know, he took into account the size

8    of Officer Gongora, in saying that in a cell that small, that

9    four officers wouldn't be needed and might not even fit if

10   there to do a thorough search.

11        And that -- so there's no evidence that Officer Healy

12   conducted the search.  Mr. Perez has produced no evidence that

13   Officer Healy conducted the search.  He couldn't see which

14   officers went into the cell to do the search because he was

15   down in the rotunda.

16        And his witness, Mr. Mendoza, who was in the cell next

17   door, now, he testified the other day that he saw four officers

18   enter the cell.  However, at his deposition, taken earlier this

19   year, he had testified that he saw three officers enter the

20   cell, and that one of them left shortly afterward, leaving two

21   officers in the cell.

22        Which one is it?  It seems more likely that Mr. Mendoza's

23   testimony at his deposition where he saw three officers enter

24   the cell is accurate.  Because that is what the cell search

25   receipt form shows.

1        Now, Mr. Perez has also talked about how he was subjected

2   to a strip search, that he had to take all of his clothing off

3   and be searched before exiting the cell.

4        You heard from Associate Warden Barneburg on Wednesday

5   that an unclothed body search is standard procedure before

6   escorting inmates out of the cell in the Security Housing Unit.

7   And that's to ensure that no contraband is hidden inside of

8   their clothing or on their person.  He even said that he's

9   found contraband secured between the cheeks of buttocks of

10  inmates.

11       So that is how important it is to have had Mr. Perez

12  stripped down before exiting the cell.  It wasn't done as an

13  attempt to humiliate him.  It was taken as a safety and

14  security measure.  And it complied with standard procedures.

15       Now, Mr. Perez has testified that his cell was trashed

16  (Indicating quotation marks).  He says that there were sheets

17  and clothing on the floor, with dirty bootprints on them, and

18  that Guerrero's mattress was on the floor and that their

19  toiletries had been spilled out of the cups that they were

20  stored in.

21       However, his cellmate, Mr. Guerrero, painted a very

22  different picture of what the cell looked like when they

23  returned.  Mr. Guerrero testified that it was pretty messed up

24  (Indicating quotation marks) but he stated that there the was

25  paper all over the floor, torn-up paper, just paper all over

1  the floor (Indicating quotation marks).

2      Don't you think if Mr. Guerrero's clothing had been on the

3  floor with dirty bootprints, he would have told you about that?

4  Don't you think that if Mr. Guerrero's sheets were on the floor

5  with dirty bootprints, he would have stated that?  Don't you

6  think that if Mr. Guerrero's shampoo and toiletries had been

7  all messed up, he would have testified about that?  And don't

8  you think that if his mattress had been on the ground as

9  Mr. Perez testified, that Mr. Guerrero would have mentioned

10  that?

11      Again, Mr. Perez's story that his cell was trashed just

12  doesn't make sense.  Even his own witness doesn't support it.

13      Now, Mr. Perez also claims the defendants confiscated a

14  legal document and some articles that he had written.  You now,

15  there's no dispute that all of Mr. Perez's paperwork was

16  removed from the cell during the search.  That's standard

17  procedure.

18      Officers Burris and Pimentel reviewed all of the

19  paperwork, and returned it to him the next day, with the

20  exception of a few items which you saw listed on Exhibit 50,

21  including addresses, an address book, anything that was written

22  in the Nahautl language.

23      There was no mention -- excuse me.

24      Now when Mr. Perez filed an inmate grievance, a few weeks

25  later, he only specifically asked for the return of his photos

```
 1   and addresses.  You heard Mr. Perez testify to that, himself.
 2   He didn't specifically ask for the return of a legal -- a legal
 3   brief.  He didn't specifically ask for the return of articles.
 4        Again, Mr. Perez's story just doesn't make sense.
 5        Finally, Mr. Perez alleges that he was issued basically a
 6   false RVR.  That he was completely compliant when the officers
 7   came to remove him from his cell.  But the evidence does not --
 8   just does not support that.
 9        You heard Officers Gongora, Gates, and Healy all testify
10   that they saw Mr. Perez's cellmate at the toilet, shoving
11   papers in.  And they believed that those could be gang
12   communications because that is a common practice among inmates
13   in the Security Housing Unit.  You heard Officers Gates,
14   Gongora and Healy testify that Mr. Perez was moving around in
15   an attempt to obstruct their view of Mr. Guerrero destroying
16   the contraband.
17        Now, Mr. Perez says he was completely compliant, cuffed up
18   immediately and that Mr. Guerrero did the same thing and that
19   neither one of them -- that Mr. Guerrero was not at the toilet.
20   But evidence produced at the Rule Violation Report hearing for
21   Mr. Perez's RVR, and Mr. Guerrero's RVR, showed that there was
22   photographic evidence that papers had been removed from the
23   cell that day.
24        Now, Mr. Perez says that he couldn't have fit in between
25   the toilet and the front of the cell.  So therefore, Officer
```

 1  Gates's report was -- was false.  You heard Associate Warden

 2  Barneburg testify that there is between 18 inches and two feet

 3  of space between the toilet and the wall (Indicating).  But

 4  between the -- and between the front of the toilet and the cuff

 5  port, he estimated there's at least two and a half to three

 6  feet of space.

 7      Now we have all seen Mr. Perez here in court (Indicating).

 8  And he also testified that he's five foot six to five foot

 9  seven, 145 to 150 pounds.  Does that sound like somebody who

10  could not fit into two and a half two to three feet of space?

11      And, Officer Gates testified this morning that he did not

12  classify the RVR as serious.  That was not his job.  That was

13  somebody at a much higher rank than him.  So he writes up the

14  report and it gets submitted and it gets determined to be

15  classified as serious.  He had no role in that.

16      And you also saw on Exhibit 2, the Rules Violation Report,

17  that in the "specific act" box, there was no mention of any

18  gang activity.  There was no gang nexus (Indicating quotation

19  marks).

20      And you also saw in the evidence, in Exhibit No. 4, that

21  under the new regulations that were coming down, for a Serious

22  Rules Violation Report, to have kept Mr. Perez in the SHU like

23  he's claiming, the "specific act" box required that the nexus,

24  the gang nexus be clearly articulated.  In this instance, it

25  was not.

1    If Officer Gates really wanted to keep Mr. Perez where he

2 belonged, why wouldn't he have put the gang nexus in that box?

3 That would have been ensured that this would have been the type

4 of Rules Violation Report that could have been used to retain

5 him in the SHU.  He didn't do that.

6    And if Mr. Guerrero and Mr. Perez were really compliant

7 like they said, and that the Rules Violation Report is

8 completely made up, then if the officers really wanted to keep

9 Mr. Perez in the SHU, why wouldn't they have said that he was

10 the one at the toilet, with his hands shoving gang contraband

11 down the toilet (Indicating)?  That would have been a much

12 stronger Rules Violation Report, with a gang connection, to

13 keep Mr. Perez in the SHU.

14    The reason they didn't do that is because Officer Gates

15 wrote the Rules Violation Report based on the conduct that he

16 observed.

17    Again Mr. Perez's story that this was fabricated and that

18 he was completely compliant just doesn't make sense.

19    Now, the second element of the retaliation claim that

20 Mr. Perez must prove by a preponderance of the evidence is that

21 the adverse actions taken would chill an inmate of ordinary

22 firmness from future First-Amendment activities.

23    Now a person of ordinary firmness is not defined.  So, you

24 are not given much guidance on that.  And it is up to you to

25 consider the evidence and whether a person of ordinary firmness

 1   would have been chilled by Defendants' conduct.

 2        And I say that the evidence supports nothing like that.

 3        Now, Mr. Perez must also prove by a preponderance of the

 4   evidence that his protected conduct -- in this case, his

 5   previous lawsuit -- was a substantial or motivating factor for

 6   the adverse action taken by each defendant.

 7        Again, plaintiff has not proven this.

 8        The reason the defendants went down to search Mr. Perez's

 9   cell is because they had had instructions to conduct a new gang

10   validation for Mr. Perez.  Even the officers who knew a little

11   bit about Mr. Perez's lawsuit were -- their most substantial

12   and motivating factor for them to go down and search

13   Mr. Perez's cell was the fact that they had been instructed to

14   complete a new gang validation as soon as possible.

15        And the substantial and motivating factor behind

16   confiscating paperwork during the search is also to ensure that

17   the paper is thoroughly reviewed for any sort of gang

18   communications, other contraband.  And that paperwork was

19   confiscated as part of the new gang validation that Officer

20   Burris was ordered to complete by his supervisor, Lieutenant

21   Barneburg.

22        And, the decision by Officer Gates to write Mr. Perez a

23   Rules Violation Report was not based on Mr. Perez's lawsuit.

24   You heard him testify that he didn't even know about the

25   lawsuit when he went down to do the cell search.

```
 1        Now, you also heard him testify that perhaps Mr. Perez did

 2   mention it to him during the escort, at some point during the

 3   search, because inmates -- that's something that an inmate

 4   would say.  But the reason that Officer Gates wrote the Rules

 5   Violation Report is that he witnessed inmate misconduct and

 6   it's his duty as a correctional officer to write up inmates

 7   when they are misbehaving.

 8        It was not the lawsuit -- Mr. Perez's previous lawsuit was

 9   not the substantial or motivating factor behind Mr. Gates'

10   decision to write the Rules Violation Report.

11        And, finally, Mr. Perez must also prove that the actions

12   taken did not reasonably advance a legitimate correctional

13   goal.

14        The writing of Mr. Perez -- the writing of an RVR for

15   Mr. Perez did advance a legitimate correctional goal.

16        You heard Lieutenant Anderson testify today that writing

17   up both inmates who are involved in an incident aids in the

18   investigation.  That would be a legitimate correctional goal.

19        (Document displayed.)

20        MS. NYGAARD:  Now, here is the jury instruction

21   describing a legitimate correctional goal, and one of the

22   points is that:

23        "A legitimate correctional goal can include

24        things like preserving institutional security or

25        stopping prison gang activity."
```

 1        That is exactly what happened in this case.

 2        (Document displayed)

 3        Now, I just want to remind you that the evidence does not

 4    support a claim for retaliation and that you must look at each

 5    element separately for each defendant.  And if even one element

 6    has not been proven by a preponderance of the evidence, then

 7    you must find that Mr. Perez has not proven his claim.

 8        Now, Mr. Perez is also claiming that defendants conspired

 9    to retaliate against him.  In order to prevail on this claim,

10    Perez must show that two or more of the defendants reached an

11    agreement or meeting of the minds to violate his rights.  The

12    evidence simply does not support this.

13        You heard testimony that the defendants went to search

14    Mr. Perez's cell within minutes after being asked to do the

15    search.  How would they have had time to investigate an inmate

16    who they didn't know and sit around and decide:  How are we

17    going to retaliate against him?  It just doesn't make any

18    sense.  They were just helping out their coworker, Officer

19    Burris, who was going to conduct Mr. Perez's validation.

20        Now, much of this case -- the decision you're going to

21    make in this case will be based on witness credibility.  And in

22    deciding the facts of this case you may have to decide which

23    testimony to believe and which testimony not to believe.  You

24    may believe everything a witness says, or part of it, or none

25    of it.

 1          And so in making that determination, you can take into
 2     account several factors, including:  A witness's bias in the
 3     case; whether any other evidence contradicted the witness's
 4     testimony; and any other factors that bear on believability.
 5          Let's take a look at the witnesses in this case.  First,
 6     we have Mr. Perez.  Obviously, he has an interest in the
 7     outcome of this case, but you can also take into account the
 8     weight -- how much to weigh his testimony by looking at the
 9     fact that he has been convicted of a crime.  You can use that
10     conviction to decide whether or not to believe Mr. Perez and
11     how much weight to give his testimony.
12          Now, let's look at the second witness that Mr. Perez
13     presented -- excuse me, his inmate -- his cellmate, Mr. Rudy
14     Guerrero.
15          Now, nothing that came out of this man's mouth is
16     credible.  He couldn't even get the story straight of how long
17     he and Mr. Perez knew each other.
18          We had just heard moments before that Mr. Perez said they
19     knew each other going -- they grew up in the same neighborhood.
20     They had known each other a long time.
21          Mr. Guerrero appears on video to testify, and he says:
22     I've known Mr. Perez for eight or nine years and I met him on
23     the General Population mainline at another prison.  And he said
24     that they did not grow up together, but then you saw his
25     deposition transcript where he testified that he and Mr. Perez

1  grew up together and that he had known Mr. Perez for 20 years.

2      And Mr. Guerrero couldn't get history straight of whether

3  Mr. Perez had helped him with previous legal work in the past.

4  Mr. Perez had testified that he had assisted Mr. Guerrero with

5  legal work.  Mr. Guerrero testifies no, but then his deposition

6  transcript showed that he had testified differently previously.

7      And Mr. Guerrero, obviously was testifying from prison,

8  has also been convicted of a crime.

9      Mr. Guerrero also testified that he says Officer Healy

10  made a comment to him, but at the deposition he couldn't recall

11  the identity of the officer.  So did Officer Healy say that?

12      Then we had Mr. Mendoza, who was housed in the cell

13  adjacent to Mr. Perez's.  Mr. Mendoza is also a convicted felon

14  and a long-time friend of Mr. Perez's.  Mr. Mendoza also

15  testified that Mr. Perez has helped him so much with legal work

16  in the past that he considers Mr. Mendoza a tutor [sic].

17      So Mr. Mendoza testified via video that he saw four

18  officers enter the cell, but as I said previously, at his

19  deposition he had testified that he saw three go in and then

20  one leave.  His testimony is simply inconsistent.

21      And then Mr. Perez had Richard Subia testify.  Mr. Subia

22  was paid a thousand dollars to come and speak to you for that

23  brief period of time.

24      And then for the defendants, Associate Warden Barneburg

25  testified.  He explained that Assistant Institutional Gang

 1   Investigators, such as the defendants, are selected to join the

 2   unit based on their job performance.  Associate Warden

 3   Barneburg has worked his way up the ranks at Pelican Bay for

 4   the past 18 years.

 5        Then we heard from Officer Gongora.  He's been promoted to

 6   counselor since this incident.  And Officer Healy has been

 7   promoted to sergeant.  And Officer Gates has also been promoted

 8   to sergeant.

 9        And we saw what a high ethical standard Officer Pimentel

10   has by the fact that when he received that email from Officer

11   Ellery asking him to do a retaliatory cell search, that he

12   reported Officer Ellery within less than an hour of showing up

13   to work that next morning.  Not only did he forward the email

14   onto his sergeant, but he also spoke to his sergeant personally

15   about it.

16        Mr. Perez's story just doesn't make sense.  He has not

17   proven by a preponderance of the evidence that defendants

18   retaliated against him.  And Mr. Perez has not proven by a

19   preponderance of the evidence that defendants conspired to

20   retaliate against him.

21        Now, I ask that you go back and you review all the

22   evidence very carefully that's been presented in this case and

23   you remember all of the testimony that you heard.  And then I

24   trust, after you weigh all that evidence, that you will return

25   a verdict for defendants.

```
 1        (Document displayed.)

 2        And in doing so, you will mark the verdict form

 3   (indicating).  In response to question one:

 4        "Did plaintiff Jesse Perez prove by a

 5        preponderance of the evidence that one or more of the

 6        defendants violated his First Amendment rights?"

 7        That you will mark, "No," "No," "No," "No," "No."

 8        (Document displayed)

 9        MS. NYGAARD:  And in  response to question two:

10        "Did the plaintiff Jesse Perez prove by a

11        preponderance of the evidence that one or more of the

12        defendants conspired to violate Perez's First

13        Amendment rights?"

14        That you will again check, "No," "No," "No," "No," "No."

15        (Document displayed)

16        MS. NYGAARD:  And because you have answered "No" to

17   each defendant for both the retaliation and conspiracy claims,

18   you will not even need to get to question three.  You will

19   simply have the presiding juror date and sign the form.

20        Thank you very much for your time, ladies and gentlemen,

21   over the past week.

22        THE COURT:  Thank you Ms. Nygaard.

23        Maybe -- why don't I suggest everybody take 30 seconds to

24   stand up and stretch a little bit before we hear the last word?

25   I'll do the same.
```

1        **MR. LEE:**  Your Honor, if we are going to stretch, may

2    I run to the restroom?

3        **THE COURT:**  You may run to the restroom.

4        (Brief pause.)

5        **THE COURT:**  Why don't -- do you all want to go --

6    step back for just a couple minutes into the back?  Does

7    anybody need to use the restroom or anything like that?

8        Okay.  Why doesn't everybody step back for a couple

9    minutes.

10       (Whereupon there was a recess in the proceedings

11        from 2:00 p.m. until 2:05 p.m.)

12       **THE CLERK:**  Please be seated.

13       (Brief pause.)

14       **THE COURT:**  You may proceed.

15                      **REBUTTAL ARGUMENT**

16       **MR. LEE:**  I'd like to start by talking about what

17   this case is not about, because you heard a lot of talk from

18   Lieutenant Barneburg about how dangerous prisons are and the

19   importance of cell searches, and Officer Gates trying to

20   interject that into his testimony.  They find hypodermic

21   needles.  They find razors.  They find all kinds of dangerous

22   stuff inside seams of mattresses or sheets, inside clothing.

23   And you heard talk about how kites are sometimes used to

24   communicate dangerous messages, like to put out a hit on

25   somebody.

```
 1        But, ladies and gentlemen, that's not what this case is
 2   about.  There was no evidence whatsoever that any of those
 3   items was found in Mr. Perez's cell.  There is no evidence
 4   whatsoever that any of those items has ever been found in
 5   Mr. Perez's cell.  There is no evidence that the kites that
 6   were recovered, the paperwork that was recovered from the
 7   toilet, had anything to do with any dangerous activity on them.
 8        In fact, Lieutenant Anderson testified that at the hearing
 9   he didn't even read what was in the kites.  It wasn't all that
10   important to him.
11        The reason the defendants are talking to you about those
12   dangers is to try to scare you.  It's a tactic designed to
13   divert your attention from the real issue in the case.  They
14   are trying to cloud the issues by reminding you how dangerous
15   things are.  And that's not what this case is about.
16        Now, sure, we don't dispute that prisons are -- can be a
17   dangerous place.  And we don't dispute that prison guards have
18   an important job and that their jobs can sometimes be
19   dangerous.  And we don't dispute that they protect all of us,
20   and we respect them for that.
21        But that's why they have such tremendous power and
22   authority.  Think of the power.  Think of the authority that a
23   prison guard has.  Is there anywhere else in our society where
24   the imbalance of power is as distorted as it is in a prison
25   between a guard and a prisoner?  And that's why prison guards
```

1   have to follow the rules, because of the tremendous power and

2   authority that we give them; that they wield; that they

3   possess.  They have to follow the rules.

4       And that's the way our society works.  No matter how

5   powerful you are, you have to follow the rules.  All of us have

6   to follow the rules.  And that's what this case is about,

7   because the evidence has shown that these defendants on this

8   occasion did not follow the rules.

9       We're asking you to hold the defendants accountable and to

10  tell them and Mr. Perez that, yes, everybody, no matter how

11  powerful, no matter what position you hold in life, even prison

12  guards, have to follow the rules.

13      Now, if there is any theme of this case from the defense,

14  it's standard procedure.  I don't know how many times they

15  uttered the words "standard procedure."  Everything was

16  according to standard procedure.

17      Well, I'm not sure what standard procedure is.  I mean, if

18  you look at the Cell Search Receipts, is it standard procedure?

19  Do you have to fill out the "Condition of the Cell"?  Do you

20  have to check that box?  Those boxes weren't checked.

21      Do you have to fill out the "Disciplinary Documentation"

22  part that receipt?  It wasn't in this case.  There's

23  conflicting testimony as to whether they were supposed to be or

24  whether they were not supposed to be.

25      Are you supposed to itemize everything on the -- from the

1    search that was confiscated or taken?  Unclear.

2        What's clear is that standard procedure means whatever the

3    defendants say it is.

4        Why didn't the defendants talk about Title 15?  Did you

5    notice how whenever they testified, they talked about standard

6    procedure?  Whenever counsel asked them questions, they asked

7    them about standard procedure.  It was we who had to ask them

8    about Title 15.  It was we who had to point them to the actual

9    law that governs.  Standard procedure does not trump their

10   obligation to follow the law.

11       They violated the rules.  They violated the regulations

12   that apply to them.  And those regulations are the same in

13   Pelican Bay and they are the same in the SHU.  And what the

14   defendants are trying to get you to believe is that somehow

15   things need to be different at Pelican Bay and somehow things

16   need to be different in the SHU because it's so dangerous.  And

17   that is not the case and there is no evidence to support that.

18       The RVR issued by Defendant Gates is the best evidence of

19   that.  Talk about a trumped-up charge?  You can read and you --

20   and I hope you will read what actually happened.  If you look

21   at Exhibit 2 and 3, the narrative will tell you everything.

22       Mr. Perez allegedly moved back and forth in his cell a few

23   times, maybe a couple times forward and a couple times

24   backward.  It lasted no more than a couple of minutes.

25   Mr. Perez complied with the order to cuff up.

1    The supposed attempt to destroy evidence was unsuccessful,

2    because we know that they actually -- what they actually

3    recovered and we know that it was written up by Mr. Gates.

4    And if you read the actual exhibit, if you read Exhibit 2,

5    it says the paperwork that was recovered was "kites of a gang

6    related nature."  That's the gang nexus.  It's written right

7    there in his report.  So don't believe when counsel tells you

8    there is nothing evidencing the gang nexus, it's right there in

9    his report.

10    And even if Mr. Guerrero did try to put the paper in the

11    toilet the way the defendants have described it, you heard

12    testimony that it happens all the time.  Lieutenant Barneburg

13    said he's seen it numerous times.

14    Officer Pimentel testified he's seen it happen numerous

15    times.

16    Officer Gongora said he's seen it happen multiple times.

17    And Officer Gates said dozens of times they've seen this.

18    And so what does Officer Gates do?  He issues the most

19    serious type of charge there is.  He doesn't issue a verbal

20    warning.  He doesn't issue a counseling memo.  He doesn't issue

21    an Administrative Rules Violation.  He issues a Serious Rules

22    Violation.

23    And he told you, you heard him admit, what the criteria

24    are for a Serious Rules Violation.  There has to have been some

25    violence or threat of violence, or a breach of facility

```
 1  security, or a threat to the operations of the facility.  None

 2  of those existed.  That's the law.  It doesn't matter what

 3  standard operating procedure is.  That's the law.  None of

 4  those existed.  And that's why Lieutenant Anderson dismissed

 5  that RVR.

 6       Now, Officer Gongora testified that he wouldn't have

 7  written up that RVR, and he candidly admitted that.  He

 8  candidly admitted he wouldn't have written up that RVR.  But

 9  when asked:  Well, did you think Officer Gates did anything

10  inappropriate by writing up that RVR?  He said:  No, it was

11  Gates' decision and I didn't -- you know, nothing

12  inappropriate.  I'm not going to second guess him, was what

13  Officer Gongora said.

14       We expect more of that from a sworn peace officer.  "I'm

15  not going to second guess him."  "It was his decision."  It

16  wasn't just his decision.  And you should be second guessing

17  him, because he has to follow the lawsuit.  He has to follow

18  the rules.  It doesn't matter what standard procedure is.  He

19  has to follow the rules.

20       We expect more from our sworn peace officers than:  Well,

21  I'm not going to second guess him.  Why didn't he say:  You

22  know what?  I would be concerned that he followed the law.

23       Officer Pimentel admitted.  He said:  I didn't observe

24  anything.  I don't recall observing anything that warranted an

25  RVR.  Even though he was there.
```

```
 1          And Defendant Healy, he admitted that he has had in his
 2  own career numerous RVRs that he issued dismissed against him.
 3  And this tells you everything.  When asked:  Do you care
 4  whether an RVR against you -- an RVR issued by you is
 5  dismissed?  Remember what he said?  He said no, but he said:
 6  But I take it as a learning experience.
 7          What kind of answer is that from a sworn peace officer?
 8  We expect more from our law enforcement officers.  No, he
 9  doesn't care?
10          How about saying:  You know what?  I feel badly.  I issued
11  a charge that wasn't sustained.  You know, sometimes I get it
12  right, sometimes I get it wrong, and in some cases I get it
13  wrong.  But he said no.
14          The cavalier manner tells you what you need to do about
15  these defendants.  They are just following standard procedure
16  and standard procedure is not the law.
17          And it's a learning experience?  That's what he describes,
18  issuing a charge against an inmate?  A charge that can put
19  somebody in the SHU?  A charge that can put somebody in the SHU
20  for three years?  It's not sustained.  Dismissed at a hearing.
21  And he calls it a "learning experience"?  What kind of attitude
22  is that from our sworn officers?
23          Let's talk about the email that defendant Pimentel
24  received.  This email right here.
25          (Demonstrative displayed)
```

1      He was asked to pay Mr. Perez and his next door neighbor

2  "a little visit and clean their house."

3      He conceded that he was asked in writing to carry out an

4  illegal act -- an "illegal extraordinary act" in Mr. Pimentel's

5  own concession -- against one of the three people in the SHU

6  with the last name Perez, who had been in the SHU for 10 years.

7      Now, Mr. Pimentel did forward it to his supervisor, but he

8  never followed up.  And when asked why he didn't follow up, why

9  didn't he say:  Hey, wait a second.  You know, this is

10  something illegal going on here.

11      He said:  Well, chain of command.

12      And, sure, chain of command.  Maybe it was standard

13  operating procedure, but that's not the law.

14      Now, the defendants are trying to make this a swearing

15  match, a contest of credibility.  And, of course, they are

16  counting on you just to believe the defendants over our

17  clients.  Because, after all, who would believe a bunch of

18  prisoners over a bunch of law enforcement officers, especially

19  AIGIs, the so-called cream of the crop.

20      But when you look at the credibility of the witnesses,

21  look at more than just who they are because you know in your

22  common sense that prison guards sometimes lie and they

23  sometimes tell the truth.  And prisoners sometimes lie and they

24  sometimes tell the truth.  So look at the other evidence.  Look

25  at who has more to lose.

1         Rudy Guerrero has nothing to lose by -- he has nothing

2    invested in the outcome of this case.

3         Salvador Mendoza has nothing to gain.  They are not even

4    at the same institution any more.  They are just eye witnesses,

5    just as customers in a bank witnessing a bank robbery.  They

6    just happened to see what happened.

7         Mr. Mendoza is at Kern Valley.  He's at a totally

8    different prison hundreds of miles away.  And Mr. Guerrero is

9    still in the SHU.  And my client is out of the SHU.

10        They have not been in communication for two years.  And if

11   there were any evidence that they had been in communication,

12   you can bet you would have seen it from the defendants.  You

13   can infer from the lack of any evidence to the contrary, that

14   they have not been in communication.

15        And now compare that to the defendants.  They still see

16   each other.  They still work together.  They are all still at

17   Pelican Bay.  They all hang out together.  You can infer from

18   that who has the greatest interest here.

19        Officer Burris said he didn't even know who Jesse Perez

20   was, but he had issued him a disciplinary memo just the year

21   before.

22        Officer Pimentel said he didn't know who Mr. Perez was,

23   but he had been the subject of that extraordinary email right

24   there (indicating).

25        And look at the double cellie request.  Look at request,

1   "close scrutiny of" by the IGI.  "Close scrutiny of Mr. Perez

2   and Mr. Guerrero."  "Close scrutiny."  That tells you what you

3   need to know about the credibility of the witnesses.

4        Now, the First Amendment protects free speech.  It

5   protects the free exercise of religion and it protects the

6   right of the people to petition the Government for redress of

7   their grievances.  It's part of the Bill of Rights.  It's the

8   First Amendment.  It's the Bill of Rights.  It's been a bedrock

9   of our Constitution since 1791.  It embodies what we hold dear

10  in this country about individual liberty.

11       But the real test of a constitutional right is not whether

12  it protects the popular view or the privileged or the wealthy

13  or the entitled.  The real test of our Constitution is whether

14  it protects the unpopular, the underprivileged, the oppressed.

15  And, yes, whether it protects a prisoner at Pelican Bay.

16       Whatever you may think of prisoners is not the issue here

17  in this case.  We are asking you to stand up for the principle

18  that the First Amendment protects everyone in this country,

19  period.  And that when a Government official tries to interfere

20  with that right, we will stand up and say no.  That decision is

21  now in your hands.

22       Thank you very much for your time.

23            **THE COURT:**  Thank you, Mr. Lee.

24       Okay.  The case is yours now.  You are free to head back

25  to the jury room and I -- I understand from Kristen that you're

PROCEEDINGS

1  at least going to begin some deliberations now.  And good luck

2  to you.

3      Thank you.

4      (Jury exits courtroom at 2:20 p.m.)

5          **THE COURT:**  Okay.  Thanks very much.

6      What they told Kristen is that they -- please, be seated.

7      What they told Kristen is that they plan maybe to

8  deliberate for about a half hour today and then resume on

9  Monday.  That's what they tentatively chose to do.  But,

10  obviously, stick around until you hear from us that they have

11  decided to go home for the day.  Stay within a few minutes.

12      Thank you very much.

13      (Whereupon at 2:21 p.m. further proceedings were

14       adjourned for jury deliberations.)

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

**PLAINTIFF'S REBUTTAL WITNESS**                    **PAGE**   **VOL.**

**PEREZ, JESSE**
(PREVIOUSLY SWORN)                                   675       4
Direct Examination by Mr. Benedetto                  675       4
Cross Examination by Mr. Nygaard                     684       4
Redirect Examination by Mr. Benedetto               685       4


— — —


**DEFENDANTS' WITNESSES**                            **PAGE**   **VOL.**

**GATES, ANTHONY**
(SWORN)                                              590       4
Direct Examination by Ms. Nygaard                    591       4
Cross Examination by Mr. Lee                         621       4
Redirect Examination by Ms. Nygaard                 648       4


**ANDERSON, JUDD**
(SWORN)                                              649       4
Direct Examination by Ms. Nygaard                    650       4
Cross Examination by Mr. Benedetto                   668       4
Redirect Examination by Ms. Nygaard                 674       4


- - -


Final Instructions                                   689       4
Closing Argument by Mr. Benedetto                    701       4
Closing Argument by Ms. Nygaard                      725       4
Rebuttal Argument by Mr. Lee                         746       4


— — —

## <u>CERTIFICATE OF REPORTER</u>

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RMR, RPR

Friday, November 20, 2015