Volume 7

Pages 807 - 861

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

JESSE PEREZ,                    )
                                )
            Plaintiff,          )
                                )
    VS.                         )        NO. C 13-5359 VC
                                )
A. GATES, et al.,               )
                                )
            Defendants.         )
_____ )

San Francisco, California
Wednesday, November 25, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    WILMER CUTLER PICKERING HALE DORR LLP
                    350 South Grand Avenue - Suite 2100
                    Los Angeles, California  90071
            BY:  **MATTHEW D. BENEDETTO, ATTORNEY AT LAW**
                 **KATHLEEN B. MORAN, ATTORNEY AT LAW**

For Defendants:
                    OFFICE OF THE ATTORNEY GENERAL
                    State of California
                    455 Golden Gate Avenue - Room 11000
                    San Francisco, California  94102
            BY:  **JENNIFER J. NYGAARD, ATTORNEY AT LAW**
                 **ELLIOTT T. SEALS, ATTORNEY AT LAW**

*Reported By:  Jo Ann Bryce, CSR  3321, CRR, RMR*
        *Debra Pas, CSR 11926, CRR, RMR*

<u>**I N D E X**</u>

Wednesday, November 25, 2015 - Volume 7

|  | **PAGE** | **VOL.** |
|---|---|---|
| Jury Instructions | 814 | 7 |
| Closing Argument by Mr. Benedetto | 845 | 7 |
| Closing Argument by Ms. Nygaard | 851 | 7 |
| Rebuttal Argument by Mr. Benedetto | 855 | 7 |

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **PEREZ, JESSE (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 817 | 7 |
| Direct Examination by Mr. Benedetto | 817 | 7 |
| Cross-Examination by Ms. Nygaard | 825 | 7 |
| Redirect Examination by Mr. Benedetto | 835 | 7 |

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **GATES, ANTHONY (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 837 | 7 |
| Direct Examination by Mr. Seals | 837 | 7 |
| Cross-Examination by Ms. Moran | 841 | 7 |
| Redirect Examination by Mr. Seals | 843 | 7 |

PROCEEDINGS

| | |
|---|---|
| 1 | <u>Wednesday - November 25, 2015</u>                    <u>8:07 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE COURT:**  Can we talk about jury instructions |
| 6 | without Mr. Perez? |
| 7 | **MR. BENEDETTO:**  Yes, sir. |
| 8 | **THE COURT:**  All right.  I want to make -- I want to |
| 9 | start exactly at 8:30. |
| 10 | By the way, I'm going to hold everybody to the time limits |
| 11 | they announced yesterday.  Kristen will set the timer, and the |
| 12 | plaintiffs will have 45 minutes and the defendants will have an |
| 13 | hour. |
| 14 | I would be surprised if it really takes you that long; and |
| 15 | if questions start getting repetitive and stuff, I'm going to |
| 16 | be more aggressive about cutting you off.  So just I want to |
| 17 | let you know that. |
| 18 | On the jury instructions, I made a couple little tweaks to |
| 19 | what we put out last night just in the interest of focusing the |
| 20 | jury a little more and making it, you know, a little bit more |
| 21 | clear. |
| 22 | So Instruction Number 2, I just propose to change the |
| 23 | title to instead of "Damages," "Compensatory Damages." |
| 24 | Instruction Number 3, on the second line I propose to add |
| 25 | the word "compensatory," so that it says, "Plaintiff has failed |

1   to prove compensatory damages."

2       In the Instruction Number 4, beginning of the third

3   paragraph, I thought it was worth making absolutely sure the

4   jury understands that it is only to consider Sergeant Gates'

5   conduct on the punitive damages question, so I made a couple

6   tweaks that are designed to make that a little more clear.

7       So in the beginning of the third paragraph, I added the

8   words -- I propose to add the words "against Anthony Gates," so

9   that it says, "If you find that punitive damages against

10  Anthony Gates are appropriate," et cetera, et cetera.

11      And then the second sentence, the last two words of the

12  second sentence are "any party."  I propose replacing "any

13  party" with "Gates or Perez."

14      And then in the next sentence -- the next sentence it says

15  "reprehensibility of the defendant's conduct."  I thought it

16  would be more appropriate to say "reprehensibility of Gates'

17  conduct."

18      And then the last sentence of that paragraph, "In order to

19  punish the defendant," it is suggested -- I suggest replacing

20  it with, "In order to punish Gates for harm."

21      And that's it.  Those are my proposed tweaks to what I put

22  out last night.  Any concerns?  I know you may have other

23  concerns with the instructions, but any concerns with those?

24          MR. SEALS:  No objection from the defendants,

25  Your Honor.

**PROCEEDINGS**

1              **MR. BENEDETTO:**  None from us, Your Honor.

2              **THE COURT:**  Okay.  Anything else regarding the

3   instructions?

4              **MS. NYGAARD:**  No.

5              **MR. BENEDETTO:**  Nothing else.

6              **THE COURT:**  Okay.  How about the verdict form?

7              **MR. SEALS:**  The defendants' only comment is that

8   there's no signature place for the foreperson.

9              **THE COURT:**  We will add that.

10             **MR. SEALS:**  Okay.

11             **THE COURT:**  Anything from you?

12             **MR. BENEDETTO:**  No objection from the plaintiffs.

13             **THE COURT:**  Okay.  And then, let's see, so who is your

14  first witness?  Is it Mr. Perez?

15             **MR. BENEDETTO:**  Mr. Perez.

16             **THE COURT:**  Okay.  And how long do you expect him to

17  be on?

18             **MR. BENEDETTO:**  I mean, under 45 minutes.

19             **THE COURT:**  Okay.  And that's your only witness?

20             **MR. BENEDETTO:**  Yes.

21             **THE COURT:**  Okay.  So we'll do Mr. Perez.  We'll take

22  a five-minute break after Mr. Perez.

23         And then who are your witnesses?

24             **MR. SEALS:**  Defendants will call Eric Healy and

25  Anthony Gates.  Both should be probably 10 to 15 minutes at the

**PROCEEDINGS**

1   most for each of them.

2       **THE COURT:**  Okay.  And then are there any stipulations

3   about, like, net worth, or anything along those lines?

4       **MR. SEALS:**  We haven't made any, but we'll take a

5   brief moment to discuss them.

6       **THE COURT:**  I assume it's not going to take that long

7   to put that on, so I'm not insisting that you reach a

8   stipulation.  But is there anything that you anticipate will

9   take long that is worthy of discussion of a stipulation, or

10  have you thought about that?

11                      (No response.)

12      **THE COURT:**  No?  Okay.

13      And shall I read the instructions to the jury before we

14  proceed with the evidence?

15      **MS. NYGAARD:**  Yes.

16      **MR. SEALS:**  Yes.

17      **MR. BENEDETTO:**  That's fine with us.

18      **THE COURT:**  Okay.  I'll do that.  So I'll fix these up

19  real quick, and we'll be out here at 8:30 sharp.

20      **THE CLERK:**  Can I call the case and have them make

21  appearances?

22      **THE COURT:**  Oh, sorry.

23      See, I'm in such a rush to get the jury home for

24  Thanksgiving, that I didn't even allow Kristen to call the

25  case.

**PROCEEDINGS**

```
 1        Go ahead.
 2        THE CLERK:  Calling Case Number 13-CV-5359, Perez v.
 3   Gates, et al.
 4        Counsel, please state your appearances for the record.
 5        MR. BENEDETTO:  Good morning, Your Honor.  Matthew
 6   Benedetto and Katie Moran on behalf of Jesse Perez, who is not
 7   present yet.
 8        THE COURT:  Good morning.
 9        MS. NYGAARD:  Good morning.  Jennifer Nygaard and
10   Elliott Seals from the California Attorney General's Office on
11   behalf of the defendants who are here.
12        THE COURT:  Good morning.
13        Okay.  So we'll see you at 8:30 sharp.  Thanks.
14                (Recess taken at 8:12 a.m.)
15             (Proceedings resumed at 8:21 a.m.)
16        (Proceedings were heard out of the presence of the jury:)
17        THE COURT:  Okay.  Kristen is handing each of you a
18   copy of the final jury instructions for damages and the final
19   verdict form.
20        So I think what we'll do is have Mr. Perez testify, we'll
21   take about a five-minute break, and then we will -- the defense
22   can put on its evidence, and then we'll go straight to closings
23   after that without a break.  And that way we'll probably have
24   the jury back in there at 9:30-ish, or something like that.
25        Anything else before we call in the jury?
```

1          **MS. NYGAARD:**  Nothing.

2          **THE COURT:**  Okay.  Go ahead and bring them in.

3          **THE CLERK:**  They will remain seated.

4          **THE COURT:**  Yes.  Everyone remain seated.  Thank you.

5      (Proceedings were heard in the presence of the jury:)

6          **THE COURT:**  Okay.  Good morning.

7      As I indicated, we're going to go very quickly and

8  efficiently this morning.  I am going to read you a few short

9  instructions regarding damages.  You are going to hear a small

10  amount of testimony regarding damages, and then we're going

11  to -- and then you'll hear some very short closing arguments

12  about damages, and then we're going to send you back into the

13  jury room to deliberate regarding damages.

14      There will be a verdict form for you, which is shorter

15  than the one you were dealing with before.

16      And now let me just read you the instructions regarding

17  damages, and you'll have a written set of these instructions

18  with you -- you'll have written sets of these instructions with

19  you in the jury room, so you don't need to take any notes, or

20  anything like that.

21                     <u>**JURY INSTRUCTIONS**</u>

22          **THE COURT:**  Because you found defendants

23  Anthony Gates, Daniel Gongora, Eric Healy, and Guillermo

24  Pimentel violated plaintiff Jesse Perez's constitutional

25  rights, you must award him compensation for the constitutional

1  violation.

2      You must also award Mr. Perez compensatory damages for any

3  actual harm he experienced as a result of the constitutional

4  violation.

5      "Damages" means the amount of money that will reasonably

6  and fairly compensate the plaintiff for any harm you find was

7  caused by these defendants.  The plaintiff has the burden of

8  proving damages by a preponderance of the evidence.  You should

9  consider the following:

10      The nature and extent of the harm, the mental or emotional

11  pain and suffering experienced by the plaintiff.

12      It is for you to determine what damages for actual harm,

13  if any, have been proved.  Your award must be based on evidence

14  and not upon speculation, guesswork, or conjecture.

15      Nominal Damages.  The law which applies to this case

16  authorizes an award of nominal damages.  If you find that the

17  plaintiff has failed to prove compensatory damages as defined

18  in these instructions, you must award nominal damages.  Nominal

19  damages may not exceed one dollar.

20      Punitive Damages.  Because you found that defendant

21  Anthony Gates' conduct that harmed plaintiff Jesse Perez was

22  malicious, oppressive, or in reckless disregard of the

23  plaintiff's rights, you may, but are not required to, award

24  punitive damages.

25      The purposes of punitive damages are to punish a defendant

1  and to deter similar acts in the future.  Punitive damages may

2  not be awarded to compensate a plaintiff.  That's compensatory

3  damages.

4      The plaintiff has the burden of proving by a preponderance

5  of the evidence that punitive damages should be awarded; and if

6  so, the amount of any such damages.  If you find that punitive

7  damages against Anthony Gates are appropriate, you must use

8  reason in setting the amount.  Punitive damages, if any, should

9  be in an amount sufficient to fulfill their purposes, but

10  should not reflect bias, prejudice, or sympathy towards Gates

11  or Perez.

12      In considering the amount of any punitive damages,

13  consider the degree of reprehensibility of Gates' conduct,

14  including whether the conduct that harmed the plaintiff was

15  particularly reprehensible because it also caused harm or posed

16  a substantial risk of harm to people who are not parties to the

17  case.

18      You may not, however, set the amount of any punitive

19  damages in order to punish Gates for harm to anyone other than

20  the plaintiff in this case.

21      In addition, you may consider the relationship of any

22  award of punitive damages to any actual harm inflicted on the

23  plaintiff.

24      Punitive damages may be awarded even if you award the

25  plaintiff only nominal and not compensatory damages.

1     And those will be your instructions governing this phase

2  of the trial.

3     And with that, we'll begin with the presentation of the

4  evidence.

5     Mr. Benedetto?

6         **MR. BENEDETTO:**  The plaintiff calls Jessie Perez.

7         **THE COURT:**  Okay.  Mr. Perez, you're still under oath.

8         **THE WITNESS:**  Yes.

9         **JESSE PEREZ, PLAINTIFF WITNESS, PREVIOUSLY SWORN**

10                    **DIRECT EXAMINATION**

11 **BY MR. BENEDETTO:**

12 **Q.**  Good morning, Mr. Perez.

13 **A.**  Good morning.

14 **Q.**  Aside from this lawsuit, have you filed any other lawsuit

15 since October 10th, 2012?

16 **A.**  No.

17 **Q.**  Prior to October 2012, had you participated in any hunger

18 strikes while a prisoner at Pelican Bay?

19 **A.**  Yes.

20 **Q.**  And when was this?

21 **A.**  This would be in 2011 in July and in September of 2011 as

22 well.

23 **Q.**  And can you explain for the jury how these hunger strikes

24 began?

25         **MS. NYGAARD:**  Objection, Your Honor.  MIL.

 1              THE COURT:  Overruled.

 2              THE WITNESS:  The hunger strikes began because the

 3    prisoners at solitary confinement at Pelican Bay objected to

 4    the practice as inhumane and began, in a series of protests, to

 5    request that the Department overhaul the policy so that it can

 6    begin to have a more humane housing policy.

 7    BY MR. BENEDETTO:

 8    Q.   And do you know how many -- or, roughly, how many

 9    prisoners participated in the 2011 hunger strikes?

10    A.   In the very first hunger strike that took place in July,

11    approximately, I believe, 3,000 were involved; and as the

12    second hunger strike came about, the number increased to, I

13    believe, 8,000.

14    Q.   Did the prisoners who participated in the hunger strikes

15    at Pelican Bay, yourself included, make any demands of the

16    CDCR?

17    A.   Yes.  There was specifically five core demands.

18    Q.   And what were they?

19    A.   One was individual accountability.  The other one was to

20    overhaul the debriefing policy and the active/inactive review

21    process, abolish solitary confinement, provided adequate food,

22    and increase programming for SHU prisoners and privileges.

23    Q.   How long did each of the hunger strikes last?

24    A.   It was incremental.  The first one lasted, I believe, 22

25    days; and the second one lasted, I believe, 23; and the third

1   one, which was in 2013, lasted approximately 60 days.

2   Q.   And did you refuse food for each of those periods of time?

3   A.   Yes.

4   Q.   Why did the 2011 hunger strikes stop?

5   A.   The initial hunger strike stopped because the Department

6   of Corrections agreed with the demands that were being made by

7   the prisoner representatives to overhaul the housing policy of

8   individuals who had been placed there on a SMR validation

9   label.

10  Q.   And you used the term our "representatives."  What do you

11  mean by that term?

12  A.   The people that were engaging in negotiations with the

13  Department of Corrections as a result of the hunger strike.

14  Q.   Did the CDCR agree to any of the demands that you had

15  made?

16  A.   That is my understanding.

17  Q.   Do you have an understanding of whether the 2011 hunger

18  strikes had any influence on the CDCR with respect to the

19  development of the STG Pilot Program?

20  A.   My understanding is that the decision to overhaul the

21  validation process and the placement policy of the Department

22  was borne directly out of the objections and the demonstrations

23  by the prisoners at Pelican Bay and throughout the entire state

24  of California.

25  Q.   Now, during the first phase of this trial, do you remember

1    testifying about four articles that were confiscated from your

2    cell on October 10th, 2012?

3    A.    Sure.

4    Q.    Were these the only articles that you had ever written

5    while housed in the SHU?

6    A.    No.

7    Q.    You wrote -- how many other articles would you say you

8    wrote?

9    A.    Approximately an additional four more.

10   Q.    And did you write these articles for a publication outside

11   of Pelican Bay?

12   A.    Yes.

13   Q.    To which publications did you send these articles?

14   A.    Various publications.  One of them was, I believe, the

15   *San Francisco Bay View*.  The other one was *The Rock* newsletter.

16   The other one was *California Prison Focus*.  And I think that's

17   the only ones I can remember at this point.

18   Q.    And can you tell the jury, or explain for the jury, what

19   sort of publications those are?

20   A.    These are general publications that have -- especially the

21   *San Francisco Bay View*, has wide distribution throughout the

22   Bay Area and throughout the state of California.  The other

23   publications are prisoner rights publications.

24   Q.    And what topics did you address in these articles?

25   A.    In general, policies that I objected to from the

1  Department of Corrections, but specifically the practice of

2  long-term solitary confinement.

3  **Q.**  Were any of your articles, in fact, published?

4  **A.**  Yes.

5  **Q.**  Do you consider yourself a prisoner rights activist?

6  **A.**  My answer to the question is a definitive yes.  By the

7  first hunger strike in 2011, my time in solitary confinement

8  led me to experience quite vividly the horrific and

9  torturous -- how the horrific and torturous conditions of

10  confinement in solitary forced once vibrant and engaging human

11  beings to devolve into a subversion of their original self.

12      This experience and the separation from my family had a

13  profound effect on me, and it became something that was very

14  difficult for me to let go no matter how hard I tried.  So I

15  began to speak out, and I began to write articles in opposing

16  this practice specifically.

17  **Q.**  You remember testifying about the cell search on

18  October 10th, 2012; is that right?

19  **A.**  Yes.

20  **Q.**  And do you recall testifying in the first phase of this

21  trial about what you could see from inside your cell?

22  **A.**  Yes.

23  **Q.**  Can you explain to the jury whether the same case would be

24  for what you could hear from inside your cell, how sound

25  carries in the SHU?

**PEREZ - DIRECT / BENEDETTO**

1  **A.**   Yes.

2  **Q.**   Can you explain to the jury your understanding of how --

3  and your experience of how voices and sounds carry in the SHU?

4  **A.**   Because of the small, confined space, there is a large

5  echo that carries throughout the entire housing pod, much like

6  this place here, so you can hear quite a lot of the sounds that

7  take place in solitary confinement.

8  **Q.**   And was that true of the time when you were housed in D9?

9  **A.**   Yes.

10  **Q.**   And was that true of the time when you were housed in D9,

11  Cell 113?

12  **A.**   Yes.

13  **Q.**   Okay.  Back to October 10th of 2012 after you returned to

14  your cell that day, how did you feel?

15  **A.**   I felt devastated really because of everything that I had

16  been working on up until that point when I first was assigned

17  to solitary confinement.  In my mind it appeared to be

18  vanishing.

19  **Q.**   And were you scared?

20  **A.**   Yes.

21  **Q.**   And why were you scared?

22  **A.**   Because, again, everything that I'd been working on,

23  especially trying to get back to a situation where I can be

24  reengaged with my family in a meaningful way, it appeared to be

25  just evaporating.

**PEREZ - DIRECT / BENEDETTO**

1   Q.   And when you were served with a serious RVR by

2   Sergeant Gates on October 21st, how did that make you feel?

3   A.   It exacerbated the way that I felt about whether or not

4   there was a possibility of -- for me to return to a situation

5   where I could again reengage with my family.

6   Q.   And how did that experience affect you otherwise?

7   A.   It generated a sense of hopelessness.  I had insomnia.  I

8   could not sleep.  I had a lot of anxiety and, in general, I

9   became just hopeless.

10  Q.   Did you seek medical attention for how you felt?

11  A.   Yeah.  In July, I believe, of 2013, I asked

12  Sergeant Cummins if I could speak to a psychiatrist.

13  Q.   And did you eventually do that?

14  A.   A lady appeared in front of my cell a few days afterwards,

15  and she mentioned to me, "Perez, do you want to talk?"

16        And when I asked her, "Here?", she said, "Yeah."

17        At that point I told her, "I'm okay."

18  Q.   And did that individual identify herself as a counselor?

19  A.   My understanding is that -- no, she did not identify

20  herself as a counselor, but she would come around saying,

21  "Mental health."  So from that I inferred that she was a

22  psychiatrist or a therapist.

23  Q.   Now, despite how you were feeling at this time, did you

24  continue to write articles?

25  A.   Yes.

**PEREZ - DIRECT / BENEDETTO**

1  **Q.**   So how scared were you if you were continuing to publish?

2  **A.**   Plenty.  But, as I mentioned before, I felt very strongly

3  about the practice of solitary confinement, so regardless of

4  what I was risking, I felt like I had to speak out.

5  I felt like one of the things that kept coming back to my

6  mind was a quote that I read one time, "As long as the world

7  shall last, there will be wrongs; and if no man objects and no

8  man rebels, those wrongs will last forever."  That became kind

9  of like a source of strength for me.  And in remembering those

10  words, I, nevertheless, decided to risk whatever circumstances

11  or whatever consequences to speak out.

12  **Q.**   Since you have been in the general population at

13  Pelican Bay, have you been frightened that you would be sent

14  back to the SHU?

15  **A.**   Yes.

16  **Q.**   And why is that?

17  **A.**   In my experience, what we were doing, speaking out against

18  the practice, most employees of the Department did not agree

19  with that.  I think any negative publicity that is brought to

20  the Department of Corrections isn't generally -- is generally

21  objected to or disagreed by their employees.  But I,

22  nevertheless, again, felt strongly against the practice of

23  solitary confinement, so I continued to speak out even then.

24  **Q.**   And despite these fears, why did you proceed with this

25  lawsuit?

1   A.   I felt like the public needed to know about what's going

2   on behind closed doors, behind the wall.  I felt like, you

3   know, our story -- my story needed to be told because in

4   reality, most of what goes on in prison is not really

5   publicized.  So that was one of the main motivators for me, to

6   sort of educate the public about what goes on in these public

7   taxpayer-funded institutions.

8           MR. BENEDETTO:  Thank you.  No further questions.

9                       CROSS-EXAMINATION

10  BY MS. NYGAARD:

11  Q.   Good morning, Mr. Perez.

12  A.   Good morning, Ms. Nygaard.

13  Q.   So isn't it true that you've been endorsed for transfer to

14  a prison closer to your family now?

15  A.   That's correct.

16  Q.   Okay.  So let's go back to October 2012.  When you

17  received the Rules Violation Report, you knew that you would

18  get a disciplinary hearing on that; correct?

19  A.   That's correct.

20  Q.   And you knew that at that hearing you would be able to

21  present your version of the incident; correct?

22  A.   That's correct.

23  Q.   And you knew this because this was not the first serious

24  Rules Violation Report you had ever received; correct?

25  A.   I knew that because I knew what my rights were.

**PEREZ - CROSS / NYGAARD**

1  Q.   But this was not the first serious Rules Violation Report

2  you had ever received?

3  A.   That's correct.

4  Q.   And you knew that at the disciplinary hearing that the

5  Rules Violation Report could be dismissed; correct?

6  A.   Correct.

7  Q.   I'd now like to call up Exhibit 4, which has previously

8  been admitted.

9       So while that's being pulled up, Mr. Perez, you were

10  familiar with the upcoming STG policy changes in October of

11  2012; correct?

12  A.   That's correct.

13  Q.   And that's because you testified earlier in this trial

14  that you had received a copy of the pilot program delivered to

15  your housing unit; correct?

16  A.   That's correct.

17  Q.   Okay.  So I'd now like to direct your attention to this

18  section that's being highlighted, the STG Disciplinary Matrix.

19       So you had seen this policy before -- you had seen this

20  policy -- strike that.

21       You had seen this policy in October 2012; correct?

22  A.   That's correct.

23  Q.   So you knew that a gang nexus needed to be clearly

24  identified in the "Specific Act" box of the RVR for it to

25  qualify as to STG behavior under the Disciplinary Matrix;

1    correct?

2           **MR. BENEDETTO:**  Objection.  Misstates the document.

3           **THE COURT:**  Overruled.

4           **THE WITNESS:**  My understanding was that the nexus --

5           **MS. NYGAARD:**  That's a yes-or-no answer.  Move to

6    strike as nonresponsive.

7           **THE COURT:**  Sustained.

8           **THE WITNESS:**  Yeah.

9    **BY MS. NYGAARD:**

10   **Q.**  Okay.  And you knew that there was no gang nexus

11   articulated in the "Specific Act" box of the RVR that

12   Officer Gates had written; correct?

13   **A.**  No, I did not know that.

14          **MS. NYGAARD:**  You can take Exhibit 4 off now.  Thank

15   you.

16   **Q.**  And could you please briefly describe what credit loss is

17   to the jury as far as, you know, inmate earning credit or

18   losing credit?

19   **A.**  As I understand, state law requires the Department of

20   Corrections to grant prisoners credit off their sentence.

21   **Q.**  And sometimes an RVR could result in loss of credit;

22   correct?

23   **A.**  Yes.

24   **Q.**  But you knew in this instance -- strike that.

25          But in this instance you had not received any credit loss

1  because you had been issued the RVR; correct?

2  A.   I didn't receive any credit loss because the RVR was

3  dismissed.

4  Q.   And you were not placed in any more restrictive housing

5  while the RVR was pending; correct?

6  A.   I was held in the same cell that I initially was in.

7  Q.   And you would have been housed in that cell at that point

8  in time regardless of whether you had been issued the RVR;

9  correct?

10  A.   That's my understanding.

11  Q.   And you claim that you suffered depression upon the

12  issuance of the RVR; is that correct?

13  A.   That's correct.

14  Q.   But the depression that you claimed you suffered upon the

15  issuance of the RVR subsided after you were found not guilty

16  less than a month later; correct?

17  A.   Somewhat.

18  Q.   And you also claimed that you suffered anxiety after

19  receiving the RVR; correct?

20  A.   That's correct.

21  Q.   But, again, the anxiety that you claimed that you suffered

22  upon the issuance of the RVR subsided after it was dismissed

23  just less than a month later; correct?

24  A.   Somewhat.

25  Q.   And you never requested any medical treatment for insomnia

1   or any other injuries; correct?

2   **A.**   After my experience with the psychiatrist, no.

3   **Q.**   Before that psychiatrist came in July of 2013, you had

4   never requested any medical treatment; correct?

5   **A.**   That's correct.

6   **Q.**   And you didn't request any mental health treatment until

7   July of 2013; correct?

8   **A.**   That's when I felt compelled to do so.

9   **Q.**   And isn't it true that you made that request in July of

10  2013 because you felt that CDCR was not complying with the

11  settlement agreement in your other lawsuit?

12  **A.**   In addition to other reasons, yeah.

13  **Q.**   And what other reasons?

14  **A.**   I still had no idea what was happening.  Based on what I

15  had experienced in October 10th, 2012, I didn't know if,

16  indeed, Officer Gates, or any of the other officers, or any

17  other employee with the Department was going to make good on

18  the threat to keep me in solitary confinement.

19        **MS. NYGAARD:**  Your Honor, I'd like to direct your

20  attention to page 91 of Mr. Perez's deposition transcript,

21  lines 18 through 25.

22                  (Pause in proceedings.)

23        **THE COURT:**  One moment.

24                  (Pause in proceedings.)

25        **THE COURT:**  Sure.  Do you want to give that extra copy

1    to Mr. Benedetto?

2        **MR. BENEDETTO:** I'd appreciate it. Thank you.

3     What page and line again, Jenn?

4        **MS. NYGAARD:** Sure. Page 91, lines 18 through 25.

5    Actually, we might want to add in lines 13 through 17 for a

6    complete picture.

7        **MR. BENEDETTO:** No objection.

8        **THE COURT:** You can read it.

9        **MS. NYGAARD:** (reading)

10    "**Q.** Approximately how long after you made the oral

11     request until she arrived?

12    "**A.** I believe I made the oral request on July 8th, 2013;

13     and, once again, in July 10th, 2013, so approximately, to

14     answer your question, three days.

15    "**Q.** Okay. And why did you put in that request to speak

16     to a therapist?

17    "**A.** During this time of numerous attempts to have the

18     Department of Corrections comply with the settlement

19     agreement, I was becoming hopeless, desperate, depressed,

20     anxiety. So my brother has PTSD, and he told me how much

21     it helped him to speak with a therapist. So I thought I

22     would give it a shot."

23   **Q.** So, Mr. Perez, you didn't request to speak to a therapist

24    to address any mental health issues that you were still

25    experiencing from the trashed cell nine months earlier;

1  correct?

2  **A.**  Specifically, no.

3  **Q.**  And you didn't request to speak to a therapist to address

4  any mental health issues that you were still experiencing

5  because you had been issued a Rules Violation Report that was

6  dismissed eight months earlier; correct?

7  **A.**  That's correct.

8  **Q.**  And you never sought any other treatment for the feelings

9  of depression or anxiety you were experiencing; correct?

10  **A.**  That's correct.

11  **Q.**  And when that therapist came to your cell in July of 2013,

12  you testified earlier that you told her you were okay; correct?

13  **A.**  That's correct.

14  **Q.**  And you did not request to speak with her in a more

15  private setting; correct?

16  **A.**  That's correct.

17  **Q.**  You also never submitted a request to see a mental health

18  provider in a confidential setting any time after that

19  encounter, did you?

20  **A.**  Not after that encounter.

21  **Q.**  And you never put in a request to speak to a mental health

22  provider in a confidential setting before she came to your cell

23  in July 2013 either, did you?

24  **A.**  That's correct.

25  **Q.**  And while you were housed in the Security Housing Unit, a

1  clergy member would come and talk to you every two months or

2  so; correct?

3  **A.**   On average.

4  **Q.**   Yet you never sought any sort of counseling from the

5  clergy, did you?

6  **A.**   No.

7  **Q.**   And you never sought any other treatment for your anxiety

8  or depression; correct?

9  **A.**   Not after that experience with that therapist.

10 **Q.**   And you never spoke to a medical doctor about your

11 insomnia?

12 **A.**   No.

13 **Q.**   Now, we know that you filed an inmate appeal regarding the

14 October incident, but isn't it true that you've continued to

15 file inmate appeals since the October incident?

16 **A.**   Yes.

17 **Q.**   And as you discussed with Mr. Benedetto, you continued to

18 write articles critical of CDCR after the cell search; correct?

19 **A.**   Yes.

20 **Q.**   And you've mailed those out for publication?

21 **A.**   Yes.

22 **Q.**   And, in fact, you wrote one in response to a December 6,

23 2012, article that had been published in *Rolling Stone*

24 *Magazine*; correct?

25 **A.**   Yes.  Excuse me.  It wasn't an article.  It was just sort

1    of like a commentary.

2    **Q.**   Okay.  And you wrote that shortly after the *Rolling Stone*

3    *Magazine*'s December 6, 2012, issue; correct?

4    **A.**   Yes.

5    **Q.**   And you also wrote another article approximately 20 to 30

6    days after the tragic Sandy Hook shooting; correct?

7    **A.**   Yes.

8    **Q.**   And that was in approximately December 2013?

9    **A.**   I believe it was about 30 days after the incident in

10   Sandy Hook happened.

11   **Q.**   Okay.  So approximately December 2013-January 2014,

12   somewhere around there?

13   **A.**   I can't remember the exact date of the incident.

14   **Q.**   Okay.  And you wrote an article just two weeks after the

15   one we were just discussing in response to Sandy Hook; correct?

16   **A.**   I believe so, yes.

17   **Q.**   And you wrote an article titled "Prisoner Political Action

18   Committee Proposal" in September 2013; correct?

19   **A.**   Correct.

20   **Q.**   And this was published in the *San Francisco Bay View*;

21   correct?

22   **A.**   That's my understanding.

23   **Q.**   And you wrote another article "Prisoner Political Action

24   Committee Update," and that was published in the *San Francisco*

25   *Bay View* in January of 2014; correct?

1   A.    Yes.

2   Q.    And most recently you submitted an article that was

3   published in the *San Francisco Bay View* just November 12th,

4   2015; correct?

5   A.    I'm not aware of that.

6   Q.    Did you submit an article to the *San Francisco Bay View*

7   about this trial?

8   A.    Yes.

9   Q.    Okay.  And was that submitted within weeks of coming here

10  to testify?

11  A.    Yes.

12  Q.    Okay.  You also participated in a hunger strike in July of

13  2013; correct?

14  A.    Yes.

15  Q.    And that hunger strike was to bring public awareness to

16  the Security Housing Unit?

17  A.    In part.

18  Q.    And you've continued to help other inmates with their

19  legal work; correct?

20  A.    Yes.

21  Q.    And you've organized a prisoner activity group; correct?

22  A.    Yes.

23        **MS. NYGAARD:**  Just one moment, Your Honor.

24        **THE COURT:**  Sure.

25                    (Pause in proceedings.)

1    BY MS. NYGAARD:

2    Q.    And did you find out that your RVR had been dismissed when

3    you were at the RVR hearing?

4    A.    Yes.

5    Q.    And that was November 18th?

6    A.    I believe that's correct, yes.

7              MS. NYGAARD:  Okay.  No further questions.  Thank you.

8              THE COURT:  Mr. Benedetto?

9              MR. BENEDETTO:  Very briefly.

10                       REDIRECT EXAMINATION

11   BY MR. BENEDETTO:

12   Q.    Mr. Perez, when the mental health professional approached

13   your cell in July of 2013, did she offer to speak to you in a

14   confidential setting?

15   A.    No.

16   Q.    And with respect to the articles that you just discussed

17   with Ms. Nygaard that postdated October of 2012, did you

18   believe you were putting yourself at risk by writing those

19   articles?

20   A.    Every time I wrote an article.

21   Q.    And why was that?

22   A.    Because of the experience that I had in October 10, 2012,

23   I believed that if I continued writing, that I was risking

24   additional retribution.

25             MR. BENEDETTO:  Thank you.  Nothing further.

 1          **THE COURT:**  Anything further, Ms. Nygaard?

 2          **MS. NYGAARD:**  Nothing.

 3          **THE COURT:**  Okay.  We're well ahead of schedule.

 4   We're going to take a very short break, five minutes.  I'll

 5   have you go back to the jury room for five minutes, and then we

 6   will resume with a small amount of additional testimony, and

 7   we'll be ready to send the case back to you shortly.

 8      (Proceedings were heard out of the presence of the jury:)

 9          **THE COURT:**  Okay.  We'll see you back at 9:00 o'clock.

10   You can have your first witness ready on the stand if you want.

11          **MS. NYGAARD:**  Okay.

12          **THE WITNESS:**  May I step down, Your Honor?

13          **THE COURT:**  You may.

14          **THE WITNESS:**  Thank you.

15                      (Witness excused.)

16                  (Recess taken at 8:56 a.m.)

17               (Proceedings resumed at 9:01 a.m.)

18      (Proceedings were heard out of the presence of the jury:)

19          **THE COURT:**  All right.  Shall we bring in the jury?

20      (Proceedings were heard in the presence of the jury:)

21          **THE COURT:**  All right, Mr. Seals?

22          **MR. SEALS:**  Defendants call Sergeant Anthony Gates.

23          **THE COURT:**  Sergeant Gates, you're still under oath as

24   well.

25          **THE WITNESS:**  Okay.

```
 1        ANTHONY GATES, DEFENDANTS WITNESS, PREVIOUSLY SWORN

 2                      DIRECT EXAMINATION

 3   BY MR. SEALS:

 4   Q.   Good morning, Mr. Gates.

 5   A.   Good morning.

 6   Q.   Plaintiff is seeking punitive damages against you, so I'm

 7   going to ask you a few questions about your financial

 8   situation.

 9   A.   Okay.

10   Q.   What are your liabilities or how much money do you owe for

11   credit cards, house mortgage, car payments?

12   A.   Probably -- I mean, maybe, like, 420, 430.

13   Q.   420 or 430,000?

14   A.   Yeah, 430.

15   Q.   And approximately how much do you owe for mortgage?

16   A.   My mortgage?

17   Q.   Does that include a mortgage payment?

18   A.   Oh, yeah.  Yes.

19   Q.   How much do you owe?  How much do you owe on your home?

20   A.   On the house, 290.

21   Q.   290,000?

22   A.   Yeah.  Sorry.  290,000.

23   Q.   Okay.  And how much did you purchase that home for?

24   A.   305.

25   Q.   Thousand?
```

1  **A.**   Yeah.

2  **Q.**   Okay.  And who lives in that house with you?

3  **A.**   My wife and son.

4  **Q.**   And is your wife's name also on the mortgage?

5  **A.**   I think so.  Probably.  I don't know.

6  **Q.**   And approximately how much do you owe -- do you own a car?

7  **A.**   Two.

8  **Q.**   How much do you owe on those cars?

9  **A.**   60 -- 60,000.  I don't know.  65 maybe.

10 **Q.**   And about how much money do you owe in credit card or

11 other personal debts?

12 **A.**   I'm not sure how it worked out.  I kind of went over it

13 last night.  It came out to be about 425, 430 total.  I'm not

14 really sure.  The rest of whatever minus the house and cars

15 would be revolving normal debt.

16 **Q.**   Okay.  So you said you worked it out last night.  You mean

17 you looked over your --

18 **A.**   I looked over it, yeah.  So my best estimate is pretty

19 close probably, but not exact.

20 **Q.**   And do you have any other assets that you own?  Do you own

21 any other houses?

22 **A.**   No.

23 **Q.**   Do you own anything else that would be considered an

24 asset?

25 **A.**   Not that I can think of.

**GATES - DIRECT / SEALS**

1    Q.    And are you still employed by the California Department of

2    Corrections and Rehabilitation?

3    A.    I am still employed there, yes.

4    Q.    And what is your salary?

5    A.    I don't know.  I don't know what it is.  It's 80-ish,

6    probably.  I don't know.

7    Q.    Approximately 80,000?

8    A.    Yeah.

9    Q.    Per year?

10   A.    Yes.

11   Q.    Do you get paid monthly?

12   A.    Yes.

13   Q.    How much do you receive every month after taxes?

14   A.    Like 52 -- like 5200 probably.

15   Q.    Is that about $5,200?

16   A.    Yes.

17   Q.    Okay.  And approximately how much do you have to pay in

18   bills every month?

19   A.    My bills are about 64 -- 6400.

20   Q.    And you stated that you're married; correct?

21   A.    Yeah.  Yes.

22   Q.    What does your wife do?

23   A.    She's a mental health caseworker for the County of Curry.

24   Q.    Approximately how much money does she make?

25   A.    Take-home?  Probably 24.

**GATES - DIRECT / SEALS**

1    **Q.**    $2400?

2    **A.**    $2400.

3    **Q.**    Per month?

4    **A.**    Yes, sir.

5    **Q.**    And so we've just gone through your monthly income, your

6    monthly liabilities, your assets, and your --

7    **A.**    It was a lot of fun, yeah.

8    **Q.**    -- mortgage payments.  And so would you say your net worth

9    is positive or negative?

10   **A.**    Negative.

11   **Q.**    And approximately how negative is your net worth --

12   **A.**    I don't know.

13   **Q.**    -- including your liabilities of 420,000?

14   **A.**    My house is probably worth probably what I paid for it, I

15   would think, 305.  The cars are probably worth around what I

16   owe on them total.  So negative whatever credit card debt.  I

17   mean, what is that?  About 50,000 probably.

18          **MR. SEALS:**  Okay.  No further questions.

19       Oh, sorry.

20                      (Pause in proceedings.)

21   **BY MR. SEALS:**

22   **Q.**    How old is your son?

23   **A.**    11.

24   **Q.**    So are you and your wife responsible for taking care of

25   him?

1    A.    Yes.

2              MR. SEALS:  No further questions.

3              THE COURT:  Ms. Moran?

4                      **CROSS-EXAMINATION**

5    BY MS. MORAN:

6    Q.    Good morning, Sergeant Gates.

7          Sergeant Gates, you were promoted; is that right?

8    A.    Yes.

9    Q.    And since October of 2012, how many times have you been

10   promoted?

11   A.    Just one.

12   Q.    And when was that promotion?

13   A.    I do not -- I don't really know.  Recently.

14   Q.    Recently?

15   A.    Uh-huh.

16   Q.    Did that promotion come with a raise in your pay?

17   A.    Yeah.  That's -- I reflected that in my answer, my

18   monthly -- or annual income.

19   Q.    Okay.  You say you own two cars; is that correct?

20   A.    I owe on them but, yeah.  I pay for them, but I own -- I

21   have two cars, yes.

22   Q.    What are the makes of those cars?

23   A.    Ford.

24   Q.    Both of them Ford?

25   A.    Yeah.

GATES - CROSS / MORAN

1  Q.   And are they -- what type of Ford?

2  A.   I have a Ford F-350 truck, a 2010, and a Ford Mustang.  My

3  wife drives a Mustang.

4  Q.   And do you own any other recreational vehicles?

5  A.   I do.  I have a trailer that's probably not worth what I

6  owe on it, like a Travel Trailer.

7  Q.   I see.

8  A.   I don't know -- actually, I shouldn't say that because I

9  actually have no idea, but I don't think it's worth what I owe

10 on it.

11 Q.   Any boats?

12 A.   No.

13 Q.   Or ATVs?

14 A.   No.

15 Q.   Do you own any guns?

16 A.   Yes.

17 Q.   How many guns do you own?

18 A.   I don't even know.  Maybe seven or eight probably.

19 Q.   And how much would you say you spend a year in guns and

20 ammunition?

21 A.   Now?  Nothing.

22 Q.   In years past?

23 A.   Years past I would spend money when I could, when I could

24 afford it --

25 Q.   Okay.

GATES - REDIRECT / SEALS

1  A.    -- which was most months.  I mean, I would buy at least

2  ammo.  You have to qualify for work.

3  Q.    And then how much would you say you would spend -- in the

4  years that you were spending money on ammunition, how much do

5  you think you spent?

6  A.    On ammunition, in a year, I mean, probably -- it's a total

7  guess, I couldn't say -- maybe a couple hundred dollars.  I

8  don't know.

9         MS. MORAN:  Thank you.  No further questions.

10        THE COURT:  Anything further, Mr. Seals?

11        MR. SEALS:  Yes, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. SEALS:

14  Q.    Hello again, Mr. Gates.

15        You stated that you were promoted to Sergeant; correct?

16  A.    Yes.

17  Q.    Was that within the last year?

18  A.    Yeah.  Yes.

19  Q.    And you said that that came with a pay raise; correct?

20  A.    Yep.

21  Q.    Now, have you worked any overtime over the last year?

22  A.    No.

23  Q.    And in years previous, did you used to work overtime?

24  A.    I generally -- I'd try to get as much as I could, yeah.

25  Q.    So have you made more or less money this year than you

1  have made in the past?

2  **A.**  Less.

3  **Q.**  Why is it that you're not working overtime anymore?

4  **A.**  I'm not working at all.

5  **Q.**  Why is it that you're not working at all?

6  **A.**  I'm out on medical.

7  **Q.**  And what led to you being out on medical?

8  **A.**  I had some heart attacks.

9  **Q.**  And when did that happen?

10  **A.**  Black Friday last year, day after tomorrow.

11  **Q.**  And you said "some heart attacks."  How many heart attacks

12  was that?

13  **A.**  I don't even know.

14  **Q.**  And so at the current moment you are not working?  You're

15  not actually going to Pelican Bay to work; correct?

16  **A.**  No.

17  **Q.**  And you're unable to work overtime; correct?

18  **A.**  Yeah, that's correct, I can't work.

19  **Q.**  And do you anticipate being able to work overtime again in

20  the near future?

21  **A.**  I don't anticipate going back to work.

22  **MR. SEALS:**  Thank you, Mr. Gates.

23  **MS. MORAN:**  Nothing further.

24  **THE COURT:**  Nothing further?

25  Okay.  Thank you, Sergeant Gates.

```
 1                        (Witness excused.)

 2           THE COURT:  Next witness?

 3           MR. SEALS:  The defendants have no further witnesses,

 4    Your Honor.

 5           THE COURT:  Okay.  Anything further from plaintiff?

 6           MR. BENEDETTO:  Nothing, Your Honor.

 7           THE COURT:  Okay.  That concludes the presentation of

 8    testimony relating to damages.  We will now proceed directly to

 9    very short closing arguments by the lawyers.  I'm giving each

10    side ten minutes, no more than ten minutes, and then

11    Mr. Perez's attorney will have two minutes for rebuttal, and

12    then we'll be able to send you back to the jury room.

13        Mr. Benedetto?
```

**<u>CLOSING ARGUMENT</u>**

```
15           MR. BENEDETTO:  When you returned a verdict in favor

16    of Mr. Perez and against defendants Gates, Gongora, Healy, and

17    Pimentel, you concluded that the evidence in this case proved

18    that these defendants retaliated against Mr. Perez in violation

19    of the First Amendment.

20        Now it will be your charge as a jury to decide what amount

21    of damages to award Mr. Perez to compensate him for that

22    First Amendment violation and to deter this type of conduct

23    from ever happening again through an award of punitive damages

24    against Sergeant Gates.  Soon you will have the opportunity to

25    say with a number, "This can't happen again.  We demand
```

1    better."

2        But how do you value a right that too many of us forget we

3    even have?  How do you value a right whose meaning and value in

4    this case are informed so uniquely by living conditions that

5    none of us has ever experienced, by living conditions you may

6    not have even known to exist and may now quickly wish to

7    forget, the SHU at Pelican Bay?

8        The First Amendment right in this case can seem abstract

9    or academic.  You can't see it or touch it or feel it.  You

10   can't measure it or take pictures of it.

11       I can tell you that the right to petition the courts dates

12   back at least to the Magna Carta in England in 1215.  It is

13   literally part of the First Amendment to the Constitution.  The

14   framers assigned it primary importance, but what does that

15   mean?

16       There's no formula I can give you, there's no calculation,

17   and counsel for the defendants can't give you one either.  You

18   have to use other values, other instincts.  You will have to

19   consider the importance of this right to a particular person in

20   a particular place at a particular time, a person who had

21   overcome very particular odds to file the lawsuit that he did

22   in 2005 and to achieve the success that he did seven years

23   later.

24       On Friday, I told you about a prisoner of ordinary

25   firmness.  Now we're talking about Jesse Perez, no ordinary

1    prisoner.

2         You heard from Mr. Perez again this morning.  He told you

3    some about the history and the context for the events of

4    October 10th, 2012.  He told you that he participated in the

5    2011 and 2013 hunger strikes at Pelican Bay.

6         Mr. Perez also told you that both before and after

7    October 2012, he wrote and published articles that criticized

8    the CDCR's use of long-term solitary confinement.  These

9    articles were part of his prison activism.  He wrote these

10   articles to try to inform the public about the harm of solitary

11   confinement.

12        This evidence allows you to put Mr. Perez's 2005 lawsuit

13   into proper context.  He filed that lawsuit because he believed

14   that his gang validation had violated his own constitutional

15   rights; but as he litigated the suit, as he learned the law and

16   came to appreciate the good that it can achieve, he came to

17   realize that he could be the spokesperson for a movement.  He

18   could give voice to the silenced.  He could represent their

19   hopes and their dreams and in doing so, help the CDCR and, in

20   turn, all of us think of prisoners in a new and brighter light.

21        But as the evidence also shows, on October 10th, 2012,

22   defendants Gates, Gongora, Healy, and Pimentel tried to

23   extinguish that light by retaliating against Mr. Perez.  On

24   that day, they tried to silence his voice.

25        They tried to send Mr. Perez, and everyone in D pod within

1   earshot that day, a clear message:  File a lawsuit against IGI,

2   and reap the consequences.  Get comfortable.

3       Mr. Perez told you how he felt when he returned to his

4   cell that day and how he felt when he was issued the RVR 11

5   days later.  He was scared.  He was distraught by the

6   proposition of finding himself at the bottom of that very steep

7   hill one more time.  He couldn't sleep.  He had anxiety.

8       You have the power to tell Mr. Perez, "You didn't push

9   that rock all those long and grim days for nothing.  You made

10  it to the top of the hill, and you earned it.  You belong

11  there.  The law can achieve great things and good."

12      You will also be determining punitive damages against

13  Sergeant Gates.  You found that Sergeant Gates punished

14  Mr. Perez for speaking his mind, for filing a lawsuit against

15  his colleagues.  Now you must award an amount that will deter

16  Sergeant Gates from doing this again.  No longer can

17  Sergeant Gates, a sworn peace officer, be so cavalier, so

18  dismissive of the First Amendment rights of the individuals in

19  his custody.  We demand better.

20      Remember some of what Sergeant Gates told you during the

21  liability phase in this trial, "It was a good RVR."  No, it

22  wasn't.  You know that.  Lieutenant Anderson knew that.

23      Sergeant Gates would not even admit he was wrong.  He sat

24  up in that witness box and told you that he believed Lieutenant

25  Anderson was wrong.  What would have happened if Lieutenant

1   Anderson had not fairly adjudicated that RVR?   Three more years

2   in the SHU.

3       When asked how soon Sergeant Gates searched Mr. Perez's

4   cell upon receiving the order to do so, he answered, "I can't

5   give an exact time, but I would imagine within five minutes of

6   going, 'Oh, not again, another cell search,' blah, blah, blah,

7   we probably walked down there."

8       Is this the sort of response you expect from an IGI

9   officer?   Where is the honor that Officer Gongora testified to?

10      You saw Sergeant Gates testify during the first phase of

11   this trial.   Was that the demeanor of someone who had learned

12   anything or felt any remorse?

13      On the stand Sergeant Gates told you he specifically

14   recalled thinking about using mace on October 10th, 2012, but

15   you heard his deposition testimony.   Can you believe anything

16   he said to you?

17      This is no longer about only Mr. Perez.   You are not

18   compensating him.   You are punishing Sergeant Gates.   You will

19   be saying, "This conduct is reprehensible and it cannot

20   continue."   If you don't send this message, it will be back to

21   business as usual at Pelican Bay.   Who else will they promote?

22      As I told you on Friday, this is not about just a messy

23   cell.   It is about Jesse Perez's seven-year struggle day in and

24   day out to prove that he should not be locked away and

25   forgotten in a concrete coffin for 22 and a half hours a day.

1        **THE CLERK:**  Less than two minutes.

2        **MR. BENEDETTO:**  The defendants did not retaliate

3   against someone -- against a random individual.  They targeted

4   someone in particular, someone with a history of activism,

5   someone with a pen that he was not afraid to use, and someone

6   with an eloquence that called out from the windowless box that

7   confined him and demanded to be heard.

8        You now have the opportunity to say, "We heard that voice.

9   That voice belonged to someone with a future."  You heard

10  Mr. Perez.

11       Don't diminish this because it is just a prison cell.  It

12  was Jesse Perez's home.  It was everything he had.  It is no

13  different from a peace officer coming into your home or into

14  mine and trashing it.  But unlike the rest of us who have jobs

15  and families and hobbies and freedom beyond a space size of

16  8 feet by 10, Jesse Perez had nothing else.  This was his whole

17  world.

18       The harm in this case is real.  It is not abstract.  It is

19  not academic.  It is not impossible to imagine.  It is not

20  impossible to feel.  We showed you what that harm looks like.

21  It looks like this (indicating), and like this (indicating).

22  And the next (indicating).  And the next (indicating).  Keep

23  going (indicating).

24       The harm looks like this (indicating).  Thank you.

25       **THE COURT:**  Ms. Nygaard?

| | |
|---|---|
| 1 | <u>**CLOSING ARGUMENT**</u> |
| 2 |    **MS. NYGAARD:**  Good morning, ladies and gentlemen.  You |
| 3 | will soon be sent back again to the jury room to deliberate and |
| 4 | complete another verdict form.  This time question one asks you |
| 5 | to specify the amount of damages that will reasonably and |
| 6 | fairly compensate Mr. Perez for the actions of defendants |
| 7 | Gates, Gongora, Healy, and Pimentel. |
| 8 |    Now, you heard Mr. Perez testify this morning that he did |
| 9 | not seek any mental healthcare, he did not seek any medical |
| 10 | care for the depression and anxiety that he claimed he was |
| 11 | experiencing.  If he was really suffering that much, why did it |
| 12 | take him nine months to summon a mental healthcare provider to |
| 13 | his cell? |
| 14 |    And at that point in time it was for a different reason. |
| 15 | It wasn't because he was still experiencing anxiety or |
| 16 | depression or insomnia because Mr. Gates had issued him the RVR |
| 17 | that was dismissed.  It wasn't because he was still |
| 18 | experiencing mental health issues because the defendants had |
| 19 | trashed his cell.  It was because the previous lawsuit that we |
| 20 | had discussed earlier in this trial, he felt he wasn't getting |
| 21 | that satisfied. |
| 22 |    These four officers had nothing to do with that lawsuit. |
| 23 | They had nothing to do with fulfilling the terms of that |
| 24 | lawsuit. |
| 25 |    Mr. Perez was not injured in any way by defendants' |

1    actions.  There's no evidence to support his theory that he

2    suffered mental anguish, et cetera.  He simply did not request

3    any care and did not receive any care.  He said that clergy

4    members came by.  He never spoke to a clergy member about

5    anything.

6        He continued to file inmate appeals.  He continued to help

7    other inmates file lawsuits.  He continued to write articles

8    critical of the CDCR and sent for publication.  These are all

9    of his rights under the First Amendment absolutely saying, you

10   know, that he had a right to do that; but if defendants had

11   chilled his First Amendment rights so seriously, why did he

12   continue to do these things?  How could he have continued to do

13   these things if he had been damaged that way?

14       He filed -- he formed a prisoner political action

15   committee group.  He assisted other inmates with lawsuits.

16   This was not a man who was injured or harmed by defendants'

17   actions.  The evidence just simply does not support it.

18       And, again, plaintiff has the burden of proof to prove

19   damages by a preponderance of the evidence; and in doing that,

20   to consider that, you can take into account the nature and

21   extent of the harm and the mental or emotional pain and

22   suffering experienced by plaintiff.

23       I'm telling you that he has not proven by a preponderance

24   of the evidence that he suffered any serious mental or

25   emotional harm.

1    In lieu of awarding Mr. Perez compensatory damages, you

2  are permitted, as the judge explained earlier this morning, to

3  award nominal damages; and, in fact, if you find that he hasn't

4  proven the compensatory damages at all, then you must award

5  nominal damages, and the nominal damages may not exceed one

6  dollar.

7    Ladies and gentlemen, that is the appropriate amount in

8  this case.  Plaintiff has not proven by a preponderance of the

9  evidence that he was injured in any way.

10    Now, the issue of punitive damages is being brought before

11  you to decide whether you should award Officer Gates the

12  punitive damages.  That's question two on the verdict form.

13    Again, plaintiff has the burden of proving by a

14  preponderance of the evidence that punitive damages should be

15  awarded; and if so, the amount of any damages.

16    If you find that punitive damages are appropriate, you

17  must use reason in setting the amount.  Punitive damages should

18  be an amount sufficient to fill their purpose but should not

19  reflect bias, prejudice, or sympathy toward any party.  So

20  regardless of what you feel about Officer Gates personally, you

21  cannot take that into account.

22    What you need to consider is the degree of

23  reprehensibility of defendant's conduct, including whether the

24  conduct harmed the plaintiff was particularly reprehensible

25  because it also caused substantial harm or posed a substantial

1   risk of harm to people who are not parties to this case.

2       There is simply no evidence that that is what happened

3   here.  No other inmates were harmed by officer Gates issuing a

4   Rules Violation -- writing a Rules Violation Report that

5   happened to be dismissed 28 days later.  A message wasn't sent

6   out to other inmates to never file a lawsuit because if you do,

7   you might get a Rules Violation Report issued for you.

8       The evidence showed that paper was found in Mr. Perez's

9   toilet.  It was not reprehensible for Officer Gates to write up

10  a Rules Violation Report when he believed that Mr. Perez was

11  interfering with his ability to get the paper out of the toilet

12  to discover what was on the paper.  It could have prevented

13  other inmates or other correctional staff, or even civilians in

14  the outside world, from being killed.  It's not reprehensible

15  for him to have made that decision.

16      And punitive damages -- I'm sorry.

17      You also heard Officer Gates testify this morning that he

18  owes more than $430,000 in liabilities.  His income is $1200 a

19  month less than his debt.  This is not a man that should be

20  punished by an exorbitant amount of punitive damages.  He

21  shouldn't be punished with any punitive damages.

22      He suffered heart attacks a year ago.  Now he can't even

23  return to work because of the heart attacks.  So there's no

24  risk of Officer Gates doing this again to anybody else.  He's

25  not -- you would not be punishing him by awarding punitive

1    damages.

2        You heard that he and his wife drive Fords.  They're not

3    driving Mercedes and, you know, fancy sports cars.  They're

4    driving Fords.  He has a son, an 11-year-old son, at home and a

5    wife.  I ask you to take that into account when deciding how

6    much to award in punitive damages, which I believe is nothing.

7    There would be nothing gained by awarding punitive damages in

8    this case.

9        Therefore, when you go back to the jury room and fill out

10   this proposed verdict form, I ask that in response to question

11   one, that you award Mr. Perez one dollar in nominal damages,

12   and that in question two you award zero dollars to

13   Anthony Gates for punitive damages.

14       Thank you.

15       **THE COURT:**  Thank you, Ms. Nygaard.

16   Mr. Benedetto, you have two minutes?

17       **MR. BENEDETTO:**  Yes, sir.

18                        **REBUTTAL ARGUMENT**

19       **MR. BENEDETTO:**  Ladies and gentlemen, you have plenty

20   of evidence in this case to allow you to conclude that the

21   defendants knew exactly who Jesse Perez was on October 10th,

22   2012.  Three guys named Perez in the SHU for nearly a decade.

23   Of course, these defendants knew who Jesse Perez was on that

24   day, and they targeted him because he stood for something.  He

25   stood for a demand to be heard and not forgotten.  He demanded

1    recognition as a person with rights and hopes and a family.

2        He told you that he lived in fear of being sent back to

3    the SHU.  He lived in fear that all of that hard work that he

4    had put into his lawsuit filed in 2005 with only a seventh

5    grade education and no legal background, that the defendants

6    were going to take all of that hard work away from him.

7        Ms. Nygaard continues to try to scare you about the pieces

8    of paper in the toilet.  There is no evidence to support any of

9    that conjecture.  That is reprehensible.

10       Ladies and gentlemen, who else is Pelican Bay going to

11   promote?  When will we speak up and say, "We believe we deserve

12   better"?  Now is the time to send that message loud and clear.

13   More people than you may even realize are listening.

14       Thank you.

15           **THE COURT:**  Okay.  Thank you very much.

16       That concludes this phase, the final phase, of the trial

17   and you may begin your deliberations.  Thanks very much.

18               (Jury beginning deliberations at 9:33 a.m.)

19       (Proceedings were heard out of the presence of the jury:)

20           **THE COURT:**  Okay.  Thank you for being very efficient

21   about that.  Anything to discuss before we break?

22           **MR. BENEDETTO:**  No, Your Honor.

23           **MS. NYGAARD:**  No.

24           **THE COURT:**  Okay.  See you later.

25               (Recess taken at 9:34 a.m.)

1      **THE COURT:**  All right.  Bring in the jury.

2          (Jury enters courtroom at 11:18 A.M.)

3      **THE CLERK:**  Please be seated.

4      **THE COURT:**  Okay.  Ms. Williams, I understand the jury

5   has reached a verdict with respect to the second phase.

6      **FOREPERSON WILLIAMS:**  Yes.

7      **THE COURT:**  Okay.  Kristen, do you want to grab it and

8   bring it over?

9          (Whereupon, document was tendered to the Court.)

10     **THE COURT:**  Okay.  You can read the verdict.

11     **THE CLERK:**  Ladies and gentlemen of the jury, listen

12  to your verdict as it will stand recorded.  Omitting the court

13  and caption.

14     Question 1:  Specify the amount of damages that will

15  reasonably and fairly compensate the plaintiff, Jesse Perez,

16  for the actions of defendants Anthony Gates, Daniel Gongora,

17  Eric Healy and/or Guillermo Pimentel.  Amount:  $20,000.

18     Question 2:  If you find punitive damages should be

19  awarded against Defendant Anthony Gates, specify the amount.

20  $5,000.

21     The presiding juror shall sign and date the special

22  verdict form and return it to the Court.  Dated November 25th,

23  2015.  By Dana Williams, presiding juror.

24     **THE COURT:**  Okay.  Would anybody like the jury polled?

25     **MS. NYGAARD:**  No.  That's fine, your Honor.

1          **MR. BENEDETTO:**  No, your Honor.

2          **THE COURT:**  Okay.  Ladies and gentlemen of the jury,

3   thank you again very much for being so attentive and being so

4   patient during these proceedings.  It's obvious that you were

5   paying close attention throughout the trial and it's obvious

6   from the many notes that you sent out that you were approaching

7   this in a very conscientious fashion.  So on behalf of myself

8   and on behalf of the parties, I want to really thank you for

9   that and thank you for putting in the time.

10         Now, I want to -- I'm now discharging you and that means

11  that you are free to go.  It means, also, that the admonition

12  that I've given you is now lifted.  You are free to talk about

13  the case and about the deliberation process, and that

14  restriction is lifted.  You are not required to talk to anybody

15  about it.  If you prefer not to talk to anybody about the trial

16  or the process, certainly, there is no requirement that you do

17  and you have the right not to.  But if you are interested in

18  discussing it with people, you're free to do so.  And that

19  includes the lawyers in this case.

20         And what I like to do after a trial is over is -- as I

21  said, if you like, you're free to go now.  But what I like to

22  do is first invite you back to my Chambers, sit down for a few

23  minutes, answer any questions that you may have about the

24  process.  And after that I encourage you -- like I said, you're

25  not required to do it.  You're welcome to leave out the main

1    exit and take off and go begin your Thanksgiving preparations,

2    but after any -- and you don't even need to come meet with me,

3    in my office with me and my law clerks if you don't want to.

4    But if you meet with me in my office and, if you wish, you can

5    come back into the courtroom and the lawyers will be waiting

6    here in the courtroom to talk to you.  Their clients will not

7    be here.

8         I have a rule that says the clients cannot stick around to

9    interact with the jurors.  But it's very helpful, particularly

10   when you have younger lawyers, for the lawyers to be able to

11   interact with you a little bit and sort of ask questions about

12   what you thought, you know, was particularly effective in a

13   closing argument and/or during trial or what you thought was

14   ineffective and whatnot.

15        So, obviously, as I said, you're not required, but I would

16   encourage you, if you're willing, to spend a little extra time

17   after we meet to come back -- to come back into the courtroom

18   and chat with the lawyers.  And my law clerks will probably

19   come observe that process as well, because it's a good learning

20   experience for them.

21        So with that, I thank you.  We'll have you retire back to

22   the jury room now and I'll be out in a couple minutes and I

23   will invite you -- if you're still around, I will invite you

24   back to come see me in Chambers.

25        Thank you very much.

1    (Jury exits courtroom at 11:23 a.m.)

2    **THE COURT:**  Okay.  Mr. Benedetto, do you want to

3 prepare a proposed judgment and submit it after its reviewed by

4 Ms. Nygaard?

5    **MR. BENEDETTO:**  Yes, your Honor.

6    **THE COURT:**  Okay.  Anything else we need to discuss at

7 the moment?

8    **MR. BENEDETTO:**  I guess we would have the one issue of

9 the equitable relief that was sought in the complaint, and I'm

10 not sure --

11    **THE COURT:**  I can't remember what that was.

12    **MR. BENEDETTO:**  With respect to future retaliation by

13 these defendants.  Our client is expected to return to Pelican

14 Bay for at least a period of time and we would be concerned

15 about that period of time and going forward as well.

16    **THE COURT:**  Okay.

17    **MR. BENEDETTO:**  That's the only injunctive relief that

18 was sought in the complaint that is still viable.

19    **THE COURT:**  Okay.  I will give that a little bit of --

20 so you don't need to prepare a proposed judgment yet because

21 that issue remains.

22    **MR. BENEDETTO:**  Okay.

23    **THE COURT:**  I'll give that a little bit of thought and

24 I'll let you know if I need any further briefing on that.

25    Ms. Nygaard, you were going to say something?

1        **MS. NYGAARD:**  Yes.  Defendants would object to any

2    injunctive relief.  The request that they seek that defendants

3    and all Pelican Bay and CDCR employees cease from future

4    retaliation is not narrowly tailored and does not comply with

5    the Prison Litigation Reform Act.

6        **THE COURT:**  Okay.  Thank you very much for making this

7    trial go smoothly and effectively.  I thought you all did a

8    very good job.

9        Thank you for taking on this case on behalf of somebody

10   who didn't have the money to pay for it.

11       Thank you for being such good public servants.  I

12   appreciate it.  And we will see you soon.

13       **THE CLERK:**  Court is adjourned.

14       **THE COURT:**  And, as I said, lawyers are -- the lawyers

15   are free to stick around.  I'm fairly confident that a good

16   portion of the jurors will come back and be interested in

17   talking to you.  It's not a time for, you know, lobbying them

18   or trying to convince them that they were wrong.  It's an

19   opportunity for you to learn from the experience.  So, please,

20   don't sort of abuse it by trying to reargue your case with the

21   jury.

22       Thank you.

23       **THE CLERK:**  Court is adjourned.

24       (Whereupon at 11:26 a.m. further proceedings were

25        adjourned.)

CERTIFICATE OF REPORTER

         We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


_____

JoAnn Bryce, CSR 8785, CRR, RMR, RPR


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, November 25, 2015